# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

AMERICAN UNIVERSITY OF ANTIGUA          Case No.
COLLEGE OF MEDICINE                       ECF Case
                    Petitioner,

      -against-                       **NOTICE OF PETITION/**
                                         **MOTION TO CONFIRM**
LEEWARD CONSTRUCTION COMPANY, LTD.     **ARBITRATION AWARD**

                    Respondent.
----------------------------------------------------------X

PLEASE TAKE NOTICE than upon the Verified Petition of American University of Antigua College of

Medicine ("AUA") and the Memorandum of Law in support thereof, Petitioner American University of

Antigua College of Medicine will petition and move this Court for an order pursuant to the Convention

on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 et seq., at the United

States District Court for the Southern for the Southern District of New York, 500 Pearl Street, New

York, New York for an order confirming a Partial Final Arbitration Award, certified September 18,

2014 and for entry of a money judgment against the Respondent, Leeward Construction Company,

Ltd, and in favor of Petitioner AUA in the amount stated in the Award.

Dated: October 17, 2014
        New York, New York

                                Leonard A. Sclafani, Esq.
                                Law Offices of Leonard A. Sclafani, Esq.
                                1 Battery Park Plaza, 33rd Floor
                                New York, NY 10004
                                Telephone: (212) 696-9880

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE

                    Petitioner,

      -against-

LEEWARD CONSTRUCTION COMPANY, LTD.

                    Respondents.

-------------------------------------------------------------X

Case No.

**(ECF Case)**

Hon.

**VERIFIED PETITION**

Petitioner American University of Antigua College of Medicine (hereafter "AUA")

petitions and moves this court pursuant to the Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, 9 U.S.C. §201 et seq., for an order confirming a

Partial Final Arbitration Award, certified September 18, 2014 and for entry of a money

judgment against the Respondent and in favor of Petitioner for the amount stated in the

Award: to wit, E C $3,614,522.41/US $1,344,588.35[1]:\

## THE PARTIES

1. Petitioner AUA is a corporation duly organized and existing under the laws of

   Antigua and Barbuda, with office and principal place of business at University Park,

   Jabberwock Beach Road, Coolidge, Antigua, W.I.

2. Respondent Leeward Construction Company, Ltd. (hereinafter, "Leeward") has

   asserted that it is a corporation organized and existing under the laws of Antigua

   and Barbuda, with an office and principal place of business at All Saints Road, St.

   Johns, Antigua, W.I. (, hereafter "Respondent").

---

[1] The Arbitration Tribunal awarded damages in Eastern Caribbean Dollars ("EC"). As of September 18, 2014, the conversion rate for Eastern Caribbean dollars to United States dollars is 0.3704 United States dollars for each Eastern Caribbean dollar, and United States dollar to Eastern Caribbean dollar is 2.700 Eastern Caribbean dollars for each United States dollar. See http://www.likeforex.com. For purposes of this Petition/Motion, the Petitioner will reference the award going forward in both United States Dollars and Eastern Caribbean Dollars.

**JURISDITIONAL STATEMENT**

3.  This Court has jurisdiction over this proceeding pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §203 (the "Convention").

4.  This Court also has jurisdiction over the proceeding pursuant to 28 U.S.C. §1331 in that this action arises under a treaty of the United States; to wit, the Convention.

**VENUE**

5.  Pursuant to 9 U.S.C. §204 and 28 U.S.C. §139l(b)(2) and (3), venue is proper in the United States District Court for the Southern District of New York because there is no district in which this action otherwise may be brought and Leeward is subject to the Court's personal jurisdiction over it in this action, having availed itself of this Court in a related arbitration and having retained counsel in this District to represent it in both that and the instant arbitration and because a substantial part of the monies in controversy in this action are located in this District.

**FACTS**

6.  On September 25, 2008, Leeward, as contractor, and the AUA, as owner, executed a contract for the construction of a medical school in Coolidge, Antigua (the "Contract"). Section 4.6 of the General Conditions to the Contract contains an arbitration agreement that reads as follows:

    §4.6 ARBITRATION

    § 4.6.1 Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after

submission of the Claim to the Architect, be subject to arbitration.

§ 4.6.2 Claims shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect. Location of any Arbitration will be Antigua.

7. A copy the Contract containing the above quoted arbitration agreement is annexed hereto as Exhibit A.

8. On February 7, 2013, Leeward commenced an arbitration proceeding with the American Arbitration Association International Center for Dispute Resolution (hereinafter the "AAA") for the arbitration of claims that it asserted against AUA arising out of and related to the Contract. Pursuant to the Construction Industry Rules of American Arbitration Association, the AAA appointed a panel of three arbitrators to hear and determine the claims.

9. Through its Statement of Claim in the arbitration (Exhibit B), Leeward sought an award from AUA of EC$83,059.56/US$30,762, which sum Leeward claims was owed it as a result of an alleged "mis-tabulation" of monies due it from AUA as Antigua and Barbuda Sales Tax ("ABST") in connection with its work as general contractor on the construction of AUA's medical school.

10. On February 27, 2013, AUA served and filed its Answer and Counterclaims to Leeward's Statement of Claim through which AUA denied that Leeward was entitled to the sums it

sought and, itself, sought an award against Leeward in the sum of E C $3,614,522.41/ US$1,344,588.35 for reimbursement of ABST that it had remitted to Leeward during the construction of the school and to which AUA asserted Leeward had no entitlement or right to collect or receive from AUA.

11. Subsequently, with the permission of the arbitrator, AUA amended its Answer and Counterclaims to include counterclaims for damages based on defects in Leeward's work (the "Construction Defects Claims").

12. Copies of AUA's Answer and Counterclaims and Amended Counterclaims are annexed to hereto as Exhibits C and D respectively.

13. Thereafter, both parties moved the Arbitrators for, essentially, summary judgment. Leeward sought to have AUA's defenses to its claim and all of AUA's counterclaims stricken on various grounds including res judicata and waiver; AUA sought an award striking both Leeward's claim against AUA and Leeward's defenses to AUA's counterclaims for reimbursement of ABST and directing that Leeward pay AUA the sums that it had paid Leeward as ABST as above set forth.

14. Initially, the Arbitrators denied both motions on the ground that there existed issues of fact that could not be resolved through motion practice (A copy of the Arbitrators' "Decision on the Parties' Dispositive Motions and Related Counterclaims" pursuant to which the respective motions of the parties were initially denied is annexed to the Petition herein as Exhibit E).

15. Thereafter, the Arbitrators conducted additional proceedings, and with the consent of the parties, reviewed their initial Decision and, based on them, determined to

reconsider their initial Decision.

16. By Partial Final Award certified September 18, 2014, ultimately, the Arbitrators

denied Leeward's dispositive motion and granted AUA's motion. Pursuant to the Partial

Final Award, the Arbitrators found that there was no merit to Leeward's claim against

AUA or to Leeward's defenses to AUA's counterclaims for reimbursement of ABST that it

had paid to Leeward and directed Leeward to pay damages to AUA in the amount

of EC$3,614,522.41/US$1,344,588.35.

17. A copy of the Partial Final Arbitration Award certified on September 18, 2014, is

annexed herein as Exhibit F.

18. As a result, there remains to be arbitrated only AUA's Construction Defects Claims

against Leeward and the parties' respective claims for costs of the arbitration.

19. Pursuant to the Partial Final Award and the Convention on the Enforcement of

Foreign Arbitral Awards, 9 U.S.C. §201 et seq., AUA is entitled to Judgment against

the Respondent, Leeward, in amount of EC$3,614,522.41/US$1,344,588.25, no part

of which has been paid, although duly demanded.

**WHEREFORE**, for reasons set forth herein, Petitioner AUA petitions and moves this Court to

confirm the Final Arbitration Award and enter a judgment against the Respondent in the sum of

US$1,344,588.35.


Dated: September 30, 2014
     New York, New York

Leonard A. Sclafani, Esq.
Law Offices of Leonard A. Sclafani, Esq.
1 Battery Park Plaza, 33rd Floor
New York, NY 10004
Telephone: (212) 696-9880

## **VERIFICATION**

Neal Simon, being first duly sworn, deposes and says:

I am president of petitioner named in the Petition herein. I have reviewed the Petition herein and know the contents thereof. The allegations set forth therein are true to my knowledge, information and belief based upon my personal knowledge and upon my review of the relevant books and records of the Petitioner.

Neal Simon

Sworn to before me this 16th
Day of October 16, 2014

Notary Public

LEONARD A. SCLAFANI
Notary Public, State of New York
No. 02SC6120579
Qualified in Westchester County
Commission Expires December 20, 2016

# EXHIBIT A



# AMERICAN UNIVERSITY OF ANTIGUA

### COLLEGE OF MEDICINE

### FOR

### AUA COLLEGE OF MEDICINE

## PROJECT MANUAL
## (Contract)

**VOLUME ONE**
Contract Forms and
Conditions of Contract and Schedules

September 2008

American University of Antigua Contract Manual

AUA 000001

# ®AIA Document A101™ – 1997

## Standard Form of Agreement Between Owner and Contractor
### where the basis of payment is a STIPULATED SUM

**AGREEMENT** made as of the 25 day of September                in the year of     2008
*(In words, indicate day, month and year)*

**BETWEEN the Owner:**
*(Name, address and other information)*

AUA College of Medicine
c/o Greater Caribbean Learning Center
New York, NY 10005

**and the Contractor:**
*(Name, address and other information)*

Leeward Construction Company Limited
All Saints Road, P.O. Box 1400
St. Johns, Antigua

**The Project is:**
*(Name and location)*

American University of Antigua
College of Medicine

**The Architect is:**
*(Name, address and other information)*

Sundaram Architects Pvt. Ltd.
No. 19 Kumara Krupa Road
Bangalore – 560001 India

The Owner and Contractor agree as follows.

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:55 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                                           (1908669884)

**Init.**      **1**

AUA 000005

**ARTICLE 1   THE CONTRACT DOCUMENTS**
The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 8.

**ARTICLE 2   THE WORK OF THIS CONTRACT**
The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

**ARTICLE 3   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION**
**§ 3.1** The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Paragraphs deleted)*
Commencement Date is 1ˢᵗ May, 2008

**§ 3.2** The Contract Time shall be measured from the date of commencement.

**§ 3.3** The Contractor shall achieve Substantial Completion of the entire Work not later than the three hundred and sixty four (364) calendar days from the date of commencement, or as follows:
*(Paragraphs deleted)*

| Portion of Work | Substantial Completion Date |
|---|---|
| Classroom Block | 29/01/2009 |
| Lab Block | 06/03/2009 |
| Service Block | 29/01/2009 |
| Library and Admin. Block | 30/04/2009 |

, subject to adjustments of this Contract Time as provided in the Contract Documents.

**3.3.1 Liquidated Damages**

The Owner will suffer financial damage if the project is not substantially complete within the dates noted herein or any authorized extension there of granted by the Architect in accordance with Article 8.3 of the General Conditions of the Contract.

The Contractor shall be liable for and shall pay or allow to the Owner due sum herein stipulated as fixed, agreed and Liquidated Damages for each calendar day of delay until the work is substantially complete.

One Thousand Five Hundred US Dollars (US$1,500.00)

The owner may deduct any such sum (s) upon certification by the Architect from any monies due or to become due to the Contractor.

**ARTICLE 4   CONTRACT SUM**
**§ 4.1** The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be ~~Twenty seven million four hundred thirty six thousand eight~~ (EC$ 27,436,824.00) subject to additions and deductions as provided in the Contract Documents. *hundred twenty four EC dollars.*

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:55 on 09/24/2008 under Order No.1000355698_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                               (1908869884)

Init.

2

AUA 000006

**§ 4.2** The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(Paragraphs deleted)*

**§ 4.3** Unit prices, if any, are as follows:

| Description | Units | Price ($ 0.00) |
|---|---|---|

As contained in the Bills of Quantities (Volume 1 of Project Manual)

The unit rates and other prices in the Project Manual shall determine the value of extra work or changes as applicable. They shall be considered complete including as appropriate all materials and equipment, labour, installation costs, overhead and profit and shall be considered uniformly for either additions or deductions subject to the provisions of Article 7 of the General Conditions of the Contractor.

Note: Amounts included in the Contract Sum for Preliminaries/General conditions- 'Time related recurring, setup and Management' Costs are to be based on actuals provided these are approved one week in advance by the Owner.

**ARTICLE 5 - PAYMENTS**
**§ 5.1 PROGRESS PAYMENTS**
**§ 5.1.1** Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

**§ 5.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

**§ 5.1.3** Provided that an Application for Payment prepared by the Contractor , agreed with the Owner and is received by the Architect not later than the Seventh (7th) day of a month, the Owner shall make payment to the Contractor not later than the twenty second (22nd) day of the same month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than fifteen (15th) days after the Architect receives the Application for Payment.

**§ 5.1.4** Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

**§ 5.1.5** Applications for Payment shall indicate the measured works of each B/Q portion of the Work as of the end of the period covered by the Application for Payment.

**§ 5.1.6** Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1    Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of five ( 5 % ). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.8 of AIA Document A201-1997;

.2    Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:55 on 03/24/2008 under Order No.1000356822_1 which expires on 5/19/2009, and is not for resale.
User Notes:           (1908669884)

Init.

3

in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of  five ( 5% );

.3      Subtract the aggregate of previous payments made by the Owner; and

.4      Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Section 9.5 of AIA Document A201-1997.

**§ 5.1.7** The progress payment amount determined in accordance with Section 5.1.6 shall be further modified under the following circumstances:

.1      Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to ninety seven and one half percent (97½%) of the Contract Sum, less such amounts as the Architect shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and *(Section 9.8.5 of AIA Document A201-1997 requires release of applicable retainage upon Substantial Completion of Work with consent of surety, if any.)*

.2      Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Section 9.10.3 of AIA Document A201-1997.

.3      Provided that any part of the works is certified as substantially complete in accordance with article 9.8 of the General Conditions and before the completion of the whole of the works then the retention shall be reduced by the proportional value of the works complete relative to the value of the whole works.

**§ 5.1.8** Reduction or limitation of retainage, if any, shall be as follows:
*(Paragraphs deleted)*
        1. Limit of - 5% Contract Sum
        2. Release of Retention – 50% upon Certificate of Substantial Completion

**§ 5.1.9** Except with the Owner's prior approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

A Mobilisation Advance, equal to 12% of the contract sum (less advances issued at time of contract signing), will be paid within 7 days of receipt of an executed copy of this agreement. The arrangement/formula for pay back of this advance shall be in equal installments resulting in the advance being paid back in its entirety 3 months prior to Substantial Completion of the library works. Prior to release of this payment a detailed breakdown of expenditure against this advance is to be submitted to the Owner. Subsequent advance payments for major material order will be considered on an "as needed" basis conditional upon receipt of supporting documentation.

An option to secure an Advance Payment Bond in the amount of the Mobilisation payment is to be priced and submitted to the Owner for review.

**§ 5.2 FINAL PAYMENT**
**§ 5.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

.1      the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; and

.2      a final Certificate for Payment has been issued by the Architect.

**§ 5.2.2** The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

Init.   AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:55 on 09/24/2008 under Order No.1000356589_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                          (1908869684)

4

## ARTICLE 6  TERMINATION OR SUSPENSION

§ 6.1 The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201-1997.

§ 6.2 The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997.

## ARTICLE 7  MISCELLANEOUS PROVISIONS

§ 7.1 Where reference is made in this Agreement to a provision of AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

§ 7.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

|     (     ) per annum

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision.  Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

§ 7.3 The Owner's representative is:
*(Name, address and other information)*

Lt.Col Roche Anthony/ Mr. Corey Greenberg

§ 7.4 The Contractor's representative is:
*(Name, address and other information)*

Mr. Neil Dickinson

§ 7.5 Neither the Owner's nor the Contractor's representative shall be changed without ten days written notice to the other party.

§ 7.6 Other provisions:

## ARTICLE 8  ENUMERATION OF CONTRACT DOCUMENTS

§ 8.1 The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

§ 8.1.1 The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A101-1997.

§ 8.1.2 The General Conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201-1997.

§ 8.1.3 The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated September 2008 , and are as follows

Init.

/

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects.  All rights reserved.  WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.  This document was produced by AIA software at 13:24:55 on 09/24/2008 under Order No.1000356899_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                         (1908669884)

5

AUA 000009

| Document | Title | Pages |
|---|---|---|
| SUPPLEMENTARY CONDITIONS – Clause 1-24   A101 | | 6-10 |

**§ 8.1.4** The Specifications are those contained in the Project Manual dated as in Section 8.1.3, and are as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

*(Table deleted)*

**§ 8.1.5** The Drawings are as follows, and are dated        unless a different date is shown below:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*
REFER TO 'LIST OF DRAWINGS' contained in the PROJECT MANUAL
*(Table deleted)*

**§ 8.1.6** The Addenda, if any, are as follows:

| Number | Date | Pages |
|---|---|---|

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 8.

**§ 8.1.7** Other documents, if any, forming part of the Contract Documents are as follows:
*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements such as advertisement or Invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

Bills of Quantities
Advance Payment Bond (if option accepted by owner via change order)
Performance Bond (if Option accepted by owner via change order)

SUPPLEMENTARY CONDITIONS

1.    **GENERAL:**

The General Conditions of the Contract shall be A.I.A. Document A201, 1997 Edition, except as hereafter modified by these Supplementary Conditions.

2.    **Reference Article 2, Clause 2.1.2:**

Delete Clause 2.1.2 in its entirety.

3.    **Reference Article 3, Clause 3.6 ADD Sub-Paragraphs 3.6.2-5:**

3.6.2    The project is not subject to Antiguan import permits and payments of custom duties upon goods, material and equipment delivered for use in the work. This includes any applicable CST.

3.6.3    The Contractor shall be responsible for obtaining clearance through Customs for any such material and equipment purchased by him for use in the works and the Owner shall endorse such clearance requirements.

3.6.4    The Contractor will be responsible for handling or moving equipment and/or material to the job site except those purchased directly by the Owner.

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:55 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                (1908669884)

Init.

6

3.6.5    Equipment and/or material purchased in the Antigua wherein the purchase price includes duty, such duty shall be borne by the Contractor. Where required, the Contractor shall pay duty upon equipment and/or materials imported into Antigua which do not or will not become a permanent part of the work.

4.    **Reference Article 3, Clause 3.7 Sub-Paragraph 3.7.1:**

Delete as written and insert in lieu thereof the following:

3.7.1          The Owner will secure and pay for the Government Building Permit. All other permits and licences necessary for the proper execution and completion of the work shall be secured and paid for and maintained as a responsibility of the Contractor.

5.    **Reference Article 3, Clause 3.8 Sub-Paragraph 3.8.2:**

Delete as written and insert in lieu thereof the following:

3.8.2          Unless otherwise provided in the Contract Documents:

.1          materials and equipment under an allowance shall be selected promptly by the Owner to avoid delay in the Work;

.2          allowances shall cover the cost to the Contractor, less any applicable trade discount, of the materials and equipment required by the allowance delivered at the site and all applicable duties and taxes together with the Contractor's costs for unloading and handling on the site, labour installation costs, overhead, profit and other expenses. Where such allowances cover work to be carried out by specialist sub-contractors, these allowances shall include the handling costs on the site, labour installation costs, overhead, profit and other expenses of such sub-contractors.

.3          whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect the difference between actual costs and the allowances under Clause 3.8.2.2.

.4          the Contractor shall include for carrying out works under a Cash Allowance in his Construction Schedule.

6.    **Reference Article 4, Clause 4.3.9:**

Delete Clause 4.3.9 in its entirety.

7.    **Reference Article 4, Clause 4.4. Amend Sub-Paragraphs 4.4.1, 4.4.5 & 4.4.6:**

Delete all references to "Mediation".

8.    **Reference Article 4, Clause 4.4-Delete Sub-Paragraph 4.4.8.**

9.    **Delete Clause 4.5 in its entirety.**

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:44:55 on 09/24/2008 under Order No.1000356698_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                      (1908669884)

10.   **Reference Article 4, Clause 4.6. Amend Sub-Paragraphs 4.6.1 & 4.6.2:**

    4.6.1      Delete "Prior to arbitration......... with the provisions of Paragraph 5.4" in its entirety.

    4.6.2      Delete "not resolved by mediation" from first sentence.

11.   **Reference Article 8, Clause 8.2.2**

    8.2.2   Delete references to 'mechanics lien'

12.   **Reference 8.3, Clause 8.3.1**

    Delete reference to "Mediation".

13.   **Reference Article 9, Clause 9.6 ADD Paragraph 9.6.8:**

    9.6.8      The Contractor, upon receipt of each progress payment from the Owner, shall promptly furnish the Owner with a receipt indicating the amount paid and the date payment was received.

14.   **Reference Article 11, Clause 11.1 Sub-Paragraph 11.1.1.6:**

    Delete as written and insert in lieu thereof the following:

    11.1.1.6      Claims for damages because of bodily injury, death of any person or property damage arising out of the ownership, maintenance or use of any motor vehicle either on or off the site including motor vehicles using public highways; and

15.   **Reference Article 11, Clause 11.1 ADD Sub-Paragraph 11.1.4:**

    11.1.4      The Contractor shall in addition to the foregoing of Article 11.1 maintain such insurances as required by the Laws of Antigua and the Owner.

        .1      The Contractor shall maintain Liability cover at not less than the following limits:

                Bodily Injury & Accidental Death:
                      EC$1,000,000 per occurrence.

                Property Damage: EC$1,500,000 per occurrence.

        .2      The Contractor's liability insurance shall also include the interests of the Owner and un-named subcontractors in the work.   The above noted interests to be endorsed on all other policies of insurance maintained by the Contractor in respect of the Work.

        .3      The Contractor's liability insurance shall incorporate the following "cross liability" clause into the policy wording:

                "It is hereby agreed and declared that for the purpose of this policy each of the parties comprising the insured shall be considered as a separate and distinct unit and the words "The Insured" shall be considered as applying to each party in the same manner as if a separate policy had been issued to each of the said parties

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:55 on 09/24/2008 under Order No.1000956699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                          (1908669884)

Init.

8

and the company hereby agrees to waive all rights of subrogation or action which the company may have or acquire against either of the aforesaid parties arising out of any accident in respect of which any claim is made hereunder".

16.   **Reference Article 11, Clause 11.4, Paragraph 11.4.1 and Sub-Paragraphs 11.4.1.1 through 11.4.1.4:**

Delete as written and insert in lieu thereof the following:

11.4.1          The Contractor shall purchase and maintain property insurance upon the entire Work at the site to the full insurable value thereof.

.1          Such insurance shall be in a company or companies against which the Owner and/or his agents have no reasonable objection. This insurance shall include the interests of the Owner, the Owner's Agents, the Contractor, Sub-contractors and Sub-subcontractors in the Work and shall insure against the perils of fire and extended coverage and shall include "all risk" insurance for physical loss or damage including, without duplication of coverage, theft, vandalism and malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's and other appointed consultancy services and expenses required as a result of such insured loss.

.2          If not covered under all risk insurance or otherwise provided in the Contract Documents, the Contractor shall effect and maintain similar insurance on portions of the Work stored off the site or in transit when such portions of the Work are to be included in an Application for Payment under Sub-Paragraph 9.3.2

.3          If by the terms of this insurance any mandatory deductibles are required, or if the Contractor should elect, with the concurrence of the Owner, to increase the mandatory deductible amounts or purchase this insurance with voluntary deductible amounts, the Contractor shall be responsible for payment of the amount of the deductible in the event of a paid claim.

17.   **Reference Article 11, Clause 11.4, Paragraph 11.4.4: Delete entirely.**

18.   **Reference Article 11, Clause 11.4, Paragraph 11.4.6:**

Delete as written and insert in lieu thereof the following:-

11.4.6          The Contractor shall file two certified copies of all policies with the Owner before exposure to loss can occur. If the Owner is damaged by the failure of the Contractor to maintain such insurance and to so notify the Owner, then the Contractor shall bear all reasonable costs properly attributable thereto and such costs shall not be reimbursed by the Owner.

19.   **Reference Article 11, Clause 11.4 ADD Paragraph 11.4.11**

11.4.11          The Contractor shall insure all materials and equipment to be incorporated in the project from the time of dispatch from the premises of the supplier or distributor until delivered to the project site for the full value thereof.  Certificates of insurance shall be made available to the Owner upon request.

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects.  All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:55 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                                (1908669684)

Init.

/

9

20.    **Reference Article 11, Clause 11.4 ADD Paragraphs 11.4.12 & 11.4.13**

11.4.12    Notwithstanding the foregoing of Article 11.4 with regard to insuring against damage by hurricane, the Contractor, on becoming aware of a hurricane warning, is to take all reasonable precautions including securing loose materials and plant, protecting windows and other openings, etc., to minimize the damage likely to be caused thereby.

11.4.13    The cost to the Contractor of installing temporary hurricane protection to partially or substantially completed portions of the building shall be paid by the Owner on the basis of cost plus an agreed percentage to cover overhead and profit. Such amount shall be agreed between the Contractor and the Owner.

21.    **Reference Article 13, Clause 13.1 Sub-Paragraph 13.1.1:**

Delete as written and insert in lieu thereof the following:

13.1.1    The Contract shall be governed by and construed according to the laws for the time being in force in Antigua.

22.    **Reference General Conditions, ADD Article 15**

15.1    QUALITY AND QUANTITY OF THE WORK

15.1.1    The quality and quantity of the work included in the Contract Sum shall be deemed to be that which is shown upon the contract drawings and described in Project Manual Volumes One but nothing contained in these documents shall override, modify, or affect in any way whatsoever the application or interpretation of that which is contained in these conditions.

15.1.2    Any error in description or omission of items from the Project Manual shall not vitiate this contract but shall be corrected and deemed to be a change required by the Architect and Owner.

23.    **Reference General Conditions, ADD Article 16**

16.1    IMMIGRATION

16.1.1    Attention of the Contractor is called to the Laws of Antigua as to require work and entry permits for persons entering the Country. The Contractor shall make any and all arrangements for such permits and assume full responsibility for compliance with such laws.

24.    **Reference General Conditions, ADD Article 17**

17.1    HEADINGS

17.1.1    The headings to the clauses shall not form part of this contract or affect the interpretation thereof.

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:24:55 on 09/24/2008 under Order No.1000356599_1 which expires on 5/16/2009, and is not for resale.
User Notes:    (1008669884)

10

AUA 000014

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

_____                    _____
OWNER (Signature)                            CONTRACTOR (Signature)

American University of Antigua                Leeward Construction Co. Ltd.
_____                    _____
(Printed name and title)                      (Printed name and title)

LT. COL. RICHE ANTONY                         NEIL DICKINSON
                                              PROJECTS DIRECTOR
This Agreement entered into as of the day and year first written above

General Manager Projects

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:55 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                    (1908669884)

Init.

/

11

AUA 000015

# AIA® Document A201™ – 1997

## General Conditions of the Contract for Construction

for the following PROJECT:
*(Name and location or address):*
American University of Antigua
College of Medicine

THE OWNER:
*(Name and address):*
AUA College of Medicine
c/o Greater Caribbean Learning Center
New York, NY 10005

THE ARCHITECT:
*(Name and address):*
Sundaram Architects PVT. Ltd.
No. 19 Kumara Krupa Road.
Bangalore 560-001
India

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

This document has been approved and endorsed by The Associated General Contractors of America

**TABLE OF ARTICLES**

1   GENERAL PROVISIONS

2   OWNER

3   CONTRACTOR

4   ADMINISTRATION OF THE CONTRACT

5   SUBCONTRACTORS

6   CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7   CHANGES IN THE WORK

8   TIME

9   PAYMENTS AND COMPLETION

10   PROTECTION OF PERSONS AND PROPERTY

11   INSURANCE AND BONDS

12   UNCOVERING AND CORRECTION OF WORK

13   MISCELLANEOUS PROVISIONS

14   TERMINATION OR SUSPENSION OF THE CONTRACT

**Init.**

*/*

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 19:26:35 on 09/24/2008 under Order No.1000355599_1 which expires on 6/16/2009, and is not for resale.
**User Notes:**                                                                                                   (2404291990)

1

**INDEX**
(Numbers and Topics in Bold are Section Headings)

**Acceptance of Nonconforming Work**
9.6.6, 9.9.3, 12.3
**Acceptance of Work**
9.6.6, 9.8.2, 9.9.3, 9.10.1, 9.10.3, 12.3
**Access to Work**
3.16, 6.2.1, 12.1
Accident Prevention
4.2.3, 10
Acts and Omissions
3.2, 3.3.2, 3.12.8, 3.18, 4.2.3, 4.3.8, 4.4.1, 8.3.1,
9.5.1, 10.2.5, 13.4.2, 13.7, 14.1
Addenda
1.1.1, 3.11
Additional Costs, Claims for
4.3.4, 4.3.5, 4.3.6, 6.1.1, 10.3
Additional Inspections and Testing
9.8.3, 12.2.1, 13.5
Additional Time, Claims for
4.3.4, 4.3.7, 8.3.2
**ADMINISTRATION OF THE CONTRACT**
3.1.3, 4, 9.4, 9.5
Advertisement or Invitation to Bid
1.1.1
Aesthetic Effect
4.2.13, 4.5.1
**Allowances**
3.8
All-risk Insurance
11.4.1.1
**Applications for Payment**
4.2.5, 7.3.8, 9.2, 9.3, 9.4, 9.5.1, 9.6.3, 9.7.1, 9.8.5,
9.10, 11.1.3, 14.2.4, 14.4.3
Approvals
2.4, 3.1.3, 3.5, 3.10.2, 3.12, 4.2.7, 9.3.2, 13.4.2, 13.5
**Arbitration**
4.3.3, 4.4, 4.5.1, 4.5.2, 4.6, 8.3.1, 9.7.1, 11.4.9,
11.4.10
**Architect**
4.1
Architect, Definition of
4.1.1
Architect, Extent of Authority
2.4, 3.12.7, 4.2, 4.3.6, 4.4, 5.2, 6.3, 7.1.2, 7.3.6, 7.4,
9.2, 9.3.1, 9.4, 9.5, 9.8.3, 9.10.1, 9.10.3, 12.1, 12.2.1,
13.5.1, 13.5.2, 14.2.2, 14.2.4
Architect, Limitations of Authority and
Responsibility
2.1.1, 3.3.3, 3.12.4, 3.12.8, 3.12.10, 4.1.2, 4.2.1,
4.2.2, 4.2.3, 4.2.6, 4.2.7, 4.2.10, 4.2.12, 4.2.13, 4.4,
5.2.1, 7.4, 9.4.2, 9.6.4, 9.6.6
Architect's Additional Services and Expenses
2.4, 11.4.1.1, 12.2.1, 13.5.2, 13.5.3, 14.2.4
**Architect's Administration of the Contract**

3.1.3, 4.2, 4.3.4, 4.4, 9.4, 9.5
Architect's Approvals
2.4, 3.1.3, 3.5.1, 3.10.2, 4.2.7
Architect's Authority to Reject Work
3.5.1, 4.2.6, 12.1.2, 12.2.1
Architect's Copyright
1.6
Architect's Decisions
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4, 4.4.1, 4.4.5,
4.4.6, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2, 9.4,
9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4
Architect's Inspections
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.8.3, 9.9.2, 9.10.1, 13.5
Architect's Instructions
3.2.3, 3.3.1, 4.2.6, 4.2.7, 4.2.8, 7.4.1, 12.1, 13.5.2
Architect's Interpretations
4.2.11, 4.2.12, 4.3.6
Architect's Project Representative
4.2.10
Architect's Relationship with Contractor
1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.4.2, 3.5.1,
3.7.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2,
4.3.4, 4.4.1, 4.4.7, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4,
9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12,
13.4.2, 13.5
Architect's Relationship with Subcontractors
1.1.2, 4.2.3, 4.2.4, 4.2.6, 9.6.3, 9.6.4, 11.4.7
Architect's Representations
9.4.2, 9.5.1, 9.10.1
Architect's Site Visits
4.2.2, 4.2.5, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2, 9.10.1,
13.5
Asbestos
10.3.1
Attorneys' Fees
3.18.1, 9.10.2, 10.3.3
Award of Separate Contracts
6.1.1, 6.1.2
Award of Subcontracts and Other Contracts for
Portions of the Work
5.2
**Basic Definitions**
1.1
Bidding Requirements
1.1.1, 1.1.7, 5.2.1, 11.5.1
Boiler and Machinery Insurance
11.4.2
Bonds, Lien
9.10.2
Bonds, Performance, and Payment
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, 11.5
Building Permit
3.7.1
Capitalization
1.3
Certificates of Substantial Completion

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                    (2404291890)

Init.
/

2

9.8.3, 9.8.4, 9.8.5
**Certificates for Payment**
4.2.5, 4.2.9, 9.3.3, 9.4, 9.5, 9.6.1, 9.6.6, 9.7.1, 9.10.1,
9.10.3, 13.7, 14.1.1.3, 14.2.4
Certificates of Inspection, Testing or Approval
13.5.4
Certificates of Insurance
9.10.2, 11.1.3
**Change Orders**
1.1.1, 2.4.1, 3.4.2, 3.8.2.3, 3.11.1, 3.12.8, 4.2.8, 4.3.4,
4.3.9, 5.2.3, 7.1, 7.2, 7.3, 8.3.1, 9.3.1.1, 9.10.3,
11.4.1.2, 11.4.4, 11.4.9, 12.1.2
Change Orders, Definition of
7.2.1
**CHANGES IN THE WORK**
3.11, 4.2.8, 7, 8.3.1, 9.3.1.1, 11.4.9
Claim, Definition of
4.3.1
**Claims and Disputes**
3.2.3, 4.3, 4.4, 4.5, 4.6, 6.1.1, 6.3, 7.3.8, 9.3.3, 9.10.4,
10.3.3
**Claims and Timely Assertion of Claims**
4.6.5
**Claims for Additional Cost**
3.2.3, 4.3.4, 4.3.5, 4.3.6, 6.1.1, 7.3.8, 10.3.2
**Claims for Additional Time**
3.2.3, 4.3.4, 4.3.7, 6.1.1, 8.3.2, 10.3.2
**Claims for Concealed or Unknown Conditions**
4.3.4
Claims for Damages
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3,
11.1.1, 11.4.5, 11.4.7, 14.1.3, 14.2.4
Claims Subject to Arbitration
4.4.1, 4.5.1, 4.6.1
**Cleaning Up**
3.15, 6.3
**Commencement of Statutory Limitation Period**
13.7
Commencement of the Work, Conditions Relating to
2.2.1, 3.2.1, 3.4.1, 3.7.1, 3.10.1, 3.12.6, 4.3.5, 5.2.1,
5.2.3, 6.2.2, 8.1.2, 8.2.2, 8.3.1, 11.1, 11.4.1, 11.4.6,
11.5.1
Commencement of the Work, Definition of
8.1.2
**Communications Facilitating Contract
Administration**
3.9.1, 4.2.4
Completion, Conditions Relating to
1.6.1, 3.4.1, 3.11, 3.15, 4.2.2, 4.2.9, 8.2, 9.4.2, 9.8,
9.9.1, 9.10, 12.2, 13.7, 14.1.2
**COMPLETION, PAYMENTS AND
9**
Completion, Substantial
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, 9.8, 9.9.1, 9.10.3,
9.10.4.2, 12.2, 13.7
Compliance with Laws

1.6.1, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6.4,
4.6.6, 9.6.4, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1,
13.5.2, 13.6, 14.1.1, 14.2.1.3
Concealed or Unknown Conditions
4.3.4, 8.3.1, 10.3
Conditions of the Contract
1.1.1, 1.1.7, 6.1.1, 6.1.4
Consent, Written
1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4, 9.3.2,
9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1, 13.2, 13.4.2
**CONSTRUCTION BY OWNER OR BY
SEPARATE CONTRACTORS**
1.1.4, 6
Construction Change Directive, Definition of
7.3.1
**Construction Change Directives**
1.1.1, 3.12.8, 4.2.8, 4.3.9, 7.1, 7.3, 9.3.1.1
Construction Schedules, Contractor's
1.4.1.2, 3.10, 3.12.1, 3.12.2, 6.1.3
**Contingent Assignment of Subcontracts**
5.4, 14.2.2.2
**Continuing Contract Performance**
4.3.3
Contract, Definition of
1.1.2
**CONTRACT, TERMINATION OR
SUSPENSION OF THE**
5.4.1.1, 11.4.9, 14
Contract Administration
3.1.3, 4, 9.4, 9.5
Contract Award and Execution, Conditions Relating
to
3.7.1, 3.10, 5.2, 6.1, 11.1.3, 11.4.6, 11.5.1
**Contract Documents, The**
1.1, 1.2
Contract Documents, Copies Furnished and Use of
1.6, 2.2.5, 5.3
Contract Documents, Definition of
1.1.1
**Contract Sum**
3.8, 4.3.4, 4.3.5, 4.4.5, 5.2.3, 7.2, 7.3, 7.4, 9.1, 9.4.2,
9.5.1.4, 9.6.7, 9.7, 10.3.2, 11.4.1, 14.2.4, 14.3.2
Contract Sum, Definition of
9.1
Contract Time
4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1.3, 7.3, 7.4, 8.1.1, 8.2,
8.3.1, 9.5.1, 9.7, 10.3.2, 12.1.1, 14.3.2
Contract Time, Definition of
8.1.1
**CONTRACTOR**
3
Contractor, Definition of
3.1, 6.1.2
**Contractor's Construction Schedules**
1.4.1.2, 3.10, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
Contractor's Employees

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the
maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2009 under Order No.1000356699_1 which
expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                          (2404291980)

Init.

3

3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1

Contractor's Liability Insurance
11.1

Contractor's Relationship with Separate Contractors and Owner's Forces
3.12.5, 3.14.2, 4.2.4, 6, 11.4.7, 12.1.2, 12.2.4

Contractor's Relationship with Subcontractors
1.2.2, 3.3.2, 3.18.1, 3.18.2, 5, 9.6.2, 9.6.7, 9.10.2, 11.4.1.2, 11.4.7, 11.4.8

Contractor's Relationship with the Architect
1.1.2, 1.1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.4.2, 3.5.1, 3.7.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2, 4.3.4, 4.4.1, 4.4.7, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12, 13.4.2, 13.5

Contractor's Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.8.2

Contractor's Responsibility for Those Performing the Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2, 6.3, 9.5.1, 10

Contractor's Review of Contract Documents
1.5.2, 3.2, 3.7.3

Contractor's Right to Stop the Work
9.7

Contractor's Right to Terminate the Contract
4.3.10, 14.1

Contractor's Submittals
3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6, 9.2, 9.3, 9.8.2, 9.8.3, 9.9.1, 9.10.2, 9.10.3, 11.1.3, 11.5.2

Contractor's Superintendent
3.9, 10.2.6

Contractor's Supervision and Construction Procedures
1.2.2, 3.3, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3, 6.1.3, 6.2.4, 7.1.3, 7.3.4, 7.3.6, 8.2, 10, 14

Contractual Liability Insurance
11.1.1.8, 11.2, 11.3

Coordination and Correlation
1.2, 1.5.2, 3.3.1, 3.10, 3.12.6, 6.1.3, 6.2.1

Copies Furnished of Drawings and Specifications
1.6, 2.2.5, 3.11

Copyrights
1.6, 3.17

Correction of Work
2.3, 2.4, 3.7.4, 4.2.1, 9.4.2, 9.8.2, 9.8.3, 9.9.1, 12.1.2, 12.2, 13.7.1.3

Correlation and Intent of the Contract Documents
1.2

Cost, Definition of
7.3.6

Costs
2.4, 3.2.3, 3.7.4, 3.8.2, 3.15.2, 4.3, 5.4.2, 6.1.1, 6.2.3, 7.3.3.3, 7.3.6, 7.3.7, 7.3.8, 9.10.2, 10.3.2, 10.5, 11.3, 11.4, 12.1, 12.2.1, 12.2.4, 13.5, 14

Cutting and Patching

6.2.5, 3.14

Damage to Construction of Owner or Separate Contractors
3.14.2, 6.2.4, 9.2.1.5, 10.2.1.2, 10.2.5, 10.6, 11.1, 11.4, 12.2.4

Damage to the Work
3.14.2, 9.9.1, 10.2.1.2, 10.2.5, 10.6, 11.4, 12.2.4

Damages, Claims for
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3, 11.1.1, 11.4.5, 11.4.7, 14.1.3, 14.2.4

Damages for Delay
6.1.1, 8.3.3, 9.5.1.6, 9.7, 10.3.2

Date of Commencement of the Work, Definition of
8.1.2

Date of Substantial Completion, Definition of
8.1.3

Day, Definition of
8.1.4

Decisions of the Architect
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4, 4.4.1, 4.4.5, 4.4.6, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2, 9.4, 9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4

Decisions to Withhold Certification
9.4.1, 9.5, 9.7, 14.1.1.3

Defective or Nonconforming Work, Acceptance, Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.5.2, 9.6.6, 9.8.2, 9.9.3, 9.10.4, 12.2.1, 13.7.1.3

Defective Work, Definition of
3.5.1

Definitions
1.1, 2.1.1, 3.1, 3.5.1, 3.12.1, 3.12.2, 3.12.3, 4.1.1, 4.3.1, 5.1, 6.1.2, 7.2.1, 7.3.1, 7.3.6, 8.1, 9.1, 9.8.1

Delays and Extensions of Time
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3.1, 7.4.1, 8.3, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2

Disputes
4.1.4, 4.3, 4.4, 4.5, 4.6, 6.3, 7.3.8

Documents and Samples at the Site
3.11

Drawings, Definition of
1.1.5

Drawings and Specifications, Use and Ownership of
1.1.1, 1.3, 2.2.5, 3.11, 5.3

Effective Date of Insurance
8.2.2, 11.1.2

Emergencies
4.3.5, 10.6, 14.1.1.2

Employees, Contractor's
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1

Equipment, Labor, Materials and
1.1.3, 1.1.6, 3.4, 3.5.1, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2

Execution and Progress of the Work

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/15/2009, and is not for resale.
User Notes:                                                                                          (2404291990)

4

1.1.3, 1.2.1, 1.2.2, 2.2.3, 2.2.5, 3.1, 3.3, 3.4, 3.5, 3.7,
3.10, 3.12, 3.14, 4.2.2, 4.2.3, 4.3.3, 6.2.2, 7.1.3, 7.3.4,
8.2, 9.5, 9.9.1, 10.2, 10.3, 12.2, 14.2, 14.3
Extensions of Time
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3, 7.4.1,
9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2
Failure of Payment
4.3.6, 9.5.1.3, 9.7, 9.10.2, 14.1.1.3, 14.2.1.2, 13.6
Faulty Work
(See Defective or Nonconforming Work)
Final Completion and Final Payment
4.2.1, 4.2.9, 4.3.2, 9.8.2, 9.10, 11.1.2, 11.1.3, 11.4.1,
11.4.5, 12.3.1, 13.7, 14.2.4, 14.4.3
Financial Arrangements, Owner's
2.2.1, 13.2.2, 14.1.1.5
Fire and Extended Coverage Insurance
11.4
GENERAL PROVISIONS
1
Governing Law
13.1
Guarantees (See Warranty)
Hazardous Materials
10.2.4, 10.3, 10.5
Identification of Contract Documents
1.5.1
Identification of Subcontractors and Suppliers
5.2.1
Indemnification
3.17, 3.18, 9.10.2, 10.3.3, 10.5, 11.4.1.2, 11.4.7
Information and Services Required of the Owner
2.1.2, 2.2, 3.2.1, 3.12.4, 3.12.10, 4.2.7, 4.3.3, 6.1.3,
6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3,
11.2, 11.4, 13.5.1, 13.5.2, 14.1.1.4, 14.1.4
Injury or Damage to Person or Property
4.3.8, 10.2, 10.6
Inspections
3.1.3, 3.3.3, 3.7.1, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.2,
9.8.3, 9.9.2, 9.10.1, 12.2.1, 13.5
Instructions to Bidders
1.1.1
Instructions to the Contractor
3.2.3, 3.3.1, 3.8.1, 4.2.8, 5.2.1, 7, 12, 8.2.2, 13.5.2
Insurance
3.18.1, 6.1.1, 7.3.6, 8.2.1, 9.3.2, 9.8.4, 9.9.1, 9.10.2,
9.10.5, 11
Insurance, Boiler and Machinery
11.4.2
Insurance, Contractor's Liability
11.1
Insurance, Effective Date of
8.2.2, 11.1.2
Insurance, Loss of Use
11.4.3
Insurance, Owner's Liability
11.2

Insurance, Project Management Protective
Liability
11.3
Insurance, Property
10.2.5, 11.4
Insurance, Stored Materials
9.3.2, 11.4.14
INSURANCE AND BONDS
11
Insurance Companies, Consent to Partial Occupancy
9.9.1, 11.4.1.5
Insurance Companies, Settlement with
11.4.10
Intent of the Contract Documents
1.2.1, 4.2.7, 4.2.12, 4.2.13, 7.4
Interest
13.6
Interpretation
1.2.3, 1.4, 4.1.1, 4.3.1, 5.1, 6.1.2, 8.1.4
Interpretations, Written
4.2.11, 4.2.12, 4.3.6
Joinder and Consolidation of Claims Required
4.6.4
Judgment on Final Award
4.6.6
Labor and Materials, Equipment
1.1.3, 1.1.6, 3.4, 3.5.1, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1,
42.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3,
9.10.2, 10.2.1, 10.2.4, 14.2.1.2
Labor Disputes
8.3.1
Laws and Regulations
1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6,
9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1,
13.5.2, 13.6, 14
Liens
2.1.2, 4.4.8, 8.2.2, 9.3.3, 9.10
Limitation on Consolidation or Joinder
4.6.4
Limitations, Statutes of
4.6.3, 12.2.6, 13.7
Limitations of Liability
2.3, 3.2.1, 3.5.1, 3.7.3, 3.12.8, 3.12.10, 3.17, 3.18,
4.2.6, 4.2.7, 4.2.12, 6.2.2, 9.4.2, 9.6.4, 9.6.7, 9.10.4,
10.3.3, 10.2.5, 11.1.2, 11.2.1, 11.4.7, 12.2.5, 13.4.2
Limitations of Time
2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11, 3.12.5, 3.15.1,
4.2.7, 4.3, 4.4, 4.5, 4.6, 5.2, 5.3, 5.4, 6.2.4, 7.3, 7.4,
8.2, 9.2, 9.3.1, 9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9,
9.10, 11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2, 13.5,
13.7, 14
Loss of Use Insurance
11.4.3
Material Suppliers
1.6, 3.12.1, 4.2.4, 4.2.6, 5.2.1, 9.3, 9.4.2, 9.6, 9.10.5
Materials, Hazardous
10.2.4, 10.3, 10.5

Init.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the
maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356599_1 which
expires on 5/16/2009, and is not for resale.
User Notes:                                                                                    (2404291990)

5

AUA 000020

Materials, Labor, Equipment and
1.1.3, 1.1.6, 1.6.1, 3.4, 3.5.1, 3.8.2, 3.8.23, 3.12, 3.13,
3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3,
9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2
Means, Methods, Techniques, Sequences and
Procedures of Construction
3.3.1, 3.12.10, 4.2.2, 4.2.7, 9.4.2
Mechanic's Lien
4.4.8
Mediation
4.4.1, 4.4.5, 4.4.6, 4.4.8, 4.5, 4.6.1, 4.6.2, 8.3.1, 10.5
Minor Changes in the Work
1.1.1, 3.12.8, 4.2.8, 4.3.6, 7.1, 7.4
MISCELLANEOUS PROVISIONS
13
Modifications, Definition of
1.1.1
Modifications to the Contract
1.1.1, 1.1.2, 3.7.3, 3.11, 4.1.2, 4.2.1, 5.2.3, 7, 8.3.1,
9.7, 10.3.2, 11.4.1
Mutual Responsibility
6.2
Nonconforming Work, Acceptance of
9.6.6, 9.9.3, 12.3
Nonconforming Work, Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.8.2, 9.9.3, 9.10.4,
12.2.1, 13.7.1.3
Notice
2.2.1, 2.3, 2.4, 3.2.3, 3.3.1, 3.7.2, 3.7.4, 3.12.9, 4.3,
4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 11.1.3,
11.4.6, 12.2.2, 12.2.4, 13.3, 13.5.1, 13.5.2, 14.1, 14.2
Notice, Written
2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3, 4.4.8, 4.6.5,
5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 10.3, 11.1.3, 11.4.6,
12.2.2, 12.2.4, 13.3, 14
Notice of Testing and Inspections
13.5.1, 13.5.2
Notice to Proceed
8.2.2
Notices, Permits, Fees and
2.2.2, 3.7, 3.13, 7.3.6.4, 10.2.2
Observations, Contractor's
1.5.2, 3.2, 3.7.3, 4.3.4
Occupancy
2.2.2, 9.6.6, 9.8, 11.4.1.5
Orders, Written
1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1, 12.2,
13.5.2, 14.3.1
OWNER
2
Owner, Definition of
2.1
Owner, Information and Services Required of the
2.1.2, 2.2, 3.2.1, 3.12.4, 3.12.10, 4.2.7, 4.3.3, 6.1.3,
6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3,
11.2, 11.4, 13.5.1, 13.5.2, 14.1.1.4, 14.1.4
Owner's Authority

1.6, 2.1.1, 2.3, 2.4, 3.4.2, 3.8.1, 3.12.10, 3.14.2, 4.1.2,
4.1.3, 4.2.4, 4.2.9, 4.3.6, 4.4.7, 5.2.1, 5.2.4, 5.4.1,
6.1, 6.3, 7.2.1, 7.3.1, 8.2.2, 8.3.1, 9.3.1, 9.3.2, 9.5.1,
9.9.1, 9.10.2, 10.3.2, 11.1.3, 11.3.1, 11.4.3, 11.4.10,
12.2.2, 12.3.1, 13.2.2, 14.3, 14.4
Owner's Financial Capability
2.2.1, 13.2.2, 14.1.1.5
Owner's Liability Insurance
11.2
Owner's Loss of Use Insurance
11.4.3
Owner's Relationship with Subcontractors
1.1.2, 5.2, 5.3, 5.4, 9.6.4, 9.10.2, 14.2.2
Owner's Right to Carry Out the Work
2.4, 12.2.4, 14.2.2.2
Owner's Right to Clean Up
6.3
Owner's Right to Perform Construction and to
Award Separate Contracts
6.1
Owner's Right to Stop the Work
2.3
Owner's Right to Suspend the Work
14.3
Owner's Right to Terminate the Contract
14.2
Ownership and Use of Drawings, Specifications
and Other Instruments of Service
1.1.1, 1.6, 2.2.5, 3.2.1, 3.11.1, 3.17.1, 4.2.12, 5.3
Partial Occupancy or Use
9.6.6, 9.9, 11.4.1.5
Patching, Cutting and
3.14, 6.2.5
Patents
3.17
Payment, Applications for
4.2.5, 7.3.8, 9.2, 9.3, 9.4, 9.5.1, 9.6.3, 9.7.1, 9.8.5,
9.10.1, 9.10.3, 9.10.5, 11.1.3, 14.2.4, 14.4.3
Payment, Certificates for
4.2.5, 4.2.9, 9.3.3, 9.4, 9.5, 9.6.1, 9.6.6, 9.7.1, 9.10.1,
9.10.3, 13.7, 14.1.1.3, 14.2.4
Payment, Failure of
4.3.6, 9.5.1.3, 9.7, 9.10.2, 14.1.1.3, 14.2.1.2, 13.6
Payment, Final
4.2.1, 4.2.9, 4.3.2, 9.8.2, 9.10, 11.1.2, 11.1.3, 11.4.1,
11.4.5, 12.3.1, 13.7, 14.2.4, 14.4.3
Payment Bond, Performance Bond and
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, 11.5
Payments, Progress
4.3.3, 9.3, 9.6, 9.8.5, 9.10.3, 13.6, 14.2.3
PAYMENTS AND COMPLETION
9
Payments to Subcontractors
5.4.2, 9.5.1.3, 9.6.2, 9.6.3, 9.6.4, 9.6.7, 11.4.8,
14.2.1.2
PCB
10.3.1

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the
maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which
expires on 5/18/2009, and is not for resale.
User Notes:                                                                                    (2404291990)

6

Performance Bond and Payment Bond
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, 11.5
Permits, Fees and Notices
2.2.2, 3.7, 3.13, 7.3.6.4, 10.2.2
PERSONS AND PROPERTY, PROTECTION
OF
10

Polychlorinated Biphenyl
10.3.1
Product Data, Definition of
3.12.2
Product Data and Samples, Shop Drawings
3.11, 3.12, 4.2.7
Progress and Completion
4.2.2, 4.3.3, 8.2, 9.8, 9.9.1, 14.1.4
Progress Payments
4.3.3, 9.3, 9.6, 9.8.5, 9.10.3, 13.6, 14.2.3
Project, Definition of the
1.1.4
Project Management Protective Liability
Insurance
11.3
Project Manual, Definition of the
1.1.7
Project Manuals
2.2.5
Project Representatives
4.2.10
Property Insurance
10.2.5, 11.4
PROTECTION OF PERSONS AND PROPERTY
10
Regulations and Laws
1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6,
9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1,
13.5.2, 13.6, 14
Rejection of Work
3.5.1, 4.2.6, 12.2.1
Releases and Waivers of Liens
9.10.2
Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.4.2, 9.5.1,
9.8.2, 9.10.1
Representatives
2.1.1, 3.1.1, 3.9, 4.1.1, 4.2.1, 4.2.10, 5.1.1, 5.1.2,
13.2.1
Resolution of Claims and Disputes
4.4, 4.5, 4.6
Responsibility for Those Performing the Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2, 6.3, 9.5.1,
10
Retainage
9.3.1, 9.6.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3
Review of Contract Documents and Field
Conditions by Contractor
1.5.2, 3.2, 3.7.3, 3.12.7, 6.1.3

Review of Contractor's Submittals by Owner and
Architect
3.10.1, 3.10.2, 3.11, 3.12, 4.2, 5.2, 6.1.3, 9.2, 9.8.2
Review of Shop Drawings, Product Data and
Samples by Contractor
3.12
Rights and Remedies
1.1.2, 2.3, 2.4, 3.5.1, 3.15.2, 4.2.6, 4.3.4, 4.5, 4.6, 5.3,
5.4, 6.1, 6.3, 7.3.1, 8.3, 9.5.1, 9.7, 10.2.5, 10.3,
12.2.2, 12.2.4, 13.3, 14
Royalties, Patents and Copyrights
3.17
Rules and Notices for Arbitration
4.6.2
Safety of Persons and Property
10.2, 10.6
Safety Precautions and Programs
3.3.1, 4.2.2, 4.2.7, 5.3.1, 10.1, 10.2, 10.6
Samples, Definition of
3.12.3
Samples, Shop Drawings, Product Data and
3.11, 3.12, 4.2.7
Samples at the Site, Documents and
3.11
Schedule of Values
9.2, 9.3.1
Schedules,
1.4.1.2, 3.10, 3.Construction12.1, 3.12.2, 4.3.7.2,
6.1.3
Separate Contracts and Contractors
1.1.4, 3.12.5, 3.14.2, 4.2.4, 4.2.7, 4.6.4, 6, 8.3.1,
11.4.7, 12.1.2, 12.2.5
Shop Drawings, Definition of
3.12.1
Shop Drawings, Product Data and Samples
3.11, 3.12, 4.2.7
Site, Use of
3.13, 6.1.1, 6.2.1
Site Inspections
1.2.2, 3.2.1, 3.3.3, 3.7.1, 4.2, 4.3.4, 9.4.2, 9.10.1, 13.5
Site Visits, Architect's
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2, 9.10.1, 13.5
Special Inspections and Testing
4.2.6, 12.2.1, 13.5
Specifications, Definition of the
1.1.6
Specifications, The
1.1.1, 1.1.6, 1.1.7, 1.2.2, 1.6, 3.11, 3.12.10, 3.17
Statute of Limitations
4.6.3, 12.2.6, 13.7
Stopping the Work
2.3, 4.3.6, 9.7, 10.3, 14.1
Stored Materials
6.2.1, 9.3.2, 10.2.1.2, 10.2.4, 11.4.1.4
Subcontractor, Definition of
5.1.1
SUBCONTRACTORS

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the
maximum extent possible under the law. This document was produced by AIA software at 13:25:35 on 09/24/2008 under Order No.1000356699_1 which
expires on 5/16/2009, and is not for resale.
User Notes:                                                                                              (2404291900)

Init.
/

AUA 000022

5

Subcontractors, Work by
1.2.2, 3.3.2, 3.12.1, 4.2.3, 5.2.3, 5.3, 5.4, 9.3.1.2,
9.6.7
Subcontractual Relations
5.3, 5.4, 9.3.1.2, 9.6, 9.10 10.2.1, 11.4.7, 11.4.8, 14.1,
14.2.1, 14.3.2
Submittals
1.6, 3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6, 9.2,
9.3, 9.8, 9.9.1, 9.10.2, 9.10.3, 11.1.3
Subrogation, Waivers of
6.1.1, 11.4.5, 11.4.7
Substantial Completion
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, 9.8, 9.9.1, 9.10.3,
9.10.4.2, 12.2, 13.7
Substantial Completion, Definition of
9.8.1
Substitution of Subcontractors
5.2.3, 5.2.4
Substitution of Architect
4.1.3
Substitutions of Materials
3.4.2, 3.5.1, 7.3.7
Sub-subcontractor, Definition of
5.1.2
Subsurface Conditions
4.3.4
Successors and Assigns
13.2
Superintendent
3.9, 10.2.6
Supervision and Construction Procedures
1.2.2, 3.3, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3, 6.1.3,
6.2.4, 7.1.3, 7.3.6, 8.2, 8.3.1, 9.4.2, 10, 12, 14
Surety
4.4.7, 5.4.1.2, 9.8.5, 9.10.2, 9.10.3, 14.2.2
Surety, Consent of
9.10.2, 9.10.3
Surveys
2.2.3
Suspension by the Owner for Convenience
14.4
Suspension of the Work
5.4.2, 14.3
Suspension or Termination of the Contract
4.3.6, 5.4.1.1, 11.4.9, 14
Taxes
3.6, 3.8.2.1, 7.3.6.4
Termination by the Contractor
4.3.10, 14.1
Termination by the Owner for Cause
4.3.10, 5.4.1.1, 14.2
Termination of the Architect
4.1.3
Termination of the Contractor
14.2.2

TERMINATION OR SUSPENSION OF THE
CONTRACT
14
Tests and Inspections
3.1.3, 3.3.3, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.3, 9.9.2,
9.10.1, 10.3.2, 11.4.1.1, 12.2.1, 13.5
TIME
8
Time, Delays and Extensions of
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3.1,
7.4.1, 8.3, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2
Time Limits
2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11, 3.12.5, 3.15.1,
4.2, 4.3, 4.4, 4.5, 4.6, 5.2, 5.3, 5.4, 6.2.4, 7.3, 7.4,
8.2, 9.2, 9.3.1, 9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9,
9.10, 11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2, 13.5,
13.7, 14
Time Limits on Claims
4.3.2, 4.3.4, 4.3.8, 4.4, 4.5, 4.6
Title to Work
9.3.2, 9.3.3
UNCOVERING AND CORRECTION OF
WORK
12
Uncovering of Work
12.1
Unforeseen Conditions
4.3.4, 8.3.1, 10.3
Unit Prices
4.3.9, 7.3.3.2
Use of Documents
1.1.1, 1.6, 2.2.5, 3.12.6, 5.3
Use of Site
3.13, 6.1.1, 6.2.1
Values, Schedule of
9.2, 9.3.1
Waiver of Claims by the Architect
13.4.2
Waiver of Claims by the Contractor
4.3.10, 9.10.5, 11.4.7, 13.4.2
Waiver of Claims by the Owner
4.3.10, 9.9.3, 9.10.3, 9.10.4, 11.4.3, 11.4.5, 11.4.7,
12.2.2.1, 13.4.2, 14.2.4
Waiver of Consequential Damages
4.3.10, 14.2.4
Waiver of Liens
9.10.2, 9.10.4
Waivers of Subrogation
6.1.1, 11.4.5, 11.4.7
Warranty
3.5, 4.2.9, 4.3.5.3, 9.3.3, 9.8.4, 9.9.1, 9.10.4, 12.2.2,
13.7.1.3
Weather Delays
4.3.7.2
Work, Definition of
1.1.3
Written Consent

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000359699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                          (2404291990)

Init.

/

8

| | |
|---|---|
| 1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4, 9.3.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1, 13.2, 13.4.2 | 2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3, 4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 10.3, 11.1.3, 11.4.6, 12.2.2, 12.2.4, 13.3, 14 |
| **Written Interpretations** | **Written Orders** |
| 4.2.11, 4.2.12, 4.3.6 | 1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1, 12.2, |
| **Written Notice** | 13.5.2, 14.3.1 |

AIA Document A201™ – 1997. Copyright © 1911, 1916, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American
Institute of Architects.  All rights reserved.  WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the
maximum extent possible under the law.  This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which
expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                                  (2404291990)

Init.

/

9

# ARTICLE 1  GENERAL PROVISIONS

## § 1.1 BASIC DEFINITIONS

### § 1.1.1 THE CONTRACT DOCUMENTS

The Contract Documents consist of the Agreement between Owner and Contractor (hereinafter the Agreement), Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect. Unless specifically enumerated in the Agreement, the Contract Documents do not include other documents such as bidding requirements (advertisement or invitation to bid, Instructions to Bidders, sample forms, the Contractor's bid or portions of Addenda relating to bidding requirements).

### § 1.1.2 THE CONTRACT

The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and Contractor, (2) between the Owner and a Subcontractor or Sub-subcontractor, (3) between the Owner and Architect or (4) between any persons or entities other than the Owner and Contractor. The Architect shall, however, be entitled to performance and enforcement of obligations under the Contract intended to facilitate performance of the Architect's duties.

### § 1.1.3 THE WORK

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

### § 1.1.4 THE PROJECT

The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors.

### § 1.1.5 THE DRAWINGS

The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

### § 1.1.6 THE SPECIFICATIONS

The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services.

### § 1.1.7 THE PROJECT MANUAL

The Project Manual is a volume assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications.

## § 1.2 CORRELATION AND INTENT OF THE CONTRACT DOCUMENTS

### § 1.2.1 The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

### § 1.2.2 Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

### § 1.2.3 Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                        (2404291990)

Init.

**10**

### § 1.3 CAPITALIZATION

§ 1.3.1 Terms capitalized in these General Conditions include those which are (1) specifically defined, (2) the titles of numbered articles or (3) the titles of other documents published by the American Institute of Architects.

### § 1.4 INTERPRETATION

§ 1.4.1 In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

### § 1.5 EXECUTION OF CONTRACT DOCUMENTS

§ 1.5.1 The Contract Documents shall be signed by the Owner and Contractor. If either the Owner or Contractor or both do not sign all the Contract Documents, the Architect shall identify such unsigned Documents upon request.

§ 1.5.2 Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

### § 1.6 OWNERSHIP AND USE OF DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE

§ 1.6.1 The Drawings, Specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service through which the Work is to be executed by the Contractor is described. The Contractor may retain one record set. Neither the Contractor nor any Subcontractor, Sub-subcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect or the Architect's consultants, and unless otherwise indicated the Architect and the Architect's consultants shall be deemed the authors of them and will retain all common law, statutory and other reserved rights, in addition to the copyrights. All copies of Instruments of Service, except the Contractor's record set, shall be returned or suitably accounted for to the Architect, on request, upon completion of the Work. The Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants, and copies thereof furnished to the Contractor, are for use solely with respect to this Project. They are not to be used by the Contractor or any Subcontractor, Sub-subcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner, Architect and the Architect's consultants. The Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers are authorized to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants appropriate to and for use in the execution of their Work under the Contract Documents. All copies made under this authorization shall bear the statutory copyright notice, if any, shown on the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's or Architect's consultants' copyrights or other reserved rights.

### ARTICLE 2 OWNER

### § 2.1 GENERAL

§ 2.1.1 The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. Except as otherwise provided in Section 4.2.1, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.

§ 2.1.2 The Owner shall furnish to the Contractor within fifteen days after receipt of a written request, information necessary and relevant for the Contractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

### § 2.2 INFORMATION AND SERVICES REQUIRED OF THE OWNER

§ 2.2.1 The Owner shall, at the written request of the Contractor, prior to commencement of the Work and thereafter, furnish to the Contractor reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract. Furnishing of such evidence shall be a condition precedent to commencement or

Init.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356689_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                               (2404291990)

11

AUA 000026

continuation of the Work. After such evidence has been furnished, the Owner shall not materially vary such financial arrangements without prior notice to the Contractor.

§ 2.2.2 Except for permits and fees, including those required under Section 3.7.1, which are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

§ 2.2.3 The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

§ 2.2.4 Information or services required of the Owner by the Contract Documents shall be furnished by the Owner with reasonable promptness. Any other information or services relevant to the Contractor's performance of the Work under the Owner's control shall be furnished by the Owner after receipt from the Contractor of a written request for such information or services.

§ 2.2.5 Unless otherwise provided in the Contract Documents, the Contractor will be furnished, free of charge, such copies of Drawings and Project Manuals as are reasonably necessary for execution of the Work.

§ 2.3 OWNER'S RIGHT TO STOP THE WORK
§ 2.3.1 If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents as required by Section 12.2 or persistently fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Section 6.1.3.

§ 2.4 OWNER'S RIGHT TO CARRY OUT THE WORK
§ 2.4.1 If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a seven-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may after such seven-day period give the Contractor a second written notice to correct such deficiencies within a three-day period. If the Contractor within such three-day period after receipt of such second notice fails to commence and continue to correct any deficiencies, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost of correcting such deficiencies, including Owner's expenses and compensation for the Architect's additional services made necessary by such default, neglect or failure. Such action by the Owner and amounts charged to the Contractor are both subject to prior approval of the Architect. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

ARTICLE 3  CONTRACTOR
§ 3.1 GENERAL
§ 3.1.1 The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Contractor" means the Contractor or the Contractor's authorized representative.

§ 3.1.2 The Contractor shall perform the Work in accordance with the Contract Documents.

§ 3.1.3 The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

§ 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR
§ 3.2.1 Since the Contract Documents are complementary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the

Init.

/

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:25:35 on 09/24/2008 under Order No.1000356699_1 which expires on 9/16/2009, and is not for resale.
User Notes:                                                                                (2404291890)

12

AUA 000027

Work, as well as the information furnished by the Owner pursuant to Section 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents; however, any errors, inconsistencies or omissions discovered by the Contractor shall be reported promptly to the Architect as a request for information in such form as the Architect may require.

**§ 3.2.2** Any design errors or omissions noted by the Contractor during this review shall be reported promptly to the Architect, but it is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents. The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations, but any nonconformity discovered by or made known to the Contractor shall be reported promptly to the Architect.

**§ 3.2.3** If the Contractor believes that additional cost or time is involved because of clarifications or instructions issued by the Architect in response to the Contractor's notices or requests for information pursuant to Sections 3.2.1 and 3.2.2, the Contractor shall make Claims as provided in Sections 4.3.6 and 4.3.7. If the Contractor fails to perform the obligations of Sections 3.2.1 and 3.2.2, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. The Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents or for differences between field measurements or conditions and the Contract Documents unless the Contractor recognized such error, inconsistency, omission or difference and knowingly failed to report it to the Architect.

## § 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES

**§ 3.3.1** The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and Architect and shall not proceed with that portion of the Work without further written instructions from the Architect. If the Contractor is then instructed to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner shall be solely responsible for any resulting loss or damage.

**§ 3.3.2** The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

**§ 3.3.3** The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

## § 3.4 LABOR AND MATERIALS

**§ 3.4.1** Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**§ 3.4.2** The Contractor may make substitutions only with the consent of the Owner, after evaluation by the Architect and in accordance with a Change Order.

**§ 3.4.3** The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356869_1 which expires on 6/15/2009, and is not for resale.
User Notes:                                                                                                    (2404281990)

13

AUA 000028

## § 3.5 WARRANTY

§ 3.5.1 The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

## § 3.6 TAXES

§ 3.6.1 The Contractor shall pay sales, consumer, use and similar taxes for the Work provided by the Contractor which are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

## § 3.7 PERMITS, FEES AND NOTICES

§ 3.7.1 Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for the building permit and other permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Work which are customarily secured after execution of the Contract and which are legally required when bids are received or negotiations concluded.

§ 3.7.2 The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities applicable to performance of the Work.

§ 3.7.3 It is not the Contractor's responsibility to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations. However, if the Contractor observes that portions of the Contract Documents are at variance therewith, the Contractor shall promptly notify the Architect and Owner in writing, and necessary changes shall be accomplished by appropriate Modification.

§ 3.7.4 If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the Architect and Owner, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

## § 3.8 ALLOWANCES

§ 3.8.1 The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents. Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection.

§ 3.8.2 Unless otherwise provided in the Contract Documents:

  .1  allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;

  .2  Contractor's costs for unloading and handling at the site, labor, installation costs, overhead, profit and other expenses contemplated for stated allowance amounts shall be included in the Contract Sum but not in the allowances;

  .3  whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Section 3.8.2.1 and (2) changes in Contractor's costs under Section 3.8.2.2.

§ 3.8.3 Materials and equipment under an allowance shall be selected by the Owner in sufficient time to avoid delay in the Work.

## § 3.9 SUPERINTENDENT

§ 3.9.1 The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor. Important

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356689_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                             (2404291990)

Init.

/

14

communications shall be confirmed in writing. Other communications shall be similarly confirmed on written request in each case.

### § 3.10 CONTRACTOR'S CONSTRUCTION SCHEDULES

**§ 3.10.1** The Contractor, promptly after being awarded the Contract, shall prepare and submit for the Owner's and Architect's information a Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

**§ 3.10.2** The Contractor shall prepare and keep current, for the Architect's approval, a schedule of submittals which is coordinated with the Contractor's construction schedule and allows the Architect reasonable time to review submittals.

**§ 3.10.3** The Contractor shall perform the Work in general accordance with the most recent schedules submitted to the Owner and Architect.

### § 3.11 DOCUMENTS AND SAMPLES AT THE SITE

**§ 3.11.1** The Contractor shall maintain at the site for the Owner one record copy of the Drawings, Specifications, Addenda, Change Orders and other Modifications, in good order and marked currently to record field changes and selections made during construction, and one record copy of approved Shop Drawings, Product Data, Samples and similar required submittals. These shall be available to the Architect and shall be delivered to the Architect for submittal to the Owner upon completion of the Work.

### § 3.12 SHOP DRAWINGS, PRODUCT DATA AND SAMPLES

**§ 3.12.1** Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

**§ 3.12.2** Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

**§ 3.12.3** Samples are physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

**§ 3.12.4** Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. The purpose of their submittal is to demonstrate for those portions of the Work for which submittals are required by the Contract Documents the way by which the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents. Review by the Architect is subject to the limitations of Section 4.2.7. Informational submittals upon which the Architect is not expected to take responsive action may be so identified in the Contract Documents. Submittals which are not required by the Contract Documents may be returned by the Architect without action.

**§ 3.12.5** The Contractor shall review for compliance with the Contract Documents, approve and submit to the Architect Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors. Submittals which are not marked as reviewed for compliance with the Contract Documents and approved by the Contractor may be returned by the Architect without action.

**§ 3.12.6** By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents that the Contractor has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

**§ 3.12.7** The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the Architect.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356899_1 which expires on 6/16/2009, and is not for resale.
User Notes:                                                                                      (2404291990)

Init.

15

§ 3.12.8 The Work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the Architect's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submittal and (1) the Architect has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order or Construction Change Directive has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Architect's approval thereof.

§ 3.12.9 The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the Architect on previous submittals. In the absence of such written notice the Architect's approval of a resubmission shall not apply to such revisions.

§ 3.12.10 The Contractor shall not be required to provide professional services which constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner and the Architect will specify all performance and design criteria that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the Architect. The Owner and the Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, provided the Owner and Architect have specified to the Contractor all performance and design criteria that such services must satisfy. Pursuant to this Section 3.12.10, the Architect will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.

§ 3.13 USE OF SITE
§ 3.13.1 The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

§ 3.14 CUTTING AND PATCHING
§ 3.14.1 The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

§ 3.14.2 The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

§ 3.15 CLEANING UP
§ 3.15.1 The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove from and about the Project waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials.

§ 3.15.2 If the Contractor fails to clean up as provided in the Contract Documents, the Owner may do so and the cost thereof shall be charged to the Contractor.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356692_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                              (2404291990)

Init.

/

16

**§ 3.16 ACCESS TO WORK**
**§ 3.16.1** The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

**§ 3.17 ROYALTIES, PATENTS AND COPYRIGHTS**
**§ 3.17.1** The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and Architect harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the Owner or Architect. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the Architect.

**§ 3.18 INDEMNIFICATION**
**§ 3.18.1** To the fullest extent permitted by law and to the extent claims, damages, losses or expenses are not covered by Project Management Protective Liability insurance purchased by the Contractor in accordance with Section 11.3, the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 3.18.

**§ 3.18.2** In claims against any person or entity indemnified under this Section 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 3.18.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

**ARTICLE 4  ADMINISTRATION OF THE CONTRACT**
**§ 4.1 ARCHITECT**
**§ 4.1.1** The Architect is the person lawfully licensed to practice architecture or an entity lawfully practicing architecture identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Architect" means the Architect or the Architect's authorized representative.

**§ 4.1.2** Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, Contractor and Architect. Consent shall not be unreasonably withheld.

**§ 4.1.3** If the employment of the Architect is terminated, the Owner shall employ a new Architect against whom the Contractor has no reasonable objection and whose status under the Contract Documents shall be that of the former Architect.

**§ 4.2 ARCHITECT'S ADMINISTRATION OF THE CONTRACT**
**§ 4.2.1** The Architect will provide administration of the Contract as described in the Contract Documents, and will be an Owner's representative (1) during construction, (2) until final payment is due and (3) with the Owner's concurrence, from time to time during the one-year period for correction of Work described in Section 12.2. The Architect will have authority to act on behalf of the Owner only to the extent provided in the Contract Documents, unless otherwise modified in writing in accordance with other provisions of the Contract.

**§ 4.2.2** The Architect, as a representative of the Owner, will visit the site at intervals appropriate to the stage of the Contractor's operations (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/15/2009, and is not for resale.
User Notes:                                                                                    (2404291990)

Init.
/

17

AUA 000032

deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents, except as provided in Section 3.3.1.

§ 4.2.3 The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

§ 4.2.4 Communications Facilitating Contract Administration. Except as otherwise provided in the Contract Documents or when direct communications have been specially authorized, the Owner and Contractor shall endeavor to communicate with each other through the Architect about matters arising out of or relating to the Contract. Communications by and with the Architect's consultants shall be through the Architect. Communications by and with Subcontractors and material suppliers shall be through the Contractor. Communications by and with separate contractors shall be through the Owner.

§ 4.2.5 Based on the Architect's evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.

§ 4.2.6 The Architect will have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with Sections 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

§ 4.2.7 The Architect will review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action will be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review of the Contractor's submittals shall not relieve the Contractor of the obligations under Sections 3.3, 3.5 and 3.12. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

§ 4.2.8 The Architect will prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Section 7.4.

§ 4.2.9 The Architect will conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, will receive and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract and assembled by the Contractor, and will issue a final Certificate for Payment upon compliance with the requirements of the Contract Documents.

§ 4.2.10 If the Owner and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in an exhibit to be incorporated in the Contract Documents.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356698_1 which expires on 5/18/2009, and is not for resale.
User Notes:                                                                                                      (2404291990)

Init.
/

18

§ 4.2.11 The Architect will interpret and decide matters concerning performance under and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness. If no agreement is made concerning the time within which interpretations required of the Architect shall be furnished in compliance with this Section 4.2, then delay shall not be recognized on account of failure by the Architect to furnish such interpretations until 15 days after written request is made for them.

§ 4.2.12 Interpretations and decisions of the Architect will be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or decisions so rendered in good faith.

§ 4.2.13 The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

§ 4.3 CLAIMS AND DISPUTES

§ 4.3.1 Definition.  A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

§ 4.3.2 Time Limits on Claims. Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the Architect and the other party.

§ 4.3.3 Continuing Contract Performance. Pending final resolution of a Claim except as otherwise agreed in writing or as provided in Section 9.7.1 and Article 14, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents.

§ 4.3.4 Claims for Concealed or Unknown Conditions. If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall notify the Owner and Contractor in writing, stating the reasons. Claims by either party in opposition to such determination must be made within 21 days after the Architect has given notice of the decision. If the conditions encountered are materially different, the Contract Sum and Contract Time shall be equitably adjusted, but if the Owner and Contractor cannot agree on an adjustment in the Contract Sum or Contract Time, the adjustment shall be referred to the Architect for initial determination, subject to further proceedings pursuant to Section 4.4.

§ 4.3.5 Claims for Additional Cost.  If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.6.

§ 4.3.6 If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the Architect, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the Architect, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner's suspension or (7) other reasonable grounds, Claim shall be filed in accordance with this Section 4.3.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356692_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                          (2404291990)

19

AUA 000034

**§ 4.3.7** Claims for Additional Ti...

**§ 4.3.7.1** If the Contractor wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.

**§ 4.3.7.2** If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated and had an adverse effect on the scheduled construction.

**§ 4.3.8** Injury or Damage to Person or Property. If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, or of others for whose acts such party is legally responsible, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

**§ 4.3.9** If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order or Construction Change Directive so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

**§ 4.3.10** Claims for Consequential Damages. The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes:

.1    damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

.2    damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this Section 4.3.10 shall be deemed to preclude an award of liquidated direct damages, when applicable, in accordance with the requirements of the Contract Documents.

**§ 4.4 RESOLUTION OF CLAIMS AND DISPUTES**

**§ 4.4.1** Decision of Architect. Claims, including those alleging an error or omission by the Architect but excluding those arising under Sections 10.3 through 10.5, shall be referred initially to the Architect for decision. An initial decision by the Architect shall be required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Architect with no decision having been rendered by the Architect. The Architect will not decide disputes between the Contractor and persons or entities other than the Owner.

**§ 4.4.2** The Architect will review Claims and within ten days of the receipt of the Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise, or (5) advise the parties that the Architect is unable to resolve the Claim if the Architect lacks sufficient information to evaluate the merits of the Claim or if the Architect concludes that, in the Architect's sole discretion, it would be inappropriate for the Architect to resolve the Claim.

**§ 4.4.3** In evaluating Claims, the Architect may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist the Architect in rendering a decision. The Architect may request the Owner to authorize retention of such persons at the Owner's expense.

**§ 4.4.4** If the Architect requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either provide a response on the requested supporting data, advise the Architect when the response or supporting data will be furnished or advise the Architect that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Architect will either reject or approve the Claim in whole or in part.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                                        (2404291990)

Init.

20

**§ 4.4.5** The Architect will approve or reject Claims by written decision, which shall state the reasons therefor and which shall notify the parties of any change in the Contract Sum or Contract Time or both. The approval or rejection of a Claim by the Architect shall be final and binding on the parties but subject to mediation and arbitration.

**§ 4.4.6** When a written decision of the Architect states that (1) the decision is final but subject to mediation and arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 days' period shall result in the Architect's decision becoming final and binding upon the Owner and Contractor. If the Architect renders a decision after arbitration proceedings have been initiated, such decision may be entered as evidence, but shall not supersede arbitration proceedings unless the decision is acceptable to all parties concerned.

**§ 4.4.7** Upon receipt of a Claim against the Contractor or at any time thereafter, the Architect or the Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, the Architect or the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

**§ 4.4.8** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the Claim by the Architect, by mediation or by arbitration.

**§ 4.5 MEDIATION**

**§ 4.5.1** Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5 shall, after initial decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party.

**§ 4.5.2** The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to the Contract and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

**§ 4.5.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

**§ 4.6 ARBITRATION**

**§ 4.6.1** Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Section 4.5.

**§ 4.6.2** Claims not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect. Location of any Arbitration will be Antigua.

**§ 4.6.3** A demand for arbitration shall be made within the time limits specified in Sections 4.4.6 and 4.6.1 as applicable, and in other cases within a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined pursuant to Section 13.7.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356589_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                     (2404291990)

Init.

21

AUA 000036

§ 4.6.4 Limitation on Consolidation or Joinder. No arbitration arising out of or relating to the Contract shall include, by consolidation or joinder or in any other manner, the Architect, the Architect's employees or consultants, except by written consent containing specific reference to the Agreement and signed by the Architect, Owner, Contractor and any other person or entity sought to be joined. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Contractor, a separate contractor as described in Article 6 and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration. No person or entity other than the Owner, Contractor or a separate contractor as described in Article 6 shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim not described therein or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

§ 4.6.5 Claims and Timely Assertion of Claims. The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded.

§ 4.6.6 Judgment on Final Award. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 5 SUBCONTRACTORS
### § 5.1 DEFINITIONS
§ 5.1.1 A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

§ 5.1.2 A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

### § 5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK
§ 5.2.1 Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner through the Architect the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Architect will promptly reply to the Contractor in writing stating whether or not the Owner or the Architect, after due investigation, has reasonable objection to any such proposed person or entity. Failure of the Owner or Architect to reply promptly shall constitute notice of no reasonable objection.

§ 5.2.2 The Contractor shall not contract with a proposed person or entity to whom the Owner or Architect has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

§ 5.2.3 If the Owner or Architect has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner or Architect has no reasonable objection. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.

§ 5.2.4 The Contractor shall not change a Subcontractor, person or entity previously selected if the Owner or Architect makes reasonable objection to such substitute.

**Init.**

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                        (2404291980)

**22**

AUA 000037

**§ 5.3 SUBCONTRACTUAL RELA...S**

**§ 5.3.1** By appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumes toward the Owner and Architect. Each subcontract agreement shall preserve and protect the rights of the Owner and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement which may be at variance with the Contract Documents. Subcontractors will similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

**§ 5.4 CONTINGENT ASSIGNMENT OF SUBCONTRACTS**

**§ 5.4.1** Each subcontract agreement for a portion of the Work is assigned by the Contractor to the Owner provided that

.1    assignment is effective only after termination of the Contract by the Owner for cause pursuant to Section 14.2 and only for those subcontract agreements which the Owner accepts by notifying the Subcontractor and Contractor in writing; and

.2    assignment is subject to the prior rights of the surety, if any, obligated under bond relating to the Contract.

**§ 5.4.2** Upon such assignment, if the Work has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted for increases in cost resulting from the suspension.

**ARTICLE 6   CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS**

**§ 6.1 OWNER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS**

**§ 6.1.1** The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such Claim as provided in Section 4.3.

**§ 6.1.2** When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.

**§ 6.1.3** The Owner shall provide for coordination of the activities of the Owner's own forces and of each separate contractor with the Work of the Contractor, who shall cooperate with them. The Contractor shall participate with other separate contractors and the Owner in reviewing their construction schedules when directed to do so. The Contractor shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Contractor, separate contractors and the Owner until subsequently revised.

**§ 6.1.4** Unless otherwise provided in the Contract Documents, when the Owner performs construction or operations related to the Project with the Owner's own forces, the Owner shall be deemed to be subject to the same obligations and to have the same rights which apply to the Contractor under the Conditions of the Contract, including, without excluding others, those stated in Article 3, this Article 6 and Articles 10, 11 and 12.

**§ 6.2 MUTUAL RESPONSIBILITY**

**§ 6.2.1** The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No. 1000359699_1 which expires on 5/19/2009, and is not for resale.
User Notes:                                                                                        (2404291990)

Init.

23

AUA 000038

**§ 6.2.2** If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the Architect apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgment that the Owner's or separate contractor's completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

**§ 6.2.3** The Owner shall be reimbursed by the Contractor for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor. The Owner shall be responsible to the Contractor for costs incurred by the Contractor because of delays, improperly timed activities, damage to the Work or defective construction of a separate contractor.

**§ 6.2.4** The Contractor shall promptly remedy damage wrongfully caused by the Contractor to completed or partially completed construction or to property of the Owner or separate contractors as provided in Section 10.2.5.

**§ 6.2.5** The Owner and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in Section 3.14.

**§ 6.3 OWNER'S RIGHT TO CLEAN UP**
**§ 6.3.1** If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and the Architect will allocate the cost among those responsible.

**ARTICLE 7   CHANGES IN THE WORK**
**§ 7.1 GENERAL**
**§ 7.1.1** Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or order for a minor change in the Work, subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.

**§ 7.1.2** A Change Order shall be based upon agreement among the Owner, Contractor and Architect; a Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Architect alone.

**§ 7.1.3** Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive or order for a minor change in the Work.

**§ 7.2 CHANGE ORDERS**
**§ 7.2.1** A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect, stating their agreement upon all of the following:
   change in the Work;
 .2 the amount of the adjustment, if any, in the Contract Sum; and
 .3 the extent of the adjustment, if any, in the Contract Time.

**§ 7.2.2** Methods used in determining adjustments to the Contract Sum may include those listed in Section 7.3.3.

**§ 7.3 CONSTRUCTION CHANGE DIRECTIVES**
**§ 7.3.1** A Construction Change Directive is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.

**§ 7.3.2** A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

Init.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 8/16/2009, and is not for resale.
**User Notes:**

24

(2404291990)

AUA 000039

**§ 7.3.3** If the Construction Change Directive provides for an adjustment to the Contract Sum, the adjustment shall be based on one of the following methods:

.1    mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

.2    unit prices stated in the Contract Documents or subsequently agreed upon;

.3    cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or

.4    as provided in Section 7.3.6.

**§ 7.3.4** Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.

**§ 7.3.5** A Construction Change Directive signed by the Contractor indicates the agreement of the Contractor therewith, including adjustment in Contract Sum and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

**§ 7.3.6** If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the method and the adjustment shall be determined by the Architect on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, a reasonable allowance for overhead and profit. In such case, and also under Section 7.3.3.3, the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this Section 7.3.6 shall be limited to the following:

.1    costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.2    costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.3    rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;

.4    costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work; and

.5    additional costs of supervision and field office personnel directly attributable to the change.

**§ 7.3.7** The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the Contract Sum shall be actual net cost as confirmed by the Architect. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**§ 7.3.8** Pending final determination of the total cost of a Construction Change Directive to the Owner, amounts not in dispute for such changes in the Work shall be included in Applications for Payment accompanied by a Change Order indicating the parties' agreement with part or all of such costs. For any portion of such cost that remains in dispute, the Architect will make an interim determination for purposes of monthly certification for payment for those costs. That determination of cost shall adjust the Contract Sum on the same basis as a Change Order, subject to the right of either party to disagree and assert a claim in accordance with Article 4.

**§ 7.3.9** When the Owner and Contractor agree with the determination made by the Architect concerning the adjustments in the Contract Sum and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

**§ 7.4 MINOR CHANGES IN THE WORK**

**§ 7.4.1** The Architect will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and Contractor. The Contractor shall carry out such written orders promptly.

Init.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:

25

(2404291990)

AUA 000040

**ARTICLE 8   TIME**
**§ 8.1 DEFINITIONS**
**§ 8.1.1** Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, alloted in the Contract Documents for Substantial Completion of the Work.

**§ 8.1.2** The date of commencement of the Work is the date established in the Agreement.

**§ 8.1.3** The date of Substantial Completion is the date certified by the Architect in accordance with Section 9.8.

**§ 8.1.4** The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

**§ 8.2 PROGRESS AND COMPLETION**
**§ 8.2.1** Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

**§ 8.2.2** The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance required by Article 11 to be furnished by the Contractor and Owner. The date of commencement of the Work shall not be changed by the effective date of such insurance. Unless the date of commencement is established by the Contract Documents or a notice to proceed given by the Owner, the Contractor shall notify the Owner in writing not less than five days or other agreed period before commencing the Work to permit the timely filing of mortgages, mechanic's liens and other security interests.

**§ 8.2.3** The Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

**§ 8.3 DELAYS AND EXTENSIONS OF TIME**
**§ 8.3.1** If the Contractor is delayed at any time in the commencement or progress of the Work by an act or neglect of the Owner or Architect, or of an employee of either, or of a separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, or by delay authorized by the Owner pending mediation and arbitration, or by other causes which the Architect determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.

**§ 8.3.2** Claims relating to time shall be made in accordance with applicable provisions of Section 4.3.

**§ 8.3.3** This Section 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents.

**ARTICLE 9   PAYMENTS AND COMPLETION**
**§ 9.1 CONTRACT SUM**
**§ 9.1.1** The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

**§ 9.2 SCHEDULE OF VALUES**
**§ 9.2.1** Before the first Application for Payment, the Contractor shall submit to the Architect a schedule of values allocated to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

**§ 9.3 APPLICATIONS FOR PAYMENT**
**§ 9.3.1** At least ten days before the date established for each progress payment, the Contractor shall submit to the Architect an itemized Application for Payment for operations completed in accordance with the schedule of values. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:

Init.

26

(2404291990)

AUA 000041

payment as the Owner or Architect may require, such as copies of requisitions from Subcontractors and material suppliers, and reflecting retainage if provided for in the Contract Documents.

**§ 9.3.1.1** As provided in Section 7.3.8, such applications may include requests for payment on account of changes in the Work which have been properly authorized by Construction Change Directives, or by interim determinations of the Architect, but not yet included in Change Orders.

**§ 9.3.1.2** Such applications may not include requests for payment for portions of the Work for which the Contractor does not intend to pay to a Subcontractor or material supplier, unless such Work has been performed by others whom the Contractor intends to pay.

**§ 9.3.2** Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable insurance, storage and transportation to the site for such materials and equipment stored off the site.

**§ 9.3.3** The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information and belief, be free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

## § 9.4 CERTIFICATES FOR PAYMENT
**§ 9.4.1** The Architect will, within seven days after receipt of the Contractor's Application for Payment, either issue to the Owner a Certificate for Payment, with a copy to the Contractor, for such amount as the Architect determines is properly due, or notify the Contractor and Owner in writing of the Architect's reasons for withholding certification in whole or in part as provided in Section 9.5.1.

**§ 9.4.2** The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

## § 9.5 DECISIONS TO WITHHOLD CERTIFICATION
**§ 9.5.1** The Architect may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Section 9.4.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and Owner as provided in Section 9.4.1. If the Contractor and Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Owner. The Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Section 3.3.2, because of:

   **.1** defective Work not remedied;

**Init.**

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356690_1 which expires on 5/16/2009, and is not for resale.
User Notes: (404291990)

27

.2   third party claims . . . .ed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;

.3   failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

.4   reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

.5   damage to the Owner or another contractor;

.6   reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or

.7   persistent failure to carry out the Work in accordance with the Contract Documents.

**§ 9.5.2** When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

**§ 9.6 PROGRESS PAYMENTS**
**§ 9.6.1** After the Architect has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Contract Documents, and shall so notify the Architect.

**§ 9.6.2** The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner.

**§ 9.6.3** The Architect will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action thereon by the Architect and Owner on account of portions of the Work done by such Subcontractor.

**§ 9.6.4** Neither the Owner nor Architect shall have an obligation to pay or to see to the payment of money to a Subcontractor except as may otherwise be required by law.

**§ 9.6.5** Payment to material suppliers shall be treated in a manner similar to that provided in Sections 9.6.2, 9.6.3 and 9.6.4.

**§ 9.6.6** A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract Documents.

**§ 9.6.7** Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under a contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.

**§ 9.7 FAILURE OF PAYMENT**
**§ 9.7.1** If the Architect does not issue a Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Architect or awarded by arbitration, then the Contractor may, upon seven additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Contract Documents.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356693_1 which expires on 5/16/2009, and is not for resale.
User Notes:   (2404291990)

Init.

AUA 000043

## § 9.8 SUBSTANTIAL COMPLETION

§ 9.8.1 Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use.

§ 9.8.2 When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor shall prepare and submit to the Architect a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

§ 9.8.3 Upon receipt of the Contractor's list, the Architect will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Architect's inspection discloses any item, whether or not included on the Contractor's list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. In such case, the Contractor shall then submit a request for another inspection by the Architect to determine Substantial Completion.

§ 9.8.4 When the Work or designated portion thereof is substantially complete, the Architect will prepare a Certificate of Substantial Completion which shall establish the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

§ 9.8.5 The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of surety, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

## § 9.9 PARTIAL OCCUPANCY OR USE

§ 9.9.1 The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is consented to by the insurer as required under Section 11.4.1.5 and authorized by public authorities having jurisdiction over the Work. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the Architect as provided under Section 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Contractor or, if no agreement is reached, by decision of the Architect.

§ 9.9.2 Immediately prior to such partial occupancy or use, the Owner, Contractor and Architect shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

§ 9.9.3 Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

## § 9.10 FINAL COMPLETION AND FINAL PAYMENT

§ 9.10.1 Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 18:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                    (2404291990)

AUA 000044

Init.

the final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions listed in Section 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

**§ 9.10.2** Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final payment and (5), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

**§ 9.10.3** If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, and the Architect so confirms, the Owner shall, upon application by the Contractor and certification by the Architect, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Architect prior to certification of such payment. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

**§ 9.10.4** The making of final payment shall constitute a waiver of Claims by the Owner except those arising from:
1. liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;
2. failure of the Work to comply with the requirements of the Contract Documents; or
3. terms of special warranties required by the Contract Documents.

**§ 9.10.5** Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

**ARTICLE 10   PROTECTION OF PERSONS AND PROPERTY**
**§ 10.1 SAFETY PRECAUTIONS AND PROGRAMS**
**§ 10.1.1** The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

**§ 10.2 SAFETY OF PERSONS AND PROPERTY**
**§ 10.2.1** The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:
1. employees on the Work and other persons who may be affected thereby;
2. the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Subsubcontractors; and
3. other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

**§ 10.2.2** The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 03/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                  (2404281690)

Init.

30

§ 10.2.3 The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

§ 10.2.4 When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

§ 10.2.5 The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Sections 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Section 3.18.

§ 10.2.6 The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect.

§ 10.2.7 The Contractor shall not load or permit any part of the construction or site to be loaded so as to endanger its safety.

§ 10.3 HAZARDOUS MATERIALS
§ 10.3.1 If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing.

§ 10.3.2 The Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Contractor and the Architect will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If either the Contractor or Architect has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor and the Architect have no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up, which adjustments shall be accomplished as provided in Article 7.

§ 10.3.3 To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

§ 10.4 The Owner shall not be responsible under Section 10.3 for materials and substances brought to the site by the Contractor unless such materials or substances were required by the Contract Documents.

Init.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 08/24/2006 under Order No.1000355699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                              (2404291990)

31

AUA 000046

**§ 10.5** If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

**§ 10.6 EMERGENCIES**
**§ 10.6.1** In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Section 4.3 and Article 7.

**ARTICLE 11   INSURANCE AND BONDS**
**§ 11.1 CONTRACTOR'S LIABILITY INSURANCE**
**§ 11.1.1** The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

   .1   claims under workers' compensation, disability benefit and other similar employee benefit acts which are applicable to the Work to be performed;

   .2   claims for damages because of bodily injury, occupational sickness or disease, or death of the Contractor's employees;

   .3   claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;

   .4   claims for damages insured by usual personal injury liability coverage;

   .5   claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

   .6   claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle;

   .7   claims for bodily injury or property damage arising out of completed operations; and

   .8   claims involving contractual liability insurance applicable to the Contractor's obligations under Section 3.18.

**§ 11.1.2** The insurance required by Section 11.1.1 shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment.

**§ 11.1.3** Certificates of insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Work. These certificates and the insurance policies required by this Section 11.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment as required by Section 9.10.2. Information concerning reduction of coverage on account of revised limits or claims paid under the General Aggregate, or both, shall be furnished by the Contractor with reasonable promptness in accordance with the Contractor's information and belief.

**§ 11.2 OWNER'S LIABILITY INSURANCE**
**§ 11.2.1** The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance.

**§ 11.3 PROJECT MANAGEMENT PROTECTIVE LIABILITY INSURANCE**
**§ 11.3.1** Optionally, the Owner may require the Contractor to purchase and maintain Project Management Protective Liability insurance from the Contractor's usual sources as primary coverage for the Owner's, Contractor's and Architect's vicarious liability for construction operations under the Contract. Unless otherwise required by the Contract Documents, the Owner shall reimburse the Contractor by increasing the Contract Sum to pay the cost of purchasing and maintaining such optional insurance coverage, and the Contractor shall not be responsible for purchasing any other liability insurance on behalf of the Owner. The minimum limits of liability purchased with such coverage shall be equal to the aggregate of the limits required for Contractor's Liability Insurance under Sections 11.1.1.2 through 11.1.1.5.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                  (2404261990)

Init.
/

32

AUA 000047

**§ 11.3.2** To the extent damages are covered by Project Management Protective Liability insurance, the Owner, Contractor and Architect waive all rights against each other for damages, except such rights as they may have to the proceeds of such insurance. The policy shall provide for such waivers of subrogation by endorsement or otherwise.

**§ 11.3.3** The Owner shall not require the Contractor to include the Owner, Architect or other persons or entities as additional insureds on the Contractor's Liability Insurance coverage under Section 11.1.

**§ 11.4 PROPERTY INSURANCE**

**§ 11.4.1** Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Section 9.10 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.4 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project.

**§ 11.4.1.1** Property insurance shall be on an "all-risk" or equivalent policy form and shall include, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's and Contractor's services and expenses required as a result of such insured loss.

**§ 11.4.1.2** If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work. The Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor in writing, then the Owner shall bear all reasonable costs properly attributable thereto.

**§ 11.4.1.3** If the property insurance requires deductibles, the Owner shall pay costs not covered because of such deductibles.

**§ 11.4.1.4** This property insurance shall cover portions of the Work stored off the site, and also portions of the Work in transit.

**§ 11.4.1.5** Partial occupancy or use in accordance with Section 9.9 shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, without mutual written consent, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

**§ 11.4.2** Boiler and Machinery Insurance. The Owner shall purchase and maintain boiler and machinery insurance required by the Contract Documents or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner; this insurance shall include interests of the Owner, Contractor, Subcontractors and Sub-subcontractors in the Work, and the Owner and Contractor shall be named insureds.

**§ 11.4.3** Loss of Use Insurance. The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Contractor for loss of use of the Owner's property, including consequential losses due to fire or other hazards however caused.

**Init.** AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                     (2404291990)

**33**

AUA 000048

**§ 11.4.4** If the Contractor requests . . . writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Owner shall, if possible, include such insurance, and the cost thereof shall be charged to the Contractor by appropriate Change Order.

**§ 11.4.5** If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project; or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Section 11.4.7 for damages caused by fire or other causes of loss covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

**§ 11.4.6** Before an exposure to loss may occur, the Owner shall file with the Contractor a copy of each policy that includes insurance coverages required by this Section 11.4. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire, and that its limits will not be reduced, until at least 30 days' prior written notice has been given to the Contractor.

**§ 11.4.7 Waivers of Subrogation.** The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

**§ 11.4.8** A loss insured under Owner's property insurance shall be adjusted by the Owner as fiduciary and made payable to the Owner as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause and of Section 11.4.10. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

**§ 11.4.9** If required in writing by a party in interest, the Owner as fiduciary shall, upon occurrence of an insured loss, give bond for proper performance of the Owner's duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The Owner shall deposit in a separate account proceeds so received, which the Owner shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Section 4.6. If after such loss no other special agreement is made and unless the Owner terminates the Contract for convenience, replacement of damaged property shall be performed by the Contractor after notification of a Change in the Work in accordance with Article 7.

**§ 11.4.10** The Owner as fiduciary shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing within five days after occurrence of loss to the Owner's exercise of this power; if such objection is made, the dispute shall be resolved as provided in Sections 4.5 and 4.6. The Owner as fiduciary shall, in the case of arbitration, make settlement with insurers in accordance with directions of the arbitrators. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

**§ 11.5 PERFORMANCE BOND AND PAYMENT BOND**
**§ 11.5.1** The Owner shall have the right to require the Contractor to furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder as stipulated in bidding requirements or specifically required in the Contract Documents on the date of execution of the Contract.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/15/2009, and is not for resale.
User Notes:                                                                                      (2404281990)

Init.

34

§ 11.5.2 Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall permit a copy to be made.

## ARTICLE 12  UNCOVERING AND CORRECTION OF WORK
### § 12.1 UNCOVERING OF WORK
§ 12.1.1 If a portion of the Work is covered contrary to the Architect's request or to requirements specifically expressed in the Contract Documents, it must, if required in writing by the Architect, be uncovered for the Architect's examination and be replaced at the Contractor's expense without change in the Contract Time.

§ 12.1.2 If a portion of the Work has been covered which the Architect has not specifically requested to examine prior to its being covered, the Architect may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, correction shall be at the Contractor's expense unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

### § 12.2 CORRECTION OF WORK
#### § 12.2.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION
§ 12.2.1.1 The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense.

#### § 12.2.2 AFTER SUBSTANTIAL COMPLETION
§ 12.2.2.1 In addition to the Contractor's obligations under Section 3.5, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 9.9.1, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall give notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If the Contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner or Architect, the Owner may correct it in accordance with Section 2.4.

§ 12.2.2.2 The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual performance of the Work.

§ 12.2.2.3 The one-year period for correction of Work shall not be extended by corrective Work performed by the Contractor pursuant to this Section 12.2.

§ 12.2.3 The Contractor shall remove from the site portions of the Work which are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

§ 12.2.4 The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

§ 12.2.5 Nothing contained in this Section 12.2 shall be construed to establish a period of limitation with respect to other obligations which the Contractor might have under the Contract Documents. Establishment of the one-year period for correction of Work as described in Section 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract

Init.

/

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                         (2404291990)

35

AUA 000050

Documents may be sought to be ... rced, nor to the time within which proceedings ma .e commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

**§ 12.3 ACCEPTANCE OF NONCONFORMING WORK**
**§ 12.3.1** If the Owner prefers to accept Work which is not in accordance with the requirements of the Contract Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

**ARTICLE 13   MISCELLANEOUS PROVISIONS**
**§ 13.1 GOVERNING LAW**
**§ 13.1.1** The Contract shall be governed by the law of the place where the Project is located.

**§ 13.2 SUCCESSORS AND ASSIGNS**
**§ 13.2.1** The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Except as provided in Section 13.2.2, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

**§ 13.2.2** The Owner may, without consent of the Contractor, assign the Contract to an institutional lender providing construction financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under the Contract Documents. The Contractor shall execute all consents reasonably required to facilitate such assignment.

**§ 13.3 WRITTEN NOTICE**
**§ 13.3.1** Written notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice.

**§ 13.4 RIGHTS AND REMEDIES**
**§ 13.4.1** Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**§ 13.4.2** No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

**§ 13.5 TESTS AND INSPECTIONS**
**§ 13.5.1** Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Contractor shall give the Architect timely notice of when and where tests and inspections are to be made so that the Architect may be present for such procedures. The Owner shall bear costs of tests, inspections or approvals which do not become requirements until after bids are received or negotiations concluded.

**§ 13.5.2** If the Architect, Owner or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Section 13.5.1, the Architect will, upon written authorization from the Owner, instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Contractor shall give timely notice to the Architect of when and where tests and inspections are to be made so that the Architect may be present for such procedures. Such costs, except as provided in Section 13.5.3, shall be at the Owner's expense.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:28:35 on 09/24/2008 under Order No.1000355899_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                          (2404291990)

36

AUA 000051

§ 13.5.3 If such procedures for testing, inspection or approval under Sections 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, all costs made necessary by such failure including those of repeated procedures and compensation for the Architect's services and expenses shall be at the Contractor's expense.

§ 13.5.4 Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the Architect.

§ 13.5.5 If the Architect is to observe tests, inspections or approvals required by the Contract Documents, the Architect will do so promptly and, where practicable, at the normal place of testing.

§ 13.5.6 Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

§ 13.6 INTEREST
§ 13.6.1 Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

§ 13.7 COMMENCEMENT OF STATUTORY LIMITATION PERIOD
§ 13.7.1 As between the Owner and Contractor:
  .1   Before Substantial Completion. As to acts or failures to act occurring prior to the relevant date of
       Substantial Completion, any applicable statute of limitations shall commence to run and any alleged
       cause of action shall be deemed to have accrued in any and all events not later than such date of
       Substantial Completion;
  .2   Between Substantial Completion and Final Certificate for Payment. As to acts or failures to act
       occurring subsequent to the relevant date of Substantial Completion and prior to issuance of the final
       Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged
       cause of action shall be deemed to have accrued in any and all events not later than the date of
       issuance of the final Certificate for Payment; and
  .3   After Final Certificate for Payment. As to acts or failures to act occurring after the relevant date of
       issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to
       run and any alleged cause of action shall be deemed to have accrued in any and all events not later
       than the date of any act or failure to act by the Contractor pursuant to any Warranty provided under
       Section 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor
       under Section 12.2, or the date of actual commission of any other act or failure to perform any duty or
       obligation by the Contractor or Owner, whichever occurs last.

ARTICLE 14   TERMINATION OR SUSPENSION OF THE CONTRACT
§ 14.1 TERMINATION BY THE CONTRACTOR
§ 14.1.1 The Contractor may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:
  .1   issuance of an order of a court or other public authority having jurisdiction which requires all Work to
       be stopped;
  .2   an act of government, such as a declaration of national emergency which requires all Work to be
       stopped;
  .3   because the Architect has not issued a Certificate for Payment and has not notified the Contractor of
       the reason for withholding certification as provided in Section 9.4.1, or because the Owner has not
       made payment on a Certificate for Payment within the time stated in the Contract Documents; or
  .4   the Owner has failed to furnish to the Contractor promptly, upon the Contractor's request, reasonable
       evidence as required by Section 2.2.1.

§ 14.1.2 The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work

Init.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2009 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                        (240429 1990)

37

by the Owner as described in Se      1 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

§ 14.1.3 If one of the reasons described in Section 14.1.1 or 14.1.2 exists, the Contractor may, upon seven days' written notice to the Owner and Architect, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

§ 14.1.4 If the Work is stopped for a period of 60 consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has persistently failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon seven additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner as provided in Section 14.1.3.

## § 14.2 TERMINATION BY THE OWNER FOR CAUSE

§ 14.2.1 The Owner may terminate the Contract if the Contractor:

  .1  persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;

  .2  fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

  .3  persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction; or

  .4  otherwise is guilty of substantial breach of a provision of the Contract Documents.

§ 14.2.2 When any of the above reasons exist, the Owner, upon certification by the Architect that sufficient cause exists to justify such action, may without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's surety, if any, seven days' written notice, terminate employment of the Contractor and may, subject to any prior rights of the surety:

  .1  take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

  .2  accept assignment of subcontracts pursuant to Section 5.4; and

  .3  finish the Work by whatever reasonable method the Owner may deem expedient. Upon request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

§ 14.2.3 When the Owner terminates the Contract for one of the reasons stated in Section 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

§ 14.2.4 If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for the Architect's services and expenses made necessary thereby, and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or Owner, as the case may be, shall be certified by the Architect, upon application, and this obligation for payment shall survive termination of the Contract.

## § 14.3 SUSPENSION BY THE OWNER FOR CONVENIENCE

§ 14.3.1 The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

§ 14.3.2 The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 14.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent:

  .1  that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or

  .2  that an equitable adjustment is made or denied under another provision of the Contract.

Init.    AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:    (2404291990)

38

**§ 14.4 TERMINATION BY THE OWNER FOR CONVENIENCE**

**§ 14.4.1** The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

**§ 14.4.2** Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall:

   **.1**   cease operations as directed by the Owner in the notice;

   **.2**   take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

   **.3**   except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

**§ 14.4.3** In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.



AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No. 1000356699_1 which expires on 5/15/2009, and is not for resale.
User Notes:                                                                                       (2404291990)

**Init.**

**39**

## Additions and Deletions Report for
AIA Document A201™ – 1997

This Additions and Deletions Report, as defined on page 1 of the associated document, reproduces below all text the author has added to the standard form AIA document in order to complete it, as well as any text the author may have added to or deleted from the original AIA text. Added text is shown underlined. Deleted text is indicated with a horizontal line through the original AIA text.

Note: This Additions and Deletions Report is provided for information purposes only and is not incorporated into or constitute any part of the associated AIA document. This Additions and Deletions Report and its associated document were generated simultaneously by AIA software at 13:26:35 on 09/24/2008.

PAGE 1

American University of Antigua
College of Medicine

(Name and address):
AUA College of Medicine
c/o Greater Caribbean Learning Center
New York, NY 10005

...

(Name and address):
Sundaram Architects PVT. Ltd.
No. 19 Kumara Krupa Road,
Bangalore 560-001
India

PAGE 21

§ 4.6.2 Claims not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect. Location of any Arbitration will be Antigua.

Additions and Deletions Report for AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                    (2404281990)

1

AUA 000055

# EXHIBIT B

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

## CONSTRUCTION INDUSTRY ARBITRATION RULES
### Demand for Arbitration

**MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| Name of Respondent | Name of Representative (if known) |
|---|---|
| American University of Antigua - College of Medicine | Leonard Sclafani, Esq. |
| Address: | Name of Firm (if applicable) |
| c/o Manipal Education Americas, LLC, Agent for AUA | American University of Antigua - College of Medicine |
|  | Representative's Address: |
| One Battery Park Plaza, 33rd Floor | One Battery Park Plaza, 33rd Floor |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| New York | NY | 10004 | New York | NY | 10004 |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| 212-661-8849 | | 212-661-8849 | |

| Email Address: | Email Address: |
|---|---|
| | |

The named claimant, a party to an arbitration agreement dated September 25, 2008 _____, which provides for arbitration under the Construction Industry Rules of the American Arbitration Association, hereby demands arbitration.

ARBITRATION CLAUSE: Please indicate whether the contract containing the dispute resolution clause governing this dispute is a standard industry form contract (such as AIA, ConsensusDOCS or AGC) or a customized contract for the specific project.

Contract Form: AIA Document 201-1997

THE NATURE OF THE DISPUTE
See attached.

| Dollar Amount of Claim  $ | Other Relief Sought: ☒ Attorneys Fees    ☒ Interest |
|---|---|
| EC $83,059.56/US $30,762.80 | ☒ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other _____ |

Amount Enclosed $ 975.00 _____    In accordance with Fee Schedule:  ☐Flexible Fee Schedule  ☒Standard Fee Schedule

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Jorge R. Jimenez, Esq.; Hector M. Varela, PE, MBA, FASCE; or Jose Rafael Capo Lopez, Esq.

| Hearing locale requested San Juan, Puerto Rico | Project site AUA College of Medicine, Antigua |
|---|---|

| Estimated time needed for hearings overall: | Specify type of business:  Claimant General Contractor |
|---|---|
| _____ hours or    1.00    days | Respondent Medical School |

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| Signature (may be signed by a representative)    Date: 2/7/2013 | Name of Representative |
|---|---|
| | J. Scott Greer, Esq. |
| Name of Claimant | Name of Firm (if applicable) |
| Leeward Construction Company Limited | Lewis & Greer, P.C. |
| Address (to be used in connection with this case) | Representative's Address |
| All Saints Road, PO Box 1400 | 510 Haight Avenue, Suite 202 |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| St. Johns, Antigua | | | Poughkeepsie | NY | 12603 |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| 268-462-0071 | | 845-454-1200 | 845-454-3315 |

| Email Address: | Email Address: |
|---|---|
| info@leeward.ag | jsgreer@lewisgreer.com |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ  08043.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Case Filing Services can be reached at 877-495-4185.

**AMERICAN ARBITRATION ASSOCIATION**
**CONSTRUCTION INDUSTRY ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

Date: February 7, 2013

TO:   Neal S. Simon, President
American University of Antigua, College of Medicine
c/o Manipal Education Americas, LLC,
Agent for American University of Antigua, College of Medicine
Kasturba Medical College International Center
One Battery Park Plaza, 33rd Floor
New York, NY 10004

**PLEASE TAKE NOTICE THAT** Leeward Construction Company, Ltd. ("Leeward"), a party to a written agreement dated September 25, 2008 (the "Contract"), which, *inter alias* provides that:

§ 4.6 ARBITRATION

§ 4.6.1  Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration.

§ 4.6.2  Claims shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect.  The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect.  Location of any Arbitration will be Antigua.

(A copy of the "Agreement to Arbitrate" as set forth in the General Conditions to the Contract, is annexed hereto) hereby demands arbitration of the following disputes, which are subject to arbitration thereunder:

This dispute arises out of the construction of a medical school in St. Johns, Antigua. On September 25, 2008, Leeward, as general contractor, entered into a Contract with the Respondent, American University of Antigua — College of Medicine (the "AUA"), as owner, for the construction of the medical school for the fixed price of EC $27,436,824.00, subject to additions and deductions as provided in the contract documents.

**CLAIMANT** seeks recovery of contract funds in the amount of EC$83,059.56/US$30,762.80[1] that were inadvertently mis-tabulated as Antigua and Barbuda Sales Tax during the requisition process. The Respondent admitted owing these funds at a prior related arbitration proceeding entitled *Leeward Construction Company, Inc. v. American University of Antigua, College of Medicine*, Case No. 50 110 T 00075 11, Jose R. Capo, Esq., Jorge R. Jimenez, Esq. and Hector M. Varela, PE, MBA, FASCE. The relevant facts as previously determined by the Arbitration Tribunal are set forth in the Arbitration Award dated June 22, 2012, as modified by The Final Arbitration Award dated August 8, 2012. The issue concerning the ABST is set forth on pages 11-12 and 27-28 of the Award. (A copy of the award as modified is attached hereto and incorporated herein.)

CLAIMANT seeks cost of arbitration

CLAIMANT seeks attorneys fees.

---

[1]  The Arbitration Tribunal awarded damages in Eastern Carribean Dollars ("EC"). As of June 22, 2012 and August 8, 2012, the conversion rate for Eastern Caribbean dollars to United States dollars is 0.3704 United States dollars for each Eastern Caribbean dollar, and United States dollar to Eastern Caribbean dollar is 2.700 Eastern Caribbean dollars for each United States dollar. *See* http://www.likeforex.com. For purposes of this Petition/Motion, the Petitioner will reference the award going forward in both United States Dollars and Eastern Caribbean Dollars.

**PLEASE TAKE FURTHER NOTICE** that in accordance with §4.61 of the General Conditions to the Contract, a written claim, dated November 20, 2012 and supplemented on December 21, 2012, upon which this demand for arbitration is founded, was served upon Sundaram Architects Pvt. Ltd. ("Sundaram Architects") and the AUA, and that the AUA having the power to pay the claims have neglected or refused to make payment thereof for more than thirty (30) days after such presentment.

**YOU ARE HEREBY NOTIFIED** that a copy of this Demand for Arbitration with a copy of the agreement to arbitrate will be filed with the International Center for Dispute Resolution, American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043, USA location, with a request that it commence administration of the arbitration pursuant to the Construction Industry Rules. Under the rules, you may file a Statement of Defense within the time specified in the rules after notice from the administrator.

Dated: February 7, 2013
      Poughkeepsie, New York

Leeward Construction Co. Ltd.

By:_____
     J. Scott Greer, Esq.
     **Lewis & Greer, P.C.**
     *Attorney for Claimant,*
     *Leeward Construction Co. Ltd.*
     510 Haight Avenue, P.O. Box 5990
     Poughkeepsie, New York 12603
     Tel: (845) 454-1200
     email: jsgreer@lewisgreer.com

cc:    Eric Linde, Chairman
      Leeward Construction Co. Ltd.
      All Saints Road, P.O. Box 1400
      St. Johns, Antigua
      Tel: (268) 462-0071
      email: info@leeward.ag

§ 4.4.5 The Architect will approve or reject Claims by written decision, which shall state the reasons therefor and which shall notify the parties of any change in the Contract Sum or Contract Time or both. The approval or rejection of a Claim by the Architect shall be final and binding on the parties but subject to mediation and arbitration.

§ 4.4.6 When a written decision of the Architect states that (1) the decision is final but subject to mediation and arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 days' period shall result in the Architect's decision becoming final and binding upon the Owner and Contractor. If the Architect renders a decision after arbitration proceedings have been initiated, such decision may be entered as evidence, but shall not supersede arbitration proceedings unless the decision is acceptable to all parties concerned.

§ 4.4.7 Upon receipt of a Claim against the Contractor or at any time thereafter, the Architect or the Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, the Architect or the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

§ 4.4.8 If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the Claim by the Architect, by mediation or by arbitration.

## § 4.5 MEDIATION

§ 4.5.1 Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5 shall, after initial decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party.

§ 4.5.2 The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to the Contract and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

§ 4.5.3 The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

## § 4.6 ARBITRATION

§ 4.6.1 Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Section 4.5.

§ 4.6.2 Claims not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect. Location of any Arbitration will be Antigua.

§ 4.6.3 A demand for arbitration shall be made within the time limits specified in Sections 4.4.6 and 4.6.1 as applicable, and in other cases within a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined pursuant to Section 13.7.

Init.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                                          (2404291990)

21

LC000036

AUA 000036

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| LEEWARD CONSTRUCTION COMPANY, LTD., **Claimant,** vs. **AMERICAN UNIVERSITY OF ANTIGUA – COLLEGE OF MEDICINE, Respondent.** | Case No.: 50 110 T 00075 11 |

### FINAL AWARD

We, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the Arbitration Agreement entered into between the above named parties and dated September 25, 2008, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and the parties having agreed that the Arbitrators need to render a reasoned award, do hereby, AWARD, as follows:

**I.    BRIEF PROCEDURAL BACKGROUND:**



The present case was brought on February 3, 2011 by Leeward Construction Company, LTD. ("Leeward") against American University of Antigua – College of Medicine ("AUA"), claiming the amount of EC $13,161,137[1] from a dispute that arose out of the construction of a medical school in St. Johns, Antigua. Leeward claimed that AUA breached their contract and sought remedies under § 4.6 of the Contract, henceforth demanded arbitration for the disputes set forth in their claim.



AUA filed a response on March 4, 2011, stating that Leeward's claim was so vague, confusing and contradictory that AUA was not in the position to understand the basis for the claims.

The Panel was selected and sworn on July 6th, 2011, comprised by Attorneys José R. Capo, Jorge R. Jimenez and Professional Engineer Héctor M. Varela. Attorney Jimenez was designated Chair of the Panel.

On October 14, 2011, Leeward filed an Amended Demand for Arbitration seeking EC $6,800,572.28 in damages. AUA filed its Answering Statement and Counterclaim on November 30, 2011.

---

[1] Whenever reference is made to a monetary sum, same shall be understood to be represented in Eastern Caribbean (EC) dollars, unless otherwise stated.

On December 12, 2011, Leeward filed a Statement objecting AUA's claims for liquidated damages and delay damages, arguing that such claims have been presented untimely. On December 23, 2011, AUA's filed a Statement in opposition to the motion presented by Leeward to dismiss AUA's counterclaims, asserting the timeliness of its claims.

Afterwards both parties commenced discovery proceedings and filed numerous motions including dispositive motions, the resolution of which the Panel held in abeyance until the holding of the Hearings to be decided as part of the Final Award. We will discuss same in detail in **Section III** of this Award. The Hearings were held in the Marriott Courtyard in Isla Verde, Puerto Rico, from March 5th through March 9th, 2012. On April 11, 2012, AUA withdrew from its Answering Statement and Counterclaim the portion that sought actual damages and left only those claims for liquidated damages in the amount of US $117,000 and for attorneys' fees and expenses. As per their request, the parties submitted their Proposed Findings of Facts and Conclusions of Law on April 20, 2012. The parties also submitted rebuttal briefs on May 4th, 2012.

The Panel declared the hearings closed and the case submitted for resolution on May 22, 2012.

This case was administered under the AAA Construction Industry Arbitration Rules ("CIAR") as amended and in effect October 1, 2009.




## II. UNCONTESTED FACTS:

1. Leeward is a corporation duly organized and existing under the laws of the Commonwealth of Antigua and Barbuda, with office and principal place of business at All Saints Road, St. Johns, Antigua.

2. AUA is owned by the GCLR, LLC, a limited liability company organized and existing under the laws of the State of New York, with office and principal place of business at 1 Battery Park Plaza, 33rd Floor, New York, New York, U.S.A.

3. In the Spring of 2008, AUA and Leeward began to negotiate the terms of a contract to construct the structural works portion of the AUA's new medical school campus in Antigua.

4. AUA and Leeward entered into a Letter of Intent on or about April 21, 2008 which was signed by Neal Simon, President of AUA, and Andy Green, Managing Director of Leeward. A copy of the April 21, 2008 Letter of Intent was marked as LC 69.

5. AUA and Leeward entered into a second Letter of Intent on or about May 10, 2008, which was signed by Corey Greenberg, Chief Operating Officer of AUA, and Andy Green, Managing Director of Leeward. A copy of the May 10, 2008 Letter of Intent was marked as LC 70.

6. On September 25, 2008, Leeward (as contractor) and AUA (as project owner) executed a contract for the construction of the College of Medicine in St. John's

2

Antigua for the fixed price of EC $27,436,824.00, subject to additions and deductions as provided in the Contract Documents, under the AIA Contract Document (A101-1997).

7.　　The parties agreed that the commencement date for the works was May 1, 2008.

8.　　Leeward had to achieve substantial completion of the entire work in 364 calendar days or as follows:

| Portion of the work | Substantial Completion Date |
|---|---|
| Classroom block | 29/01/2009 |
| Lab Block | 06/03/2009 |
| Service Block | 29/01/2009 |
| Library and Admin. Block | 30/04/2009 |

9.　　Lt. Colonel Roche Antony was AUA's representative for the project and signed the Contract Documents on AUA's behalf.

10.　　Neil Dickinson was Leeward's Project Manager for the project and signed the Contract Documents on Leeward's behalf.

11.　　Sundaram Architects Pvt., Ltd. ("SAPL" or the Architect") was the architect that designed AUA's new Medical School Campus. A.S. Nagesh served as the Architect's representative.

12.　　Leeward and AUA also entered into a number of Separate Contracts, including a contract to install the doors and windows dated July 13, 2009 (marked as LC 228) and a contract of laying floor tiles dated July 13, 2009 (marked as LC 229).

13.　　On February 3, 2011, Leeward filed a Demand for Arbitration seeking EC$13,161,137.00 in damages.

14.　　On October 14, 2011, Leeward filed an Amended Demand for Arbitration seeking EC$6,800,572.28 in damages.

III.　TRIAL EXHIBITS:

A) Leeward's Trial Exhibits

*Exhibit list 1-245 as amended by the Joint Post-Hearing Motion, dated April 12, 2012.*

B) AUA's Trial Exhibits

*Exhibit list 1-71 as amended by the Joint Post-Hearing Motion, dated April 12, 2012.*

3.

IV.    WITNESSES:

A) Leeward's Witnesses

1. Robert Winwood-Senior Quantity Surveyor for Leeward, from Sept. 1, 2008-August 14, 2009.  He was responsible for administration and surveying of the work with respect to the Construction of the AUA Project.

2. Eric Linde-Director of Leeward.  Over 45 years of hands on experience in the Construction Industry in Antigua and US.

3. Neil Dickinson-Projects Director for Leeward from March 1, 2007 to Feb. 17, 2009, then managing director until Oct. 9, 2009, and was responsible for contract negotiations and administration of the works with respect to the Construction of the AUA Project.

4. Andy Green-Managing Director of Leeward.

B) AUA's Witnesses

1. Prabhu Marudheri-Executive Director of Finance for GCLE, LLC, an agent for AUA.

2. Peter McLeod-Partner with DHP Associates, a firm of Chartered Quantity Surveyors and Project Managers located in the Bahamas.

3. A.S.Nagesh-Architects' representative.

4. Lt. Col. Roche Antony-General Manager on behalf of AUA, for the project.

V.    INTERLOCUTORY MATTERS:

1.    Controversy:

Leeward's request to strike the testimony of AUA's witness Peter McLeod based on the fact that same is expert testimony, which AUA had represented it would not be using.  The Panel must decide if said testimony is factual or expert testimony.

Panel's Decision:

*Refer to the Panel's Decision in section VI. (A-25).*

2.    Controversy:

AUA's motion requesting dismissal of Leeward's claims for amounts unpaid or due under the contracts for additional work.  The Panel must decide if: (1) Leeward's claim for unpaid

4

balances and monies owed for additional works was included in the Amended Demand for Arbitration; henceforth, providing AUA with due process; and (2) if the parties submitted to arbitration said claims in this proceeding.

Panel's Decision:

After reviewing both parties' arguments and careful analysis of the questions posed, this Panel finds that all claims arising from the Separate Contracts are not subject to this Arbitration. We find in favor of AUA and conclude that the arbitration clause that both parties agreed to, only reached claims arising out of or relating to the original Contract. Nothing in the Separate Contracts evidence intent from the parties to subject same to arbitration, nor does the record show that AUA agreed to arbitrate disputes under the Separate Contracts.

3. Controversy:

AUA's motion requesting that Leeward's claims be dismissed for untimely filing. This Panel must decide if dismissal is appropriate against Leeward, because Leeward's claim for final payment was initiated in violation of the 21 day notice requirement, and because Leeward's 16-20 month delay in commencing arbitration was unreasonable.

Panel's Decision:

After due analysis, this Panel denies AUA's motion requesting that Leeward's claims be dismissed for untimely filing.

4. Controversy:

Leeward's motion requesting that AUA's counterclaim be dismissed for untimely filing. This Panel must determine if AUA filed the counterclaim within the time period stated under Section R-4(c)(ii) of the AAA's CIAR.

Panel's Decision:

After due analysis, this Panel denies Leeward's motion requesting that AUA's counterclaim be dismissed for untimely filing.

VI.    CONTROVERSIES SUBMITTED TO THE PANEL FOR RESOLUTION:

A.    Claimant's (Leeward's) controversies submitted to arbitration:

1.    Controversy:

Whether the Contract is a fixed price contract subject to additions or deletions by change order or whether the Contract price is based upon measured works?

Panel's Decision:

The Panel rules that the Contract is a fixed price contract subject to additions and deletions. Leeward is entitled to receive compensation for work performed. Even though the Contract provides that additions and deletions should be made by formal change orders, from the evidence considered by the Panel it appears that both parties waived this requirement.

2.    Controversy:

Whether AUA breached the Contract with respect to the issuance of change orders, certificates of substantial completion, certificate of final completion, the review, certification, and payment of payment requisitions, the determination of claims, and the administration of the Contract?

Panel's Decision:

This Panel finds that both parties failed in their contractual responsibility to follow and enforce the General Conditions of the Contract AIA 201-1997. The respective liability of each party with respect to certain claims will be addressed in this Final Award.

6

3.  Controversy:

Whether AUA breached the Contract by failing to timely pay the amount due on payment requisitions?

Panel's Decision:

This Panel finds that AUA did breach the Contract on this matter. In many instances AUA had concerns regarding the quantities invoiced, however, there were reasonable alternatives in case the parties did not reach an agreement to issue the partial payments, as stated in Article 9.5.1 of the Contract. This Panel rules that holding the entire amount was far from reasonable and fair.

4.  Controversy:

If AUA breached the Contract by failing to timely pay the amount due on payment requisitions, is Leeward entitled to interest on the late payments at the legal rate under the laws of Antigua and if so, whether 10% per annum is the proper rate?

Panel's Decision:

This Panel finds that Leeward is entitled to interest on the payments due and unpaid as set forth under sections 7.2 and 13.6.1 of the Contract and General Conditions. However, this Panel agrees with AUA in that the interest agreed upon by the parties was the "legal rate" and therefore interest shall be calculated at 7% per annum.

5.  Controversy:

If the Contract was for a fixed price, is Leeward entitled to payment for work that AUA omitted, deleted or modified from the Contract's original scope of work?

Panel's Decision:

No. Leeward is only entitled to payment for work performed. However, this Panel finds that Leeward is entitled to damages in the amount of EC $ 232,670.13 for work that was deleted

from the Contract and then assigned to Leeward under Separate Contracts, under the bad faith doctrine.

6.    Controversy:

If the Contract price is based upon measured works, what adjustments should be made to the Contract sum for work omitted, deleted or modified from the Contract's original scope of work despite the AUA's failure and refusal to issue change orders?

  Panel's Decision:

The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a decrease in the Contract Sum shall be the actual net cost.

7.    Controversy:

If the Contract was based upon measured works, is Leeward entitled to overhead and/or profit for work omitted, deleted or modified from the Contract's original scope of work and if so, what amount is Leeward entitled to for overhead and/or profit on omitted, deleted or modified work?

  Panel's Decision:

The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a decrease in the Contract Sum shall be the actual net cost. When both additions and credits covering related work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change, i.e., AIA Document A201-1997 General Conditions of the Contract for Construction, Section 7.3.7. Therefore, Leeward is entitled to overhead and profit for work omitted, deleted or modified as claimed, except for the $185,425.07 of overhead and profit for the Doors & Windows and Flooring works that were deleted from the Contract's original scope of work and then given to Leeward under a Separate Contract.

8

8.  Controversy:

What amount is Leeward entitled to for additions to the Contract that should have been added pursuant to change orders had AUA properly issued change orders on the Project?

Panel's Decision:

This Panel finds that Leeward is entitled to receive compensation for work performed, despite any formal change orders, based on Measured Work and the Bill of Quantities (BOQ).

9.  Controversy:

Whether AUA was responsible for project delays that impaired Leeward's ability to substantially complete the Contract work by the substantial completion dates in the Contract, as extended?

Panel's Decision:

After a careful study and analysis of the witness statements as well as the evidence presented, the Panel finds that both parties were equally responsible for the project delays. Leeward failed to reach substantial completion of the project in the time that was agreed upon. The numerous delays and changes to the drawings and the fact that AUA had knowledge of Leeward's request for extension of time, draw us to determine equal responsibility for both parties regarding the delays in the substantial completion.

10.  Controversy:

If AUA is responsible for project delays that impaired Leeward's ability to complete the project by the substantial completion dates in the Contract as extended, then what amount is Leeward entitled to for additional preliminaries as a result of the AUA's actions?

Panel's Decision:

This Panel finds that both parties were equally responsible for the project delays. Consequently, we find AUA responsible for 50% of the Additional Preliminaries in the

amount of EC $477,777.04 and such amount is hereby granted in favor of Leeward.

11. Controversy:

Whether Leeward was responsible for the project delays that caused it to fail to substantially complete the work by the Contract's deadlines?

Panel's Decision:

No. *Refer to Panel Decisions in Section VI. (A-9) and (A-10), above.*

12. Controversy:

If Leeward is responsible for the project delays that caused it to fail to substantially complete the work by the Contract's deadlines, what amount is due from Leeward to AUA for liquidated damages?

Panel's Decision:

*Refer to Panel Decisions in Section VI. (A- 9), (A-10) and (B-36), above.*

13. Controversy:

Whether Leeward substantially complied with the notice of claim provision in the Contract?

Panel's Decision:

By reason of the conduct of the parties during the development, construction and liquidation of the Project, the Panel concludes that the time limit for the notice of claims stipulated in Section 4.3.2 of the General Conditions was waived, as well as Section 4.6.3 of the General Conditions referring to the initiation of an arbitration process. This decision is applicable to both parties.

14. Controversy:

If Leeward did not substantially comply with the notice of claim provision in the Contract, whether AUA waived compliance with such provision?

Panel's Decision:

*See Panel's Decision of Controversy in Section VI. (A-13), above.*

10

15. Controversy:

Whether AUA substantially complied with the notice of claim provision in the Contract?

Panel's Decision:

*See Panel Decisions in Section VI, (A-14) and (A-15), above.*

16. Controversy:

Whether Leeward is entitled to pre-judgment interest on its damages as a result of the AUA's breach of the Contract?

Panel's Decision:

This Panel is awarding pre-judgment interest to Leeward from October 31, 2009, as detailed in the Award, at the rate of 7% per annum.

17. Controversy:

If Leeward is entitled to pre-judgment interest on its damages, is 10% per annum the appropriate rate of interest to be charged under the laws of Antigua and if so, from what date should the interest begin to run?

Panel's Decision:

Yes. *But see Panel's Decision to Controversy 16, above.*

18. Controversy:

Whether Leeward is entitled to payment in the amount of US $30,743.20/EC $83,000.00 for the AUA's acknowledged error in the calculation of ABST payments?

Panel's Decision:

This Panel finds that the ABST error was mutually acknowledged by both parties, and not having been originally claimed and submitted as a controversy in this Arbitration and having been discovered and in good faith informed by AUA representatives during the Hearings,

11

the Panel concludes that this claim should be corrected outside of the context of this Arbitration.

19.  <u>Controversy:</u>

If Leeward is not entitled to any other damages in this proceeding, whether Leeward is entitled to the payment of US $218,566.74/EC $590,083.00 in retainage?

   <u>Panel's Decision:</u>

After careful consideration regarding the works that were deleted from the Contract and then assigned to Leeward under Separate Contracts, this Panel finds that Leeward is entitled to damages under the bad faith doctrine.  Therefore, this Panel grants Leeward damages in an amount equal to EC $232,670.13.  As per Leeward's claim for retainage, *refer to the Panel's Decision in section **VI. (B-29)** infra.*

20.  <u>Controversy:</u>

If AUA breached the Contract, is Leeward entitled to damages as specified in Claimant's Proposed Findings of Fact and Conclusions of Law Paragraphs 130, 131, or 133 or some other amount?

   <u>Panel's Decision:</u>

The Panel finds that both parties breached the Contract and therefore, in some instances share direct responsibility for same.  As such, this Panel will not grant damages to Leeward as requested, but as specifically provided in the Award on page 31.

21.  <u>Controversy:</u>

Whether the additional works contracts Leeward entered into with AUA are subject to arbitration?

   <u>Panel's Decision:</u>

The Panel finds that the additional works contracts are not subject to this Arbitration.

22. Controversy:

If the additional works contracts are subject to arbitration, then what is the amount due from AUA to Leeward for the unpaid balances on the additional works contracts?

Panel's Decision:

The Panel finds that the Separate Contracts Leeward entered into with AUA are not subject to this Arbitration.

23. Controversy:

Whether the arbitration was commenced within a reasonable time not to exceed the statute of limitations for breach of contract actions under the laws of Antigua?

Panel's Decision:



The Panel finds that this Arbitration was commenced timely.

24. Controversy:

What is the statute of limitations for breach of contract actions under the laws of Antigua?

Panel's Decision:

The Panel finds that this Arbitration was commenced within the six (6) year term.

25. Controversy:

Whether the Panel should strike the AUA's witness statement of Peter McLeod on the grounds that Mr. McLeod's witness statement constitutes an expert opinion that AUA failed to disclose until the eve of the hearing after representing to the Panel during a telephone conference on December 15, 2011 that it did not foresee the use of expert witness testimony?

Panel's Decision:

This Panel finds that Peter McLeod's testimony is not that of an expert witness. Therefore, all parts of his witness statement and testimony rendered based on his opinion as an expert are stricken from the record. However, this Panel considered as factual the testimony

13

offered by Peter McLeod which relates to his personal knowledge and intervention in the negotiation of the Contract Documents, and will give it the probatory value it deems appropriate.

26.  Controversy:

Whether Leeward is entitled to attorneys' fees, arbitration fees, expenses and compensation as provided under the laws of Antigua or otherwise?

   Panel's Decision:

Considering that both parties shared responsibility regarding some of the controversies submitted and in the management of the Contract, the Panel finds no compelling reason to grant attorney's fees, arbitration fees, expenses and compensation as provided under the laws of Antigua or otherwise.  Each party shall bear their own attorneys' fees, arbitration expenses and such the like.

B.  RESPONDENTS (AUA'S) CONTROVERSIES SUBMITTED TO ARBITRATION:

1.  Controversy:

Is Leeward barred from seeking to be paid EC $1,604,617 for work it did not perform as a result of design changes and site conditions (like the chain link fence) (the "Omitted Work") because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a Claim throughout the course of construction and no later than October 2009, but initiated it no sooner than December 17, 2010 - 14 months later?

   Panel's Decision:

The Panel finds that Leeward is barred from seeking to be paid for work it did not perform, not because it failed to initiate a claim, but because the evidence received and considered by the Panel is that the Contract was a fixed sum contract subject to additions and deductions, and Leeward would be paid for work it actually performed, based on the BOQ.

14

In regards to the "timeliness" of Leeward's claim, it is the determination of the Panel that both parties breached various provisions of the Contract and are, therefore, barred from enforcing said provisions against each other.

2.  Controversy:

Even if Leeward had initiated a claim timely, is Leeward entitled to be paid for the Omitted Work on the ground that AUA did no document changes in the scope of Leeward's work by issuing formal change orders in the manner provided by Section 7 of the General Conditions, or did the parties waive the formal change order procedure by implementing another method, i.e., the monthly requisition process, to document additions and deductions to the Contract Sum, as evidenced by the parties' course of conduct throughout the duration of the Project?

   Panel's Decision:

*See Panel's Decision to Controversy 1, supra.*

3.  Controversy:

Is Leeward barred from pursuing its new alternative claim that it be paid overhead and profit on the Omitted Work for one or more of the following separate reasons:

   a)  Because Leeward asserted its new alternative claim for the first time in its post-trail submission, in violation of Section R-6(b) of the AAA's CIAR, thereby depriving AUA of a fair opportunity to proffer a defense? Or

   b)  Because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a claim throughout the course of the construction and no later than October 2009, but never initiated a claim and raised the issue for the first time in Leeward's April 2012 Proposed Findings of Facts and Conclusion of Law? Or

   c)  Because the new claim was not asserted in Leeward's February 3, 2011 Demand for Arbitration or its October 14, 2011 Amended Demand for Arbitration, but instead raised for the first time on April 20, 2012, in violation of Section 4.6.5 of the General Conditions, which provides that the "party filing a notice of demand for arbitration must assert in the demand all claims then known to that party on which arbitration is permitted to be demanded"?



15

Panel's Decision:

This Panel will not exclude any claim under the sole contention of timeliness. Therefore, Leeward is not barred from pursuing its claim for the payment of overhead and profit on the Omitted Work.

4.    Controversy:

Even if Leeward had initiated its new alternative claim for overhead and profit on the Omitted Work timely in accordance with the Contract Documents and the CIAR, is Leeward entitled to be paid overhead and profit on the Omitted Work given the testimony that the parties intended to use the Bills of Quantities to value changes to the scope of the work necessitated by design changes and site conditions, and given that Leeward never sought to be paid its overhead and profit Omitted Work?

Panel's Decision:

Yes. This Panel finds that Leeward is entitled to overhead and profit for work omitted, deleted or modified, except for the $185,425.07 of overhead and profit for the Doors & Windows and Flooring works that were deleted from the Contract's original scope of work and then given to Leeward under a Separate Contract.

5.    Controversy:

Is Leeward barred from seeking to be paid for the Flooring Work that AUA deleted from Leeward's scope of work because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward admits it was aware of the facts giving rise to such a claim no later than April 21, 2009, but initiated a claim no sooner than December 17, 2010 – 20 months later?

Panel's Decision:

The Panel finds that both parties were at fault with their mutual responsibilities in following and enforcing the General Conditions of the Contract, therefore, this Panel will not exclude

16

any claim under the sole contention of timeliness. The evidence also showed that Leeward in many instances notified AUA of its claims, even though it was not in the manner set forth in the Contract. Therefore, the Panel finds that Leeward is entitled to receive compensation for work performed; however, with regard to the Flooring Work, which is part of the Separate Contracts, same is not subject to this Arbitration.

6. Controversy:

Even if Leeward had initiated a claim timely, is Leeward entitled to be paid for the Flooring Work that AUA deleted from Leeward's scope of work on the ground that AUA did not document the deletion of this work by issuing formal change orders in the manner provided by Section 7 of the General Conditions, or did the parties waive the formal change order procedure by implementing another method, i.e., the monthly requisition process, to document additions and deductions to the Contract Sum, as evidenced by the parties' course of conduct throughout the duration of the Project?

Panel's Decision:

The Panel finds that the Separate Contracts are not subject to this Arbitration. Therefore, this Panel will not grant remedies for the Flooring Work.

7. Controversy:

Is Leeward barred from pursuing its new alternative claim that it be paid overhead and profit on the Flooring Work (EC $1,741,032 * 18% = EC $313,385.76) for one or more of the following separate reasons:

   a) Because Leeward asserted this new alternative claim for the first time in its post-trial submissions, in violation of CIAR R-6(b), thereby depriving AUA of a fair opportunity to proffer a defense? Or

   b) Because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a claim on April 21, 2009 and no later than October 2009, but never initiated a claim and raised the issue for the first time in Leeward's April 20, 2012 Proposed Findings of Fact and Conclusions of Law? Or

17

c) Because the new alternative claim was not asserted in Leeward's February 3, 2011 Demand for Arbitration or its October 14, 2011 Amended Demand for Arbitration, but instead raised for the first time on April 20, 2012, in violation of Section 4.6.5 of the General Conditions, which provides that the "party filing a notice of demand for arbitration must assert in the demand all claims then known to that party on which arbitration is permitted to be demanded"?

Panel's Decision:

The Panel finds that each party is barred from alleging non-compliance against each other regarding the terms of the Contract under the sole contention of timeliness and, therefore, will consider all claims brought without regard to timeliness. However, this Panel finds that Leeward is entitled to overhead and profit for work omitted, deleted or modified, but not for the Flooring Work, which was given to Leeward under a Separate Contract.

8. Controversy:

Even if Leeward had initiated its alternative claim for overhead and profit on the Flooring Work timely under the Contract Documents and the CIAR, is Leeward entitled to be paid EC $313,385.76 in overhead and profit on the Flooring Work given that Leeward entered into a separate contract with AUA on July, 2009 to perform this work, and was paid under the terms of that separate contract?

Panel's Decision:

No. Refer to Panel's Decision in Section VI (B-7), above.

9. Controversy:

There is no decision to render with respect to the Modified Work Delta of negative EC $14,294.10. Leeward is not seeking to recover any money reflected in this delta, which reflects that Leeward was paid more by seeking payment for work "as built" and in accordance with the "final measure" that it would have received had it been paid based upon the measurements in the initial Bills of Quantities.

18

Panel's Decision:

This Panel finds that Controversy number 9, as stated by AUA, does not require the Panel's decision for it does not constitute a claim. In the alternative, the Panel finds the claim to be inadmissible and therefore, dismissed and denied.

10. Controversy:

Is Leeward barred from pursuing its May 11, 2009 Claim for an Extension of Time and the accompanying Additional Preliminaries in the amount of EC $955,554.08 (the difference between the EC $5,891,857.68 in Preliminaries sought by Leeward and the EC $4,936,303.60 approved and paid by AUA) because it failed to initiate the claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward admits that it was aware on January, 2009 that it was not going to complete its work within the Contract Time?

Panel's Decision:

No. Although this Panel finds that both parties were not in strict compliance with the Contract and Contract documents, Leeward is not barred from its claim regarding the responsibility for delays and substantial completion. Consequently, this Panel finds AUA responsible for 50% of the Additional Preliminaries amounting to EC $477,777.04 and such amount is hereby granted in favor of Leeward.

11. Controversy:

Is Leeward barred from pursuing its Claim for an Extension of Time and the accompanying Additional Preliminaries in the amount of EC $955,554.08 because it failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the Claim accrued in January 2009 and Leeward waited until February 3, 2011 – 25 months later – to commence arbitration?

Panel's Decision:

No. *Refer to Panel's Decision in Controversy number 10, above, where the controversy relative to the Additional Preliminaries is resolved.*

12. Controversy:

Even if Leeward had initiated its Claim for Additional Preliminaries timely and commenced arbitration in a reasonable amount of time, is Leeward entitled to Additional Preliminaries based upon the ground asserted in its May 11, 2009 Claim, *i.e.*, that it had been denied access to a $500,000.00 (EC $1,350,000.02) set aside for Non-Productive Overtime, given the absence of any evidence that such an account was agreed to by the parties or that the alleged lack of access to overtime impacted the critical path and caused the damages asserted?

Panel's Decision:

Yes. *Refer to the Panel's Decision in Controversy number 10, above.*

13. Controversy:

Aside from the Claim for Additional Preliminaries based on the alleged denial of Non-Productive Overtime initiated on May 11, 2009, did Leeward timely initiate any other claims for an extension of the Contract Time or an increase in the Contract Sum for the Additional Preliminaries in accordance with Section 4.3 of the General Conditions based on any other alleged theory of delay?

Panel's Decision:

This Panel finds that each party is barred from alleging non-compliance with the terms of the Contract and, therefore, will consider all claims brought without regards to timeliness. AUA shall refer to the Award as to claims granted, on pages 31-32.

20

14.   Controversy:

If so, did Leeward establish that each such claim for delay satisfied each of the following elements:  (a) caused by AUA; (b) impacted the critical path; and (c) resulted in a specific loss of time or amount of damages?

  Panel's Decision:

After a careful study and analysis of the witness statements as well as the evidence presented, the Panel finds that both parties were responsible for the project delays. Leeward failed to reach substantial completion of the project in the time that was agreed upon.  However, the numerous delays and changes to the drawings and the fact that AUA had knowledge of Leeward's request for extension of time, draw us to determine equal fault for each party regarding the delays in the substantial completion.  Moreover, AUA shall refer to the Award on pages 31-32, as to the claims granted.

15.   Controversy:

Is Leeward barred from seeking to be paid EC $190,210.19 more than the EC $1,232,008.91 it was already paid for additional work it documented as "Change Orders" in the monthly payment applications because Leeward failed to initiate a Claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a claim no later than October 26, 2009, but initiated a Claim no sooner than December 17, 2010 – 14 months later?

  Panel's Decision:

The Panel finds that Leeward is entitled to payment for all work performed under the Contract subject to this Arbitration, without consideration to the timeliness of the claims.

16.   Controversy:

Even if Leeward had timely initiated a claim to be paid an additional EC $190,210.19 for Change Order work, is Leeward entitled to be paid this money given that Leeward did not

21

make a demand for payment contemporaneous with the payment of its Draft Final Account and given that Leeward did not otherwise submit evidence to substantiate its right to payment?

Panel's Decision:

From the evidence presented at trial, the Panel finds that Leeward is entitled to the additional EC $190,210.19. Consequently, the Panel grants Leeward's claim for EC $190,210.19.

17. Controversy:

Is Leeward barred from pursuing its claim to recover EC $19,475.40 for the Whitsuntide Holiday because it failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the claim accrued on June 1, 2009 and Leeward waited until February 3, 2011 – 21 months later – to commence arbitration?

Panel's Decision:

The Panel finds that Leeward is not barred from any of its claims based on timeliness. However, claims pertaining to delays in the completion of the Project are subject to the Panel Decisions in *Section VI. (B-14) and (B-15)*, above.

18. Controversy:

Even if Leeward had commenced arbitration in a reasonable amount of time, is Leeward entitled to EC $19,475.40 in damages for closing the construction site on June 1, 2009 for the Whitsuntide Holiday given that the holiday occurred after the May 14, 2009 deadline for Leeward to complete its work under the Contract Documents?

Panel's Decision:

No. Refer to the Panel's Decision in *Section VI. (B-14)*, above.

22

19.    Controversy:

Is Leeward barred from seeking payment for an additional EC $162,372.12 in "claims" out of the EC $181,847.52 sought in the Amended Demand for Arbitration because Leeward failed to initiate a Claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a claim no later than October 26, 2009, but initiated a Claim no sooner than December 17, 2010 – 14 months later?



Panel's Decision:



This Panel finds that each party is barred from alleging non-compliance with the terms of the Contract and therefore, will consider all claims brought without regards to timeliness, except those that were specifically distinguished by the Panel's legal reasoning in each of the controversies submitted for resolution in the Award on page 31.

20.    Controversy:

Even if Leeward had timely initiated a claim, is Leeward entitled to recover an additional EC $162,372.12 in "claims" given that Leeward was already paid that precise amount, EC $162,372.12, for these identical "claims," as confirmed by the Draft Final Account submitted by Leeward, certified by the Architect, and paid by AUA?

Panel's Decision:

This Panel finds that Leeward was rightfully paid for extra work, and for the "claims" (adverse weather and holiday) for a total of EC $1,232,008.91 in Change Orders and EC $162,372.12 in "Claims" paid in the Draft Final Account.

21.    Controversy:

Is Leeward barred from seeking EC $1,000,000 allegedly due and owing from the Cash Allowance portion of the Contract Sum because Leeward failed to initiate a Claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that

23

Leeward was aware of the facts giving rise to such a claim no later than October 26, 2009, but initiated a claim no sooner than December 17, 2010 – 14 months later?

Panel's Decision:

This Panel finds that each party is barred from alleging non-compliance with the terms of the Contract and therefore, will consider all claims brought without regards to timeliness, except those that were specifically distinguished by the Panel's legal reasoning in each of the controversies submitted for resolution in this Award.

22.    Controversy:

Even if Leeward had timely initiated such a claim, is Leeward entitled to recover EC $1,000,000 from the Cash Allowance component of the initial Contract Sum for contingent costs, including craneage, scaffolding and overtime, given that the EC $2,262,166.51 that Leeward billed for and received for such contingent costs includes the EC $1,000,000 allocated to contingent costs in the EC $27,436,824 Contract Sum, which Leeward uses as costs?

Panel's Decision:

This Panel finds that Leeward is not entitled to its claim for Cash Allowance because the evidence received and considered demonstrated to the Panel that, Leeward was paid EC $2,262,166.51 in Cash Allowance, with included the EC $1,000,000.00 claim.

23.    Controversy:

Is Leeward barred from pursuing to recover overhead and profit on the EC $191,090 in Doors and Windows Work deleted by AUA from Leeward's scope of work because it failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the claim accrued on April 21, 2009 and Leeward waited until February 3, 2011 – 22 months later – to commence arbitration?

24

Panel's Decision:

This Panel finds that Leeward is barred from pursuing the overhead and profit on the EC $191,090 in Doors and Windows Work deleted by AUA because such work was then given to Leeward under a Separate Contract and, therefore, is not subject to this Arbitration. Refer to the Panel's Decision in Section V. *(2)*.

24. Controversy:

Even if Leeward had commenced arbitration in a reasonable amount of time on its claim for overhead and profit on the Doors and Windows Work, is Leeward entitled to recover EC $34,396.20 as and for its overhead and profit on this work given that the unit rates contained in the initial Bills of Quantities were "provisional sum rates" and given that Leeward entered into a separate contract with AUA in July 2009 to perform this work?

Panel's Decision:

No. *Refer to Panel's Decision in Controversy number 23, above.*

25. Controversy:

Is Leeward barred from pursuing its claim to recover overhead and profit on the EC $1,735,589 in Painting Work deleted by AUA from Leeward's scope of work because Leeward failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the claim accrued on April 21, 2009 and Leeward waited until February 3, 2011 – 22 months later – to commence arbitration?

Panel's Decision:

The Panel finds that each party is barred from alleging non-compliance with the terms of the Contract and, therefore, will consider all claims brought without regards to timeliness, except those that were specifically distinguished by the Panel's legal reasoning in each of the controversies submitted for resolution in this Final Award.

25

26. **Controversy:**

Even if Leeward had commenced arbitration in a reasonable amount of time on its claim for overhead and profit on the Painting Work, is Leeward entitled to recover EC $312,406.02 as and for its overhead and profit on this work given that Leeward would have incurred more in liquidated damages had the Painting Work not been removed from Leeward's scope of work than it seeks to recover in overhead and profit for this work?

**Panel's Decision:**

Yes. *Refer to the Panel's Decision in Section VI. (A-7).*

27. **Controversy:**

Is Leeward barred from seeking to recover monies allegedly due and owing under the Separate Contracts in the arbitration for either of the following separate reasons:

   a) Claims under the Separate Contracts are not arbitrable because AUA did not agree to arbitrate them; Or

   b) In the event Leeward's payment claims under the Separate Contracts fall within the scope of the arbitration provision (Section 4.6.1 of the General Conditions), because Leeward failed to initiate any claims within 21 days of their accrual in accordance with Section 4.3 of the General Conditions.

**Panel's Decision:**

Yes. This Panel finds in favor of AUA in that works that were performed under Separate Contracts are not subject to this Arbitration

28. **Controversy:**

Even if Leeward's claims under the Separate Contracts are subject to arbitration, and even if Leeward had initiated claims timely, has Leeward established that AUA only paid Leeward EC $1,359,035.40, in the aggregate, on the Separate Contracts and owes it an additional EC $202,943 on these contracts based upon the proposed contract amounts, particularly considering the evidence presented by AUA that Leeward was to be paid as per actual work (not the proposed amounts), and that Leeward was paid EC $1,452,261.32 for that work?

26

Panel's Decision:

No. See Panel Decisions in Section VI. (A-7 and (B-2).

29.    Controversy:

Is Leeward entitled to an award for the EC $590,083 that AUA holds as retainage given that Leeward has not provided evidence that it satisfied its obligations under Section 9.10.2 of the General Conditions to provide "an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered have been paid or otherwise satisfied."?

Panel's Decision:

This Panel finds that the only issue regarding the retainage is the submittance by Leeward to AUA of the required documents. Therefore, this Panel hereby Orders Leeward to comply with Section 9.10.02 of the General Conditions, as applicable to the particular Project within the term provided in the Award on pages 31-32 and, thereafter, AUA must pay the remaining 2.5% of the Contract Sum equal to EC $590,083.00, without interest, if paid within the time allowed.

30.    Controversy:

Should the mutual accounting mistake discovered by AUA on the eve of trial that resulted in Leeward receiving EC $83,059.56 less than was reflected in the Draft Final Account be part of any arbitration award, and potentially subject to the assessment of interest, given that Leeward never notified AUA of the error, or specifically demanded payment, or asserted any claim to recover this amount?

27

Panel's Decision:

This Panel determines that the ABST error was mutually acknowledged by both parties, and not having it been submitted as a controversy of this Arbitration and having it been discovered and in good faith informed by an AUA representative during the hearings, we conclude that this issue should be resolved outside of the context of this Arbitration.

31. Controversy:

Is Leeward entitled to an award of interest for any portion of Leeward's EC $6,701,390.33 demand? If so, when should interest begin to run given Leeward's long delay in commencing arbitration on the three claims it actually initiated during the Project (*i.e.*, Additional Preliminaries, Whitsuntide Holiday and Overhead and Profit on the Painting Work and Doors and Windows Work) and given Leeward's failure to identify the remainder of its claims until filing its Amended Demand for Arbitration dated October 14, 2011?

Panel's Decision:

This Panel finds that Leeward is entitled to the claims recognized in this Award as herein stated. These claims shall accrue interest at the rate of 7% per annum, since the date of termination of the Project, October 31, 2009, as determined by the Panel, except for those claims that are specifically without interest.

32. Controversy:

Did Leeward establish that AUA failed to pay one or more monthly payment applications timely, and if so, then what is the date of each such late payments and is Leeward entitled to an award of interest on any alleged late payments?

Panel's Decision:

Yes. *See Panel's Decision in Controversy (A-3) in Section VI.*

28

33.   Controversy:

Is Leeward entitled to an award of interest on any allegedly late mobilization payments, or were its claims with respect to this issue settled in January 2009 as set forth in AUA Ex. 67 at AUA 003269?

  Panel's Decision:

The Panel finds that the disputes regarding mobilization were resolved with a payment by AUA in December 22, 2009 and a settlement was reached by the parties in January 13, 2009.

34.   Controversy:

To the extent Leeward is awarded any interest, should the rate of interest equal the statutory judgment rate in Antigua of 5%, given that the Contract Documents refer to the "legal rate" in Antigua?

  Panel's Decision:

The Panel finds that Leeward is entitled to interest on the payments due and unpaid as set forth under Section 13.6.1 of the Contract and General Conditions as of October 3, 2009. However, this Panel finds that the interest shall be calculated at 7% per annum.

35.   Controversy:

Is Leeward entitled to recover any of its legal fees and expenses in prosecuting its claims or in defending AUA's counterclaim for Liquidated Damages?

  Panel's Decision:

Upon careful consideration and considering that both parties were equally at fault (Leeward 50%- AUA 50%) regarding some of the controversies submitted and in the management of the Contract, the Panel finds no compelling reason to grant attorney's fees, arbitration fees, expenses and compensation as provided under the laws of Antigua or otherwise.  Each party shall bear their own attorneys' fees, arbitration expenses and such the like.

29

36. Controversy:

Is AUA entitled to an award of Liquidated Damages in the amount of US $117,000.00 based upon Leeward's failure to achieve Substantial Completion within the Contract Time, but instead doing so 78 days later?

Panel's Decision:

After a careful analysis and evaluation of the witness statements as well as the evidence presented to the Panel, we find that both parties shared responsibilities for the project delays and, consequently, Leeward is responsible for 50% of the Liquidated Damages in the amount of EC $ 157,950.00[2], and such amount is hereby granted in favor of AUA.

37. Controversy:

Is AUA entitled to setoff Liquidated Damages from the retainage it currently holds?

Panel's Decision:

No. The Panel finds neither spurious allegations in Leeward's claims, nor intentional wrongdoing to award damages to AUA. Consequently, AUA is denied its claim to setoff Liquidated Damages.

38. Controversy:

Is AUA entitled to recover any of its legal fees and expenses in defending the claims asserted by Leeward and in prosecuting its counterclaim for Liquidated Damages?

Panel's Decision:

Upon careful consideration and considering that both parties were at fault regarding some of the controversies submitted and in the management of the Contract, the Panel finds no compelling reason to grant attorney's fees, arbitration fees, expenses and compensation as

---

[2] As per AUA's counterclaim for Liquidated Damages, the amount was expressed in US dollars and not EC dollars, therefore, considering the current currency conversion, said amount was calculated at $315,900.00 of which 50% is granted to AUA for $157,950.00.

provided under the laws of Antigua or otherwise. Each party shall bear their own attorneys'

fees, arbitration expenses and such the like.

## AWARD

Accordingly, we ORDER and AWARD as follows:

1. Within thirty (30) days from the date of issuance of this Final Award Respondent

AUA shall pay to Claimant Leeward the following amounts:

| | | |
|---|---|---|
| a) Interest on the Payments Due and Unpaid | EC $44,617.37 | This sum shall accrue interest of 7% per annum from the date of issuance of termination of the Project, October 31, 2009. |
| b) Damages | EC $232,670.13 | This sum shall accrue interest of 7% per annum from the date of issuance of this Final Award. |
| c) Overhead and Profit for work deleted, omitted or modified | EC $802,399.25 | This sum shall accrue interest of 7% per annum from the date of termination of the Project, October 31, 2009 |
| d) Additional Preliminaries | EC $477,777.04 | This sum shall accrue interest of 7% per annum from the date of termination of the Project, October 31, 2009 |
| e) Change Order Work | EC $190,210.19 | This sum shall accrue interest of 7% per annum from the date of termination of the Project, October 31, 2009 |
| f) Retainage | EC $590,083.00 | This sum shall not accrue any interest. Leeward shall submit to AUA all contractually required documentation as set forth in Section 9.10.2 of the General Conditions. Leeward will have a term of not more than 30 calendar days from the date of issuance of this Final Award to submit said documentation. Once Leeward has submitted all required documentation accordingly, AUA shall release the retainage in a term not to exceed 30 calendar days, upon after which such amount shall start accruing interest at the rate of 7% per annum. If Leeward fails to comply with Section 9.10.2, of the General Conditions in the time hereby stated and granted the claim for such amount will be considered |

31

relinquished. Considering that this case is sub-judice, the herein referred notice may be made by counsel for Leeward to counsel for AUA, or by Leeward to AUA.

2. As per AUA's counterclaim for Liquidated Damages, this Panel grants 50% of such in the amount of EO $157,950.00, which will accrue interest at the rate of 7% per annum from the date of this Final Award.

3. The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling $17,550.00 shall be borne by the parties as incurred. The compensation and expenses of the Panel totaling $151,992.75 shall be borne by the parties as incurred.

4. The terms of this Final Award shall be complied within thirty (30) days from the date of this Final Award.

This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration.

This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

Per the arbitration clause, the location of the arbitration is Antigua; however, the parties jointly agreed for the Hearings to be held in Isla Verde, Puerto Rico. We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Isla Verde, Puerto Rico, on June 22, 2012, amended *nunc pro tunc* on this 8 day of August, 2012.

32

8/8/2012
Date

Jorge R. Jiménez, Esq.
Panel Chairman

8/8/2012
Date

Héctor M. Varela, P.E.
Arbitrator

8/8/2012
Date

José R. Capó, Esq.
Arbitrator

State of Puerto Rico
County of San Juan        Affidavit # 301

On this 8 day of August, 2012 before me personally came and appeared Jorge R. Jiménez, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledge to me that he executed the same.

8/8/2012
Dated

_____
Notary Public

State of Puerto Rico
County of San Juan        Affidavit # 302

On this 8 day of August, 2012 before me personally came and appeared Héctor M. Varela, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledge to me that he executed the same.

8/8/2012
Dated

_____
Notary Public

State of Puerto Rico
County of San Juan        Affidavit # 303

On this 8 day of August, 2012 before me personally came and appeared José R. Capó, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledge to me that he executed the same.

8/8/2012
Dated

_____
Notary Public

33



301



#302



#303

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK     )
COUNTY OF DUTCHESS   ) ss:

    MELINDA L. BENANTI, being sworn says: I am not a party to the action, am over 18 years of age and reside at Marlboro, New York.

    On February 7, 2013, I served the within Demand for Arbitration with arbitration clause by depositing a true copy thereof, enclosed in a post-paid wrapper, sent in an official depository under the exclusive care and custody of:

**VIA INTERNATIONAL FEDERAL EXPRESS**
A.S. Nagesh
Sundaram Architects Pvt. Ltd.
No. 19 Kumara Krupa Road
Bangalore – 560001
India

| **VIA U. S. POSTAL SERVICE** **CERTIFIED MAIL,** **RETURN RECEIPT REQUESTED** | **VIA U. S. POSTAL SERVICE** **CERTIFIED MAIL,** **RETURN RECEIPT REQUESTED** |
|---|---|
| Neal S. Simon, President American University of Antigua, College of Medicine c/o Manipal Education Americas, LLC, Agent for American University of Antigua, College of Medicine Kasturba Medical College International Center One Battery Park Plaza, 33rd Floor New York, New York 10004 | Leonard Sclafani, Esq. American University of Antigua, College of Medicine c/o Manipal Education Americas, LLC, Agent for American University of Antigua, College of Medicine Kasturba Medical College International Center One Battery Park Plaza, 33rd Floor New York, New York 10004 |

MELINDA L. BENANTI

Sworn to before me on the 7th
day of February, 2013.

Notary Public

*Carol A. Verdis*
*NOTARY PUBLIC, State of New York*
*No. 01VE5037251*
*Qualified in Dutchess County*
*Commission Expires May 6, 2015*

# EXHIBIT C

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL CONSTRUCTION INDUSTRY ARBITRATION RULES
ANSWER AND COUNTERCLAIM

TO: Leeward Construction Company, Ltd.
c/o Lewis & Greer, P.C.
Attorneys for Claimant
510 Haight Avenue
Poughkeepsie, New York 12603

Re: 50 110 T 00118 13
Leeward Construction Corp. v. American University of Antigua College of Medicine

PLEASE TAKE NOTICE that American University of Antigua College of Medicine hereby answers the Statement of Claim of Leeward Construction Company, Ltd. and Counterclaims as follows:

Claimant claims entitlement to EC$83, 059.56/US$30,762/80 which said sum derives from an alleged "mis-tabulation as Antigua and Barbuda Sales Tax ("ABST") during the requisition process.

There is no issue that the sum was paid to Leeward. The claim here is that the sum was paid as reimbursement for ABST that AUA allegedly owed to Leeward, but was subsequently added to the amount that was paid to Leeward as a progress payment so that, when Leeward was paid on the following requisition, the amount allegedly "mis-tabulated" was deducted from that requisition leaving Leeward short on the payment of the requisition in the amount of the sum above stated.

AUA asserts herein, first, that Leeward has not provided any evidence that it actually paid the Government of Antigua and Barbuda the ABST in connection with the requisition at issue or in connection with any prior or subsequent requisition.

AUA further asserts that, even if Leeward establishes that it paid this, or any other amount of ABST, it was its responsibility and obligation to do so under the terms of the parties contract, such that the amount that Leeward was paid for the requisition at issue was correctly added to the amount of its progress payment. Leeward was not entitled to a separate or additional payment for reimbursement of ABST.

AUA further asserts by way of a defense and a counterclaim that it paid ABST to Leeward in addition to, and not as a part of its progress payments in all but the one from which Leeward's claim herein originates in the sum of EC$3,614,552.41 as a result of error, mis-tabulation and mutual mistake, despite that Leeward provided no proof of payment of the tax and, in any event, was, itself, obligated to pay the tax without reimbursement by AUA.

Lastly, AUA asserts that it submitted its claim for a reimbursement of the said sum to the Project Architect, R. Sundaram, Sundaram Architects as required by the parties contract; and that the Project Architect has approved the claim. AUA is therefore entitled to this sum. (see the attached correspondence)

In this regard, AUA states the following:

Section 3.6.1 of the General Conditions to the Contract, entitled "Taxes," unambiguously obligates the Contractor, Leeward, to "pay sales, consumer, use and similar taxes for the Work provided by the Contractor ... ." This obligation plainly includes the Antigua and Barbuda Sales Tax ("ABST"). Notwithstanding this clear mandate, as evidenced by the payment applications submitted by Leeward (*e.g.,* Ex. A to Leeward's December 21, 2012 letter to the Project Architect), throughout the Project Leeward charged AUA ABST at a rate of 15% for all the work Leeward performed on the Project. As the invoices AUA approved for payment reflect, AUA paid the ABST charged by Leeward. See Ex. 1, hereto. Our records reflect that Leeward wrongfully charged, and AUA mistakenly paid, no less than EC $3,614,552.41 in ABST. Accordingly, AUA is entitled to a ruling that Leeward was obligated to pay ABST, and Leeward, in turn, is therefore obligated to reimburse AUA for all the ABST it collected from AUA.

In its November 20, 2012 claim, Leeward contends that AUA conceded during a prior arbitration that it was obligated to pay Leeward EC $83,083.24 in progress payment, because that payment was a payment for ABST in connection with Payment Requisition No. 22 and wrongfully applied. However, Leeward's claim for this money, and the alleged concession made by AUA's counsel during opening arguments at the prior arbitration, are both premised on the mistaken belief that AUA was responsible to pay ABST and on the assumption to Leeward actually paid Antigua EC $ 83,083.24 for the ABST collected at that time.[1]

As set forth in Leeward's December 21, 2012 supplemental submission to the Project Architect on its claim herein, what the parties called at the arbitration the "ABST Error" and what Leeward has now labeled a "mis-tabulation" was a product of the manner in which Leeward tracked payments on the Project. Generally speaking, Leeward issued monthly payment applications for the work it completed on the Project since the last payment application, which amounts were based upon measuring the work done and applying the predetermined unit rates set forth in the Bill of Quantities that was made a part of the Contract. Leeward's payment application would calculate the amount earned to date for its Work and then subtract the total amount that had been paid to date. Leeward would then bill AUA for this difference, separately charge AUA 15% in ABST and request payment for the sum. AUA would then pay the sum, including ABST.

Leeward would determine how much had been paid to date by keeping a running tally of the prior progress payments, exclusive of ABST, which it submitted with its payment applications. With respect to the EC $ 83,083.24 ABST payment at issue, Leeward, according to its claim, mistakenly recorded the total amount paid by AUA, including ABST, in its running tally. As a result, when Leeward issued the following payment application, the amount of money Leeward reflected as having been paid by AUA in prior progress payments was EC $ 83,083.24 more than it should have been.

---

[1] AUA's wrongful payment of ABST, in general, was not at issue in the prior arbitration.

The so-called concession was simply an acknowledgment of this alleged error and by implication assumed that AUA was obligated to pay the misapplied ABST in the first place, nothing more. Because, as demonstrated above, AUA was not obligated to pay ABST, Leeward's misapplication of the money serves to reimburse AUA for a small fraction of the ABST Leeward wrongfully collected.

In sum, AUA respectfully requests that Leeward's claim be denied and that an award issue in AUA's favor declaring for the amount of the ABST that Leeward was wrongfully paid; to wit, EC $3,614,552.

Dated: February 27, 2013
New York, New York

American University of Antigua College of Medicine

By: _____
Leonard A. Sclafani, Esq.
Law Offices of Leonard A. Sclafani, Esq.
Attorneys for Respondent AUA
One Battery Park Plaza, 33rd Fl.
New York, New York 10004
(Tel.) 212-696-988
email: l.a.s@mindspring.com

**ABST Payments**

$50,075.05
$65,398.08
$36,694.52
$36,586.04
$46,519.90
$120,969.00
$176,431.68
$70,116.02
$9,666.98
$143,779.67
$137,766.27
$409,676.77
$550,835.46
$230,721.53
$410,551.87
$415,282.54
$196,410.71
$209,080.45
$190,590.53
$83,083.24
$8,586.66
$15,729.44
**$3,614,552.41**



# SUNDARAM ARCHITECTS PVT. LTD.

ARCHITECTURE • ENGINEERING • PLANNING • INTERIORS • SERVICES

Fax : 001-845-454-3315                                    Date : 27.02.2013

### *Kind attn: Veronica A. McMillan.*

M/s. Lewis & Greer, P.C.
Attorneys at Law,
510 Haight Avenue,
POUGHKEEPSIE,
NEW YORK 12603, USA

Dear Sirs,

### Leeward Claim with respect to ABST

It is verified that AUA paid the ABST charged by Leeward. The amount is $3,614,552.41

As per contract Leeward has to pay all taxes including ABST.

It is a fact that AUA has paid Leeward ABST taxes although Leeward should pay the taxes.

Please advise Leeward to return the ABST collected from AUA to AUA.

Thanking you,

Yours faithfully,
For Sundaram Architects Pvt. Ltd.

R. SUNDARAM



#19, Kumara Krupa Road, Bangalore - 560 001, India
Tel : +91 (0)80 2238 0701 / 2238 0702 / 2238 0703
Fax : +91 (0)80 2225 2339   Email : edp@sundaramarchitects.com

SUNDARAM CONSULTANTS
GROUP

**ABST Payments**

$50,075.05
$65,398.08
$36,694.52
$36,586.04
$46,519.90
$120,969.00
$176,431.68
$70,116.02
$9,666.98
$143,779.67
$137,766.27
$409,676.77
$550,835.46
$230,721.53
$410,551.87
$415,282.54
$196,410.71
$209,080.45
$190,590.53
$83,083.24
$8,586.66
$15,729.44
**$3,614,552.41**

# American University of Antigua
## College of Medicine
### Check Request Form

Name: MIKE JOHNSON

Department: CONSTRUCTION

Date: 4/18/08

PHASE 1 + HOUSING CONTRACT: LEEWARD CONSTRUCTION

INTERIM PAYMENT # 1.00          333,833.67

ABST                            50 075.05

EC$ 383 908 72

Vendor's name: LEEWARD CONSTRUCTION COMPANY LTD.

Vendor's TIN / SS#:

Make check payable to: LEEWARD CONSTRUCTION COMPANY LTD.

Contact name: NEIL DICKENSON.

Contact phone #: 729/0072

Payment address: ALL SAINTS ROAD,
P.O. BOX 1400
ST. JOHN'S
ANTIGUA

| | US $'s | EC $'s |
|---|---|---|
| Check amount: | | 383908.72 |

APPROVED FOR PAYMENT PENDING AGREEMENT OF BILL
OF QUANTITIES RATES + COMPLETION OF CONTRACT.

Requestor's Signature: _[signature]_

Request Date: 4/18/08

Dean's Approval:

Approval Date:

Finance Approval:

Approval Date:

LC000242
AUA000431

# American University of Antigua
# College of Medicine
# Check Request Form

## AUA Employee Information

| | |
|---|---|
| **Name:** | Mike Johnson |
| **Department:** | Construction |
| **DATE** | May 30th, 2008 |

### Phase 1: Classroom /Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment # 2.00/A | 435,986.79 |
| ABST | 65,398.02 |
| Subtotal | 501,384.81 |
| LESS: Payment A/C: Corey Greenberg email 5/22/08 | 300,000.00 |
| | EC $ 201,384.81 |

## Vendor Information

| | |
|---|---|
| **Vendor's name:** | Leeward Construction Company Ltd. |
| **Vendor's TIN / SS#** | |
| **Make check payable to:** | Leeward Construction Company Ltd. |
| **Contact name:** | Neil Dickenson |
| **Contact phone #:** | 729-0072 |
| **Payment address:** | All Saints Raod |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| **CHEQUE AMOUNT** | | 201,384.81 |

## Additional Comments

Approved For Payment Pending Agreement of Bill of Quantities Rates & Completion of Contract.

## Approval

| | |
|---|---|
| **Requestor's Signature:** | _(signature)_ |
| **Request Date:** | 5/30/08 |
| **Dean's Approval:** | |
| **Approval Date:** | |
| **Finance Approval:** | |
| **Approval Date:** | |

LC000270
AUA000456

# American University of Antigua
# College of Medicine
# Check Request Form

## AUA Employee Information

| | |
|---|---|
| Name: | Mike Johnson |
| Department: | Construction |
| DATE | May 30th, 2008 |

### Phase 1: Classroom /Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment #3.00 | 244,630.15 |
| ABST | 36,694.52 |
| | EC $ 281,324.67 |

## Vendor Information

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Raod |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 281,324.67 |

## Additional Comments

Approved For Payment Pending Agreement of Bill of Quantities Rates & Completion of Contract.

### Approval

| | |
|---|---|
| Requestor's Signature: | |
| Request Date: | 5/30/08. |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

LC000294
AUA000479

# American University of Antigua
# College of Medicine
# Check Request Form

## AUA Employee Information

| | |
|---|---|
| Name: | Mike Johnson |
| Department: | Construction |
| DATE | May 30th, 2008 |

## Phase 1: Classroom /Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment #4.00 | 243,906.96 |
| ABST | 36,586.04 |
| | EC $ 280,493.00 |

## Vendor Information

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Raod |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

|  | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 280,493.00 |

## Additional Comments

Approved For Payment Pending Agreement of Bill of Quantities Rates & Completion of Contract.

### Approval

| | |
|---|---|
| Requestor's Signature: | _(signature)_ 5/30/08 |
| Request Date: | |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

**LC000317**
AUA000500

# American University of Antigua
# College of Medicine
# Check Request Form

## AUA Employee Information

| | |
|---|---|
| Name: | Mike Johnson |
| Department: | Construction |
| DATE | 13-Jun-08 |

### Phase 1: Classroom /Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment #5.00 | 310,132.65 |
| ABST | 46,519.90 |
| Total Payment | EC $ 356,652.55 |

## Vendor Information

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Raod |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 356,652.55 |

## Additional Comments

Approved For Payment Pending Agreement of Bill of Quantities Rates & Completion of Contract.

Retention received to 5% in Accordance with Letter of Intent.

## Approval

| | |
|---|---|
| Requestor's Signature: | |
| Request Date: | 6/13/08 |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

LC000342
AUA000525

# American University of Antigua
## College of Medicine
## Check Request Form

### AUA Employee Information

| | |
|---|---|
| Name: | Mike Johnson |
| Department: | Construction |
| DATE | 13-Jun-08 |

### Phase 1: Classroom /Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment #6.00 Mobilization | 806,460.00 |
| ABST | 120,969.00 |
| Total Payment | EC $ 927,429.00 |

### Vendor Information

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Raod |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 927,429.00 |

### Additional Comments

Approved For Payment Pending Agreement of Bill of Quantities Rates & Completion of Contract

### Approval

| | |
|---|---|
| Requestor's Signature: | |
| Request Date: | 6/13/08 |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

LC000372
AUA000555

# American University of Antigua
## College of Medicine
### Check Request Form

Ⓘ

**AUA Employee Information**

| | |
|---|---|
| Name: | Mike Johnson |
| Department: | Construction |
| DATE | July 25th,2008 |

**Phase 1: Classroom/Library/Nurses: Leeward Constrcution**

| | |
|---|---|
| Interim Payment #7.00 Measured Works/Materials on Site. | 1,176,211.22 |
| ABST | 176,431.68 |
| Total Payment | 1,352,642.90 |

**Vendor Information**

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | |
| Make check payable to: | Leewatd Consstruction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Road |
| | P.O. Box, 1400 |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 1,352,624.90 |

**Additional Comments**

*Approved for payment pending agreement of BOQ rate and Pre-lims, and correlation of contract.* ~~7/25/08~~

**Approval**

| | |
|---|---|
| Requestor's Signature: | |
| Request Date: | 7/25/08 |
| | LT COL ROCHE ANTONY. |
| Man's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

LC000377
AUA000560

# American University of Antigua
## College of Medicine
### Check Request Form

**AUA Employee Information**

| | |
|---|---|
| Name: | Mike Johnson |
| Department: | Construction |
| DATE | July 25th, 2008 |

**Phase 1: Classroom/Library/Nurses: Leeward Constrcution**

| | |
|---|---|
| Interim Payment #9.00 Measured Works/Materials on Site. | 467,440.11 |
| ABST | 70,116.02 |
| Total Payment | 537,556.13 |

**Vendor Information**

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | |
| Make check payable to: | Leeward Consstruction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Road |
| | P.O. Box, 1400 |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 537,556.13 |

**Additional Comments**

Ns/

7/14/08/08.

**Approval**

| | |
|---|---|
| Requestor's Signature: | |
| Request Date: | 8/14/08 |
| Dean's Approval: | Passed for payment. 08/14/08 |
| Approval Date: | to Col Roche Autry, GM, Projects. |
| Finance Approval: | |
| Approval Date: | |

LC000453
AUA000615

# American University of Antigua
# College of Medicine
# Check Request Form

## AUA Employee Information

| | |
|---|---|
| Name: | Lt Col Roche Antony |
| Department: | Construction |
| DATE | September 18th, 2008 |

## Phase 1: Classroom/Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment #10.00 Measured Works/Materials on Site. | 64,446.50 |
| ABST | 9,666.98 |
| Prelims From 8/3/08 to 30/4/08 | 199,853.39 |
| Total | EC $ 273,966.87 |

## Vendor Information

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Raod |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 273,966.87 |

## Additional Comments

Nil .

## Approval

| | |
|---|---|
| Requestor's Signature: | Certified for payment EC $ 273,966.87 |
| Request Date: | |
| Dean's Approval: | Pmm 7 19 Sep 2008. |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

LC000523
AUA000684



# American University of Antigua
## College of Medicine
### Check Request Form

| AUA Employee Information | |
|---|---|
| Name: | Lt Col Roche Antony |
| Department: | Construction |
| DATE | October 14th,2008 |

**Phase 1: Classroom/Library/Nurses: Leeward Construction**

| | |
|---|---|
| Interim Payment #10.00 Measured Works/Materials on Site. | 958,531.17 |
| ABST | 143,779.67 |

| | |
|---|---|
| Total | EC $ 1,102,310.84 |

| Vendor Information | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | ABSTNO:TIN0502142 |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Road |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 1,102,310.84 |

| Additional Comments | |
|---|---|

Passed for payment EC $ 1,102,310.84
(EC $ One million one hundred two thousand three hundred ten
and eighty four cents only )

| Approval | |
|---|---|
| Requestor's Signature: | |
| Request Date: | (Lt Col ROCHE ANTONY, GY. Projects.) 14 Oct 2008 |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

AUA000769



# American University of Antigua
## College of Medicine
### Check Request Form

**AUA Employee Information**

| | |
|---|---|
| **Name:** | Lt Col Roche Antony |
| **Department:** | Construction |
| **DATE** | November 17th, 2008 |

**Phase 1: Classroom/Library/Nurses: Leeward Construction**

| | |
|---|---|
| Interim Payment #12.00 Measured Works/Materials on Site. | $718,588.47 |
| ABST | $107,788.27 |
| Outstanding ABST Application #10 | $29,978.00 |
| Total | $856,354.74 |

**Vendor Information**

| | |
|---|---|
| **Vendor's name:** | Leeward Construction Company Ltd. |
| **Vendor's TIN / SS#** | ABSTNO:TIN0502142 |
| **Make check payable to:** | Leeward Construction Company Ltd. |
| **Contact name:** | Neil Dickenson |
| **Contact phone #:** | 729-0072 |
| **Payment address:** | All Saints Road |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| **CHEQUE AMOUNT** | | 856,354.74 |

**Additional Comments**

*BE Closure was effected by LC with effect from 2d October 2008 to 8th November 2008. Prelims have been included for one week for the month of Oct in the payment application. Without prejudice, the amount is defrayed against total contract/completion period of 52 weeks.* ~~~~ 14/November 2008

| | |
|---|---|
| **Requestor's Signature:** | *Passed for payment EC$ 856,354.74 ( EC dollars eighty hundred* |
| **Request Date:** | *fifty six thousand three hundred fifty four and seventy four cents only )* ~~~~ 14 Nov 2008 |
| **Dean's Approval:** | |
| **Approval Date:** | |
| **Finance Approval:** | |
| **Approval Date:** | |

AUA000856



# American University of Antigua
## College of Medicine
## Check Request Form

**Employee Information**

| | |
|---|---|
| Name: | Lt Col Roche Antony |
| Department: | Construction |
| DATE | December 16th, 2008 |

### Phase 1: Classroom/Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment #13.00 Measured Works/Materials on Site. | $2,731,178.48 |
| ABST | $409,676.77 |
| Less Mobilisation Advance | $1,956,460.00 |
| Total | $1,184,395.25 |

**Vendor Information**

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | ABSTNO:TIN0502142 |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Road |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 1,184,395.25 |

**Additional Comment**

Taxed for payment EC$1,184,395.25 only.
Eastern Caribbean dollars One million one hundred eighty four thousand
three hundred ninety five and twenty five cents only.

**Approval**

| | |
|---|---|
| Requestor's Signature: | |
| Request Date: | 16 December, 2008 |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

AUA000956

## ACE Employee Information

| | |
|---|---|
| **Name:** | Lt Col Roche Antony |
| **Department:** | Construction |
| **DATE:** | January 13th, 2009 |

### Phase 1: Classroom/Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment #14.00 Measured Works/Materials on Site. | $3,672,236.40 |
| ABST 15% | $550,835.46 |
| Less Mobilisation Advance | $3,292,418.00 |
| **Total** | **$930,653.85** |

### Vendor Information

| | | |
|---|---|---|
| **Vendor's name:** | Leeward Construction Company Ltd. | |
| **Vendor's TIN / SS#** | ABST NO: TIN0502142 | |
| **Make check payable to:** | Leeward Construction Company Ltd. | |
| **Contact name:** | Neil Dickenson | |
| **Contact phone #:** | 729-0072 | |
| **Payment address:** | All Saints Road | |
| | P.O. Box, 1400 | |
| | St. John's | |
| | Antigua | |
| | US $'s | EC $'s |
| **CHEQUE AMOUNT** | | 930,653.85 |

**Additional Comments**

*Rated for payment E C $ 930, 653. 85 only*
*(EC $ nine hundred thirty thousand six hundred fifty three and*
*eighty five cents only )*

**Approval**

| | |
|---|---|
| **Requestor's Signature:** | *[signature]* |
| **Request Date:** | LtCol Roche Antony, 13 January 2009 |
| **Dean's Approval:** | |
| **Approval Date:** | |
| **Finance Approval:** | |
| **Approval Date:** | |

AUA001142



### AUA Employee Information

| | |
|---|---|
| Name: | Lt Col Roche Antony |
| Department: | Construction |
| DATE | February 18th, 2009 |

#### Phase I: Classroom/Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment #15.00 Measured Works/Materials on Site. | $11,993,466.76 |
| Less 5% Retention | $599,673.34 |
| Previous Payments | $9,855,649.87 |
| Subtotal | $1,538,143.55 |
| ABST 15% | $230,721.53 |
| Total Payment | $1,768,865.09 |

### Vendor Information

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | ABST NO: TIN 0502142 |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Road |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 1,768,865.09 |

### Additional Comments

Asked for payment ee.$ 1,768,865.09 only.

### Approval

| | |
|---|---|
| Requestor's Signature: | |
| Request Date: | 18 February 2009. |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

AUA001163



①

## AUA Employee Information

| | |
|---|---|
| Name: | Lt Col Roche Antony |
| Department: | Construction |
| DATE | March 11th, 2009 |

### Phase 1: Classroom/Library/Nurses; Leeward Construction

| | |
|---|---|
| Interim Payment #16.00 Measured Works/Materials on Site. | $14,874,532.22 |
| Less 5% Retention | $743,726.61 |
| Previous Payments | $11,393,793.12 |
| Subtotal | $2,737,012.49 |
| ABST 15% | $410,551.87 |
| **Total Payment** | **$3,147,564.36** |

### Vendor Information

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS#: | ABST NO: TIN0502142 |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Road |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 3,147,564.36 |

### Additional Comments

...ated for payments EC$3,147,564.36 only.

NOTE: Payment due by 20 March 2009.

### Approval

| | |
|---|---|
| Requestor's Signature: | _(signature)_ 11 MARCH 2009 |
| Request Date: | G Col Roche Antony, General Manager, Project |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

AUA001183



## AUA Employee Information

| | |
|---|---|
| Name | Lt Col Roche Antony |
| Department | Construction |
| DATE | April 17th, 2009 |

### Phase 1: Classroom / Library / Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment #17.00 Measured Works/Materials on Site. | $17,716,317.09 |
| Less 5% Retention | $885,815.85 |
| Previous Payments | $14,130,805.61 |
| Subtotal | $2,699,695.63 |
| Retention Release ( Classroom 50%) | $38,951.85 |
| Retention Release ( Service 50%) | $29,902.91 |
| ABST 15% | $415,282.54 |
| Total Payment | $3,183,832.95 |

## Vendor Information

| | |
|---|---|
| Vendor's name | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | ABSTNO:TIN0502142 |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Road |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 3,183,832.95 |

## Additional Comments

Asked for payment EC$ 3,183,832.95

## Approval

| | |
|---|---|
| Requestor's Signature: | Lt Col Roche Antony |
| Request Date: | 17 April 2009 |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

AUA001204

| | |
|---|---|
| Name: | Lt Col Roche Antony |
| Department: | Construction |
| DATE | April 17th, 2009 |

## Phase 1: Classroom/Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment #18.00 Measured Works/Materials on Site. | $19,094,021.50 |
| Less 5% Retention | $954,701.08 |
| Previous Payments | $16,899,356.01 |
| Subtotal | $1,239,946.42 |
| Retention Release ( Classroom 50%) | $40,368.71 |
| Retention Release ( Service 50%) | $29,071.62 |
| ABST 15% | $196,410.71 |
| Total Payment | $1,505,815.46 |

**Vendor Information**

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | ABSTNO:TIN0502142 |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Road |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | | EC $'s |
|---|---|---|---|
| CHEQUE AMOUNT | | | 1,505,815.46 |

**Additional Comments**

Noted for payment EC $1,505,815.46

| | |
|---|---|
| Requestor's Signature: | Lt Col Roche Antony |
| Request Date: | 11 May, 2009 |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

AUA001413



## AUA Employee Information

Name: Lt Col Roche Antony

Department: Construction

DATE: June 19th, 2009

### Phase 1: Classroom/Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment #19.00 Measured Works/Materials on Site. | $20,561,252.75 |
| Less 5% Retention | $1,028,062.64 |
| Previous Payments | $18,208,760.76 |
| Subtotal | $1,324,429.35 |
| Retention Release | $69,440.33 |
| ABST 15% | $209,080.45 |
| Total Payment | $1,602,950.13 |

### Vendor Information

Vendor's name: Leeward Construction Company Ltd.

Vendor's TIN / SS#: ABSTNO:TIN0502142

Make check payable to: Leeward Construction Company Ltd.

Contact name: Neil Dickenson

Contact phone #: 729-0072

Payment address:
All Saints Road
P.O. Box 1400
St. John's
Antigua

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 1,602,950.13 |

### Additional Comments

*Passed for payment EC$1,602,950.13 only*

### Approval

Requestor's Signature: *Lt col Roche Antony*

Request Date: *19 June 2009*

Dean's Approval:

Approval Date:

Finance Approval:

Approval Date:

AUA001639

# American University of Antigua
## College of Medicine
### Check Request Form

AUA Employee Information

| | |
|---|---|
| Name: | Lt Col Roche Antony |
| Department: | Construction |
| DATE | July 17th, 2009 |

**Phase 1: Classroom/Library/Nurses: Leeward Construction**

| | |
|---|---|
| Interim Payment #20.00 Measured Works/Materials on Site. | $21,898,730.18 |
| Less 5% Retention | $1,094,936.51 |
| Previous Payments | $19,602,630.44 |
| Subtotal | $1,201,163.24 |
| Retention Release | $69,440.33 |
| ABST 15% | $1,270,603.57 |
| Total Payment | $1,461,194.10 |

Vendor Information

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | ABSTNO:TIN0502142 |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Road |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 1,461,194.10 |

Additional Comments

Running bill. approved item #20. Paid for EC$1,461,194.10 only

Approval

| | |
|---|---|
| Requestor's Signature: | Lt Col Roche Antony |
| Request Date: | 17 July 2009 |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

AUA001659

# American University of Antigua
# College of Medicine
# Check Request Form



## AUA Employee Information

| | |
|---|---|
| Name: | Lt Col Roche Antony |
| Department: | Construction |
| DATE | September 26th, 2009 |

**Phase 1: Classroom/Library/Nurses; Leeward Construction**

| | |
|---|---|
| Contract value | 27,436,824.00 |
| Interium Payment # 22 measured works | 22,897,758.49 |
| Retention 5% | 1,144,887.92 |
| Previous payment | 21,714,181.86 |
| Sub Total | 38,688.71 |
| Retention Release 90% | 515,199.56 |
| Total | 553,888.27 |
| ABST 15 % | 83,083.24 |
| Total payable | 636,971.51 |

## Vendor Information

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | ABSTNO:TIN0502142 |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Rd. |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 636,971.51 |

## Additional Comments

Naked for payment EC$ 636,971.57 *leward payment application # 22.*

## Approvals

| | |
|---|---|
| Requestor's Signature: | Lt Col Roche Antony |
| Request Date: | 26 September, 2009 |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |

AUA 000370

# American University of Antigua
## College of Medicine
## Check Request Form



### AUA Employee Information

| | |
|---|---|
| Name: | Lt Col Roche Antony |
| Department: | Construction |
| DATE | September 30th, 2009 |

Phase 1: Classroom/Library/Nurses; Leeward Construction.

| | |
|---|---|
| Contract value in EC $ | 27,436,824.00 |
| Interium Payment # 22- measured works | 22,897,758.49 |
| Retention 5% | 1,144,887.92 |
| 50% of retention to be released after substantial compltion | 572,443.96 |
| Retention released along with invioce no 22 (90% of above amt.) | 515,199.56 |
| Release of balance 10% Retention release | 57,244.40 |
| ABST 15 % | 8,586.66 |
| Total payable | EC $ 65831.06 |

### Vendor Information

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN./SS# | ABSTNO:TIN0502142 |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Rd. |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | - | 65,831.06 |

### Additional Comments

*asked for payment EC $65,831.06 on Substantial compltion of structural works balance 10% of overal 2½%*

### Approval

| | |
|---|---|
| Requestor's Signature: | *[signature]* |
| Request Date: | Lt Col Roche Antony, 30 September, 2009 |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

AUA001682

# American University of Antigua
## College of Medicine
### Check Request Form

**AUA Employee Information**

| | |
|---|---|
| Name: | Lt Col Roche Antony |
| Department: | Construction |
| DATE: | October 22nd, 2009 |

## Phase 1: Classroom/Library/Nurses: Leeward Construction

| | |
|---|---|
| Interim Payment Draft Final Account Measured Works/Materials on Site. | $23,603,320.00 |
| Less 5% Retention | $1,180,166.00 |
| Previous Payments | $22,908,374.09 |
| Subtotal | −$485,220.09 |
| Retention Release | $590,083.00 |
| Total Payment | $104,862.91 |
| ABST 15% | $15,729.44 |
| Total Payment | $120,592.35 |

**Vendor Information**

| | |
|---|---|
| Vendor's name: | Leeward Construction Company Ltd. |
| Vendor's TIN / SS# | ABSTNO:TIN0502142 |
| Make check payable to: | Leeward Construction Company Ltd. |
| Contact name: | Neil Dickenson |
| Contact phone #: | 729-0072 |
| Payment address: | All Saints Road |
| | P.O. Box, 1400 |
| | St. John's |
| | Antigua |

| | US $'s | EC $'s |
|---|---|---|
| CHEQUE AMOUNT | | 120,592.35 |

**Additional Comments**

Raised for payment EC$120,592.35 Only towards interim draft final account of Architect. EC$500,000.00 fully Retained

**Approval**

| | |
|---|---|
| Requestor's Signature: | Lt Col Roche Antony |
| Request Date: | 22 October, 2009 |
| Dean's Approval: | |
| Approval Date: | |
| Finance Approval: | |
| Approval Date: | |

AUA002854

# EXHIBIT D

Thursday, October 16, 2014 at 2:0___9 PM Eastern Daylight Time

**Subject:** Re: Leeward v. AUA, Case No. 50 110 T 0011813 - AUA Revised Statement of Claim
**Date:** Tuesday, June 25, 2013 at 4:31:09 PM Eastern Daylight Time
**From:** Leonard Sclafani
**To:** Melinda Benanti, 'Carolina Cardenas-Soto, LL.M.', 'J. Scott Greer', jsgreer0821@gmail.com
**CC:** 'Carlos A. Romero Jr.', 'Judith Ittig', 'Diego Brian Gosis', melinda_benanti@msn.com

Please accept the attached document as AUA's revised statement of the counterclaims that expects to advance in the above referenced arbitration subject to discovery that may alter AUA's position.
--
LEONARD A. SCLAFANI, ESQ.
Sr. V.P. And General Counsel
MANIPAL EDUCATION AMERICAS, LLC
One Battery Park Plaza, 33rd Fl.
New York, New York 10004
212-661-8899

Mr Gosis, Mr. Romero, Ms. Ittig and Ms.Cardenas-Soto,

Pursuant to your direction of June 21, 2013 and subject to such
determinations as AUA may make following discovery in these proceedings,
AUA will advance as counterclaims the below itemized list of claims as
against Leeward:

I.    AUA has the following claims against Leeward, each in the sum of
EC 3,614,552.41, arising out of AUA's payment to Leeward of
funds in that total amount during the course of the construction
of AUA's main campus building in Antigua purportedly as and for
Antigua and Barbuda Sales Tax (ABST) incident to Leeward's
construction of the said building:

A.  A claim sounding in fraud, deceit and misrepresentation in
that, through approximately 27 separate demands for progress
payments on the construction project at issue, Leeward
invoiced and received payment from AUA of ABST that it did
not pay to the government of Antigua, directly or indirectly,
and/or, at no time, it had any plan, purpose or intention to
pay. This claim is based on the common law of Antigua and
Barbuda.

B.  An alternative claim pursuant to Section 3.6.1 of the parties'
contract, which provides that, as between the parties, it was
Leeward's responsibility and obligation, and not AUA's
obligation and responsibility, to pay any ABST to the
government of Antigua that was due in connection with the
construction project that is the subject of the parties contract.
Notwithstanding the terms of the agreement, Leeward
invoiced and received from AUA, and AUA paid to Leeward,
the above stated sums purportedly as and for ABST due in
connection with work, labor and services provided by Leeward
on the project.

C.  An alternative claim pursuant to the Antigua and Barbuda
Sales Tax Act of 2006, as amended, which Act places the
responsibility and obligation to pay ABST in connection with

the work, labor, services and materials provided by Leeward on the construction project on Leeward and not on AUA.

D. An alternative claim sounding in mutual mistake under the parties' contract in that both parties' acted in the mistaken understanding that AUA was responsible and obligated under the parties' agreement to reimburse Leeward for ABST that it paid in connection with the work, labor, services and materials that Leeward provided on the construction project. This claim is based on the common law of Antigua and Barbuda.

E. An alternative claim sounding in unjust enrichment in that Leeward has received from AUA sums in the above stated amount as and for reimbursement for ABST that Leeward did not pay, and has not paid, directly or indirectly to the government of Antigua and Barbuda. This claim is based on the common law of Antigua and Barbuda.

II. AUA seeks damages against Leeward for defects in its work on the project. These claims have been submitted to the project architect in accordance with the requirements of the parties' contract. As of the date hereof, the architect has not rendered any determination on them. However, he has advised AUA that he will respond to AUA's claims within two or three days from the date hereof. Below is a list of the defects.

1. The risers on staircases in the building are of uneven height creating a safety hazard. The defect has not been repaired as of today's date. Repair would require the removal and reconstruction of the staircases. AUA estimates its damages for this defect at $241,200 EC.

2. Wall surfaces throughout the building were improperly finished. The integrity of the structure of the masonry wall systems throughout the project is lacking resulting in cracking which continues to reveal itself in multiple locations throughout the project. Additionally, the wall finish is uneven and unacceptable in its appearance The defect has not been repaired as of today's date. AUA estimates the cost of repair at $268,000 EC.

3. Common to all roofs throughout the building is the absence of needed flashing. The failure to provide and install flashing has resulted in incursion of storm water into the interior spaces of the building, leaking and flooding. AUA estimates the cost or repair to be upward of $536,000 EC.

4. Tiles had to be installed on the roofs of the building in order to mitigate against leaks due to improper roof installation. Some areas have already been tiled; others have not yet been tiled or are in the process of being tiled. To date, AUA has expended $266,310 EC AUA has also contracted, and partially paid for additional tile and roof leak repair work at a cost in excess of $94,150 EC.

5. Scuppers and pipes in the drain system were improperly sized leading to flooding in the building during heavy rains. The collection area of the roof and the 4-inch drains connect to 2 ½-inch storm water pipes at ground level.. Some repairs have been made at a cost of $8,500 EC; however, these repairs have not fully alleviated the problem. As a result, AUA expends approximately $8,500 EC each time the building is flooded due to the improper sizing of the scuppers. These events occur on average three times each year.

6. Windows in the lobby and third floor of the building were improperly installed without removal of the packing materials. As a result, every window leaked both internally into the walls and externally into the interior of the building. The external leaks caused damage to floors and finish of the interior walls. The water that leaked inside the walls caused damage to the finished exterior walls. The improperly installed windows were refitted without the packaging material. The cost of this repair was $129,385 EC.

7. Roof tiles throughout the entire roofing areas were of poor quality resulting in discoloration. This condition has not been repaired. The estimated cost of replacement of the defective tiles. Flashing is missing throughout the project is $ 639,792 EC.

8. The tracery and fascia throughout the building are failing and continue to disengage from the building. This condition has not been repaired as of today's date. The estimated cost of repair is $115,592.60 EC.

9. The flat roof area slopes toward the building. This condition coupled with the lack of flashing and the improper installations of roof tiles (see item 4 above) have resulted in ponding on the roof and leaking into the building. See items 3 and 4 for the costs associated with the repairs of these conditions to date and the estimate for completion of these repairs. It is estimated that an additional sum of $ 110,216 will be required for repair of these conditions.

10. The elevator shafts were not square. AUA estimates the cost of repair of the shafts to be in the amount of $168,130 EC

11. Several areas of the concrete floors of the building were uneven and not properly graded. The floors on the third floor wings needed to be screeded at a total cost of $56,675 EC.

# EXHIBIT E

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

---

In the Matter of the Arbitration between

**Leeward Construction Corp. (Claimant)**
**and**
**American University of Antigua College of Medicine (Respondent)**

**Case No. 50 110 T 00118 13**

under the Construction Industry Arbitration Rules (including the Procedures for Large, Complex Construction Disputes), before

> **Diego Brian Gosis (Chair)**
> **Judith B. Ittig**
> **Carlos A. Romero, Jr.**

---

**Decision on the Parties' Dispositive Motions and Related Cross-Motions**

I.    **Introduction:**

1.   These proceedings are brought under the Construction Industry Arbitration Rules (including the Procedures for Large, Complex Construction Disputes) of the American Arbitration Association in effect as from 1 October, 2009 (the "Rules"), as supplemented by the ICDR Guidelines for Arbitrators Concerning Exchanges of Information (the "Guidelines"),[1] and are administered through the International Center for Dispute Resolution of the American Arbitration Association (the "Association").  This decision is preceded by Procedural Orders ## 1 through 8 (collectively, the "Procedural Orders"), which have been notified to the parties in due course.  Except where this decision expresses otherwise, capitalized terms not defined herein shall have the meanings assigned to them in the Procedural Orders.

---

[1] *Cf.* Procedural Order #1, ¶4(f).

2. For ease of reference, the claims being discussed in these proceedings can be summarized as[2] (i) a claim for sums which Claimant Leeward maintains are due by Respondent AUA regarding certain Antigua and Barbuda Sales Tax ("ABST") payments (the "ABST Claim"); (ii) a counterclaim for sums which Respondent AUA maintains are due by Claimant Leeward regarding certain amounts improperly charged and/or perceived by the latter as ABST payments (the "ABST Counterclaim"), and (iii) a counterclaim for sums which Respondent AUA maintains are due by Claimant Leeward on account of certain construction defects incurred by the latter under the contract with the former (the "Construction Counterclaim", and, together with the ABST Counterclaim, the "Counterclaims").

3. During the hearings held via telephonic conference prior to the issuance of Procedural Order #1, both Parties expressed their intention to file dispositive motions aimed at obtaining the dismissal of the claims submitted or advanced by the opposing party. In Procedural Order #1, the Tribunal granted such requests, subject to the following terms:

> *11. The proceedings shall consist of a written phase followed, to the extent necessary, by an oral phase. As the parties have anticipated during the Preliminary Hearing that there would be certain jurisdictional objections or dispositive motions related to certain causes of action advanced in the initial pleadings, which objections they considered best to deal with as a threshold matter, the Tribunal orders that the proceeding shall be bifurcated as follows:*
>
> *a. **Dispositive motions***
> *12. A preliminary phase shall be comprised of:*
> *(i) A limited document production procedure [...];*
> *(ii) The filing by Claimant of its advanced motion aimed at the rejection of Respondent's counterclaims by any reason not requiring the examination of any evidence other than documentary evidence submitted therewith, and the filing of a responsive brief by Respondent; and*

---

[2] As part of the procedural calendar of the case, the Parties were required to submit a short abstract of their claims, defenses and counterclaims. Respondent AUA submitted an amended statement of its counterclaims after the date of Procedural Order #1, as agreed by the Parties and allowed by the Tribunal. Both Parties agreed that the elaboration on the other party's claims or counterclaims memorialized on those abstracts was sufficient for them to prepare their respective dispositive or related motions under Procedural Order #1, and that a fuller presentation of their respective claims would only occur to the extent that any such claim was not dismissed under this decision.

2

> (iii)*The filing by Respondent of any motion […]aimed at the rejection of Claimant's claims by any reason not requiring the examination of any evidence other than documentary evidence submitted therewith, and the filing of a responsive brief by Claimant.*

4. As discussed in further detail below in §II, the three steps prescribed in ¶12 of Procedural Order #1 have been followed, and, after having reviewed the submissions and evidence produced by the Parties, the Tribunal has deliberated and adopted this Decision.

5. The Tribunal notes that the references to the claims and motions submitted –and the arguments and admissible evidence presented– by each Party are made in summarized format, with the sole purpose of facilitating the Parties' understanding of the reasons underlying the adoption by this Tribunal of its decision hereunder. The Parties must rest assured that the Tribunal has reviewed, considered and debated in detail every nuance of the claims, arguments and evidence in the preparation of this decision.

## II.     Procedural Background:

6. After several exchanges between the Parties, the Tribunal issued Procedural Order #2 on 22 August, 2013. Procedural Order #2 and its Annexes I and II contain the Tribunal's rulings on each party's requests for the production of documentary evidence by the other party. Those rulings were supplemented, as required by the submissions by the Parties, by Procedural Orders ##3 through 8, which also disposed of certain requests for orders imposing confidentiality obligations or costs, precluding certain arguments, or allowing the redaction of certain pieces of information.

7. Through the Procedural Orders, and through interspersed and subsequent exchanges between the Parties and the Tribunal, the deadlines and number of submissions by the Parties in furtherance of their respective dispositive motions was set and later amended, as follows:

(i)     On 16 October, 2013, Claimant Leeward submitted a "Motion to Dismiss Respondent's Counterclaims," together with Exhibits 1 through 65 ("Leeward's Motion");

(ii)    On 12 November, 2013, Respondent AUA submitted a "Memorandum of Law in Support of [Respondent AUA]'s Opposition to the Claimant's Motion for Dismissal of AUA's ABST Related [sic] Claims on Various Grounds and Cross-Motion for an Order Striking Claimant's Stated Defenses and Awarding Summary Judgment to Respondent on Its ABST Related [sic] Claims," together with Schedule I, Exhibits A

3

to BB, an Affirmation and Supplemental Affirmation by Neal Simon,[3] and an Affirmation by Douglas James McLaren ("AUA's Motion");

(iii) On 22 November, 2013, Claimant Leeward submitted a "Claimant's Reply in Further Support of Its Motion to Dismiss Respondent's Counterclaims and in Opposition to Respondent's Cross-Motion for Summary Judgment," together with exhibits and legal authorities ("Leeward's Reply");[4] and

(iv) On 11 December, 2013, Respondent AUA submitted a "Reply Memorandum of Law in Further Support of AUA's Cross-Motion for an Order Striking Claimant's Defenses and Awarding Summary Judgment to Respondent on its ABST Related [sic] Claims and in Further Opposition to Claimant's Motion to Dismiss," together with Exhibit CC and a Supplemental Affirmation by Douglas James McLaren ("AUA's Reply," and, together with Leeward's Motion, AUA's Motion and Leeward's Reply, the "Motions").

8. Before, during and after the period in which the Motions were filed, the Parties also issued a sizeable number of communications containing statements or applications which directly or indirectly touched upon the matters discussed in the Motions, and which were not resolved under the Procedural Orders. Each such communication, statement and application has been dutifully considered by the Tribunal in due course, and, to the extent not disposed of under the Procedural Orders, shall be considered as resolved under this decision.

### III. Preliminary Matters:

9. In keeping with the Parties' request, the Tribunal ordered, in Procedural Order #1, that the Parties would be allowed to file their Motions, with a view to optimizing the efficiencies of the proceeding, by reducing the number of issues to be subjected to a full debate, including witness testimony and an evidentiary hearing. Such optimization would only actually be achieved if the Motions could be resolved without a hearing, and, as a consequence, the

---

[3] This Supplemental Affirmation was submitted by Respondent AUA under a separate cover on 13 November, 2013, hours after submitting its 12 November, 2013 presentation, arguing that "a section that [had been] separately prepared had been omitted from the final version," (email from L. Sclafani dated 13 November, 2013) and that the Supplemental Affirmation aimed to cure that inadvertent omission.

[4] This delivery consisted in a single .pdf document of 996 pages, but did not include an index of exhibits or legal authorities, making it difficult to identify each evidentiary piece separately. However, counsel for Claimant Leeward explained in an email sent to the Tribunal and Respondent on the matter of this delivery, that *"the reply submission may appear deceptively large. In the body of the reply, we have hyperlinked all exhibit citations. To accomplish this, many of the exhibits to Leeward's original submission had to be reattached to this submission. The legal authorities have also been attached and hyperlinked where cited in the document"* (email from V. McMillan dated 22 November, 2013).

Tribunal ordered that the Motions should only be supported by documentary evidence, which should be submitted together with the Motions.[5]

10. Respondent AUA submitted, in support of AUA's Motion and AUA's Reply, respectively, statements and supplementary statements by each of Messrs. Neil Simon and Douglas James McLaren (the "Witness Statements"). Claimant Leeward objected arguing, *inter alia*, that under Procedural Order #1 it would not be permissible for the Motions to be submitted supported by witness statements, but only documentary evidence.[6] Respondent AUA submitted that the expression "documentary evidence" did not exclude written witness statements,[7] and that –as a consequence– the Witness Statements should be admitted.

11. Under the Rules, the Tribunal has ample discretion to "determine the admissibility, relevance, and materiality of the evidence offered."[8] Accordingly, in light of the materials and submissions by the Parties, and noting that Claimant Leeward has referred to the scope and substance of the Witness Statements in Leeward's Reply,[9] the Tribunal has admitted the Witness Statements into the record, but only after noting that they have had no weight in the Tribunal's findings herein.:

12. As a result, the Tribunal, in deciding over the Motions, has considered all the evidence before it, but has made no finding which is based on any of the Witness Statements, nor has it considered as proven any submission supported exclusively by any assertion contained in a Witness Statement.

## IV.     The Motions Filed:

13. Below appears a summary of the motions included in each Party's Motions, which is produced for ease of reference only, and which is without prejudice to the fuller scope of each of the Motions, which has been duly weighed and considered by the Tribunal in preparing this decision.

---

[5] Procedural Order #1, ¶¶12(ii) and (iii).

[6] Leeward's Reply, p. 2, and email from J.S. Greer dated 16 December, 2013. In those materials, Claimant Leeward argued additional, discrete reasons for rejecting the statements by Messrs. Simon and McLaren, respectively. As discussed herein, the Tribunal finds that the Witness Statements in general are not admissible at this stage of the proceedings, and will thus not entertain the arguments pointing to objections to some assertions contained therein in particular.

[7] AUA's Reply, Point II, ¶¶31-33, cited also in the document titled "AUA Response to Greer email of 12-16-13," attached to an email from L. Sclafani dated 16 December, 2013.

[8] Rules, R-33(b). The Tribunal also takes guidance on the matter of its powers regarding evidence from rules R-32 through R-34, and, especially, from R-33(a) of the Rules, which provides that "[c]onformity to legal rules of evidence shall not be necessary."

[9] See, e.g., Leeward's Reply, ¶¶2, 23, 24.

14. In the summary below, the number assigned to each individual argument (each, an "Argument") is kept seriatim in a single series, to facilitate the references.

### b. Claimant Leeward's Motions:

15. Claimant Leeward moved this Tribunal for dismissal of Respondent AUA's Counterclaims as follows:[10]

    A. Regarding the ABST Counterclaim, it maintained that:

      i. when read together, the contract between the Parties and the ABST Act require AUA to pay ABST to Leeward;

      ii. the ABST Counterclaim is barred under the doctrine of res judicata;

      iii. Respondent AUA lacks standing to bring the ABST Counterclaim;

      iv. the ABST Counterclaim is barred under either or both the doctrines of waiver and/or modification; and that

      v. the ABST Counterclaim does not arise under the Contract and, therefore, is not subject to arbitration.

    B. Regarding the Construction Counterclaim, it maintained that:

      vi. the Construction Counterclaim is barred under the doctrine of res judicata;

      vii. the Construction Counterclaim is inadmissible because of their untimeliness, which it considered was the consequence of Respondent AUA having failed to comply with certain contractually-agreed notice requirements in connection with those claims; and

      viii. a certain portion of the Construction Counterclaim, which dealt with window installation works, is not subject to arbitration because it had been performed by Claimant Leeward under a separate contract.

### c. Respondent AUA's Motions:

16. Respondent AUA, on its part, moved this Tribunal for a summary judgment in the amount of USD 1,409,307.67[11] under its ABST Counterclaim,[12] together with such other relief as the

---

[10] *See* Leeward's Motion, ¶8. Although these arguments were ordered differently in Leeward's Reply (*see* Leeward's Reply, ¶¶1-3), the Tribunal follows here the order adopted in Leeward's Motion for ease of reference.

[11] In AUA's Motion, Respondent AUA assumes an exchange rate of 2.688 Eastern Caribbean Dollars per US Dollar (*see* AUA's Motion, p. 1), thus requesting a summary judgment in the amount of EC 3,788,500.87 **or** USD 1,409,307.67. Meanwhile, Claimant Leeward submits that the exchange rate as of 15 October, 2013 was 2.700 Eastern Caribbean Dollars per US Dollar (*see* Leeward's Motion, fn. 1). The

6

Tribunal deems appropriate, including an award of costs and legal fees in connection with this arbitration,[13] and for dismissal of Claimant Leeward's following defenses:

ix. lack of arbitrability of Respondent AUA's ABST Counterclaim;

x. Respondent AUA's lack of standing to maintain its Counterclaims;

xi. waiver;

xii. res judicata; and

xiii. an alleged obligation under contract or law for Respondent AUA to pay Leeward the sums claimed by AUA in these proceedings.

## V.   The Issues Being Resolved:

17. At the outset, the Tribunal notes that the Motions submitted by the Parties do not address the entirety of the claims or defenses raised in these proceedings.[14] As a result, irrespective of the findings of this Tribunal with respect to each individual motion or cross-motion before it, the Motions would not prevent the proceedings from moving forward with respect to one or more claims by one or more Parties.

18. That said, the Tribunal shall address below each of the Arguments raised in the motions and cross-motions contained in the Motions, and, given that some of those Arguments refer to the same factual or legal issues, it shall do so in collated fashion, interspersing the arguments by the Parties to best allow for an orderly disposition of the motions before the Tribunal, although some Arguments could be considered to fall under more than one section of this analysis by the Tribunal.  Again, the Tribunal notes that this exposition device shall not be taken as an indication that the Tribunal has not weighed or reviewed in full every aspect of each allegation of law or fact by each Party in adopting this decision.

---

tribunal notes this potentiality for a discrepancy, although, as discussed below, any such discrepancy will bear no relevance to this decision or, in general, at this stage of the proceedings.

[12] *See* p. 37 of AUA's Motion ("this Tribunal must grant summary judgment on AUA's claims relating to ABST herein") and ¶130 of AUA's Reply.

[13] *See* AUA's Reply, ¶130.  The Tribunal notes that, as discussed below (*see* ¶17), the motions submitted by Respondent AUA in AUA's Motion and AUA's Reply do not address the entirety of the claims or defenses by Claimant Leeward.  As a consequence, the Tribunal takes this portion of the motion to refer only to costs and fees related to the arguments raised in the Motions.  However, as discussed below in §VI, the Tribunal defers any decision on costs to the final award, which renders this assumption by the Tribunal of no practical significance.

[14] By way of example, Respondent AUA does not move the Tribunal for a summary judgment on the Construction Counterclaims, nor is there a motion for the dismissal of the ABST Claim, or of the defenses related to notice requirements affecting the Construction Counterclaims.  Similarly, Claimant Leeward does not move the Tribunal for a summary judgment on the ABST Claim, or for dismissal of Respondent AUA's defenses regarding Claimant Leeward's ABST Claim.

19. Finally, in reaching the findings contained in this decision, the Tribunal is mindful that the burden of proof regarding the Motions lies in principle with the moving party, which must satisfy the Tribunal that its motion is with merit. In the particular context of the agreements between the Parties and the related Tribunal's orders in the Procedural Orders, that meant that, to the extent that the motion was one for dismissal of a claim or counterclaim, the moving party had assumed the challenge of proving, on the limited basis of documentary evidence, that such claim or counterclaim could not succeed irrespective of any further argumentation or non-documentary evidence. Conversely, to the extent that the motion was one for dismissal of a defense, it meant that the moving party had assumed the challenge of proving, on the limited basis of documentary evidence, that such defense could not succeed irrespective of any further argumentation or non-documentary evidence.[15]

### a. **Issue I: Respondent AUA's Duty to Pay ABST to Claimant Leeward, and Claimant Leeward's Entitlement to Perceive ABST (Arguments (i), (iv), (xi) and (xiii))**

20. It is undisputed that the Contract contained a provision that provided that Claimant Leeward would "pay sales, consumer, use and similar taxes for the Work provided by [Claimant Leeward]."[16]

21. However, the Parties disagree as to whether this provision (i) was as from the inception of the Contract an implementation of the generally applicable tax rules of the ABST Act,[17] (ii) was, to the contrary, derogated by those tax rules,[18] or (iii) was devised as an exception to

---

[15] Cf. Procedural Order #1, ¶¶12(ii) and (iii).

[16] General Conditions of Contract, §3.6.1.

[17] This seems at first sight to be proposed by Claimant Leeward, at ¶44 of Leeward's Motion ("*44. The Contract requires the AUA to pay ABST. Pursuant to §3.6.1 of the General Conditions of the Contract, Leeward is required to "pay sales, consumer, use and similar taxes for the Work provided by the Contractor." (Exhibit 1) **This provision read in conjunction with the ABST Act, requires Leeward to: (a) collect 15% ABST from the AUA on the payments that the AUA made to Leeward for the goods and services that Leeward provided under the Contract**, see, e.g., ABST Act, Part II (2006), as amended (2008), and (b) pay the Antiguan Government to the extent that the ABST that Leeward collected on all "outputs" during the tax period excedes* [sic] *the ABST that Leeward paid on the work, labor, services, equipment, and materials that it produced during the tax period. See ABST Act, Part VII (2006), as amended (2008).*") (emphasis added)

[18] This also seems at first sight to be proposed by Claimant Leeward, at ¶¶66-67 of Leeward's Motion. ("*66. Even assuming, arguendo, that the AUA's course of conduct and written documentation does not meet the formal requirements of waiver, the **AUA's written approval of the payment of ABST, without protest, in each of the 27 payment applications constitutes a modification of the Contract's tax payment provisions**. 67. The Contract provides that any modifications must be in writing and signed by both parties. (Exhibit 1, General Conditions, §§ 1.1.1, 1.1.2, pg. LC000025/ADA000025) **The AUA's written***

those generally applicable tax rules.[19]  Any finding regarding Arguments (i), (iv), (xi) and (xiii) would require a clear understanding of the scope and effects of that provision as between the parties, but the Motions and the evidence in support thereof currently in the record do not allow this Tribunal to dispose of the claims and counterclaims related to this issue at this stage.

22. The discrepancies above would suffice to deny any portion of the Motions requesting this Tribunal to dismiss one or more claims or one or more defenses related to the ABST Claim or the ABST Counterclaim on the basis of the current record.  However, the Tribunal has found a number of other occurrences of relevant facts or legal issues not having been fully covered through the Motions, which would also prevent the Tribunal from granting any Motions regarding the ABST Claim or the ABST Counterclaim.  By way of example, the record does not conclusively show:

    a.  whether ABST was at all due with respect to the work performed under the Contract, based on the location of the construction site;

    b.  what was the actual scope of the agreement and of the understanding of the Parties regarding the applicability of ABST, and the economic and financial implications as between the Parties of any ABST charges;

    c.  whether Respondent AUA knew it was paying ABST-related charges to Claimant Leeward together with 27 of the payment requisitions; whether it assumed that it would later recover any such payments from the Antiguan tax authorities; whether, to the contrary, it paid in error; and whether such error –if any– is legally relevant; or

    d.  whether Claimant Leeward was under a contractual or legal duty to pay or account for any sums perceived from Respondent AUA to the Antiguan tax

---

*approval of the payment of ABST on each and every payment application submitted by Leeward constitutes a modification of the Contract's tax payment provisions to provide that the AUA will pay the ABST that Leeward is required to charge under the ABST Act. These written modifications of the Contract's tax payment provisions are binding upon the AUA, and remove the AUA's right to seek repayment under the Contract.*") (emphasis added)

[19] This seems at first sight to be proposed by Respondent AUA, at p. 3 of AUA's Motion. ("[*a]ll of AUA's claims, including its unjust enrichment claim, have their origin, at least in part, in Article 3.6.1 of the Contract, which provides that the Leeward was responsable for payment of all taxes, including sales taxes. ABST is clearly one of the taxes that the Leeward agreed through this provision that it would pay. [...] AUA has claimed that, notwithstanding this provision in the Contract, the Leeward wrongfully invoiced AUA for ABST on the 27 separate requisitions for payment that it submitted during* the course of its performance of the Contract and on other ancillary invoices*, purportedly pursuant to the provisions of the Contract and in consideration for its performance thereunder, which invoices, to the extent that they included ABST, AUA paid in error.*") (emphasis added)

9

authorities as ABST; and what are the contractual consequences of any breach thereof.

23. As a consequence, this Tribunal denies any portion of the Motions requiring it to dismiss a claim, counterclaim or defense dealing with Respondent AUA's duty to pay ABST to Claimant Leeward, or with Claimant Leeward's right to perceive ABST, or with Claimant Leeward's duty to pay or account for ABST collected to the Antiguan tax authority, be it as part of the ABST Claim or the ABST Counterclaim.

### b. <u>Issue II</u>: Respondent AUA's Right to Claim ABST-Related Reimbursements from Claimant Leeward (Arguments (iii), (v), (ix) and (x))

24. Claimant Leeward disputes that the ABST Counterclaim be considered a claim against it –as opposed to a claim for reimbursement from the Antiguan tax authorities–,[20] or that such claim can be brought under the arbitration clause in the Contract.[21] It maintains that "the only mechanism by which [Respondent AUA] can obtain a refund of ABST [...] is to seek a refund from the Antiguan Government pursuant to the ABST Act."[22] However, it does not dispute that it "did not produce or file any tax returns with the tax authorities of Antigua and Barbuda with respect to ABST during the period in which the development and construction of [Respondent AUA's] campus in Coolidge, Antigua was under course."[23]

25. Respondent AUA, on its part, maintains that, since no ABST was due because of the location of the construction site in a Trade Free Zone, and as "[Claimant] Leeward did, in fact, fail to treat the sums that it invoiced and collected as ABST from [Respondent] AUA as taxes due the Government,"[24] the collection of ABST-related sums by Claimant Leeward is "at best for the Leeward, a mutual mistake of the parties to a contract [...]; or a mistake on the part of AUA and willful fraud and deceit on the Leeward's part that, in either case[,] resulted in the Leeward improperly invoicing and collecting from AUA in connection with its Work sums far in excess of those to which it was entitled under the [P]arties' Contract."[25]

26. The Tribunal has found[26] that the record does not as yet permit a definitive finding on key issues surrounding the ABST Claim and the ABST Counterclaim. Absent a finding on these points, which would require the examination of evidence and the presentation of legal

---

[20] *See* Leeward's Motion, ¶¶56-59. *See also* Leeward's Reply, ¶¶23-30.
[21] *See* Leeward's Motion, ¶¶68-74. *See also* Leeward's Reply, ¶¶15-22.
[22] Leeward's Reply, ¶23.
[23] *See* Statement by Eric Linde, Claimant Leeward's Director, dated 23 September, 2013, ¶2.
[24] AUA's Motion, p. 4, second paragraph.
[25] Id, third paragraph.
[26] *See* §V.a above.

arguments not currently present in the record, the Tribunal cannot grant any motion to dismiss the ABST Counterclaims or any defenses thereto based on these Arguments.

27. Also, Claimant Leeward's Argument that the ABST Counterclaim does not fall within the scope of the arbitration clause contained in the Contract[27] must be rejected. The Tribunal considers that this consequence would follow irrespective of any final determination on the legal nature of the ABST Claim or the ABST Counterclaim, as the Counterclaims presented in this arbitration arise out of and concern the Parties' Contract.

28. As a consequence, this Tribunal denies any portion of the Motions requiring it to dismiss a claim, counterclaim or defense dealing with Claimant Leeward's duty to reimburse Respondent AUA of any sums perceived as ABST under the Contract or related payments, or the arbitrability thereof.

### c. <u>Issue III</u>: The Effect of the Prior Proceedings (Arguments (ii), (vi) and (xii))

29. The Parties disagree on the scope and effects of the issues raised, the arguments made, and the decisions issued, in the Prior Proceedings. While Claimant Leeward maintains that one or more of the above bars the ABST Counterclaim and/or the Constructive Counterclaim from being heard,[28] Respondent AUA argues that neither the ABST Counterclaim nor the Constructive Counterclaim was argued or decided upon in the Prior Proceedings, but that, rather, some of Claimant Leeward's Arguments are barred under *res judicata*, as the tribunal in the Prior Proceedings issued findings related to both ABST payments and the mechanics of contract claims under the Contract which should prevent Claimant Leeward from maintaining them.[29]

30. The Motions and the Arguments fail to account for the legal standard applicable to a determination of res judicata in the particular circumstances of these proceedings. While it is true that certain disputes between the Parties have been raised, debated and resolved in the Prior Proceedings, the effect of those claims, arguments and decisions on the jurisdiction of this Tribunal or the admissibility of the claims of which it is seized cannot be properly assessed without addressing the obvious: while the Prior Proceedings were seated in Puerto Rico —and are subject to challenges and other procedures brought under the Federal Arbitration Act of the United States—,[30] these proceedings are seated in Antigua and Barbuda, and the procedural laws applied in those two sets of proceedings are, as a consequence,

---

[27] *See* Leeward's Motion, ¶¶68-74. *See also* Leeward's Reply, ¶¶15-22.
[28] *See* Leeward's Motion, ¶¶46-55 (regarding the ABST Counterclaim) and ¶¶77-83 (regarding the Construction Counterclaim). *See also* Leeward's Reply, ¶¶5-14.
[29] *See* AUA's Motion, pp. 26-35. *See also* AUA's Reply, ¶¶53-93.
[30] *See* Procedural Order #1, ¶3(a).

different. The Tribunal can only analyze the legal arguments as presented by the parties, and –at this point–, the Parties have failed to indicate which doctrine of res judicata applies –ie, that applicable in Puerto Rico or that of Antigua, to the extent different–, or how to apply the doctrine to the facts as presented.

31. None of the Motions or Arguments provides any guidance as to what are the consequences – if any– of those differences. As a result, absent a fuller elaboration and briefing on the matter of the legal regime applicable to the effects of the Prior Proceedings in Puerto Rico in these subsequent proceedings in Antigua and Barbuda, the Tribunal is not in a position to grant any Motion calling for the dismissal of any claim or counterclaim herein based on this Argument.[31]

### d. Issue IV: Effect of Notice Requirements on the Construction Counterclaims (Arguments (vii), (xi) and (xii))

32. Claimant Leeward argues that the Construction Counterclaim is untimely because of the failure by Respondent AUA to follow certain requirements regarding notices of defects, including an agreed maximum period for admissibility of claims regarding such defects.[32] These allegations could be seen as a discrete, separate Argument, or as a variation on the Argument dealing with waiver.

33. Although Respondent AUA fails to expressly take issue with this Argument –or specifically with the waiver Argument as applied to the Construction Counterclaim–, the thrust of Claimant Leeward's Argument seems to be anchored on the provisions of §12.2.2.1 of the Contract,[33] which does not –at this stage of the proceedings– meet the stringent test for dismissing the Construction Counterclaim, which seems to rely on other provisions of the

---

[31] On a side note, the Tribunal is concerned at what appears, at first sight, to be some degree of inconsistency in the Arguments underlying Claimant Leeward's Motion and Reply, as revealed in the tension between maintaining that the ABST Counterclaim is barred under res judicata, but not the ABST Claim, or maintaining that some of the Counterclaims are at the same time beyond the arbitration clause, and barred under res judicata. However, the continued course of the proceedings regarding the Counterclaims as decided by this Tribunal will give both Parties ample chance to elaborate on these points more fully.

[32] *See* Leeward's Motion, ¶¶84-90. *See also* Leeward's Reply, ¶¶34-36.

[33] *See*, e.g., Leeward's Motion, ¶¶85, 90 ("*85.Section 12.2.2.1 of the General Conditions to the contract requires that the AUA give Leeward written notice of defective work and an opportunity to cure with respect to defective work discovered during the one (1) year warranty period that runs from substantial completion of the project.[…]. […] 90. As a result of the AUA's failure to provide timely written notice of the alleged defects, **as required under §12.2.2.1 of the Contact, the AUA's [Construction Counterclaim] must be dismissed as untimely.***") (emphasis added).

Contract.[34]   In any event, nothing except Claimant Leeward's Motion and Reply seem to indicate that the Construction Counterclaim are brought in reliance on §12.2.2.1 of the Contract and not on other provisions thereof.

34. The fact that the record does not currently allow for a definitive decision on which are the contractual provisions invoked under the Construction Counterclaim, or the effect that the contractual provisions invoked as defenses bear on those Construction Counterclaims, should not be taken as an indication that the Construction Counterclaims should prevail on the merits or not, but, merely, that the Motions have failed to provide the procedural mechanism to dispose of them appropriately, and that, as a consequence, any Motions related to the untimeliness of Counterclaims must fail.

### e. Issue V: Construction Counterclaims under other Contracts (Argument (viii))

35. Upon review of the Motions, the Tribunal notes that the Parties agree that a certain portion of the Construction Counterclaim, dealing with certain window installation works (the "Windows Counterclaim") eventually performed under a contract other than the Contract should not be arbitrated as part of these proceedings.[35]

36. Accordingly, the Tribunal shall consider that Claimant Leeward's Motion regarding the Windows Counterclaim was sufficiently based, and that Respondent AUA has as a consequence discontinued its Windows Counterclaim.

## VI.   Decision:

---

[34] By way of example, §12.2.2.5 of the Contract states that "[n]*othing contained in this Section 12.2 shall be construed to establish a period of limitation with respect to other obligations which [Claimant Leeward] might have under the Contract Documents. Establishment of the one-year period for correction of Work as described in Section 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.*"
This provision could be relevant in light of ¶3.5 of the Contract, which reads as follows: *"§ 3.5 WARRANTY § 3.5.1 [Claimant Leeward] warrants to [Respondent AUA] and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents,* **that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective.** […]."(emphasis added)
[35] *See* Leeward's Motion, ¶¶ 91-97; and AUA's Reply, ¶¶19-20.

37. For the reasons discussed above, this Tribunal has found that all of the claims before it – except for the Windows Counterclaim– are arbitrable under the Contract, and, having considered all arguments and evidence before it, ORDERS as follows:

### i. As to Claimant's Motions:

All of Claimant Leeward's Motions contained in Leeward's Motion and Leeward's Reply are hereby denied, with one exception. Both Parties agree in their submissions that the Windows Counterclaim is to be excluded from the arbitration before this Tribunal. Accordingly, the Windows Counterclaim is dismissed without prejudice.

### ii. As to Respondent's Motions:

All of Respondent AUA's Motions contained in AUA's Motion and AUA's Reply are hereby denied.

### iii. As to other matters:

#### 1. Next Procedural Steps:

The Tribunal shall set the procedural calendar for the next steps of these proceedings at the next telephone conference with the Parties.

#### 2. Costs:

The Tribunal defers a decision on the costs up to this stage of the proceedings for the final award.

#### 3. Miscellaneous Applications:

All other pending requests for a ruling or order are denied.


Signed on 6 February, 2014.

For the Tribunal,


| Judith B. Ittig | Diego Brian Gosis (chair) | Carlos A. Romero, Jr. |

14

# EXHIBIT F

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**International Arbitration Tribunal**

---

**In the Matter of the Arbitration between**

**Leeward Construction Corp.,**

       *Claimant/Counter-Respondent,*

**and**                                 **Case No. 50 110 T 00118 13**

**American University of Antigua College of Medicine,**

       *Respondent/Counter-Claimant.*

---

**PARTIAL FINAL AWARD AND SECOND DECISION ON THE PARTIES'**
**DISPOSITIVE MOTIONS AND RELATED CROSS-MOTIONS**

---

WE, THE UNDERSIGNED ARBITRATORS, having been appointed in accordance with the arbitration agreement entered into between the above-named Parties and dated 25 September, 2008 (the "Arbitration Agreement"), and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, issue this Partial Final Award and Second Decision on the Parties' Dispositive Motions and Related Cross-Motions where we FIND and AWARD, as follows:

1.      These proceedings are brought under the Construction Industry Arbitration Rules (including the Procedures for Large, Complex Construction Disputes) of the American Arbitration Association in effect as from 1 October, 2009, and are administered

1

through the International Centre for Dispute Resolution of the American Arbitration Association.

2.    Leeward Construction Corp. ("Leeward") and American University of Antigua College of Medicine ("AUA") submitted motions for dispositive relief, which were addressed in the Tribunal's February 6, 2014 Decision on the Parties' Dispositive Motions and Related Cross-Motions (the "First Decision"), which is attached hereto as Annex I. Both Parties then requested to be given a chance to elaborate further on their arguments in support of their respective motions, and to answer any questions that the Tribunal may have regarding the substance of their motions. In making this request the Parties averred that there are no material facts in dispute regarding the matter of the motions, and that the Tribunal should make final determinations on their motions.[1] The Tribunal granted this request and it was agreed by the Tribunal and the Parties that oral argument would be held on the dispositive and related cross-motions.

3.    Oral argument was held on April 28, 2014. For the convenience of the Parties and the Tribunal, it was agreed that the oral argument would be held in the offices of the American Arbitration Association in Miami, Florida, while the seat of arbitration would remain to be Saint John, Antigua, Antigua and Barbuda, as per the Parties' arbitration agreement. Having heard oral argument by the Parties, having reviewed and considered the Parties' written submissions, and having reviewed the Parties'

---

[1] In the First Decision (¶17), the Tribunal found that not all claims and defenses had been subjected to dispositive motions. Under the further submissions made by the Parties, dispositive motions and cross-motions were made for and against all claims and defenses by both parties.

2

resubmitted motions, the Tribunal issues this Partial Final Award and Second Decision on the Parties' Dispositive Motions and Related Cross-Motions (the "Second Decision"). This Second Decision hereby incorporates the First Decision, and makes further final decisions on these motions as set forth herein. Except to the extent defined otherwise herein, all capitalized terms shall have the meaning ascribed to them in the First Decision.

4. As discussed in the First Decision, each of the Parties has submitted one or more claims, and also defenses to the other Party's claims. In short, Claimant Leeward has submitted an Antigua and Barbuda Sales Tax (ABST) Claim, and Respondent AUA has submitted an ABST Counterclaim and a Construction Counterclaim.[2] In the Parties' motions and related submissions –as supplemented, in each case, after the First Decision– each party seeks the dismissal of the other party's claims and defenses.

5. This Second Decision is issued by a majority, and includes a partial dissenting opinion of this same date, issued by Arbitrator Carlos Romero Jr.

## I. The Claims, Counterclaims and Defenses

### a. General Defenses: The Arguments of Res Judicata and Estoppel

---

[2] Under ¶37(i) of the First Decision, the Tribunal found that "Both Parties agree in their submissions that the Windows Counterclaim is to be excluded from the arbitration before this Tribunal. Accordingly, the Windows Counterclaim is dismissed without prejudice." As a result, only the Construction Counterclaim remaining after deduction of the Window Counterclaim –as defined in the First Decision– is still pending before this Tribunal, and this Second Decision only refers to such reduced scope of the Construction Counterclaim.

6.     In general terms, and in addition to certain other defenses, Claimant Leeward has argued that all of Respondent AUA's Counterclaims were precluded under either or both res judicata or estoppel, by reason of the scope or decisions of the Prior Proceedings.

7.     The Tribunal finds the arguments regarding res judicata or estoppel unconvincing.  In particular, the arguments proposed by Leeward fail to satisfy any tenable test for precluding the claims submitted by Respondent AUA based on either or both res judicata or estoppel.

8.     Claimant Leeward's proposed test that any claim arising under the same transaction as the claims debated in the Prior Proceedings should be precluded is not persuasive.[3] The Tribunal has found the additional arguments that the AUA's ABST arguments should have been submitted before –at the time of the Prior Proceedings or even before that– and that Leeward's defense of res judicata should prevail even in light of its own ABST claim, are similarly not persuasive.

9.     Accordingly, all defenses against Respondent AUA's Counterclaims based on either res judicata or estoppel are rejected.

   **b.  The ABST Claim and ABST Counterclaim**

---

[3]  The preclusive effect of a prior arbitration decision on a subsequent arbitration is a matter for the arbitrator to decide.  This has been ratified by recent, persuasive decisions, in several jurisdictions. *See, e.g.,* in the United States, *Employers Insurance Company of Wausau et al. v. OneBeacon American Insurance Company et al.* (1st Cir., February 26, 2014).

10.     During the course of the project, Leeward invoiced for –and AUA paid– an amount equal to 13% of the sums otherwise invoiced, which was identified in those invoices – and generally throughout these proceedings– as ABST-related payments calculated in connection with work, labor, materials and services provided by Leeward on the project. The Parties agree that AUA in fact made such payments with respect to 26 of the 27 requisitions for payment made under the Contract. Leeward does not dispute that it never filed any ABST tax returns with, nor paid any corresponding ABST tax to, the tax authorities of Antigua and Barbuda during or after the construction project.

11.     As a threshold issue, Leeward argues that the Parties' arbitration agreement does not encompass AUA's ABST Counterclaim. That argument is rejected.

12.     The Parties' arbitration agreement covers "[a]ny Claim arising out of or related to the Contract . . . ." That provision is sufficiently broad to apply to the ABST Claim and the ABST Counterclaim, and Claimant Leeward itself is seeking an award of damages based on a claim that –as per the Contract or under a separate promise–[4] certain funds mis-tabulated in the payments received should have been paid as ABST.

13.     In the First Decision, the Tribunal determined that the ABST Counterclaim falls within the scope of the Parties' arbitration agreement. That determination remains unchanged.

---

[4] Claimant Leeward has sought to identify its claim as not being an ABST claim but a different claim based on a contract shortfall or a separate promise received during the First Proceedings, and which would not be affected by res judicata. The Tribunal is not persuaded by these arguments.

5

14.   Leeward maintains that the only mechanism by which AUA can obtain a refund of ABST is to seek relief from the Antiguan Government pursuant to the ABST Act. AUA contends that no ABST was in fact due because of the location of the construction project in a Trade Free Zone. The Tribunal need not determine whether AUA's assertion is accurate.

15.   Claimant Leeward makes an additional argument that Respondent AUA should have asserted with the first of Leeward's invoices that it did not need to pay ABST. Leeward argues that AUA's failure to do so was a waiver that bars it from recovery now. Regardless of whether AUA mistakenly paid the ABST to Leeward, as it originally contended in this arbitration, or whether it had an oral agreement with Leeward to collect the ABST pending a determination by the government, as it asserted at oral argument, Leeward has not established sufficient facts to prove waiver. In light of this Tribunal's findings discussed below, the argument of waiver, even if proven, would not change the determination of the ABST Claims.

16.   Under these circumstances, where the Antiguan government is not holding any ABST monies from Leeward, there are no ABST monies in the possession of the government from which AUA can seek a refund. Leeward's collection of ABST –or sums due to be paid as ABST– from AUA places Leeward in the position of the holder, but not the owner, of funds which it labeled as ABST. The record does not contain credible indication of any title or ownership in favor of Leeward entitling it to keep or retain these monies.

6

17. Inasmuch as Leeward failed to pay over to the government the sums that it invoiced and collected from AUA as ABST related to the project, Leeward would be unjustly enriched if it were permitted to retain those monies.[5] Contrary to Leeward's position, equitable claims such as unjust enrichment are within the scope of the Parties' arbitration agreement, and Rule R-45 of the AAA's Construction Industry Arbitration Rules grants the authority to the Tribunal to make this ruling.

18. Claimant Leeward's defenses regarding unjust enrichment as a basis for the ABST Counterclaim were two-tiered. It maintained that

    (i)    if AUA's claim for unjust enrichment were considered to be a contractual claim, it would be precluded under the doctrine of res judicata by reason of the decision issued in the Prior Proceedings;

    (ii)    in the alternative, if that claim were considered not to be contractual, it would fall beyond the scope of the arbitration clause in the Contract, and thus would be unarbitrable.

19. The Tribunal has already found that Claimant Leeward's res judicata and non-arbitrability defenses were rejected, which, in this context, means that Claimant Leeward has not submitted any valid defense to the claim for unjust enrichment included as one of the avenues argued by Respondent AUA for maintaining the entirety of the ABST Counterclaim.

---

[5] Respondent AUA has formulated its counterclaim such that it includes a claim for unjust enrichment (AUA's Statement of Defense and Counterclaim, §I.E), and the Parties' subsequent oral and written submissions have addressed this unjust enrichment claim (See, eg, Leeward's Motion, ¶6, and AUA's Motion, pp. 2, 3, 5 and 36).

20.     Respondent AUA has submitted alternative avenues supporting its claim for the same amounts claimed under unjust enrichment, both under contract and under law. Claimant Leeward has submitted certain other defenses to those alternative avenues. As the Tribunal has found that there was no valid defense to AUA's claims under unjust enrichment, and all alternative avenues would lead to the same result, the Tribunal considers it unnecessary to dwell in detail in each such construction.

21.     Accordingly, AUA is entitled to the return from Claimant Leeward of the funds it collected from AUA as ABST in the amount of XCD $3,614,522.41, and the Tribunal hereby orders Leeward to pay AUA the sum of XCD $3,614,522.41.

22.     The Tribunal further finds and orders, though, that to the extent that Leeward is later required by the Antigua and Barbuda tax authorities to account for, and pay to, the Antigua and Barbuda authorities ABST on this construction project, AUA shall then be required to indemnify Leeward from any double liability by it –*i.e.*, liability to both AUA and the tax authorities– arising from Tax Deficiencies (as defined below) as follows: [6]

    a.  For purposes hereof, "Tax Deficiencies" shall mean any tax deficiency or liability asserted by the Antigua and Barbuda tax authorities against Leeward for failing to collect from AUA, for reimbursing to AUA, or for failing to pay to the tax authorities, ABST relating to the taxable supplies provided by Leeward to AUA

---

[6] Based on the submissions by the Parties, the Tribunal finds this to be a necessary corollary of the principles embodied in §45 of the ABST Act, and also to be an order permitted to be adopted under the scope of Rule R-45 of the Rules governing this arbitration.

during the construction of the school project. AUA shall not be liable for penalties or interest asserted for non-collection from AUA or reimbursement to AUA or nonpayment to the tax authority of the ABST tax in question, or for not filing any required tax returns with any relevant tax authority.

b. If a Tax Deficiency is validly asserted against Leeward, then AUA shall indemnify Leeward by paying to the relevant Antigua and Barbuda tax authority, upon due notice, an amount not to exceed the Indemnity Cap (as defined below). All obligations of indemnification by AUA hereunder shall be limited to making any payments described hereunder. In the event that no payment is due hereunder, then no indemnification obligation by AUA to Leeward shall be deemed to exist.

c. For purposes hereof, "Indemnity Cap" shall mean any sums that Leeward has paid AUA under the ABST Counterclaim hereunder in cash or through any valid set-off or reciprocal claims agreed by the parties or finally ordered by a competent authority.

**c. Construction Counterclaim**

23.  Claimant Leeward argues that the Construction Counterclaim is untimely because of Respondent AUA's failure to give the required notices of defects. Leeward's argument was rejected in the Tribunal's First Decision, and that decision to deny Leeward's motions as to untimeliness of the Construction Counterclaim remains unchanged.

24.  Claimant Leeward also contends that AUA's claims are barred by res judicata by reason of the decision issued in the Prior Proceedings. The Tribunal has rejected the

9

defenses based on res judicata, and, as a consequence, these proceedings shall continue with respect to the Construction Counterclaim.

## II. Decision

25.    For the reasons discussed above, this Tribunal finds that all of the claims currently before it[7] are arbitrable under the Contract and, having considered all arguments and evidence before it, ORDERS as follows:

> (i)     That Claimant Leeward's ABST Claim is hereby dismissed with prejudice;
>
> (ii)    That Claimant Leeward's motion to dismiss Respondent AUA's Counterclaims is hereby dismissed with prejudice, with the exception that the Windows Counterclaim was dismissed without prejudice under the First Decision;
>
> (iii)   That Respondent AUA's cross-motion for a summary judgment on its ABST Counterclaim is hereby granted, and Claimant Leeward is ordered to pay Respondent AUA the amount of XCD $3,614,522.41;
>
> (iv)    That in the event that Leeward is later required by the Antigua and Barbuda tax authorities to account for, and pay to, the Antigua and Barbuda authorities ABST on this construction project, AUA shall then be required to indemnify Leeward from any double liability —

---

[7] This excludes the Windows Counterclaim as per the First Decision, §37(i).

*i.e.*, liability to both AUA and the tax authorities– arising from Tax Deficiencies as follows:

    a. If a Tax Deficiency is validly asserted against Leeward, then AUA shall indemnify Leeward by paying to the relevant tax authority, upon due notice, an amount not to exceed the Indemnity Cap. All obligations of indemnification by AUA hereunder shall be limited to making any payments described hereunder. In the event that no payment is due hereunder, then no indemnification obligation by AUA to Leeward shall be deemed to exist.

(v)    That Respondent AUA's Construction Counterclaim is to be arbitrated by this Tribunal. The Tribunal will hold a telephone conference with the Parties at the earliest convenient date in order to schedule the following steps of these proceedings;

(vi)    That each Party shall bear its own costs and expenses, and one half of the arbitration costs and expenses, in both cases with respect to all procedural activity up to this stage of the proceedings;

(vii)    That all other requests included in the Motions are hereby denied.

The undersigned arbitrators hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made as in St. John, Antigua, Antigua and Barbuda.

11

Signed on 18 September, 2014

_____         _____
        Judith B. Ittig                      Diego Brian Gosis
                                           (Chair)

12

State of _Florida_                  )

                                    )    SS:

County of _Miami-Dade_              )

I, Diego Brian Gosis do hereby affirm upon my oath as Arbitrator that I am the individual

described in and who executed this instrument, which is our Partial Final Award.

_9/18/2014_                                    _____

Date                                           Diego Brian Gosis, Arbitrator

State of _Florida_                  )

                                    )    ss:

County of _Miami-Dade_              )

On this _18_ day of September, 2014, before me personally came and appeared Diego Brian

Gosis, to me known and known to me to be the individual described in and who executed the

foregoing instrument and he acknowledged to me that he executed the same.

13

Notary Public

LADY JOHANNA SMITH
Notary Public - State of Florida
My Comm. Expires Jul 19, 2018
Commission # FF 111740
Bonded Through National Notary Assn.

State of _____        )

                          )   SS:

County of_____           )

I, Judith Ittig do hereby affirm upon my oath as Arbitrator that I am the individual described in and

who executed this instrument, which is our Partial Final Award.

_____          _____

Date                           Judith B. Ittig, Arbitrator

State of _____           )

                           )   ss:

County of _____            )

On this _____ day of September, 2014, before me personally came and appeared Judith B. Ittig, to

me known and known to me to be the individual described in and who executed the foregoing

instrument and she acknowledged to me that he executed the same.

14

_____

Notary Public

Signed on 18 September, 2014


Judith B. Ittig

Diego Brian Gosis
(Chair)

12

_____

Notary Public


State of _____          )

                          )    SS:

County of_____            )



I, Judith Ittig do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

_____9-23-14_____          _____Judith B. Ittig_____

Date                       Judith B. Ittig, Arbitrator



State of _____           )

                          )    ss:

County of ____            )



On this 23 day of September, 2014, before me personally came and appeared Judith B. Ittig, to me known and known to me to be the individual described in and who executed the foregoing instrument and she acknowledged to me that he executed the same.


14

District of Columbia: SS

Subscribed and Sworn to before me

this 23 day of Sept . 2014

Notary Public. D.C.

My commission expires 11-30-2017

Notary Public

15