# 15-1595-cv

## United States Court of Appeals

*for the*

## Second Circuit

~.~

AMERICAN UNIVERSITY OF ANTIGUA - COLLEGE OF MEDICINE,

*Petitioner-Appellee,*

-v.-

LEEWARD CONSTRUCTION COMPANY, LTD.,

*Respondent-Appellant,*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX

### Volume 2 of 4 (Pages A249 to A462)

VERONICA A. MCMILLAN
LEWIS & GREER, P.C.
*Attorneys for Respondent-Appellant*
510 Haight Avenue, Suite 202
Poughkeepsie, New York 12603
(845) 454-1200

APPENDIX TABLE OF CONTENTS

**Volume 1**

Docket Entries ..................................................................................A001

Notice of Appeal ..............................................................................A014

Opinion & Order, Dated May 1, 2015 .............................................A015

Verified Petition ..............................................................................A035

    Contract (Verified Petition, Ex. A).........................................A041

    Statement of Claim (Verified Petition, Ex. B) ........................A093

    Answer and Counterclaim (Verified Petition, Ex. C) .............A132

    Amended Counterclaim (Verified Petition, Ex. D).................A154

    Arbitrators' Decision on the Parties' Dispositive Motions and
    Related Counterclaims (Verified Petition, Ex. E) ...................A158

    Partial Final Arbitration Award, dated September 18, 2014
    (Verified Petition, Ex. F) ........................................................A172

Affirmation of Leonard Sclafani in Support of Petition/Motion for
    Confirmation of, and for Judgment on, an Arbitration Award.................A189

    Letter to Hon. Justin L. Simon, Attorney General from Neil S.
    Simon, dated September 28, 2010 (Exhibit 46 of Exhibit B of
    Sclafani Affirmation)...............................................................A196

    Email to Jackie Williams from Lyle Novick, dated November
    17, 2009 (Exhibit 50 of Exhibit B of Sclafani Affirmation) ...................A200

Email to Lyle Novick from Jackie Williams, dated November 17, 2009 (Exhibit 60 of Exhibit B of Sclafani Affirmation) ....................A208

Email to Matt Peterson, Jackie Williams and Lyle Novick from Basil Stuart, dated November 17, 2009 (Exhibit 61 of Exhibit B of Sclafani Affirmation) ..........................................................................A217

Email to Basil Stuart; Barrymore Warren; Antony Roche; Nagesha, A.S. from Corey Greenberg, dated December 10, 2009
(Exhibit 62 of Exhibit B of Sclafani Affirmation) ...................................A227

Email to Matt Petersen and Prabhu Marudheri from Antony Roche, dated December 11, 2009 (Exhibit 63 of Exhibit B of Sclafani Affirmation)..................................................................................A236

Email to Matt Petersen from Jackie Williams, dated December 22, 2009 (Exhibit 64 of Exhibit B of Sclafani Affirmation) ....................A240

Email to Matt Petersen, lyle Novick, Jackie Williams, Basil Stuart;, and Corey Greenberg from Leonard Sclafani, dated December 23, 2009 (Exhibit 65 of Exhibit B of Sclafani Affirmation) ...............................................................................................A243

## Volume 2

Notice of Cross-Motion to Deny Enforcement, Vacate or Modify Arbitration Award....................................................................................A249

Declaration of Veronica A. McMillan in Support of Notice of Cross Motion....................................................................................................A251

Amended Demand for Arbitration (Exhibit 1 of Cross-Motion) .............A259

Answering Statement and Counterclaim of American
University in Antigua to the Amended Demand for Arbitration
Submitted by Leeward Construction Company, Ltd. (Exhibit 2
of Cross-Motion) ....................................................................A283

Final Award (Exhibit 3 of Cross-Motion) ...............................A321

Memorandum Opinion, Hon. Lewis A. Kaplan, USDC, SDNY,
Dated March 26, 2013
(Exhibit 4 of Cross-Motion) ....................................................A388

Corrected Amended Judgment, Dated June 11, 2013 (Exhibit 5
of Cross-Motion) .....................................................................A397

Partial Final Award and Second Decision on the Parties'
Dispositive Motions and Related Cross-Motions and Dissent to
Partial Final Award and Second Decision on the Parties'
Dispositive Motions and Related Cross-Motions (Exhibit 7 of
Cross-Motion)..........................................................................A400

Laws of Antigua and Barbuda – The Arbitration Act, Chapter
33 (Exhibit 8 of Cross-Motion) ...............................................A438

## Volume 3

The Antigua and Barbuda Sales Tax Act, 2006 and The Antigua and
Barbuda Sales Tax Act (Amended), 2008 (Exhibit 9 of Cross-
Motion) ....................................................................................A463

## Volume 4

Index of Authorities (Exhibit 11 of Cross-Motion)...........................A609

Alfa Telecom Turkey Limited v. Cukurova Finance
International Limited and Cukurova Holdings AS,
HCVAP 2009/001 ........................................................A610

iii

*Baldwin Spencer v. The Attorney General of Antigua and Barbuda, Lester Bryant Bird and Asian Village Antigua Limited CIV*.APP.NO.20A of 1997, Antigua and Barbuda Court of Appeal ............................................................................ A683


*Besseler Waechter Glover & Co. v. South Derwent Coal Co.,* 59 Lloyd's List Law Report 104 (King's Bench 1937) ................ A710

*Bremer Handelsgesellschaft v. C. Mackprang Jr.,* 1 Lloyd's Law Report 221 (Court of Appeal 1979) ...................... A716

*Clearlie Todman-Brown v. Nat'l. Bank of the Virgin Islands, Ltd.,* BVIHCV 64/2013 ........................................................................ A727

*Fibrosa Societe Anonyme v. Fairbaum Lawson Combe Barbour Ltd.,* [1942] UKHL 4, [1943] AC 32 ...................................................... A742

*Mavis Henry, Attorney for Millicent Ralph v. Tyrone Warner,* Claim No. ANUHCV 2000/0277, The Eastern Caribbean Supreme Court in the High Court of Justice Antigua and Barbuda ...................................................................................... A803

*Meyer v. Gilmer,* 18 NZLR 129 (1899) .................................................................... A816

*Motor Oil Hella (Corinth) Refineries SA v. Shipping Corp. of India ("The Kanchenjunga"),* 1 Lloyd's Rep. 391 (House of Lords 1990) ............................................................... A823

*Premium Nafta Products, Ltd. And Others v. Fili Shipping Co. Ltd.,*2007 UKHL 40 (House of Lords 2007) ................................... A835

*Westdeutsche Landesbank Girozentrale v. Islington London Borough Council,* [1996] UKHL 12, [1996] AC 669 (House of Lords 1996) ............................................................... A843

13 Lord, Williston on Contracts .............................................. A853

Chitty on Contracts ................................................................ A855

iv

Wilken and Villiers: The Law of Waiver, Variation and
Estoppel 2d ......................................................................................A861

Claimant's Reply in Further Support of its Motion to Dismiss
Respondents Counterclaims and in Opposition to Respondent's
Cross-Motion for Summary Judgment (Exhibit 12 to Cross
Motion................................................................................................A876

AUA Amended Answer and Counterclaims.......................................A877

Civil Judgment, Dated May 5, 2015 .................................................A902

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
AMERICAN UNIVERSITY OF ANTIGUA –
COLLEGE OF MEDICINE,                                    Case No.: 14-CV-8410-DLC/GWG

                                    Petitioner,

                    -against-                           **NOTICE OF CROSS-MOTION
                                                        TO DENY ENFORCEMENT,
                                                        VACATE OR MODIFY
LEEWARD CONSTRUCTION COMPANY, LTD. ,                    ARBITRATION AWARD**

                                    Respondent.
-----------------------------------------------------------------x

    **PLEASE TAKE NOTICE** that, on a time and date to be set by the Court, or as soon

thereafter as counsel may be heard, Respondent Leeward Construction Company, Ltd.

("Respondent") shall cross-move before the Honorable Denise L. Cote, at the Daniel Patrick

Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007, for an Order

denying enforcement, vacating or modifying the Final Partial Award, dated September 18, 2014,

and reinstating Respondent's claim pursuant to the Federal Arbitration Act, 9 U.S.C. §§1, *et seq.*

and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and for

such other relief as the Court deems just and proper.

    **PLEASE TAKE FURTHER NOTICE** that in support of its motion, Respondent shall

rely upon its Memorandum of Law in Support of Cross-Motion to Deny Enforcement, Vacate

and/or Modify and in Opposition to the Petition and Motion to Confirm Arbitration Award, the

Declaration of Veronica A. McMillan (with exhibits) submitted herewith as well as the exhibits

submitted with the Petition, filed October 21, 2014, and Affirmation of Leonard A. Sclafani in

Support of the Petition/Motion for Confirmation of, and for Judgment on, an Arbitration Award,

dated November 20, 2014.

**A249**

Dated: December 11, 2014
      Poughkeepsie, New York

Respectfully submitted,

Veronica A. McMillan, Esq. (VM1107)
**LEWIS & GREER, P.C.**
*Attorney for Respondent,*
*Leeward Construction Company, Ltd.*
510 Haight Avenue, Suite 202
Poughkeepsie, New York 12603
Telephone: (845) 454-1200

To:    Leonard A. Sclafani, Esq.
       Law Offices of Leonard A. Sclafani, Esq.
       *Attorney for Petitioners,*
       *American University of Antigua -- College of Medicine*
       1 Battery Park Plaza, 33rd Floor
       New York, New York 10004
       Telephone: (212) 696-9880

**A250**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.

                         Petitioner,

         -against-

AMERICAN UNIVERSITY OF ANTIGUA --
COLLEGE OF MEDICINE AND MANIPAL
EDUCATION AMERICAS, LLC f/k/a GCLR, LLC

                        Respondents.
-----------------------------------------------------------------x

Case No. 14-CV-8410-DLC/GWG
(ECF CASE)

**DECLARATION OF**
**VERONICA A. MCMILLAN**

**VERONICA A. MCMILLAN**, being duly sworn, deposes and says:

    1.     I am a member of the law firm of Lewis & Greer, P.C., counsel for the Respondent,

Leeward Construction Company, Ltd. ("Respondent" or "Leeward"), and am fully familiar with

all the facts and circumstances set forth herein.

    2.     I submit this declaration in support of Respondent's Notice of Cross-Motion for an

Order denying enforcement, vacating or modifying the Final Partial Award, dated September 18,

2014, and reinstating Respondent's claim pursuant to the Federal Arbitration Act, 9 U.S.C. §§1, *et*

*seq.* and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and for

such other relief as the Court deems just and proper.

### The Parties

    3.     Leeward is a corporation duly organized and existing under the laws of the

Commonwealth of Antigua and Barbuda, with office and principal place of business at All Saints

Road, St. John's, Antigua.

    4.     The Petitioner, American University of Antigua – College of Medicine

("Petitioner" or "AUA") is a corporation organized and existing under the of Antigua and

Barbuda, with office and principal place of business at University Park, Jabberwock Beach Road, Coolidge, Antigua. The AUA also has an office in New York State through its principal/agent.

<u>**The First Arbitration Proceeding**</u>

5.      On September 25, 2008, Leeward, as contractor, and the AUA, as owner, executed a contract for the construction of a medical school in St. Johns, Antigua (the "Contract"). Section 4.6 of the General Conditions to the Contract contained an arbitration agreement that reads as follows:

> § 4.6 ARBITRATION
>
> § 4.6.1  Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration.
>
> § 4.6.2  Claims shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect. Location of any Arbitration will be Antigua.

(A copy the Contract containing the arbitration agreement is annexed to the AUA's Petition as Exhibit A.)

6.      On February 3, 2011, Leeward commenced the an arbitration proceeding with the American Arbitration Association International Center for Dispute Resolution ("AAA") to arbitrate claims arising out of or related to the Contract (the "First Arbitration Proceeding"). On or about October 14, 2011, Leeward served and filed an Amended Demand for Arbitration

requesting an award for breach of contract in the amount of US $2,518,931.97/EC $6,800,572.28[1]; interest on late payments as provided in the Contract from the date the payments were due until the date the payments were made at the legal rate of interest in Antigua as determined by the Arbitrators; and legal fees and expenses, including the cost and expense of arbitration, as determined by the Arbitrators in accordance with the laws of Antigua. (A copy of Leeward's Amended Demand for Arbitration in the First Arbitration Proceeding is annexed hereto as Exhibit 1.)

7.     On or about November 30, 2011, the AUA filed a reply to the Amended Demand that included counterclaims for liquidated delay damages in the amount of US $117,000.00 and in the alternative, actual delay damages in the amount of US $371,955.31/EC $1,004,199.00. (The AUA withdrew its counterclaim for actual delay damages on April 11, 2012.) (A copy of the AUA's November 30, 2011 reply in the First Arbitration Proceeding is annexed hereto as Exhibit 2.)

8.     In March, 2012, the Tribunal conducted evidentiary hearings in San Juan, Puerto Rico. On May 22, 2012, the hearings were closed following the submission of the parties' lengthy post-hearing findings of fact and conclusions of law. The Tribunal issued the First Arbitration Award certified June 22, 2012 and modified August 8, 2012, in which the Arbitrators directed the AUA to pay damages to Leeward in the amount of $976,421.37, plus interest at the rate of seven percent (7%) per annum as provided in the Award. The First Arbitration Award also granted the

---

[1]Leeward's breach of contract claim alleged that the AUA repeatedly breached the contract by failing to issue change orders/change directives for additional contract work; failing to pay for additional work that the AUA authorized and directed Leeward to perform; failing to pay Leeward's payment applications in accordance with the terms of the Contract; failing to certify the Project as substantially complete; failing to issue a final certificate of payment; failing to make final payment to Leeward in accordance with the terms of the Contract; failing to pay the mobilization fee as provided in the Contract; failing to authorize overtime as provided in the Contract; failing to coordinate the work of other contractors as required in the Contract; and failing to properly administer the Contract as provided in the Contract documents. (McMillan Declaration, Exhibit 1)

3

**A253**

AUA damages in the amount of $58,500.00, plus interest at the rate of 7% per annum as provided in the Award. (A copy of the Final Arbitration Award certified on June 22, 2012, and the August 8, 2012 modified Final Award is annexed hereto as Exhibit 3.)

9. On August 16, 2012, Leeward commenced a proceeding in this Court styled *Leeward Construction Company, Ltd. v. American University of Antigua – College of Medicine, et ano.*, 12-CV-062080-LAK/GWG, for an order confirming the First Arbitration Award and for the entry of a money judgment against AUA in the amounts stated in the First Arbitration Award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards as codified at 9 U.S.C. §201 *et seq.* (the "Convention").[2] On September 25, 2012, AUA cross-moved to dismiss pursuant to the *Forum Non Conveniens* Doctrine and Fed. R. Civ. P. 12(b)(6) or in the alternative, to vacate or modify the award pursuant to the Federal Arbitration Act, 9 U.S.C. §1 *et seq.* On March 26, 2013, the Court entered a Memorandum Opinion which, *inter alia*, granted Leeward's petition. *See Leeward Constr. Co. v. Am. Univ. of Antigua*, 2013 U.S. Dist. LEXIS 43350 (SDNY 2013) (A copy of the opinion is annexed hereto as Exhibit 4.) On June 11, 2013, the Court's Clerk entered the Corrected Amended Judgment. (A copy of the June 11, 2013 Corrected Amended Judgment is annexed hereto as Exhibit 5.)

10. On April 29, 2013, AUA filed a Notice of Appeal and thereafter, moved the Court for a stay of enforcement of the First Judgment pending the outcome of its appeal. On August 9, 2013, AUA filed a *supersedeas* bond in the amount of $1,073,000. On August 16, 2013, the Court entered a Stipulation and Consent Order staying the enforcement of the First Judgment pending

---

[2] The Convention, also known as the "New York Convention" and the "1958 Convention," was enacted on June 10, 1958 and ratified by the United States on December 29, 1970. *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15-18 n.1. (2d Cir. 1997). The Commonwealth of Antigua and Barbuda ratified the Convention on February 2, 1989. *See* http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention_status.html.

**A254**

the outcome of AUA's appeal. (A copy of the Court's August 16, 2013 Stipulation and Consent Order is annexed hereto as Exhibit 6.)   Pursuant to subsequent Local 42.1 stipulations between the parties, AUA now has until February 2, 2015 to reinstate and perfect its appeal. (A copy of the parties' November 18, 2014 stipulation extending the AUA's deadline to reinstate and perfect its appeal is annexed hereto as Exhibit 10.)

## The Second Arbitration Proceeding

11.     On February 7, 2013, Leeward commenced a second arbitration proceeding against AUA with the American Arbitration Association International Center for Dispute Resolution to arbitrate a small amount of money ($30,762.00) outstanding after the First Arbitration Proceeding (the "Second Arbitration Proceeding"). (A copy of Leeward's February 7, 2011 Demand for Arbitration is annexed to the AUA's Petition to Confirm as Exhibit B.)   During the First Arbitration Proceeding, the AUA admitted it was liable to pay to Leeward the outstanding amount as a result of a mis-tabulation during invoicing on the project. (Exhibit 3, pp. 11-12)  Neither party was aware of the outstanding amount until the AUA pointed it out during the hearings.  Thus, the First Arbitration Proceeding Tribunal held that it could not award the amount to Leeward because it was not part of the First Arbitration Proceeding. (Exhibit 3)   Leeward attempted to obtain payment from the AUA for this amount but was refused.

12.     The AUA has pled its answer and counterclaims in this matter several times.  In its initial Answer and Counterclaim, dated February 27, 2013, the AUA denied that it owes Leeward the monies for the invoice mis-tabulation (despite admitting the liability on multiple occasions during the First Arbitration Proceeding (Exhibit 3)) and, as a counterclaim, the AUA asserted, for the very first time, that it is entitled to a refund of all of the ABST that it paid to Leeward on the project, in the amount of EC $3,614,522.41/US$1,338,723.00 (the "ABST claim").   (A copy of

5

**A255**

AUA's Answer and Counterclaim is annexed to the AUA's Petition to Confirm as Exhibit C.) Subsequently, the AUA amended its answer to assert an additional counterclaim alleging various construction defect claims in the amount of EC$2,642,450.00/US$978,685.00 (the "Defective Work claims"). The AUA's Defective Work claims allege defects with respect to the staircases, wall surfaces, roof, scuppers and pipes, windows, tracery and fascia, elevator shafts, and concrete installed on the Project. (A copy of the AUA's Revised Statement of Counterclaims is annexed to the AUA's Petition to Confirm as Exhibit D.) Thereafter, the AUA served an Amended Answer and Counterclaims dated August 1, 2013. The AUA failed to include a copy of this final pleading with its petition. (A copy of the AUA's August 1, 2013 Amended Answer and Counterclaims is annexed hereto as Exhibit 13.) The AUA has admitted herein that these claims were known to the AUA at the time of the First Arbitration Proceeding. (A copy of Leeward's moving papers before the Tribunal is annexed to the Sclafani Affirmation, dated November 20, 2014 at Exhibits A and B; *see* Leeward Exhibits 46, 50, 60-65 as annexed to the Sclafani Affirmation, Exhibit B)

13.     The parties agreed to submit their claims to the Tribunal for decision in the nature of motions for summary judgment. In its motion, Leeward argued that AUA's ABST claim should be dismissed because (a) the AUA was required under the Contract, read in conjunction with the ABST Act, to pay Leeward ABST; (b) the doctrine of *res judicata* bars the ABST claim; (c) the AUA lacks standing to bring the ABST claim; (d) the doctrines of waiver and/or modification bar the ABST claim; and (e) the ABST claim does not arise under the Contract and, therefore, is not subject to arbitration. With regard to the AUA's defective work claims, Leeward argued that the claims were subject to dismissal because (a) the doctrine of *res judicata* bars the Defective Work claims; (b) the AUA failed to comply with the required notice provision under the Contract and, as a result, the Defective Work claims are untimely; and (c) the windows portion of the Defective Work

6

**A256**

claims is not subject to arbitration because the windows work was performed under a separate contract. The AUA moved for summary judgment on its ABST claim and for dismissal of several of Leeward's defenses. (Copies of the parties' submissions to the Tribunal are annexed to the Affirmation of Leonard Sclafani, dated November 20, 2014 as Exhibits A through I. A copy of Leeward's moving papers is annexed thereto as Exhibits A and B. Leeward's reply in further support of its motion to dismiss was not included and is annexed hereto as Exhibit 12.)

14.     On February 6, 2014, the Tribunal issued a decision which failed to resolve any of the major issues in the proceeding. (A copy of the Decision on the Parties' Dispositive Motions and Related Cross-Motions is annexed to the AUA's Petition to Confirm as Exhibit E.) On April 28, 2014, at the joint request of the parties, the Tribunal conducted a day-long oral argument in Miami, Florida in which it heard from counsel for both parties. On September 18, 2014, the Tribunal issued a Partial Final Award which, *inter alia*, dismissed Leeward's claim and granted AUA's ABST claim. (A copy of the Partial Final Award is annexed to the AUA's Petition to Confirm as Exhibit F.) The Partial Final Award contained a lengthy dissenting opinion which detailed the errors in the Partial Final Award. The AUA failed to include the dissenting opinion with its Petition to Confirm. (A copy of the complete Partial Final Award, including the dissenting opinion is annexed hereto as Exhibit 7.)

15.     Leeward opposes the AUA's petition and motion to confirm the Partial Final Award and cross-moves the Court for an Order denying enforcement, vacating or modifying the Final Partial Award, dated September 18, 2014, and reinstating Respondent's claim pursuant to the Federal Arbitration Act, 9 U.S.C. §§1, *et seq*. and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and for such other relief as the Court deems just and proper.

Case 1:13-cv-05962-DLC Document Document 23 15 Filed 08/23/14 Page Page 8 of 20 8

16.    For the Court's convenience, a copy of the Antiguan Arbitration Act is annexed hereto as Exhibit 8.

17.    For the Court's convenience, a copy of the ABST Act (2006), as amended (2008) is annexed hereto as Exhibit 9.

18.    For the Court's convenience, copies of all non-U.S. precedent relied upon by Leeward before the Tribunal during the parties' motion practice is annexed hereto as Exhibit 11.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:        December 11, 2014

_____

Veronica A. McMillan, Esq.

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES
-----------------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.,

                              Claimant,

                                                    **AMENDED DEMAND**
          -against-                                 **FOR ARBITRATION**

AMERICAN UNIVERSITY OF ANTIGUA                      Case No. 50 110 T 00075 11
COLLEGE OF MEDICINE C/O GCLR, LLC,

                              Respondent.
-----------------------------------------------------------------------x

**PLEASE TAKE NOTICE THAT** Leeward Construction Company, Ltd., a party to a written agreement dated September 25, 2008, which, *inter alia* provides that:

> § 4.6 ARBITRATION
>
> § 4.6.1  Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration.
>
> § 4.6.2  Claims shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect.  The demand for arbitration shall be filed in writing with the other party to the Contract and with the

1

**A259**

American Arbitration Association, and a copy shall be filed with the

Architect. Location of any Arbitration will be Antigua.


(A copy of the "Agreement to Arbitrate" as set forth in the General Conditions to the Contract, is

annexed hereto) hereby demands arbitration of the following disputes, which are subject to

arbitration thereunder:


## PARTIES

1.      Claimant, Leeward Construction, Ltd., ("Leeward" or the "Claimant") is a

corporation duly organized and existing under the laws of the Commonwealth of Antigua and

Barbuda ("Antigua") with an office and principal place of business at All Saints Road, St. Johns,

Antingua.

2.      Upon information and belief, Respondent, the American University of Antigua —

College of Medicine (the "AUA" or "Respondent") was a subsidiary, affiliate, or assumed name of

the Greater Caribbean Learning Center, Inc., a corporation organized and existing under the laws of

the State of New York, United States of America, with an office and principle place of business at

2 Wall Street, 10th Floor, New York, New York, which was dissolved by proclamation and

annulment of authority on October 27, 2010.

3.      Upon information and belief, the AUA is currently a subsidiary, affiliate, or

assumed name of the GCLR, LLC, a limited liability company organized and existing under the

laws of the State of New York, United States of America, with an office and principal place of

business at 2 Wall Street, New York, New York.  Upon information and belief, the physical

location of the American University of Antigua — College of Medicine is at the American

2

**A260**

University of Antigua, University Park, Jebberock Beach Road, Coollidge, Antigua.

## **GENERAL ALLEGATIONS**

4.      This dispute arises out of the construction of a medical school in Antigua (the "project").

5.      On September 25, 2008, Leeward, as general contractor, entered into a Contract with the AUA, as the owner of the project, for the construction of the medical school for the fixed price of EC $27,436,824.00/US $10,162,599.00,[1] subject to additions and deductions by change order as provided in the Contract documents.

6.      The Architect for the project was Sundaram Architects, Pvt. Ltd., No. 19 Kumara Kroupa Road, Bangalore, India (the "Architect").

7.      The owners/representatives for the project were Lt. Col. Anthony Roche and Mr. Corey Greenberg.

8.      Leeward's project representative was Mr. Neil Dickenson.

9.      The Contract documents, include the following:

- AIA A101 (1997) Standard Form of Agreement Between Owner and Contractor (the "Contract").

- AIA A201 (1997) General Conditions of the Contract (the "General Conditions").

- Supplemental Conditions of the Contract as Set Forth in Article 8.1.7 of the Contract §8.1.7 (the "Supplemental Conditions").

- The Project Drawings and specifications.

---

[1] As of October 1, 2011, the conversion rate for Eastern Caribbean Dollars to United States Dollars is .3704 United States Dollars for each Eastern Caribbean Dollar.  See http://www.likeforex.com.

3

**A261**

- Pricing Schedules and Bills of Quantities, including Preliminaries/General Conditions, Schedule of Labor Rates, Schedule of Basic Plant Charges, Schedule of On-Costs, and Bill of Quantities for Work and Materials.

(A complete list of the Contract documents is set forth in the "Project Manual," dated September, 2008.)

10.     According to Article 3 of the Contract, the commencement date of the Contract work was May 1, 2008 and the substantial completion date was April 30, 2009.

11.     Leeward commenced the Contract work on or about May 10, 2008, substantially completed the Contract work on or about July 31, 2009, and finally completed the Contract work on or about September 18, 2009.

12.     Upon information and belief, the AUA has been occupying and using the project for its intended purpose since October, 2009.

13.     Article 5.1.3 of the Contract requires the AUA to pay Leeward's monthly payment applications by the twenty-second day of each month for applications submitted by the seventh day of the month.

14.     Article 5.1.6 of the Contract authorizes the AUA to withhold retainage in the amount of five percent (5%) of the Contract sum (EC $1,371,841.20/US $508,129.98) and requires the AUA to release fifty percent (50%) of the retainage to Leeward at substantial completion.

15.     Article 5.1.9 of the Contract requires the AUA to pay Leeward an advance payment for mobilization equal to twelve percent (12%) of the Contract price (EC $3,292,418.80/ US $1,219,511.92) within seven (7) days of execution of the Contract.

16.     Article 5.2 of the Contract requires the AUA to make final payment of the Contract sum within thirty (30) days after the Architect issues a final Certificate for Payment.

**A262**

17.      Article 7.2 of the Contract and Article 13.6 of the General Conditions requires the AUA to pay interest on payments due and unpaid under the Contract at the "legal rate" in Antigua from the date the payment is due until the date the payment is made.

18.      Article 7 of the General Conditions requires the Owner to issue written change orders or change directives for changes to the Contract work that result in an increase or decrease in the Contract price.


## CLAIM ONE

19.      Leeward repeats and realleges each and every allegation contained in paragraphs "4" through "18" of the General Allegations as though fully set forth at length herein.

20.      The AUA has repeatedly breached the Contract by failing to issue change orders/change directives for additional Contract work, by failing to pay for additional work that the AUA authorized and directed Leeward to perform, by failing to pay Leeward's payment application in accordance with the terms of the Contract, by failing to certify the project as substantially complete, by failing to issue to a final certificate of payment, and by failing to make final payment to Leeward in accordance with the terms of the Contract.

21.      In addition, due to no fault of its own, Leeward expended an additional nineteen (19) weeks to complete the Contract work as a result of Owner initiated changes to the Contract drawings, specifications, design, and Contract work; the AUA's failure to timely pay the mobilization fee as provided in Article 5.1.9 of the Contract; the AUA's failure to authorize overtime as provided in the Contract documents (Pricing Schedules/Bill of Qualities) the AUA's failure to coordinate the work of other contractors as required under Article 6.1.3 of the General Conditions; and the Architect's failure to properly administer the Contract as provided in Article

4.2 of the General Conditions, including its failure to issue change orders, change directives, timely responses to requests for information, the certificate of substantial completion and the certificate of final payment.

22.     Leeward submitted its Draft Final Application for payment (the "DFA") to the Architect on October 5, 2009 (BS 10)[2], but as if this date, neither the Architect, nor the AUA has approved or rejected the DFA in whole or in part, and the AUA has paid no part thereof.

23.     As a result of the AUA's breach of contract, Leeward has suffered damages in the amount of EC $6,800,572.28/US $2,518,931.97 calculated as follows:

| | | |
|---|---|---|
| Original Contract Amount Sum (BS 9) | EC $27,436,824.00 | US $10,162,599.61 |
| Deleted Work (Summary of Deleted Work, Annexed Hereto) | EC $ 1,948,755.32 | US $ 721,818.97 |
| Overhead and Profit (18%) on Deleted Work (Article 14.4.3 of General Conditions; Schedule of Claim) | EC $ 350,775.96 | US $ 129,927.42 |
| Revised Contract Sum | EC $25,838,844.64 | US $ 9,570,708.05 |
| Approved Extra Work -- Paid (Revised Statement of Claim and BS 50-60) | EC $ 1,422,219.10 | US $ 526,789.95 |
| Approved Extra Work -- Unpaid (Revised Statement of Claim and BS 52, 55, 56) | EC $ 181,847.52 | US $ 67,356.32 |
| Additional Work (Revised Statement of Claim and BS 258-282) | EC $ 1,361,628.64 | US $ 504,347.25 |
| Additional Preliminaries/General Conditions (BS 11, 283-286) | EC $ 1,985,711.68 | US $ 735,507.61 |
| Total | EC $ 30,790,251.58 | US $11,404,709.19 |
| Payments Received (BS 16) | EC $ 23,989,679.30 | US $ 8,885,777.21 |
| TOTALS: | EC $ 6,800,572.28 | US $ 2,518,931.97 |

24.     The "Deleted Work" refers to the items of work that the AUA removed from Leeward's Contract and awarded other contractors. The scope of the deleted work is detailed in

**A264**

Leeward's Deleted Work Summary annexed hereto.  This summary was provided to the project Architect on May 12, 2009.  Article 14.4.3 of the General Conditions provides that the contractor is entitled to reasonable overhead and profit on unperformed work if the AUA terminates the Contract for convenience.  Further, the Contract documents (Schedule of On-Costs), provide for overhead and profit at eighteen percent (18%).

25.    "Approved Extra Work -- Paid" refers to additional work that Leeward performed at the request of the AUA.  Although the AUA never issued change orders or change directives for the additional work, Leeward included the extra work in payment applications which were approved by the Architect and paid by the AUA.  A summary of the Approved Extra Work -- Paid is set forth in the Revised Statement of Claim, annexed hereto, and at BS 50-60.

26.    "Approved Extra Work -- Unpaid" refers to additional work that the AUA requested Leeward to perform, which Leeward included in its payment applications, that the Architect failed to approve and/or the AUA failed to pay.  A summary of the unpaid additional work is set forth at Revised Statement of Claim, annexed hereto, and at BS 52, 55, 56.

27.    "Additional Work" refers to work that was included in the original contract, that the AUA removed from the Contract then awarded the work back to Leeward in a separate contract.  A summary of the Contract work that the AUA removed from the contract and then awarded back to Leeward in a separate contract is set forth at Revised Statement of Claim, annexed hereto, and at BS 258-282.

28.    "Additional Preliminaries/General Conditions" refers to the preliminaries/general conditions as set forth in the Contract documents for the agreed amount of EC $3,906,146.00/US $1,446,836.48.  However, as a result of the project delays attributable to the AUA and the Architect

---

[2] "BS" refers to Bate Stamp numbers on the documents that Leeward produced to the Respondent and to the Arbitrators on September 9, 2011 (hardcopy) and September 29, 2011 (CD).

**A265**

the actual cost of preliminaries/general conditions was EC $5,891,857.68/US $2,182,344.08.  Thus, Leeward is entitled to an additional EC $1,985,711.68/US $735,507.61 for preliminaries/general conditions.  (*See* Revised Statement of Claim annexed hereto, and at BS 11, 283-286.)

### CLAIM TWO

29.     Leeward repeats and realleges each and every allegation contained in paragraphs "4" through "28" of the General Allegations as though fully set forth at length herein.

30.     Pursuant to Article 7.2 of the Contract and Article 13.6 of the General Conditions, Leeward is entitled to interest on payments due and unpaid under the Contract at the "legal rate" in Antigua from the date that the payment is due until the date the payment is made.

31.     Leeward is entitled to interest on the total unpaid balance due under the contract in the amount of EC $6,800,572.28/US $2,518,931.97,  at the legal rate of interest in Antigua as determined by the Arbitrators from October 22, 2008, until the date the amount is paid.

32.     The AUA repeatedly failed to pay approved payment applications in a timely fashion and/or pay the entire payment of the applications, and as a result, Leeward is entitled to interest on the late payments, from the date due until the date paid, at the legal rate in Antigua as determined by the Arbitrators.

33.     The AUA repeatedly breached Article 5.1.9 of the Contract by failing to timely pay Leeward for "mobilization" in the amount of EC $3,292,418.80/ US $1,219,511.92 and as a result, Leeward is entitled to interest on the mobilization payments from the date due until the date paid, at the legal rate in Antigua as determined by the Arbitrators.

**A266**

## CLAIM THREE

34.     Leeward repeats and realleges each and every allegation contained in paragraphs "4" through "33" of the General Allegations as though fully set forth at length herein.

35.     In the event that Leeward prevails in this arbitration, Leeward respectfully requests the Arbitrators to award legal fees and expenses to Leeward in an amount to be determined at the conclusion of the arbitration, as well as the costs and expenses of the arbitration, in accordance with the laws of Antigua.

**WHEREFORE**, Leeward Construction, Co. Ltd. respectfully requests the panel of arbitrators for the following relief:

1.     Claim Number One, an award in the amount of EC $6,800,572.28/US $2,518,931.97.

2.     Claim Number Two, an award of interest on every late payment from the date due until the date paid, at the legal rate in Antigua, as determined by the Arbitrators.

3.     Claim Number Three, legal fees and expenses, including the cost and expense of arbitration, as determined by the Arbitrators, in accordance with the Laws of Antigua.

4.     Such other and further relief as the Arbitrators may deem just and proper.

Dated: October 14, 2011
        Poughkeepsie, New York

LEEWARD CONSTRUCTION CO. LTD.

By: _____
        J. Scott Greer, Esq.
        **Lewis & Greer, P.C.**
        *Attorney for Claimant,*
        *Leeward Construction Co. Ltd.*
        510 Haight Avenue, P.O. Box 5990
        Poughkeepsie, New York  12603
        Tel:  (845) 454-1200
        Email:  jsgreer@lewisgreer.com

9

# A267

To:

Leonard Sclafani, Esq.
c/o GCLR, LLC
2 Wall Street, 10th Floor
New York, New York  10005
Email: lsclafani@auamed.org


Mark S. Olinsky, Esq.
Sills, Cummis & Gross, P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102-5400
Email: molinsky@sillscummis.com


Lori Sapir, Esq.
Sills, Cummis & Gross, P.C.
30 Rockefeller Plaza, 29th Floor
New York, New York 10112
Email: lsapir@sillscummis.com

Govinda Jayasinghe
International Case Manager
International Centre for Dispute Resolution
1633 Broadway, 10th Floor
New York, New York  10019
Email: JayasingheG@adr.org


Jose Rafael Capo, Esq.
American Arbitration Association
Bank of America Tower at International
100 SE 2nd Street
Suite 2300
Miami, Florida 33131
Email: josecapo@prtc.net


Jorge R. Jimenez, Esq.
American Arbitration Association
Bank of America Tower at International
100 SE 2nd Street
Suite 2300
Miami, Florida 33131
Email: jiminezjorger@gmail.com


Hector M. Varela
American Arbitration Association
Bank of America Tower at International
100 SE 2nd Street
Suite 2300
Miami, Florida 3313
Email: hmvarela@hmvarelainc.com

**A268**

# REVISED STATEMENT OF CLAIM

## REVISED STATEMENT OF CLAIM

AUA FINAL ACCOUNT

| | | | | |
|---|---|---|---|---|
| A | CONTRACT SUM | | | 27,436,824.00 |
| | SUBTRACTED DELETED WORK (SEE LEEWARD SUMMARY) | | | (1,948,755.32) |
| | ADD OH&P ON DELETED WORK | | | 350,775.96 |
| B | APPROVED EXTRA WORKS -- PAID (awaiting Change Orders)[1] | | | |
| | Full details in last account (November 2009) | | | |
| | 1 | Laboratory & Classroom buildings - additional foundation works | | 270,096.61 |
| | 2 | Library building - piling rig standing | (incl) | |
| | 3 | Service building - piling rig standing | (incl) | |
| | 4 | Library building - Non-Productive labour | | 1,000.00 |
| | 5 | Library building - piles 35' long | | 121,125.42 |
| | 6 | Library building - excavation & backfill around piles | | 2,684.33 |
| | 7 | Service building - clear steelwork | | 2,401.30 |
| | 8 | Library building - pile extensions | | 9,663.14 |
| | 9 | Service building - additional excavation & backfill | | 1,477.54 |
| | 10 | Service building - pile removal | | 1,174.32 |
| | 11 | Service building - walls to manholes | | 2,051.88 |
| | 12 | Library building - clocktower pile reductions | | 5,022.46 |
| | 13 | Laboratory & Classroom buildings - electric conduits, etc. | | 40,520.44 |
| | 14 | Library, Amphitheatre, Service buildings - surveyor fees | | 5,400.00 |
| | 15 | NUCOR Buildings - Engineering Works Order | | 3,837.36 |
| | 16 | VSL - attendance on post-tensioning contractor | | 20,021.90 |
| | 19 | Steel bending sheet - flood protection | | 10,000.00 |
| | 20 | Blockwork reinforcement details | (incl) | |
| | 21 | Pile extensions | | 1,979.78 |
| | 23 | Laboratory & Classroom buildings - conduits sweeps | | 3,459.76 |
| | 24 | Classroom building - anchor bolds for steelwork | | 11,824.37 |
| | 25 | Library building - chajja detail revisions (blocks C&D) | | 1,164.90 |
| | 26 | APUA electricity bill | | 1,954.54 |

[1] The numerical list of change orders coordinates with the list of change orders at BS 50-61.

| | | |
|---|---|---|
| 27 | Housing block piles | 8,342.50 |
| 28 | Classroom building - approved NPO for slab pour | 6,720.54 |
| 29 | Classroom building - additional excation below 5'-0" | 12,615.50 |
| 30 | VSL - dayworks for post-tensioning contractor | 31,039.03 |
| 31 | 12" diameter sch 40 PVC pipe installation | 3,142.57 |
| 32 | Groundworks for crane | 4,823.84 |
| 33 | Groundworks for car parking area | 6,566.16 |
| 34 | 6" Internal blockwork | 13,432.22 |
| 35 | Toilet block plumbing | 148,760.38 |
| 36 | Laboratory building - approved NPO for slab pour | 6,720.54 |
| 37 | Laboratory & Classroom buildings - staircase excavation & backfill | 26,141.01 |
| 38 | Approved NPO due to port delays | 3,091.20 |
| 39 | Car park remedial works | 8,365.00 |
| 40 | Plasticiser to concrete pours | 61,596.00 |
| 41 | Service building - additional fill to raise levels | |
| 42 | Library courtyard crushed stone fill | 21,559.20 |
| 43 | Service building - NPO for painting works | |
| 44 | Laboratory building - excavation & backfill around piles | 12,615.50 |
| 45 | Service building - granolithic flooring | 31,348.00 |
| 46 | Temporary generators | 14,688.95 |
| 49 | Service building - external painting | 14,955.00 |
| 50 | Library building - chajja detail revisions (block B) | 4,062.40 |
| 51a | Service building - additional excavation below 5'-0" | 20,238.00 |
| 51b | Floore slab/grade beam concrete measure correction | 8,681.31 |
| 52 | Walkway to IT building | 6,121.71 |
| 53 | Concrete pad to client office | 1,032.45 |
| 55 | Classroom stages | 12,528.07 |
| 56 | Miscellenaqus NPO payments | 19,899.80 |
| 59 | Clasrrom building - walkway curbs | 36,937.60 |
| 60 | Library building - internal wall revisions (block B) | 2,238.88 |
| 60 | Classroom building - temporary waterproofing | 4,392.00 |
| 61 | 12" diameter drainage pipes | 13,103.80 |
| 62 | Manlift rental | 495.60 |
| 63 | Library building - plumbing works (block D) | 8,348.10 |
| 64 | Library building - courtyard drainage | 13,103.80 |

**A271**

| | | |
|---|---|---:|
| 65 | Decorative archways | 59,520.00 |
| 66 | Security huts - supply 1, relocate 1 | 1,662.00 |
| 67 | Walkways drainage pipes | 2,566.90 |
| 68 | Site water | 1,896.27 |
| 69 | Floor slab preparations for vinyl tiles | 2,080.00 |
| 70 | Terrace drainage pipes | 1,002.12 |
| 71 | Library buildings - reinforcement revisions (blocks A&D) | 155.76 |
| 72 | Service building - additional painting | 1,196.40 |
| 73 | Amphitheatre steps | 10,959.63 |
| 74 | Amphitheatre wall cappings | 2,788.14 |
| 75 | Library blocks wall cappings | 23,855.31 |
| 76 | Laboratory toilet block manholes | 1,175.82 |
| 77 | Manlift & forklift rentals | 1,058.40 |
| 78 | Entrance gates installation | 1,925.00 |
| 79 | APUA electricity bill | 1,042.51 |
| 80 | Upload windows & doors | 3,338.72 |
| 81 | Concrete pad to volleyball courts | 4,060.34 |
| 82 | Window sills | 39,659.45 |
| 83 | Upload windows & doors (10-17 july 2009) | 16,624.86 |
| 84 | Break out for AC installation | 4,770.72 |
| 86 | Clock tower - demolish lintol beam | 563.60 |
| 87 | Decorative plaster grooves | 23,450.00 |
| 88 | Window jambs | 47,895.20 |
| 89 | Laboratory building - partitions | 47,752.12 |
| 90 | Scaffold rental | 1,000.00 |
| 91 | Laboratory & Classroom buildings - walkways protection | 1,490.40 |
| 92 | Plaster cap to parapet walls | |
| 93 | Entrance gate repairs | 405.84 |
| 94 | Door openings size revisions | 3,042.68 |
| 95 | Terrace level columns slope design finish | 1,815.00 |
| 96 | Block up windows library blocks B&C | (incl) |
| 97 | Parapet walls to classroom & laboratory | (incl) |
| 98 | Granolithic flooring to AHU room roofs | 7,376.00 |
| 99 | Timber stepts to laboratory roof | 1,523.20 |

**A272**

| | | | |
|---|---|---|---:|
| | | SUBTOTAL - APPROVED EXTRA WORK -- PAID: | 1,422,219.10 |
| | **APPROVED EXTRA WORK -- UNPAID** [2] | | |
| | 17 | Hurricane Omar site preparation | 23,682.00 |
| | 18 | Site shutdown October 2008 | 24,681.82 |
| | 47 | Customs storage charges | 33,943.10 |
| | 48 | Election shutdown costs | 30,294.86 |
| | 54 | Labour Day shutdown costs | 24,642.84 |
| | 57 | Whitsuntide Monday public holiday | 19,475.40 |
| | 58 | Adverse weather | 25,127.50 |
| | | SUBTOTAL - APPROVED EXTRA WORK -- UNPAID: | 181,847.52 |
| | **ADDITIONAL WORK** [3] | | |
| | | Glazing | 48,770.00 |
| | | Civil Works in DATA Centre | 27,250.00 |
| | | Concrete Band Work | 36,463.13 |
| | | Screed Work at Terrace | 48,020.00 |
| | | Doors & Windows | 419,932.68 |
| | | Floor Coverings | 610,206.58 |
| | | Toilet Fixtures | 130,523.75 |
| | | AC Concrete Bed | 40,462.50 |
| | | SUBTOTAL - ADDITIONAL WORK: | 1,361,628.64 |
| C | ADDITIONAL PRELIMINARIES | | 1,985,711.68 |
| | | TOTAL: | 30,790,251.58 |
| | | LESS PREVIOUS PAYMENTS: | 23,989,679.30 |
| | | AMOUNT NOW DUE  EC $: | 6,800,572.28 |
| | | US $: | 2,518,931.97 |
| D | COSTS AND EXPENSES OF ARBITRATORS, INCLUDING LEGAL FEES | | TBD |
| E | INTEREST AT THE LEGAL RATE IN ANTIGUA | | TBD |

[2] The numerical list of change orders coordinates with the list of change orders at BS 50-61.

[3] This list of additional work coordinates with the additional work documents at BS 258-282.

# A273

# DELETED WORK SUMMARY

## P 103 - AUA SUPERSTRUCTURE WORKS
### Deleted Items - Amphitheatre

**LEEWARD**

| ITEM | DESCRIPTION | QUANTITY | UNIT | RATE | AMOUNT EC$ |
|---|---|---|---|---|---|
| IX | **PAINTING AND FINISHES** | | | | |
| 1 | Providing and painting external surface with trowellex including feature bands/grooves etc., of approved colour all as per manufacturers instructions and directions inlcuding scaffolding etc., complete at all levels. | 378 | YD² | 74.95 | 28,331.10 |
| 2 | Preparing surface and painting with Traveltex fine grade internally, Plastic emulsion paint of approved colour including providing and removing scaffolding, finishing etc., complete | 800 | YD² | 74.95 | 59,960.00 |
| 3 | Preparing surface and painting with 2 coats of latex emultion of approved colour and make over a coat of primer for ceiling internal surfaces as per directions including providing and removing scaffolding, finishing etc., complete in all floors. (may not be required for full area due to  false ceiling) | 750 | YD² | 19.94 | 14,955.00 |
| X | **DOOR AND WINDOWS** (For UPVC as per PVC Windoor inc specification  or equivalent) All Door and Window Rates are inserted as a PC Sum rates. | | | | |
| 1 | **DOORS**<br>providing and fixing Double leaf side hung door with Aluminium/UPVC frame & shutter partly with infill panel of 30mm particle board finished with 1mm laminate on both sides and 6mm laminated glass.With  all necessary accessaries  Main Door of size 6'0" x 8'0"<br>    Labour - fixed labour rate required including setting material/grout | 2 | NR | 654.85 | 1,309.70 |
| 2 | Providing and fixing Double leaf side hung door with aluminium/UPVC frame & shutter partly with infill panel of 30mm particle board finished with 1mm laminate on both sides and 6mm laminated glass with all necessary accessaries .for student centre and back stage area of the size of 4'0" x 8'0"<br>    Labour - fixed labour rate required including setting material/grout | 6 | NR | 295.40 | 1,772.40 |
| 3 | providing and fixing Single leaf side hung door with UPVC shutter & frame with all necessary accessaries for change rooms and make up roomof the size of 3'0" x 7'0"<br>    Labour - fixed labour rate required including setting material/grout | 2 | NR | 245.25 | 490.50 |
| | | | | c/fwd: | 106,818.70 |

**A275**

| ITEM | DESCRIPTION | QUANTITY | UNIT | RATE | AMOUNT EC$ |
|---|---|---|---|---|---|
| | | | | b/fwd: | 106,818.70 |
| | **WINDOWS** | | | | |
| 1 | Providing and fixingaluminium/ UPVC three track horizontal sliding & Fixed aluminium/UPVC shutter with 6mm laminated glass with all necessary accessaries for student centre of the size of 5' 0" x 5' 0" | | | | |
| | Labour - fixed labour rate | 6 | NR | 335.31 | 2,011.86 |
| 2 | Providing and fixing aluminium/UPVC three track horizontal sliding & Fixed aluminium/UPVC shutter with 6mm laminated glass with all necessary accessaries of the size of 3' 0" x 5' 0" | | | | |
| | Labour - fixed labour rate | 4 | NR | 335.31 | 1,341.24 |
| | **VENTILATORS** | | | | |
| 1 | Providing and fixing Aluminium/UPVC single track  fixed aluminium/UPVC shutter with louvers with all necessary accessaries, of the size of     4' 0" x 3' 0" | | | | |
| | Labour - fixed labour rate | 2 | NR | 335.31 | 670.62 |
| | | | | **TOTAL EC$:** | 110,842.42 |

**A276**

## P 103 - AUA SUPERSTRUCTURE WORKS
### Deleted Items - Classroom & Laboratory Buildings



| ITEM | DESCRIPTION | QUANTITY | UNIT | RATE | AMOUNT EC$ |
|------|-------------|----------|------|------|------------|
| VII | **PAINTING AND FINISHES** | | | | |
| 1 | Providing and painting **external** surface with trowellex including feature bands/grooves etc of approved colour all as per manufacturers instructions and directions inlcuding scaffolding etc., complete at all levels. | 3,500 | YD² | 74.95 | 262,325.00 |
| 2 | Preparing surface and painting with Traveltex fine grade **internally,** Plastic emulsion paint of approved colour including providing and removing scaffolding, finishing etc., complete | | | | |
| | Ground Floor | 2,080 | YD² | 74.75 | 155,480.00 |
| | First Floor | 1,960 | YD² | 74.75 | 146,510.00 |
| 3 | Preparing surface and painting with 2 coats of latex emultion of approved colour and make over a coat of primer for ceiling **internal** surfaces as per directions including providing and removing scaffolding, finishing etc., complete in all floors. | RATE ONLY | YD² | 19.94 | 0.00 |
| X | **DOOR AND WINDOWS (For UPVC as per PVC Windoor inc specification or equivalent) All Door and Window Rates are inserted as a PC Sum Rate** | | | | |
| 1 | **DOORS**<br>Providing and fixing Single leaf side hung door with aluminium/UPVC framed shutter with infill panel of 30mm particle board finished with 1mm laminate on both sides with all necessary accessories with vision panel of size 6" X 2' with the door size of 4' x8'<br>    Labour - fixed labour rate required including setting material/grout | 48 | NR | 295.40 | 14,179.20 |
| 2 | providing and fixing Double leaf side hung door with M.S frame & shutter with 2hr fire proof with all necessary accessories . Of the size of 6' x 8'<br>    Labour - fixed labour rate required including setting material/grout | 8 | NR | 464.45 | 3,715.60 |
| 3 | providing and fixing Single leaf side hung door with M.S frame & shutter with 2hr fire proof with all necessary accessories for electric room with the size of 4' x 8'<br>    Labour - fixed labour rate required including setting material/grout | 4 | NR | 295.40 | 1,181.60 |
| | | | | c/fwd: | 583,391.40 |

**A277**

| ITEM | DESCRIPTION | QUANTITY | UNIT | RATE | AMOUNT EC$ |
|------|-------------|----------|------|------|------------|
| | | | | b/fwd: | 583,391.40 |
| | **WINDOWS** | | | | |
| 1 | Providing and fixing Single track fixed aluminium/UPVC shutter(3" x 2½") & frame( 2½" x 2½") with all necessary accessories with 6mm laminated glass.of the size  4' x 5' | | | | |
| | Labour - fixed labour rate | 68 | NR | 335.31 | 22,801.08 |
| 2 | Three track  horizontal  sliding Aluminium/ UPVC shutter(3"x2½")  & frame with 6mm laminated glass with all necessary accessories& mosquito mesh with the size of 3' x 5' | | | | |
| | Labour - fixed labour rate | 20 | NR | 335.31 | 6,706.20 |
| XII | **MISCELLANEOUS** | | | | |
| 3 | Providing and fixing in position wooden columns of size 8" x 8" with necessary fittings as  architectural design **(PROVISIONAL SUM)** | 178 | YD | 120.00 | 21,360.00 |
| | | | | **TOTAL EC$:** | **634,258.68** |

## P 103 - AUA SUPERSTRUCTURE WORKS
### Deleted Items - Service Block



| ITEM | DESCRIPTION | QUANTITY | UNIT | RATE | AMOUNT EC$ |
|---|---|---|---|---|---|
| X | **DOOR AND WINDOWS (For UPVC as per PVC Windoor inc specification   or equivalent)** | | | | |
| | **DOORS** | | | | |
| 1 | Providing and fixing Double leaf side hung  pressed door with steel frame of 2.5"X5" with1.5" shutter of 1.5 mm steel sheet on both sides with 2 hr fire proof  with all necessary accessories. **FR   D1   of size 5'0" x 8'6"** | | | | |
| | Labour - fixed labour rate required including setting material/grout | 4 | NR | 408.75 | 1,635.00 |
| 2 | Providing and fixing Double leaf side hung  pressed door of steel frame 2.5"X5" with1.5" shutter of 1.5 mm th steel sheet on both sides with 2 hr fire proof with all necessary accessories.. **D1 of size  5'0" x 8'0"** | | | | |
| | Labour - fixed labour rate required including setting material/grout | 1 | NR | 408.75 | 408.75 |
| 3 | Providing and fixing Single leaf side hung  pressed steel frame 2.5"X5" with1.5" shutter of 1.5 mm th steel sheet on both sides with 2 hr fire proof with all necessary accessories..  **D2 of the size of 3'0" x 8'0"** | | | | |
| | Labour - fixed labour rate required including setting material/grout | 1 | NR | 295.40 | 295.40 |
| | **WINDOWS** | | | | |
| 1 | Providing and fixing Single track  fixed Aluminium/  UPVC frame( 2½" x 2½")with partly fixed 6mm laminated glass louvers & partly with fixed laminated glass. **SW 1 of the size of  5'0" x** | | | | |
| | Labour - fixed labour rate required including setting material/grout | 1 | NR | 335.31 | 335.31 |
| | **VENTILATORS** | | | | |
| 1 | Providing and fixingAluminium/ UPVC frame & with fixed  6mm laminated glass louvers with all necessary accessories.. **V1  of the size of 6'0" x 3'0"** | | | | |
| | Labour - fixed labour rate required including setting material/grout | 17 | NR | 286.50 | 4,870.50 |
| | | | | **TOTAL EC$:** | **7,544.96** |

## P 103 - AUA SUPERSTRUCTURE WORKS
## Deleted Items - Library Buildings

 **LEEWARD**

| ITEM | DESCRIPTION | QUANTITY | UNIT | RATE | AMOUNT EC$ |
|------|-------------|----------|------|------|------------|
| IX | **PAINTING AND FINISHES** | | | | |
| 1 | Providing and painting **external** surface with trowellex including feature bands/grooves etc of approved colour all as per manufacturers instructions and directions inlcuding scaffolding etc., complete at all levels. | 3,040 | YD² | 74.95 | 227,848.00 |
| 2 | Preparing surface and painting with Traveltex fine grade **internally,** Plastic emulsion paint of approved colour including providing and removing scaffolding, finishing etc., complete | | | | |
| | Ground Floor | 3,450 | YD² | 74.95 | 258,577.50 |
| | First Floor | 1,835 | YD² | 74.95 | 137,533.25 |
| | Second Floor | 1,355 | YD² | 74.95 | 101,557.25 |
| | Terrace | 215 | YD² | 74.95 | 16,114.25 |
| 3 | Preparing surface and painting with 2 coats of latex emultion of approved colour and make over a coat of primer for ceiling internal surfaces as per directions including providing and removing scaffolding, finishing etc., complete in all floors. | | | | |
| | Ground Floor | 5,330 | YD² | 19.94 | 106,280.20 |
| | First Floor | 6,370 | YD² | 19.94 | 127,017.80 |
| | Second Floor | 4,630 | YD² | 19.94 | 92,322.20 |
| | Terrace | 75 | YD² | 19.94 | 1,495.50 |
| X | **DOOR AND WINDOWS** (For UPVC as per PVC Windoor inc specification or equivalent) All Door and Window Rates are inserted as a PC Sum rates. | | | | |
| | **DOORS** | | | | |
| 1 | Providing and fixing Main Entrance Door Double leaf side hung aluminium/UPVC frame(2" x 3") & shutter(2" x 1.2") of 3mm thk with 6mm laminated glass with all necessary accessories .   ED 8'0" x 8' 6" | | | | |
| | Labour - fixed labour rate required including setting material/grout | 1 | NR | 654.85 | 654.85 |
| 2 | Providing and fixing Double leaf side hung door withaluminium/ UPVC frame & shutter with 6mm laminated glass for entrance Door with all necessary accessories with the opening of 5'0" x 8'0" | | | | |
| | Labour - fixed labour rate required including setting material/grout | 8 | NR | 459.13 | 3,673.04 |
| | | | | c/fwd: | 1,073,073.84 |

| ITEM | DESCRIPTION | QUANTITY | UNIT | RATE | AMOUNT EC$ |
|------|-------------|----------|------|------|------------|
| | | | | b/fwd: | 1,073,073.84 |
| | **DOORS (continued)** | | | | |
| 3 | Providing and fixing Double leaf side hung  pressed door of steel frame 2.5"X5" with1.5" shutter of 1.5 mm th steel sheet on both sides with 2 hr fire proof with all necessary accessories . D1 of size  4'0" x 8'0" | | | | |
| | Labour - fixed labour rate required including setting material/grout | 16 | NR | 295.40 | 4,726.40 |
| 4 | Providing and fixing Single leaf side hung door with Aluminium/UPVC frame & shutter with infill panel of 30mm particle board finished with 1mm laminate on both sides with all necessary accessories for Admission room,office area with the opening size of 3'6" x 8'0" | | | | |
| | Labour - fixed labour rate required including setting material/grout | 5 | NR | 245.25 | 1,226.25 |
| 5 | Providing and fixing Single leaf side hung door with UPVC shutter & frame toilet entrance door with all necessary accessories with opening of 3'0" x 8'0" | | | | |
| | Labour - fixed labour rate required including setting material/grout | 22 | NR | 245.25 | 5,395.50 |
| 6 | Providing and fixing Single leaf side hung door with UPVC shutter & frame toilet entrance door with all necessary accessories  opening of 2'9" x 8'0" | | | | |
| | Labour - fixed labour rate required including setting material/grout | 71 | NR | 245.25 | 17,412.75 |
| | **WINDOWS** | | | | |
| 1 | Providing and fixing Aluminium/UPVC fixed window with 6mm laminated glass with all necessary accessories with opening size of 3'0' x 8'0" | | | | |
| | Labour - fixed labour rate | 6 | NR | 429.44 | 2,576.64 |
| 2 | Providing and fixing Two track  Aluminium/UPVC  frame( 2½" x 2½") horizantal sliding shutter with 6mm laminated glass with all necessary accessories  with opening size of 7'10" x 5'0" | | | | |
| | Labour - fixed labour rate | 94 | NR | 549.47 | 51,650.18 |
| 3 | Providing and fixingTwo track  fixed aluminium/UPVC  frame( 2½" x 2½")  horizontal sliding shutter with  6mm laminated glass with all necessary accessories with opening size of 6'0" x5'0" | | | | |
| | Labour - fixed labour rate | 68 | NR | 408.65 | 27,788.20 |
| 4 | Providing and fixing Two track  fixed Aluminium/UPVC  frame( 2½" x 2½")  horizantal sliding shutter with 6mm laminated glass with all necessary accessories with opening size of 4'0" x5'0" | | | | |
| | Labour - fixed labour rate | 10 | NR | 408.65 | 4,086.50 |
| | | | | c/fwd: | 1,187,936.26 |

**A281**

| ITEM | DESCRIPTION | QUANTITY | UNIT | RATE | AMOUNT EC$ |
|---|---|---|---|---|---|
| | | | | b/fwd: | 1,187,936.26 |
| 1 | **VENTILATORS**<br>Providing and fixing Toilet Ventilator aluminium/UPVC frame & shutter with 6mm laminated glass louvers. Of the size of 6'0" x 5'0" | | | | |
| | Labour - fixed labour rate | 6 | NR | 408.65 | 2,451.90 |
| 2 | Providing and fixing Toilet Ventilator Aluminium/ UPVC frame & shutter with 6mm laminated glass louvers with all necessary accessories . Of the size of 4'0" x 5'0" | | | | |
| | Labour - fixed labour rate | 14 | NR | 408.65 | 5,721.10 |
| | | | | **TOTAL EC$:** | **1,196,109.26** |

**A282**

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES

| | |
|---|---|
| LEEWARD CONSTRUCTION COMPANY, Ltd.<br><br>           Claimant,<br><br>v.<br><br>AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE C/O GCLR, LLC,<br><br>           Respondent. | Case No. 50 110 T 00075 11 |

---

**ANSWERING STATEMENT AND COUNTERCLAIM OF AMERICAN UNIVERSITY IN ANTIGUA ("AUA") TO THE AMENDED DEMAND FOR ARBITRATION SUBMITTED BY LEEWARD CONSTRUCTION COMPANY, LTD. ("LEEWARD")**

---

SILLS CUMMIS & GROSS, P.C.
Mark S. Olinsky, Esq.
Jonathan S. Jemison, Esq.
30 Rockefeller Plaza
New York, New York 10112
(212) 643-7000
*Attorneys for Respondent*

**A283**

## PRELIMINARY STATEMENT

1.     Leeward and AUA entered into a contract for certain Work (defined below) to be performed in connection with the construction of AUA's Medical School campus in Antigua. As is common in construction contracts, the scope of that Work changed during the course of the project, with some work being added and other work being altered or deleted. As the Work changed, the parties jointly measured and reached agreement on the amounts due by adjusting for what had actually been built and what had not.

2.     When Leeward completed its Work in October 2009 and submitted its Draft Final Account, the parties conducted a final measurement of what had actually been constructed and -- with three exceptions -- came to terms as to how much in total Leeward was entitled to be paid for the Work. The three exceptions amounted to only EC $1,072,083.88 for:  additional preliminaries, time lost for the Whitsuntide Holiday, and a claim for overhead and profit on certain work. Leeward threatened to bring a timely arbitration on these three claims, but did not.

3.     Fourteen months later, in December 2010, Leeward suddenly claimed to be entitled to EC $13,161,136.88, and then commenced this arbitration in February 2011 for that precise amount. Last month, under order of the Tribunal to specify its claim, Leeward dropped its EC $13,161,136.88 claim to EC $6,800,572.28.

4.     Now, more than two years after the parties measured what was actually built when the project was complete in October 2009, the only matters genuinely in dispute remain the three that were in dispute back then (though Leeward has more than doubled the amount claimed on those three). Those three claims are no more valid now than they were then. But, as set forth at length below, two-thirds of Leeward's current EC $6.8 million claim -- EC $4,282,288.24 --

1

simply constitutes an effort to be paid for Work that was not in fact performed because of changes to the scope that occurred during the contract period.

## BACKGROUND FACTS

### A.    The Construction Project

5.    In May 2008, AUA began construction of a medical school in Antigua. The initial project was limited in scope and Leeward had been retained to perform certain of that work.

6.    In the middle of 2008, AUA expanded the scope of the project. Revised architectural drawings were prepared and AUA reached a preliminary agreement with Leeward to provide the primary construction services for the expanded work.

7.    The revised project ultimately involved the construction of: (i) a Classroom and Laboratory Building; (ii) a Library Block; (iii) a Service Block; and (iv) an Amphitheater (the "Project"). Leeward was retained to construct the structural works of these four campus buildings as set forth in the Contract Documents (defined herein) (the "Work").

8.    Sundaram Architects (the "Architect") was retained by AUA to prepare the drawings and oversee the construction of the campus. A.S. Nagesh served as the Architect's representative for the majority of the Project.

9.    From the middle of 2008, Lt. Col. Roche Antony served as AUA's representative on site. He also signed the Contract Documents on AUA's behalf. Leeward's primary representatives on site were Neil Dickinson (who also signed the Contract Documents) and Paul Webster. The Contract Documents are attached hereto as AUA Exhibit 1.

### B.    The Negotiation of the Contract

10.    During the summer of 2008, AUA and Leeward negotiated the terms of their contract governing the Project. In connection with that effort, the parties retained the services of

2

**A285**

Peter McLeod of DHP Associates. Mr. McLeod assisted the parties in drafting the Contract Documents and negotiating their key terms.

11.     The parties negotiated the length of the project and ultimately agreed upon a 52 week construction period, commencing as of May 1, 2008 and ending on April 30, 2009 (the "Contract Time"). While Leeward initially had sought a longer construction schedule, it ultimately agreed that the 52 week schedule was appropriate after AUA removed plumbing and electrical works from the scope of Leeward's work.

12.     Leeward agreed that the time limits in the Contract Documents "are of the essence of the Contract." General Conditions (defined herein) § 8.2.1 (AUA Ex. 1 at AUA 000041)[1]. Further, Leeward agreed that "[b]y executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work." *Id.*

13.     If Leeward failed to reach Substantial Completion by the end of the Contract Time, Leeward agreed to pay AUA liquidated damages of US $1,500 per day until the Work was substantially complete. Contract (defined herein) § 3.3.1 (AUA Ex. 1 at AUA 000006).

14.     Part and parcel with determining the length of the Project was determining the amount of money Leeward would be paid to operate the construction site on a weekly basis. These costs, called "Preliminaries," generally refer to the overhead costs incurred in maintaining the work site and managing the project. The parties estimated the amount of Preliminaries that would be expended over the 52 week construction period, but agreed that Preliminaries would be paid based upon actual costs as approved by AUA.

---

[1]  Submitted with this Answering Statement is a volume of AUA Exhibits 1 to 13 (the "AUA Exhibits"). The documents contained in the AUA Exhibits are numbered consecutively from AUA 000001 to AUA 000427 (the "AUA Page Number") to facilitate locating each specific reference to the AUA Exhibits. Citation to the AUA Exhibits will identify the AUA Exhibit and, where appropriate, the AUA Page Number.

3

15.     The scope of the work to be completed by Leeward was set forth in a Bill of

Quantities ("BOQs"), which listed specific "measured works," including individualized items of

work, that the Architect expected Leeward would perform to construct the campus in accordance

with the architectural drawings. *See* AUA Ex. 1 at AUA 000072 to AUA 000103. The BOQs

contained the expected quantity of work for each line item and the parties negotiated the unit

rates to be paid for each item of "measured work."

16.     This "Measured Works" portion of the contract was based upon the total amount

of work set forth in the BOQs in the event that each item listed in the BOQs was performed and

the work as-built measured the same as the pre-construction measurements and quantities.

However, the actual work performed by Leeward was less than that which was listed in the

BOQs and, as explained herein, the Contract Sum became reduced accordingly by the terms of

the Contract Documents.

17.     The parties also negotiated an EC $1,000,000 Cash Allowance, from which

Leeward could make claims for certain contingent costs, such as overtime, scaffolding charges

and craneage costs, should Leeward adequately substantiate the need for such costs. During

contract negotiations, Leeward made it clear that it wanted a separate reserve of EC $500,000 for

what it called "Non-Productive Overtime," but AUA did not agree and that term requested by

Leeward was not included in the Contract Documents executed by the parties.

C.      **The Contract Documents and the Pertinent Provisions**

18.     The parties agreed upon the documents that would comprise the Contract

Documents, which were collected together in a Project Manual and executed on September 25,

2009: (i) AIA Document A101-1997 -- Standard Form of Agreement Between Owner and

Contractor where the basis of payment is a STIPULATED SUM (the "Contract"); (ii) AIA

4

**A287**

Document A201-1997 -- General Conditions for the Contract for Construction (the "General

Conditions"); (iii) the Bill of Quantities; (iv) the Drawings and (v) the Specifications

(collectively, the "Contract Documents"). *See* AUA Exhibit 1.

19.     The parties expressly agreed that the Contract Documents as a whole govern the

obligations of AUA and Leeward. Section 1.2.1 of the General Conditions (AUA Ex. 1 at AUA

000025) provides:

> The intent of the Contract Documents is to include all items
> necessary for the proper execution and completion of the Work by
> the Contractor. The Contract Documents are complementary, and
> what is required by one shall be as binding as if required by all;
> performance of the Contractor shall be required only to the extent
> consistent with the Contract Documents and reasonably inferable
> from them as being necessary to produce the indicated results.

20.     Leeward's work under the Contract Documents was to commence on May 1,

2008 and be completed in 364 days thereafter. Contract §§ 3.1 and 3.3 (AUA Ex. 1 at AUA

000006). Substantial Completion for each of the four parts of the Project was to be achieved

between January 29, 2009 and April 30, 2009. Contract § 3.3.

21.     As noted, because the full potential scope of the work was sufficiently defined,

the parties agreed that the contract would be based upon a Contract Sum, as opposed to Time and

Materials. However, the Contract Sum was not the equivalent of a guaranteed flat fee to be paid

regardless of what works Leeward actually completed. Rather, the parties intended and

understood, as contemplated by the specific provisions of the Contract Documents and as

demonstrated by their actions throughout the duration of the contract, that Leeward was only to

be paid for the work actually performed, as measured and verified by the Architect.

22.     The Contract Sum is a defined term in the Contract Documents. Section 9.1.1 of

the General Conditions provides that the "Contract Sum . . ., including authorized adjustments, is

the total amount payable by the Owner to the Contractor for performance of the Work under the

5

Contract Documents." (AUA Ex. 1 at AUA 000041). When the parties executed the Contract

Documents, that amount was EC $27,436,824 "subject to additions and deductions as provided

in the Contract Documents." Contract, § 4.1 (AUA Ex. 1 at AUA 000006). By its nature, the

amount of the Contract Sum is fluid and changes during the life of the Project based upon such

"additions and deductions." At the conclusion of the Project, "[f]inal payment, constituting the

unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor." Contract §

5.2.1 (AUA Ex. 1 at AUA 000008).

23.     As set forth in the Statement of Contract Sum Collection Page (the "Statement of

Contract Sum") included within the Project Manual, the amount of the Contract Sum stated in

the Contract Documents was based upon three main components: (i) Preliminaries and Site

Setup costs (EC $3,906,146); (ii) the Measured Works (EC $22,530,678); and (iii) the Cash

Allowance (EC $1,000,000). *See* AUA Ex. 1 at AUA 000071. The parties understood that these

components were subject to change, and they did, in fact, change over the course of the Project.

24.     The first section of the Statement of Contract Sum covers Preliminaries and Site

Setup costs. The amounts used to calculate this portion of the original Contract Sum were based

upon a set of predicted costs over the 52 week contract period. These assumptions were detailed

in the Project Manual. *See* AUA Ex. 1 at AUA 000062 to AUA 000063. Knowing that the

actual cost of Preliminaries would change, the Contract provided that "Time related [to]

recurring, setup and Management Costs are to be based on actuals provided these are approved

one week in advance by the Owner." Contract § 4.3 (AUA Ex. 1 at AUA 000007) and Statement

of Contract Sum (AUA Ex. 1 at AUA 000071).

25.     The second section of the Statement of Contract Sum is entitled "Measured

Works." The amounts listed in this section were carried over from the BOQs, subject to the

6

**A289**

items of work actually being performed and the quantities and measurements being verified. Leeward would not be entitled to payment when items of work listed in the BOQs were omitted from performance, as recognized by Leeward in its Amended Demand for Arbitration (Leeward acknowledges a EC $1,948,755.32 reduction in the Contract Sum for works it did not perform pursuant to the terms of the Contract Documents).

26.     The value of extra work or changes was to be based upon the agreed upon unit rates in the BOQs. Contract § 4.3 (AUA Ex. 1 at AUA 000007).

27.     The onus was placed on Leeward to verify the accuracy of the Measured Works and Leeward was only to be paid for the Work actually performed. Sections 1.5(E) and (F) of the Specifications (AUA Ex. 1 at AUA 000114) provide:

> E.     Quantity Surveyors and other staff shall be provided by the contractor in connection with the works, in measuring any changes and in preparing other records reasonably requested by the Architect or Owner. Contractor is to verify accuracy of quantities and any errors/or omissions are subject to adjustment via Change Order.

> F.     All changes arising out of the performance of the work and any errors and/or omissions in the Bills of Quantities shall be measured and valued in accordance with the methods adopted in the unit rates.

28.     The third section of the Statement of Contract Sum is for "Cash Allowances." This consisted of an EC $1,000,000 contingency that was to be expended in accordance with the Owner's directions. General Conditions, § 3.8.1 (AUA Ex. 1 at AUA 000029). Approved charges for Overtime, Scaffolding and Craneage, as instructed by Change Order, were to be adjusted against this contingency. *See* Statement of Contract Sum (AUA Ex. 1 at AUA 000071). Moreover, the Contract Sum was to be adjusted when the actual costs were more or less than the Cash Allowance. General Conditions, § 3.8.2 (as supplemented) (AUA Ex. 1 at AUA 000011). The Specifications further provided that "Cash Allowances are to be expended only as directed

7

**A290**

via written Change Order by the Owner and may be deducted in whole or in part if not required."
Specifications, § 1.2(C) (AUA Ex. 1 at AUA 000111).

29.     The Contract Documents acknowledged that they could be modified after
execution. *See* General Conditions, § 1.1.1 (defining Modifications) (AUA Ex. 1 at AUA
000025). A Modification to the Contract Sum is to be done via Change Order or Change
Directive. While the Contract Documents provide a formal means to issue Change Orders and
Change Directives (General Conditions, Article 7), as demonstrated herein, the parties did not
adhere to the formal requirements of the Contract Documents for making construction changes
that either added, changed or omitted work. Whether changed by formal or informal process, as
is common in the construction industry, the parties agreed and understood that the Contract Sum
could, and probably would, change such that AUA would pay Leeward only for the work
actually performed. Indeed, as will be demonstrated below, prior to making its December 17,
2010 "Claim," Leeward only sought payment for the work it actually performed despite the lack
of formal Change Orders.

30.     Leeward's Amended Demand for Arbitration (the "Amended Demand") concedes
that the Contract Sum was adjusted (both upwards and downwards) without formal Change
Orders for changes that either added or omitted work. For example, Leeward claims it was paid
for approved extra work even though "AUA never issued change orders or change directive for
additional work." Amended Demand, ¶ 25. Similarly, Leeward concedes the Contract Sum was
reduced by work being "removed" from Leeward's scope of work, despite the absence of a
formal Change Order. *Id.*, ¶¶ 23-24.

8

**A291**

**D.**     <u>The Processing of Payments Under the Contract Documents</u>

31.     Leeward submitted Applications for Payment on a monthly basis ("Payment Applications"). Pursuant to Section 5.1.5 of the Contract, Payment Applications were to "indicate the measured works of each [BOQ] portion of the Work as of the end of the period covered by the Application for Payment." (AUA Ex. 1 at AUA 000007).

32.     Accordingly, Leeward submitted Payment Applications based on actual work and actual costs. Thus, with each Payment Application Leeward sought payment for the measured work it actually performed since the last Payment Application. In so doing, Leeward would submit the BOQs to reflect the amount of Measured Works performed. Each interim version of the BOQs would reflect the pre-contract quantity or measurement, the actual measurement of the work performed, the unit rate, and the amount due for each line item based upon the actual measurements. Leeward would also attach extensive paperwork with the actual measurements. *E.g.,* AUA Exhibit 2. This process was followed up to and including Leeward's final Payment Application, submitted at the completion of the Work. *See* ¶¶ 56 to 61, below and AUA Exhibit 3. By the terms of the Contract Documents, the aggregate modification of Measured Works actually performed served to reduce the Contract Sum.

33.     As the Project progressed, the Architect also determined that certain items listed in the BOQs were not necessary (the "Omitted Work"). Essentially, site conditions or changes in the design dictated whether certain items listed in the BOQs were required, and if they were not, the Architect would direct Leeward to not perform those tasks. Because Leeward was only to be paid for works actually done, Leeward properly did not include any of the Omitted Work in its Payment Applications notwithstanding the absence of a formal Change Order. By the terms of the Contract Documents, these omissions served to reduce the Contract Sum.

34.     Each Payment Application also included an itemization of other costs, including actual Preliminaries and a list of what Leeward called "Change Orders," for which it sought payment. To the extent the actual Preliminaries and Change Orders exceeded the EC $1,000,000 Cash Allowance, by the terms of the Contract Documents they served to increase the Contract Sum.

35.     Upon receipt of a Payment Application, the Architect and a Leeward representative would check all of the measurements to verify that the Measured Works claimed accurately reflected the quantity of the Measured Works actually performed. The Architect would reach agreement with Leeward as to the revised measurements, and then make revisions to the Payment Application accordingly. The Architect and AUA also reviewed and approved (or rejected) the actual Preliminaries and "Change Orders" sought by Leeward in each Payment Application. Once all parties agreed on the payment amount, either the Architect would certify the marked-up Payment Application or Leeward would submit a new Payment Application consistent with the revisions made, which the Architect would then certify.

36.     The certified Payment Applications were also counter-signed by Col. Antony on behalf of AUA and, in most instances, a representative of Leeward. Once certified, AUA would process the Payment Application and wire the monies to Leeward.

37.     As set forth in Section 5.1.3 of the Contract, once AUA and Leeward reached agreement on a Payment Application and sent it to the Architect, AUA had 15 days to make payment to Leeward. *See* AUA Ex. 1 at AUA 000007. Given the manner in which AUA, Leeward and the Architect would work together to review and verify the accuracy of each Payment Application, the date on which agreement was achieved as between AUA and Leeward was typically the same date the Architect certified the Payment Application.

10

38.     As set forth in Paragraph 138 below, Leeward claims certain payments were not paid by AUA in a timely fashion, but has not alleged either those payments it claims were paid outside the 15 day window or the number of days by which any allegedly late payment exceeded the 15 day period.

39.     Finally, as set forth in Section 5.1.8 of the Contract (AUA Ex. 1 at AUA 000008), AUA retained a portion of each Payment Application as retainage.

**E.      The October 2008 Shutdown**

40.     Soon after signing the Contract Documents, disputes arose over the payment of monies. Specifically, Leeward and AUA had a dispute over one of the Payment Applications and a dispute with respect to the payment of Mobilisation advances.

41.     In light of these disputes, Leeward walked-off the construction site in October 2008 for a period of two weeks (the "October 2008 Shutdown"). Leeward returned to the Project after two weeks, on or about November 5, 2009, while the parties worked to resolve the dispute.

42.     On December 15, 2008, Leeward submitted a claim to the Architect relating to the October 2008 Shutdown, both with respect to the disputes that led to the shutdown as well as the losses incurred during the two weeks Leeward was not working. *See* AUA Exhibit 4. Specifically, Leeward claimed:

> 1.      Release of the outstanding balance of Mobilisation Advance Payment, plus compensation in respect of financing costs and lost interest, plus any Extension of Time for completion of the Works deemed to be attributable to non-availability of cash resources to facilitate purchase of materials and/or equipment necessary for the timely execution of said Works; and
>
> 2.      An extension of Time of fourteen days for completion of the Works, plus costs in respect of the shut-down, delay, and start-up of the Works, plus interest subsequent to non-payment by the Owner of monies due with the prescribed timescales.

11

43.     Leeward threatened to commence an arbitration as provided by the Contract Documents if not awarded the relief claimed. *Id.*

44.     On January 13, 2009, AUA and Leeward met and agreed to settle the claims set forth in Leeward's December 15, 2008 claim, and thereby avoid arbitration. As part of that settlement, AUA agreed that Leeward could extend the Project two weeks, from April 30, 2009 to May 14, 2009, without costs, meaning Leeward would not be paid Preliminaries for those two weeks and AUA would not seek liquidated damages for those two weeks. AUA also agreed to extend the time in which it would credit monies due Leeward against the prior Mobilisation advances, so as to provide Leeward with greater cash flow for a longer period of time.

**F.     Leeward's Failure to Timely Complete the Works**

45.     Leeward agreed that it would "proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time." General Conditions, § 8.2.3 (AUA Ex. 1 at AUA 000041).

46.     Despite this agreement, throughout the duration of the Project, Leeward was behind schedule and failed to take the necessary steps to complete the Project on time. Leeward made some overtime requests, which were reviewed on a case-by-case basis by AUA, but these were not accepted unless the overtime was productive and allowed for Leeward to get back on schedule.

47.     As the Project neared the expiration of the Contract Time, it was evident that Leeward would not be able to complete its Work on time. As a result of Leeward's delay in performing the Work, in late April 2009 AUA decided to take certain of the finishing works from Leeward's scope of Work, including fixing doors and windows (the "Doors and Windows Work"), installing the flooring (the "Flooring Work") and painting the buildings (the "Painting Work"). AUA decided to have each of these items performed under separate contracts, whether

12

**A295**

by Leeward or another contractor, in the hope that this would allow Leeward to reach Substantial Completion as close to on-time as possible.

48.     Leeward was awarded separate contracts to perform the Doors and Windows Work and the Flooring Work. Leeward was paid for this work.

49.     The Painting Work was awarded to another contractor.

50.     Despite the reduction in the scope of Work, on May 11, 2009, three days before the extended deadline for Substantial Completion, Leeward submitted a Claim, pursuant to Article 4 of the General Conditions, to extend the Contract Time by 15 weeks "together with reimbursement of costs expended." *See* AUA Exhibit 5.

51.     The sole basis for Leeward's claim to extend the Contract Time by 15 weeks was its contention that EC $500,000 was set aside for Non-Productive Overtime costs in the Contract Documents "necessary to reduce the construction period by 16 weeks" from 68 weeks to 52 weeks. *Id.* Leeward claimed that by only approving EC $36,511.68 in overtime, or 1.2 weeks of overtime, AUA denied Leeward "the ability to finish the Works on time, and have created a delay to the construction programme in the order of 14.8 weeks." *Id.*

52.     AUA rejected this claim and refused to extend the Contract Time because the Contract Documents did not contain any provision for an EC $500,000 escrow for Non-Productive Overtime. While Leeward specifically requested this set-aside for Non-Productive Overtime as late as one week before the execution of the Contract Documents (*see* AUA Exhibit 6), it was rejected by AUA and was not included in the final version of the Contract Documents signed by the parties. AUA also rejected Leeward's claim for a 15 week extension of time because Leeward's inability to complete the Work within the Contract Time was due to Leeward's own delay. Moreover, the parties specifically negotiated the Contract Time and

13

**A296**

agreed, as reflected in the Contract Documents, that 52 weeks was more than sufficient to complete the Work.

53.     Leeward reiterated its Claim for an additional 15 weeks in Contract Time, and raised a number of other claims, on May 29, 2009. AUA Ex. 7.

54.     Because it rejected Leeward's claim to extend the Contract Time, AUA refused to pay Preliminaries beyond the 52 week Contract Time set forth in the Contract Documents. With each Payment Application thereafter, Leeward would attempt to assess additional Preliminaries based upon this additional time, but each time AUA would reject this portion of Leeward's Payment Application. *E.g.*, AUA Exhibit 8 at AUA 000348.

**G.     The Draft Final Account**

55.     Leeward admits that it did not achieve Substantial Completion until July 31, 2009. Amended Demand, ¶ 11. Leeward also claims that it "finally completed" the Work governed by the Contract Documents (*i.e.*, excluding the work done under separate contracts) on or about September 18, 2009. *Id.*

56.     Upon completion of the Work, on October 8, 2009 Leeward submitted a first draft of its Final Account, which it called "Draft Final Account." AUA Exhibit 3. Unlike the Payment Applications before it, the Draft Final Account did not specify the period of time covered by the application; it was to be the final Payment Application.

57.     As with the prior Payment Applications, Leeward only sought payment for the work actually performed. Leeward did not seek payment for Omitted Work (EC $1,430,284 of the original BOQs), Doors and Window Work (EC $191,090 of the original BOQs), Flooring Work (EC $1,762,459 of the original BOQs) or Painting Work (EC $1,844,789 of the original BOQs), resulting in a total reduction of the Contract Sum of EC $ 5,229,277.

14

**A297**

58.    Moreover, Leeward only sought payment for the Measured Works it did perform based upon actual quantities and measurements of the completed Work. In many instances, the actual measurements were greater than as set forth in the BOQs, and thus Leeward was paid more for each of those items than set forth in the BOQs. In other instances, the measurements were less, and thus Leeward was paid less. In the aggregate, the adjusted measurements resulted in a reduction of the Contract Sum of EC $28,765.63. Combined with the items omitted from the Work, the Measured Works portion of the BOQs was reduced from EC $22,530,678 to EC $17,272,635.37, resulting in a combined reduction to the Contract Sum of EC $5,258,042.63, and not merely the EC $1,948,755.32 reduction claimed in the Amended Demand.

59.    As with the prior Payment Applications, Leeward's Draft Final Account was reviewed for accuracy by the Architect and AUA. Accordingly, the Architect and Leeward verified each item of the Measured Works for accuracy and reached agreement on the requisite alterations.

60.    AUA also scrutinized the Draft Final Account with respect to Leeward's request for additional Preliminaries, "Change Orders" and other claims. The Architect and AUA approved some of these for payment and rejected others.

61.    After the parties exchanges several versions of the Draft Final Account, on October 21, 2009, AUA approved and the Architect certified a revised Collections Page for payment based upon the measurements verified by the Architect and additional expenses approved by AUA. *See* AUA Exhibit 9.[2]

62.    The Collections Page confirmed that AUA agreed to pay Leeward EC $23,603,320 for the Work performed under the Contract Documents as follows:

_____

[2]  The Draft Final Account submitted by Leeward in this arbitration differs from both the version it initially sent to AUA and the Architect on October 8, 2009 (AUA Ex. 3) and the amounts certified for payment on October 21, 2009 (AUA Ex. 9).

A298

| Preliminaries/General Conditions: | EC $ 4,936,303.60 |
| Measured Works: Classroom and Lab Building | EC $ 3,393,169.12 |
| Measured Works: Service Block | EC $ 1,197,242.34 |
| Measured Works: Library Block | EC $12,075,689.50 |
| Measured Works: Amphitheater | EC $ 606,534.41 |
| "Change Orders" | EC $ 1,232,088.91 |
| Claims | EC $ 162,372.12 |
| **TOTAL** | **EC $23,603,320.00** |

63.     In calculating how much AUA owed Leeward, AUA took into consideration its prior payments, the amount of retainage it was required to release, and a prior advance it gave Leeward in the amount of EC $500,000. Those calculations resulted in a payment of EC $104,862,91 (exclusive of ABST). Leeward was wired payment on October 26, 2009. *See* AUA Exhibit 10.

64.     AUA kept EC $590,083 from the final EC $23,603,320 earned by Leeward as retainage to be paid in accordance with the Contract Documents, which require, among other things, submission of the documentation set forth in Section 9.10.2 of the General Conditions. (AUA Ex. 1 at AUA 000045).

65.     Neither AUA nor the Architect expected to receive any further invoices from Leeward for the Measured Works performed under the Contract Documents, and Leeward did not submit any.

**H.     Leeward's October 26, 2009 Claim**

66.     On October 26, 2009, Leeward reasserted its Claim with respect to three specific items not resolved as of the payment of the Draft Final Account. Specifically, Leeward sought payment for "Additional Preliminaries" (EC $955,544.08), a claim for time lost for the

16

**A299**

Whitsuntide Holiday (EC $19,457.40), and a claim for overhead and profits (EC $97,064.40). AUA Exhibit 11. Leeward indicated its desire to start the arbitration process "immediately" with respect to its EC $1,071,994.88 aggregate claim. *Id.*

67.     These claims correspond with specific differences between the Draft Final Account initially submitted by Leeward, and the Draft Final Account approved by AUA. Specifically, Leeward sought Preliminaries of EC $5,891,857.68, but AUA only approved and paid EC $4,936,303.60. The difference between the two is EC $955,455.08. Leeward also sought EC $278,911.92 in Claims, but AUA only approved and paid EC $162,372.12. The EC $116,539.80 difference is precisely the aggregate of Leeward's Whitsuntide Holiday claim and its Overhead and Profits Claim (EC $19,475.40 + EC $97,064.40 = EC $116,539.80).

68.     In November 2009, the parties met in an effort to resolve these three remaining claims, but were unable to reach an amicable resolution. AUA advised Leeward it would need to commence an arbitration if it wanted to continue to pursue these three claims.

69.     Despite professing a desire to proceed to arbitration as quickly as possible if the parties did not settle these three remaining claims, Leeward took no steps to pursue arbitration of the claims asserted in its October 26, 2009 letter until it filed this arbitration in February 2011.

**I.     Leeward's February 17, 2010 Claim and Its Original Demand for Arbitration**

70.     For fourteen months, from October 26, 2009 to December 2010, Leeward never claimed that it was due any more money, including interest, under the Contract Documents other than the EC $1,071,994.88 detailed in its October 26, 2009 letter for the three claims described above. The only monies Leeward sought during this time was a release of the remaining retainage. Leeward made that request in July 2010, even though it still had not complied with its

17

**A300**

obligation under General Conditions § 9.10.2 as a prerequisite to being paid the remaining retainage.

71.     On December 17, 2010, Leeward for the first time submitted a claim for what it called Final Payment under the Contract Documents.  The claim was signed by Leeward's Directors, Andy Green and Eric Linde, and copied Leeward's current counsel, J. Scott Greer, Esq.

72.     This claim for final payment, submitted fourteen months after payment on the Draft Final Account, sought EC $13,161,163.88.  This amount included a claim for payment in full of the amount of the Contract Sum in the Contract Documents (EC $27,436,824), even though a significant portion of that work (EC $5,258,042.63) had been omitted from the scope of work and/or performed by Leeward under a separate contract.

73.     Leeward's December 17, 2010 Claim also included its claim for Additional Preliminaries, although, without explanation, Leeward increased the claimed amount from EC $955,544.08 to EC $1,427,245.73.  Leeward also asserted a variety of other unsubstantiated claims, most of which had not been previously asserted.

74.     On February 3, 2011, Leeward filed this arbitration seeking EC $13,161,136.88, which was the exact amount sought in its December 17, 2010 claim.  Leeward's arbitration claim was vague and confusing, and the itemized list of its claims seemed to bear no resemblance to what Leeward claimed to remain at issue in October 2009.  Leeward provided a binder of supporting documents, including a version of the Draft Final Account (before it was certified by the Architect and paid by AUA), and a smattering of other documents, none of which were specifically tied to the items listed in Leeward's claim.

75.     On September 8, 2011, the Tribunal conducted a Preliminary Hearing. Prior to the Preliminary Hearing, AUA requested that Leeward be required to submit a more detailed and definite statement of its claims and damages because the EC $13,161,137 sought by Leeward in arbitration was so inconsistent with the EC $1,071,944.88 claimed by Leeward in October 2009 and the EC $13,161,137 demand was neither documented nor cogently explained in Leeward's arbitration demand. Leeward opposed this request, but the Tribunal granted AUA's request and required Leeward to submit a more particularized claim by October 14, 2011.

### J.     The Amended Demand

76.     Leeward submitted its Amended Demand on October 14, 2011. Forced to explain the basis for its various claims, Leeward abandoned a number of them, reducing its demand from EC $13,161,137 to EC $6,800,572.88 as detailed in its "Revised Statement of Claim" attached to its Amended Demand. Among the items in Leeward's February 3, 2011 Claim that were not contained in its Revised Statement of Claim included: (i) EC $2,087,982.16 for "Overtime Paid per Schedule"; (ii) EC $693,870.95 for "Redundancy Payments per Schedule"; (iii) EC $667,876.19 for "Antigua Unpaid Transaction" and (iv) EC $1,030,783.95 for "Construction Equipment."

77.     Leeward's Revised Statement of Claim starts with a EC $27,436,824 Contract Sum, deletes some, but not all, of the work it did not perform, and then adds all of the work it claims to have billed to AUA (whether performed under the Contract Documents or separate contracts). From that sum, Leeward subtracts the amount it claims AUA paid.[3] The difference is Leeward's EC $6,800,573 Claim.

---

[3]  AUA paid Leeward in excess of EC $24 million for all of the work identified in the Revised Statement of Claim, not EC $23,989,679.30.

78.     Thus, we understand Leeward's Amended Demand to make the following claims: (i) payment of the original Contract Sum, less payments made and EC $1,948,755.32 million in deleted work; (ii) overhead and profits on the Doors and Windows Work and the Painting Work; (iii) Additional Preliminaries (increased from EC $1.4 million in the Statement of Claim to EC $1,985,711.68 in the Revised Statement of Claim) and (iv) the various unpaid claims for additional work.

79.     For the reasons set forth in detail below, (i) Leeward was paid for all work it actually performed under the Contract Documents and is not entitled to more; (ii) Leeward is not entitled to overhead and profits for the Doors and Windows Work or the Painting Work; (iii) Leeward is not entitled to any Additional Preliminaries, all of which seek payment for work done beyond the Contract Time; and (iv) Leeward was paid for all the extra work identified, whether pursuant to the Contract Documents or separate contracts, with the exception of its Whitsuntide Holiday claim, for which Leeward is not entitled to payment.

## DEFENSE TO LEEWARD'S CLAIMS

80.     The Contract Documents placed the burden on Leeward to substantiate all Claims, including its Claim for EC $6,800,875.28.  General Conditions § 4.3.1.  (AUA Ex. 1 at AUA 000034).  As demonstrated below, Leeward did not substantiate any portion of its Claim before commencing arbitration and still fails to do so.

### A.     Leeward Was Properly Paid Under the Contract Documents Only for the Work Actually Performed

81.     It is well established that payments under construction contracts – including those that identify a stipulated sum -- are likely to and do change as the scope of the work changes. Consistent with this reality, the Contract Documents used by AUA and Leeward to memorialize

their agreement provided the necessary flexibility to adjust the Work and the Contract Sum to meet the requirements of the Project.

82.     The parties agreed to a Contract Sum based upon a set of assumptions outlined in the Statement of Contract Sum. Those assumptions were estimates. The parties knew that the actual amount billed and paid under the Contract Documents (*i.e.*, the final Contract Sum) would be based upon the actual costs, measurements and authorized contingencies. In other words, the parties did not enter into a flat fee contract, whereby Leeward would absolutely be paid the original Contract Sum, regardless of what work it actually performed. Rather, the Contract Documents expressly provided that the Contract Sum was "subject to additions and deductions." Contract § 4.1. (AUA Ex. 1 at AUA 000006).

83.     Leeward's Amended Demand confirms that Leeward shared this general understanding of how the Contract Documents were designed to operate. As demonstrated in Paragraph 23 of the Amended Demand, Leeward starts with the Contract Sum, deducts for work within that amount that it did not perform, and adds charges for additional work it did perform.

84.     Where Leeward's claim goes awry, however, is that it fails to account for an additional EC $3,309,287 in work within the beginning EC $27,436,824 Contract Sum that Leeward did not perform. Leeward also does not account for changes in the quantities of the Measured Works it performed, even though its Draft Final Account was so limited. Finally, as explained herein, Leeward appears to have accounted for the EC $1 million Cash Allowance twice.

85.     The Contract Documents provide that the Contract Sum is to be adjusted by work added, changed or omitted over the life of the Project. Section 1.1.1 of the General Conditions expressly provides for "Modifications" that can serve to alter the terms of the Contract

21

**A304**

Documents, including the Contract Sum. The Contract Documents provided for modifications affecting the amount of the Contract Sum to be to done via written Change Orders or Change Directives, but the Architect, AUA and Leeward made these changes less formally, without the issuance of formal Change Orders.

86.     Despite the absence of formal Change Orders, Leeward sought and received payment for: (i) work it actually performed that was within the original scope, but the quantity of which exceeded that scope based upon actual measurements; and (ii) additional work it actually performed that was outside the original scope.

87.     Similarly, despite the absence of formal Change Orders, Leeward did not seek payment for work removed, in whole or in part, from the original scope, as evidenced by its Payment Applications and its reduction of the Contract Sum in the Amended Demand.

88.     Accordingly, when Leeward submitted its Draft Final Account at the conclusion of its Work, it only sought payment for the work it actually performed. AUA and the Architect verified the measurements supplied for accuracy, and AUA paid Leeward based upon the corrected measurements, with the exception of the three items Leeward identified in its October 26, 2009 letter.

89.     The amount of the Contract Sum due when Leeward completed the Work was EC $23,603,320. Leeward has been paid this entire amount, less EC $590,083 in retainage, as of October 26, 2009.[4]

90.     The Contract Sum changed over the life of the Project from the initial amount of EC $27,439,824 to EC $23,603,320, as set forth below.

---

[4]  The Amended Demand erroneously claims that AUA never paid the Draft Final Account. Amended Demand ¶ 22. Documentary evidence proves otherwise. *See* AUA Exhibits 9 and 10.

22

**A305**

## Preliminaries/General Conditions

91.   The Statement of Contract Sum attached to the Contract Documents estimated Site Setup costs and Preliminaries (based on a 52 week schedule) to equal EC $3,609,146. *See* AUA Exhibit 1 at AUA 000071.

92.   As confirmed by the Statement of Contract Sum, however, both costs were to be paid based upon actual costs. *Id.*

93.   The Draft Final Account as approved and paid by AUA included a total of EC $4,936,303.60 in Preliminaries and Site Setup costs actually incurred by Leeward during the same 52 week schedule. *See* AUA Exhibit 9. Accordingly, Leeward was paid an additional EC $1,030,157.60 for Preliminaries, resulting in an increase in the Contract Sum.

94.   While Leeward's Draft Final Account sought payment for an additional 8 weeks of Preliminaries, that claim was rejected by AUA. AUA adjusted the amount of Preliminaries charged for the Project back to the amount submitted and approved in Leeward's September 2009 payment application. *See* AUA Exhibit 12 at AUA 000372. The difference between what Leeward sought in the Draft Final Account and what AUA paid is EC $955,884.08. That amount is approximately EC $1,000,000 less than Leeward now seeks, fourteen months later, in Additional Preliminaries.

## Measured Works

95.   The Statement of Contract Sum estimated the Measured Works performed by Leeward would total EC $22,530,678, broken down as follows: (i) Classroom and Laboratory Building (EC $5,060,075); (ii) Service Block (EC $1,471,074); (iii) Library Block (EC $14,975,517) and (iv) Amphitheater (EC $1,024,012). AUA Ex. 1 at AUA 000071. The

23

**A306**

amounts were based entirely on the BOQs at the time the parties executed the Contract Documents.

96.     During the course of the Project, the Measured Works changed. First, certain work was removed from the scope of the project entirely because of Leeward's delay. Leeward concedes that a total of EC $1,948,755.32 was removed from the Measured Works for the Doors and Windows Work and the Painting Work, thereby reducing the Contract Sum by this amount.

97.     In addition to these two items, the Flooring Work was also removed from the Measured Works, resulting in a further reduction of the Contract Sum in the amount of EC $1,762,459.

98.     Similarly, as the Project progressed and designed changed, the Architect determined that certain items listed in the BOQs were not necessary and directed that Leeward not perform those tasks. These Omitted Works reduced the Contract Sum an additional EC $1,430,284.

99.     Finally, throughout the course of the Project, as contemplated and required by the Contract Documents (*see* ¶¶ 22 to 30, above), Leeward and the Architect confirmed the precise amount of work performed by Leeward by verifying the measurements of each task listed in the BOQs. AUA paid Leeward based upon the verified measurements, and not by the quantities listed in the initial BOQs. In some instances, this resulted in Leeward being paid more for a specific item, and in other instances, it resulted in Leeward being paid less. In the aggregate, the Contract Sum was reduced by EC $28,765.63 based upon adjustments made to the quantities of the Measured Works.

100.    Leeward acknowledged all of these permanent changes to the Measured Works portion on the Contract Sum when it submitted its Draft Final Account. The BOQs attached to

24

Leeward's submission only sought payment for the Measured Works actually performed. A line by line comparison between the BOQs attached to the Draft Final Account and those in the Contract Documents confirms as much. *Compare* AUA Ex. 3 at AUA 000267 to AUA 000295 *with* AUA Exhibit 1 at AUA 000072 to AUA 000103.

101.    Accordingly, Leeward sought, the Architect certified, and AUA paid a total of EC $17,727,635.37 in Measured Works, meaning the Contract Sum was reduced by a total of EC $5,258,042.63 for the Measured Works portion of the Contract.

**Cash Allowances/Change Orders/Claims**

102.    The Statement of Contract Sum contained an EC $1,000,000 contingency for Cash Allowances, which served as a budgeted amount of expected extra costs, such as for scaffolding, craneage and overtime.

103.    Leeward was only to be paid for approved expenses drawn against the Cash Allowance. *See* Statement of Contract Sum (AUA Ex. 1 at AUA 000071).

104.    The Draft Final Account did not contain a line item requesting payment for the Cash Allowance. Rather, the entire Cash Allowance amount was accounted for through "Change Orders" and Preliminaries paid by AUA.

105.    For example, scaffolding and craneage charges were accounted for in the Statement of Contract Sum as a Cash Allowance, but Leeward included those costs in its claim for Preliminaries. *See* AUA Exhibit 3 at AUA 000261. Indeed, EC $583,066.62 of the Preliminaries approved for payment in the Draft Final Account were allocated to Scaffolding and Craneage.

106.    Similarly, AUA approved a total of EC $1,232,008.91 in "Change Orders" for additional work performed by Leeward, including Overtime and other contingent costs. AUA

25

**A308**

Exhibit 9. These "Change Orders" served to increase the Contract Sum, though none were accompanied by a formal Change Order in accordance with the terms of the Contract Documents.

107. Leeward's Draft Final Account also sought EC $278,911.92 in "Claims," which include the seven (7) allegedly "unpaid" claims identified in Leeward's Revised Statement of Claim in its Amended Demand, plus a EC $97,064.40 claim for Overhead Profits on "Deleted Works." *See* AUA Exhibit 3 at AUA 000297 to AUA 000308.

108. AUA approved and paid EC $162,372.12 in "Claims," which constituted payment for all of the above claims with the exception of the Whitsuntide Holiday and Overhead & Profits claims. The Contract Sum was increased by this amount.

109. In total, the Contract Sum was changed over the course of the Work as follows:

| | |
|---|---|
| Contract Sum as of September 2008 | EC $ 27,436,824.00 |
| Less Reduced Measured Works | (EC $ 5,258,042.63) |
| Plus Additional Preliminaries | EC $ 1,030,157.60 |
| Plus "Change Orders" Above EC $1 million | EC $ 232,008.91 |
| Plus Claims | EC $ 162,372.12 |
| **Total Revised Contract Sum as of October 2009** | **EC $ 23,603,320.00** |

110. At the time AUA paid Leeward on the Draft Final Account, Leeward did not claim or seek any more monies under the Contract Documents with the exception of three distinct claims, cumulating EC $1,071,994.88, that remained in dispute. Leeward identified these claims in an October 26, 2009 letter and expressed its intention to arbitrate them: (i) EC $955,884.08 in "Additional Preliminaries due to extension of time"; (ii) EC $19,475.40 for

26

**A309**

"Whit Monday Public Holiday due to extension of time" and (iii) $97,064.40 in "Loss of OH & P Finishing works." *See* AUA Exhibit 11.

111.    As demonstrated above, Leeward submitted and was paid for additional work (without receiving formal Change Orders) that increased the Contract Sum, and Leeward acknowledges that work removed from the contract served to reduce the Contract Sum. *See* Amended Demand ¶ 23.  Leeward's Amended Demand ignores these payment details and instead seeks a windfall payment for substantial portions of work that it never performed.

**B.    Leeward's "Claim" For Final Payment under the Contract Documents Is Procedurally Barred.**

112.    Putting aside the merits of Leeward's December 17, 2010 claim for a "Final Payment" that serves as the crux of this arbitration, Leeward's assertion is far beyond the strict time limits set forth in the Contract Documents for asserting claims.

113.    "Claim" is a defined term in the Contract Documents.

> A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract.

114.    The Contract Documents further require that Claims are to be initiated by written notice to the Architect and the Owner.  General Conditions, § 4.3.2. (AUA Ex. 1 at AUA 000034).

115.    Finally, the Contract Documents provide for strict time limitations on asserting a Claim. Section 4.3.2 of the General Conditions requires a Claim to be asserted within 21 days "after occurrence of the event giving rise to the Claim." *Id.*

116.    Leeward claims, erroneously, that AUA never paid the Draft Final Account it submitted in October 2009.  Amended Demand, ¶ 22.  Leeward also claims that AUA never

A310

made a final payment. Amended Demand ¶ 20. While it is unclear when Leeward claims this alleged final payment was due, presumably it was no later than when Leeward sought a release of the remaining retainage held by AUA in July 2010.

117.     Nevertheless, Leeward did not initiate a Claim for payment under the Draft Final Account and/or for a final payment until December 17, 2010, far beyond the 21 days time limitation provided in the Contract Documents. Accordingly, this portion of Leeward's claim should be rejected because Leeward failed to initiate it in a timely fashion.

**C.     Leeward Is Not Entitled to Overhead and Profits on Deleted Works.**

118.     Leeward claims that it is entitled to EC $350,775.96 in Overhead and Profits on the Doors and Windows Work and the Painting Work, calculated to be 18% of the amounts set forth in the original BOQs for these items. Leeward relies upon Section 14.4.3 of the General Conditions, which allows for an award of Overhead and Profits when the Owner terminates the Contract for convenience. *See* AUA Ex. 1 at AUA 000054. For several reasons, Leeward's claim for Overhead and Profits lacks merit.

119.     First, the contractual right to Overhead and Profits cited by Leeward only applies if AUA terminates the entire Contract at its convenience, which would result in Leeward ceasing its operations on the Project. General Conditions § 14.4.1 (AUA Ex. 1 at AUA 000054).

120.     Article 14.4.3 provides:

> In the case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

121.     The General Conditions do not provide for profits and overhead when the Contract is terminated or suspended for any reason other than Owner's convenience. *See* General Conditions, Article 14 (AUA Ex. 1 at AUA 000052 to AUA 000054). Here, the

28

Contract was not "terminated" and the works at issue were not removed from the scope of work for AUA's convenience. They were removed because Leeward was severely behind on its schedule as a result of its own delay. Indeed, even after these works were removed from Leeward's scope of work under the Contract Documents, Leeward failed to meet the Substantial Completion deadline by 10 weeks.

122.    AUA's claim for Overhead and Profits with respect to the Doors and Windows Work fails for a separate and independent reason. Leeward was awarded that work under a separate contract and paid for performing it. Indeed, Leeward claims it was paid more under its separate contract (EC $419,932) than it was due to earn under the Contract Documents (EC $191,090) for this same work. Having been paid for this work, Leeward is not entitled to recover its Overhead and Profits on the basis that it was removed from the Work to be performed under the Contract Documents.

123.    Finally, how Leeward calculates its claim for Overhead and Profits is a mystery. When Leeward originally initiated this claim on May 12, 2009 (within 21 days of learning AUA was removing these works from Leeward's Work), it sought EC $297,267.76 and attached the same list of deleted items that are attached to Leeward's Amended Demand. AUA Exhibit 13. However, Leeward's Overhead & Profit claim was reduced to EC $97,064.40 in its Draft Final Account, and Leeward confirmed as much when it sent its October 26, 2009 claim. In Leeward's December 17, 2010 claim and February 3, 2011 Demand for Arbitration, it no longer asserted a claim for Overhead and Profits. Now, Leeward seeks EC $350,775.96. The Contract Documents obligated Leeward to substantiate its claim, but it has failed to do so.

C.    **Leeward Is Not Entitled to Additional Preliminaries.**

124.    On May 11, 2009, three days before the extended Substantial Completion deadline, Leeward initiated with the Architect a "Claim For Extension of Time for Completion

29

**A312**

of the Works due to restriction of working hours." AUA Exhibit 5. Leeward sought a fifteen (15) week extension of time plus costs expended, *i.e.*, additional preliminaries.

125.    The sole basis for its claim was Leeward's contention that the Contract Documents contained a Cash Allowance of EC $500,000 in the Contract Sum dedicated for non-productive overtime necessary to reduce the Contract Time from 68 to 52 weeks. *Id.* AUA's failure to approve such overtime, Leeward claims, prevented Leeward from completing its work within the Contract Time.

126.    Leeward's claim is not supported by the Contract Documents, which expressly provide for a 52 week schedule and contain Leeward's written agreement that this time frame is reasonable. While the Contract Sum contains a Cash Allowance, and while claims for productive overtime, if approved, can be drawn against that allowance, AUA specifically rejected dedicating a sum of EC $500,000 for Non-Productive Overtime ("NPO"). Such a set-aside was not included in the Contract Documents, notwithstanding Leeward's written demand that it be included. *See* AUA Exhibit 6.

127.    Aside from failing to provide a legitimate reason to extend the Contract Time, the reality is that Leeward was behind schedule because it failed to efficiently manage the Work. Leeward was required to "proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time." General Conditions, § 8.2.3 (AUA Ex. 1 at AUA 000041). AUA properly rejected Leeward's attempt to pass the blame onto AUA for its own delay in performing its Work and to collect Additional Preliminaries based upon such delay.

128.    Even if Leeward were entitled to Additional Preliminaries, at most it would be limited to the period between the end of the Contract Time (May 14, 2009) and the date of Substantial Completion (July 31, 2009), which is a period of 10 weeks. Once Leeward reached

**A313**

Substantial Completion, meaning the Work "is sufficiently complete…so that the Owner can occupy or utilize the Work for its intended use," General Conditions § 9.8.1 (AUA Ex. 1 at AUA 000044), it did not need to maintain or manage a construction site as contemplated by the Preliminaries.

129.    The factual basis for Leeward's claim for Additional Preliminaries is unknown. In its Draft Final Account, submitted at the conclusion of the Work, Leeward sought EC $955,884.08 for Additional Preliminaries based upon managing the site beyond the May 14, 2009. *See* Paragraph 94, above. This claim increased to EC $1,427,245.73 in Leeward's December 17, 2010 Claim, apparently based on "19 weeks pro rata contract." Leeward's claim for Additional Preliminaries increased even further in the Amended Demand, and now stands at EC $1,985,711.68. The Contract Documents obligated Leeward to substantiate its Claim, but it has failed to do so.

**D.    AUA Has Paid All Claims For "Additional Work" Except Leeward's Claim for the Whitsuntide Holiday, Which Was Properly Rejected.**

130.    The Revised Statement of Claim in Leeward's Amended Demand contains an itemized list of:  (i) "Approved Extra Work – Paid;" (ii) "Approved Extra Work – Unpaid" and (iii) "Additional Work." *See* Leeward's Revised Statement of Claim.

131.    The "Approved Extra Work – Paid" is Leeward's so-called "Change Orders." Based on the Draft Final Account Collections Page (AUA Exhibit 9), AUA paid EC $1,232,008.91 of this amount.  Leeward never claimed it was owed anything more on its "Change Orders" after receiving payment on its Draft Final Account.

132.    The "Approved Extra Work – Unpaid" is Leeward's "Claims" on its Draft Final Account, with the exception of its Overhead and Profits Claim.  As shown above, all but the

31

**A314**

Whitsuntide Holiday claim was paid. The Whitsuntide Holiday at issue was in June 2009, after the deadline for Substantial Completion. AUA, therefore, properly rejected Leeward's claim.

133. The "Additional Work" refers to the eight Separate Contracts awarded to Leeward for work performed outside of the Contract Documents. AUA paid Leeward in full for all of this work and Leeward does not claim otherwise.

**E. Leeward Failed Timely to Commence Arbitration on Its Claims for Overhead and Profits, Additional Preliminaries and the Whitsuntide Holiday.**

134. As best we can tell, Leeward initiated its Claim for Overhead and Profits on May 12, 2009, its claim for Additional Preliminaries on May 11, 2009, and its claim for the Whitsuntide Holiday at some point during the Summer of 2009. Leeward reiterated its Claims for these three items in its Payment Applications and Draft Final Account. Leeward also reiterated these claims on October 26, 2009. *See* AUA Exhibit 11.

135. Pursuant to the Contract Documents, a Claim is to be initiated in writing with the Architect, who is supposed to adjudicate the Claim in writing within 10 days. General Conditions, § 4.4.1 (AUA Ex. 1 at AUA 000035). If the Architect rejects the Claim or fails to respond within 30 days, the Claimant can proceed to Arbitration. General Conditions, § 4.6.1 (AUA Ex. 1 at AUA 000036). Unless otherwise provided, a demand for arbitration shall be made "within a reasonable time after the Claim has arisen." General Conditions, §4.6.3 (AUA Ex. 1 at AUA 000036).

136. For each of the above claims, Leeward waited over a year and a half to file a demand for arbitration. While the Contract Documents do not define what amount of time is "reasonable," given that Leeward reached Substantial Completion on July 31, 2009 and was paid its Draft Final Account on October 26, 2009, it is inherently unreasonable for Leeward to have

32

**A315**

waited until February 2011 to arbitrate these claims, long after the individuals involved with the Project left Antigua.

137.    Therefore, even if any of the above claims had merit, the arbitration demand should be dismissed as untimely.

F.    **Leeward Has Failed to Demonstrate Any Right to Interest**

138.    In Count Two of the Amended Demand, Leeward claims it is entitled to interest for late payments, including interim payments, mobilization payments and the final payment of EC $6.8 million allegedly due.

139.    As an initial matter, Leeward is not entitled to interest on late payments allegedly made prior to January 13, 2009. As set forth in Paragraph 42, above, on December 15, 2008 Leeward initiated a Claim for a variety of items, including interest for late mobilization payment and late interim payments. AUA Exhibit 4. Those claims were settled, and thus Leeward is precluded from re-asserting them again here.

140.    Between settling its December 15, 2008 claim and serving its December 17, 2010 claim for final payment, Leeward did not once seek to recover interest on any allegedly late payments. Leeward did not make any such claim in its Draft Final Account or include unpaid interest within the three remaining payment issues set forth in Leeward's October 26, 2009 Letter. Leeward should not now be permitted to pursue interest payments it did not seek at the time AUA allegedly failed to make a timely payment due under the Contract Documents.

141.    In any event, Leeward must do more than simply claim AUA paid certain invoices late. Leeward is obligated to substantiate it claims, meaning it is required to identify each payment that was allegedly paid late, set forth the facts upon which it relies to establish when such payment was due to be paid, and state the number of days such payment was late. Without this information, AUA is unable to provide a precise response.

33

**A316**

142.    To the extent Leeward seeks interest on its unpaid retainage, it is not entitled to claim interest because the retainage is not yet due.  Leeward was obligated to provide the information set forth in Section 9.10.2 of the General Conditions before this money was released. Leeward has failed to do so.

143.    Likewise, to the extent Leeward establishes in this arbitration that it is entitled to some portion of its claim for final payment, Leeward is not entitled to interest because any such monies would not be due to be paid until Leeward completed its obligations under Section 9.10.2 of the General Conditions.

**G.    Leeward is Not Entitled to Recover its Legal Fees and Expenses.**

144.    In Count Three of its Amended Demand, Leeward claims it is entitled to recover its legal fees and expenses in the event it prevails in this arbitration "in accordance with the laws of Antigua."  Leeward does not specify the legal basis for its claim for legal fees.

145.    In any event, because the claims asserted in Leeward's Amended Demand lack merit, it is not entitled to an award of legal fees and expenses.

146.    On the contrary, if and to the extent legal fees and expenses are to be awarded to the prevailing party, they should be awarded to AUA for having to undergo the time and expense to defend Leeward's baseless claim.

**COUNTERCLAIMS/SETOFF**

147.    AUA incorporates as if fully set forth herein the statements set forth in Paragraphs 1 to 146.

**A.    AUA is Entitled to Delay Damages.**

148.    The Contract provides AUA with the right to Liquidated Damages in the amount of US $1,500 per day from the Contract Time deadline until Substantial Completion is achieved. Contract, § 3.3.1.  (AUA Ex. 1 at AUA 000006).

34

149.     Leeward failed to complete its Work within the Contract Time, and did not achieve Substantial Completion until 10 weeks later. AUA is entitled to US $117,000 in Liquidated Damages based upon a July 31, 2009 date of Substantial Completion (US $1,500 x 78 days).

150.     Alternatively, AUA is entitled to its actual damages. Leeward did not reach Substantial Completion of the structural works until July 31, 2011 and did not complete its Work until at least September 2009. Due to Leeward's failure to keep to the construction schedule, AUA was forced to have some of the finishing works performed under separate contracts, including the Painting Work and the Flooring Work, and those items were not completed in time for AUA to open the campus for the Fall of 2009.

151.     As a result, AUA was forced to operate its Medical School at an alternate site, which resulted in increased expenses. Among other things, AUA incurred rental and operational overhead expenses that it would have avoided had Leeward completed its Work within the Contract Time.

**B.     AUA Is Entitled To Recover the Legal Fees and Expenses Incurred Defending Leeward's Baseless Claims**

152.     As set forth in Paragraph 146, above, if and to the extent legal fees and expenses are to be recovered by the prevailing party, AUA is entitled to such a recovery.

153.     Despite being required by the Tribunal to submit a more particularized claim, Leeward's Amended Demand remains short on detail substantiating its Claim. As a result, AUA was required to spend an inordinate amount of time and expense just to make sense of Leeward's Amended Demand and prepare this defense. Should this dispute proceed to an arbitration hearing, AUA will incur even more legal costs defending Leeward's attempt to get paid for work it never performed.

## CONCLUSION

154.  In sum, Leeward is not entitled to any portion of its EC $6,800,572.28 Claim:

| Claim | Amount | Summary of Defense |
|---|---|---|
| Overhead and Profits | EC $350,577.96/ US $129,854.07[5] | Contract not terminated for Owner's Convenience, thus no contractual right to Overhead & Profits under General Conditions §14.4.3, as claimed by Leeward. Tasks were removed because of Leeward's inability to complete the Work timely. Leeward was paid for Doors and Window Works under separate contract, so claim for overhead and profits on this work would result in double payment. |
| Additional Work – Unpaid Claims | EC $181,547.52/ US $67,245.20 | All but Whitsuntide Holiday claim (EC $19,475.40) was paid. Whitsuntide Holiday fell after expiration of Contract Time, and was properly rejected. |
| Additional Preliminaries | EC $1,985,711.68/ US $ 735,507 | Contract Documents did not include EC $500,000 for Non-Productive Overtime, which was the basis asserted by Leeward for this claim. Leeward agreed it could complete the Work within the Contract Time and is responsible for its own delay. Preliminaries not needed after Substantial Completion. Leeward has not substantiated increase in claim from EC $995,884.08 asserted in October 2009. |
| Balance of Claim | EC $4,282,288.24/ US $1,586,159.40 | Leeward failed to properly account for changes to the Contract Sum arising from changes, additions and deductions in the Work. Leeward is not entitled to payment for work it did not perform. |
| TOTAL | EC $6,800,572.28/ US $ 2,518,931.97 | |

---

[5]  For the sake of convenience, AUA used the same conversion rate (.3704) used by Leeward in its Amended Demand. AUA does not concede this rate is appropriate and reserves the right to apply a different conversion rate.

36

**A319**

155.   Leeward is also not entitled to interest or legal fees.

156.   AUA, on the other hand, is entitled to delay damages of not less than US

$117,000 and an award of its legal fees.

Dated:  November 30, 2011

SILLS CUMMIS & GROSS, P.C.
30 Rockefeller Plaza
New York, New York 10112
(212) 643-7000
*Attorneys for Respondent*

By: _____
Mark S. Olinsky
Jonathan S. Jemison

37

**A320**

### INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
### AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| **LEEWARD CONSTRUCTION COMPANY, LTD.,**<br><br>**Claimant,**<br><br>**vs.**<br><br>**AMERICAN UNIVERSITY OF ANTIGUA –**<br>**COLLEGE OF MEDICINE,**<br><br>**Respondent.** | **Case No.: 50 110 T 00075 11** |

### FINAL AWARD

We, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the Arbitration Agreement entered into between the above named parties and dated September 25, 2008, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and the parties having agreed that the Arbitrators need to render a reasoned award, do hereby, AWARD, as follows:

## I.  BRIEF PROCEDURAL BACKGROUND:

The present case was brought on February 3, 2011 by Leeward Construction Company, LTD. ("Leeward") against American University of Antigua - College of Medicine ("AUA"), claiming the amount of EC $13,161,137[1] from a dispute that arose out of the construction of a medical school in St. Johns, Antigua. Leeward claimed that AUA breached their contract and sought remedies under § 4.6 of the Contract, henceforth, demanded arbitration for the disputes set forth in their claim.

AUA filed a response on March 4, 2011, stating that Leeward's claim was so vague, confusing and contradictory that AUA was not in the position to understand the basis for the claims.

The Panel was selected and sworn on July 6th, 2011, comprised by Attorneys José R. Capó, Jorge R. Jiménez and Professional Engineer Héctor M. Varela. Attorney Jiménez was designated Chair of the Panel.

On October 14, 2011, Leeward filed an Amended Demand for Arbitration seeking EC $6,800.572.28 in damages. AUA filed its Answering Statement and Counterclaim on November 30, 2011.

---

[1] Whenever reference is made to a monetary sum, same shall be understood to be represented in Eastern Caribbean (EC) dollars, unless otherwise stated.

**A321**

On December 12, 2011, Leeward filed a Statement objecting AUA's claims for liquidated damages and delay damages, arguing that such claims have been presented untimely.   On December 23, 2011, AUA's filed a Statement in opposition to the motion presented by Leeward to dismiss AUA's counterclaims, asserting the timeliness of its claims.

Afterwards both parties commenced discovery proceedings and filed numerous motions including dispositive motions, the resolution of which the Panel held in abeyance until the holding of the Hearings to be decided as part of the Final Award.  We will discuss same in detail in *Section III* of this Award.   The Hearings were held in the Marriott Courtyard in Isla Verde, Puerto Rico, from March 5th through March 9th 2012.  On April 11, 2012, AUA withdrew from its Answering Statement and Counterclaim the portion that sought actual damages and left only those claims for liquidated damages in the amount of US $117,000.00 and for attorneys' fees and expenses.  As per their request, the parties submitted their Proposed Findings of Facts and Conclusions of Law on April 20, 2012. The parties also submitted rebuttal briefs on May 4th, 2012.

The Panel declared the hearings closed and the case submitted for resolution on May 22, 2012.

This case was administered under the AAA Construction Industry Arbitration Rules ("CIAR") as amended and in effect October 1, 2009.

## II.   UNCONTESTED FACTS:

1.     Leeward is a corporation duly organized and existing under the laws of the Commonwealth of Antigua and Barbuda, with office and principal place of business at All Saints Road, St. Johns, Antigua.

2.     AUA is owned by the GCLR, LLC, a limited liability company organized and existing under the laws of the State of New York, with office and principal place of business at 1 Battery Park Plaza, 33rd Floor, New York, New York, U.S.A.

3.     In the Spring of 2008, AUA and Leeward began to negotiate the terms of a contract to construct the structural works portion of the AUA's new medical school campus in Antigua.

4.     AUA and Leeward entered into a Letter of Intent on or about April 21, 2008 which was signed by Neal Simon, President of AUA, and Andy Green, Managing Director of Leeward.  A copy of the April 21, 2008 Letter of Intent was marked as LC 69.

5.     AUA and Leeward entered into a second Letter of Intent on or about May 10, 2008, which was signed by Corey Greenberg, Chief Operating Officer of AUA, and Andy Green, Managing Director of Leeward.  A copy of the May 10, 2008 Letter of Intent was marked as LC 70.

6.     On September 25, 2008, Leeward (as contractor) and AUA (as project owner) executed a contract for the construction of the College of Medicine in St. John's

2

Antigua for the fixed price of EC $27,436,824.00, subject to additions and deductions as provided in the Contract Documents, under the AIA Contract Document (A101-1997).

7.     The parties agreed that the commencement date for the works was May 1, 2008.

8.     Leeward had to achieve substantial completion of the entire work in 364 calendar days or as follows:

| Portion of the work | Substantial Completion Date |
|---|---|
| Classroom block | 29/01/2009 |
| Lab Block | 06/03/2009 |
| Service Block | 29/01/2009 |
| Library and Admin. Block | 30/04/2009 |

9.     Lt. Colonel Roche Antony was AUA's representative for the project and signed the Contract Documents on AUA's behalf.

10.     Neil Dickinson was Leeward's Project Manager for the project and signed the Contract Documents on Leeward's behalf.

11.     Sundaram Architects Pvt., Ltd. ("SAPL" or the Architect") was the architect that designed AUA's new Medical School Campus.  A.S. Nagesh served as the Architect's representative.

12.     Leeward and AUA also entered into a number of Separate Contracts, including a contract to install the doors and windows dated July 13, 2009 (marked as LC 228) and a contract of laying floor tiles dated July 13, 2009 (marked as LC 229).

13.     On February 3, 2011, Leeward filed a Demand for Arbitration seeking EC$13,161,137.00 in damages.

14.     On October 14, 2011, Leeward filed an Amended Demand for Arbitration seeking EC$6,800,572.28 in damages.

III.    **TRIAL EXHIBITS:**

A) Leeward's Trial Exhibits

   *Exhibit list 1-245 as amended by the Joint Post-Hearing Motion, dated April 12, 2012.*

B) AUA's Trial Exhibits

   *Exhibit list 1-71 as amended by the Joint Post-Hearing Motion, dated April 12, 2012.*

3

**A323**

## IV.    WITNESSES:

A) Leeward's Witnesses

1. Robert Winwood-Senior Quantity Surveyor for Leeward, from Sept. 1, 2008-August 14, 2009.  He was responsible for administration and surveying of the work with respect to the Construction of the AUA Project.

2. Eric Linde-Director of Leeward. Over 45 years of hands on experience in the Construction Industry in Antigua and US.

3. Neil Dickinson-Projects Director for Leeward from March 1, 2007 to Feb. 17, 2009, then managing director until Oct. 9, 2009, and was responsible for contract negotiations and administration of the works with respect to the Construction of the AUA Project.

4. Andy Green-Managing Director of Leeward.

B) AUA's Witnesses

1. Prabhu Marudheri-Executive Director of Finance for GCLE, LLC, an agent for AUA.

2. Peter McLeod-Partner with DHP Associates, a firm of Chartered Quantity Surveyors and Project Managers located in the Bahamas.

3. A.S.Nagesh-Architects' representative.

4. Lt. Col. Roche Antony-General Manager on behalf of AUA, for the project.

## V.    INTERLOCUTORY MATTERS:

1.    Controversy:

Leeward's request to strike the testimony of AUA's witness Peter McLeod based on the fact that same is expert testimony, which AUA had represented it would not be using.  The Panel must decide if said testimony is factual or expert testimony.

Panel's Decision:

*Refer to the Panel's Decision in section VI. (A-25).*

2.    Controversy:

AUA's motion requesting dismissal of Leeward's claims for amounts unpaid or due under the contracts for additional work.  The Panel must decide if: (1) Leeward's claim for unpaid

4

**A324**

balances and monies owed for additional works was included in the Amended Demand for Arbitration, henceforth, providing AUA with due process; and (2) if the parties submitted to arbitration said claims in this proceeding.

Panel's Decision:

After reviewing both parties' arguments and careful analysis of the questions posed, this Panel finds that all claims arising from the Separate Contracts are not subject to this Arbitration.   We find in favor of AUA and conclude that the arbitration clause that both parties agreed to, only reached claims arising out of or relating to the original Contract. Nothing in the Separate Contracts evidence intent from the parties to subject same to arbitration, nor does the record show that AUA agreed to arbitrate disputes under the Separate Contracts.

3.     Controversy:

AUA's motion requesting that Leeward's claims be dismissed for untimely filing.  This Panel must decide if dismissal is appropriate against Leeward, because Leeward's claim for final payment was initiated in violation of the 21 day notice requirement, and because Leeward's 16-20 month delay in commencing arbitration was unreasonable.

Panel's Decision:

After due analysis, this Panel denies AUA's motion requesting that Leeward's claims be dismissed for untimely filing.

4.     Controversy:

Leeward's motion requesting that AUA's counterclaim be dismissed for untimely filing.  This Panel must determine if AUA filed the counterclaim within the time period stated under Section R-4(c)(ii) of the AAA's CIAR.

5

**A325**

Panel's Decision:

After due analysis, this Panel denies Leeward's motion requesting that AUA's counterclaim be dismissed for untimely filing.

## VI.   CONTROVERSIES SUBMITTED TO THE PANEL FOR RESOLUTION:

### A.   Claimant's (Leeward's) controversies submitted to arbitration:

1.   Controversy:

Whether the Contract is a fixed price contract subject to additions or deletions by change order or whether the Contract price is based upon measured works?

Panel's Decision:

The Panel rules that the Contract is a fixed price contract subject to additions and deletions. Leeward is entitled to receive compensation for work performed.  Even though the Contract provides that additions and deletions should be made by formal change orders, from the evidence considered by the Panel it appears that both parties waived this requirement.

2.   Controversy:

Whether AUA breached the Contract with respect to the issuance of change orders, certificates of substantial completion, certificate of final completion, the review, certification, and payment of payment requisitions, the determination of claims, and the administration of the Contract?

Panel's Decision:

This Panel finds that both parties failed in their contractual responsibility to follow and enforce the General Conditions of the Contract AIA 201-1997.  The respective liability of each party with respect to certain claims will be addressed in this Final Award.

6

**A326**

3.    Controversy:

Whether AUA breached the Contract by failing to timely pay the amount due on payment requisitions?

   Panel's Decision:

This Panel finds that AUA did breach the Contract on this matter.  In many instances AUA had concerns regarding the quantities invoiced, however, there were reasonable alternatives in case the parties did not reach an agreement to issue the partial payments, as stated in Article 9.5.1 of the Contract.  This Panel rules that holding the entire amount was far from reasonable and fair.

4.    Controversy:

If AUA breached the Contract by failing to timely pay the amount due on payment requisitions, is Leeward entitled to interest on the late payments at the legal rate under the laws of Antigua and if so, whether l0% per annum is the proper rate?

   Panel's Decision:

This Panel finds that Leeward is entitled to interest on the payments due and unpaid as set forth under sections 7.2 and 13.6.1 of the Contract and General Conditions.  However, this Panel agrees with AUA in that the interest agreed upon by the parties was the "legal rate" and therefore interest shall be calculated at 7% per annum.

5.    Controversy:

If the Contract was for a fixed price, is Leeward entitled to payment for work that AUA omitted, deleted or modified from the Contract's original scope of work?

   Panel's Decision:

No.  Leeward is only entitled to payment for work performed.  However, this Panel finds that Leeward is entitled to damages in the amount of EC $ 232,670.13 for work that was deleted

7

**A327**

Case 15-1595, Document 50, 08/27/2015, 1586805, Page86 of 220

Case 1:14-cv-08410-DLC   Document 33-3   Filed 12/12/14   Page 8 of 17

from the Contract and then assigned to Leeward under Separate Contracts, under the bad faith doctrine.

6.   Controversy:

If the Contract price is based upon measured works, what adjustments should be made to the Contract sum for work omitted, deleted or modified from the Contract's original scope of work despite the AUA's failure and refusal to issue change orders?

   Panel's Decision:

The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a decrease in the Contract Sum shall be the actual net cost.

7.   Controversy:

If the Contract was based upon measured works, is Leeward entitled to overhead and/or profit for work omitted, deleted or modified from the Contract's original scope of work and if so, what amount is Leeward entitled to for overhead and/or profit on omitted, deleted or modified work?

   Panel's Decision:

The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a decrease in the Contract Sum shall be the actual net cost.  When both additions and credits covering related work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change, i.e., AIA Document A201-1997 General Conditions of the Contract for Construction, Section 7.3.7.  Therefore, Leeward is entitled to overhead and profit for work omitted, deleted or modified as claimed, except for the $185,425.07 of overhead and profit for the Doors & Windows and Flooring works that were deleted from the Contract's original scope of work and then given to Leeward under a Separate Contract.

8

8.   Controversy:

What amount is Leeward entitled to for additions to the Contract that should have been added pursuant to change orders had AUA properly issued change orders on the Project?

   Panel's Decision:

This Panel finds that Leeward is entitled to receive compensation for work performed, despite any formal change orders, based on Measured Work and the Bill of Quantities (BOQ).

9.   Controversy:

Whether AUA was responsible for project delays that impaired Leeward's ability to substantially complete the Contract work by the substantial completion dates in the Contract, as extended?

   Panel's Decision:

After a careful study and analysis of the witness statements as well as the evidence presented, the Panel finds that both parties were equally responsible for the project delays. Leeward failed to reach substantial completion of the project in the time that was agreed upon. The numerous delays and changes to the drawings and the fact that AUA had knowledge of Leeward's request for extension of time, draw us to determine equal responsibility for both parties regarding the delays in the substantial completion.

10.  Controversy:

If AUA is responsible for project delays that impaired Leeward's ability to complete the project by the substantial completion dates in the Contract as extended, then what amount is Leeward entitled to for additional preliminaries as a result of the AUA's actions?

   Panel's Decision:

This Panel finds that both parties were equally responsible for the project delays. Consequently, we find AUA responsible for 50% of the Additional Preliminaries in the

amount of EC $477,777.04 and such amount is hereby granted in favor of Leeward.

11. Controversy:

Whether Leeward was responsible for the project delays that caused it to fail to substantially complete the work by the Contract's deadlines?

Panel's Decision:

No. *Refer to Panel Decisions in **Section VI. (A-9) and (A-10)**, above.*

12. Controversy:

If Leeward is responsible for the project delays that caused it to fail to substantially complete the work by the Contract's deadlines, what amount is due from Leeward to AUA for liquidated damages?

Panel's Decision:

*Refer to Panel Decisions in **Section VI. (A- 9), (A-10) and (B-36)**, above.*

13.  Controversy:

Whether Leeward substantially complied with the notice of claim provision in the Contract?

Panel's Decision:

By reason of the conduct of the parties during the development, construction and liquidation of the Project, the Panel concludes that the time limit for the notice of claims stipulated in Section 4.3.2 of the General Conditions was waived, as well as Section 4.6.3 of the General Conditions referring to the initiation of an arbitration process.  This decision is applicable to both parties.

14.  Controversy:

If Leeward did not substantially comply with the notice of claim provision in the Contract, whether AUA waived compliance with such provision?

Panel's Decision:

*See Panel's Decision of Controversy in **Section VI. (A-13)**, above.*

10

15.  Controversy:

Whether AUA substantially complied with the notice of claim provision in the Contract?

    Panel's Decision:

*See Panel Decisions in* **Section VI. (A-14) and (A-15),** *above.*

16.  Controversy:

Whether Leeward is entitled to pre-judgment interest on its damages as a result of the AUA's breach of the Contract?

    Panel's Decision:

This Panel is awarding pre-judgment interest to Leeward from October 31, 2009, as detailed in the Award, at the rate of 7% per annum.

17.  Controversy:

If Leeward is entitled to pre-judgment interest on its damages, is 10% per annum the appropriate rate of interest to be charged under the laws of Antigua and if so, from what date should the interest begin to run?

    Panel's Decision:

Yes. *But see Panel's Decision to Controversy* **16,** *above.*

18.  Controversy:

Whether Leeward is entitled to payment in the amount of US $30,743.20/EC $83,000.00 for the AUA's acknowledged error in the calculation of ABST payments?

    Panel's Decision:

This Panel finds that the ABST error was mutually acknowledged by both parties, and not having been originally claimed and submitted as a controversy in this Arbitration and having been discovered and in good faith informed by AUA representatives during the Hearings,

the Panel concludes that this claim should be corrected outside of the context of this Arbitration.

19.   Controversy:

If Leeward is not entitled to any other damages in this proceeding, whether Leeward is entitled to the payment of US $218,566.74/EC $590,083.00 in retainage?

   Panel's Decision:

After careful consideration regarding the works that were deleted from the Contract and then assigned to Leeward under Separate Contracts, this Panel finds that Leeward is entitled to damages under the bad faith doctrine.   Therefore, this Panel grants Leeward damages in an amount equal to EC $232,670.13.  As per Leeward's claim for retainage, *refer to the Panel's Decision in section VI. (B-29), infra.*

20.   Controversy:

If AUA breached the Contract, is Leeward entitled to damages as specified in Claimant's Proposed Findings of Fact and Conclusions of Law Paragraphs 130, 131, or 133 or some other amount?

   Panel's Decision:

The Panel finds that both parties breached the Contract and therefore, in some instances share direct responsibility for same.  As such, this Panel will not grant damages to Leeward as requested, but as specifically provided in the Award on page 31.

21.   Controversy:

Whether the additional works contracts Leeward entered into with AUA are subject to arbitration?

   Panel's Decision:

The Panel finds that the additional works contracts are not subject to this Arbitration.

**A332**

22.   Controversy:

If the additional works contracts are subject to arbitration, then what is the amount due from AUA to Leeward for the unpaid balances on the additional works contracts?

   Panel's Decision:

The Panel finds that the Separate Contracts Leeward entered into with AUA are not subject to this Arbitration.

23.   Controversy:

Whether the arbitration was commenced within a reasonable time not to exceed the statute of limitations for breach of contract actions under the laws of Antigua?

   Panel's Decision:

The Panel finds that this Arbitration was commenced timely.

24.   Controversy:

What is the statute of limitations for breach of contract actions under the laws of Antigua?

   Panel's Decision:

The Panel finds that this Arbitration was commenced within the six (6) year term.

25.   Controversy:

Whether the Panel should strike the AUA's witness statement of Peter McLeod on the grounds that Mr. McLeod's witness statement constitutes an expert opinion that AUA failed to disclose until the eve of the hearing after representing to the Panel during a telephone conference on December 15, 2011 that it did not foresee the use of expert witness testimony?

   Panel's Decision:

This Panel finds that Peter McLeod's testimony is not that of an expert witness.  Therefore, all parts of his witness statement and testimony rendered based on his opinion as an expert are stricken from the record.  However, this Panel considered as factual the testimony

13

**A333**

offered by Peter McLeod which relates to his personal knowledge and intervention in the negotiation of the Contract Documents, and will give it the probatory value it deems appropriate.

26.   Controversy:

Whether Leeward is entitled to attorneys' fees, arbitration fees, expenses and compensation as provided under the laws of Antigua or otherwise?

   Panel's Decision:

Considering that both parties shared responsibility regarding some of the controversies submitted and in the management of the Contract, the Panel finds no compelling reason to grant attorney's fees, arbitration fees, expenses and compensation as provided under the laws of Antigua or otherwise.   Each party shall bear their own attorneys' fees, arbitration expenses and such the like.

**B.   RESPONDENTS (AUA'S) CONTROVERSIES SUBMITTED TO ARBITRATION:**

1.   Controversy:

Is Leeward barred from seeking to be paid EC $1,604,617 for work it did not perform as a result of design changes and site conditions (like the chain link fence) (the "Omitted Work") because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a Claim throughout the course of construction and no later than October 2009, but initiated it no sooner than December 17, 2010 - 14 months later?

   Panel's Decision:

The Panel finds that Leeward is barred from seeking to be paid for work it did not perform, not because it failed to initiate a claim, but because the evidence received and considered by the Panel is that the Contract was a fixed sum contract subject to additions and deductions, and Leeward would be paid for work it actually performed, based on the BOQ.

14

In regards to the "timeliness" of Leeward's claim, it is the determination of the Panel that both parties breached various provisions of the Contract and are, therefore, barred from enforcing said provisions against each other.

2.   <u>Controversy:</u>

Even if Leeward had initiated a claim timely, is Leeward entitled to be paid for the Omitted Work on the ground that AUA did no document changes in the scope of Leeward's work by issuing formal change orders in the manner provided by Section 7 of the General Conditions, or did the parties waive the formal change order procedure by implementing another method, i.e., the monthly requisition process, to document additions and deductions to the Contract Sum, as evidenced by the parties' course of conduct throughout the duration of the Project?

   <u>Panel's Decision:</u>

*See Panel's Decision to Controversy 1, supra.*

3.   <u>Controversy:</u>

Is Leeward barred from pursuing its new alternative claim that it be paid overhead and profit on the Omitted Work for one or more of the following separate reasons:

   a)   Because Leeward asserted its new alternative claim for the first time in its post-trail submission, in violation of Section R-6(b) of the AAA's CIAR, thereby depriving AUA of a fair opportunity to proffer a defense? **Or**

   b)   Because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a claim throughout the course of the construction and no later than October 2009, but never initiated a claim and raised the issue for the first time in Leeward's April 2012 Proposed Findings of Facts and Conclusion of Law? **Or**

   c)   Because the new claim was not asserted in Leeward's February 3, 2011 Demand for Arbitration or its October 14, 2011 Amended Demand for Arbitration, but instead raised for the first time on April 20, 2012, in violation of Section 4.6.5 of the General Conditions, which provides that the "party filing a notice of demand for arbitration must assert in the demand all claims then known to that party on which arbitration is permitted to be demanded"?

15

**A335**

Case 15-1595, Document 50, 08/27/2015, 1586805, Page94 of 220

Case 1:14-cv-08410-DLC   Document 33-3   Filed 12/12/14   Page 16 of 17

<u>Panel's Decision:</u>

This Panel will not exclude any claim under the sole contention of timeliness.  Therefore, Leeward is not barred from pursuing its claim for the payment of overhead and profit on the Omitted Work.

4.     <u>Controversy:</u>

Even if Leeward had initiated its new alternative claim for overhead and profit on the Omitted Work timely in accordance with the Contract Documents and the CIAR, is Leeward entitled to be paid overhead and profit on the Omitted Work given the testimony that the parties intended to use the Bills of Quantities to value changes to the scope of the work necessitated by design changes and site conditions, and given that Leeward never sought to be paid its overhead and profit Omitted Work?

<u>Panel's Decision:</u>

Yes. This Panel finds that Leeward is entitled to overhead and profit for work omitted, deleted or modified, except for the $185,425.07 of overhead and profit for the Doors & Windows and Flooring works that were deleted from the Contract's original scope of work and then given to Leeward under a Separate Contract.

5.     <u>Controversy:</u>

Is Leeward barred from seeking to be paid for the Flooring Work that AUA deleted from Leeward's scope of work because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward admits it was aware of the facts giving rise to such a claim no later than April 21, 2009, but initiated a claim no sooner than December 17, 2010 – 20 months later?

<u>Panel's Decision:</u>

The Panel finds that both parties were at fault with their mutual responsibilities in following and enforcing the General Conditions of the Contract, therefore, this Panel will not exclude

16

**A336**

any claim under the sole contention of timeliness. The evidence also showed that Leeward in many instances notified AUA of its claims, even though it was not in the manner set forth in the Contract. Therefore, the Panel finds that Leeward is entitled to receive compensation for work performed; however, with regard to the Flooring Work, which is part of the Separate Contracts, same is not subject to this Arbitration.

6.   Controversy:

Even if Leeward had initiated a claim timely, is Leeward entitled to be paid for the Flooring Work that AUA deleted from Leeward's scope of work on the ground that AUA did not document the deletion of this work by issuing formal change orders in the manner provided by Section 7 of the General Conditions, or did the parties waive the formal change order procedure by implementing another method, *i.e.*, the monthly requisition process, to document additions and deductions to the Contract Sum, as evidenced by the parties' course of conduct throughout the duration of the Project?

   Panel's Decision:

The Panel finds that the Separate Contracts are not subject to this Arbitration. Therefore, this Panel will not grant remedies for the Flooring Work.

7.   Controversy:

Is Leeward barred from pursuing its new alternative claim that it be paid overhead and profit on the Flooring Work (EC $1,741,032 * 18% = EC $313,385.76) for one or more of the following separate reasons:

   a)  Because Leeward asserted this new alternative claim for the first time in its post-trial submissions, in violation of CIAR R-6(b), thereby depriving AUA of a fair opportunity to proffer a defense? **Or**

   b)  Because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a claim on April 21, 2009 and no later than October 2009, but never initiated a claim and raised the issue for the first time in Leeward's April 20, 2012 Proposed Findings of Fact and Conclusions of Law? **Or**

17

**A337**

c) Because the new alternative claim was not asserted in Leeward's February 3, 2011 Demand for Arbitration or its October 14, 2011 Amended Demand for Arbitration, but instead raised for the first time on April 20, 2012, in violation of Section 4.6.5 of the General Conditions, which provides that the "party filing a notice of demand for arbitration must assert in the demand all claims then known to that party on which arbitration is permitted to be demanded"?

Panel's Decision:

The Panel finds that each party is barred from alleging non-compliance against each other regarding the terms of the Contract under the sole contention of timeliness and, therefore, will consider all claims brought without regard to timeliness. However, this Panel finds that Leeward is entitled to overhead and profit for work omitted, deleted or modified, but not for the Flooring Work, which was given to Leeward under a Separate Contract.

8.    Controversy:

Even if Leeward had initiated its alternative claim for overhead and profit on the Flooring Work timely under the Contract Documents and the CIAR, is Leeward entitled to be paid EC $313,385.76 in overhead and profit on the Flooring Work given that Leeward entered into a separate contract with AUA on July, 2009 to perform this work, and was paid under the terms of that separate contract?

Panel's Decision:

No.  Refer to Panel's Decision in Section **VI. (B-7)**, above.

9.    Controversy:

There is no decision to render with respect to the Modified Work Delta of negative EC $14,294.10.  Leeward is not seeking to recover any money reflected in this delta, which reflects that Leeward was paid more by seeking payment for work "as built" and in accordance with the "final measure" that it would have received had it been paid based upon the measurements in the initial Bills of Quantities.

18

**A338**

Panel's Decision:

This Panel finds that Controversy number **9**, as stated by AUA, does not require the Panel's decision for it does not constitute a claim.  In the alternative, the Panel finds the claim to be inadmissible and therefore, dismissed and denied.

10.   Controversy:

Is Leeward barred from pursuing its May 11, 2009 Claim for an Extension of Time and the accompanying Additional Preliminaries in the amount of EC $955,554.08 (the difference between the EC $5,891,857.68 in Preliminaries sought by Leeward and the EC $4,936,303.60 approved and paid by AUA) because it failed to initiate the claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward admits that it was aware on January, 2009 that it was not going to complete its work within the Contract Time?

Panel's Decision:

No. Although this Panel finds that both parties were not in strict compliance with the Contract and Contract documents, Leeward is not barred from its claim regarding the responsibility for delays and substantial completion. Consequently, this Panel finds AUA responsible for 50% of the Additional Preliminaries amounting to EC $477,777.04 and such amount is hereby granted in favor of Leeward.

11.   Controversy:

Is Leeward barred from pursuing its Claim for an Extension of Time and the accompanying Additional Preliminaries in the amount of EC $955,554.08 because it failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the Claim accrued in January 2009 and Leeward waited until February 3, 2011 – 25 months later – to commence arbitration?

19

**A339**

Panel's Decision:

No. *Refer to Panel's' Decision in Controversy number **10**, above, where the controversy relative to the Additional Preliminaries is resolved.*

12. Controversy:

Even if Leeward had initiated its Claim for Additional Preliminaries timely and commenced arbitration in a reasonable amount of time, is Leeward entitled to Additional Preliminaries based upon the ground asserted in its May 11, 2009 Claim, *i.e.*, that it had been denied access to a $500,000.00 (EC $1,350,000.02) set aside for Non-Productive Overtime, given the absence of any evidence that such an account was agreed to by the parties or that the alleged lack of access to overtime impacted the critical path and caused the damages asserted?

Panel's Decision:

Yes. *Refer to the Panel's Decision in Controversy number **10**, above.*

13.   Controversy:

Aside from the Claim for Additional Preliminaries based on the alleged denial of Non-Productive Overtime initiated on May 11, 2009, did Leeward timely initiate any other claims for an extension of the Contract Time or an increase in the Contract Sum for the Additional Preliminaries in accordance with Section 4.3 of the General Conditions based on any other alleged theory of delay?

Panel's Decision:

This Panel finds that each party is barred from alleging non-compliance with the terms of the Contract and, therefore, will consider all claims brought without regards to timeliness. AUA shall refer to the Award as to claims granted, on pages 31-32.

20

14.     Controversy:

If so, did Leeward establish that each such claim for delay satisfied each of the following elements: (a) caused by AUA; (b) impacted the critical path; and (c) resulted in a specific loss of time or amount of damages?

    Panel's Decision:

After a careful study and analysis of the witness statements as well as the evidence presented, the Panel finds that both parties were responsible for the project delays. Leeward failed to reach substantial completion of the project in the time that was agreed upon. However, the numerous delays and changes to the drawings and the fact that AUA had knowledge of Leeward's request for extension of time, draw us to determine equal fault for each party regarding the delays in the substantial completion. Moreover, AUA shall refer to the Award on pages 31-32, as to the claims granted.

15.     Controversy:

Is Leeward barred from seeking to be paid EC $190,210.19 more than the EC $1,232,008.91 it was already paid for additional work it documented as "Change Orders" in the monthly payment applications because Leeward failed to initiate a Claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a claim no later than October 26, 2009, but initiated a Claim no sooner than December 17, 2010 – 14 months later?

    Panel's Decision:

The Panel finds that Leeward is entitled to payment for all work performed under the Contract subject to this Arbitration, without consideration to the timeliness of the claims.

16.     Controversy:

Even if Leeward had timely initiated a claim to be paid an additional EC $190,210.19 for Change Order work, is Leeward entitled to be paid this money given that Leeward did not

21

**A341**

make a demand for payment contemporaneous with the payment of its Draft Final Account and given that Leeward did not otherwise submit evidence to substantiate its right to payment?

   Panel's Decision:

From the evidence presented at trial, the Panel finds that Leeward is entitled to the additional EC $190,210.19. Consequently, the Panel grants Leeward's claim for EC $190,210.19.

17.   Controversy:

Is Leeward barred from pursuing its claim to recover EC $19,475.40 for the Whitsuntide Holiday because it failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the claim accrued on June 1, 2009 and Leeward waited until February 3, 2011 – 21 months later – to commence arbitration?

   Panel's Decision:

The Panel finds that Leeward is not barred from any of its claims based on timeliness. However, claims pertaining to delays in the completion of the Project are subject to the Panel Decisions in *Section VI. (B-14) and (B-15)*, above.

18.   Controversy:

Even if Leeward had commenced arbitration in a reasonable amount of time, is Leeward entitled to EC $19,475.40 in damages for closing the construction site on June 1, 2009 for the Whitsuntide Holiday given that the holiday occurred after the May 14, 2009 deadline for Leeward to complete its work under the Contract Documents?

   Panel's Decision:

No.  Refer to the Panel's Decision in *Section VI. (B-14)*, above.

22

**A342**

19.   Controversy:

Is Leeward barred from seeking payment for an additional EC $162,372.12 in "claims" out of

the EC $181,847.52 sought in the Amended Demand for Arbitration because Leeward failed

to initiate a Claim within 21 days of its accrual in accordance with Section 4.3.2 of the

General Conditions, given that Leeward was aware of the facts giving rise to such a claim

no later than October 26, 2009, but initiated a Claim no sooner than December 17, 2010 –

14 months later?

   Panel's Decision:

This Panel finds that each party is barred from alleging non-compliance with the terms of

the Contract and therefore, will consider all claims brought without regards to timeliness,

except those that were specifically distinguished by the Panel's legal reasoning in each of

the controversies submitted for resolution in the Award on page 31.

20.   Controversy:

Even if Leeward had timely initiated a claim, is Leeward entitled to recover an additional

EC $162,372.12 in "claims" given that Leeward was already paid that precise amount,

EC $162,372.12, for these identical "claims," as confirmed by the Draft Final Account

submitted by Leeward, certified by the Architect, and paid by AUA?

   Panel's Decision:

This Panel finds that Leeward was rightfully paid for extra work, and for the "claims"

(adverse weather and holiday) for a total of EC $1,232,008.91 in Change Orders and

EC $162,372.12 in 'Claims' paid in the Draft Final Account.

21.   Controversy:

Is Leeward barred from seeking EC $1,000,000 allegedly due and owing from the Cash

Allowance portion of the Contract Sum because Leeward failed to initiate a Claim within 21

days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that

23

**A343**

Leeward was aware of the facts giving rise to such a claim no later than October 26, 2009, but initiated a claim no sooner than December 17, 2010 – 14 months later?

   Panel's Decision:

This Panel finds that each party is barred from alleging non-compliance with the terms of the Contract and therefore, will consider all claims brought without regards to timeliness, except those that were specifically distinguished by the Panel's legal reasoning in each of the controversies submitted for resolution in this Award.

22.    Controversy:

Even if Leeward had timely initiated such a claim, is Leeward entitled to recover EC $1,000,000 from the Cash Allowance component of the initial Contract Sum for contingent costs, including craneage, scaffolding and overtime, given that the EC $2,262,166.51 that Leeward billed for and received for such contingent costs includes the EC $1,000,000 allocated to contingent costs in the EC $27,436,824 Contract Sum, which Leeward uses as costs?

   Panel's Decision:

This Panel finds that Leeward is not entitled to its claim for Cash Allowance because the evidence received and considered demonstrated to the Panel that, Leeward was paid EC $2,262,166.51 in Cash Allowance, with included the EC $1,000,000.00 claim.

23.    Controversy:

Is Leeward barred from pursuing to recover overhead and profit on the EC $191,090 in Doors and Windows Work deleted by AUA from Leeward's scope of work because it failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the claim accrued on April 21, 2009 and Leeward waited until February 3, 2011 – 22 months later – to commence arbitration?

24

**A344**

<u>Panel's Decision:</u>

This Panel finds that Leeward is barred from pursuing the overhead and profit on the EC $191,090 in Doors and Windows Work deleted by AUA because such work was then given to Leeward under a Separate Contract and, therefore, is not subject to this Arbitration. Refer to the Panel's Decision in Section *V. (2)*.

24.   <u>Controversy:</u>

Even if Leeward had commenced arbitration in a reasonable amount of time on its claim for overhead and profit on the Doors and Windows Work, is Leeward entitled to recover EC $34,396.20 as and for its overhead and profit on this work given that the unit rates contained in the initial Bills of Quantities were "provisional sum rates" and given that Leeward entered into a separate contract with AUA in July 2009 to perform this work?

<u>Panel's Decision:</u>

No. *Refer to Panel's Decision in Controversy number **23**, above.*

25.   <u>Controversy:</u>

Is Leeward barred from pursuing its claim to recover overhead and profit on the EC $1,735,589 in Painting Work deleted by AUA from Leeward's scope of work because Leeward failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the claim accrued on April 21, 2009 and Leeward waited until February 3, 2011 – 22 months later – to commence arbitration?

<u>Panel's Decision:</u>

The Panel finds that each party is barred from alleging non-compliance with the terms of the Contract and, therefore, will consider all claims brought without regards to timeliness, except those that were specifically distinguished by the Panel's legal reasoning in each of the controversies submitted for resolution in this Final Award.

25

26. <u>Controversy:</u>

Even if Leeward had commenced arbitration in a reasonable amount of time on its claim for overhead and profit on the Painting Work, is Leeward entitled to recover EC $312,406.02 as and for its overhead and profit on this work given that Leeward would have incurred more in liquidated damages had the Painting Work not been removed from Leeward's scope of work than it seeks to recover in overhead and profit for this work?

    <u>Panel's Decision:</u>

Yes. *Refer to the Panel's Decision in Section VI. (A-7).*

27. <u>Controversy:</u>

Is Leeward barred from seeking to recover monies allegedly due and owing under the Separate Contracts in the arbitration for either of the following separate reasons:

    a)  Claims under the Separate Contracts are not arbitrable because AUA did not agree to arbitrate them; **Or**

    b)  In the event Leeward's payment claims under the Separate Contracts fall within the scope of the arbitration provision (Section 4.6.1 of the General Conditions), because Leeward failed to initiate any claims within 21 days of their accrual in accordance with Section 4.3 of the General Conditions.

    <u>Panel's Decision:</u>

Yes.  This Panel finds in favor of AUA in that works that were performed under Separate Contracts are not subject to this Arbitration

28. <u>Controversy:</u>

Even if Leeward's claims under the Separate Contracts are subject to arbitration, and even if Leeward had initiated claims timely, has Leeward established that AUA only paid Leeward EC $1,359,035.40, in the aggregate, on the Separate Contracts and owes it an additional EC $202,943 on these contracts based upon the proposed contract amounts, particularly considering the evidence presented by AUA that Leeward was to be paid as per actual work (not the proposed amounts), and that Leeward was paid EC $1,452,261.32 for that work?

26

**A346**

Panel's Decision:

No. *See Panel Decisions in Section **VI. (A-7 and (B-2)**.*

29.   Controversy:

Is Leeward entitled to an award for the EC $590,083 that AUA holds as retainage given that Leeward has not provided evidence that it satisfied its obligations under Section 9.10.2 of the General Conditions to provide "an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered have been paid or otherwise satisfied."?

Panel's Decision:

This Panel finds that the only issue regarding the retainage is the submittance by Leeward to AUA of the required documents. Therefore, this Panel hereby Orders Leeward to comply with Section 9.10.02 of the General Conditions, as applicable to the particular Project within the term provided in the Award on pages 31-32 and, thereafter, AUA must pay the remaining 2.5% of the Contract Sum equal to EC $590,083.00, without interest, if paid within the time allowed.

30.   Controversy:

Should the mutual accounting mistake discovered by AUA on the eve of trial that resulted in Leeward receiving EC $83,059.56 less than was reflected in the Draft Final Account be part of any arbitration award, and potentially subject to the assessment of interest, given that Leeward never notified AUA of the error, or specifically demanded payment, or asserted any claim to recover this amount?

27

**A347**

Panel's Decision:

This Panel determines that the ABST error was mutually acknowledged by both parties, and not having it been submitted as a controversy of this Arbitration and having it been discovered and in good faith informed by an AUA representative during the hearings, we conclude that this issue should be resolved outside of the context of this Arbitration.

31.     Controversy:

Is Leeward entitled to an award of interest for any portion of Leeward's EC $6,701,390.33 demand? If so, when should interest begin to run given Leeward's long delay in commencing arbitration on the three claims it actually initiated during the Project (*i.e.*, Additional Preliminaries, Whitsuntide Holiday and Overhead and Profit on the Painting Work and Doors and Windows Work) and given Leeward's failure to identify the remainder of its claims until filing its Amended Demand for Arbitration dated October 14, 2011?

Panel's Decision:

This Panel finds that Leeward is entitled to the claims recognized in this Award as herein stated.  These claims shall accrue interest at the rate of 7% per annum, since the date of termination of the Project, October 31, 2009, as determined by the Panel; except for those claims that are specifically without interest.

32.     Controversy:

Did Leeward establish that AUA failed to pay one or more monthly payment applications timely, and if so, then what is the date of each such late payments and is Leeward entitled to an award of interest on any alleged late payments?

Panel's Decision:

Yes. *See Panel's Decision in Controversy (A-3) in Section VI.*

28

**A348**

33.    Controversy:

Is Leeward entitled to an award of interest on any allegedly late mobilization payments, or were its claims with respect to this issue settled in January 2009 as set forth in AUA Ex. 67 at AUA 003269?

   Panel's Decision:

The Panel finds that the disputes regarding mobilization were resolved with a payment by AUA in December 22, 2009 and a settlement was reached by the parties in January 13, 2009.

34.    Controversy:

To the extent Leeward is awarded any interest, should the rate of interest equal the statutory judgment rate in Antigua of 5%, given that the Contract Documents refer to the "legal rate" in Antigua?

   Panel's Decision:

The Panel finds that Leeward is entitled to interest on the payments due and unpaid as set forth under Section 13.6.1 of the Contract and General Conditions as of October 3, 2009. However, this Panel finds that the interest shall be calculated at 7% per annum.

35.    Controversy:

Is Leeward entitled to recover any of its legal fees and expenses in prosecuting its claims or in defending AUA's counterclaim for Liquidated Damages?

   Panel's Decision:

Upon careful consideration and considering that both parties were equally at fault (Leeward 50%- AUA 50%) regarding some of the controversies submitted and in the management of the Contract, the Panel finds no compelling reason to grant attorney's fees, arbitration fees, expenses and compensation as provided under the laws of Antigua or otherwise.  Each party shall bear their own attorneys' fees, arbitration expenses and such the like.

29

**A349**

36.   Controversy:

Is AUA entitled to an award of Liquidated Damages in the amount of US $117,000.00 based upon Leeward's failure to achieve Substantial Completion within the Contract Time, but instead doing so 78 days later?

   Panel's Decision:

After a careful analysis and evaluation of the witness statements as well as the evidence presented to the Panel, we find that both parties shared responsibilities for the project delays and, consequently, Leeward is responsible for 50% of the Liquidated Damages in the amount of EC $ 157,950.00[2], and such amount is hereby granted in favor of AUA.

37.   Controversy:

Is AUA entitled to setoff Liquidated Damages from the retainage it currently holds?

   Panel's Decision:

No.   The Panel finds neither spurious allegations in Leeward's claims, nor intentional wrongdoing to award damages to AUA.   Consequently, AUA is denied its claim to setoff Liquidated Damages.

38.   Controversy:

Is AUA entitled to recover any of its legal fees and expenses in defending the claims asserted by Leeward and in prosecuting its counterclaim for Liquidated Damages?

   Panel's Decision:

Upon careful consideration and considering that both parties were at fault regarding some of the controversies submitted and in the management of the Contract, the Panel finds no compelling reason to grant attorney's fees, arbitration fees, expenses and compensation as

---

[2] As per AUA's counterclaim for Liquidated Damages, the amount was expressed in US dollars and not EC dollars, therefore, considering the current currency conversion, said amount was calculated at $315,900.00 of which 50% is granted to AUA for $157,950.00.

30

**A350**

provided under the laws of Antigua or otherwise. Each party shall bear their own attorneys' fees, arbitration expenses and such the like.

**AWARD**

Accordingly, we ORDER and AWARD as follows:

1. Within thirty (30) days from the date of issuance of this Final Award Respondent AUA shall pay to Claimant Leeward the following amounts:

| | | |
|---|---|---|
| a) Interest on the Payments Due and Unpaid | EC $44,617.37 | This sum shall accrue interest of 7% per annum from the date of issuance of termination of the Project, October 31, 2009. |
| b) Damages | EC $232,670.13 | This sum shall accrue interest of 7% per annum from the date of issuance of this Final Award. |
| c) Overhead and Profit for work deleted, omitted or modified | EC $802,399.25 | This sum shall accrue interest of 7% per annum from the date of termination of the Project, October 31, 2009 |
| d) Additional Preliminaries | EC $477,777.04 | This sum shall accrue interest of 7% per annum from the date of termination of the Project, October 31, 2009 |
| e) Change Order Work | EC $190,210.19 | This sum shall accrue interest of 7% per annum from the date of termination of the Project, October 31, 2009 |
| f) Retainage | EC $218,566.74 | This sum shall <u>not accrue any interest</u>. Leeward shall submit to AUA all contractually required documentation as set forth in Section 9.10.2 of the General Conditions. Leeward will have a term of not more than 30 calendar days from the date of issuance of this Final Award to submit said documentation. Once Leeward has submitted all required documentation accordingly, AUA shall release the retainage in a term not to exceed 30 calendar days, upon after which such amount shall start accruing interest at the rate of 7% per annum. If Leeward fails to comply with Section 9.10.2, of the General Conditions in the time hereby stated and granted the claim for such amount will be considered |

31

relinquished.  Considering that this case is sub-judice, the herein referred notice may be made by counsel for Leeward to counsel for AUA, or by Leeward to AUA.

2. As per AUA's counterclaim for Liquidated Damages, this Panel grants 50% of such in the amount of EC $157,950.00, which will accrue interest at the rate of 7% per annum from the date of this Final Award.

3. The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling $17,550.00 shall be borne by the parties as incurred.  The compensation and expenses of the Panel totaling $151,992.75 shall be borne by the parties as incurred.

4. The terms of this Final Award shall be complied within thirty (30) days from the date of this Final Award.

This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration.

This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

Per the arbitration clause, the location of the arbitration is Antigua; however, the parties jointly agreed for the Hearings to be held in Isla Verde, Puerto Rico.  We hereby certify that, for the purposes of Article I of the New York Convention of 1957, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Isla Verde, Puerto Rico, on this 22 day of June, 2012.

32

A352

June 22, 2012
Date

Jorge R. Jiménez, Esq.
Panel Chairman

June 22, 2012
Date

Héctor M. Varela, P.E.
Arbitrator

June 22, 2012
Date

José R. Capó, Esq.
Arbitrator

State of Puerto Rico
County of San Juan

On this 22 day of June, 2012 before me personally came and appeared Jorge R. Jiménez, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledge to me that he executed the same.

June 22, 2012
Dated

Notary Public
Affidavit # 286



State of Puerto Rico
County of San Juan

On this 22 day of June, 2012 before me personally came and appeared Héctor M. Varela, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledge to me that he executed the same.

June 22, 2012
Dated

Notary Public
Affidavit # 287



State of Puerto Rico
County of San Juan

On this 22 day of June, 2012 before me personally came and appeared José R. Capó, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledge to me that he executed the same.

June 22, 2012
Dated

Notary Public
Affidavit # 288



## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| **LEEWARD CONSTRUCTION COMPANY, LTD.,** | |
| **Claimant,** | |
| **vs.** | **Case No.: 50 110 T 00075 11** |
| **AMERICAN UNIVERSITY OF ANTIGUA – COLLEGE OF MEDICINE,** | |
| **Respondent.** | |

### FINAL AWARD



We, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the Arbitration Agreement entered into between the above named parties and dated September 25, 2008, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and the parties having agreed that the Arbitrators need to render a reasoned award, do hereby, AWARD, as follows:

### I.   BRIEF PROCEDURAL BACKGROUND:



The present case was brought on February 3, 2011 by Leeward Construction Company, LTD. ("Leeward") against American University of Antigua - College of Medicine ("AUA"), claiming the amount of EC $13,161,137[1] from a dispute that arose out of the construction of a medical school in St. Johns, Antigua.   Leeward claimed that AUA breached their contract and sought remedies under § 4.6 of the Contract, henceforth, demanded arbitration for the disputes set forth in their claim.

AUA filed a response on March 4, 2011, stating that Leeward's claim was so vague, confusing and contradictory that AUA was not in the position to understand the basis for the claims.

The Panel was selected and sworn on July 6th, 2011, comprised by Attorneys José R. Capó, Jorge R. Jiménez and Professional Engineer Héctor M. Varela. Attorney Jiménez was designated Chair of the Panel.

On October 14, 2011, Leeward filed an Amended Demand for Arbitration seeking EC $6,800.572.28 in damages.  AUA filed its Answering Statement and Counterclaim on November 30, 2011.

---

[1] Whenever reference is made to a monetary sum, same shall be understood to be represented in Eastern Caribbean (EC) dollars, unless otherwise stated.

On December 12, 2011, Leeward filed a Statement objecting AUA's claims for liquidated damages and delay damages, arguing that such claims have been presented untimely.  On December 23, 2011, AUA's filed a Statement in opposition to the motion presented by Leeward to dismiss AUA's counterclaims, asserting the timeliness of its claims.

Afterwards both parties commenced discovery proceedings and filed numerous motions including dispositive motions, the resolution of which the Panel held in abeyance until the holding of the Hearings to be decided as part of the Final Award.  We will discuss same in detail in **Section III** of this Award.  The Hearings were held in the Marriott Courtyard in Isla Verde, Puerto Rico, from March 5th through March 9th 2012.  On April 11, 2012, AUA withdrew from its Answering Statement and Counterclaim the portion that sought actual damages and left only those claims for liquidated damages in the amount of US $117,000 and for attorneys' fees and expenses.  As per their request, the parties submitted their Proposed Findings of Facts and Conclusions of Law on April 20, 2012. The parties also submitted rebuttal briefs on May 4th, 2012.



The Panel declared the hearings closed and the case submitted for resolution on May 22, 2012.

This case was administered under the AAA Construction Industry Arbitration Rules ("CIAR") as amended and in effect October 1, 2009.

## II.   UNCONTESTED FACTS:

1.    Leeward is a corporation duly organized and existing under the laws of the Commonwealth of Antigua and Barbuda, with office and principal place of business at All Saints Road, St. Johns, Antigua.

2.    AUA is owned by the GCLR, LLC, a limited liability company organized and existing under the laws of the State of New York, with office and principal place of business at 1 Battery Park Plaza, 33rd Floor, New York, New York, U.S.A.

3.    In the Spring of 2008, AUA and Leeward began to negotiate the terms of a contract to construct the structural works portion of the AUA's new medical school campus in Antigua.

4.    AUA and Leeward entered into a Letter of Intent on or about April 21, 2008 which was signed by Neal Simon, President of AUA, and Andy Green, Managing Director of Leeward.  A copy of the April 21, 2008 Letter of Intent was marked as LC 69.

5.    AUA and Leeward entered into a second Letter of Intent on or about May 10, 2008, which was signed by Corey Greenberg, Chief Operating Officer of AUA, and Andy Green, Managing Director of Leeward.  A copy of the May 10, 2008 Letter of Intent was marked as LC 70.

6.    On September 25, 2008, Leeward (as contractor) and AUA (as project owner) executed a contract for the construction of the College of Medicine in St. John's

2

Antigua for the fixed price of EC $27,436,824.00, subject to additions and deductions as provided in the Contract Documents, under the AIA Contract Document (A101-1997).

7.     The parties agreed that the commencement date for the works was May 1, 2008.

8.     Leeward had to achieve substantial completion of the entire work in 364 calendar days or as follows:

| Portion of the work | Substantial Completion Date |
| --- | --- |
| Classroom block | 29/01/2009 |
| Lab Block | 06/03/2009 |
| Service Block | 29/01/2009 |
| Library and Admin. Block | 30/04/2009 |



9.     Lt. Colonel Roche Antony was AUA's representative for the project and signed the Contract Documents on AUA's behalf.

10.     Neil Dickinson was Leeward's Project Manager for the project and signed the Contract Documents on Leeward's behalf.

11.     Sundaram Architects Pvt., Ltd. ("SAPL" or the Architect") was the architect that designed AUA's new Medical School Campus.  A.S. Nagesh served as the Architect's representative.

12.     Leeward and AUA also entered into a number of Separate Contracts, including a contract to install the doors and windows dated July 13, 2009 (marked as LC 228) and a contract of laying floor tiles dated July 13, 2009 (marked as LC 229).

13.     On February 3, 2011, Leeward filed a Demand for Arbitration seeking EC$13,161,137.00 in damages.

14.     On October 14, 2011, Leeward filed an Amended Demand for Arbitration seeking EC$6,800,572.28 in damages.

**III.   TRIAL EXHIBITS:**

A)  Leeward's Trial Exhibits

   *Exhibit list 1-245 as amended by the Joint Post-Hearing Motion, dated April 12, 2012.*

B)  AUA's Trial Exhibits

   *Exhibit list 1-71 as amended by the Joint Post-Hearing Motion, dated April 12, 2012.*

3

IV.   **WITNESSES:**

A) Leeward's Witnesses

1. Robert Winwood-Senior Quantity Surveyor for Leeward, from Sept. 1, 2008-August 14, 2009. He was responsible for administration and surveying of the work with respect to the Construction of the AUA Project.

2. Eric Linde-Director of Leeward. Over 45 years of hands on experience in the Construction Industry in Antigua and US.

3. Neil Dickinson-Projects Director for Leeward from March 1, 2007 to Feb. 17, 2009, then managing director until Oct. 9, 2009, and was responsible for contract negotiations and administration of the works with respect to the Construction of the AUA Project.

4. Andy Green-Managing Director of Leeward.

B) AUA's Witnesses

1. Prabhu Marudheri-Executive Director of Finance for GCLE, LLC, an agent for AUA.

2. Peter McLeod-Partner with DHP Associates, a firm of Chartered Quantity Surveyors and Project Managers located in the Bahamas.

3. A.S.Nagesh-Architects' representative.

4. Lt. Col. Roche Antony-General Manager on behalf of AUA, for the project.

V.   **INTERLOCUTORY MATTERS:**

1.   Controversy:

Leeward's request to strike the testimony of AUA's witness Peter McLeod based on the fact that same is expert testimony, which AUA had represented it would not be using. The Panel must decide if said testimony is factual or expert testimony.

Panel's Decision:

*Refer to the Panel's Decision in section* **VI. (A-25).**

2.   Controversy:

AUA's motion requesting dismissal of Leeward's claims for amounts unpaid or due under the contracts for additional work. The Panel must decide if: (1) Leeward's claim for unpaid

4

**A357**

balances and monies owed for additional works was included in the Amended Demand for Arbitration, henceforth, providing AUA with due process; and (2) if the parties submitted to arbitration said claims in this proceeding.

Panel's Decision:

After reviewing both parties' arguments and careful analysis of the questions posed, this Panel finds that all claims arising from the Separate Contracts are not subject to this Arbitration. We find in favor of AUA and conclude that the arbitration clause that both parties agreed to, only reached claims arising out of or relating to the original Contract. Nothing in the Separate Contracts evidence intent from the parties to subject same to arbitration, nor does the record show that AUA agreed to arbitrate disputes under the Separate Contracts.

3. Controversy:

AUA's motion requesting that Leeward's claims be dismissed for untimely filing. This Panel must decide if dismissal is appropriate against Leeward, because Leeward's claim for final payment was initiated in violation of the 21 day notice requirement, and because Leeward's 16-20 month delay in commencing arbitration was unreasonable.

Panel's Decision:

After due analysis, this Panel denies AUA's motion requesting that Leeward's claims be dismissed for untimely filing.

4. Controversy:

Leeward's motion requesting that AUA's counterclaim be dismissed for untimely filing. This Panel must determine if AUA filed the counterclaim within the time period stated under Section R-4(c)(ii) of the AAA's CIAR.

5

Panel's Decision:

After due analysis, this Panel denies Leeward's motion requesting that AUA's counterclaim be dismissed for untimely filing.

## VI.   CONTROVERSIES SUBMITTED TO THE PANEL FOR RESOLUTION:

### A.   Claimant's (Leeward's) controversies submitted to arbitration:

1. Controversy:

Whether the Contract is a fixed price contract subject to additions or deletions by change order or whether the Contract price is based upon measured works?

Panel's Decision:

The Panel rules that the Contract is a fixed price contract subject to additions and deletions. Leeward is entitled to receive compensation for work performed.  Even though the Contract provides that additions and deletions should be made by formal change orders, from the evidence considered by the Panel it appears that both parties waived this requirement.

2. Controversy:

Whether AUA breached the Contract with respect to the issuance of change orders, certificates of substantial completion, certificate of final completion, the review, certification, and payment of payment requisitions, the determination of claims, and the administration of the Contract?

Panel's Decision:

This Panel finds that both parties failed in their contractual responsibility to follow and enforce the General Conditions of the Contract AIA 201-1997.  The respective liability of each party with respect to certain claims will be addressed in this Final Award.

6

**A359**

3.   Controversy:

Whether AUA breached the Contract by failing to timely pay the amount due on payment requisitions?

   Panel's Decision:

This Panel finds that AUA did breach the Contract on this matter.  In many instances AUA had concerns regarding the quantities invoiced, however, there were reasonable alternatives in case the parties did not reach an agreement to issue the partial payments, as stated in Article 9.5.1 of the Contract.  This Panel rules that holding the entire amount was far from reasonable and fair.

4.   Controversy:

If AUA breached the Contract by failing to timely pay the amount due on payment requisitions, is Leeward entitled to interest on the late payments at the legal rate under the laws of Antigua and if so, whether l0% per annum is the proper rate?

   Panel's Decision:

This Panel finds that Leeward is entitled to interest on the payments due and unpaid as set forth under sections 7.2 and 13.6.1 of the Contract and General Conditions.  However, this Panel agrees with AUA in that the interest agreed upon by the parties was the "legal rate" and therefore interest shall be calculated at 7% per annum.

5.   Controversy:

If the Contract was for a fixed price, is Leeward entitled to payment for work that AUA omitted, deleted or modified from the Contract's original scope of work?

   Panel's Decision:

No.  Leeward is only entitled to payment for work performed.  However, this Panel finds that Leeward is entitled to damages in the amount of EC $ 232,670.13 for work that was deleted

7

**A360**

from the Contract and then assigned to Leeward under Separate Contracts, under the bad faith doctrine.

6.   Controversy:

If the Contract price is based upon measured works, what adjustments should be made to the Contract sum for work omitted, deleted or modified from the Contract's original scope of work despite the AUA's failure and refusal to issue change orders?

   Panel's Decision:

The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a decrease in the Contract Sum shall be the actual net cost.

7.   Controversy:

If the Contract was based upon measured works, is Leeward entitled to overhead and/or profit for work omitted, deleted or modified from the Contract's original scope of work and if so, what amount is Leeward entitled to for overhead and/or profit on omitted, deleted or modified work?

   Panel's Decision:

The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a decrease in the Contract Sum shall be the actual net cost.  When both additions and credits covering related work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change, i.e., AIA Document A201-1997 General Conditions of the Contract for Construction, Section 7.3.7.  Therefore, Leeward is entitled to overhead and profit for work omitted, deleted or modified as claimed, except for the $185,425.07 of overhead and profit for the Doors & Windows and Flooring works that were deleted from the Contract's original scope of work and then given to Leeward under a Separate Contract.

8

**A361**

8.   Controversy:

What amount is Leeward entitled to for additions to the Contract that should have been added pursuant to change orders had AUA properly issued change orders on the Project?

   Panel's Decision:

This Panel finds that Leeward is entitled to receive compensation for work performed, despite any formal change orders, based on Measured Work and the Bill of Quantities (BOQ).

9.   Controversy:

Whether AUA was responsible for project delays that impaired Leeward's ability to substantially complete the Contract work by the substantial completion dates in the Contract, as extended?

   Panel's Decision:

After a careful study and analysis of the witness statements as well as the evidence presented, the Panel finds that both parties were equally responsible for the project delays. Leeward failed to reach substantial completion of the project in the time that was agreed upon.   The numerous delays and changes to the drawings and the fact that AUA had knowledge of Leeward's request for extension of time, draw us to determine equal responsibility for both parties regarding the delays in the substantial completion.

10.   Controversy:

If AUA is responsible for project delays that impaired Leeward's ability to complete the project by the substantial completion dates in the Contract as extended, then what amount is Leeward entitled to for additional preliminaries as a result of the AUA's actions?

   Panel's Decision:

This Panel finds that both parties were equally responsible for the project delays. Consequently, we find AUA responsible for 50% of the Additional Preliminaries in the

9

amount of EC $477,777.04 and such amount is hereby granted in favor of Leeward.

11. Controversy:

Whether Leeward was responsible for the project delays that caused it to fail to substantially complete the work by the Contract's deadlines?

Panel's Decision:

No. *Refer to Panel Decisions in Section VI. (A-9) and (A-10), above.*

12. Controversy:

If Leeward is responsible for the project delays that caused it to fail to substantially complete the work by the Contract's deadlines, what amount is due from Leeward to AUA for liquidated damages?

Panel's Decision:

*Refer to Panel Decisions in Section VI. (A- 9), (A-10) and (B-36), above.*

13. Controversy:

Whether Leeward substantially complied with the notice of claim provision in the Contract?

Panel's Decision:

By reason of the conduct of the parties during the development, construction and liquidation of the Project, the Panel concludes that the time limit for the notice of claims stipulated in Section 4.3.2 of the General Conditions was waived, as well as Section 4.6.3 of the General Conditions referring to the initiation of an arbitration process. This decision is applicable to both parties.

14. Controversy:

If Leeward did not substantially comply with the notice of claim provision in the Contract, whether AUA waived compliance with such provision?

Panel's Decision:

*See Panel's Decision of Controversy in Section VI. (A-13), above.*

10

**A363**

15.  Controversy:

Whether AUA substantially complied with the notice of claim provision in the Contract?

Panel's Decision:

*See Panel Decisions in **Section VI, (A-14) and (A-15),** above.*

16.  Controversy:

Whether Leeward is entitled to pre-judgment interest on its damages as a result of the AUA's breach of the Contract?

Panel's Decision:

This Panel is awarding pre-judgment interest to Leeward from October 31, 2009, as detailed in the Award, at the rate of 7% per annum.



17.  Controversy:

If Leeward is entitled to pre-judgment interest on its damages, is 10% per annum the appropriate rate of interest to be charged under the laws of Antigua and if so, from what date should the interest begin to run?

Panel's Decision:

Yes. *But see Panel's Decision to Controversy **16**, above.*

18.  Controversy:

Whether Leeward is entitled to payment in the amount of US $30,743.20/EC $83,000.00 for the AUA's acknowledged error in the calculation of ABST payments?

Panel's Decision:

This Panel finds that the ABST error was mutually acknowledged by both parties, and not having been originally claimed and submitted as a controversy in this Arbitration and having been discovered and in good faith informed by AUA representatives during the Hearings,

11

**A364**

the Panel concludes that this claim should be corrected outside of the context of this Arbitration.

19.   Controversy:

If Leeward is not entitled to any other damages in this proceeding, whether Leeward is entitled to the payment of US $218,566.74/EC $590,083.00 in retainage?

   Panel's Decision:

After careful consideration regarding the works that were deleted from the Contract and then assigned to Leeward under Separate Contracts, this Panel finds that Leeward is entitled to damages under the bad faith doctrine.   Therefore, this Panel grants Leeward damages in an amount equal to EC $232,670.13.  As per Leeward's claim for retainage, *refer to the Panel's Decision in section VI. (B-29), infra.*

20.   Controversy:

If AUA breached the Contract, is Leeward entitled to damages as specified in Claimant's Proposed Findings of Fact and Conclusions of Law Paragraphs 130, 131, or 133 or some other amount?

   Panel's Decision:

The Panel finds that both parties breached the Contract and therefore, in some instances share direct responsibility for same.  As such, this Panel will not grant damages to Leeward as requested, but as specifically provided in the Award on page 31.

21.   Controversy:

Whether the additional works contracts Leeward entered into with AUA are subject to arbitration?

   Panel's Decision:

The Panel finds that the additional works contracts are not subject to this Arbitration.

12

**A365**

22.   Controversy:

If the additional works contracts are subject to arbitration, then what is the amount due from AUA to Leeward for the unpaid balances on the additional works contracts?

   Panel's Decision:

The Panel finds that the Separate Contracts Leeward entered into with AUA are not subject to this Arbitration.



23.   Controversy:

Whether the arbitration was commenced within a reasonable time not to exceed the statute of limitations for breach of contract actions under the laws of Antigua?

   Panel's Decision:

The Panel finds that this Arbitration was commenced timely.

24.   Controversy:

What is the statute of limitations for breach of contract actions under the laws of Antigua?

   Panel's Decision:

The Panel finds that this Arbitration was commenced within the six (6) year term.

25.   Controversy:

Whether the Panel should strike the AUA's witness statement of Peter McLeod on the grounds that Mr. McLeod's witness statement constitutes an expert opinion that AUA failed to disclose until the eve of the hearing after representing to the Panel during a telephone conference on December 15, 2011 that it did not foresee the use of expert witness testimony?

   Panel's Decision:

This Panel finds that Peter McLeod's testimony is not that of an expert witness.  Therefore, all parts of his witness statement and testimony rendered based on his opinion as an expert are stricken from the record.  However, this Panel considered as factual the testimony

13

offered by Peter McLeod which relates to his personal knowledge and intervention in the negotiation of the Contract Documents, and will give it the probatory value it deems appropriate.

26.  Controversy:

Whether Leeward is entitled to attorneys' fees, arbitration fees, expenses and compensation as provided under the laws of Antigua or otherwise?

   Panel's Decision:

Considering that both parties shared responsibility regarding some of the controversies submitted and in the management of the Contract, the Panel finds no compelling reason to grant attorney's fees, arbitration fees, expenses and compensation as provided under the laws of Antigua or otherwise.  Each party shall bear their own attorneys' fees, arbitration expenses and such the like.

**B.   RESPONDENTS (AUA'S) CONTROVERSIES SUBMITTED TO ARBITRATION:**

1.   Controversy:

Is Leeward barred from seeking to be paid EC $1,604,617 for work it did not perform as a result of design changes and site conditions (like the chain link fence) (the "Omitted Work") because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a Claim throughout the course of construction and no later than October 2009, but initiated it no sooner than December 17, 2010 - 14 months later?

   Panel's Decision:

The Panel finds that Leeward is barred from seeking to be paid for work it did not perform, not because it failed to initiate a claim, but because the evidence received and considered by the Panel is that the Contract was a fixed sum contract subject to additions and deductions, and Leeward would be paid for work it actually performed, based on the BOQ.

14

**A367**

In regards to the "timeliness" of Leeward's claim, it is the determination of the Panel that both parties breached various provisions of the Contract and are, therefore, barred from enforcing said provisions against each other.

2.   Controversy:

Even if Leeward had initiated a claim timely, is Leeward entitled to be paid for the Omitted Work on the ground that AUA did no document changes in the scope of Leeward's work by issuing formal change orders in the manner provided by Section 7 of the General Conditions, or did the parties waive the formal change order procedure by implementing another method, i.e., the monthly requisition process, to document additions and deductions to the Contract Sum, as evidenced by the parties' course of conduct throughout the duration of the Project?




   Panel's Decision:

*See Panel's Decision to Controversy 1, supra.*

3.   Controversy:

Is Leeward barred from pursuing its new alternative claim that it be paid overhead and profit on the Omitted Work for one or more of the following separate reasons:

   a)  Because Leeward asserted its new alternative claim for the first time in its post-trail submission, in violation of Section R-6(b) of the AAA's CIAR, thereby depriving AUA of a fair opportunity to proffer a defense? **Or**

   b)  Because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a claim throughout the course of the construction and no later than October 2009, but never initiated a claim and raised the issue for the first time in Leeward's April 2012 Proposed Findings of Facts and Conclusion of Law? **Or**

   c)  Because the new claim was not asserted in Leeward's February 3, 2011 Demand for Arbitration or its October 14, 2011 Amended Demand for Arbitration, but instead raised for the first time on April 20, 2012, in violation of Section 4.6.5 of the General Conditions, which provides that the "party filing a notice of demand for arbitration must assert in the demand all claims then known to that party on which arbitration is permitted to be demanded"?

15

Panel's Decision:

This Panel will not exclude any claim under the sole contention of timeliness. Therefore, Leeward is not barred from pursuing its claim for the payment of overhead and profit on the Omitted Work.

4.   Controversy:

Even if Leeward had initiated its new alternative claim for overhead and profit on the Omitted Work timely in accordance with the Contract Documents and the CIAR, is Leeward entitled to be paid overhead and profit on the Omitted Work given the testimony that the parties intended to use the Bills of Quantities to value changes to the scope of the work necessitated by design changes and site conditions, and given that Leeward never sought to be paid its overhead and profit Omitted Work?



Panel's Decision:

Yes. This Panel finds that Leeward is entitled to overhead and profit for work omitted, deleted or modified, except for the $185,425.07 of overhead and profit for the Doors & Windows and Flooring works that were deleted from the Contract's original scope of work and then given to Leeward under a Separate Contract.

5.   Controversy:

Is Leeward barred from seeking to be paid for the Flooring Work that AUA deleted from Leeward's scope of work because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward admits it was aware of the facts giving rise to such a claim no later than April 21, 2009, but initiated a claim no sooner than December 17, 2010 – 20 months later?

Panel's Decision:

The Panel finds that both parties were at fault with their mutual responsibilities in following and enforcing the General Conditions of the Contract, therefore, this Panel will not exclude

16

any claim under the sole contention of timeliness.  The evidence also showed that Leeward in many instances notified AUA of its claims, even though it was not in the manner set forth in the Contract.  Therefore, the Panel finds that Leeward is entitled to receive compensation for work performed; however, with regard to the Flooring Work, which is part of the Separate Contracts, same is not subject to this Arbitration.

6.    Controversy:

Even if Leeward had initiated a claim timely, is Leeward entitled to be paid for the Flooring Work that AUA deleted from Leeward's scope of work on the ground that AUA did not document the deletion of this work by issuing formal change orders in the manner provided by Section 7 of the General Conditions, or did the parties waive the formal change order procedure by implementing another method, *i.e.*, the monthly requisition process, to document additions and deductions to the Contract Sum, as evidenced by the parties' course of conduct throughout the duration of the Project?

Panel's Decision:

The Panel finds that the Separate Contracts are not subject to this Arbitration.  Therefore, this Panel will not grant remedies for the Flooring Work.

7.    Controversy:

Is Leeward barred from pursuing its new alternative claim that it be paid overhead and profit on the Flooring Work (EC $1,741,032 * 18% = EC $313,385.76) for one or more of the following separate reasons:

a)  Because Leeward asserted this new alternative claim for the first time in its post-trial submissions, in violation of CIAR R-6(b), thereby depriving AUA of a fair opportunity to proffer a defense?  **Or**

b)  Because Leeward failed to initiate a claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a claim on April 21, 2009 and no later than October 2009, but never initiated a claim and raised the issue for the first time in Leeward's April 20, 2012 Proposed Findings of Fact and Conclusions of Law?  **Or**

17

**A370**

c)  Because the new alternative claim was not asserted in Leeward's February 3, 2011 Demand for Arbitration or its October 14, 2011 Amended Demand for Arbitration, but instead raised for the first time on April 20, 2012, in violation of Section 4.6.5 of the General Conditions, which provides that the "party filing a notice of demand for arbitration must assert in the demand all claims then known to that party on which arbitration is permitted to be demanded"?

Panel's Decision:

The Panel finds that each party is barred from alleging non-compliance against each other regarding the terms of the Contract under the sole contention of timeliness and, therefore, will consider all claims brought without regard to timeliness. However, this Panel finds that Leeward is entitled to overhead and profit for work omitted, deleted or modified, but not for the Flooring Work, which was given to Leeward under a Separate Contract.

8.    Controversy:

Even if Leeward had initiated its alternative claim for overhead and profit on the Flooring Work timely under the Contract Documents and the CIAR, is Leeward entitled to be paid EC $313,385.76 in overhead and profit on the Flooring Work given that Leeward entered into a separate contract with AUA on July, 2009 to perform this work, and was paid under the terms of that separate contract?

Panel's Decision:

No.  *Refer to Panel's Decision in Section VI. (B-7), above.*

9.    Controversy:

There is no decision to render with respect to the Modified Work Delta of negative EC $14,294.10.  Leeward is not seeking to recover any money reflected in this delta, which reflects that Leeward was paid more by seeking payment for work "as built" and in accordance with the "final measure" that it would have received had it been paid based upon the measurements in the initial Bills of Quantities.

18

**A371**

Panel's Decision:

This Panel finds that Controversy number **9**, as stated by AUA, does not require the Panel's decision for it does not constitute a claim.  In the alternative, the Panel finds the claim to be inadmissible and therefore, dismissed and denied.

10.   Controversy:

Is Leeward barred from pursuing its May 11, 2009 Claim for an Extension of Time and the accompanying Additional Preliminaries in the amount of EC $955,554.08 (the difference between the EC $5,891,857.68 in Preliminaries sought by Leeward and the EC $4,936,303.60 approved and paid by AUA) because it failed to initiate the claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward admits that it was aware on January, 2009 that it was not going to complete its work within the Contract Time?

Panel's Decision:

No. Although this Panel finds that both parties were not in strict compliance with the Contract and Contract documents, Leeward is not barred from its claim regarding the responsibility for delays and substantial completion. Consequently, this Panel finds AUA responsible for 50% of the Additional Preliminaries amounting to EC $477,777.04 and such amount is hereby granted in favor of Leeward.

11.   Controversy:

Is Leeward barred from pursuing its Claim for an Extension of Time and the accompanying Additional Preliminaries in the amount of EC $955,554.08 because it failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the Claim accrued in January 2009 and Leeward waited until February 3, 2011 – 25 months later – to commence arbitration?

19

**A372**

Panel's Decision:

No.   *Refer to Panel's' Decision in Controversy number* **10**, *above, where the controversy relative to the Additional Preliminaries is resolved.*

12.   Controversy:

Even if Leeward had initiated its Claim for Additional Preliminaries timely and commenced arbitration in a reasonable amount of time, is Leeward entitled to Additional Preliminaries based upon the ground asserted in its May 11, 2009 Claim, *i.e.*, that it had been denied access to a $500,000.00 (EC $1,350,000.02) set aside for Non-Productive Overtime, given the absence of any evidence that such an account was agreed to by the parties or that the alleged lack of access to overtime impacted the critical path and caused the damages asserted?

Panel's Decision:

Yes.   *Refer to the Panel's Decision in Controversy number* **10**, *above.*

13.   Controversy:

Aside from the Claim for Additional Preliminaries based on the alleged denial of Non-Productive Overtime initiated on May 11, 2009, did Leeward timely initiate any other claims for an extension of the Contract Time or an increase in the Contract Sum for the Additional Preliminaries in accordance with Section 4.3 of the General Conditions based on any other alleged theory of delay?

Panel's Decision:

This Panel finds that each party is barred from alleging non-compliance with the terms of the Contract and, therefore, will consider all claims brought without regards to timeliness. AUA shall refer to the Award as to claims granted, on pages 31-32.



14.    Controversy:

If so, did Leeward establish that each such claim for delay satisfied each of the following elements:  (a) caused by AUA; (b) impacted the critical path; and (c) resulted in a specific loss of time or amount of damages?

   Panel's Decision:

After a careful study and analysis of the witness statements as well as the evidence presented, the Panel finds that both parties were responsible for the project delays. Leeward failed to reach substantial completion of the project in the time that was agreed upon.  However, the numerous delays and changes to the drawings and the fact that AUA had knowledge of Leeward's request for extension of time, draw us to determine equal fault for each party regarding the delays in the substantial completion.  Moreover, AUA shall refer to the Award on pages 31-32, as to the claims granted.

15.    Controversy:

Is Leeward barred from seeking to be paid EC $190,210.19 more than the EC $1,232,008.91 it was already paid for additional work it documented as "Change Orders" in the monthly payment applications because Leeward failed to initiate a Claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a claim no later than October 26, 2009, but initiated a Claim no sooner than December 17, 2010 – 14 months later?

   Panel's Decision:

The Panel finds that Leeward is entitled to payment for all work performed under the Contract subject to this Arbitration, without consideration to the timeliness of the claims.

16.    Controversy:

Even if Leeward had timely initiated a claim to be paid an additional EC $190,210.19 for Change Order work, is Leeward entitled to be paid this money given that Leeward did not

21

**A374**

make a demand for payment contemporaneous with the payment of its Draft Final Account and given that Leeward did not otherwise submit evidence to substantiate its right to payment?

Panel's Decision:

From the evidence presented at trial, the Panel finds that Leeward is entitled to the additional EC $190,210.19. Consequently, the Panel grants Leeward's claim for EC $190,210.19.

17.    Controversy:

Is Leeward barred from pursuing its claim to recover EC $19,475.40 for the Whitsuntide Holiday because it failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the claim accrued on June 1, 2009 and Leeward waited until February 3, 2011 – 21 months later – to commence arbitration?

Panel's Decision:

The Panel finds that Leeward is not barred from any of its claims based on timeliness. However, claims pertaining to delays in the completion of the Project are subject to the Panel Decisions in *Section VI. (B-14) and (B-15), above.*

18.    Controversy:

Even if Leeward had commenced arbitration in a reasonable amount of time, is Leeward entitled to EC $19,475.40 in damages for closing the construction site on June 1, 2009 for the Whitsuntide Holiday given that the holiday occurred after the May 14, 2009 deadline for Leeward to complete its work under the Contract Documents?

Panel's Decision:

No.  Refer to the Panel's Decision in *Section VI. (B-14), above.*

22

**A375**

19.   Controversy:

Is Leeward barred from seeking payment for an additional EC $162,372.12 in "claims" out of the EC $181,847.52 sought in the Amended Demand for Arbitration because Leeward failed to initiate a Claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that Leeward was aware of the facts giving rise to such a claim no later than October 26, 2009, but initiated a Claim no sooner than December 17, 2010 – 14 months later?

Panel's Decision:

This Panel finds that each party is barred from alleging non-compliance with the terms of the Contract and therefore, will consider all claims brought without regards to timeliness, except those that were specifically distinguished by the Panel's legal reasoning in each of the controversies submitted for resolution in the Award on page 31.

20.   Controversy:

Even if Leeward had timely initiated a claim, is Leeward entitled to recover an additional EC $162,372.12 in "claims" given that Leeward was already paid that precise amount, EC $162,372.12, for these identical "claims," as confirmed by the Draft Final Account submitted by Leeward, certified by the Architect, and paid by AUA?

Panel's Decision:

This Panel finds that Leeward was rightfully paid for extra work, and for the "claims" (adverse weather and holiday) for a total of EC $1,232,008.91 in Change Orders and EC $162,372.12 in 'Claims' paid in the Draft Final Account.

21.   Controversy:

Is Leeward barred from seeking EC $1,000,000 allegedly due and owing from the Cash Allowance portion of the Contract Sum because Leeward failed to initiate a Claim within 21 days of its accrual in accordance with Section 4.3.2 of the General Conditions, given that

23

**A376**

Leeward was aware of the facts giving rise to such a claim no later than October 26, 2009, but initiated a claim no sooner than December 17, 2010 – 14 months later?

   Panel's Decision:

This Panel finds that each party is barred from alleging non-compliance with the terms of the Contract and therefore, will consider all claims brought without regards to timeliness, except those that were specifically distinguished by the Panel's legal reasoning in each of the controversies submitted for resolution in this Award.



22.   Controversy:

Even if Leeward had timely initiated such a claim, is Leeward entitled to recover EC $1,000,000 from the Cash Allowance component of the initial Contract Sum for contingent costs, including craneage, scaffolding and overtime, given that the EC $2,262,166.51 that Leeward billed for and received for such contingent costs includes the EC $1,000,000 allocated to contingent costs in the EC $27,436,824 Contract Sum, which Leeward uses as costs?

   Panel's Decision:

This Panel finds that Leeward is not entitled to its claim for Cash Allowance because the evidence received and considered demonstrated to the Panel that, Leeward was paid EC $2,262,166.51 in Cash Allowance, with included the EC $1,000,000.00 claim.

23.   Controversy:

Is Leeward barred from pursuing to recover overhead and profit on the EC $191,090 in Doors and Windows Work deleted by AUA from Leeward's scope of work because it failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the claim accrued on April 21, 2009 and Leeward waited until February 3, 2011 – 22 months later – to commence arbitration?

24

**A377**

Panel's Decision:

This Panel finds that Leeward is barred from pursuing the overhead and profit on the EC $191,090 in Doors and Windows Work deleted by AUA because such work was then given to Leeward under a Separate Contract and, therefore, is not subject to this Arbitration. Refer to the Panel's Decision in Section *V. (2)*.

24.    Controversy:

Even if Leeward had commenced arbitration in a reasonable amount of time on its claim for overhead and profit on the Doors and Windows Work, is Leeward entitled to recover EC $34,396.20 as and for its overhead and profit on this work given that the unit rates contained in the initial Bills of Quantities were "provisional sum rates" and given that Leeward entered into a separate contract with AUA in July 2009 to perform this work?

Panel's Decision:

No. *Refer to Panel's Decision in Controversy number 23, above.*

25.    Controversy:

Is Leeward barred from pursuing its claim to recover overhead and profit on the EC $1,735,589 in Painting Work deleted by AUA from Leeward's scope of work because Leeward failed to commence arbitration within a reasonable amount of time after its accrual in accordance with Section 4.6.3 of the General Conditions, given that the claim accrued on April 21, 2009 and Leeward waited until February 3, 2011 – 22 months later – to commence arbitration?

Panel's Decision:

The Panel finds that each party is barred from alleging non-compliance with the terms of the Contract and, therefore, will consider all claims brought without regards to timeliness, except those that were specifically distinguished by the Panel's legal reasoning in each of the controversies submitted for resolution in this Final Award.

25

**A378**

26.   Controversy:

Even if Leeward had commenced arbitration in a reasonable amount of time on its claim for overhead and profit on the Painting Work, is Leeward entitled to recover EC $312,406.02 as and for its overhead and profit on this work given that Leeward would have incurred more in liquidated damages had the Painting Work not been removed from Leeward's scope of work than it seeks to recover in overhead and profit for this work?

Panel's Decision:

Yes. *Refer to the Panel's Decision in Section VI. (A-7).*

27.   Controversy:

Is Leeward barred from seeking to recover monies allegedly due and owing under the Separate Contracts in the arbitration for either of the following separate reasons:

a) Claims under the Separate Contracts are not arbitrable because AUA did not agree to arbitrate them; **Or**

b) In the event Leeward's payment claims under the Separate Contracts fall within the scope of the arbitration provision (Section 4.6.1 of the General Conditions), because Leeward failed to initiate any claims within 21 days of their accrual in accordance with Section 4.3 of the General Conditions.

Panel's Decision:

Yes.  This Panel finds in favor of AUA in that works that were performed under Separate Contracts are not subject to this Arbitration

28.   Controversy:

Even if Leeward's claims under the Separate Contracts are subject to arbitration, and even if Leeward had initiated claims timely, has Leeward established that AUA only paid Leeward EC $1,359,035.40, in the aggregate, on the Separate Contracts and owes it an additional EC $202,943 on these contracts based upon the proposed contract amounts, particularly considering the evidence presented by AUA that Leeward was to be paid as per actual work (not the proposed amounts), and that Leeward was paid EC $1,452,261.32 for that work?

26

**A379**

Panel's Decision:

No. *See Panel Decisions in Section VI. (A-7 and (B-2).*

29.    Controversy:

Is Leeward entitled to an award for the EC $590,083 that AUA holds as retainage given that Leeward has not provided evidence that it satisfied its obligations under Section 9.10.2 of the General Conditions to provide "an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered have been paid or otherwise satisfied."?

Panel's Decision:

This Panel finds that the only issue regarding the retainage is the submittance by Leeward to AUA of the required documents.  Therefore, this Panel hereby Orders Leeward to comply with Section 9.10.02 of the General Conditions, as applicable to the particular Project within the term provided in the Award on pages 31-32 and, thereafter, AUA must pay the remaining 2.5% of the Contract Sum equal to EC $590,083.00, without interest, if paid within the time allowed.

30.    Controversy:

Should the mutual accounting mistake discovered by AUA on the eve of trial that resulted in Leeward receiving EC $83,059.56 less than was reflected in the Draft Final Account be part of any arbitration award, and potentially subject to the assessment of interest, given that Leeward never notified AUA of the error, or specifically demanded payment, or asserted any claim to recover this amount?

27

**A380**

Panel's Decision:

This Panel determines that the ABST error was mutually acknowledged by both parties, and not having it been submitted as a controversy of this Arbitration and having it been discovered and in good faith informed by an AUA representative during the hearings, we conclude that this issue should be resolved outside of the context of this Arbitration.



31.   Controversy:

Is Leeward entitled to an award of interest for any portion of Leeward's EC $6,701,390.33 demand? If so, when should interest begin to run given Leeward's long delay in commencing arbitration on the three claims it actually initiated during the Project (*i.e.*, Additional Preliminaries, Whitsuntide Holiday and Overhead and Profit on the Painting Work and Doors and Windows Work) and given Leeward's failure to identify the remainder of its claims until filing its Amended Demand for Arbitration dated October 14, 2011?

Panel's Decision:

This Panel finds that Leeward is entitled to the claims recognized in this Award as herein stated.  These claims shall accrue interest at the rate of 7% per annum, since the date of termination of the Project, October 31, 2009, as determined by the Panel; except for those claims that are specifically without interest.

32.   Controversy:

Did Leeward establish that AUA failed to pay one or more monthly payment applications timely, and if so, then what is the date of each such late payments and is Leeward entitled to an award of interest on any alleged late payments?

Panel's Decision:

Yes. *See Panel's Decision in Controversy (A-3) in Section VI.*

28

**A381**

33.   <u>Controversy:</u>

Is Leeward entitled to an award of interest on any allegedly late mobilization payments, or were its claims with respect to this issue settled in January 2009 as set forth in AUA Ex. 67 at AUA 003269?

   <u>Panel's Decision:</u>

The Panel finds that the disputes regarding mobilization were resolved with a payment by AUA in December 22, 2009 and a settlement was reached by the parties in January 13, 2009.

34.   <u>Controversy:</u>

To the extent Leeward is awarded any interest, should the rate of interest equal the statutory judgment rate in Antigua of 5%, given that the Contract Documents refer to the "legal rate" in Antigua?

   <u>Panel's Decision:</u>

The Panel finds that Leeward is entitled to interest on the payments due and unpaid as set forth under Section 13.6.1 of the Contract and General Conditions as of October 3, 2009. However, this Panel finds that the interest shall be calculated at 7% per annum.

35.   <u>Controversy:</u>

Is Leeward entitled to recover any of its legal fees and expenses in prosecuting its claims or in defending AUA's counterclaim for Liquidated Damages?

   <u>Panel's Decision:</u>

Upon careful consideration and considering that both parties were equally at fault (Leeward 50%- AUA 50%) regarding some of the controversies submitted and in the management of the Contract, the Panel finds no compelling reason to grant attorney's fees, arbitration fees, expenses and compensation as provided under the laws of Antigua or otherwise.  Each party shall bear their own attorneys' fees, arbitration expenses and such the like.

29

36.     Controversy:

Is AUA entitled to an award of Liquidated Damages in the amount of US $117,000.00 based upon Leeward's failure to achieve Substantial Completion within the Contract Time, but instead doing so 78 days later?

   Panel's Decision:

After a careful analysis and evaluation of the witness statements as well as the evidence presented to the Panel, we find that both parties shared responsibilities for the project delays and, consequently, Leeward is responsible for 50% of the Liquidated Damages in the amount of EC $ 157,950.00[2], and such amount is hereby granted in favor of AUA.

37.     Controversy:

Is AUA entitled to setoff Liquidated Damages from the retainage it currently holds?

   Panel's Decision:

No.   The Panel finds neither spurious allegations in Leeward's claims, nor intentional wrongdoing to award damages to AUA.   Consequently, AUA is denied its claim to setoff Liquidated Damages.

38.     Controversy:

Is AUA entitled to recover any of its legal fees and expenses in defending the claims asserted by Leeward and in prosecuting its counterclaim for Liquidated Damages?

   Panel's Decision:

Upon careful consideration and considering that both parties were at fault regarding some of the controversies submitted and in the management of the Contract, the Panel finds no compelling reason to grant attorney's fees, arbitration fees, expenses and compensation as

---

[2] As per AUA's counterclaim for Liquidated Damages, the amount was expressed in US dollars and not EC dollars, therefore, considering the current currency conversion, said amount was calculated at $315,900.00 of which 50% is granted to AUA for $157,950.00.

provided under the laws of Antigua or otherwise.  Each party shall bear their own attorneys'
fees, arbitration expenses and such the like.

### AWARD

Accordingly, we ORDER and AWARD as follows:

1. Within thirty (30) days from the date of issuance of this Final Award Respondent
AUA shall pay to Claimant Leeward the following amounts:



| a) Interest on the Payments Due and Unpaid | EC $44,617.37 | This sum shall accrue interest of 7% per annum from the date of issuance of termination of the Project, October 31, 2009. |
|---|---|---|
| b) Damages | EC $232,670.13 | This sum shall accrue interest of 7% per annum from the date of issuance of this Final Award. |
| c) Overhead and Profit for work deleted, omitted or modified | EC $802,399.25 | This sum shall accrue interest of 7% per annum from the date of termination of the Project, October 31, 2009 |
| d) Additional Preliminaries | EC $477,777.04 | This sum shall accrue interest of 7% per annum from the date of termination of the Project, October 31, 2009 |
| e) Change Order Work | EC $190,210.19 | This sum shall accrue interest of 7% per annum from the date of termination of the Project, October 31, 2009 |
| f) Retainage | EC $590,083.00 | This sum shall <u>not accrue any interest</u>. Leeward shall submit to AUA all contractually required documentation as set forth in Section 9.10.2 of the General Conditions. Leeward will have a term of not more than 30 calendar days from the date of issuance of this Final Award to submit said documentation. Once Leeward has submitted all required documentation accordingly, AUA shall release the retainage in a term not to exceed 30 calendar days, upon after which such amount shall start accruing interest at the rate of 7% per annum. If Leeward fails to comply with Section 9.10.2, of the General Conditions in the time hereby stated and granted the claim for such amount will be considered |

31

**A384**

relinquished.   Considering   that   this   case
is sub-judice, the herein referred notice may
be made by counsel for Leeward to counsel
for AUA, or by Leeward to AUA.

2. As per AUA's counterclaim for Liquidated Damages, this Panel grants 50% of

such in the amount of EC $157,950.00, which will accrue interest at the rate of 7% per

annum from the date of this Final Award.

3. The administrative fees and expenses of the International Centre for Dispute

Resolution (ICDR) totaling $17,550.00 shall be borne by the parties as incurred. The

compensation and expenses of the Panel totaling $151,992.75 shall be borne by the parties

as incurred.

4. The terms of this Final Award shall be complied within thirty (30) days from the

date of this Final Award.

This Final Award is in full settlement of all claims and counterclaims submitted to this

Arbitration.

This Final Award may be executed in any number of counterparts, each of which

shall be deemed an original, and all of which shall constitute together one and the same

instrument.

Per the arbitration clause, the location of the arbitration is Antigua; however, the

parties jointly agreed for the Hearings to be held in Isla Verde, Puerto Rico.  We hereby

certify that, for the purposes of Article I of the New York Convention of 1958, on the

Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Isla

Verde, Puerto Rico, on June 22, 2012, amended *nunc pro tunc* on this 8 day of August,

2012.

32

**A385**

8|8|2012
_____
Date

_____
Jorge R. Jiménez, Esq.
Panel Chairman

8|8|2012
_____
Date

_____
Héctor M. Varela, P.E.
Arbitrator

8|8|2012
_____
Date

_____
José R. Capó, Esq.
Arbitrator

State of Puerto Rico
County of San Juan        Affidavit # 301

On this __8__ day of August, 2012 before me personally came and appeared Jorge R. Jiménez, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledge to me that he executed the same.

8|8|2012
_____
Dated

_____
Notary Public

State of Puerto Rico        Affidavit # 302
County of San Juan

On this __8__ day of August, 2012 before me personally came and appeared Héctor M. Varela, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledge to me that he executed the same.

8|8|2012
_____
Dated

_____
Notary Public

State of Puerto Rico        Affidavit # 303
County of San Juan

On this __8__ day of August, 2012 before me personally came and appeared José R. Capó, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledge to me that he executed the same.

8|8|2012
_____
Dated

_____
Notary Public

33

**A386**



9397
07/05/2012
$3.00
$3 Sello Asistencia Legal
51261-2012-0705-53394916

301



9397
07/05/2012
$3.00
$3 Sello Asistencia Legal
51261-2012-0705-53394919

# 302

9397
07/05/2012
$3.00
$3 Sello Asistencia Legal
51261-2012-0705-53394922

#303

**A387**

✧ Positive
As of: December 10, 2014 11:15 AM EST

## Leeward Constr. Co. v. Am. Univ. of Antigua

United States District Court for the Southern District of New York

March 26, 2013, Decided; March 26, 2013, Filed

12 Civ. 6280 (LAK)

**Reporter**
2013 U.S. Dist. LEXIS 43550; 2013 WL 1245549

*LEEWARD* CONSTRUCTION COMPANY, Petitioner, -against- AMERICAN UNIVERSITY OF ANTIGUA - COLLEGE OF MEDICINE, and MANIPAL EDUCATION AMERICAS, LLC f/k/a GCLR, LLC. Respondents.

## Core Terms

arbitrators, overhead, damages, confirm, deleted, separate contract, bad faith doctrine, cross motion, bidding, internal quotation marks, original contract, mobilization, calculation, contends, modify, amended petition, change order, bad faith, parties, competitive, covenant

**Counsel:** [*1] For Petitioner: Veronica A. McMillan, J. Scott Greer, Alana Bartley, LEWIS & GREER, P.C.

For Respondents: Michael B. Goldsmith, Katherine M. Lieb, SILLS CUMMIS & GROSS P.C.

**Judges:** Lewis A. Kaplan, United State District Judge.

**Opinion by:** Lewis A. Kaplan

## Opinion

### MEMORANDUM OPINION

Lewis A. Kaplan, *District Judge.*

Petitioner *Leeward* Construction Company ("*Leeward*") seeks to confirm an international arbitration award against Respondents American University of Antigua ("AUA") and Manipal Education Americas ("Manipal").[1]

In September 2008, *Leeward* and AUA contracted for *Leeward* to construct a medical school for AUA in Antigua.[2] Pursuant to an arbitration clause in the contract, *Leeward* commenced an arbitration proceeding against AUA before the American Arbitration Association in February 2011 regarding disputes that had arisen between them in the course of performance.[3] The arbitrators held hearings in March 2012 in Puerto Rico and issued an award in favor of *Leeward* of approximately $1 million in June 2012, which was modified to correct clerical errors in August [*2] 2012.[4] *Leeward* then petitioned to confirm the award against AUA and also against Manipal, the latter on a theory that Manipal

---

[1]  Leeward and AUA are both Antiguan corporations, while Manipal is a New York limited liability company. *See* Am. Petition ¶¶ 4, 5; Scalafani Reply Decl. ¶ 4, Ex. A.

[2]  Scalafani Decl. Ex. H (hereinafter "Award") at 2.

[3]  *Id.* at 1.

[4]

2013 U.S. Dist. LEXIS 43550, *2

was the *alter ego* of AUA. Manipal was not a signatory to the underlying agreement, nor was it a party to the arbitration proceeding.

Respondents cross move to dismiss the petition or modify or vacate the award on a number of grounds.[5] For the reasons stated, the petition is granted, but only insofar as *Leeward* seeks to confirm the award against AUA. Manipal's cross motion to dismiss is granted, and AUA's cross motion is denied.

*I. Cross Motions to Dismiss*

As stated at oral argument, the Court grants the cross motion to dismiss the petition against Manipal because "an action

for confirmation is not the proper time for a District Court to pierce the corporate veil."[6] This dismissal is without prejudice to *Leeward*'s filing a separate plenary action against Manipal to enforce the judgment against AUA it obtains here under an *alter ego* or other theory.[7]

As stated also at oral argument, the Court denies AUA's cross motion to dismiss the petition on grounds of *forum non conveniens*.[8]

*II. Cross Motion to Vacate or Modify the Award*

AUA additionally contends that the award should be vacated or modified on a number of grounds. In particular, AUA challenges four components of the arbitrators' award: (1)

---

[5] *Id.* at 2; McMillan Decl., Ex. G at 2.

[5] Respondents' motion was directed against *Leeward*'s initial petition to confirm, rather than an amended petition that *Leeward* filed subsequently to add allegations regarding its claim against Manipal. *Compare* DI 2 *with* DI 19. The Court rejects respondents' contention that *Leeward* needed to file a new "request to confirm the Amended Petition" in light of the mooting of the initial petition. DI 22 at 2. The amended petition itself is the request; what is confirmed is not the petition but the award. To the extent that the filing of the amended [*3] petition might have mooted respondents' motion, pursuant to respondents' alternative request, *id.*, the Court construes the motion as applying also to the amended petition.

[6] *Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.*, 312 F.2d 299, 301 (2d Cir. 1963) (internal quotation marks omitted).

[7] *Id.* (noting that holding does not preclude petitioner from being separate action to enforce award against third party).

[8] The Court briefly amplifies the reasons it set forth in open court for denying the motion on this ground. Even as a foreign plaintiff, *Leeward*'s choice of forum is entitled to some deference, particularly to the extent [*4] that it sues here for "legitimate reasons." *Bigio v. Coca-Cola*, 448 F.3d 176, 179 (2d Cir. 2006); *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (*en banc*) (setting forth "sliding scale" of deference). The Court credits *Leeward*'s contention that it chose this forum to expedite enforcement of the judgment against the assets it has reason to believe AUA possesses within the United States. This is a legitimate reason to bring the petition here. *See Sonera Holding B.V. v. Cukurova Holding, A.S.*, 895 F. Supp. 2d 513, 2012 U.S. Dist. LEXIS 128602, 2012 WL 3925853, *8 (S.D.N.Y. Sep. 10, 2012); *Norex Petroleum Ltd. v. Access Industries, Inc.*, 416 F.3d 146, 155 (2d Cir. 2005) (legitimate reasons are those based on questions of "genuine convenience").

VERONICA MCMILLAN

2013 U.S. Dist. LEXIS 43550, *4

overhead and profit for "omitted work," (2) "change order work," (3) damages under the "bad faith doctrine," and (4) interest.

The parties agree that, as an international arbitration occurring in Puerto Rico, the defenses to confirmation set forth both in the New York Convention and in the Federal Arbitration Act apply.[9] In either case, review of the award [*6] is "severely limited."[10] Indeed, when considering the merits of an arbitrators' decision, "the award should be enforced, despite a court's disagreement with it . . . , if there is a *barely colorable justification* for the outcome reached."[11]

For the reasons stated, AUA fails to meet its heavy burden to prevent confirmation of each challenged component of the award.

*A. Overhead and Profit for Omitted Work*

In the arbitration proceeding, the central dispute was whether, in light of various reductions in the scope of the project from what *Leeward* and AUA initially contemplated, *Leeward* was entitled to be paid on the basis of the contract price or on the work actually performed. The arbitrators ruled that the contract between *Leeward* and AUA was a fixed-price contract subject to additions and deletions.[12] Although the contract envisioned that additions and deletions

---

Assuming *arguendo* that Antigua would have been an adequate alternative forum, the Court finds that the public and private interest factors do not support dismissal, let alone outweigh the deference owed to *Leeward*'s choice. As this action is a summary confirmation proceeding requiring no further evidence, there is no practical difficulty in resolving it here. See *Sonera Holding*, 2012 U.S. Dist. LEXIS 128602, 2012 WL 3925853 at *9; *Constellation Energy Commodities Group, Inc. v. Transfield ER Cape Ltd.*, 801 F. Supp.2d 211, 220 (S.D.N.Y. 2011); [*5] *Iragorri*, 274 F.3d at 74 (directing courts to consider practical conveniences regarding "precise issues that are likely to be actually tried"). Moreover, while generally there is a "local interest in having localized controversies decided at home," the Second Circuit has recognized that confirmation of international arbitration awards falling under the New York Convention is a "favored policy" of the United States—a public interest that weighs here heavily in favor of accepting jurisdiction. *Figueiredo Ferraz E Engharia de Projeta Ltda. v. Peru*, 665 F.3d 384, 389-90, 392 (2d Cir. 2011) (internal quotation marks omitted).

9

See *Scandinavian Reinsurance Co. Ltd. v. St. Paul Marine & Fire Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012); *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 21 (2d Cir. 1997); *see generally* 9 U.S.C. §§ 10, 11.

10

*Scandinavian Reinsurance Co.*, 668 F.3d at 71 (internal quotation marks omitted).

11

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) (emphasis in original; internal quotation marks omitted); *see also Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444, 452 (2d Cir. 2011) (describing standard for whether arbitrators engaged in "manifest disregard of law" sufficient to warrant vacatur as "first, whether the governing law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable, and, second, whether the arbitrator knew about the existence of a clearly governing legal principle but decided to ignore it or pay no attention to it"); *Jock v. Sterling Jewelers, Inc.*, 646 F.3d 113, 122 n.1 (2d Cir. 2011) [*7] (vacatur requires more than mere legal error, but a showing "that the panel intentionally defied the law" (internal quotation marks omitted)).

12

Award at 6.

VERONICA MCMILLAN

2013 U.S. Dist. LEXIS 43550, *6

would occur through formal change orders and AUA never issued any such orders, the arbitrators concluded that *Leeward* was entitled to payment for only the work it performed on the ground that *Leeward* and AUA had waived the change order requirement.[13]

This said, the arbitrators generally accepted *Leeward*'s claim that it was owed compensation for its overhead and profit on work it did not perform, [*8] including both (1) "deleted work," which was work that AUA removed from the contract and submitted for general bidding, and (2) "omitted work," which was work that never was done at all due to design changes in the project.[14]

AUA challenges the arbitrators' grant of overhead and profit for omitted work. It contends that AUA did not seek this overhead and profit until its post-hearing submissions and that the arbitrators therefore exceeded their powers and engaged in prejudicial misconduct in making that part of the award.[15]

As AUA itself concedes, *Leeward* sought payment for omitted work in its notice of claim, which sought full payment for such work and not just recovery of its overhead and profit. It was not outside of the arbitrators' power to award only a portion of what *Leeward* sought. Moreover, AUA was able to defend against this particular alternative claim in its rebuttal post-hearing submissions and argued there that the claim should not be considered because it was

untimely. The arbitrators [*9] specifically rejected the latter contention, concluding that they "will not exclude any claim under the sole contention of timeliness," apparently because "both parties breached various provisions of the Contract and are, therefore, barred from enforcing said provisions against each other."[16] AUA does not even attempt to identify error in this conclusion in its submissions. The Court identifies no misbehavior by the arbitrators or other ground for vacatur in the circumstances.

*B. Change Order Work*

AUA next challenges the arbitrators' award regarding change order work, i.e., work that *Leeward* completed but that was not part of the original contract. AUA contends that the arbitrators' decision provided no reasoning as to why it accepted *Leeward*'s contentions regarding this compensation, stating only that "[f]rom the evidence presented at trial, the Panel finds that *Leeward* is entitled [to such compensation]." AUA contends that therefore the arbitrators exceeded their powers as they failed to provide the "reasoned award" required by the parties' contract.

Courts have read a "reasoned award" requirement as mandating that the arbitrators provide "something short of findings [*10] [of fact] and conclusions [of law] but more

---

[13]

   *Id.* at 6-7.

[14]

   *See id.* at 31.

[15]

   *See* 9 U.S.C. § 10 (permitting vacatur where arbitrators "exceeded their powers" or were "guilty of . . . misbehavior by which the rights of any party have been prejudiced").

[16]

   Award at 15-16.

VERONICA MCMILLAN

2013 U.S. Dist. LEXIS 43550, *10

than a simple result."[17] The decision in this case was well over thirty pages long with considerable detail regarding the panel's findings and conclusions as to the various components of the overall award. The parties had ample opportunity to contest *Leeward*'s entitlement to compensation for change order work, and the summary nature of the discussion in the decision shows that the panel simply accepted *Leeward*'s arguments on this particular point. While the award may have been deficient if it summarily had indicated agreement with all of *Leeward*'s contentions, that does not mean that the arbitrators were obliged to show how every single proposition they adopted could be derived from first principles.[18]

### C. Damages Under "Bad Faith Doctrine"

AUA contends also that the arbitrators' award for damages under the "bad faith doctrine" cannot stand. While this presents a closer [*11] question, the challenge fails.

### 1. Background

As discussed above, the original contract contemplated that *Leeward* would do a number of projects that AUA deleted from the scope of engagement and then put out for competitive bidding—namely, (1) flooring work, (2) door and window work, and (3) painting work.[19] It appears that *Leeward* submitted bids and was chosen to do the flooring work and the door and window work, which it completed under contracts separate from the principal contract.[20] Apparently, however, *Leeward* did not do the painting work.[21]

*Leeward* sought in the arbitration both unpaid balances on its separate contracts with AUA and overhead and profit on all deleted work, including the flooring and door and window work that it had completed pursuant to the separate contracts.[22] *Leeward* argued that the fact that it was able to complete work under a separate contract did not eliminate its entitlement to overhead and profit for that same work under the original contract, because among other things, *Leeward* had to [*12] bid competitively for such work "with

---

[17] *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 473 (5th Cir. 2012) (internal quotation marks omitted).

[18] To the extent AUA suggests that other aspects of the award were deficient also for failing to satisfy the "reasoned award" requirement, this same reasoning applies.

[19] Scalafani Decl. Ex. E at 15.

[20] *See* Award at 16, 18 (finding that door and window work and flooring work were given to *Leeward* under separate contracts).

[21] *See id.* at 8, 26.

[22] *See id.* at 13, 16, 25.

VERONICA MCMILLAN

2013 U.S. Dist. LEXIS 43550, *12

no guarantee of being awarded the work."[23] As a consequence, *Leeward* suggested that it might have had to bid "at a significantly lower rate [of overhead and profit] to stay competitive."[24] It contended that "AUA removed these items of work from the Contract in an effort to reduce the cost of the works through competitive bidding and to avoid paying *Leeward* preliminaries for work performed after the substantial completion date."[25]

### 2. Award

To the extent that *Leeward* sought payment of unpaid balances under the separate contracts, the arbitrators ruled that those contracts were not subject to the arbitration clause and that therefore the claims could not be considered.[26] They concluded also that, while as a general matter, *Leeward* was entitled to overhead and profit for omitted and deleted work, they would not award such overhead and profit for deleted work that had been awarded to *Leeward* under separate contracts.[27] The award did not appear to conclude that *Leeward* was not entitled to such compensation, however. Rather, it appeared to exempt this work from its overhead [*13] and profit award "because such work was then given to *Leeward* under a Separate Contract *and, therefore, is not subject to this Arbitration.*"[28] Nevertheless, the arbitrators went on to award damages for this work, concluding that "*Leeward* is entitled to damages in the amount of EC $232,670.13 for work that was deleted from the Contract and then assigned to *Leeward* under Separate Contracts, under the bad faith doctrine."[29]

### 3. Discussion

AUA objects to the arbitrators' reliance on a "bad faith doctrine," noting that no such doctrine was invoked by

---

[23]

McMillan Decl. Ex. E at 26.

[24]

*Id.*

[25]

Scalafani Decl. Ex. E at 15.

[26]

Award at 5.

[27]

*Id.* at 8.

[28]

*Id.* at 25 (emphasis added).

[29]

VERONICA MCMILLAN

**A393**

2013 U.S. Dist. LEXIS 43550, *13

*Leeward* throughout the arbitration proceedings. It contends [*14] also that the award appears to provide tort damages, above and beyond the contract damages to which *Leeward* may have been entitled, that would not have been within the arbitrators' power to grant. In response, *Leeward* urges this Court to construe reference to the "bad faith doctrine" as a determination that AUA breached the implied covenant of good faith and fair dealing.

Under general principles of contract law,[30] the implied covenant of good faith and fair dealing requires "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."[31] Examples of bad faith include "evasion of the spirit of the bargain" and "abuse of a power to specify terms."[32] Importantly, the

implied covenant does *not* provide some form of general damages awardable simply because a court determines that a party acted in bad faith.[33] Rather, it provides a basis for damages if the other party took actions in bad faith that worked to deprive the plaintiff of the benefit of the bargain.

Recognizing that the arbitrators' reasoning regarding the deleted work awarded to *Leeward* under separate contracts is questionable and leaves much to be desired, the Court concludes that there is at least a "barely colorable justification" for the award rendered and that AUA's challenge therefore fails.[34] While *Leeward* had framed its claim as one for overhead and profit and did not use the term bad faith, it essentially argued that AUA's actions with regard to this work breached the implied covenant of good

---

*Id.* at 8. Describing the same award elsewhere in the decision, the arbitrators said, "After careful consideration regarding the works that were deleted from the Contract and then assigned to *Leeward* under Separate Contracts, this Panel finds that *Leeward* is entitled to damages under the bad faith doctrine." *Id.* at 12.

"EC $" refers to Eastern Caribbean dollars and is the denomination of the award. The petition indicates that at the time of the award, 2.700 Eastern Caribbean dollars equaled one United States dollar. Am. Petition ¶ 3 n.1.

[30]

No party has argued that Antiguan contract law deviates from these principles.

[31]

RESTATEMENT (SECOND) OF CONTRACTS, § 205.

[32]

*Id.*

[33]

See *Southeastern Penn. Transp. Auth. v. Bank of New York Mellon Corp.*, No. 12 Civ. 3066, 921 F. Supp. 2d 56, 2013 U.S. Dist. LEXIS 9345, 2013 WL 440628, *13 (S.D.N.Y. Jan. 23, 2013) [*15] ("The implied covenant protects the benefit of the bargain made. It does not create new benefits out of whole cloth.").

[34]

*T.Co Metals, LLC*, 592 F.3d at 339 (emphasis, internal quotation marks omitted).

VERONICA MCMILLAN

2013 U.S. Dist. LEXIS 43550, *14

faith and fair dealing. That is, it argued that it was entitled to the benefit of the margins it had negotiated for such work in the original contract and that AUA had deprived it of this benefit when it deleted the work from the contract and then put the work up for separate bidding.

In awarding damages under what they called the "bad faith doctrine," the arbitrators apparently accepted *Leeward*'s contentions that AUA had evaded the spirit of the bargain. The award of damages can be [*16] construed as restoring to *Leeward* the benefit of the original contract as to this work. To be sure, the arbitrators might have achieved the same outcome by simply accepting *Leeward*'s claim to overhead and profit for this work. They appeared to conclude that they could not do so because the work had been part of separate contracts not subject to arbitration, even though it would seem that *Leeward*'s claim for overhead and profit derived from the original contract, not the separate ones. In any event, the damages award can be construed as amounting to the same thing, and this is a barely colorable justification for this award. The conclusion finds further support in the rough proportionality between the bad faith damages award and what it appears *Leeward* was seeking for overhead and profit as to this work.[35]

While complaining generally about the issuance of "bad faith" damages, AUA's submissions before this Court do not even attempt to engage with the issue with which the arbitrators were clearly concerned: AUA's actions in deleting work from the original contract and then putting that work up for competitive bidding. In the circumstances, AUA has not met its heavy burden to prevent confirmation [*17] of this portion of the award.

### D. Interest Calculation

Finally, AUA challenges the arbitrators' award of EC $44,617.37 for interest. *Leeward* had sought interest at a rate of 10 percent, which it calculated to be EC $63,739.12. The arbitrators concluded that an interest award was appropriate, but only on a 7 percent rate, and awarded *Leeward* 70 percent of what it had sought.[36]

The problem, AUA contends, is that *Leeward*'s interest demand included interest for "mobilization" payments and that, in addressing whether *Leeward* would receive interest on such payments, the arbitrators stated that "the disputes regarding mobilization were resolved" by a separate settlement between the parties.[37] AUA reads the decision as having concluded that no interest was warranted on mobilization payments, but then failing to exclude this interest from *Leeward*'s claim before scaling the award by 70 pecent. It asserts that the Court should modify the award by removing interest relating to mobilization because the calculation is an "evident material miscalculation of figures,"[38] which would reduce the interest awarded to EC $17,152.92.

Assuming [*18] *arguendo* that a miscalculation amounting to approximately $10,000 U.S. dollars on an approximately $1 million award is "material," the Court nevertheless

---

[35]

*See* Award at 7, 16-18.

[36]

*Id.* at 28-29.

[37]

*Id.* at 29.

[38]

9 U.S.C. § 11(a).

VERONICA MCMILLAN

2013 U.S. Dist. LEXIS 43550, *20

rejects AUA's request.[39] First, while the language of the decision strongly suggests that the arbitrators denied interest for mobilization, the decision did not expressly say so.[40] Rather, what is clear is that the arbitrators decided to award EC $44,617.37 in interest, whatever that was meant to represent. Second, courts considering the "evident material miscalculation of figures" ground for modification have limited it to "'mathematical error appearing *on the face of the award*,'"[41] such as when the arbitrators award various damages but then err in computation of the total amount. That is not this case; AUA must make assumptions about the arbitrators' calculation methodology to demonstrate error. While the assumptions AUA makes are quite reasonable, and it seems likely that there was a small error here, this does not mean that the error is evident on the face of the award permitting modification under *9 U.S.C. § 11*.[42]

*III. Conclusion*

For the reasons stated, (1)  [*20] *Leeward*'s amended petition to confirm the arbitration [DI 19] is granted, but only as against AUA; (2) Manipal's cross motion to dismiss as to itself [DI 9] is granted without prejudice to *Leeward*'s filing a separate plenary action against it; and (3) AUA's cross motion to dismiss, modify, or vacate [DI 9] is denied. The Clerk shall close the case.

SO ORDERED.

Dated: March 26, 2013

/s/ Lewis A. Kaplan

Lewis A. Kaplan

United State District Judge

---

39

    *Cf. South East Atlantic Shipping Ltd. v. Garnac Grain Corp., 356 F.2d 189, 192 (2d Cir. 1966)* (concluding that certain [*19] discrepancies due to rounding error were not material, and that "[i]f such calculations were to be subject to judicial review, there would be few arbitration awards which would be immune from the very time and money consuming court reviews which arbitration is designed to avoid").

40

    *See* Award at 29 (finding, in response to question about whether *Leeward* was entitled to mobilization interest or whether this issue was previously settled, that "the disputes regarding mobilization were resolved with a payment by AUA in December 22, 2009 and a settlement was reached by the parties in January 13, 2009").

41

    *Grain v. Trinity Health, Mercy Health Servs., Inc., 551 F.3d 374, 378 (6th Cir. 2008)* (quoting *Apex Plumbing Supply, Inc. v. U.S. Supply Co., 142 F.3d 188, 194 (4th Cir. 1998)*) (emphasis added).

42

    In fact, AUA presented the purported calculation error to the arbitrators in a letter after the initial decision. *See* Scalafani Decl., Ex. G at 2. While the arbitrators made some other clerical corrections after submission of the letter, they did not modify the award's interest calculation. This further augurs against presuming that any error was evident.

VERONICA MCMILLAN

# A396

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/11/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.,

                                    Petitioner,                    **CORRECTED**
                                                                   **AMENDED JUDGMENT**
                    -against-
                                                                   12 CIVIL 6280 (LAK)
AMERICAN UNIVERSITY OF ANTIGUA-
COLLEGE OF MEDICINE and MANIPAL                                    #13,1085
EDUCATION AMERICAS, LLC f/k/a GCLR, LLC,

                                    Respondents,
------------------------------------------------------------------x

Petitioner Leeward Construction Company, Ltd. ("Leeward") having sought to confirm
an international arbitration award against Respondents American University of Antigua (AUA")
and Manipal Education Americas, LLC ("Manipal"), and the matter having been brought before
the Honorable Lewis A. Kaplan, United States District Judge, and the Court, on March 26, 2013,
having issued its Memorandum Opinion granting Leeward's amended petition to confirm the
arbitration, but only as against AUA, granting Manipal's cross motion to dismiss as to itself
without prejudice to Leeward's filing a separate plenary action against it, and denying AUA's
cross motion to dismiss, modify, or vacate, it is

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's
Memorandum Opinion dated March 26, 2013, Leeward's amended petition to confirm the
arbitration is GRANTED, but only as against AUA, and Leeward is awarded a judgment against
the AUA as follows:

a)      the sum of $16,524.95[1] with 7% interest thereon from the 31st day of October 2009 through June 11, 2013, totaling $20,763.14;

b)      the sum of $86,174.12 with 7% interest thereon from the 22nd day of June 2012 thought June 11, 2013, totaling $92,105.77;

c)      the sum of $297,184.91 with 7% interest thereon from the 31st day of October 2009 through June 11, 2013, totaling $373,404.58;

d)      the sum of $176,954.46 with 7% interest thereon from the 31st day of October 2009 through June 11, 2013, totaling $222,338.36;

e)      the sum of $70,448.22 with 7% interest thereon from the 31st day of October 2009 through June 11, 2013, totaling $88,516.23;

f)      and the sum of $218,549.26 with 7% interest thereon from the 12th day of August 2012 through June 11, 2013, totaling $231,425.45; and

g)      the total of the above referenced being $1,028,553.54;

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Opinion, dated March 26, 2013, the AUA is awarded a judgment against Leeward in the sum of $58,500.00 with 7% interest thereon from the 22nd day of June, 2012, totaling $62,526.76 and deducting this amount from Leeward's judgment yields a judgment to Leeward in the amount of $966,026.79 and it is further

**ORDERED, ADJUDGED AND DECREED:** That Leeward is hereby awarded a judgment in the amount of $966,026.79 plus interest at a rate of 7% per annum until the judgment is paid.

---

[1] All dollar amounts in the Judgment have been converted from East Caribbean Dollars, as they were issued in the original arbitration award, at the current conversion rate of $1 U.S. Dollar to $2.700 East Caribbean Dollars.

2

**A398**

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Opinion dated March 26, 2013, Manipal's cross motion to dismiss as to itself is GRANTED without prejudice to Leeward's filing a separate plenary action against it; and it is further

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Opinion dated March 26, 2013, AUA's cross motion to dismiss, modify, or vacate is DENIED; and accordingly, the case is closed.

Dated:    June ___, 2013
            New York, New York

Enter,

_____
_____

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

3

**A399**

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

In the Matter of the Arbitration between

Leeward Construction Corp.,

*Claimant/Counter-Respondent,*

and                                                                    Case No. 50 110 T 00118 13

American University of Antigua College of Medicine,

*Respondent/Counter-Claimant.*

## PARTIAL FINAL AWARD AND SECOND DECISION ON THE PARTIES' DISPOSITIVE MOTIONS AND RELATED CROSS-MOTIONS

WE, THE UNDERSIGNED ARBITRATORS, having been appointed in accordance with the arbitration agreement entered into between the above-named Parties and dated 25 September, 2008 (the "Arbitration Agreement"), and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, issue this Partial Final Award and Second Decision on the Parties' Dispositive Motions and Related Cross-Motions where we FIND and AWARD, as follows:

1.        These proceedings are brought under the Construction Industry Arbitration Rules (including the Procedures for Large, Complex Construction Disputes) of the American Arbitration Association in effect as from 1 October, 2009, and are administered

1

**A400**

through the International Centre for Dispute Resolution of the American Arbitration Association.

2.  Leeward Construction Corp. ("Leeward") and American University of Antigua College of Medicine ("AUA") submitted motions for dispositive relief, which were addressed in the Tribunal's February 6, 2014 Decision on the Parties' Dispositive Motions and Related Cross-Motions (the "First Decision"), which is attached hereto as Annex I. Both Parties then requested to be given a chance to elaborate further on their arguments in support of their respective motions, and to answer any questions that the Tribunal may have regarding the substance of their motions. In making this request the Parties averred that there are no material facts in dispute regarding the matter of the motions, and that the Tribunal should make final determinations on their motions.[1] The Tribunal granted this request and it was agreed by the Tribunal and the Parties that oral argument would be held on the dispositive and related cross-motions.

3.  Oral argument was held on April 28, 2014. For the convenience of the Parties and the Tribunal, it was agreed that the oral argument would be held in the offices of the American Arbitration Association in Miami, Florida, while the seat of arbitration would remain to be Saint John, Antigua, Antigua and Barbuda, as per the Parties' arbitration agreement. Having heard oral argument by the Parties, having reviewed and considered the Parties' written submissions, and having reviewed the Parties'

---

[1] In the First Decision (¶17), the Tribunal found that not all claims and defenses had been subjected to dispositive motions. Under the further submissions made by the Parties, dispositive motions and cross-motions were made for and against all claims and defenses by both parties.

2

**A401**

resubmitted motions, the Tribunal issues this Partial Final Award and Second Decision on the Parties' Dispositive Motions and Related Cross-Motions (the "Second Decision"). This Second Decision hereby incorporates the First Decision, and makes further final decisions on these motions as set forth herein. Except to the extent defined otherwise herein, all capitalized terms shall have the meaning ascribed to them in the First Decision.

4.    As discussed in the First Decision, each of the Parties has submitted one or more claims, and also defenses to the other Party's claims. In short, Claimant Leeward has submitted an Antigua and Barbuda Sales Tax (ABST) Claim, and Respondent AUA has submitted an ABST Counterclaim and a Construction Counterclaim.[2]    In the Parties' motions and related submissions –as supplemented, in each case, after the First Decision– each party seeks the dismissal of the other party's claims and defenses.

5.    This Second Decision is issued by a majority, and includes a partial dissenting opinion of this same date, issued by Arbitrator Carlos Romero Jr.

## I.  The Claims, Counterclaims and Defenses

### a.  General Defenses: The Arguments of Res Judicata and Estoppel

---

[2]  Under ¶37(i) of the First Decision, the Tribunal found that "Both Parties agree in their submissions that the Windows Counterclaim is to be excluded from the arbitration before this Tribunal. Accordingly, the Windows Counterclaim is dismissed without prejudice." As a result, only the Construction Counterclaim remaining after deduction of the Window Counterclaim –as defined in the First Decision– is still pending before this Tribunal, and this Second Decision only refers to such reduced scope of the Construction Counterclaim.

3

6.  In general terms, and in addition to certain other defenses, Claimant Leeward has argued that all of Respondent AUA's Counterclaims were precluded under either or both res judicata or estoppel, by reason of the scope or decisions of the Prior Proceedings.

7.  The Tribunal finds the arguments regarding res judicata or estoppel unconvincing. In particular, the arguments proposed by Leeward fail to satisfy any tenable test for precluding the claims submitted by Respondent AUA based on either or both res judicata or estoppel.

8.  Claimant Leeward's proposed test that any claim arising under the same transaction as the claims debated in the Prior Proceedings should be precluded is not persuasive.[3] The Tribunal has found the additional arguments that the AUA's ABST arguments should have been submitted before –at the time of the Prior Proceedings or even before that– and that Leeward's defense of res judicata should prevail even in light of its own ABST claim, are similarly not persuasive.

9.  Accordingly, all defenses against Respondent AUA's Counterclaims based on either res judicata or estoppel are rejected.

**b. The ABST Claim and ABST Counterclaim**

---

[3] The preclusive effect of a prior arbitration decision on a subsequent arbitration is a matter for the arbitrator to decide. This has been ratified by recent, persuasive decisions, in several jurisdictions. *See, e.g.,* in the United States, *Employers Insurance Company of Wausau et al. v. OneBeacon American Insurance Company et al.* (1st Cir., February 26, 2014).

4

**A403**

10.    During the course of the project, Leeward invoiced for –and AUA paid– an amount equal to 13% of the sums otherwise invoiced, which was identified in those invoices – and generally throughout these proceedings– as ABST-related payments calculated in connection with work, labor, materials and services provided by Leeward on the project. The Parties agree that AUA in fact made such payments with respect to 26 of the 27 requisitions for payment made under the Contract. Leeward does not dispute that it never filed any ABST tax returns with, nor paid any corresponding ABST tax to, the tax authorities of Antigua and Barbuda during or after the construction project.

11.    As a threshold issue, Leeward argues that the Parties' arbitration agreement does not encompass AUA's ABST Counterclaim. That argument is rejected.

12.    The Parties' arbitration agreement covers "[a]ny Claim arising out of or related to the Contract . . . ." That provision is sufficiently broad to apply to the ABST Claim and the ABST Counterclaim, and Claimant Leeward itself is seeking an award of damages based on a claim that –as per the Contract or under a separate promise–[4] certain funds mis-tabulated in the payments received should have been paid as ABST.

13.    In the First Decision, the Tribunal determined that the ABST Counterclaim falls within the scope of the Parties' arbitration agreement. That determination remains unchanged.

---

[4] Claimant Leeward has sought to identify its claim as not being an ABST claim but a different claim based on a contract shortfall or a separate promise received during the First Proceedings, and which would not be affected by res judicata. The Tribunal is not persuaded by these arguments.

5

**A404**

14. Leeward maintains that the only mechanism by which AUA can obtain a refund of ABST is to seek relief from the Antiguan Government pursuant to the ABST Act. AUA contends that no ABST was in fact due because of the location of the construction project in a Trade Free Zone. The Tribunal need not determine whether AUA's assertion is accurate.

15. Claimant Leeward makes an additional argument that Respondent AUA should have asserted with the first of Leeward's invoices that it did not need to pay ABST. Leeward argues that AUA's failure to do so was a waiver that bars it from recovery now. Regardless of whether AUA mistakenly paid the ABST to Leeward, as it originally contended in this arbitration, or whether it had an oral agreement with Leeward to collect the ABST pending a determination by the government, as it asserted at oral argument, Leeward has not established sufficient facts to prove waiver. In light of this Tribunal's findings discussed below, the argument of waiver, even if proven, would not change the determination of the ABST Claims.

16. Under these circumstances, where the Antiguan government is not holding any ABST monies from Leeward, there are no ABST monies in the possession of the government from which AUA can seek a refund. Leeward's collection of ABST –or sums due to be paid as ABST– from AUA places Leeward in the position of the holder, but not the owner, of funds which it labeled as ABST. The record does not contain credible indication of any title or ownership in favor of Leeward entitling it to keep or retain these monies.

6

17.     Inasmuch as Leeward failed to pay over to the government the sums that it invoiced and collected from AUA as ABST related to the project, Leeward would be unjustly enriched if it were permitted to retain those monies.[5] Contrary to Leeward's position, equitable claims such as unjust enrichment are within the scope of the Parties' arbitration agreement, and Rule R-45 of the AAA's Construction Industry Arbitration Rules grants the authority to the Tribunal to make this ruling.

18.     Claimant Leeward's defenses regarding unjust enrichment as a basis for the ABST Counterclaim were two-tiered. It maintained that

    (i)     if AUA's claim for unjust enrichment were considered to be a contractual claim, it would be precluded under the doctrine of res judicata by reason of the decision issued in the Prior Proceedings;

    (ii)     in the alternative, if that claim were considered not to be contractual, it would fall beyond the scope of the arbitration clause in the Contract, and thus would be unarbitrable.

19.     The Tribunal has already found that Claimant Leeward's res judicata and non-arbitrability defenses were rejected, which, in this context, means that Claimant Leeward has not submitted any valid defense to the claim for unjust enrichment included as one of the avenues argued by Respondent AUA for maintaining the entirety of the ABST Counterclaim.

---

[5] Respondent AUA has formulated its counterclaim such that it includes a claim for unjust enrichment (AUA's Statement of Defense and Counterclaim, §I.E), and the Parties' subsequent oral and written submissions have addressed this unjust enrichment claim (See, eg, Leeward's Motion, ¶6, and AUA's Motion, pp. 2, 3, 5 and 36).

7

**A406**

20.     Respondent AUA has submitted alternative avenues supporting its claim for the same amounts claimed under unjust enrichment, both under contract and under law. Claimant Leeward has submitted certain other defenses to those alternative avenues. As the Tribunal has found that there was no valid defense to AUA's claims under unjust enrichment, and all alternative avenues would lead to the same result, the Tribunal considers it unnecessary to dwell in detail in each such construction.

21.     Accordingly, AUA is entitled to the return from Claimant Leeward of the funds it collected from AUA as ABST in the amount of XCD $3,614,522.41, and the Tribunal hereby orders Leeward to pay AUA the sum of XCD $3,614,522.41.

22.     The Tribunal further finds and orders, though, that to the extent that Leeward is later required by the Antigua and Barbuda tax authorities to account for, and pay to, the Antigua and Barbuda authorities ABST on this construction project, AUA shall then be required to indemnify Leeward from any double liability by it –*i.e.*, liability to both AUA and the tax authorities– arising from Tax Deficiencies (as defined below) as follows: [6]

   a.     For purposes hereof, "Tax Deficiencies" shall mean any tax deficiency or liability asserted by the Antigua and Barbuda tax authorities against Leeward for failing to collect from AUA, for reimbursing to AUA, or for failing to pay to the tax authorities, ABST relating to the taxable supplies provided by Leeward to AUA

---

[6] Based on the submissions by the Parties, the Tribunal finds this to be a necessary corollary of the principles embodied in §45 of the ABST Act, and also to be an order permitted to be adopted under the scope of Rule R-45 of the Rules governing this arbitration.

8

during the construction of the school project. AUA shall not be liable for penalties or interest asserted for non-collection from AUA or reimbursement to AUA or nonpayment to the tax authority of the ABST tax in question, or for not filing any required tax returns with any relevant tax authority.

b. If a Tax Deficiency is validly asserted against Leeward, then AUA shall indemnify Leeward by paying to the relevant Antigua and Barbuda tax authority, upon due notice, an amount not to exceed the Indemnity Cap (as defined below). All obligations of indemnification by AUA hereunder shall be limited to making any payments described hereunder. In the event that no payment is due hereunder, then no indemnification obligation by AUA to Leeward shall be deemed to exist.

c. For purposes hereof, "Indemnity Cap" shall mean any sums that Leeward has paid AUA under the ABST Counterclaim hereunder in cash or through any valid set-off or reciprocal claims agreed by the parties or finally ordered by a competent authority.

**c. Construction Counterclaim**

23. Claimant Leeward argues that the Construction Counterclaim is untimely because of Respondent AUA's failure to give the required notices of defects. Leeward's argument was rejected in the Tribunal's First Decision, and that decision to deny Leeward's motions as to untimeliness of the Construction Counterclaim remains unchanged.

24. Claimant Leeward also contends that AUA's claims are barred by res judicata by reason of the decision issued in the Prior Proceedings. The Tribunal has rejected the

9

**A408**

defenses based on res judicata, and, as a consequence, these proceedings shall continue with respect to the Construction Counterclaim.

**II. Decision**

25.    For the reasons discussed above, this Tribunal finds that all of the claims currently before it[7] are arbitrable under the Contract and, having considered all arguments and evidence before it, ORDERS as follows:

    (i)    That Claimant Leeward's ABST Claim is hereby dismissed with prejudice;

    (ii)    That Claimant Leeward's motion to dismiss Respondent AUA's Counterclaims is hereby dismissed with prejudice, with the exception that the Windows Counterclaim was dismissed without prejudice under the First Decision;

    (iii)    That Respondent AUA's cross-motion for a summary judgment on its ABST Counterclaim is hereby granted, and Claimant Leeward is ordered to pay Respondent AUA the amount of XCD $3,614,522.41;

    (iv)    That in the event that Leeward is later required by the Antigua and Barbuda tax authorities to account for, and pay to, the Antigua and Barbuda authorities ABST on this construction project, AUA shall then be required to indemnify Leeward from any double liability –

---

[7] This excludes the Windows Counterclaim as per the First Decision, §37(i).

10

**A409**

*i.e.*, liability to both AUA and the tax authorities– arising from Tax Deficiencies as follows:

    a.  If a Tax Deficiency is validly asserted against Leeward, then AUA shall indemnify Leeward by paying to the relevant tax authority, upon due notice, an amount not to exceed the Indemnity Cap. All obligations of indemnification by AUA hereunder shall be limited to making any payments described hereunder. In the event that no payment is due hereunder, then no indemnification obligation by AUA to Leeward shall be deemed to exist.

(v)    That Respondent AUA's Construction Counterclaim is to be arbitrated by this Tribunal. The Tribunal will hold a telephone conference with the Parties at the earliest convenient date in order to schedule the following steps of these proceedings;

(vi)    That each Party shall bear its own costs and expenses, and one half of the arbitration costs and expenses, in both cases with respect to all procedural activity up to this stage of the proceedings;

(vii)    That all other requests included in the Motions are hereby denied.

The undersigned arbitrators hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made as in St. John, Antigua, Antigua and Barbuda.

11

**A410**

Signed on 18 September, 2014

_____          _____
Judith B. Ittig                    Diego Brian Gosis
                                   (Chair)

12

State of ___Florida___          )

                                )     SS:

County of ___Miami-Dade___      )

I, Diego Brian Gosis do hereby affirm upon my oath as Arbitrator that I am the individual

described in and who executed this instrument, which is our Partial Final Award.

___9/18/2014___                         _____

Date                                    Diego Brian Gosis, Arbitrator

State of ___Florida___          )

                                )     ss:

County of ___Miami-Dade___      )

On this __18__ day of September, 2014, before me personally came and appeared Diego Brian

Gosis, to me known and known to me to be the individual described in and who executed the

foregoing instrument and he acknowledged to me that he executed the same.

13

**A412**

Notary Public

State of _____          )

                           )    SS:

County of_____            )

I, Judith Ittig do hereby affirm upon my oath as Arbitrator that I am the individual described in and

who executed this instrument, which is our Partial Final Award.

_____          _____

Date                              Judith B. Ittig, Arbitrator

State of _____          )

                           )    ss:

County of _____           )

On this ____ day of September, 2014, before me personally came and appeared Judith B. Ittig, to

me known and known to me to be the individual described in and who executed the foregoing

instrument and she acknowledged to me that he executed the same.

14

_____

Notary Public

A414

Signed on 18 September, 2014

Judith B. Ittig
Judith B. Ittig

_____
Diego Brian Gosis
(Chair)

12

_____

Notary Public


State of _____          )

                          )   SS:

County of_____            )



I, Judith Ittig do hereby affirm upon my oath as Arbitrator that I am the individual described in and
who executed this instrument, which is our Partial Final Award.

9-23-14                        _Judith B. Ittig_____

Date                           Judith B. Ittig, Arbitrator


State of _____           )

                          )  ss:

County of _____           )


On this 23 day of September, 2014, before me personally came and appeared Judith B. Ittig, to
me known and known to me to be the individual described in and who executed the foregoing
instrument and she acknowledged to me that he executed the same.


14


**A416**

District of Columbia: SS

Subscribed and Sworn to before me

this 23 day of Sept . 2014

_Lydia Sis_
Notary Public, D.C.

My commission expires 11-30-2017

Notary Public

15

A417

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**International Arbitration Tribunal**

---

In the Matter of the Arbitration between


Leeward Construction Company Ltd., Claimant


And                                    Case No. 50 2013 110 T 00118 13



American University of Antigua College of Medicine, Respondent

---

**DISSENT TO**
**PARTIAL FINAL AWARD AND SECOND DECISION ON THE PARTIES'**
**DISPOSITIVE MOTIONS AND RELATED CROSS-MOTIONS**

---

The majority of the Tribunal issued a Partial Final Award.  I dissent with respect to specific subject matters and concur on others.  (The same defined terms used in the Partial Final Award will be adopted unless expressly noted otherwise.)

1

A summary of the undisputed facts (as submitted by the parties in their respective dispositive and related motions filed February 6, 2014, and at oral arguments held on April 28, 2014) will provide a relevant backdrop to this dissent.

**Undisputed Material Facts.-**

1.      Leeward Construction Company Ltd. ("Leeward") and American University of Antigua College of Medicine ("AUA") disagree on whether Leeward is entitled to retain the Antigua and Barbuda sales tax ("ABST") in the amount of XCD $3,614,522.41 that Leeward collected from AUA during the construction project. This tax is imposed by the Antigua and Barbuda Sales Tax Act, 2006 (as amended) ("ABST Act") and enforced by the Commissioner of Inland Revenue (the tax authority).

2.      During the construction project, Leeward billed AUA, among materials and labor, ABST taxes. AUA paid all billed ABST taxes without protest (excepting a small amount of less than US $40,000, which is not relevant for purposes of this dissent).

3.      Leeward had an obligation to file with the tax authority, on a monthly basis, a tax return and to pay the ABST taxes collected (net of any credit that Leeward might have been entitled to claim, if any). Leeward never filed a return. Leeward never reported or paid the collected ABST

2

**A419**

taxes to the tax authority. Leeward improperly kept the ABST taxes collected from AUA.

4.    AUA conceded at oral arguments that it never filed formally with the tax authority a claim for refund.

5.    After the project was completed and the taxes paid, the tax authority informally advised AUA that any filing of a refund claim would be denied by the tax authority, because Leeward never paid to the tax authority the ABST taxes collected from AUA. AUA does not identify a single provision in the ABST Act supporting the denial of a refund claim based on nonpayment by collecting taxpayer (Leeward) that collected the tax from the paying taxpayer (AUA).

6.    At pages 24-25 of the AUA's Memorandum of Law (undated but filed on or about November 2013), AUA conceded and admitted that it voluntarily paid the ABST tax, because there was uncertainty on whether the ABST tax applied to the project and whether the project was exempt from this tax altogether. The tax authority did not resolve this controversy; until after the project was completed, and after the taxes had been paid by AUA to Leeward. AUA "determined that it would pay...the ABST that would otherwise be due on the Leeward's Work and seek a refund from the Government". *Id.* at 25. It did so voluntarily and with full knowledge.

3

*At all relevant times, AUA believed that it had no choice but to pay the ABST that the Leeward had invoiced and, thereafter, obtain a refund of those sums from the Government until such time as the Government acceded to AUA's long standing and repeated requests for written certification that ABST need not be paid to suppliers on its Project at all.*

*AUA had asked the Government for confirmation that no ABST should be paid ab initio in connection with its Project; but did not receive that confirmation until after it had paid all of the sums to the Leeward as ABST that are in dispute herein.*

*...which confusion [refering to whether ABST did apply to the project] the Government did not clear up despite AUA's efforts, until after the Leeward completed the Work on the Project.*

*...because of the confusion AUA determined that it would pay what it believed to be the ABST that otherwise would be due on the Leeward's Work and seek a refund from the Government.*

*AUA did not know until after the Leeward commenced this arbitration, that in paying th sums that the Leeward invoiced to AUA as ABST, it would not be entitled to a refund from the Government because...the Leeward...failed to account to the Government for those sums by filing tax returns...*

*...AUA paid the ABST that the Leeward invoiced with the understanding and expectation that it the Leeward would treat the sums as ABST and both account to the Government for what it had invoiced and collected through the filing of required monthly tax returns and pay over those sums...to the Government so that AUA could obtain a refund of those sums from Government.* Id. at 24-25.

7.    Although AUA claims that sometime after completion of the project, the tax authority agreed <u>informally</u> that AUA was exempt from the ABST tax, AUA never produced in evidence a single <u>official</u> determination or <u>official</u> certificate issued by the tax authority evidencing agreement with AUA's claimed or asserted exempt status.  And AUA presented no evidence

4

showing whether the informal confirmation by the tax authority concerning the "exempt" status of AUA or its project indicated a retroactive or prospective view of the tax authority. Thus, at oral arguments, there was no official evidence from the tax authority as to whether AUA was ever exempt during the construction of the project. In any event, during the construction of the project through its completion, AUA believed that it owed the ABST (in light of the unwillingness of the tax authority to resolve the exemption status of AUA), and it willingly and knowingly paid with a view of seeking in the future a refund from the tax authority[1].

8.    During the course of the project and when ABST taxes were paid to Leeward, there was no issue of any overpayment by AUA, and there was no issue of any erroneous payment by AUA of the ABST taxes paid to Leeward. After all, AUA willingly and knowingly paid all ABST taxes billed by Leeward.

---

[1] See Affidavit of Neal Simon, President of AUA, dated November 11, 2013. The suppliers to the project were unwilling to extend exempt or zero tax rate to the supplies and forego collection of the ABST tax absent "an official statement from the Government expressly providing that it [the supplier] would not be held responsible for ABST on supplies that AUA requested..." Par. 40. AUA requested from the Prime Minister, the Attorney General, Minister of Finance, and the Ambassador of the United States for assurances that AUA was exempt from such tax. "Unfortunately, these officials provided much by way of oral assurances...and that official written clarification to this effect would soon be forthcoming, but official clarification was not forthcoming for some time to come." Par. 44-45. "AUA received assurances from these officials that, if AUA would so proceed to pay its suppliers any ABST that would otherwise be due..., AUA would receive a refund form the Government of the ABST that it paid." Par. 47. "Having received these assurances, AUA proceeded to advise its suppliers that it would pay ABST on supplies that they provided..." Par. 48. "Despite its efforts, and all of the Government oral assurances that AUA would receive the declaration that it required, nothing official was forthcoming from the Government for more than two years, during which time, construction...was virtually completed." Par. 56. The affidavit fails to identify any official declaration or certificate issued by the tax authority confirming expressly that no ABST tax was due whether by virtue of the project being exempt or the zero tax rate being applicable to the suppliers. There is simply nothing in the record that such declaration or certificate was ever issued.

9.    There is no evidence (or claim by AUA) that AUA ever exhausted the administrative remedies provided to a taxpayer under the ABST Act or ever sought a judicial determination in Antigua and Barbuda.

10.    There is no evidence that AUA has standing to sue the collecting taxpayer (Leeward) under the ABST Act.

11.    Leeward never claimed ownership to the ABST taxes collected from AUA.    Leeward has admitted at oral arguments that it had an obligation to file returns and remit the collected taxes (net of any credits to which Leeward might be entitled) to the tax authority. [2]    Leeward also admitted not having done so.

12.    Leeward's position is that AUA's sole remedy is to seek from and file a claim for refund with the tax authority.

---

[2]   The position of Leeward is consistent with the ABST Act.  Under Part III, sections 9-12 of the ABST Act, a person must register under the act under specific circumstances (and collecting the ABST tax is one of them).  "A person who fails to apply for registration when required to do so [as was the case with Leeward] when required is treated as registered from (a) the first day of the tax period which the person was required to apply for registration..." Thus, Leeward is treated as being registered, even if it did not register with the government.  Under Part X of the ABST Act, ABST returns must be filed generally on a monthly basis.  Under section 41(1) of the ABST Act, "[t]he ABST payable by a taxable person [like Leeward] to the Commissioner...**is due and payable** by the due date for lodgement of the ABST return for the period." (Emphasis supplied.)  And section 41(2) provides that "[t]he liability to pay an amount of ABST arises by operation of this section and does not depend on the Commissioner making an assessment of the ABST due."  And under section 105 of the ABST Act, if a company fails to pay ABST taxes, the company and its directors are jointly and severally liable to the government.

   Thus, on the due date of each monthly return that Leeward failed to file, the ABST taxes collected by Leeward became an ABST tax due and owning, by operation of law, to the government.  Likewise, Leeward, did not, and could not, owe the same amount to AUA under unjust enrichment that Leeward by operation of law owed to and become liable to the government for the ABST taxes collected as the monthly tax returns became due.  To allow AUA recovery of the same ABST taxes under the unasserted theory of unjust enrichment (that the Tribunal charges Leeward to justify its Final Partial Award) as Leeward owed the government by operation of law would constitute an unjust enrichment by AUA at the expense of imposing on Leeward a double liability by virtue of the Partial Final Award.  The recovery that the Tribunal grants AUA disregards the operation of the revenue laws of the country.  (More on the subject matter of revenue laws is set forth below.)

13.   AUA has never obtained (before or after the completion of the project) from the tax authority a formal ruling on whether AUA was exempt from the ABST tax during the construction of the school facility.

14.   The construction project was completed on October 31, 2009.

15.   By around November 2009, all ABST taxes billed by Leeward were paid by AUA.

### The decision of the Tribunal.

16.   The Tribunal concludes that where the tax authority "is not holding any ABST monies from Leeward, there are no ABST monies in the possession of the government from which AUA can seek a refund". Second, Leeward's collection of the ABST tax places it "as the holder, but not owner, of" the taxes. Leeward presented no evidence of ownership to the funds. Third, Leeward would be unjustly enriched if allowed to retain the funds. Fourth, Leeward presented no valid defense to the unjust enrichment claim of AUA.

17.   I dissent.

7

**A424**

**AUA did not present in its dispositive motion the cause of action
founded on unjust enrichment. Thus, the Tribunal had no
authority to decide an issue not submitted in the dispositive
motion. Also, if the Tribunal decides to address an issue that has
not been presented by the parties, the Tribunal must provide
constitutionally adequate advance notice to the parties with an
opportunity to object and respond.**

18.    AUA filed on February 27, 2013, its defenses and counterclaims.
Nowhere is unjust enrichment asserted as a defense. At best, AUA claims
(at page 2) that "...the Leeward wrongfully charged, and AUA mistakenly
paid" ABST taxes. AUA focused on mutual mistake and fraud.

19.    AUA filed on June 23, 2013, its counterclaims. Among them,
AUA simply noted that "Leeward is liable to AUA for the monies it received
from AUA for ABST under a cause for unjust enrichment".

20.    Then AUA also filed (in late June 2013) its amended defenses
and counterclaims asserting the following claim (item I.E.):

> An alternative claim sounding in unjust enrichment in that Leeward
> has received from AUA sums in the above stated amount as and for
> reimbursement for ABST that Leeward did not pay, and has not paid,
> directly or indirectly to the government of Antigua and Barbuda. This
> claim is based on the common law of Antigua and Barbuda.

21.    Then, AUA filed yet again on August 13, 2013, another amended
counterclaims and defenses. In its amended filing, AUA makes no mention
of unjust enrichment.    It only mentions instead that "...the Leeward

8

**A425**

wrongfully charged, and AUA mistakenly paid" ABST taxes. AUA focused on mutual mistake and fraud.

22. At this juncture, AUA's last filed amended defenses and counterclaims supersedes its prior filings and, thus, drops the unjust enrichment claim.

23. Subsequently, AUA filed its Memorandum of Law (undated but filed around November 2013). AUA raises the following six defenses and counterclaims:

- Point I (that ABS tax is arbitrable),

- Point II (that AUA has standing against Leeward to recover ABST),

- Point III (that AUA has rights under the ABST Act and the contract entitling AUA to recovery),

- Point IV (that the waiver defense of Leeward should be dismissed),

- Point V (that AUA is entitled to restitution and is not barred by res judicata), and

- Point VI (that Leeward's defenses should be stricken).

24. Nowhere does AUA raise in its Memorandum of Law the claim of unjust enrichment. (Thus, even if one were to argue that the amended counterclaim and defenses filed on August 13, 2013, did not override the prior filings, unjust enrichment claim was not raised in the dispositive motion. For the purposes of this dissent, the same grounds set forth below for dissenting apply here with equal force.)

9

**A426**

25.    At best, the Memorandum of Law, at page 5, mentions in passing "unjust enrichment" in the following context and section.  In the Memorandum of Law, at Point I titled "AUA's Claims For Recovery of the Sums That It Paid to the Leeward As ABST Are Subject to Arbitration" addresses whether ABST tax is arbitrable.  In justifying why ABST tax is arbitrable, AUA makes the passing comment as follows:

> ...AUA's counterclaim seeks restitution of the sums that the Leeward improperly over invoiced and that AUA paid to the Leeward in the mistaken belief that it was required to do so...These claims, including AUA's unjust enrichment claim, indisputably 'arise under the Contract'.

26.    The reference to "unjust enrichment" is limited to the arguments favoring AUA's position that ABST tax is arbitrable in this proceeding.  It was not presented for any other count in the brief.  And all other five counts of the brief do not assert nor involve the claim of unjust enrichment.  Thus, the unjust enrichment claim was not submitted it to the Tribunal for resolution.  (Indeed, AUA never explains what the elements of the count of unjust enrichment, the common law of Antigua and Barbuda for this claim, or the legal basis for asserting the claim.)  Thus, AUA never requested the Tribunal to decide whether AUA is entitled to recover under the doctrine of unjust enrichment.

27.    Yet, in the Partial Final Award, the Tribunal concludes not only that AUA submitted "the same amount claimed under unjust enrichment,

**A427**

both under contract and under law," but that Leeward presented no valid defense to this claim. The Tribunal does not analyze the cause of action of unjust enrichment, does not identify the source of law that gives rise to such claim, and does not even conclude that AUA has established its entitlement to unjust enrichment. (Indeed, AUA never identifies the common law basis or the elements of the cause of action of unjust enrichment under the laws of Antigua and Barbuda. Whatever that law or elements might be still remain unknown. Yet, the Tribunal disregards this void in finding in favor of AUA and never identifies the common law case or cases of Antigua and Barbuda on which its finding is grounded.) Instead, the Tribunal concludes that because Leeward failed to present any "valid defense", then "[a]ccordingly, AUA is entitled to the return from Claimant Leeward of the funds it collected from AUA as ABST..."

28. Such analytical approach violates the due process of Leeward. Leeward had no notice that the Tribunal would be deciding an issue never presented to it by AUA. The Tribunal decided the issue of entitlement in favor of AUA by reason of Leeward failing to present a valid defense to a claim not presented to the Tribunal.

29. How can Leeward present any defense in the dispositive motions and replies, if the issue was never submitted by AUA for resolution? Yet, the Tribunal found in favor of AUA, even though Leeward had no obligation

**A428**

to present any defense to an <u>unpresented and unasserted</u> claim. Thus, the Tribunal finds in favor of AUA for an unpresented claim by reason of an unpresented defense. How can Leeward be afforded a fair proceeding, if the Tribunal enters an award against Leeward for failing to present a valid defense on a claim that is not before the Tribunal?

30.    How can Leeward raise a valid defense, if the Tribunal and AUA fail to identify the case or legal source giving rise to common law unjust enrichment – if it exists at all under the laws of that country?  The legal source of this claim remains a mystery.

31.    The failure to provide adequate notice to Leeward and then to find against Leeward for failing to present a defense to a claim that is not before the Tribunal violates not only procedural but substantive due process of the United States Constitution.

32.    Leeward is entitled constitutionally to notice by this Tribunal that it was going to decide an issue that was not presented in the dispositive motions and afforded an opportunity to present its objections and defenses.

12

**A429**

**The doctrine of revenue rule requires that the Tribunal refuse jurisdiction on issues that pass judgment on the application of tax laws of foreign countries.**

33.     The common law requires that our courts apply the revenue rule and refuse (and thereby avoid violating the principle of foreign comity) to entertain issues that interpret or enforce the tax laws of a foreign nation. The dispute between AUA and Leeward concerns, at its very core, a tax collection dispute, because the tax authority will not refund AUA the ABST taxes that Leeward collected.

34.     The tax authority has refused informally to refund the ABST taxes that AUA has paid Leeward.   The tax authority has the right to enforce its laws and collection process against Leeward, if the tax authority chooses to do so.   The tax authority has the right to cross its arms concerning any informal request for refund and do nothing until a formal claim for refund is filed.   Under the ABST Act, if a taxpayer does not file a claim for refund, no refund will be ever approved.

35.     In turn, under the statutory scheme of the ABST Act, Leeward has no obligation to refund AUA the collected ABST taxes.

36.     AUA, however, instead of filing a formal claim for refund with the tax authority (and, if denied, pursue its claim in the courts of Antigua

13

**A430**

and Barbuda), AUA has chosen to short circuit all tax administrative and judicially related remedies there to sue in arbitration.

37.    The Federal Arbitration Act applies to this proceeding between parties engaged in interstate and foreign commerce.

38.    If the tax authority wants to deny AUA a refund (for which a claim has not been filed) and does not wish to collect from Leeward the ABST taxes collected from AUA, this Tribunal should not interfere with the administration of taxes by the tax authority.

39.    For example, if AUA has waited too late to file a tax refund, it is no longer entitled to a refund by application of the three year statute of limitation under Article 44(5) of the ABST Act.  (A tax refund claim must be filed "within 3 years from the end of the tax period to which the overpayment relates".)  The last tax period in which taxes were paid was in November 2009.  It has been more than three years.[3]

40.    By statute, the refund must be applied for within three years. The last tax period of payment was in 2009.  More than three years have lapsed and would appear that AUA cannot apply for a refund since December 2012.

---

[3] According to the documents filed, the first arbitration proceeding was initiated in February 2011 and resulted in an amended award being issued in August 2012.  In that proceeding, AUA never challenged, in the final accounting the ABST taxes in paid in 2009 and 2010 to Leeward.  Then, when Leeward initiated the second arbitration in February 2013, AUA raised its counterclaim (for the first time between the parties) to recoup all ABST taxes paid in 2009 and 2010.  The three year period for filing a formal claim for refund with the tax authority appears to have expired around November 2012.

14

**A431**

41.    This dispute concerns the administration of the tax authority and its province to decide against whom to collect taxes and to whom refunds should be granted.  This Tribunal should not exercise its powers to administer the tax laws of that country and should not interfere with the administration and enforcement of the tax laws of Antigua and Barbuda.

42.    Thus, the Tribunal should not allow AUA to collect indirectly (from Leeward) a tax for which AUA cannot seek directly (from the tax authority) a refund.  AUA is precluded by the ABST Act to file a claim for refund due to its failure to act on a timely basis.  If the Tribunal were to allow AUA to do so, the Tribunal would interfere, first, with the province of the tax authority to deny any refund for late filing past the three year window, and, second with the province of the tax authority to seek or forego collection against Leeward for ABST taxes it collected.

43.    Finally, the ABST Act provides for the exclusive procedures by which AUA can recover the paid ABST taxes.

44.    Section 44(4) of the ABST Act provides the sole remedy of AUA for any tax overpayment.

> *A taxable person who has erroneously overpaid ABST for a tax period may apply in writing to the Commissioner for an input tax credit equal to the amount overpaid, and if the Commissioner is satisfied that the amount was erroneously overpaid, he must allow the person an input tax credit for that amount, or such amount that the Commissioner is satisfied was erroneously paid...*

15

**A432**

45.     Nowhere does the ABST Act condition the refund to require that Leeward file the returns and pay the collected taxes.   (AUA has not identified any such provision in the ABST Act in its brief of oral arguments.)

46.     If the Tribunal allows AUA to recover taxes from Leeward contrary to the tax scheme, this Tribunal would be upsetting the legislative balance created by the fiscal and revenue laws of a foreign country.

47.     The Tribunal, by rendering its Partial Final Award, interferes improperly with the tax administration of the foreign tax revenue laws and violates the revenue rule.


**The remedy afforded to Leeward in the event of exposure to double liability (first, to AUA under the Partial Final Award and, second, to the tax authority if asserting an assessment against Leeward) is confusing.**

48.     The remedy afforded Leeward in the Partial Final Award against double liability is confusing.   Confusing language may defeat, in the event of double exposure occurring, the well intended remedy.   The Tribunal should develop clear language and craft a remedy that can be enforced by a court should the need arise.

49.     For example, the indemnity to Leeward appears to apply only "[i]f a Tax Deficiency is validly asserted against Leeward".   By contrast, "Tax Deficiencies" is defined to "mean any tax deficiency or liability asserted by the Antigua and Barbuda tax authorities".   The word "validly" should be

16

**A433**

stricken thereby allowing the indemnity in favor of Leeward to include any Tax Deficiency that the tax authority asserts against Leeward. (In addition, if the word "validly" is retained, then AUA is most likely to refuse the indemnity until the liability has been proven by Leeward to be validly asserted. Does that mean that the tax authority validly asserted the claim for ABST taxes unpaid by Leeward or must Leeward prove also that the taxes are owed to the tax authority? Must the validity of the taxes be proven by a judicial determination from that country or a ruling from the tax authority?)

### The doctrine of res judicata, collateral estoppel, claim preclusion, or issue preclusion apply.

50. Leeward presented persuasively its position that either res judicata, collateral estoppel, claim preclusion, or issue preclusion apply. In the first arbitration proceeding (which covered the period of February 2011 through August 2012, when the amended award was issued), AUA had full knowledge of the ABST taxes paid to Leeward, AUA contested in the first arbitration the final accounting and the ABST taxes appearing on the bills (and affidavits submitted by AUA expressly confirmed such review and knowledge), AUA made open representations in the first proceeding confirming not only that AUA agrees with the computations and payments it made to Leeward, but also corrected an overpayment by AUA and

17

**A434**

expressed admitted owning more taxes in the approximate amount of US $33,000. AUA openly agreed to pay it outside of the first proceeding.

51.    AUA is obligated to keep its promise and pay the additional amount AUA promised to pay. It made this promise as an inducement to Leeward not exclude it from the first proceeding and award.

52.    AUA openly represented in the first proceeding (at a time AUA had full knowledge of the issues concerning the unwillingness of the tax authority to certify nonapplicability of ABST tax as to the providers of the project), with full knowledge of the issues concerning ABST tax, that it agreed with the final accounting excepting the items challenged and damages raised.

53.    The authority cited by Leeward in its dispositive motions and related filings are persuasive. AUA is:

  (a) estopped from adopting in this second arbitration (that ABST taxes are not due) proceeding a different and contradictory position that AUA adopted in the first arbitration proceeding (that ABST taxes were due and were properly paid)

  (b) collaterally estopped from raising a challenge to the ABST tax that it could have raise (but chose not to) in the first proceeding, and

  (c) precluded by res judicata from relitigating any matter that could have been litigated (but chose not to do so) in the first proceeding (when AUA had full knowledge of its disagreement with the applicability of ABST tax and the tax authority ongoing unwillingness to issue the requested certification for two years prior to the commencement of the first arbitration proceeding.

**The First Decision should not be incorporated into the Partial Final Award.**

54.    The Tribunal incorporates into the Partial Final Award the First Decision.  The First Decision was an interim decision and is not a partial award.  Including it in the Partial Final Award simply clouds the Second Decision and will complicate, unnecessarily, the confirmation, interpretation, and enforcement of the Partial Final Award by a court.  I therefore do not join the Partial Final Award and instead issue a concurrence on specific matters noted below.

*    *    *    *    *    *

For the reasons noted, I dissent.

By way of final comments, I concur, with the Partial Final Award solely on the following matters:

1.    That all issues presented to the Tribunal are arbitrable,

2.    That the Windows Counterclaim, by mutual agreement of the parties, is not part of and is not subject to this arbitration proceeding and will be pursued separately by the parties,

3.    That AUA and Leeward shall share equally in all costs and expenses to date incurred in this proceeding,

4.    That the Construction Counterclaims shall be scheduled for final hearing along with any issue related to them.

19

**A436**

Case No. 50 2013 110 T 00118 13

Signed on 18 September, 2014

_____
Carlos A. Romero, Jr. - Arbitrator

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

      The foregoing instrument was acknowledged before me this 18th day of September, 2014, by CARLOS A. ROMERO, JR., who is personally known to me or who has produced _N/A_ as identification and who has not taken an oath.

_____
NOTARY PUBLIC, State of Florida

Print Name: _____

MARILYN GONZALEZ
Notary Public - State of Florida
My Comm. Expires Jun 2, 2019
Commission # FF 126373

Ver. 2014-08-31 Dissent Partial Final Award exe version

20

**A437**

LAWS OF ANTIGUA AND BARBUDA

*Arbitration*        (**CAP. 33**              *1*

# CHAPTER 33

## THE ARBITRATION ACT

Arrangement of Sections
Section

### PART I

*General Provisions*

1. Short title.
2. Authority of arbitrators and umpires to be irrevocable.
3. **Death of party.**
4. Bankruptcy.
5. Staying court proceedings where there is submission to arbitration.
6. Reference of interpleader issues to arbitration.

### PART II

*Arbitrators and Umpires*

7. When reference is to a single arbitrator.
8. Power of parties in certain cases to supply vacancy.
9. Umpires.
10. Agreements for reference to three arbitrators.
11. Power of court in certain cases to appoint an arbitrator or umpire.
12. Reference to official referee.

### PART III

*Conduct of Proceedings, Witnesses, etc.*

13. Conduct of proceedings, witnesses, etc.

### PART IV

*Provisions as to Awards*

14. Time for making award.
15. Interim awards.

LAWS OF ANTIGUA AND BARBUDA

2        **CAP. 33)**              *Arbitration*

16. Specific performance.
17. Awards to be final.
18. Power to correct slips.

## PART V

*Costs, Fees and Interest*

19. Costs.
20. Taxation of arbitrator's or umpire's fees.
21. Interest on awards.

## PART VI

*Special Cases, Remission and Setting Aside of Awards, etc.*

22. Statement of case.
**23.** Power to remit award.
24. Removal of arbitrator and setting aside of award.
25. Power of court to give relief where arbitrator is not impartial or the dispute involves question of fraud.
26. Power of court where arbitrator is removed or authority of arbitrator is revoked.

## PART VII

*Enforcement of Award*

27. Enforcement of award.

## PART VIII

*Miscellaneous*

28. Power of court to extend time for commencing arbitration proceedings.
29. Terms as to costs, etc.
30. Government to be bound.
31. Application of Parts I to VIII to statutory arbitrations.
32. Meaning of "arbitration agreement".

## PART IX

*Enforcement of Certain Foreign Awards*

33. Awards to which Part IX applies.
34. Effect of foreign awards.
35. Conditions for enforcement of foreign awards.

**A439**

*Arbitration*                    (**CAP. 33**                    3

---

36. Evidence.
37. Meaning of "final award".
38. Saving for other rights, etc.
39. Saving for pending proceedings.
    SCHEDULES.

## FIRST SCHEDULE

Protocol on Arbitration Clauses signed at a Meeting of the Assembly of the League of Nations held on the twenty-fourth day of September, nineteen hundred and twenty-three.

## SECOND SCHEDULE

Convention on the Execution of Foreign Arbitral Awards signed at Geneva on the twenty-sixth day of September, nineteen hundred and twenty-seven.

---

## ARBITRATION

*(15th August,* 1975.)                    **12/1975.**

### PART I

*General Provisions*

**1.**   This Act may be cited as the Arbitration Act.     Short title.

**2.**   The authority of an arbitrator or umpire appointed     Authority of
by or by virtue of an arbitration agreement shall, unless a     arbitrators and
contrary intention is expressed in the agreement, be     umpires to be
irrevocable except by leave of the High Court.     irrevocable.

**3.**   (1) An arbitration agreement shall not be     Death of party.
discharged by the death of any party thereto either as respects
the deceased or any other party, but shall in such an event
be enforceable by or against the personal representative of
the deceased.

| | | |
|---|---|---|
| 4 | *CAP. 33)* | *Arbitration* |

(2)  The authority of an arbitrator shall not be revoked by the death of any party by whom he was appointed.

(3)  Nothing in this section shall be taken to affect the operation of any enactment or rule of law by virtue of which any right of action is extinguished by the death of a person.

**Bankruptcy.**

**4.**  (1)  Where it is provided by a term in a contract to which a bankrupt is a party that any differences arising thereout or in connection therewith shall be referred to arbitration, the said term shall, if the trustee in bankruptcy adopts the contract, be enforceable by or against him so far as relates to any such differences.

(2)  Where a person who has been adjudged bankrupt had, before the commencement of the bankruptcy, become a party to an arbitration agreement, and any matter to which the agreement applies requires to be determined in connection with or for the purposes of the bankruptcy proceedings, then, if the case is one to which subsection (1) does not apply, any other party to the agreement or, with the consent of the committee of inspection, the trustee in bankruptcy, may apply to the High Court for an order directing that the matter in question shall be referred to arbitration in accordance with the agreement, and the High Court may if it is of opinion that having regard to all the circumstances of the case, the matter ought to be determined by arbitration, make an order accordingly.

**Staying court proceedings where there is submission to arbitration.**

**5.**  (1)  If any party to an arbitration agreement or any person claiming through or under him, commences any legal proceedings in any court against any other party to the agreement, or any person claiming through or under him, in respect of any matter agreed to be referred, any party to those legal proceedings may at any time after appearance, before delivering any pleadings or taking any other steps in the proceedings, apply to that court to stay the proceedings, and that court, if satisfied that there is no sufficient reason why the matter should not be referred in accordance with the agreement, and that the applicant, was, at the time when the proceedings were commenced and still remains, ready and willing to do all things necessary to the proper conduct of the arbitration, may make an order staying the proceedings.

Case 15-1595, Document 50, 08/27/2015, 1586805, Page200 of 220

LAWS OF ANTIGUA AND BARBUDA

*Arbitration*       (CAP. 33

(2)  Notwithstanding anything in Parts 1 to VIII, if any party to a submission to arbitration made in pursuance of an agreement to which the protocol set out in the First Schedule applies, or any person claiming through or under him, commences any legal proceedings in any court against any other party to the submission, or any person claiming through or under him, in respect of any matter agreed to be referred, any party to those proceedings may at any time after appearance, and before delivering any pleadings or taking any other steps in the proceedings, apply to that court to stay the proceedings, and that court or a judge or magistrate thereof, unless satisfied that the agreement or arbitration has become inoperative or cannot proceed or that there is not in fact any dispute between the parties with regard to the matter agreed to be referred, shall make an order staying the proceedings.

**6.**  Where relief by way of interpleader is granted and it appears to the court that the claims in question are matters to which an arbitration agreement, to which the claimants are parties, applies, the court may direct the issue between the claimants to be determined in accordance with the agreement. *Reference of interpleader issues to arbitration.*

PART II

*Arbitrators and Umpires*

**7.**  Unless a contrary intention is expressed therein, every arbitration agreement shall, if no other mode of reference is provided, be deemed to include a provision that the reference shall be to a single arbitrator. *When reference is to a single arbitrator.*

**8.**  Where an arbitration agreement provides that the reference shall be to two arbitrators, one to be appointed by each party, then, unless a contrary intention is expressed therein, if either of the appointed arbitrators refuses to act, or is incapable of acting, or dies, the party who appointed him may appoint a new arbitrator in his place. *Power of parties in certain cases to supply vacancy.*

**9.**  (1) Unless a contrary intention is expressed therein, every arbitration agreement shall, where the reference is to two arbitrators, be deemed to include a provision that the two arbitrators shall appoint an umpire immediately after they are themselves appointed. *Umpires.*

LAWS OF ANTIGUA AND BARBUDA

*6*      ***CAP. 33)***              *Arbitration*

(2) Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to include a provision that if the arbitrators have delivered to any party to the arbitration agreement, or to the umpire a notice in writing stating that they cannot agree, the umpire may forthwith enter upon reference in *lieu* of the arbitrators and as if he were a sole arbitrator.

**Agreements for references to three arbitrators.**

**10.**  *(1)* Where an arbitration agreement provides that the reference shall be to three arbitrators, one to be appointed by each party and the third to be appointed by the two appointed by the parties, the agreement shall have effect as if it provided for the appointment of an umpire, and not for the appointment of a third arbitrator, by the two arbitrators appointed by the parties.

(2) Where an arbitration agreement provides that the reference shall be to three arbitrators to be appointed otherwise than as mentioned in subsection (1), the award of any two of the arbitrators shall be binding.

**Power of court in certain cases to appoint an arbitrator or umpire.**

**11.**  (1) In any of the following cases—

(*a*) where an arbitration agreement provides that the reference shall be to a single arbitrator, and all parties do not, after differences have arisen concur in the appointment of an arbitrator;

(*b*) if an appointed arbitrator refuses to act, or is incapable of acting, or dies, and the arbitration agreement does not show that it was intended that the vacancy should not be supplied and the parties do not supply the vacancy;

(*c*) where the parties or two arbitrators are at liberty to appoint an umpire or third arbitrator and do not appoint him, or where two arbitrators are required to appoint an umpire and do not appoint him; or

(d) where an appointed umpire or third arbitrator refuses to act, or is incapable of acting, or dies, and the arbitration agreement does not show that it was intended that the vacancy should not be supplied and the parties or arbitrators do not supply the vacancy,

**A443**

LAWS OF ANTIGUA AND BARBUDA

*Arbitration*          **(CAP. 33**          *7*

---

any party may serve the other parties or the arbitrators, as the case may be, with a written notice to appoint or, as the case may be, concur in appointing, an arbitrator, umpire or third arbitrator, and if the appointment is not made within seven days after the service of the notice, the High Court may, on application by the party who gave the notice, appoint an arbitrator, umpire or third arbitrator who shall have the like powers to act in the reference and make an award as if he had been appointed by consent of all parties.

(2) Where an arbitration agreement provides that the reference shall be to two arbitrators one to be appointed by each party, then, unless a contrary intention appears, if one party fails to appoint an arbitrator, either originally or by way of substitution for an appointed arbitrator who refuses to act or is incapable of acting or dies, for seven clear days after the other party having appointed his arbitrator has served the party making default with notice to make the appointment, the party who gave notice may apply to the High Court and the High Court may, having heard such application, appoint an arbitrator to act, and such arbitrator shall have the like powers as if he had been appointed by the party having power to appoint and who has failed so to appoint.

**12.**   Where an arbitration agreement provides that the reference shall be to an official referee, any official referee to whom application is made shall, subject to any order of the High Court as to transfer or otherwise, hear and determine the matters agreed to be referred.

Reference to official referee.

PART III

*Conduct of Proceedings, Witnesses, Etc.*

**13.**   (1) Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the parties to the reference, and all persons claiming through them respectively, shall subject to any legal objection, submit to be examined by the arbitrator or umpire, on oath or affirmation, in relation to the matters in dispute, and shall, subject as aforesaid, produce before the arbitrator or umpire all documents within their possession or power respectively which may be required or called for, and do

Conduct of proceedings, witnesses, etc.

**A444**

LAWS OF ANTIGUA AND BARBUDA

8        **CAP. 33)**               *Arbitration*

all other **things** which during the proceedings on the reference the arbitrator or umpire may require.

(2) Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the witnesses on the reference shall, if the arbitrator or umpire thinks fit, be examined on oath or affirmation.

**(3)** An arbitrator or umpire shall, unless a contrary intention is expressed in the arbitration agreement, have power to administer oaths to, or take the affirmation of, the parties to and witnesses on a reference under the agreement.

(4) Any party to a reference under an arbitration agreement may sue out a writ of *subpoena ad testificandum* or writ of *subpoena duces tecum*, but no person shall be compelled under any such writ to produce any document which he could not be compelled to produce on the trial of an action, and the High Court may order that a writ of *subpoena ad testificandum* or of *subpoena duces tecum* shall issue to compel the attendance before an arbitrator or umpire of a witness wherever he may be within Antigua and Barbuda.

(5) The High Court may also order that a writ of *habeas corpus ad testificandum* shall issue to bring up a prisoner for examination before an arbitrator or umpire.

(6) The High Court shall have, for the purpose of and in relation to a reference, the same power of making orders in respect of—

(a) security for costs;

(b) discovery of documents and interrogatories;

(c) the giving of evidence by affidavit;

(d) examination on oath of any witness before an officer of the High Court or any other person and the issue of a commission or request for the examination of a witness out of the jurisdiction;

(e) the preservation, interim custody or sale of any goods which are the subject matter of the reference;

(f) securing the amount in dispute in the reference;

LAWS OF ANTIGUA AND BARBUDA

*Arbitration*                    (CAP. 33

---

(*g*) the detention, preservation or inspection of any property or thing which is the subject of the reference or as to which any question may arise therein, and authorising for any of the purposes aforesaid any persons to enter upon or into any land or building in the possession of any party to the reference, or authorising any samples to be taken or any observation to be made or experiment to be tried which may be necessary or expedient for the purpose of obtaining full information or evidence; and

*(h)* interim injunctions or the appointment of a receiver,

as it has for the purpose of and in relation to an action or matter in the High Court:

Provided that nothing in this subsection shall be taken to prejudice any power which may be vested in an arbitrator or umpire of making orders with respect to any of the matters aforesaid.

## PART IV

### *Provisions as to Awards*

**14.**  (1) Subject to the provisions of section 23(2), and anything to the contrary in the arbitration agreement, an arbitrator or umpire shall have power to make an award at any time.

(2) The time, if any, limited for making an award, whether under this Act or otherwise, may from time to time be enlarged by order of the High Court, whether that time has expired or not.

(3) The High Court may, on the application of any party to a reference, remove an arbitrator or umpire who fails to use all reasonable dispatch in entering on and proceeding with the reference and making an award, and an arbitrator or umpire who is removed by the High Court under this subsection shall not be entitled to receive any remuneration in respect of his services.

For the purposes of this subsection, the expresssion "proceeding with a reference" includes, in a case where two

**Time for making award.**

**A446**

LAWS OF ANTIGUA AND BARBUDA

*10*        **CAP. 33)**              *Arbitration*

---

arbitrators are unable to agree, giving notice of that fact to the parties and to the umpire.

*Interim awards.* **15.** Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the arbitrator or umpire may, if he thinks fit, make an interim award, and any reference in this Part of this Act to an award includes a reference to an interim award.

*Specific performance.* **16.** Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the arbitrator or umpire shall have the same power as the High Court to order specific performance of any contract other than a contract relating to land or any interest in land.

*Awards to be final.* **17.** Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the award to be made by the arbitrator or umpire shall be final and binding on the parties and the persons claiming under them respectively.

*Power to correct slips.* **18.** Unless a contrary intention is expressed in the arbitration agreement, the arbitrator or umpire shall have power to correct in an award any clerical mistake or error arising from any accidental slip or omission.

## PART V

### *Costs, Fees and Interest*

*Costs.* **19.** (1) Unless a contrary intention is expressed therein, every arbitration agreement shall be deemed to include a provision that the costs of the reference and award shall be in the discretion of the arbitrator or umpire who may direct to and by whom and in what manner those costs or any part thereof shall be paid, and may tax or settle the amount of costs to be so paid or any part thereof, and may award costs to be paid as between solicitor and client.

**A447**

*Arbitration*　　　　*(CAP. 33*　　　　11

───────────────────────────────

(2) Any costs directed by an award to be paid shall, unless the award otherwise directs, be taxable in the High Court.

(3) Any provision in an arbitration agreement to the effect that the parties or any party thereto shall in any event pay their or his own costs of the reference or award or any part thereof shall be void. and Parts I to VIII shall. in the case of an arbitration agreement containing any such provision, have effect as if that provision were not contained therein:

Provided that nothing in this subsection shall invalidate such a provision when it is part of an agreement to submit to arbitration a dispute which has arisen before the making of that agreement.

(4) If no provision is made by an award with respect to the costs of the reference, any party to the reference may, within fourteen days of the publication of the award or such further time as the High Court may direct, apply to the arbitrator for an order directing by and to whom those costs shall be paid, and thereupon the arbitrator shall, after hearing any party who may desire to be heard, amend his award by adding thereto such directions as he may think proper with respect to the payment of the costs of the reference.

**20.**　(1) If in any case an arbitrator or umpire refuses to deliver his award except on payment of the fees demanded by him, the High Court may, on application for the purpose, order that the arbitrator or umpire shall deliver the award to the applicant on payment into court by the applicant of the fees demanded, and further that the fees demanded shall be taxed by the Taxing Master and that out of the money paid into court there shall be paid out to the arbitrator or umpire by way of fees such sum as may be found reasonable on taxation and that the balance of the money, if any, shall be paid out to the applicant.

*Taxation of arbitrators or Umpires fees.*

(2) An application for the purposes of this section may be made by any party to the reference unless the fees demanded have been fixed by a written agreement between him and the arbitrator or umpire.

**A448**

LAWS OF ANTIGUA AND BARBUDA

*12*      *CAP. 33)*        *Arbitration*

*(3)* A taxation of fees under this section may be reviewed in the same manner as a taxation of costs.

(4) The arbitrator or umpire shall be entitled to appear and be heard on any taxation under this section.

**Interest on awards.**

**21.** A sum directed to be paid by an award shall, unless the award otherwise directs, carry interest as from the date of the award **and** at the same rate **as** a judgment debt.

PART VI

*Special Cases, Remission and Setting Aside of Awards, etc.*

**Statement of case.**

**22.** (1) An arbitrator or umpire may, and shall if so directed by the High Court, state—

(a) any question of law arising in the course of the reference; or

(*b*) an award or any part of an award, in the form of a special case for the decision of the High Court.

*(2)* A special case with respect to an interim award or with respect to a question of law arising in the course of a reference may be stated, or may be directed by the High Court to be stated, notwithstanding that proceedings under the reference are still pending.

*(3) A* decision of the High Court under this section shall be deemed to be a judgment of the Court and, with the leave of the Court of Appeal, an appeal shall lie to the Court of Appeal from such judgment.

**Power to remit award.**

**23.** (1) In all cases of reference to arbitration the High Court may from time to time remit the matters referred, or any of them to the reconsideration of the arbitrator or umpire.

*(2)* Where an award is remitted, the arbitrator or umpire shall, unless the order otherwise directs, make his award within three months after the date of the order.

**A449**

LAWS OF ANTIGUA AND BARBUDA

*Arbitration*          *(CAP. 33*          13

---

**24.**   (1) Where an arbitrator or umpire has miscon-
ducted himself or the proceedings, the High Court may
remove him.

Removal of
arbitrator and
setting aside of
award.

(2) Where an arbitrator or umpire has misconducted
himself or the proceedings, or an arbitration or award has
been improperly procured, the High Court may set the award
aside.

(3) Where an application is made to set aside an award,
the High Court may order that any money made payable
by the award shall be brought into court or otherwise secured
pending the determination of the application.

**25.**   (1) Where an agreement between any parties pro-
vides that disputes which may arise in the future between
them shall be referred to an arbitrator named or designated
in the agreement, and after a dispute has arisen any party
applies, on the ground that the arbitrator so named or
designated is not or may not be impartial, for leave to revoke
the authority of the arbitrator or for an injunction to restrain
any other party or the arbitrator from proceeding with the
arbitration, it shall not be a ground for refusing the applica-
tion that the said party at the time when he made the agree-
ment knew, or ought to have known, that the arbitrator,
by reason of his relation towards any other party to the agree-
ment or of his connection with the subject referred, might
not be capable of impartiality.

Power of court to
give relief where
arbitrator is not
impartial or the
dispute involves
question of
fraud.

(2) Where an agreement between any parties provides
that disputes which may arise in the future between them
shall be referred to arbitration, and a dispute which so arises
involves the question whether any such party has been guilty
of fraud, the High Court shall, so far as may be necessary
to enable that question to be determined by the High Court,
have power to order that the agreement shall cease to have
effect and power to give leave to revoke the authority of any
arbitrator or umpire appointed by or by virtue of the
agreement.

(3) In any case where by virtue of this section the High
Court has power to order that an arbitration agreement shall
cease to have effect or to give leave to revoke the authority

**A450**

LAWS OF ANTIGUA AND BARBUDA

14        **CAP. 33)**                Arbitration

of an arbitrator or umpire, the High Court may refuse to stay any action brought in breach of the agreement.

**Power of court where arbitrator is removed or authority of arbitrator is revoked.**

**26.** (1) Where an arbitrator (not being a sole arbitrator), or two or more arbitrators (not being all the arbitrators), or an umpire who has not entered on the reference is or are removed by the High Court, the High Court may, on the application of any party to the arbitration agreement, appoint a person or persons to act as arbitrator or arbitrators or umpire in place of the person or persons so removed.

(2) Where the authority of an arbitrator or arbitrators or umpire is revoked by leave of the High Court, or a sole arbitrator or all the arbitrators or an umpire who has entered on the reference is or are removed by the High Court, the High Court may, on the application of any party to the arbitration agreement, either—

    *(a)* appoint a person to act as sole arbitrator in place of the person or persons removed, or

    (*b*) order that the arbitration agreement shall cease to have effect with respect to the dispute referred.

(3) A person appointed under this section by the High Court as an arbitrator or umpire shall have the like power to act in the reference and to make an award as if he had been appointed in accordance with the terms of the arbitration agreement.

(4) Where it is provided (whether by means of a provision in the arbitration agreement or otherwise) that an award under an arbitration agreement shall be a condition precedent to the bringing of an action with respect to any matter to which the agreement applies, the High Court, if it orders (whether under this section or under any other enactment) that the agreement shall cease to have effect as regards any particular dispute, may further order that the provision making an award a condition precedent to the bringing of an action shall also cease to have effect as regards that dispute.

**A451**

LAWS OF ANTIGUA AND BARBUDA

*Arbitration*               (CAP. 33               15

---

PART VII

*Enforcement of Award*

**27.**   An award on an arbitration agreement may, by
leave of the High Court or a judge thereof, be enforced in
the same manner as a judgment or order of the High Court
to the same effect, and where leave is so given, judgment
may be entered in terms of the award.

Enforcement of<br>award.

PART VIII

*Miscellaneous*

**28.**   Where the terms of an agreement to refer future
disputes to arbitration provide that any claims to which the
agreement applies shall be barred unless notice to appoint
an arbitrator is given or an arbitrator is appointed or some
other step to commence arbitration proceedings is taken
within a time fixed by the agreement, and a dispute arises
to which the agreement applies, the High Court, if it is of
the opinion that in the circumstances of the case undue hard-
ship would otherwise be caused, and notwithstanding that
the time so fixed has expired, may, on such terms, if any,
as the justice of the case may require, but without prejudice
to the provisions of any enactment limiting the time for the
commencement of arbitration proceedings, extend the time
for such period as it thinks proper.

Power of court to<br>extend time for<br>commencing<br>arbitration<br>proceedings.

**29.**   Any order made under Parts I to VIII may be
made on such terms as to costs or otherwise as the authority
making the order thinks just:

Provided that this section shall not apply to any order
made under section 5(2).

Terms as to costs<br>etc.

**30.**   Parts I to VIII (except the provisions of
section 5(2) shall apply to any arbitration to which the
Government is a party.

Government to<br>be bound.

**31.**   (1) Parts I to VIII except the provisions thereof
specified in subsection (2) hereof, shall apply to every
arbitration under any other Act (whether passed before or
after the commencement of this Act) as if the arbitration
were pursuant to an arbitration agreement and as if that
other Act were an arbitration agreement, except in so far

Application of II<br>to statutory<br>arbitrations.

**A452**

LAWS OF ANTIGUA AND BARBUDA

16          **CAP. 33)**              Arbitration

___

as this Act is inconsistent with that other Act or with any rules or procedure authorised or recognised thereby.

(2)  The provisions referred to in subsection (1) are sections 3(1), 4, 5(2), 6, 19(3), 25, 26 and 28.

**Meaning of "Arbitration agreement".**

**32.**  In Parts I to VIII, unless the context otherwise requires, the expression "arbitration agreement" means a written agreement to submit present or future differences to arbitration, whether an arbitrator is named therein or not.

## PART IX

### Enforcement *of* Certain Foreign *Awards*

**Awards to which Part IX applies.**

**33.**  (1)  This Part applies to any award made, whether before or after the coming into force of this Act,

(a)  in pursuance of an agreement for arbitration to which the protocol set out in the First Schedule hereto applies; and

(b)  between persons of whom one is subject to the jurisdiction of some one of such Powers as Her Majesty, being satisfied that reciprocal provisions have been made in respect of Antigua and Barbuda, may by Order in Council declare to be parties to the Convention set out in the Second Schedule hereto, and of whom the other is subject to the jurisdiction of some other of the Powers aforesaid, and

(c)  in one of such territories as Her Majesty, being satisfied that reciprocal provisions in respect of Antigua and Barbuda have been made, may by Order in Council declare to be territories to which the said convention applies;

and an award to which this Part applies is in this Part referred to as "a foreign award".

(2)  Her Majesty may by a subsequent Order in Council vary or revoke any Order previously made under this section.

(3)  Any Order in Council under section one of the Arbitration (Foreign Awards) Act, 1930 of the United

**A453**

LAWS OF ANTIGUA AND BARBUDA

*Arbitration*　　　　(**CAP. 33**　　　　*17*

Kingdom which is in force at the commencement of this Act shall have effect as if it had been made under this section.

**34.** (1) A foreign award shall, subject to the provisions of this Part, be enforceable in Antigua and Barbuda either by action or in the same manner as the award of an arbitrator is enforceable by virtue of section *27*.

*Effect of foreign awards.*

*(2)* Any foreign award which would be enforceable under this Part shall be treated as binding for all purposes on the persons between whom it was made, and may accordingly be relied on by any of those persons by way of defence, set off or otherwise in any legal proceedings in Antigua and Barbuda, and any references in this Part to enforcing a foreign award shall be construed as including references to relying on an award.

**35.** (1) In order that a foreign award may be enforceable under this Part it must have—

*Conditions for enforcement of foreign awards.*

　　*(a)* been made in pursuance of an agreement for arbitration which was valid under the law by which it was governed;

　　*(b)* been made by the tribunal provided for in the agreement or constituted in manner agreed upon by the parties;

　　(c) been made in conformity with the law governing the arbitration procedure;

　　*(d)* become final in the country in which it was made;

　　*(e)* been in respect of a matter which may lawfully be referred to arbitration under the laws of Antigua and Barbuda,

and the enforcement thereof must not be contrary to public policy or the laws of Antigua and Barbuda.

(2) Subject to the provisions of this subsection, a foreign award shall not be enforceable under this Part if the court dealing with the case is satisfied that—

　　*(a)* the award has been annulled in the country in which it was made;

LAWS OF ANTIGUA AND BARBUDA

18          **CAP. 33)**          Arbitration

(b) the party against whom it is sought to enforce the award was not given notice of the arbitration proceedings in sufficient time to enable him to present his case, or was under some legal incapacity and was not properly represented; or

(c) the award does not deal with all the questions referred or contains decisions on matters beyond the scope of the agreement for arbitration:

Provided that, if the award does not deal with all the questions referred, the court may, if it thinks fit, either postpone the enforcement of the award or order its enforcement subject to the giving of such security by the person seeking to enforce it as the court may think fit.

(3) If a party seeking to resist the enforcement of a foreign award proves that there is any ground other than the non-existence of the conditions specified in paragraphs (a), (b) and (c) of subsection (1), or the existence of the conditions specified in paragraphs (*b*) and (*c*) of subsection (2), entitling him to contest the validity of the award the court may, if it thinks fit, either refuse to enforce the award or adjourn the hearing until after the expiration of such period as appears to the court to be reasonably sufficient to enable that party to take the necessary steps to have the award annulled by the competent tribunal.

Evidence.

**36.** (1) The party seeking to enforce a foreign award must produce—

(a) the original award or a copy thereof duly authenticated in manner required by the law of the country in which it was made; and

(*b*) evidence proving that the award has become final; and

(c) such evidence as may be necessary to prove that the award is a foreign award and that the conditions mentioned in paragraphs (a), (b), and (c) of section 35(1) are satisfied.

(2) In any case where any document required to be produced under subsection (1) is in a foreign language, it shall

**A455**

LAWS OF ANTIGUA AND BARBUDA

Arbitration             (CAP. 33              19

be the duty of the party seeking to enforce the award to pro-
duce a translation certified as correct by a diplomatic or con-
sular agent of the country to which that party belongs, or
certified as correct in such other manner as may be suffi-
cient to the laws of Antigua and Barbuda.

(3) Subject to the provisions of this section, rules of court
may be made under section seventeen of the Supreme Court **U.K.S.I. 1967 No. 223.**
Order with respect to the evidence which must be furnished
by a party seeking to enforce an award under this Part.

**37.**   For the purposes of this Part of this Act, an award **Meaning of "final" award.**
shall not be deemed final if any proceedings for the purpose
of contesting the validity of the award are pending in the
country in which it was made.

**38.**   Nothing in this Part of this Act shall—     **Saving for other rights, etc.**

(a) prejudice any rights which any person would
have had of enforcing in Antigua and Barbuda any
award or of availing himself in Antigua and Barbuda
of any award if neither this Part nor Part I of the
Arbitration (Foreign Awards) Act, 1930 of the United
Kingdom had been enacted; or

(b) apply to any award made on an arbitration
agreement governed by the law of Antigua and Barbuda.

**39.**   Any proceedings instituted under Part I of the **Saving for pending proceedings.**
Arbitration (Foreign Awards) Act, 1930, of the United
Kingdom which are not completed at the commencement
of this Act may be carried on and completed under this Part
of this Act as if they had been instituted thereunder.

SCHEDULES

FIRST SCHEDULE          Sections 5, **33**

Protocol on Arbitration Clauses signed at a Meeting of the
Assembly of the League of Nations held on the twenty-fourth day
of September, nineteen hundred and twenty-three.

The undersigned, being duly authorised, declare that they
accept, on behalf of the countries which they represent, the follow-
ing provisions—

**A456**

Case 15-1595, Document 50, 08/27/2015, 1586805, Page215 of 220

**1.** Each of the Contracting States recognises the validity of an agreement whether relating to existing or future differences between parties, subject respectively to the jurisdiction of different Contracting States by which the parties to a contract agree to submit to arbitration all or any differences that may arise in connection with such contract relating to commercial matters or to any other matter capable of settlement by arbitration, whether or not the arbitration is to take place in a country to whose jurisdiction none of the parties is subject.

Each Contracting State reserves the right to limit the obligations mentioned above to contracts which are considered as commercial under its national law. Any Contracting State which avails itself of this right will notify the Secretary-General of the League of Nations, in order that the other Contracting States may be so informed.

**2.** The arbitral procedure, including the constitution of the arbitral tribunal, shall be governed by the will of the parties and by the law of the country in whose territory the arbitration takes place.

The Contracting States agree to facilitate all steps in the procedure which require to be taken in their own territories, in accordance with the provisions of their law governing arbitral procedure applicable to existing differences.

**3.** Each Contracting State undertakes to ensure the execution by its authorities and in accordance with the provisions of its national laws of arbitral awards made in its own territory under the preceding articles.

**4.** The tribunals of the Contracting Parties, on being seized of a dispute regarding a contract made between persons to whom Article 1 applies and including an arbitration agreement whether referring to present or future differences which is valid in virtue of the said article and capable of being carried into effect, shall refer the parties on the application of either of them to the decisions of the arbitrators.

Such reference shall not prejudice the competence of the judicial tribunal in case the agreement or the arbitration cannot proceed or become inoperative.

**5.** The present Protocol, which shall remain open for signature by all States, shall be ratified. The ratifications shall be deposited as soon as possible with the Secretary-General of the League of Nations, who shall notify such deposit to all the signatory States.

LAWS OF ANTIGUA AND BARBUDA

*Arbitration*        (CAP. 33        21

---

**6.**   The present Protocol shall come into force as soon as two ratifications have been deposited. Thereafter it will take effect, in the case of each Contracting State, one month after the notification by the Secretary-General of the deposit of its ratification.

**7.**   The present Protocol may be denounced by any Contracting State on giving one year's notice. Denunciation shall be effected by a notification addressed to the Secretary-General of the League, who will immediately transmit copies of such notification to all the other signatory States and inform them of the date on which it was received. The denunciation shall take effect one year after the date on which it was notified to the Secretary-General, and shall operate only in respect of the notifying State.

**8.**   The Contracting States may declare that their acceptance of the present Protocol does not include any or all of the undermentioned territories: that is to say, their colonies, overseas possessions or territories, protectorates or the territories over which they exercise a mandate.

The said State may subsequently adhere separately on behalf of any territory thus excluded. The Secretary-General of the League of Nations shall be informed as soon as possible of such adhesions. He shall notify such adhesions to all signatory States. They will take effect one month after the notification by the Secretary-General to all signatory States.

The Contracting States may also denounce the Protocol separately on behalf of any of the territories referred to above. Article 7 applies to such denunciation.

---

SECOND SCHEDULE        Section **33**

Convention on the Execution of Foreign **Arbitral** Awards signed at Geneva on the twenty-sixth day of September, nineteen hundred and twenty-seven.

Article 1

In the territories of any High Contracting Party to which the present Convention applies, an arbitral award made in pursuance of an agreement whether relating to existing or future differences (hereinafter called "a submission to arbitration") covered

**A458**

22          CAP. 33)                *Arbitration*

---

by the Protocol on Arbitration Clauses, opened at Geneva on 24 September 1923, shall be recognised as binding and shall be enforced in accordance with the rules of the procedure of the territory where the award is relied upon, provided that the said award has been made in a territory of one of the High Contracting Parties to which the present Convention applies and between persons who are subject to the jurisdiction of one of the High Contracting Parties.

To obtain such recognition or enforcement, it shall, further, be necessary:

*(a)* That the award has been made in pursuance of a submission to arbitration which is valid under the law applicable thereto;

*(b)* That the subject-matter of the award is capable of settlement by arbitration under the law of the country in which the award is sought to be relied upon;

*(c)* That the award has been made by the Arbitral Tribunal provided for in the submission to arbitration or constituted in the manner agreed upon by the parties and in conformity with the law governing the arbitration procedure;

*(d)* That the award has become final in the country in which it has been made, in the sense that it will not be considered as such if it is open to *opposition appel* or *pourvoi en cassation* (in the countries where such forms of procedure exist) or if it is proved that any proceedings for the purpose of contesting the validity of the award are pending;

*(e)* That the recognition or enforcement of the award is not contrary to the public policy or to the principles of the law of the country in which it is sought to be relief upon.

Article 2

Even if the conditions laid down in Article 1 hereof are fulfilled. recognition and enforcement of the award shall be refused if the Court is **satisfied**—

*(a)* That the award has been annulled in the country in which it was made;

*(b)* That the party against whom it is sought to use the award was not given notice of the arbitration proceedings in sufficient time to enable him to present his case or that, being under a legal incapacity, he was not properly represented;

LAWS OF ANTIGUA AND BARBUDA

*Arbitration*                    (**CAP. 33**          23

---

*(c)* That the award does not deal with the differences contemplated by or falling within the terms of the submission to arbitration or that it contains decisions on matters beyond the scope of the submission to arbitration.

If the award has not covered all the questions submitted to the arbitral tribunal, the competent authority of the country where recognition or enforcement of the award is sought can, if it think fit, postpone such recognition or enforcement or grant it subject to such guarantees as that authority may decide.

## Article 3

If the party against whom the award has been made proves that, under the law governing the arbitration procedure, there is a ground, other than the grounds referred to in Article 1(*a*) and *(c)*, and Article 2(*b*) and *(c)*, entitling him to contest the validity of the award in a Court of Law, the Court may, if it thinks fit, either refuse recognition or enforcement of the award or adjourn the consideration thereof, giving such party a reasonable time within which to have the award annulled by the competent tribunal.

## Article 4

The party relying upon an award or claiming its enforcement must supply in **particular—**

(1) The original award or a copy thereof duly authenticated, according to the requirements of the law of the country in which it was made;

(**2**) Documentary or other evidence to prove that the award has become final, in the sense defined in Article 1(*d*), in the country in which it was made;

(**3**) When necessary, documentary or other evidence to prove that the conditions laid down in Article 1, paragraph 1 and paragraph 2(*a*) and *(c)* have been fulfilled.

Translation of the award and of the other documents mentioned in this Article into the official language of the country where the award is sought to be relied upon may be demanded. Such translation must be certified correct by a diplomatic or consular agent of the country to which the party who seeks to rely upon the award belongs or by a sworn translator of the country where the award is sought to be relied upon.

LAWS OF ANTIGUA AND BARBUDA

**CAP. 33)**                    *Arbitration*

### Article 5

The provisions of the above Articles shall not deprive any interested party of the right of availing himself of an arbitral award in the manner and to the extent allowed by the law or the treaties of the country where such award is sought to be relied upon.

### Article 6

The present Convention applies only to arbitral awards made after the coming into force of the Protocol on Arbitration Clauses, opened at Geneva on 24th September, 1923.

### Article 7

The present Convention, which will remain open to the signature of all the signatories of the Protocol of 1923 on Arbitration Clauses, shall be ratified.

It may be ratified only on behalf of those Members of the League of Nations and non-Member States on whose behalf the Protocol of 1923 shall have been ratified.

Ratifications shall be deposited as soon as possible with the Secretary-General of the League of Nations, who will notify such deposit to all the signatories.

### Article 8

The present Convention shall come into force three months after it shall have been ratified on behalf of two High Contracting Parties. Thereafter, it shall take effect, in the case of each High Contracting Party, three months after the deposit of the ratification on its behalf with the Secretary-General of the League of Nations.

### Article 9

The present Convention may be denounced on behalf of any Member of the League or non-Member State. Denunciation shall be notified in writing to the Secretary-General of the League of Nations, who will immediately send a copy thereof, certified to be in conformity with the notification, to all the other Contracting Parties, at the same time informing them of the date on which he received it.

The denunciation shall come into force only in respect of the High Contracting Party which shall have notified it and one year after such notification shall have reached the Secretary-General of the League of Nations.

The denunciation of the Protocol on Arbitration Clauses shall entail *ipso* facto the denunciation of the present Convention.

**A461**

Case 15-1595, Document 50, 08/27/2015, 1586805, Page220 of 220

LAWS OF ANTIGUA AND BARBUDA

*Arbitration*            (CAP. 33            25

---

### Article 10

The present Convention does not apply to the Colonies, Protectorates or territories under suzerainty or mandate of any High Contracting Party unless they are specially mentioned.

The application of this Convention to one or more of such Colonies, Protectorates or territories to which the Protocol on Arbitration Clauses, opened at Geneva on 24th September, 1923, applies, can be effected at any time by means of a declaration addressed to the Secretary-General of the League of Nations by one of the High Contracting Parties.

Such declaration shall take effect three months after the deposit thereof.

The High Contracting Parties can at any time denounce the Convention for all or any of the Colonies, Protectorates or territories referred to above. Article 9 hereof applies to such denunciation.

### Article 11

A certified copy of the present Convention shall be transmitted by the Secretary-General of the League of Nations to every Member of the League of Nations and to every non-Member State which signs the same.

---