# 15-1595-cv

## United States Court of Appeals

*for the*

## Second Circuit

~.~

AMERICAN UNIVERSITY OF ANTIGUA - COLLEGE OF MEDICINE,

*Petitioner-Appellee,*

-v.-

LEEWARD CONSTRUCTION COMPANY, LTD.,

*Respondent-Appellant,*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
### Volume 4 of 4 (Pages A609 to A903)

VERONICA A. MCMILLAN
LEWIS & GREER, P.C.
*Attorneys for Respondent-Appellant*
510 Haight Avenue, Suite 202
Poughkeepsie, New York 12603
(845) 454-1200

## APPENDIX TABLE OF CONTENTS

### Volume 1

Docket Entries ............................................................................................... A001

Notice of Appeal ........................................................................................... A014

Opinion & Order, Dated May 1, 2015 .......................................................... A015

Verified Petition ............................................................................................ A035

    Contract (Verified Petition, Ex. A) ........................................................ A041

    Statement of Claim (Verified Petition, Ex. B) ....................................... A093

    Answer and Counterclaim (Verified Petition, Ex. C) ............................ A132

    Amended Counterclaim (Verified Petition, Ex. D) ................................ A154

    Arbitrators' Decision on the Parties' Dispositive Motions and
    Related Counterclaims (Verified Petition, Ex. E) .................................. A158

    Partial Final Arbitration Award, dated September 18, 2014
    (Verified Petition, Ex. F) ....................................................................... A172

Affirmation of Leonard Sclafani in Support of Petition/Motion for
    Confirmation of, and for Judgment on, an Arbitration Award ................ A189

    Letter to Hon. Justin L. Simon, Attorney General from Neil S.
    Simon, dated September 28, 2010 (Exhibit 46 of Exhibit B of
    Sclafani Affirmation) .............................................................................. A196

    Email to Jackie Williams from Lyle Novick, dated November
    17, 2009 (Exhibit 50 of Exhibit B of Sclafani Affirmation) .................. A200

i

Email to Lyle Novick from Jackie Williams, dated November 17, 2009 (Exhibit 60 of Exhibit B of Sclafani Affirmation) ...................A208

Email to Matt Peterson, Jackie Williams and Lyle Novick from Basil Stuart, dated November 17, 2009 (Exhibit 61 of Exhibit B of Sclafani Affirmation) .........................................................................A217

Email to Basil Stuart; Barrymore Warren; Antony Roche; Nagesha, A.S. from Corey Greenberg, dated December 10, 2009
(Exhibit 62 of Exhibit B of Sclafani Affirmation) ...................................A227

Email to Matt Petersen and Prabhu Marudheri from Antony Roche, dated December 11, 2009 (Exhibit 63 of Exhibit B of Sclafani Affirmation)................................................................................A236

Email to Matt Petersen from Jackie Williams, dated December 22, 2009 (Exhibit 64 of Exhibit B of Sclafani Affirmation) ...................A240

Email to Matt Petersen, lyle Novick, Jackie Williams, Basil Stuart;, and Corey Greenberg from Leonard Sclafani, dated December 23, 2009 (Exhibit 65 of Exhibit B of Sclafani Affirmation)..............................................................................................A243

## Volume 2

Notice of Cross-Motion to Deny Enforcement, Vacate or Modify Arbitration Award....................................................................................A249

Declaration of Veronica A. McMillan in Support of Notice of Cross Motion...................................................................................................A251

Amended Demand for Arbitration (Exhibit 1 of Cross-Motion) .............A259

Answering Statement and Counterclaim of American
University in Antigua to the Amended Demand for Arbitration
Submitted by Leeward Construction Company, Ltd. (Exhibit 2
of Cross-Motion) ....................................................................................A283

Final Award (Exhibit 3 of Cross-Motion) ................................................A321

Memorandum Opinion, Hon. Lewis A. Kaplan, USDC, SDNY,
Dated March 26, 2013
(Exhibit 4 of Cross-Motion) ...................................................................A388

Corrected Amended Judgment, Dated June 11, 2013 (Exhibit 5
of Cross-Motion) ....................................................................................A397

Partial Final Award and Second Decision on the Parties'
Dispositive Motions and Related Cross-Motions and Dissent to
Partial Final Award and Second Decision on the Parties'
Dispositive Motions and Related Cross-Motions (Exhibit 7 of
Cross-Motion)..........................................................................................A400

Laws of Antigua and Barbuda – The Arbitration Act, Chapter
33 (Exhibit 8 of Cross-Motion) ..............................................................A438

## Volume 3

The Antigua and Barbuda Sales Tax Act, 2006 and The Antigua and
Barbuda Sales Tax Act (Amended), 2008 (Exhibit 9 of Cross-
Motion) ...................................................................................................A463

## Volume 4

Index of Authorities (Exhibit 11 of Cross-Motion)............................................A609

*Alfa Telecom Turkey Limited v. Cukurova Finance
International Limited and Cukurova Holdings AS*,
HCVAP 2009/001 ........................................................................A610

*Baldwin Spencer v. The Attorney General of Antigua and Barbuda, Lester Bryant Bird and Asian Village Antigua Limited CIV.*APP.NO.20A of 1997, Antigua and Barbuda Court of Appeal ............................................................................ A683

*Besseler Waechter Glover & Co. v. South Derwent Coal Co.,* 59 Lloyd's List Law Report 104 (King's Bench 1937) ................ A710

*Bremer Handelsgesellschaft v. C. Mackprang Jr.,* 1 Lloyd's Law Report 221 (Court of Appeal 1979) ....................... A716

*Clearlie Todman-Brown v. Nat'l. Bank of the Virgin Islands, Ltd.,* BVIHCV 64/2013......................................................................... A727

*Fibrosa Societe Anonyme v. Fairbaum Lawson Combe Barbour Ltd.,* [1942] UKHL 4, [1943] AC 32 ....................................................... A742

*Mavis Henry, Attorney for Millicent Ralph v. Tyrone Warner,* Claim No. ANUHCV 2000/0277, The Eastern Caribbean Supreme Court in the High Court of Justice Antigua and Barbuda...................................................................................... A803

*Meyer v. Gilmer,* 18 NZLR 129 (1899) ..................................................................... A816

*Motor Oil Hella (Corinth) Refineries SA v. Shipping Corp. of India ("The Kanchenjunga"),* 1 Lloyd's Rep. 391 (House of Lords 1990) ................................................................. A823

*Premium Nafta Products, Ltd. And Others v. Fili Shipping Co. Ltd.,*2007 UKHL 40 (House of Lords 2007).................................. A835

*Westdeutsche Landesbank Girozentrale v. Islington London Borough Council,* [1996] UKHL 12, [1996] AC 669 (House of Lords 1996) ................................................................. A843

13 Lord, Williston on Contracts ............................................................. A853

Chitty on Contracts ................................................................................ A855

Wilken and Villiers: The Law of Waiver, Variation and
Estoppel 2d .................................................................................... A861

Claimant's Reply in Further Support of its Motion to Dismiss
Respondents Counterclaims and in Opposition to Respondent's
Cross-Motion for Summary Judgment (Exhibit 12 to Cross
Motion ........................................................................................... A876

AUA Amended Answer and Counterclaims ........................................ A877

Civil Judgment, Dated May 5, 2015 .................................................. A902

## EXHIBIT 11

## INDEX OF AUTHORITIES

**CASES**                                                              **PAGES WITHIN EXHIBIT**

1.  *Alfa Telecom Turkey Limited v. Cukurova Finance International Limited
    and Cukurova Holdings AS*, HCVAP 2009/001 .................................................................1

2.  *Baldwin Spencer v. The Attorney General of Antigua and Barbuda,
    Lester Bryant Bird and Asian Village Antigua Limited
    CIV.APP.NO.20A of 1997, Antigua and Barburda Court of Appeal* ...............................74

3.  *Besseler Waechter Glover & Co. v. South Derwent Coal Co.,*
    59 Lloyd's List Law Report 104 (King's Bench 1937) ...................................................101

4.  *Bremer Handelsgesellschaft v. C. Mackprang Jr.,*
    1 Lloyd's Law Report 221 (Court of Appeal 1979) .......................................................107

5.  *Clearlie Todman-Brown v. Nat'l. Bank of the Virgin Islands, Ltd.,*
    BVIHCV 64/2013 ...........................................................................................................118

6.  *Fibrosa Societe Anonyme v. Fairbaum Lawson Combe Barbour Ltd.,*
    [1942] UKHL 4, [1943] AC 32........................................................................................133

7.  *Mavis Henry, Attorney for Millicent Ralph v. Tyrone Warner,*
    Claim No. ANUHCV 2000/0277, The Eastern Carribean Supreme Court
    in the High Court of Justice Antigua and Barbuda .........................................................194

8.  *Meyer v. Gilmer,*
    18 NZLR 129 (1899) .......................................................................................................207

9.  *Motor Oil Hella (Corinth) Refineries SA v. Shipping Corp. of India ("The Kanchenjunga"),*
    1 Lloyd's Rep. 391 (House of Lords 1990) ....................................................................214

10. *Premium Nafta Products, Ltd. And Others v. Fili Shipping Co. Ltd.,*
    2007 UKHL 40 (House of Lords 2007)...........................................................................226

11. *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council,*
    [1996] UKHL 12, [1996] AC 669 (House of Lords 1996).............................................234

**TREATISES**

10. 13 Lord, Williston on Contracts.......................................................................................244

11. Chitty on Contracts ..........................................................................................................246

12. Wilken and Villiers: The Law of Waiver, Variation and Estoppel 2d.................................252

BRTISH VIRGIN ISLANDS
EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
COMMERCIAL DIVISION

CLAIM NO: BVIHC (COM) 2007/072

ALFA TELECOM TURKEY LIMITED

Claimant

and

(1) CUKUROVA FINANCE INTERNATIONAL LIMITED
(2) CUKUROVA HOLDINGS AS

Defendants

and

CLAIM NO: BVIHC (COM) 2007/119

(1) CUKUROVA FINANCE INTERNATIONAL LIMITED
(2) CUKUROVA HOLDINGS AS

Claimants

and

ALFA TELECOM TURKEY LIMITED

Defendant

**Appearances:**   Mr Stephen Smith Q.C., Mr Robert Levy Q.C., and Mr Oliver Clifton for Alfa
Mr Kenneth MacLean Q.C., Ms Arabella di Iorio and Mr James Nadin for Cukurova

<u>JUDGMENT</u>

[2010: 13, 14, 15, 16, 19, 20, 21, 22, 23, 26, 29, 30 April; 20 May]

(Loan of US$1.352bn made on 25 November 2005 pursuant to Facility Agreement
– secured by equitable mortgage over shares – loan repayable by four equal
annual instalments commencing on 24 November 2008 – lender entitled to
accelerate loan and/or enforce on occurrence of continuing Event of Default –
lender claiming Events of Default continuing as at 16 April 2007 and accelerating
loan – whether continuing Events of Default subsisting when loan accelerated –
equitable mortgage containing power of appropriation under UK Financial
Collateral Arrangements (No 2) Regulations 2003 – lender exercising power of

1

**A610**

appropriation on 27 April 2007 – whether continuing Event of Default subsisting when power exercised – whether lender able to rely on post – acceleration Events of Default – whether lender acting in bad faith in negotiating and concluding lending arrangements – whether lender acting in bad faith in managing the lending – whether lender exercising the power of appropriation in bad faith and/or for a collateral purpose – whether appropriation to be set aside as a result of lender's bad faith or collateral purpose)

[1]   **Bannister J [ag]:**  In these proceedings the Claimant, Alfa Telecom Turkey Limited ('ATT'), claims against the first and second Defendants, Cukurova Finance International Limited ('CFI') and Cukurova Holdings AS ('CH'), declarations that its purported exercise on 27 April 2007 of a right of appropriation conferred in two separate charges granted to ATT by each of CFI and CH on, respectively, 28 September 2005 and 25 November 2005 (' the CFI English share charge' and 'the CH English share charge', together 'the English share charges') was valid and that thereupon ATT became absolutely entitled to the charged shares. ATT claims a number of other declarations and ancillary relief, but the substance of the claim is as I have set it out above.  CFI and CH deny that ATT was entitled as at 27 April 2007 to enforce either of the English share charges, because they say, first, that the contractual right to accelerate the lending or enforce the security had not then accrued and secondly, if it had, that the purported exercise of the right of appropriation was bad since it was done in bad faith and otherwise than for the purpose of securing repayment of the indebtedness secured by the English share charges.  If these defences fail, then CFI claims what is described as relief from forfeiture on the grounds that a little under a month after ATT's purported exercise of the remedy of appropriation it tendered the full amount of the secured indebtedness together with interest at the default rate and remains ready, able and willing to pay the full amount claimed by ATT.  It will be obvious from the fact that these proceedings have remained on foot that CFI's Defendants' tender was rejected.

**Factual background**

[2]   I shall have to go into considerably more detail in relation to the separate issues which have arisen in these proceedings, but in order for the underlying nature of the dispute to be understood I think it will be helpful if I first set out the background and key events.

[3]   ATT is a special purpose vehicle ('SPV') incorporated for the purpose of the transactions with which these proceedings are concerned.  It is part of a large Russian conglomerate ('Alfa') with

2

**Page 2**

interests in, among other things, telecommunications and in particular the provision of cell phone networks. CFI was also formed as an SPV for the purpose of those transactions. CFI is wholly owned by CH and forms part of a group of companies (I use the term in the broad sense) with extensive interests centered in, but not confined to Turkey ('Cukurova'). Prior to the transactions with which I am concerned, one of those interests was CH's indirect 27% (or thereabouts) shareholding in a Turkish cell phone network provider called Turkcell Iletisim Hizmetleri AS ('Turkcell'), whose shares are traded on the Istanbul and New York exchanges. I do not think that it is disputed that the Turkcell shares have historically been prone to considerable volatility, but when the arrangements which have given rise to these proceedings were in gestation the share price was around US$11.3. At 8 June 2007 Turkcell had a market capitalization of US$13.5 billion. I think that it was common ground that the Turkish cell phone and communications market had, certainly at the time with which these proceedings are concerned, very considerable potential for growth.

[4] CH's 27% indirect interest in Turkcell to which I have referred above was held, before the arrangements with which I am concerned were concluded, through another Turkish registered company called Turkcell Holding AS ('TCH'), which held and still holds 51% of Turkcell. CH owned a little under 53% of TCH which gave CH the 27% indirect holding in Turkcell. A Finnish telecommunications company, Sonera, held the remaining 47% or so of TCH. Sonera later merged with a Swedish cell phone network company, Telia, to become TeliaSonera Finland OYJ and I shall refer to the Sonera interest as 'TS'. CH also held a 7.43% direct interest in Turkcell and another wholly owned subsidiary of CH, Cukorova Investments NV ('CI'), held a little under 6% of Turkcell directly.

[5] In 2003 and 2004 Cukurova was under considerable financial pressure. It had, in particular, a liability of some US$3 billion to the Turkish State Savings Deposit Insurance Fund ('SDIF'), repayable over 15 years under an agreement entered into in early 2003. In August 2004 Cukurova negotiated a supplemental agreement under which it was permitted to make payment to SDIF at an accelerated rate of US$15 million per month, rising to US$135 million per month from 28 February 2005. The effect of these accelerated payments, if maintained, would be to discount the total amount of interest payable by some US$1 billion, but if four in total or any two consecutive installments were missed, then the original payment schedule would be reinstated, with the loss of

3

the interest discount. Unsurprisingly, in 2004 JP Morgan, Cukurova's bankers, were actively seeking interest in Cukurova's Turkcell shares and interests, either by sale or through some sort of joint venture arrangement in order to assist Cukurova to deal with its cash flow pressures.

[6]     There had been informal contact between Alfa and Cukurova in 2003, which bore no immediate fruit. Further discussions for the acquisition by Alfa of some or all of Cukurova's interest in TCH commenced in the autumn of 2004. There were two particular legal or regulatory matters which impacted heavily on those negotiations. First, TS had rights of pre-emption under a shareholders agreement of 21 October 1999 governing the relations of the TCH shareholders, which would require any shares intended to be purchased by Alfa to be first offered to TS; secondly, unless an exemption could be relied upon or a waiver was obtained, any person acquiring more than 25% of Turkcell or TCH would be required by the Turkish Capital Markets Board ('CMB') to make a mandatory offer for the Turkcell shares. Negotiations between Cukurova and Alpha got under way in earnest in early 2005 and there was a meeting at the Raphael Hotel in Paris towards the end of January. Present on the Alpha side were Mikhail Fridman ('Mr Fridman'), the effective controller of the Alfa group, Aleksandr Nicholas Tolchinsky ('Mr Tolchinsky'), a director or former director of certain Alfa Group companies on the banking and finance side, and Mr Alex Knaster ('Mr Knaster') who seems to have been a significant investor in Alfa and who was a director of various Alfa companies. On the Cukurova side were Mehmet Emin Karamehmet ('Mr Karamehmet') Chairman and CEO of CH, and Mr Osman Berkmen ('Mr Berkmen'), a long standing officer of Cukurova and director from time to time of various Cukurova companies. He is presently a consultant to Cukurova.   At that stage there was already for consideration a suggestion that CH should sell Alfa 50% of its TCH shares and charge the remainder to ATT as security for a loan equivalent to their current market value. This precise structure proved impossible to achieve because of TS's pre-emption rights in TCH, but it is clear that the basic commercial elements of what turned out to be the deal between Alfa and CH had been established by that time. Mr Berkmen says that he wanted to persuade Alfa to take a mixture of shares held by CH through TCH and shares held by Cukurova directly, but that Alfa was interested only in the TCH shares which, as Mr Karamehmet pointed out, conferred management control of Turkcell.

[7]     At or around the same time, Cukurova was in discussions with TS. There was disagreement at CH board level, with Mr Berkmen in favour of an outright disposal of Cukurova's entire holding of TCH

4

shares to TS and Mr Karamehmet in favour of a deal whereby CH retained an interest in (roughly) half of the TCH shares.

[8]     By February 2005 Deutsche Bank ('DB') had become involved on Alfa's behalf.  Indeed there had been a possibility, which did not materialise, that DB would provide funding to Alfa for the transaction.  DB did, however, continue to advise Alfa throughout the course of the lending.  On 25 March 2005 TS issued a press release announcing that an agreement in principle had been reached with Cukurova for the sale by Cukurova to TS of Cukurova's entire indirect 27% stake in Turkcell for US$3.1bn.  Alfa says that it was told by Cukurova that this press release was wrong and that all that had in fact been agreed between Cukurova and TS was a two month exclusivity period.

[9]     By April 2005 Cukurova had paid only $50 million of the March installment due under the SDIF agreements, leaving US$85 outstanding.  It is clear that it was also in difficulties about finding the April installment and thus short of some US$220 Million in total.  Failure to top up the March installment and meet the April installment would mean the loss of some US$1bn in discounted interest.  Cukurova was thus critically short of cash in April 2005.  TS refused to finance the current SDIF payments and so did Cukurova's bankers, JP Morgan.

[10]    On 27 April 2005, Alfa, through an associated company called Mogoton Finance Limited ('Mogoton'), extended facilities of US$220m to Cukurova in order to enable it to meet the shortfall of US$85 Million in the March 2005 SDIF installment and the US$135m due at the end of April.  In fact, Mogoton continued to finance the SDIF payments until the transactions closed in November 2005.

[11]    On 23 May 2005 TS issued another press release.  Its gist was that Cukurova had not signed any agreement for the sale to TS of the 27% indirect interest in Turkcell, but that its failure to do so was in breach of a binding agreement reached between the two sides and that TS would be pursuing legal action against Cukurova to enforce the agreement reached.  Cukurova's position, as disclosed to the CMB and thus to the public, was that the exclusivity period had expired without any binding agreement having been concluded.  Alfa says that it was assured by Cukurova that the only agreement between the parties had been for a two month exclusivity period, which had come to an end on 23 May 2005 without any agreement having been reached.

5

[12]   Negotiations between Alfa and Cukurova resumed. Alfa was advised by Jones Day and Cukurova by White & Case. As already mentioned, Alfa was also advised by DB, which in turn retained Slaughter & May to advise it. With a view of sidestepping the pre-emption provisions in the TCH shareholders agreement, CH, at the request of Alfa, transferred its TCH shares to a newly incorporated BVI registered SPV, Cukurova Telecom Holdings Limited ('CTH') itself wholly owned by the newly incorporated BVI SPV, CFI. This transfer relied upon the exemption in the TCH shareholders agreement for transfers to affiliates and, unless challenged, cleared the way for Cukurova to deal with its 27% indirect interest in Turkcell free from any interference from TS.

[13]   By 31 May 2005 Alfa and Cukurova were on course to finalizing an agreement under which CFI would sell 49% of its shares in CTH to ATT for roughly US$1.6bn, thus giving Alfa/ATT a 13.22% indirect interest and Cukurova/CFI a 13.76% indirect interest in Turkcell. CFI's remaining 51% of CTH would be charged to ATT against a loan of US$1.352bn. In addition, Alfa would make available US$355m by way of unsecured lending, supported by guarantees, including a personal guarantee from Mr Karamehmet.

[14]   A subscription agreement was executed between CH, CFI and ATT on 1 June 2005 ('the Subscription Agreement'). It was subject to a number of conditions precedent dealing with regulatory matters (including the obtaining of a waiver releasing Alfa from any obligation to make a mandatory offer to the other Turkcell shareholders) and to satisfactory completion of due diligence (in the broadest sense). The Subscription Agreement gave effect to the terms outlined above. In return for a subscription price of just under US$1.6 billion CFI was to procure CTH to issue ATT with convertible bonds which, when exercised, would give ATT 49% of the issued shares in CTH. On completion ATT would grant CFI a secured facility in the sum of US$1.352bn, secured by charges over the shares in CTH and CFI held by CFI and CH respectively, and an unsecured facility in the sum of US$355 million (each in an agreed form). In addition, the Subscription Agreement bound the parties to enter into a shareholders agreement ('the Shareholders Agreement'), again in an agreed form, governing their relationship as members of CTH.

[15]   On 17 June 2005 TS commenced an arbitration against CH in Geneva, claiming (1) specific performance of the agreement which TS asserted, but Cukurova denied, had been reached during the exclusivity period and (2) breach by CH of the TCH shareholders agreement. The latter

6

dispute ended up being heard in Vienna as a result of a choice of law provision in the TCH shareholders agreement.

[16]     On 21 June 2005 CFI and CH issued a disclosure letter for the purposes of the Subscription Agreement ('the Disclosure Letter'). Section 3 of the Disclosure Letter disclosed that TS had commenced arbitration proceedings in Geneva alleging a breach of a Memorandum of Understanding ('MOU') reached between it and CH relating to CH's 53% holding in TCH; that it had applied for an injunction in the Swiss courts to restrain the completion of the transactions envisaged by the Subscription Agreement; and that in the arbitration TS sought an order for specific performance of the agreement for the sale to it by CH of its stake in TCH or damages in lieu. Alfa's evidence was that it was assured by Cukurova that this claim was misconceived. In October 2005 TS obtained an order from the Swiss courts, the effect of which was to prevent the parties, while it remained in force, from closing the subscription and related agreements.

[17]     On 20 September 2005 ATT, CFI and Holdings executed the Shareholders Agreement.

[18]     Under an agreement executed on 28 September 2005 ('the Facility Agreement') the newly incorporated ATT agreed on closure to lend the newly incorporated CFI US$1.32bn, to be secured against CFI's 51% holding in CTH and CH's two shares in CFI (the whole of CFI's issued share capital). The borrowing was to be repaid in four equal annual installments, the first becoming payable, as matters turned out, on 24 November 2008. Interest was payable annually at the rate of LIBOR plus 8. Also on 28 September 2005, ATT agreed to lend CFI US$355m unsecured, at the same rate of interest. The first installment of interest under each of the facilities became due on 24 November 2006. The combined amount of interest payable on that date would turn out to be some US$217m. ATT accepts that it knew from the outset that it was Cukurova's intention to refinance the lending and both the Facility Agreement and the agreement granting the unsecured loan contained express provisions permitting CFI to prepay the whole or part of the lending on five days notice, provided that a rateable proportion of the unsecured lending was repaid simultaneously with any prepayment of secured lending.

[19]     Also on 28 September 2006 CFI and ATT executed the CFI English share charge, by which CFI charged its 51% of CTH by way of equitable mortgage as security for the repayment by CFI of the US$1.352bn secured facility to be provided to it by ATT. The charge contained the usual

7

provisions disapplying the restrictions contained in the Law of Property Act 1925, regarding the arising and exercise of the power of sale and of the power to appoint receivers and, by Schedule 2, conferred ancillary rights, such as the right to possession and the exercise of ownership rights. Clause 9.3 was in the following terms:

> 'Financial Collateral Arrangement
>
> (a)   To the extent that this Deed constitutes a "financial collateral arrangement" (as defined in the Financial Collateral Arrangements (No.2) Regulations 2003 (the **"Regulations"**) the Lender shall have the right (at any time after the Charges become enforceable) to appropriate any Charged Asset which constitutes "financial collateral" (as defined in the Regulations) ("Financial Collateral") in or towards satisfaction of the Liabilities in accordance with the Regulations.
>
> (b)   Financial Collateral shall be valued at its Fair Price.'

The 'Fair Price' mentioned at clause 9.3(b) was defined in an addendum deed of 25 November 2005 in the following terms:

> 'Dear Sirs,
>
> **Share Charge in respect of shares in Cukurova Telecom Holdings Limited dated September 28, 2005 between Cukurova Finance International and Alfa Telecom Turkey (the "Share Charge")**
>
> (1)   We refer to the Share Charge. Capitalised terms used herein have the meaning ascribed to them in the Share Charge unless otherwise stated.
>
> (2)   It is agreed that the definition of **"Fair Price"** is hereby deleted in its entirety and in its stead the following definition shall be deemed incorporated: **"Fair Price"** means the value of the Shares calculated, on a look-through basis, based on the weighted average market value of publicly traded Turkcell shares over the previous 60 day period as reported in the Istanbul Stock Exchange Bulletin (the "Turkcell Look-Through Value"), provided that in the event that the Lender has exercised its right of appropriation pursuant to clause 9.3 of the share charge in

8

**A617**

> respect of shares in Cukurova Telecom Holdings Limited
> dated on or about the date of this Deed between the
> Lender and Cukurova Finance International Limited or has
> otherwise enforced the charges created thereunder, the
> Turkcell Look-Through Value shall not be taken into
> account when calculating the Fair Price.'

[20]    For various reasons which I do not think it is necessary for me to set out in detail, but which
resulted partly from the continuing injunction which TS had obtained in Switzerland and partly from
the need to satisfy the Turkish regulatory requirements with which the conditions precedent to the
Subscription Agreement, had been largely concerned, these transactions did not close until 25
November 2005, shortly after the Swiss injunction had been lifted on 23 November 2005. On 25
November 2005 ATT made the secured and unsecured advances and CH entered into the CH
English share charge over its two shares in CFI. Its terms were identical in all material respects to
those of the CFI English charge and which I have mentioned above. Blank transfers, together with
the relative share certificates, were delivered to ATT by CFI and CH at closing. The Mogoton
lending (which by closing had reached US$762m) was repaid from the money advanced by ATT at
closing.

[21]    On the same day each of CFI and CH executed charges of, respectively, their CTH and CFI shares
under BVI law. The principal material distinction between these two charges and the English share
charges was that there was, obviously, no incorporation of the right to appropriate conferred by the
UK Financial Collateral Arrangements (No 2) Regulations 2003 ('the Regulations'). It appears that
the decision to take charges under both English and BVI law was the result of a disagreement
between Alfa's advisers as to the efficacy of the right to appropriate. Since it has been decided in
the English Administrative Court that the Regulations are not *ultra vires*[1] and since the Privy
Council has decided that the right of appropriation is in principle available to Alfa in the
circumstances of this case[2], there is no need for me to say anything more about that.

[22]    Thus, the position on closing was that CFI held 51% of CTH and ATT held the remaining 49%.
ATT had paid Cukurova just short of US$1.6 billion for that interest which indirectly gave it 13.22%

---

[1] [2008] EWHC 2567

[2] [2009] 3 All ER 849

9

**A618**

of Turkcell.  CFI's 51% interest in CTH (amounting, to a 13.67% indirect interest in Turkcell), was charged to ATT to secure the US$1.352bn lent to it by ATT.  CH's interest in CFI was also charged to ATT in support of the secured facility. Taking into account the unsecured facility, Alfa's total outlay was therefore some US$3.3bn.  TS still held the 47% holding in TCH, which continued to give it an indirect holding in Turkcell of some 24%.

[23]    ATT's sole *de jure* director was a Mr Nazarian, who seems to have been based in Luxembourg. ATT's immediate parent was an Alfa company called Alfa Finance Holdings Limited ('AFH'), which, as its name implies, was concerned with finance and investment rather than telecoms. From the outset, therefore, actual management of ATT was delegated to a company generally referred to at trial as 'Altimo'.  Altimo had originally been called Alfa Telecom, and had been formed to hold all the Alfa Group's telecom assets.  There was in evidence a draft of this management agreement, which was said to have been formally concluded sometime in the summer of 2006.  It is clear that it transferred or delegated the entire day to day management of ATT to Altimo.  Mr Nazarian's sole role in relation to ATT was, so far as the evidence discloses, as a signatory to formal documents required to be executed by ATT.

[24]    Although the evidence could have been clearer, it appeared that Altimo, formerly Alfa Telecom, was the name commonly given in the course of Alfa's business to a BVI registered company called Alfa Holdings and Investments Limited ('AHIL').  To add to the confusion, Altimo was often referred to in internal documentation as 'Altimo sub-holding' and it further appeared that there existed an entirely separate Russian company called Altimo LLC.  Mr Musatov said that he was employed by Altimo LLC and it may well be that Altimo LLC was used for employment or other administrative purposes, although, with the exception of the evidence of Mr Musatov to which I have referred, there is no further detail about the activities of that company.  In this judgment I shall use the expression 'Altimo' to mean Altimo sub-holding/AHIL.

[25]    Altimo has an executive board, meeting every two months or so.  It appears that some time in 2007 Altimo's executive board came to be referred to as the Altimo Consulting Board, but I shall refer to the Altimo executive board throughout this judgment as 'the Altimo board'.  Altimo's CEO is Alexey Mikhailovich Reznikovich ('Mr Reznikovich').  At times in their evidence Mr Reznikovich and Mr Tolchinsky mentioned another body, which they referred to as the consulting, or advisory board.

10

As I understood their evidence, this reference was to the beneficial owners of Altimo in their capacity as such, to whom Mr Reznikovich would occasionally refer for advice and whose sanction was, according to Altimo's Chief Legal Officer, Yuri Vladislavovich Musatov ('Mr Musatov'), required for transactions with a value in excess of US$250m. This body is not to be confused with the Altimo board, even though some and possibly most of the members were common to both. I am quite satisfied that the Altimo board, in the sense in which I am using that term in this judgment, was not merely advisory or consultative. On the contrary, it is clear from the documents that it was asked for and made executive decisions, including important decisions about ATT. That was also clear from the evidence of both Mr Reznikovich and Mr Musatov.

[26]   I am also satisfied that, as a result of the arrangements which I have mentioned in paragraph [23] above, it is the Altimo board which is to be treated as the directing mind and will of ATT. It will be seen that it was to the Altimo board that tactical and strategic questions connected with the lending to CFI were referred and it was the Altimo board which had the power to decide whether ATT should bide its time or move to accelerate the lending. Mr Reznikovich could not have done that on his own in his capacity as CEO. Indeed, Mr Musatov made clear that Mr Reznikovich's executive freedom of action was limited to transactions that did not exceed US$25m in value.

[27]   Between about 8 and 22 November 2006 CH and CI each sold, by way of secondary public offering conducted by JP Morgan, Turkcell shares directly held by each of them separately outside the security granted to ATT. The shares sold amounted in aggregate to 5.88% of Turkcell. The total proceeds came to some US$579m. Cukurova used the bulk of this money to pay, on 24 November 2006, not only the aggregate of US$217m payable by way of annual interest on the secured and unsecured borrowing, but also the entirety of the unsecured borrowing (US$355m) and US$2m of the principal amount of the secured loan, leaving US$1.35bn of secured borrowing outstanding.

[28]   Early in January 2007 with the help of JP Morgan Cukurova began in earnest efforts to find alternative investors to enable the ATT borrowing to be paid off.

[29]   On 26 January 2007 TS issued a press release announcing that the ICC arbitral tribunal in Geneva had found that a binding agreement had been concluded between TS and CH in 2005 and had required CH to transfer its TCH shares to TS upon payment of US$3.1bn. Although this

11

announcement came to the attention of Alfa in the ordinary course, Alfa made no effort to contact Cukurova about it.

[30]     On 12 February 2007 ATT, as it was entitled to under the terms of the Facility Agreement, called on CFI to provide it with CFI's financial statements relative to its last preceding financial year. On 22 February 2007 CFI, by its sole director, Ms Yasemin Cetinalp ('Ms Cetinalp'), supplied such a document. It consisted only of a balance sheet and accompanying notes. On its face it showed that CFI had negative net equity as at 31 December 2006 of some US$236m, the result of liabilities of US$574m 'due to related parties'. It was a term of the Facility Agreement that CFI should not borrow without ATT's prior written consent. Breach was an Event of Default. Balance sheet insolvency was also an Event of Default under the Facility Agreement. Alfa made no effort to take up either of these matters with Cukurova.

[31]     On 2 April 2007 the boards of AFH and Altimo met (probably by telephone) to consider (a) the CFI balance sheet sent to ATT on 22 February 2007; (b) the effect of the arbitration award obtained by TS in Geneva; and (c) certain transactions between Turkcell and Cukurova-related parties which Alfa considered to be an irremediable breach of the Shareholders Agreement and, thus, to amount to an Event of Default under the Facility Agreement. At these meetings it was resolved to declare a default under the Facility Agreement; call in the loan (as ATT was entitled to do if an Event of Default had occurred and was continuing); and perfect ATT's title to the CFI and CTH shares mortgaged pursuant to the English charges by obtaining the legal title. Then, if CFI failed to repay, it was resolved to exercise the right to appropriate conferred upon ATT by the English share charges. This last part of the decision was not reduced to writing, but the evidence made clear that that is what was decided at the meeting.

[32]     On 16 April 2007 and without any prior intimation that it had concerns about any matter connected with its acquisition of the CTH shares or with the lending it had made, ATT wrote to CFI, with a copy to CH, setting out sixteen alleged Events of Default under the Facility Agreement and demanding immediate repayment of the secured lending ('the acceleration letter'). I shall deal in due course with the separate Events of Default relied upon in the acceleration letter.

[33]     On the same day, 16 April 2007, Mr Christopher Hardman ('Mr Hardman'), a partner in Lovells LLP, personally delivered to the BVI offices of Harneys Corporate Services Limited ('HCS'), the

12

Page 12

A621

registered agent of each of CFI and CTH, the transfers handed over by CH and CFI at closing, completed in favour of ATT, together with letters prepared and signed by Walkers, ATT's BVI lawyers, requiring that ATT be registered in the register of members of CFI as the holder of CFI's two issued shares and in the register of members of CTH as the holder of the 51 shares in CTH charged to ATT by CFI. The response of Mr Parsons of HCS ('Mr Parsons'), who was the individual to whom this request was made, was that he would take instructions from his client of record. Neither request has yet been complied with.

[34]  Also on 16 April 2007 ATT commenced two sets of proceedings in this Court. The first, which has become merged in the present consolidated action, was No 72 of 2007 ('claim 72') and claimed declarations that ATT was entitled to call in the indebtedness on 16 April 2007. The second, which is not before me, was a claim to compel CFI, CTH and HCS to comply with the registration requests.

[35]  On 17 April 2007 CFI wrote to ATT challenging its right to call the lending and promising a detailed response (which never materialized). CFI's letter also demanded an assurance by later that day that no steps would be taken to enforce the security by selling, transferring or otherwise dealing with the charged shares and indicating that in the absence of such an assurance steps would be taken to protect CFI's position without further notice to ATT. ATT's response, on the same day, was to refuse to give the assurance sought, but instead to confirm that no steps had yet been taken to enforce the security and that no enforcement would be pursued without first giving CFI two BVI working day's prior notice, such arrangement to be revocable on the same notice period. ATT's letter referred to the requests for registration made on 16 April 2007 to HCS, stated that those steps were by way of perfection of its security, rather than by way of enforcement and sought CFI's confirmation that the share registers had been amended.

[36]  Also on 17 April 2007 Alfa held a press conference in Istanbul at which it announced that Events of Default had occurred under the Facility Agreement.

[37]  On 25 April 2007 ATT wrote to CFI expressing surprise that it had not heard further and giving notice that the rolling two business day moratorium on enforcement would end at 4 pm on 27 April 2007. At the same time, ATT offered to extend the moratorium but on terms that CFI undertook to

13

be responsible for any losses suffered by Alfa as a result of delay in enforcement, the undertaking to be fortified by substantial financial security.

[38]     CFI replied on the following day informing ATT that it intended to apply for an injunction restraining enforcement and asking ATT to extend the moratorium until the application could be heard in the normal course rather than requiring CFI to make an emergency application.     Failing such assurance, CFI said that it would be applying for an emergency injunction on 27 April 2007. Although CFI did not offer any security, it did point out to ATT that CTH was holding some US$185 million by way of dividends paid up from Turkcell and that CFI was entitled to the majority of that money.

[39]     On the same day ATT replied by fax (after office hours) that it was not prepared to extend the moratorium, but went on to say that provided ATT was supplied with a draft of CFI's application and complied with six other conditions (including the provision of some US$135 million by way of security and the immediate registration of ATT as transferee of the shares in CFI and CTH) it might be that ATT could agree to an extension pending hearing of CFI's application.  Those terms were rejected by CFI.

[40]     At around 3.50 in the afternoon of 27 April 2007 CFI and CH obtained stop notices under CPR Part 49 and Maples & Calder, the BVI lawyers acting for CFI and CH, told Walkers that they would be applying for an injunction to prevent ATT enforcing its security over the CTH shares.  At about 4.05 pm on the same day Walkers wrote by facsimile to CFI and to CH 'c/o CFI' at its registered agent, HCS, in the following identical terms:

> 'Dear Sirs,
>
> **ALFA TELECOM TURKEY LIMITED V (1) CUKUROVA FINANCE INTERNATIONAL LIMITED; (2) CUKUROVA HOLDINGS AS**
>
> As you are aware, we act for ATT. We refer to ATT's letter dated 16 April 2007 addressed to Cukurova Finance International Limited ("CFI") and copied to Cukurova Holding AS ("Cukurova") (further copy attached). As stated in that letter, there are currently at least sixteen continuing Events of Default under the Facility Agreement dated 28 September 2005 between ATT, CFI and Cukurova.

14

Page 14

**A623**

> Under clause 9.3 of the abovementioned Share Charge, ATT has
> the right, at any time after the charges have become enforceable,
> to appropriate the shares covered by the Share Charge pursuant
> to the Financial Collateral Arrangements (no.2) Regulations 2003
> (the "Regulations"). As a result of the Events of Default referred to
> above, the charges have become enforceable.
> On behalf of ATT, we therefore give you notice that ATT is hereby
> exercising its right to appropriate the shares referred to in the
> Shares Charge with immediate effect. We are currently
> undertaking the valuation exercise under clause 9.3 of the Share
> Charge and will revert to you shortly in that regard.
> For the avoidance of doubt, we reserve all of our rights under the
> Facility Agreement (and under the Security Documents,
> Transaction Documents and Finance Documents referred to
> therein).'

[41]    At 4.30 on the afternoon of 27 April 2007 Maples & Calder started an application before Joseph-Olivetti J for an injunction restraining registration of the transfers and enforcement of the security. Such an injunction was granted at around 6.30 pm but expressly without prejudice to ATT's claim to have appropriated the collateral earlier that afternoon.

[42]    On 17 May 2007 CFI, which had by now obtained alternative funding, gave notice to ATT under clause 6.4 of the Facility Agreement of its intention to repay the loan including, without prejudice to its contention that it was not liable to pay it, interest at the default rate under clause 7.3 of the Facility Agreement. The Altimo board, supported by the board of AFH, resolved on the following day to reject the offer of repayment. It was noted in an explanatory memorandum produced for consideration by the Altimo board that the charged shares were then worth some US$230 million more than the value to be attributed to them under the 'Fair Price' mechanism contained in the English share charges.

[43]    On 21 May 2007 ATT wrote to CFI rejecting the repayment proposal as being too late. Four days later CFI tendered payment, which was rejected, and on 25 May 2007 CFI commenced claim No 119 of 2007 ('Claim 119') seeking to compel ATT to accept the tendered repayment. Claim 119 is merged in the present proceedings as a result of an order for consolidation with claim 72.

15

**The Issues**

[44]    With that brief factual background, I can turn to consider the issues that arise for decision. The first, obviously, is whether ATT was entitled to accelerate the loan on 16 April 2007. The second, it seems to me, is whether it was entitled to enforce the English share charges on 27 April 2007. Third, whether the attempted appropriation was ineffective as having been done in bad faith and for a purpose other than the recovery of ATT's lending under the Facility Agreement. Finally, if ATT's enforcement was valid and effective, whether CFI is entitled to some sort of equitable relief upon tender of the outstanding borrowing. I shall take these issues in turn.

**Had there occurred and was there continuing as at 16 April 2007 an Event of Default under the Facility Agreement?**

[45]    I shall deal with the alleged Events of Default and the particular terms of the Facility Agreement upon which ATT relies as justifying each allegation of default serially, but first I need to say something about the terms of the Facility Agreement which are relied upon generally by ATT as justifying the acceleration of the loan. References to clauses in what follows are (unless stated otherwise) references to clauses in the Facility Agreement.

[46]    By clause 1.1 an Event of Default means any event or circumstance identified as such in clause 17. I shall set out the particular parts of clause 17 when I deal with each separate Event of Default relied upon.

[47]    Clause 17.18 provides for acceleration:

> 'On and at any time after the occurrence of an Event of Default which is continuing the Lender may by notice to the Borrower:
>
> (A) Cancel the Commitment, whereupon it shall immediately be cancelled;
> (B) Declare that all or part of the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable; and/or

16

**A625**

> (C) Declare that all or part of the Loan be payable on demand, whereupon they shall immediately become payable on demand by the Lender.

Clause 1.2(D) provides that an Event of Default is 'continuing if it has not been waived.'

[48]    With that general introduction I can turn to the specific allegations of default contained in the call letter.

Financial Indebtedness

[49]    The first Event of Default relied upon by ATT in the acceleration letter is that CFI had incurred indebtedness without the prior consent of ATT. Clause 17.2(A) of the Facility Agreement provides that it is an Event of Default if the Borrower does not comply with any provision of the Finance Documents. The Facility Agreement is a Finance Document. Clause 16.4(A) of the Facility Agreement provides as follows:

> 'Financial Indebtedness
>
> (A) The Borrower shall not (and shall ensure that no other member of the Telecom Group will) incur or contract to incur or permit to subsist any Financial Indebtedness with the prior written consent of the Lender
> (B) Paragraph (A) above does not apply to Financial Indebtedness of Turkcell up to an aggregate maximum amount of US$50,000,000.'

'Financial Indebtedness' is defined by clause 1.1 of the Facility Agreement so as to include all manner of exotic methods of obtaining credit. Mr Stephen Smith QC, who appeared together with Mr Robert Levy QC and Mr Oliver Hilton for ATT, argued that more than one of these methods of financing credit was in play, but in my judgment the only part of the definition that is conceivably engaged on the facts is *'indebtedness for or in respect of moneys borrowed'*.

[50]    It will be recalled that on 24 November 2006 Cukurova used US$574m, the greater part of the proceeds of certain TC shares which CH had CI sold between 8 and 21 November 2006, in order to repay the whole of the unsecured borrowing, US$2m of principal of the secured borrowing and the interest then payable on both the secured and unsecured borrowing.

17

Page 17

**A626**

[51]   On 22 November 2006 CFI had sent a letter to ATT, signed by Ms Cetinalp, notifying ATT of the forthcoming payment. The material parts of the letter for present purposes are the following:

> 'You will be receiving two payments both with value dates November 24, 2006 from JP Morgan Chase Bank NA, London, one for USD [489m] and the other for USD [84m], each for and on behalf of [CFI].
> As per our earlier correspondence on this matter, the foregoing amounts you will be receiving from JP Morgan Chase Bank NA London should be utilized for the following purposes:
>
> 1.   For USD [489m], for and on behalf of [CFI] [there then follow details of the amounts of principal and interest against which that payment was to be applied]
> 2.   For USD [84m], for and on behalf of [CFI] [there then follow similar details in relation to that payment].'

[52]   The money went from CH's and CI's accounts with JP Morgan Chase (Cukurova's bankers) direct to ATT's DB bank account. There is in evidence a copy of a payment instruction from CI to JP Morgan Chase dated 22 November 2006 directing that US$84m be paid to ATT's account with DB and although I have not been able to identify a corresponding payment instruction for the US$489m transferred to ATT by CH, it can be assumed that such a document existed at the time.

[53]   A journal voucher generated by CH and dated 24 November 2006 debits CFI with the sum of US$489m. Ali Nejat Yalim ('Mr Yalim') an experienced accountant who acts for Cukurova on a consultancy basis and who gave evidence for Cukurova at the trial, described this document as being in the nature of an invoice from CH to CFI. The 'details' section of the voucher explains the reason for the debit as 'Transfer to [ATT] on behalf of your company'. There is no mention of the funds transfer being by way of loan from CH to CFI.

[54]   A similar, but not identical journal voucher generated by CI and also bearing date 24 November 2006 debits CFI with US$84m and credits JP Morgan's money market account with US$84m. The 'description' section of the voucher describes the debit as being 'on behalf of CFI to the account of [ATT]' and 'On behalf of [CFI] trf to [ATT]'. Again, there is no indication in this document that the funds transfer was by way of loan.

<div align="center">18</div>

<div align="center">**A627**</div>

[55]    What appears to be a trial balance for CFI as at 31 December 2006 shows credit balances in favour of CH (US$443m) and CI (US$130m) entered under 'Other current liabilities'. The reason for the reduction in the amount due to CH from US$489m to US$443m and for the corresponding increase in CI's credit balance from US$84m to US$130m was that CFI and CI had subsequently adjusted between themselves their respective net cash entitlements to the proceeds of the TC shares and correspondingly adjusted their credit balances due from CFI. All the book keeping entries recording these arrangements were made either by or on the instructions of Ms Cetinalp. Ms Cetinalp was not called to give evidence at the trial although, as I have said, evidence was given for Cukurova on the accounting records and financial statements by Mr Yalim.

[56]    The subledger account for CFI in the accounting records of CH for the same period shows CFI with a debit balance of US$489m as at 22 November 2006, reduced to US$443m on 24 November 2006. A trial balance for CH as at 31 December 2006 shows the US$443m (converted into Turkish lira) as an 'other receivable' due from CFI.

[57]    A CI subledger account for CFI shows a receivable due from CFI to CI in the sum, first, of US$84m, later adjusted upwards to US$130m. Each entry is dated 24 November 2006. The account code which has been applied to these CI entries is '136.20'. The unchallenged evidence of Mr Andrew Palmer, FCA ('Mr Palmer'), who gave expert evidence on behalf of ATT in this case, was that that code referred to 'receivables from loans' and indeed it is the case that the sum of US$130m figures in CI's trial balance as due from CFI in the section entitled 'receivables from loans'. In cross examination Mr Yalim said that this treatment was decided upon by Ms Cetinalp, although he no longer remembered the reason. His view as stated to the Court was that the liability would have been better included in the following section of the trial balance under 'other various receivables'.

[58]    As I have said, in response to a request from ATT, CFI provided ATT on 22 February 2007 with its financial statements for the year ended 31 December 2006. The financial statements in fact consist only of a balance sheet and some accompanying Notes. These documents were prepared by Mr Yalim. The balance sheet, which contains comparative figures for 31 December 2005, shows the CTH shares as an asset at cost. Liabilities include the ATT indebtedness, which is described as 'interest bearing loans and borrowings' of US$1.35bn (down from 31 December 2005

19

as a result of the prepayments of principal made on 24 November 2006). Note 5 sets out the terms of the ATT lending, including repayment dates and rates of interest and records the event of prepayment.

[59]   Also included within liabilities in CFI's 2006 financial statements is a figure of US$574m described not as a loan but as 'due to related parties'. Note 6 identifies the amounts 'due' as the sum of US$443m to CH and the sum of US$130m to CI. Note 6 continues: 'Such payables represent the funding provided by related parties to cover [CFI]'s] prepayment of loan principals and interest payments in 2005'. It is common ground that '2005' is by mistake for '2006'.

[60]   CH produced an Annual Report for 2006 sometime before its AGM on 2 March 2007. Figures from the accompanying balance sheet for 31 December 2006 include within 'receivables from subsidiaries' the sum of US$443 due from CFI. This annual report was signed off by Ms Cetinalp in her role as one of CH's two statutory auditors.

[61]   The Notes to CI's unaudited financial statements for the year ended 31 December 2006 show the US$130m which had figured in CI's trial balance as due from CFI among a category of asset described as 'Interest–free subordinated loans'. The debt, however, is shown as due not from CFI but from CH. Mr Yalim explained in his evidence that these CI financial statements were finalized after 23 April 2007. The significance of that (subject to a point made by Mr Stephen Smith QC to which I will have to return later) is that 23 April 2007 is the date borne by a series of board resolutions and an entry in CFI's CH sub-ledger, which effected and, in the case of the sub-ledger entry, reflected a novation of the US$130m liability from CFI to CH.   Explanatory narrative in a Note to the CI financial statements states that: '$[130m] due from CH as of December 31 2006 represented net payments made by [CI] to [CFI]'s creditors on behalf of [CFI] *as instructed by CH*' [emphasis added].

[62]   · Thus, the position by reference to CFI's February 2007 unaudited, CH's statutorily[3] audited and CI's unaudited financial statements for the year ended 31 December 2006, all of which were signed off by Ms Cetinalp, is that CFI's financial statements showed sums 'due to' CH and CI; CH's financial statements showed US$443m as 'due from' CFI; and CI's financial statements showed

---

[3] which I understand to mean internally

20

CH as a debtor to CI in the sum of US$130m which CI had paid to CFI's creditors 'as instructed by CH'.

[63]     Mr Palmer was asked about the effect of the accounting entries and statements which I have summarized above. He made clear that he could not comment on what was in the mind of the parties to the various transfers, thus acknowledging that borrowing could only be borrowing if the parties to the transaction in question intended that that is what it should be, but he also made the point that he would expect accounting records accurately to reflect the intentions of the parties. Mr Palmer said that the wording of Note 6 to the CFI balance sheet[4], referring to funding by related parties, did not suggest that the items to which it referred were loans. He went on to say that the records which he had examined did not suggest an awful lot other than that CFI had a liability to CH and CI. He said that the only evidence that either of these transfers was intended by way of loan was to be found in the books of CI, but he went on to say that he did not put a lot of store on the fact that in one set of accounting entries the words 'loan' was used but not in the others. He read the CI entries as doing no more than recording an amount due to it by CFI, while CFI was recording an amount it owed CI. He said that whether the word 'loan' or 'payable' was used was, from an accounting point of view, academic. Finally, he said that the highest it could be put was that the accounting entries showed CFI as having incurred liabilities to CH and CI. Mr Palmer was not asked about the impact of the Note to the CI financial statements[5] which appears to rationalize the debt due from CH to CI in CI's financial statements as the consequence of the fact that CI's payment to CFI was made on the instructions of CH.

[64]     Mr Yalim's evidence was that he did not consider that the liabilities appearing in CFI's financial statements to CH and CI were borrowings; rather, they were related party funding which CFI could not repay and which at some stage would need to be converted to capital. In his witness statement he says that the Cukurova group has a practice of recording both actual loans and capital contributions in the current accounts of the group company receiving the funding until the nature of the transaction has been formally determined. Until that happens, the funding will generate a receivable in the paying company's books and a payable in the books of the receiving company.

---

[4] paragraph [59] above

[5] paragraph [61] above

21

He said that if it had been his understanding that the payables were loans, he would have recorded them together with the ATT borrowing under Note 5 in CFI's 2006 financial statements (rather than separately in Note 6). His explanation for the treatment of the funding as a loan in CI's books was that, as a Netherlands Antilles registered company, all its receivables are treated by the tax authorities in that jurisdiction as loans. This evidence did not form part of the contents of Mr Yalim's witness statement.

[65]     Mr Karamehmet gave evidence on this matter. He said without hesitation that the payments made to ATT on CFI's behalf on 24 November 2006 were capital contributions and that Ms Cetinalp had been wrong to record any of it as lending. He said that the intention that the payments should be so treated was his, taken in his capacity as Chairman and CEO of CH. When he was asked what authority he had in relation to CI (of which he is not a director) his response was that he had authority in relation to CI because 'if I say [something] to Cetinalp, she does it'. Ms Cetinalp was a director of CI at the relevant time. Having heard Mr Karamehmet give evidence, I found his blunt description of the decision making process inside the Cukurova group entirely credible. He was also right, in my view, as a matter of practical day to day law. Mr Karamehmet could cause CI to pass whatever resolutions CH demanded of it. If formalities were overlooked, a valid ratifying resolution could be secured within minutes.

[66]     For a contract of loan to be concluded there has to be as a minimum agreement between the parties that one of them will borrow and the other will repay. In a commercial context, that will invariably involve discussion of terms. Mr Kenneth MacLean QC, who appeared together with Ms Arabella di Iorio and Mr James Nadin for Cukurova, submitted that there was no evidence that any such agreement had even been concluded. I agree with him. Indeed, it seems to me that the documentary evidence upon which ATT has relied and which I have attempted to summarise above goes almost entirely the other way. The most important element in that evidence is the deliberate distinction which was made by Mr Yalim when he drew up CFI's financial statements between 'interest bearing loans and borrowings', into which category he placed the ATT lending, and 'Due to related parties' to which he assigned the payments made on CFI's behalf on 24 November 2006. The matter is concluded by the evidence of Mr Karamehmet, which I have no hesitation in accepting and which finds corroboration in KPMG's audit of CH's 2006 financial statements, which I deal with in paragraphs [78] to [81] below. The treatment of CI's portion of the

22

funding within CI's books is anomalous and may well be explicable by matters which were not gone into at trial.

[67]   ATT's contention that CFI caused an Event of Default to occur by incurring financial indebtedness within the meaning of clauses 16.4(a) and 17 of the Facility Agreement therefore fails.

Insolvency

[68]   The second Event of Default relied upon by ATT in the acceleration letter is that CFI was insolvent. The CFI financial statements sent to ATT under cover of CFI's letter of 22 February 2007 showed that as at 31 December 2006 CFI had assets with a book value of US$1.707bn.  But they also showed that CFI had total liabilities of US$1.942bn, made up of the outstanding balance of the secured loan, some US$18m of interest accrued since 25 November 2006 and (under 'non-current liabilities') the 'Due to related parties' figure of US$574m whose nature I have just been discussing. The result of including this last figure as a liability in the balance sheet results in an apparent balance sheet deficiency, as at 31 December 2006, of US$236m. Had it instead been included as capital, the result would have been an excess of assets over liabilities amounting to some US$339m.

[69]   Clause 17.5 of the Facility Agreement provides that an Event of Default will occur if

'(A)   The Borrower or a member of the Telecom Group is unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its indebtedness.

(B)   The value of the assets of the Borrower or any member of the Telecom Group is less than its liabilities (taking into account contingent and prospective liabilities).

(C)   A moratorium is declared in respect of any indebtedness of the Borrower or any member of the Telecom Group.'

The Telecom Group is defined as CFI, CTH and any subsidiary of CTH.

[70]   ATT contends that CFI is or has been in breach of sub-clause 17.5(A) on the grounds that it is unable to pay its debts as they fall due. When I asked Mr Stephen Smith QC whether he was

23

**Page 23**

**A632**

persisting with this allegation he declined formally to withdraw it. I need only say that there is no evidence in support of any such contention and I disregard it.

[71]   ATT relies strongly, however, upon its contention that the CFI financial statements sent to ATT on 22 February 2007 show (for the reasons I have summarized above), that as at 31 December 2006 CFI's liabilities exceeded its assets. Mr Palmer, who was scrupulous throughout his evidence, said that if the references in clause 17.5 of the Facility Agreement are to book value, then CFI was balance sheet insolvent as at 31 December 2006. It seems to me, therefore, that the first question which I have to resolve is whether clause 17.5(B) is to be read as referring to CFI's assets and liabilities as quantified and described in its financial statements from time to time or as referring to the actual realizable value of its assets and, correspondingly, to the true nature and extent of its actual liabilities.

[72]   No help is given in the definition section of the Facility Agreement. Clause 17.5 does not specify that the question is to be answered by reference exclusively to figures contained in CFI's financial statements. On the contrary, the use in clause 17.5(B) of the unqualified word 'value' suggests the contrary. On consideration of all the terms of the Facility Agreement, the circumstances under which it was entered into and the objective purpose of the transactions of which it forms part, it is plain that the bulk of the stipulations of the Facility Agreement are designed to protect ATT as lender against a deterioration in the financial condition of the borrower, CFI, or its parent, CH. Mere book values may be an uncertain or even a misleading guide to a company's financial health. It seems to me that the objective commercial purpose of the provision demands that the references to asset values and liabilities must be to actual realizable values and to liabilities which actually go to reduce the value of CFI.

[73]   I am fortified in this view by the evidence of Mr Palmer, who said that if he was asked to assess a company's balance sheet insolvency, he would want to know what the realizable value of its assets was. Mr Palmer was not asked what his valuation approach would be to liabilities, but it seems to me that the converse must apply. In other words, while the starting point is obviously the balance sheet, that is the beginning, rather than the end of the inquiry.

[74]   I have no evidence as to the actual realizable value as at 31 December 2006 or at any other time of CFI's 51% holding of CTH shares. At various points during Counsel's submissions mention was

24

made of control premiums (because the indirect 13.76% Turkcell holding confers management control of Turkcell) and, conversely, of liquidity discounts (resulting from the potential difficulty of offloading such a sizeable stake on the market) but the fact remains that I have no valuation evidence enabling me to put a figure on the value of the holding at any given time. It seems to me that the burden is on ATT, if it wishes to rely upon clause 17.5(B), to provide the evidence upon which a judgment can be made. It must, in other words show that the realizable value of the CTH shares as at 31 December 2006, when set against liabilities properly to be treated as liabilities of CFI, results in a deficiency of assets.

[75]    So far as liabilities are concerned, the evidence satisfies me that the US$574m appearing in CFI's balance sheet in consequence of the funding which it had received on 24 November 2006, if not technically capital (because the legal formalities of appropriating the payments to capital had not been undertaken) was for all practical purposes to be treated as capital. Mr Karamehmet had control of CH (and therefore of its subsidiary CI) – indeed, it was provided that an Event of Default would occur should he or his heirs cease to control CFI and CH[6]. His clear evidence, which as I say I accept, was that his intention was that the payments made on behalf of CFI in November 2006 should be capital investment. When asked about his reaction to the 16 April 2006 letter calling the loan he said, in relation to the insolvency allegation, that, Cukurova felt there was no insolvency since the payments were intended as capital. Mr Berkmen gave evidence to similar effect.

[76]    It is plain from the evidence which I have summarized that the funding was included within liabilities in the balance sheet on a holding basis and because it had to be included somewhere. During his impressive evidence Mr Palmer referred to the fact that even paid up share capital is properly treated as a form of liability[7]. Mr Yalim seems to have thought that this treatment of the funding payments was the best he could do in the circumstances, but his evidence, which I accept, is to the clear effect that had he thought the money represented a loan he would have included the figures within Note 5.

---

[6] see clause 17.8 of the Facility Agreement

[7] transcript, Tuesday 20 April 2007, page 21

25

[77]    Another way of looking at the matter is to ask what would have happened had ATT raised any query as to CFI's apparent balance sheet insolvency. I am satisfied, on the evidence to which I have already referred, that the necessary formalities would have been taken immediately to designate it as part of CFI's capital. Indeed, that is exactly what happened, although with some hiccups, after receipt by CFI of ATT's letter of 16 April 2007.

[78]    Another important item of evidence on the insolvency point, but which also has relevance for the 'borrowing' point, comes from financial statements prepared for CH by KPMG for the year ended 31 December 2006. As I understand it, the financial statements audited by CH's statutory auditors which had formed part of CH's annual report for the year ended 31 December 2006 to which I have made earlier reference[8] were insufficient for tax and perhaps for regulatory purposes also. CH therefore needed to have its financial statements audited externally and that task was carried out on this occasion by KPMG. KPMG signed off a set of financial statements for CH on 24 April 2007. That date is significant, because it was one day after the series of board resolutions to which I have earlier referred had been passed by CFI, CH and CI, the effect of which was to novate CFI's liability to CI so that it became instead a liability of CH and to make CFI liable to CH in place of CI in respect of the US$130m previously shown as due from CFI to CI. I have already mentioned that the effect of these transactions had been reflected in CI's 2006 financial statements.

[79]    Mr Stephen Smith QC questioned the validity of the CH board resolution. Mr Karamehmet was in London on 23 April 2007, attempting to interest potential investors in providing Cukurova with a syndicated loan to replace the ATT funding. His evidence was that he had been telephoned on 23 April 2007 and asked to approve the CH resolution, which he did orally. He told me that he signed the minute some time after his return on 27 April 2007 or thereabouts. Mr Stephen Smith QC says on these grounds that he does not accept that the CH board resolution was effective as at 23 April 2007. CH's corporate regulations have not been put in evidence and in any case the point would have been relevant only if I was of the opinion (which I am not) that the effective date of the resolution is critical.

---

[8] paragraph [60] above

26

[80]   What is critical is that on the day following KPMG signed off CH's 2006 financial statements. They showed (Note 17) that as at 31 December 2006 nothing was due to CH from CFI. On the contrary, Note 8 to the financial statements, explaining a balance sheet entry described as 'Advances for investments', contains the following passage (omitting the references to Turkish lira):

> 'At 31 December 2006 advances for capital contributions to CFI (a fully owned subsidiary of the Company) represented USD [443m] of net payment made by the Company to CFI's creditors, on behalf of CFI, and USD [130m] of net payments made by [CI] (another fully owned subsidiary of the Company) to [CFI]'s creditors on behalf of CFI, as instructed by the Company.'

[81]   Mr Palmer was asked about this treatment in the books of CH.  He said that 'advances for investment' is a term familiar to Turkish accountants and that it was a sort of half way house, since neither KPMG nor CH could at that time treat it is an investment in fact, because at that stage it was not represented by shares issued by CFI.  Asked if CH was justified in not treating the US$574m as a loan to CFI and if KPMG was justified in accepting that treatment, Mr Palmer's answer was that KPMG could not have signed off the Notes to which I have referred unless they were of that view.  While pointing out that he had not seen the management representation letter, the tenor of his evidence was that KPMG could not have and would not have approved this treatment of the money unless they had enough audit evidence to be comfortable about it.

[82]   Mr Palmer pointed out, however, that the CH trial balance for year ended 31 December 2006 included an account for capital advances and that the CFI receivable had not been allocated to that account.  He thought that the fact that the payment had not been so treated told its own story. He also pointed out that the financial statements annexed to CH's 2006 annual report[9] did not treat it as an advance for investment and he commented generally that it seemed to him that there was a lot of documentation which did not treat the payments as investments or even as advances for investment.

[83]   I take full account of Mr Palmer's reservations, but he had not had the advantage of hearing Mr Yalim's evidence nor of hearing Mr Karamehmet's evidence during cross examination.  I have to

---

[9] paragraph [60] above

27

reconcile the inconsistencies which can be identified in the accounting records and financial statements of the three companies one way or the other and I have no doubt, having heard Mr Yalim and Mr Karamehmet and having considered all the accounting material to which I have been referred, together with the totality of Mr Palmer's evidence, that at no stage from 22 November 2006 onwards was CFI under any enforceable obligation to reimburse CH or CI for the funds which had enabled the payments totaling US$574m to be made to ATT on 24 November 2006. ATT accordingly fails to establish that CFI's liabilities exceeded its assets, as at 31 December 2006.

[84]   Because much was made of it at trial I must add a postscript to this finding. Following the passage of the board resolutions of 23 April 2007, Mr Yalim produced a CFI balance sheet as at that date. The recast balance sheet treated the US$574 million as share capital, thus removing any patent deficiency from the balance sheet. But the comparables for December 2006 still retained the US$574m under non-current liabilities, thus leaving the figures upon which ATT had relied in the acceleration letter unaltered. A Note to the financial statements says that the US$574m was included in CFI's share capital 'as of April 23 2007'. This document was never proffered to ATT. Mr Stephen Smith QC relies upon this treatment as showing that whatever may have happened as a result of the 23 April 2007 resolutions, CFI was still shown as firmly insolvent as at 31 December 2006 and at all times down to 23 April 2007. Mr Yalim's explanation for this was that he understood that if the financial statements were going to show that the US$574m was not due to related parties as at 23 April 2007, the same must follow for 31 December 2006. With respect to Mr Yalim, this seems a hopeless position to take in the light of the clear indication on the face of the document that the money was due to related parties as at 31 December 2006.

[85]   Mr Yalim had another attempt and produced a second set of financial statements as at 23 April 2007, this time showing the US$574 as a capital contribution reserve both as at 23 April 2007 and also as at 31 December 2006 and thus getting rid of the patent balance sheet insolvency at both dates.

[86]   It follows, however, from the finding that I have made as to the true nature of the transfer of the US$574m, that these internal revisions have no relevance to the issue which I have to decide on this part of the case - although I shall have to come back to these facts in relation to a further alleged Event of Default.

28

**A637**

[87]    ATT accordingly fails to establish an Event of Default under this head.

Material Adverse Effect

[88]    Clause 17.16 provides that the occurrence of any event or circumstance which in the opinion of
ATT has had or is reasonably like to have a Material Adverse Effect is an Event of Default.
'Material Adverse Effect' is defined by clause 1.1 of the Facility Agreement as follows:

> '"Material Adverse Effect" means a material adverse effect on:
>
> (A)    The financial condition, assets or business of the Borrower
>         or any member of the Group;
> (B)    The ability of the Borrower or the Company to perform and
>         comply with its obligations under any Finance Document;
> (C)    The validity, legality or enforceability of any Security
>         expressed to be created by or pursuant to, or to be
>         evidenced in, any Security Document or on the priority and
>         ranking of any such Security.'

'Group' is defined by clause 1.1 of the Facility Agreement as meaning CH and its subsidiaries for
the time being.

[89]    The acceleration letter refers to the TS press release of 26 January 2007 which I have briefly
mentioned at paragraph [29] above, announcing that the arbitral Tribunal sitting in Geneva had
issued a preliminary award (a) finding that there had been a binding agreement between CH and
TS for the sale by CH to TS of the 51% of TCH then held by CH and presently held by CTH
pursuant to the arrangements between Alfa and Cukurova which closed in November 2005 and
which I have outlined above and (b) directing specific performance of that agreement.    The
acceleration letter goes on to state that the shares had been acquired by CTH on the basis that
there was no prior agreement affecting them and expresses the opinion that, since in those
circumstances there was no prospect that CH would be able to comply with the award of specific
performance, 'a likely consequence' would be its replacement by a significant damages award.
The letter proceeds to give it as ATT's opinion that this is likely to have a material adverse effect on
the financial condition of CH and/or other members of the Group.    Finally, the acceleration letter
states that this constitutes an Event of Default which is continuing.

29

**Page 29**

**A638**

[90]   The existence and nature of the Geneva arbitral proceedings had been disclosed by CH and CFI to ATT in the Disclosure Letter. The disclosure relating to TS appears to have been comprehensive. It covered the Memorandum of Understanding of 24 March 2005 which TS claimed, but CH denied bound CH. It set out that if the Tribunal did not grant specific performance, it was the intention of TS to seek an award of damages and mentioned that TS had made an interim application to the civil Court in Geneva to prohibit CH from initiating or proceeding with contracts for the disposal of the TCH shares, which, if granted, would (and as events proved did, at any rate temporarily) prevent the closing of the various transactions contemplated by the Subscription Agreement. However, numbered paragraph III on the opening page of the Disclosure Letter states that its purpose is to qualify and limit the liabilities of CH and CFI in relation to the warranties given by CH and CFI in Schedule 3 to the Subscription Agreement. It did not operate so as to provide blanket immunity against any other complaint which ATT might be entitled to make in respect of a matter mentioned within it.

[91]   CFI's first defence to this claimed Event of Default is that the January arbitral award has not yet had any effect on the financial position, assets or business of CH or the Group. It seems to me that this point, as put, must be bad: first, because something which happens in relation to a person and which is capable of giving rise to a deleterious contingent or 'knock on' effect must by definition have a present effect, because the condition of the person affected changes from one where he was not exposed to the risk that the contingency will materialize into one where he is presently exposed to that risk; and secondly, and more importantly, because it overlooks the words 'or is reasonably likely to have' in clause 17.16. That still leaves open, of course, the question whether the present, or the reasonably likely future effect is to be treated as materially adverse, but CFI's first line of defence is not an answer to the claim.

[92]   Mr Tolchinsky said that Alfa had been advised before entering into the transactions that the structure was secure and that it could not be unraveled by TS and that Alfa would probably not have done the deal had the advice been different.

[93]   Mr Musatov gave evidence about this issue. I have to say that I found his evidence on this part of the case unpersuasive. He seemed to be loyally attempting to support a position in which he had no personal confidence. Mr Musatov said that when he learnt of the press release he rushed into

<center>30</center>

Mr Reznikovich's office (which was either adjacent to or very close to that occupied by Mr Musatov) because, as he put it, 'it was quite important news to us.' When asked why in that case the matter was not immediately taken up with Cukurova, Mr Musatov said that Mr Reznikovich decided that Alfa would deliberately not raise the matter with Cukurova, because that might tip them off and Alfa wanted to take time to consult with outside lawyers to make sure that it understood the issues correctly. Changing tack somewhat, he said that the reason why Cukurova was not contacted was because whenever Alfa asked Cukurova for information about the progress of the arbitration they were told that confidentiality precluded the sharing of information. Mr Musatov was of the opinion that the Tribunal would not order specific performance, but he said that there was a concern that the Turkish Court might make some order prejudicial to Alfa's interest – although he said he thought the likelihood of that was closer to 0% than to 100%.

[94] Asked why he did not send a memorandum to anyone at Alfa expressing alarm about this turn of events, Mr Musatov had no explanation, although he did volunteer that Alfa 'remained alarmed' until April. Asked why a presentation made by DB to Altimo sometime in February 2007, on the topic, inter alia, of Cukurova's financial health, made no mention of the supposedly material adverse effect caused by the Geneva award, Mr Musatov's only response was that he had not attended the presentation. Mr Reznikovich said that he did not refer the information to which Mr Musatov had drawn his attention to the Altimo board (at any rate until the meeting of 2 April 2007).

[95] As to the supposed materiality of the Geneva award, Mr Musatov said that, together with an unnamed 'outside Counsel', he did a calculation based upon the increase in the underlying Turkcell share price between the date upon which TS was supposed to buy pursuant to the Memorandum of Understanding and February 2007. That calculation was said to have produced a figure of some US$700m. When some ancillary damages and a control premium uplift of 20% were factored in, the likely damages were estimated at US$1bn. When it was pointed out to an uncomfortable Mr Musatov that the Bloomberg print outs which were exhibited to his witness statement in support of this calculation were only downloaded on 4 and 12 February 2010, Mr Musatov said that the calculation to which he had been referring had been done using a calculator and prices downloaded from Yahoo. In making this calculation, Mr Musatov said he carried in his head the number of Turkcell shares in issue. Mr Reznikovich said that he, too, made a similar calculation, which he said took him a couple of minutes.

31

**A640**

[96]     On 16 April 2007 Mr Hardman swore an affidavit in these proceedings in support of ATT's application to serve CH out of the jurisdiction. In the course of that affidavit, Mr Hardman speculated that even if the value of the TCH shares which the Tribunal had held to have been sold to TS was worth only 5% more than the purchase price of US$3.1 billion payable under the Memorandum of Understanding between CH and TS, it would appear likely that a damages award of hundreds of millions of dollars might well be made against CH.   A five per cent uplift produces a figure of US$155m.  When that was put to Mr Musatov, his initial response was the one with which he greeted very many of the questions put to him – he asked Mr Kenneth MacLean QC to repeat it. His answer to the question itself was that in February 2007 Alfa considered that an award in that range would be likely to have a material adverse effect on Cukurova.

[97]     Mr Musatov was referred to some papers presented to and a record of a decision taken at the meeting of the Altimo board held on 2 April 2007, at which he was present for part of the discussions.  One of the papers that had been prepared for consideration was headed 'Turkcell – breach of 28 September 2005 Loan Agreement terms by Cukurova Group'. I set it out in full:

> 'Turkcell – breach of 28 September 2005 Loan Agreement terms by Cukurova Group
>
> Events of default
> Loans
>
> • In November 2006, CFI (the borrower) received a USD 574.4 million loan from Cukurova Group. The loan agreement prohibited CFI from taking out any loans without Alfa's approval. Also, the CFI balance sheet went into the red (liabilities exceeded assets by USD 235 million).
> • Material adverse effects
>   Cukurova's inability to comply with the arbitration court ruling against [TS] may cause Cukurova to compensate the losses of [TS], the amount of which may have material adverse effects on the financial status of Cukurova Group.
> • Reserved matters
>   Since Alfa's acquisition of a stake in Turkcell in November 2005, Cukurova Group companies concluded several deals with Turkcell, which required prior

32

> coordination between Alfa and Cukurova at the level of
> CTH (Reserved matters).'

[98]    Mr Musatov's attention was drawn to the second bullet point and he was asked why no specifics
were provided of this curiously tentative statement.  He said that the figure of US$1bn had not
been mentioned in the discussion paper because the practice was to keep presentational material
as short as possible and for that reason specifics were not gone into.  Mr Musatov also made clear
that no particular range of damages was discussed at the meeting itself.   The Altimo board's
decision is recorded thus:

> **'Report on the main results of 2006 and the 1st quarter of 2007, and
> the main tasks for 2007**
>
> In response to the breach by Cukurova Finance International limited (CFI)
> of the loan agreement with the company Alfa Telecom Turkey Limited
> (ATT), the Board has recommended that the management notify CFI
> about its default on the loan, demand repayment of the loan and transfer
> legal title to Cukurova Telecom Holdings shares pledged in favour of ATT
> by exercising the pledgee's right.'

It is impossible to tell from this document whether the meeting decided to call the loan on one only
or two (and, if so, which) or all three of the defaults mentioned in the presentation paper. There is
thus no contemporaneous documentary material evidencing the fact that an opinion on Material
Adverse Effect formed any basis for the acceleration of the loan.

[99]    Mr Reznikovich was asked why Alfa did not ask Cukurova for a statement of its financial position in
the light of the Geneva arbitration award.  His answer was that there was no point asking, because
Cukurova would just have said 'fine'.  He added that Alfa did not seriously consider asking for this
kind of information.  Instead, he said, Alfa concentrated on a legal analysis, which, he added, might
have taken a month or longer to perform, which I have to say does seem to be a substantial length
of time to deal with a short point.  He said, finally, that Altimo formed its material adverse effect
opinion after the legal advice and the calculation, which he said was done by himself and Mr
Musatov and took couple of minutes.  Mr Reznikovich said that he did not remember if anyone at
the meeting asked him to put a figure on the financial consequences of the award.

<center>33</center>

[100]   What I am left with Is a party (ATT) which suggests to the Court in an affidavit sworn only a fortnight after the 2 April 2007 meeting that TS might obtain an award in the region of US$155m, apparently oblivious of the fact that its Chief Executive Officer and Chief Legal Officer had already calculated that the likely quantum will be over six times that amount; which can produce no minutes evidencing any discussion at all of the issue at the meeting of 2 April 2007; which admits, by its Chief Legal Officer, that no attempt to quantify the probable amount of any damages award was made in the meeting itself; and which says, by its CEO, that instead of asking Cukurova for information, it concentrated on the legal angle.

[101]   It seems to me that there is no evidence that the Altimo board ever formed an opinion, let alone a fact based and reasoned opinion, that the Geneva arbitration award either had had, or was reasonably likely to have a material adverse effect on the financial condition, assets or business of CH or any other member of the Group as defined, or on the ability of CH or CFI to perform its obligations under the Facility Agreement or any other Finance Document (as defined).

[102]   I do not overlook paragraph 124 of Mr Reznikovich's witness statement in which he says that 'with the assistance of my team at Altimo' he reached the view that, in his opinion, the award would have such material adverse effect.  Whatever Mr Reznikovich may have thought in his own mind, what needs to be proved is an opinion formed and held by the Altimo board.  As to that, there is no evidence at all.

[103]   It may be said, of course, that the relevant directing mind and will for the purpose of establishing what opinions were held by ATT on this issue was not the Altimo board, to whom ATT's management had been delegated, but Mr Nazarian, its sole *de jure* director, sitting on his own in Luxembourg.  It is true, of course, that he signed the acceleration letter, but to allow ATT to rely on that fact as establishing the opinion of a company run and managed exclusively, otherwise than in point of form, by Altimo would be to allow form to triumph over substance.  The fact that this matter was referred to the Altimo board for a decision whether or not to accelerate the loan shows that the Altimo board must be treated as ATT's controlling mind and will for this purpose.  If it were not, there would have been no purpose in asking for its decision.

[104]   ATT accordingly fails to establish this Event of Default.

<div align="center">34</div>

Related party matters

[105]   On 23 December 2005 Turkcell entered into a contract with a company called Digital Platform ve
Iletisim Hizmetleri AS ('Digiturk'), which was a member of the Cukurova Group, as defined in the
Shareholders Agreement.  Although the precise terms of the contract were never made entirely
clear, it seems that it involved the restructuring of Digiturk indebtedness to Turkcell amounting to
around US$100m.   The consequence, it is alleged by ATT, is that Digiturk was saved from
impending insolvency and Cukurova was ultimately able to sell off about 46% of Digiturk for
US$246m.

[106]   On 1 September 2006 Turkcell renewed or extended an agreement between itself and a company
called ADD Production Medya AS ('ADD').  ADD is also a member of the Cukurova Group for the
purposes of the Shareholders Agreement.  The renewal was effected by managerial act by two
directors of Turkcell in reliance upon a signature circular.  The matter was not and did not need to
be referred to the Turkcell board.

[107]   Clause 4 of the Shareholders Agreement is in the following terms:

> 'RESERVED MATTERS
>
> Each party agrees to use all of the powers at its disposal and
> exercise any and all voting rights it may have to ensure that no
> action is taken or decision made relating to any of the matters
> specified in Schedule 1 (Reserved Matters) (whether by any
> members of the Board, CTH, any other member of the CTH
> Group or any of the officers or managers within the CTH Group)
> unless the [CTH] Board has given its unanimous approval to
> proceed.'

Paragraph 4.2 of Schedule 1 to the Shareholders Agreement provides as follows:

> 'Any transaction or contract proposed to be entered into between
> any member of CTH Group and
>
> (A) The Alfa Group and/or any Affiliate of Alfa and/or any other
> Person directly or indirectly having a substantial financial
> interest in the Alfa Group or any Affiliate of Alfa; or

35

**Page 35**

**A644**

> (B) The Cukurova Group and/or any Affiliate of Cukurova and/or
> any Person directly or indirectly having a substantial financial
> interest in the Cukurova Group or any Affiliate of Cukurova.'

Turkcell is a member of the CTH Group for the purposes of the Shareholders agreement.  Since
each of Digiturk and ADD are members of the Cukurova Group, transactions between Turkcell and
either of them potentially fall within clause 4 of the Shareholders Agreement.  Clause 17.10 of the
Facility Agreement makes a breach of any Transaction Document an Event of Default unless the
breach is capable of remedy and has been remedied within 5 days of ATT giving notice of the
breach to CFI.  The Shareholders Agreement is a Transaction Document for the purposes of
clause 17.10 of the Facility Agreement.

[108]  ATT pleads that by failing to take any steps to procure the approval of the CTH board to the
conclusion of the Digiturk contract or the ADD renewal or to bring these matters to the attention of
the CTH board, CFI broke clause 4 (and clause 19.1, which I do not think takes matters any
further) of the Shareholders Agreement and thus brought about an irremediable Event of Default
under clause 17.10 of the Facility Agreement.

[109]  I pointed out at trial that this manner of pleading the breaches does not reflect the wording of
clause 4 of the Shareholders Agreement.  What clause 4 does, in my judgment, is to impose an
obligation upon CFI, ATT and CTH to use all powers at the disposal of each of them and exercise
all their voting right to ensure (inter alia) that Turkcell does not contract with any Cukurova Group
company, such as Digiturk or ADD, unless the CTH board has unanimously approved the
transaction.  There is no obligation to procure the approval of the CTH board or to bring the matter
to its attention.  There is simply an absolute obligation to do all that can be done to prevent such
transactions being entered into unless they have previously been unanimously approved by CTH's
board.

[110]  How CFI or CTH was expected to know what potentially infringing transactions the board of, for
example, Turkcell, was contemplating entering into at any given time, so that they could move into
action to do whatever they could to prevent them happening, is beyond my comprehension, but if
parties are prepared to assume duties of this sort they must expect to be required to perform them,
however problematic that may prove.  The Shareholders Agreement provides for no exception for

36

want of knowledge or notice of impending transactions. Mr Kenneth MacLean QC argued that it was for ATT, if it wished to allege this particular Event of Default, to set out what it says that CFI should (or, he would say, could) have done to ensure compliance, but I do not accept that submission. The obligation is unqualified.

[111]   Given that the ADD renewal was a managerial act not considered by Turkcell's board, there was plainly no power or voting right available to CFI capable of preventing that transaction going ahead. On no conceivable basis did CFI or CTH have any standing to influence, let alone interfere in, mere managerial acts of Turkcell, so that that alleged Event of Default is not made out.

[112]   The Digiturk transaction was approved at a meeting of the Turkcell board held on 16 December 2005. The Turkcell board at that date consisted of Mr Karamehmet and Mr Burkmen, together with two directors appointed by TS and three independent directors. Mr Kenneth MacLean QC says that in those circumstances, even if CFI had somehow persuaded the Cukurova appointees to vote against the Digiturk transaction, it would still have been approved by the remainder. This argument ignores the fact that CFI had a controlling stake in Turkcell. It seems to me that as a matter of fact CFI could have taken steps to block the Digiturk transaction. There is no evidence that it *could* not have procured at least some representation on the Turkcell board by 16 December 2005 and voted against all transactions proposed to be entered into between Turkcell and any Cukurova Group entity which had not had the approval of the CTH board. In those circumstances it seems to me to be impossible to say that there were no efforts which *could* have been made by CFI to comply with this obligation.

[113]   The Digiturk agreement was mentioned in the Disclosure Letter and it appears that there had been discussions between Cukurova and Alfa in which Cukurova had attempted to get Alfa to give advance consent to its being entered into. What Cukurova actually got, on the very day the transactions closed, was a letter in the following terms (so far as material) addressed to CH only:

'Dear Sirs,

Subscription Agreement dated June 1, 2005, among Alfa Telecom Turkey Limited ("ATTL") Cukurova Finance

37

International Limited ("CFI"), and Cukurova Holding A.S. ("Cukurova"), as amended by a letter agreement, dated September 20,2005, among Alfa, CFI and Cukurova, and as further amended by a letter agreement, dated September 20,2005, among Alfa, CFI, Cukurova, and Mehmet Emin Karamehmet (the "Subscription Agreement")

(1)   We refer to the Subscription Agreement.

(2)   We understand that Turkcell Iletisim Hizmetleri A.S. ("Turkcell") is expected to enter into the following transactions.

....

(2.2)   Turkcell will enter into an agreement, a copy of which we have not seen, with Digiturk Digital Platform Iletisim Hizmetleri A.S. ("Digiturk") in relation to the provision of long-term advertising arrangements on terms which are satisfactory to DP Acquisitions BV (which entered into a share purchase agreement with Cukurova Investments NV and Cukurova Holdings A.S. on October 27,2005 for the purchase of shares Digiturk) for a period of 5 years involving marketing spending by Turkcell of at least USD 18,000,000 per annum on advertising services provided by Digiturk.

(2.3)   Turkcell will reschedule the existing indebtedness owed to it by Digiturk by entering into a barter arrangement with Digiturk on terms which are satisfactory to DP Acquisitions BV involving the provision by Digiturk of the advertising services referred to in paragraph 2.2 above in consideration for the discharge in full by Turkcell of the existing indebtedness between Digiturk and Turkcell. Any such arrangement will provide that:

(i)   irrespective of the amount of advertising services used by Turkcell in any year, the higher of the sum of USD 18,000,000 and the actual advertising spending incurred by Turkcell shall be deducted from the amount outstanding between Turkcell and Digiturk each year;

(ii)   all security provided to Turkcell in respect of the existing indebtedness owed to it by Digiturk will be released in full and no new security will be provided to Turkcell in relation to the rescheduled indebtedness; and

38

      (iii)     Digiturk will be permitted to redeem the reschedules indebtedness at Digiturk's option by the provision of advertising services or the payment of cash to Turkcell.

(3)  We confirm that, subject to the above described transactions being on arms' length terms, and subject to their fiduciary obligations, we will ensure that the vote by our representatives on the boards of Cukurova Telecom Holdings Limited and/or Turkcell Holdings A.S. and/or Turkcell to approve and give effect to the transactions described in paragraph 2 above will not be unreasonably withheld.

Yours faithfully


By: _____

For and on behalf of

Alfa Telecom Turkey Limited'

This letter shows that ATT, while giving a strong indication that, other things being equal, it would not oppose the Digiturk transaction, was nevertheless reserving the right to scrutinize a copy of the Digiturk agreement (which it had not yet seen) and to consider the implications of the proposed deal at the board meetings of whatever companies were to be called upon to approve it. The letter did not, in my judgment, amount to *carte blanche* to Turkcell and Cukurova to proceed without further reference to ATT.

[114]    Mr Kenneth MacLean QC submits, however, that quite apart from the letter of 25 November 2005, ATT waived compliance with clause 4 of the Shareholders Agreement. He bases this submission, first, on ATT's subsequent knowledge that the Digiturk deal had been closed on 23 December 2005. For example, Turkcell's Annual Report for 2005, published in April 2006, noted the Digiturk agreement in the 'due from related parties' section. One of the two Alfa representatives on the Turkcell board was a Mr Khudyakov (who did not give evidence at the trial) and Mr Reznikovich accepted that Mr Khudyatov would have been aware of this reference. A DB presentation made to Altimo on or around 28 September 2006 referred to 'important transactions with Digiturk'. Mr Reznikovich said that this presentation was attended by Mr Khudyakov and that he was shown DB's presentation document by Mr Khudyakov afterwards. The Digiturk agreement was also mentioned in papers circulated in advance of a Turkcell board meeting held on 8 November 2006

39

**A648**

and it was readily accepted by Mr Musatov and Mr Reznikovich that Altimo was aware by 8 November 2006 at the latest that Turkcell had entered into the Digiturk agreement – although there was no evidence that ATT was interested to enquire as to its precise terms until 12 February 2007.

[115]   Mr Kenneth MacLean QC says that in this state of affairs, when on 24 November 2006 ATT accepted the interest due on the secured and unsecured borrowing, together with the prepayment of US$2m under the secured borrowing and the entire US$355m due under the unsecured borrowing, it waived any failure to comply with clause 4 of the Shareholders Agreement. There was some discussion whether when it did so ATT fully comprehended its legal rights under the Transaction Documents, but I do not think that it would lie in the mouth of ATT to claim ignorance or uncertainty as to its legal rights.

[116]   In these circumstances Mr Kenneth MacLean QC submitted that, while acceptance of the interest alone might not have constituted a waiver on the part of ATT, the fact that it accepted the prepayments of principal did. I cannot accept this submission. While it may well be true that acceptance by a lender of payments the effect of which is to affirm a banking relationship (such as interest in advance) may amount, on the facts of any particular case, to a waiver, the acceptance by ATT of prepayments which it was contractually obliged to accept (see clause 6.4 of the Facility Agreement) cannot possibly amount to a waiver on its part.

[117]   Even if I am wrong about that, it must be remembered that the Event of Default relied upon is not a breach of the Facility Agreement. The obligation in question is not an obligation of CFI under the Facility Agreement. While clause 17.10 of the Facility Agreement makes CFI's failure to comply with clause 4 of the Shareholders Agreement an Event of Default under the Facility Agreement, it does not thereby make it a breach of the Facility Agreement. It seems to me that whether or not acceptance by ATT of the sums paid to it by CFI on 24 November 2006 was capable of waiving a prior breach of the Facility Agreement, it was not capable of waiving a breach of a wholly separate (albeit related) agreement. If CFI was indeed in breach of the Shareholders Agreement, therefore, that breach remained an Event of Default by reason of the terms of clause 17.10 of the Facility Agreement.

40

[118]    Mr Stephen Smith QC relied upon clause 25 of the Facility Agreement, which is in the following
terms:

'REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of
the Lender, any right or remedy under the Finance Documents
shall operate as a waiver, nor shall any single or partial exercise
of any right or remedy prevent any further or other exercise or the
exercise of any other right or remedy. The rights and remedies
provided in this Agreement are cumulative and not exclusive of
any rights or remedies provided by law.'

He says that despite the fact that the waiver in terms deals only with Finance Documents, as
defined, the fact that the Facility Agreement defines Events of Default by reference also to the
Transaction Documents means that breaches of Transaction Documents are within the purview of
clause 25. This argument fails because that is not what clause 25 says. In any case, the provision
deals only with waiver on grounds of inactivity or delay. It does not deal with waiver by affirmation.
For the reasons given above, however, Mr Stephen Smith QC does not need this argument and I
deal with it only for completeness.

[119]    I now need to return to ATT's letter to CH of 25 November 2005, to which I referred at paragraph
[113] above. As I read the final paragraph of that letter, ATT was telling CH that it would not stand
in the way of the Digiturk agreement subject only to having sight of its full terms and to ATT's
representatives being able to consider, at the appropriate board meetings, whether the agreement
was at arms' length and whether they could approve it without being in breach of their fiduciary
obligations. ATT was therefore giving its conditional consent to the Digiturk agreement. In those
circumstances it seems to me that (although the letter was not written to or copied to CFI) ATT
must be taken by this communication to its 100% parent, CH, to have released CFI from any
obligation under clause 4 of the Shareholders Agreement to take all steps in its power, etc, to
thwart or block the transaction. So that while the letter did not sanction Turkcell's entry into the
Digiturk transaction without further reference to ATT, it did, in my judgment, mean that in respect of
the transactions to which it referred ATT must be understood as not requiring CFI to take any
blocking action. It would have been an act of deliberate commercial vandalism in those
circumstances for CFI to have taken steps actively to oppose or prejudice the Digiturk transaction.

41

**Page 41**

**A650**

[120]   Accordingly, this alleged Event of Default is not made out.

<u>Sale of Turkcell Shares</u>

[121]   As mentioned in the factual summary with which I opened this judgment, between about 8 and 21 November 2006 CH and CI sold an aggregate 5.88% holding of Turkcell shares by way of secondary public offering.  The proceeds were used to make the 24 November 2006 payments to ATT.

[122]   ATT alleges that this was a breach of clause 2.1(B) of the Shareholders Agreement.  Clause 2.1 reads as follows:

> 'Each of Alfa and Cukurova will procure that:
>
> (A) Respectively, no Alfa Group Member and no Cukurova Group Member (other than as set out in Schedule 4) will (directly or indirectly) acquire or hold any interest (minority or otherwise) in any member of the CTH Group; provided that this clause 2.1 (A) shall not prohibit an Alfa Group Member or Cukurova Group Member from acquiring up to fifteen percent of the issued and outstanding equity securities of Turkcell, but no other member of the CTH Group, provided that Turkcell remains listed on an internationally recognized stock exchange and provided further that such acquisition is made only through an internationally recognized stock exchange;
> (B) Subject to the prior agreement of the Board, and except as otherwise stated herein, if the opportunity arises to acquire any interests in any CTH Group Member, the parties shall procure that such acquisition only be carried out by CTH.'

Schedule 4 simply sets out the then existing holdings of Cukurova Group members of Turkcell shares.  Turkcell is a CTH Group Member.

[123]   Clause 2.1A therefore restricts the size of parties' holdings in (inter alia) Turkcell.  Clause 2.1(B) requires the parties to procure that should an opportunity arise to acquire any interests in, inter alia, Turkcell, the acquisition will be made by CTH.  ATT says that the secondary public offering conducted by JP Morgan in November 2006 represented an opportunity to acquire an interest in a CTH Group Member and that CFI and CTH were obliged to procure that the opportunity 'could be taken up' by CTH.

42

[124]   This is an astonishing contention.  Mr Reznikovich accepted that he knew about the offering on 8 November 2006, because it had been discussed at a Turkcell board meeting on that day which had been attended by Mr Khudyakov in his capacity as board representative of ATT.  Mr Kudyakov actually voted for the resolution approving the blank endorsement of the relative share certificates, although it is true that he abstained on the resolution approving the offering itself.  Mr Reznikovich says that he discussed the offering on Mr Khudyakov's return from the board meeting (which had been held in Istanbul) and may have mentioned the fact to the Altimo board.  As he put it, he may have made a couple of phone calls.  He accepted that Alfa did not complain about the sale, because, as he said, it had not then established that it was an Event of Default.  Mr Musatov was aware of the offering at about the same time.  He, too, said he did not realize at the time that it was a breach of the Shareholders Agreement.  He only found that out in March or April 2007.  Certainly, the supposed breach was not mentioned in the course of the presentation he made to the Altimo board on 2 April 2007.

[125]   Despite being aware of the offering at the time, ATT took no steps to comply with its own mirror image obligations (if that is what they were) under clause 2.1(B).  It took no steps to procure that the opportunity could be taken up by CTH.  Yet it claims that CFI's failure to do the same was an Event of Default as amounting to a breach of a Transaction Document.

[126]   As a matter of construction clause 2.1 of the Shareholders Agreement has no bearing on disposals of Turkcell shares in the market.  The notion that each time a Turkcell share became available on either of the Istanbul or New York Exchanges, ATT, CFI and CTH had to bustle about and 'procure' that it could be purchased only by CTH is absurd.  Clause 2.1(B) is plainly aimed at preventing either Cukurova or Alfa from *obtaining* an additional position within the CTH Group, thus disturbing the 13/76%/13.22% balance which the 2005 Alfa/Cukurova transactions had been designed to achieve.  Cukurova's sale of the 5.88% holding did not affect that balance.

[127]   I do not therefore need to go on to consider waiver.  Had it been necessary for me to do so, I would have decided, for reasons similar to those that I have given in respect of the related party transactions, that no waiver had occurred.

[128]   This Event of Default is not made out.

43

<u>Failure to Notify</u>

[129]   The final Event of Default relied upon in the acceleration letter is CFI's alleged failure promptly to notify ATT of its own alleged defaults and to inform ATT what steps were being taken to remedy them.

[130]   The relevant provision in the Facility Agreement is clause 15.5(A):

> 'The borrower shall notify the Lender of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.'

[131]   Since I have held that none of the other Events of Default alleged in the acceleration letter has been made out, it follows that there cannot have been an Event of Default (or, as the acceleration letter would have it, eight Events of Default) under clause 15.5(A) of the Facility Agreement.

<u>Was the call letter effective to accelerate the loan?</u>

[132]   If ATT is to be confined to Events of Default actually specified in the acceleration letter, then it follows from the findings which I have made above that it was ineffective to accelerate the loan. ATT argues, however, that it is entitled to rely upon any Event of Default subsisting at the date of the acceleration letter, whether or not mentioned in it.  That is challenged by CFI.

[133]   There are two alleged Events of Default which ATT says were subsisting on 16 April 2007, but which were not mentioned in the acceleration letter.  Each is alleged to flow from a breach of clause 17.3 of the Facility Agreement, which is in the following terms:

> 'Misrepresentation
>
> Any representation, warranty or statement made or deemed to be made by the Borrower in the Finance Documents, any Transaction Document or any other document delivered by or on behalf of the Borrower under or in connection with any Finance Document is or proves to have been incorrect or misleading in any material respect when or deemed to be made.'

Clause 17 makes the occurrence of such a circumstance an Event of Default.

<div align="center">44</div>

[134]   The first alleged materially incorrect or misleading statement is said to arise out of the CFI financial statements submitted to ATT on 22 February 2007 and which I have considered between paragraphs [50] and [87] above. In its amended statement of claim ATT says that whereas those financial statements showed the US$574m as a liability due to related parties, Ms Cetinalp and a Mr Martin Hall (neither of whom gave evidence at the trial) have stated in affidavits sworn in these proceedings that they incorrectly recorded the sums due to CH and CI as loans to CFI because in fact they were capital contributions. Although it is not my understanding that the February 2007 financial statements record these payments as loans (and, as I understood him, it was not that of Mr Palmer either), this allegation is admitted in Cukurova's defence. It seems to me, however, that this admission was overtaken by the course which argument took at trial. In any event, CH and CFI deny that the February 2007 financial statements were materially incorrect or misleading.

[135]   There can be no doubt that the February 2007 financial statements showed liabilities where it was subsequently asserted that the reference should have been to capital contributions. Mr Palmer was clear in his evidence that from an accountancy point of view the February 2007 financial statements, if set beside the comparative figures in the April 2007 financial statements and on the assumption that the latter treatment was the correct one, were materially misstated. The question which is required to be answered for the purposes of clause 17.3 of the Facility Agreement, however, is whether the February 2007 financial statements on their own were incorrect or misleading in any material respect and Mr Palmer did not suggest that on their own they were.

[136]   Mr Stephen Smith QC says that a document showing a company to be insolvent when in fact it claims to have been solvent has to come within that category, but that submission assumes what is required to be proved. Mr Kenneth MacLean QC says that because the February 2007 financial statements understated, rather than overstated CFI's position any error giving rise to that effect should in some way be ignored. I cannot accept that submission. Whether or not a statement is materially incorrect or misleading cannot turn upon the question whether it is calculated to cause the recipient to act to his detriment.

[137]   In my judgment, the February 2007 financial statements were not materially incorrect or misleading, although not for the reason given by Mr Kenneth MacLean QC. They correctly showed that the only loan for which CFI was liable was that due to ATT. By Note 6 they described the

45

US$574m as due to related parties in respect of funding introduced.  As Mr Yalim explained, its treatment as a liability was driven by the underlying book keeping entries and the fact that no formal steps had yet been taken to capitalise the funding in CFI's books.  The arithmetical deficiency to which that treatment gave rise should have been obvious to any reader of the financial statements as being the result of the provision of funding, not commercial lending.  It seems to me that the treatment adopted by Mr Yalim of recording an as yet uncapitalised advance as a (technical) liability, when coupled with the explanation in Note 6, was a perfectly fair way of presenting the factual position and was not materially incorrect or misleading.  I accept that anyone receiving these documents who was the slightest bit interested in understanding their full effect might have wished to ask questions about them.  That would certainly not have included ATT.  When ATT wrote to CFI on 12 March 2007 about the financial statements, it was not concerned to seek clarification of their content, still less to protest about any supposed insolvency, but rather to obtain a confirmation from CFI that they fairly represented CFI's financial position and that they had been prepared using IAS.

[138]   The fact that the February 2007 financial statements might have prompted further inquiry does not mean that they were materially incorrect or misleading.  That would be to confuse material error with what is at best opacity.

[139]   It is true that the restated financial statements done in April or May 2007 treated the US$574m differently.  In the first set of financial statements produced by Mr Yalim (which was not shown to ATT) the sum is classified (wrongly) as share capital as at 23 April 2007 (but not as at 31 December 2006).  This seems to me to throw no light on the question whether the February 2007 financial statements were themselves materially inaccurate or misleading.  The same goes for the second set of financial statements prepared by Mr Yalim as at 23 April 2007, where the US$574m is shown both at 23 April 2007 and at 31 December 2006 as capital contribution.  It is true that the three sets of documents are inconsistent with one another, but the question which has to be answered is nothing to do with consistency, but always remains whether the February 2007 financial statements are themselves materially incorrect or misleading for the purposes of clause 17.3 of the Facility Agreement.  It does not assist ATT to refuse to accept that either of the two later documents are accurate and then rely upon the differences to support a submission that the earlier document must be materially incorrect and misleading.  That is a *non sequitur*.

46

[140]    This Event of Default is not made out.

[141]    The second Event of Default alleged to have arisen before 16 April 2006, but which was not referred to in the acceleration letter, arises from CFI's letter of 19 March 2007.  In that letter CFI confirmed that the February 2007 financial statements were certified by Ms Cetinalp in her capacity as a director of CFI as fairly representing CFI's financial condition as at 31 December 2006 and that they had been prepared 'using IAS'.  These are said to have been materially inaccurate or misleading statements, because (see above) ATT says that the accounts could not be said to be a fair representation of CFI's financial position so long as CFI relied upon the restatements of April 2007 and because IAS require that financial statements be accompanied by a cash flow statement (which CFI's were not) and that they required a declaration to the effect that they were IAS compliant (which CFI's did not).  The first adds nothing to what I have dealt with above; the second is *de minimis*.  Mr Palmer told the Court that IAS required a cash flow but frankly accepted that, given the simple structure of CFI's balance sheet, the inclusion of a cash flow statement would have added little or nothing to what could be gleaned from the balance sheet.  He said that he did not think that the absence of a cash flow statement or the note acknowledging compliance went to the heart of the litigation.  I agree with that.

[142]    This Event of Default is therefore not made out.

[143]    That makes it unnecessary for me to decide whether, had these two last Events of Default been established, the fact that ATT had not referred to them in the call letter would have precluded ATT from relying upon them in accelerating the loan.

**The acceleration of the loan**

[144]    It follows from the above that there was no continuing Event of Default available to ATT when it purported to accelerate the loan.  It further follows that the attempt to accelerate amounted to a breach of contract on the part of ATT and that CFI's failure to repay the loan in response to the acceleration letter was not an Event of Default.

47

Further Events of Default

[145]   On 16 April 2007 Mr Hardman delivered to the Registered Agents for CFI and CTH two letters from Walkers asking CFI and CTH to register ATT as the holder of the charged shares. The completed transfers and relative certificates were handed over to enable that to be done. On the same day, proceedings were issued and served against CFI and CTH asking for orders that their share registers be rectified accordingly.

[146]   ATT pleads that CFI committed a further Event or Events of Default by refusing or failing to comply with the requests made to it on 16 April 2007 to perfect ATT's security over the charged shares was perfected and in obtaining the stop notices and injunction restraining registration of the transfers and enforcement of the security. ATT relies principally upon clause 4.4 of the English share charges granted by CFI and CH, but it is necessary for me to set out the whole of the scattered battery of separate provisions under the Facility Agreement upon which ATT relies in order to establish these Events of Default. Clause 4.4 of the English share charges reads as follows:

> 'Further Assurance
>
> The Chargor shall promptly do whatever the Lender requires:
>
> (a) To perfect or protect the Charges or the priority of the Charges; or
> (b) To facilitate the realization of the Charged Assets or the exercise of any rights vested in the Lender or any Delegate, including executing any transfer, charge, assignment or assurance of the Charged Assets (whether to the Lender or its nominees or otherwise), making any registration and giving any notice, order or direction.

Clause 17.1(A) of the Facility Agreement made non-compliance with any provision of a Finance Document an Event of Default. The English share charges were Finance Documents.

Clauses 16.10 (C) and (D) of the Facility Agreement provide:

48

(C) The borrower shall take all such action as the Lender may reasonably request for the purpose of perfecting any such Security.

(D) The Borrower shall, if the Lender lawfully exercises any power (whether of sale or other disposal or otherwise) or right with respect to the Charged Shares, do everything within its power to permit the exercise of such power or right.

Clause 17.12 of the Facility Agreement provides that it is an Event of Default if

'The Borrower, any member of the Telecom Group or any other person takes any corporate action, legal proceedings or other procedure or step in relation to termination, revocation, suspension, cancellation or invalidation of the whole or any part of the Finance Documents and/or the Transaction Documents or takes any corporate action, legal proceedings or other procedure or step that is or reasonably likely to be prejudicial to the Lender's right under the Finance Documents and/or the Transaction Documents.'

[147]   Mr Kenneth MacLean QC raises a number of intricate defences in answer to these claimed defaults. Some of them, taken in isolation from the background facts, are technically good.

[148]   For example, Mr Kenneth MacLean QC points out that Walkers' letter of 16 April 2006 which Mr Hardman delivered to CFI asked CFI to enter ATT's name in its register of members. In terms, CFI was being asked to perfect the security granted to ATT by CH. Failure or refusal on the part of CFI to do that could not involve a breach of clause 4.4 of the CFI English share charge, since CFI's only obligation under clause 4.4 of the charge was to perfect the charge which it had granted over its shares in CTH.

[149]   Next, he says that Walkers' request to CTH was in terms a request to CTH to perfect the charge granted to ATT by CFI. But CTH owed no obligation to do that, nor could its failure to do so constitute an Event of Default under the Facility Agreement, to which it was not party. It is true that a breach by CTH, as a member of the Telecom Group, of any Transaction document might, if unremedied, give rise to an Event of Default under clause 17.10 of the Facility Agreement, but it was not a requirement of any Transaction Document (as defined) that CTH should take any steps by way of perfecting, or assisting in the perfection of, the CFI English share charge.

49

[150]    CFI did have an obligation under clause 16.10(C) of the Facility Agreement to take all such steps as ATT might reasonably request for the purpose of perfecting any security created by CFI, but Walkers letter of 16 April 2007 was not a request to CFI to perfect any security created by CFI, so that no Event of Default under clause 16.10(C) can have arisen as a result of any failure or refusal on the part of CFI to comply with that request.

[151]    Mr Kenneth MacLean QC says that the issue by ATT of Claim 73, in which ATT sought rectification of the relevant share registers, and which ATT claims amounted to a request by ATT to CFI to bring about the required rectifications, was not a request at all.    I agree with him.    The commencement of proceedings is indeed a request, but it is a request to the Court for judgment in the terms sought.   It cannot be treated as a request to CFI for the purposes of the provisions of the Facility Agreement. ATT also pleads that by letter dated 17 April 2007 it informed CFI that it had approached the registered agent for registration of the transfers and stated that it was waiting for confirmation from the registered agent that the requests had been complied with.  ATT pleads that that is to be read as a request to CFI, but in my judgment it is no such thing.

[152]    While these defences (I have not dealt with them all) work as far as they go, they all ignore the rather obvious fact that Mr Parsons forwarded the requests made by Walkers to Ms Cetinalp on the same day and asked for instructions as to how to proceed.  No documentary response has been disclosed, but Cukurova (I deliberately use the broad designation) must have understood as a group what was being asked of it.  Any confusion between perfection and enforcement would have been dispelled by Walkers' letter of 17 April 2007, which made the distinction (for what it is worth) plain.  In my judgment each of the relevant Cukurova entities must be taken to have known and understood, by close of business on 17 April 2007 at the latest, what was being required of it by ATT.  It seems to me that the absence of any response must be taken as a refusal by the group and each of its constituent parts to take any steps to comply.  I do not think that that blanket refusal can be surgically analysed by reference to individual parts of the Finance Documents and chopped so fine that it can be made to disappear.

[153]    Mr Kenneth Maclean QC submits that what ATT was up to in making its requests for registration was not perfection of its security but (I hope that I do the submission justice) perfection as part of the process of enforcement.  I cannot accept this argument.  Even though ATT may have been

50

Intent on following through with enforcement at time of its choosing and although that time might have been (indeed was) imminent, it is not possible, in my judgment, to treat a specific and legally discrete process as if it was a different one.

[154]   I am therefore satisfied that an Event of Default within the meaning of to the provisions of any rate Clause 4.4 of the CFI English share charge (taken together with clause 17.1(A) of the Facility Agreement) and of clause 16.10(C) of the Facility Agreement arose out of the failure to CFI to take any steps to comply with ATT's request to perfect the security which it had granted.

[155]   As I have earlier recorded, at around 3.50 in the afternoon of 27 April 2007 CFI and CH obtained stop notices under CPR Part 49.   The effect of those notices was that ATT could not achieve registration of the transfers until a further fourteen days had elapsed.   On the previous day Maples & Calder had told Walkers that they would be applying for an injunction to prevent ATT enforcing its security over the CTH shares.   I have already set out above how, at about 4.05 pm on the 27 April 2007 Walkers purported to appropriate the charged shares and how, at about 6.30 on the same day, Joseph-Olivetti J granted an injunction, without prejudice to ATT's claim already to have appropriated, restraining (a) registration of the transfers of the CFI and CTH shares and (b) restraining enforcement of the English share charges.

[156]   Mr Stephen Smith QC was inclined to accept that an interim injunction preventing enforcement could not be prayed in aid as an Event of Default.   But, he contended, the obtaining of the stop notices and that part of the injunction which restrained registration amounted to Events of Default under clauses 16.10(D) and/or 17.12 of the Facility Agreement.   On any footing, he submits, ATT had a rock solid entitlement in equity and under the English share charges to be registered as the holder of the charged shares.   No right of CFI or CH could possibly be damaged or infringed as a result.   Therefore the obstruction by way of stop notices and the obtaining of that part of the injunction which restrained registration (ignoring the fact that the latter relief was not obtained until after the purported appropriations had taken place) must be an available Event of Default.

[157]   I agree with Mr Stephen Smith QC that the obtaining of the stop notices and of the injunction restraining registration amounted, as a matter of contractual analysis, to Events of Default on the part of CFI under the provisions to which I have referred.   Where I part company with him is in being unable to see any difference in kind between the obtaining of the injunction against

51

A660

enforcement (which he says is not to be relied upon as an Event of Default) and the obtaining of the stop notices and the injunction restraining registration (which he says is). If ATT can rely upon the failure to effect registration and/or the obtaining of (a) the stop notices and (b) the injunction restraining registration, then there would seem to be no reason in principle and nothing in the English share charges to preclude it from relying upon those Events of Default as entitling it to appropriate. If ATT was entitled to appropriate, then the obtaining of the injunctions against enforcement was a clear Event of Default under clause 17.12. If the failure to procure (and the positive obstruction of) registration were not Events of Default, then the obtaining of the injunction against enforcement cannot have been, either. In other words, the outcome on the contractual documents must always be that there were either two Events of Default[10], or none – which does not fit in with Mr Stephen Smith QC's submissions.

[158]    I think that what this analysis reveals is that the real question, for the purposes of the post-16 April part of the case, is not whether Events of Default can be identified by an application to the facts of specific provisions of the Finance Documents, but whether in all the circumstances ATT was entitled to rely, when it purported to appropriate, upon any of the facts which happened.

[159]    The attempt to accelerate the loan on 16 April 2007 was a major breach of contract, which not only ruptured the lender/borrower relationship but also menaced the CTH shares in the most obvious and potentially irreversible manner.

[160]    The stop notices and injunction restraining registration were obtained after ATT had announced, on 25 April 2007, that it was terminating its rolling two business day moratorium on enforcement with effect from 4 pm on 27 April 2007. Cukurova's request for time to mount an injunction application that could be heard *inter partes* after evidence had been exchanged had been rejected. Further, it must be remembered that at that time there was no certainty whether a right of appropriation over shares could be exercised unless the chargee had legal title to them. Later, the experts who gave evidence before Joseph-Olivetti J - Lord Millett and Professor (now Mr Justice) Cranston - were divided upon the point, which was finally disposed of only when the matter reached the Privy Council. Nor was there any clear idea what would constitute the exercise of the right of

---

[10] treating the registration matters for this purpose as giving rise to a single Event of Default

52

appropriation: in his evidence before Joseph-Olivetti J, Lord Millett said that it was sufficient for the chargee merely to 'determine' to exercise the right. So that as at 27 April 2007 there was – or would have been had the relevant individuals then been present - very considerable uncertainty at the highest level about the precise incidents and properties of the novel right of appropriation and the manner of its exercise. It is safe to assume that Cukurova and its advisers laboured und similar uncertainty in the days after delivery of the acceleration letter.

[161]   In my judgment ATT cannot rely upon any of the post–16 April 2007 Events of Default as entitling it to enforce the security.   It was ATT which had put itself in breach of contract when it served the acceleration letter.   It went on the following day to indicate that it had in contemplation what was, on the facts as they then stood, an unlawful appropriation of the shares.   On 25 April 2007 it announced a settled intention to appropriate.   ATT cannot pick over the bundle of measures which CFI unsurprisingly took to protect itself from a wrongful seizure of the CTH shares in order to isolate one element which, if it had stood alone and unaffected by a serious breach on the part of ATT, would have constituted an available Event of Default and then use that to justify the appropriation.   ATT cannot rely upon events which were entirely provoked by, and a proportionate reaction to, its own serious breach of contract in order to justify what it would otherwise have had no entitlement to do.   In assessing ATT's entitlement to rely upon any of the post – 16 April events,, the distinction between perfection and enforcement thus becomes academic.

## Conclusion on Events of Default

[162]   In my judgment none of the Events of Default relied upon in the acceleration letter, nor those which had preceded it chronologically but which were not identified until later, has been made out.   The failure to pay was not an Event of Default.   ATT is not entitled to rely upon any of the Events of Default which happened after 16 April 2007.   It follows that ATT had no right to appropriate the security on 27 April 2007 and that it committed a further breach when on 21 May 2007 it rejected CFI's offer of tender.

[163]   While that is sufficient to dispose of ATT's case, a large portion of the hearing was taken up with the issues of bad faith/collateral purpose.   For that reason and because, if this case should go further, a higher Court may need to have my findings of fact on the bad faith and collateral purpose arguments, I shall proceed to find the facts as they emerged at trial and on which Cukurova relied

53

as establishing that ATT had acted in bad faith throughout. The process will inevitably involve some repetition of material which has already been mentioned in different contexts.

**Bad faith/collateral purpose**

[164]   Left to myself I would have found it difficult to see what bad faith or collateral purpose has to do with the right to appropriate created by the Regulations. Regulations 17 and 18 are in the following terms:

> **'No requirement to apply to court to appropriate financial collateral under a security financial collateral arrangement**
>
> Where a legal or equitable mortgage is the security interest created or rising under a security financial collateral arrangement on terms that include a power for the collateral-taker to appropriate the collateral, the collateral-taker may exercise that power in accordance with the terms of the security financial collateral arrangement, without any order for foreclosure from the courts.
>
> **Duty to value collateral and account for any difference in value on appropriation**
>
> (1)   Where a collateral-taker exercises a power contained in a security financial appropriated differs from the amount of the relevant financial obligations, then as the case may be, either-
>
>    (a)   the collateral-taker must account to the collateral-provider for the amount by which the value of the financial collateral exceeds the relevant financial obligations; or
>
>    (b)   the collateral-provider will remain liable to the collateral-taker for any amount whereby the values of the financial collateral is less than the relevant financial obligations.'

[165]   Although these Regulations refer to appropriation as a 'power', it does not seem to me to have any of the characteristics of a power such as a trustee's power of appointment, or a mortgagees' power

54

of sale or other powers which give the donee discretion (or latitude) as to the manner of their exercise.  Appropriation seems more like a right, such as a right of set off or a right of pre-emption, where there is not much room for any discretion (or latitude) except in the decision whether or not to exercise the right.    It was pointed out to me that Lord Walker of Gestingthorpe uses the word 'power' in setting out the advice of the Board his judgment in the Privy Council[11], but I doubt that he was doing more than tracking the language of the Regulations and in any case he was not considering the issue of bad faith or collateral purpose.    As I see it, the collateral taker is either entitled to appropriate or he is not.  If he is and decides to appropriate, the thing operates by way of a self executing method of payment.  I can see how a collateral taker could purport to appropriate when he had no right to (as in this case), but the vice in that is his lack of entitlement, not his state of mind.

[166]    None the less, both parties insist that because, in reliance upon the joint expert evidence of Lord Millett and Professor Cranston, Joseph-Olivetti J unsurprisingly held in the preliminary issue proceedings that the remedy of appropriation must be exercised in good faith and for a proper purpose, it is *res judicata* before me.  So I must proceed on the footing that good faith is an issue.

[167]    Mr Kenneth MacLean QC's case on bad faith goes far wider than the mere exercise of the remedy of appropriation.  He submits that ATT entered into the whole transaction in bad faith, conducted itself throughout in bad faith and appropriated the shares in bad faith.  I may not be doing justice to his excellent submissions if I say that the thrust of them was that from the outset ATT's aim was to use the lending arrangements to acquire the 51% of CTH that CH, through CFI, retained subject to ATT's security and that the security was little more than cover to enable that end to be attained.  He would also say, I think, that ATT's behaviour as lender was geared towards putting itself in a position where it could exercise its security rights and either sell the shares to an associated entity through the mechanism of a pre-pack receivership or simply appropriate them.  He says that, if established, such conduct amounts to bad faith and is evidence of a collateral purpose and is sufficient to vitiate the exercise of the remedy of appropriation.  I shall attempt to deal with the bad faith arguments in relation to the various stages in the history.

---

[11] [2009] UKPC 19 at paras 32, 33

55

## The negotiation and conclusion of the arrangement

[168]   Mr Tolchinsky gave evidence for ATT about the negotiation and conclusion of the deal. He gave his evidence frankly and without any suggestion that he had either an axe to grind or something to hide. He had been associated with Alfa since about 1998 and has a small indirect stake in Altimo. He had been a board member of Alfa Bank and AFH. He left Alfa Bank's service in 2004, but stayed on as a director of Alfa Bank and Alfa Finance until the summer of 2006. Although Mr Tolchinsky was not formally a member of the Altimo board, he was invited to its meetings out of courtesy when he was in Moscow. Mr Tolchinsky is an associate of Mr Knaster, who is a director of Alfa Finance Holdings and Alfa Bank. Mr Knaster owns a hedge fund or similar financial institution called Pamplona.

[169]   Mr Tolchinsky explained how in 2003 he had had discussions with Mr Fridman, the controller of the Alfa Group, about the possibility of making an investment in Turkey. By summer 2004 both Mr Tolchinsky and Mr Knaster were living in London. Mr Fridman asked them to use their banking connections to talk to banks and other financial institutions about the prospects for investing in Turkey. At that stage, Turkcell was not on the agenda as a specific target. It was merely one of a number of possibilities. Both Mr Tolchinsky and Mr Knaster were aware by about October/November 2004 that JP Morgan was raising finance for Cukurova by making realizations of Turkcell shares and they knew that Cukurova was under financial pressure. It seems to have been at about this time that Alfa started to concentrate upon Turkcell as a specific target. Mr Tolchinsky explained that investment in a Turkish cellphone company was attractive to Alfa, because of the geographical closeness of the two countries and the fact that Turkey is a popular holiday destination for Russians. Mr Tolchinsky said that Alfa was interested in buying a controlling interest in Turkcell, if it was for sale, but strongly denied that Alfa's aim was only and all along to acquire the whole of Cukurova's interest in TCH. Mr Tolchinsky told me that it suited Alfa to go into foreign investments together with a local partner. In that way, Alfa would get the benefit of local knowledge and access to the appropriate governmental authorities and regulatory bodies.

[170]   It is clear from the documents and Mr Tolchinsky confirmed that early in January 2005 the basis had been hammered out of a deal whereby Alfa would acquire 50% of Cukurova's holding in TCH and make a loan to Cukurova secured on the other 50%. As I have already said earlier, this had to

56

**A665**

be carefully constructed so as to avoid infringing the TS pre-emption rights under the TCH shareholders agreement and it was that necessity which resulted in the change to 51% to Cukurova, in order to take advantage of the 'affiliate' exception in the TCH shareholders agreement. A meeting took place on 25 January 2005 in Paris to discuss the proposals, attended by Mr Tolchinsky, Mr Fridman, Mr Knaster, Mr Karamehmet and Mr Berkmen. Mr Tolchinsky accepted that at the Paris meeting there would probably have been some discussion of the possibility of Alfa acquiring a majority interest, but Mr Karamehmet was seriously opposed to letting Alfa have any more than 49%. In this, he was in disagreement with Mr Berkmen, who favoured a disposal of the whole of Cukurova's interest in TCH to TS, but it was Mr Karamehmet's view which prevailed.

[171]  Significantly, however, when he was asked why Alfa did not simply buy some of Cukurova's TC shares held outside the TCH structure, Mr Tolchinsky said that that was not attractive to Alfa because they gave no control. The only way in which Alfa could acquire management control of TC would be by acquiring, directly or indirectly, more than 50% of Cukurova's holding in TCH. Under the arrangement which evolved, Alfa was only to have outright ownership of 49%. This strongly suggests that Alfa's intention from the outset was to exploit its chargee interest in the shares retained by Cukurova -- otherwise its aim to achieve control could not be realized by entering into any transaction with Cukurova to which Mr Karamehmet was not opposed.

[172]  Mr Tolchinsky said that Alfa knew that Cukurova was in financial straits. By March of 2005 those difficulties had become acute. As described above, when TS turned down Cukurova's request for assistance in meeting the SDIF instalment payments, Alfa supplied finance through Mogoton. It appeared from Mr Berkmen's evidence that Cukurova unsuccessfully approached TS for interim finance again in November of 2005. Over 31 May and 1 June 2005 a gruelling meeting, during which the lawyers acting for the parties went without sleep, took place in London. It was attended for Cukurova by Mr Karamehmet and Mr Berkmen and for Alfa by Mr Knaster and Mr Tolchinsky. Cukurova needed, but did not have readily available, US$135 million with which to pay the May installment to SDIF by 2.30 pm London time on 31 May. Although failure to pay would not have caused the withdrawal of the prepayment arrangement between Cukurova and SFIF, Mr Karamehmet explained that he was extremely anxious not to default, with the adverse publicity that that would inevitably produce. Both Mr Karamehmet and Mr Berkmen said that they had gone to

57

the London meeting expecting that Alfa would arrange for Mogoton to fund at any rate the May Installment without question, but that the Alfa representatives refused to do so until the Subscription Agreement, was executed on the following day, 1 June. They say that in order to ensure that the payment was made on time a promise was given to the Alfa representatives by Cukurova's lawyers (which I find surprising) that the subscription agreement would be executed by that time. Mogoton, under an amended and restated finance agreement which raised the facility from the US$220 million advanced on 27 April 2005 to US$760 million, thereupon paid the May Installment in time on 31 May 2005. This incident appears to be relied upon by Cukurova's witnesses as evidence of the exercise by Alfa of some sort of illicit pressure on Cukurova to sign, but duress is not pleaded and I shall have to consider later what, if any, weight I give to this evidence. Mogoton continued to finance the SDIF installments (in an overall amount of US$762 million) until the transaction closed in late November 2005.

[173] When on 25 March 2005 TS announced that it had reached agreement in principle for the acquisition of the whole of CH's 27% interest in TCH for a price of US$3.1bn, Mr Fridman wrote to Mr Karamehmet on the same day offering to beat TS's offer by US$100m and expressing an interest in matching, or at least considering, any upward revisions on the part of TS. Mr Fridman's letter offered to 'provide for immediate cash proceeds upon signing definitive documentation' and to 'take the potential legal risks of the transaction not closing'. There was some debate about the precise meaning of these expressions, but since Mr Fridman did not give evidence and since Mr Reznikovich disclaimed all knowledge of the offer, I do not think speculation as to the proper construction of Mr Fridman's language is likely to be very profitable. What is clear is that, certainly in March 2005, Mr Fridman was interested in an acquisition of the entire TCH holding. That bid failed as a result of Mr Karamehmet's refusal to sell the holding outright.

[174] On 21 September 2005 Reuters issued a press release in which it reported Mr Reznikovich as saying that Alfa was to acquire 13.2% of TCH and that the stake would shortly increase to 27%. Following this press release, Mr Reznikovich was immediately contacted by the CMB and asked to explain his intentions. There is among the papers a draft of a letter from Mr Reznikovich to the CMB explaining that he had been misquoted and Mr Reznikovich said that he was pretty sure that the letter had been sent. In cross examination Mr Reznikovich did not deny that the 27% figure had been alluded to, but he claimed that he 'may have been referring' to a possible joint venture

58

with Cukurova which would have produced a combined 27% and insisted that he was not referring to possible exercise by Alfa of security rights under the English share charges. I cannot accept this explanation, since there is no suggestion anywhere in the documentary or oral evidence of any proposal for any sort of joint venture between Alfa and Cukurova involving the TCH shares. Further, it is difficult to see where Reuters would have got the 27% figure from unless Mr Reznikovich had mentioned it in connection with the intended acquisition. I find that Mr Reznikovich was alluding to the exercise by Alfa of the security which it was to be granted under the arrangements once they closed and that Alfa was fairly confident, before it entered into the transaction, that Cukurova would not be able to fund the installment of interest that would fall due on the first anniversary of closing.

[175]   Mr Tolchinsky gave some evidence about the inclusion in the English share charges of the right of appropriation. It seems that DB (advised by Slaughter & May) had had misgivings about the effectiveness of the remedy. Alfa, however, wanted the English charges as well as the BVI charges because it was advised by Jones Day that in that way the full spectrum of available options, including appropriation, would be available to Alfa.

[176]   Based upon this evidence I find as a fact that when the transaction closed it was the expectation and aim of Alfa that Cukurova would default in November 2006 and that its remaining stake in TCH would fall into Alfa's lap.

[177]   Does that mean that Alfa entered into the transaction in bad faith and, if it does, does that mean that Alfa was in some way disabled from resorting to the remedy of appropriation?

[178]   I was referred to some authority on the question of bad faith, but none on the topic of concluding a contract in bad faith. There is in fact an interesting discussion in Chitty which makes clear that the concept has no place in English law so far as concerns the negotiation and conclusion of contracts[12]. Without authority, however, I have no doubt that in entering into the transaction Alfa did not act in bad faith. No criticism is to be made of a party who negotiates and enters into a contract with a properly advised counterparty, even if one consequence may be to confer benefits on the first party which are highly unwelcome to the counterparty but which suit the first party's

---

[12] Chitty on Contracts, 30th Ed, paras 1-022 to 1-034

59

commercial objects very well. The insistence on the conclusion of a binding agreement before extending interim finance seems to me to have been perfectly acceptable commercial behaviour. Cukurova did not need warning that if CFI committed an Event of Default the shares might be appropriated or sold. It makes no difference if the contract is a mortgage. Cukurova's argument comes close to suggesting that Alfa had a duty not to enter into the transaction, simply because it hoped and expected that the outcome would result in its obtaining the whole 27% stake in CTH. That seems to me to be untenable.

Non-payment of dividends

[179]    I now turn to the second group of allegations of bad faith, which centre around a claim that Alfa attempted to engineer a default by starving CFI of dividends from CTH and thus preventing CFI from paying the interest that fell due on 24 November 2006.

[180]    It is clear that Cukurova considered that it was entitled to be paid all of the dividends declared by TCH for the years 2003 and 2004, on the grounds that they were referable to the period before Alfa obtained its interest. Whether that was agreed or not, the transaction documents failed to make any such provision. There remained something of a mystery at trial as to whether TCH had paid up the 2003 dividends to CTH, but it was common ground that it had done so for the 2004 year. These dividends amounted to some US$40m. By February 2006 Jones Day had prepared resolutions for the distribution of the proceeds of the 2004 dividend that had been paid up by TCH to be distributed in CTH. A dispute as to whether these dividends should be paid to CFI alone or rateably to CFI and ATT then took hold and there was a meeting in London in March 2006 between Mr Knaster and Mr Tolchinsky for ATT and Mr Karamehmet for Cukurova to try and resolve the issue. Mr Karamehmet says that he was told that the matter would be put to Mr Fridman for resolution.

[181]    There was a meeting between Mr Karamehmet and Mr Berkman on the one hand and Mr Fridman on the other in the South of France in July 2006 which did not settle matters and on 7 September 2006 Mr Karamehmet wrote to Mr Fridman, telling him that the issue needed to be resolved urgently. Mr Fridman's response was to say that while ATT believed it was entitled to 49% of the dividend, it was open to proposals for resolving the issue. ATT rejected a suggestion that CFI be paid what on any footing was its 51% share, leaving the other 49% undistributed, on the grounds

60

that partial distribution of a dividend is unlawful. That is correct at one level, but not at the level at which the proposal was being discussed.

[182]   Mr Karamehmet then suggested that the disputed 49% be paid into an escrow account. In cross examination Mr Reznikovich belittled this idea on the grounds that escrow agreements were irksome to negotiate and troublesome in practice. By October 2006 CTH was sitting on dividends distributed up by TCH for the years 2001, 2005 and 2006. In a letter dated 24 October 2006, Alfa took the point that on a strict construction of the Shareholders Agreement none of this money (irrespective of the dispute over the entitlement to the 2004 dividend) could be distributed until after CTH's financial statements for the year ending 31 December 2006 had been prepared. There is some support for this contention in the wording of the Shareholders Agreement, but there was no good reason why the parties could not have agreed to pay an interim dividend at any stage. ATT also took the point that CFI had yet to open an account, charged to ATT, into which dividends could be paid, as stipulated for in the Facility Agreement. This point had more substance, since the opening of such an account for the receipt of dividends was an important part of ATT's security. Nevertheless, the letter went on to offer immediate payment of all dividends as soon as the charged account was opened, with ATT receiving 49% of the 2004 dividend on its undertaking to reimburse CFI should CFI establish an entitlement to 100%. The charged account was opened on 31 October 2006.

[183]   Cukurova replied on 3 November 2006, in essence accepting ATT's offer and inviting ATT's countersignature.

[184]   There was a board meeting of CTH held by teleconference call on 7 November 2006 (some seventeen days before the first instalment of interest fell due). Mr Reznikovich claimed that the Alfa representatives had not had time to consider Cukurova's letter of 3 November because of a public holiday in Russia. Although Mr Reznikovich agreed that the absence of a charged account no longer remained an obstacle to distribution, the Alfa representatives attending the board meeting voted against distribution of any of the dividend money until after audited financial statements as at 31 December 2006 had been produced for CTH. Given that distributions required unanimous agreement, the effect was to block any payment of dividends until well after the US$217 Million installment of interest became due on 24 November 2006. When asked if this was

61

not a rather ungenerous stance on the part of ATT, Mr Reznikovich's response was to say that it was no part of ATT's job to babysit Cukurova. He further justified the stance taken by saying that on 8 November 2006 ATTs' representative on the Turkcell board found out about the related party transactions and there was also disquiet about Cukurova's failure to arrange for the appointment of an independent CEO to Turkcell to replace the temporary CEO, who was a Cukurova employee.

[185]   I have no doubt that this conduct on the part of ATT was designed to starve CFI of funds in the hope that that would cause or help to cause CFI to default on the interest payments. Although ATT had been aware since at the latest 12 October 2006 that Cukurova was attempting to fund the payments by realizing the 5.88% Turkcell holding which it finally managed to achieve by 21 November 2006, that does not alter my conclusion that Alfa was withholding distributions in the hope of provoking a default. If Cukurova sold the holding, then the interest would be paid. If it did not, retention of the distributions in CTH would be likely to provoke an Event of Default, which I find to have been the intention behind Alfa's obstruction of the distributions.

[186]   This conduct cannot, in my judgment, be seen as amounting to bad faith on the part of ATT in its capacity as lender and mortgagee. In any case, it was within ATT's rights as a shareholder of CTH to insist on the 2006 financial statements before voting for a distribution.

Bad faith in accelerating the loan or in exercising the remedy of appropriation

[187]   At about the end of September 2006, DB had made a presentation to Altimo. Two issues were dealt with, one of which was the position of Cukurova. DB prepared materials for this presentation. From these materials it is possible to see that Altimo was being advised by DB that while the Cukurova Group retained some attractive and high growth businesses, it would be misleading to conclude that they would enable it to service the entirety of the Group's outstanding debt. Various possible options available to Cukurova are then discussed, none of which carries any implication that ATT had by then decided to call time on the lending relationship. One of the possibilities considered, for example, was a rollover of the lending. The tone changes, however, in the later sections of the document. For example, Altimo is advised by DB to start a 'dialogue' with the Turkish Government and other market players, so as to create a perception of 'presence' and 'convince of long-term interest'. The final page of the document says that '[DB] will continue to facilitate and introduce Altimo to the decision makers at every important stage of the contemplated

62

process in the coming months.' There then follows a list of Turkish Governmental or quasi-Governmental organizations, including the CMB and the Competition Authority. Finally, this section of the document states that DB will ensure that each step is prepared in an acceptable manner.

[188] The last section of the document is a basic guide to the CMB rules relating to mandatory public calls/tender offers and exemptions, followed by some case studies.

[189] When Mr Reznikovich was asked about this document he said that he thought that getting paid was uppermost in Altimo's mind at that point. He refused to accept that the 'contemplated process' involved a change of control at TCH and said he found it difficult to see why the presentation materials included materials on Turkish public call mechanics. He did concede, however, that Altimo had not ruled out the possibility that CFI would default on 24 November 2006 and that, on enforcing the security, ATT might be obliged to make a tender offer. Obviously, ATT would only ever be so obliged if it either retained the shares on an appropriation or sold them to an associated company via the mechanism of a pre-pack receivership.

[190] In my judgment, the DB presentation provides the clearest indication that by the end of September 2006 Altimo was contemplating and actively investigating the consequences of becoming, either by itself or though an associated company, the owner of the whole 27% stake in CTH.

[191] On 12 October 2006 there was a meeting of the Altimo board. Included in the papers for the board's consideration was a flowchart setting out 'Actions in the event of a Cukurova default.' It proceeds through various steps, starting with selling the collateral via a pre-pack receivership and moving on to filing in the United States; obtaining Competition Authority and Television Authority permits; tendering for the acquisition of the TCH and Turkcell shares and, finally, 'Establishing control over Turkcell' with consequential appointments of Altimo representatives to the boards of CTH, TCH and Turkcell.

[192] The decision of the Altimo board on this occasion was to 'take the information into consideration', which, it was confirmed, was the equivalent of 'noted'.

[193] Mr Musatov's initial evidence about all this was that the Altimo board was merely looking at selling the collateral from what he described as a 'legal theoretical' point of view. He said that whoever sole the charged shares would have had to file in the United States and the obligation to make a

63

mandatory offer could apply to any purchaser. He backed off from this position a little later in his evidence and accepted that consideration was also being given to the possibility that Altimo might retain the charged shares. He accepted that one did not get to the final box - 'Establishing control over Turkcell' - unless the purchaser is Altimo or a connected party. He did say, however, that no steps were taken in October/November 2006 to prepare for a pre-pack receivership.

[194]   Mr Reznikovich thought that he had approved the materials which I have summarized above before they were put before the board. He was keen to stress that the board did not know at that stage whether or not CFI would pay on 24 November 2006 and that the 'ultimate result' would be to try to get paid. He stressed that these matters required thinking about in case, on CFI's default, Alfa found itself in the position of having to make a multibillion dollar tender offer, but he did not explain why that might be necessary while it was open to ATT to sell the shares in the market or by secondary offer or simply to an interested third party.

[195]   In my judgment these materials cannot be explained away as Mr Musatov and Mr Reznikovich would have it. They are a clear indication that Alfa was preparing to assume direct or indirect ownership of the charged shares and that that was its commercial aim at that time.

[196]   There was another meeting of the Altimo board on 21 December 2006. The Digiturk and ADD matters were noted and discussed, but once again the decision was that no action should be taken. The agenda described this part of the discussion as 'Strategic options for the development of Altimo'. This suggests that the supposed related party Event of Default was being considered in the context of further expansion, possibly through the acquisition of CFI's stake in CTH, by Altimo into the Turkish telecoms market, but Mr Musatov and Mr Reznikovich were having none of that. Mr Musatov said that it was a general discussion of the options open to Alfa. When the suggestion was put to Mr Reznikovich, he first asked for the question to be repeated and then said that he was not sure why the description was used. Both witnesses would have been better off admitting that the possible acquisition of the CTH shares was the focus of this agenda item. There is nothing surprising or sinister about that. It shows neither good nor bad faith – rather, simple commercial planning. What this part of the evidence did reveal, however, was the studied reluctance of the Alfa witnesses ever to accept that Alfa had its eye on the CTH shares.

<center>64</center>

<center>**A673**</center>

[197]  Some speaking notes were put in evidence during the trial.  They are clearly designed to provide someone with a guide as to how to address a press conference on the subject of the acceleration of the loan.  They advise keeping well clear of the question whether it was Alfa's intention to acquire the CTH shares.  Mr Reznikovich did not deny that he had seen this document, but said that he was doubtful that he would have.  I think that the notes must have been prepared for a press conference which Mr Reznikovich gave in Istanbul on 17 April 2007, the day after the loan had been called.  They confirm a fixed intention on the part of Alfa never to admit it was interested in acquiring the CTH shares for itself.  I shall have to consider later whether that attitude can of itself indicate a lack of good faith on Alfa's part.

[198]  On 23 January 2007 TS issued its press release announcing that the arbitral tribunal in Geneva had awarded TS what amounted to specific performance of the agreement which TS claimed, and Cukurova denied, had been reached on 9 May 2005.  Mr Reznikovich said that this event persuaded Alfa that what he described as its 'forgiving' attitude must stop.  He said that the relationship with Cukurova had turned sour.

[199]  When Mr Musatov was asked why it took ATT so long to rely upon the related party matter or the Geneva arbitration matter, his response was that Alfa was advised at around the end of January 2007 that it was important to prepare for acceleration of the loan by the end of March.  He said that it took Alfa and its external legal advisers (an additional firm of external lawyers was hired for the purpose) some two months to prepare the ground for acceleration.  He added that the legal advice received by Alfa was that it was important not to let Cukurova know that Alfa was engaged in identifying potential Events of Default.

[200]  It was put to Mr Musatov and Mr Reznikovich that one explanation for the secrecy might be that Alfa knew that Cukurova was in the process of arranging to refinance the Alfa borrowing and Alfa was anxious that it should not do that before it had thoroughly prepared the ground for acceleration.  Cukurova had in fact embarked upon the refinancing process in earnest through JP Morgan early in 2007 and it is clear that Alfa was well aware by the end of February 2007 that this process was taking place, since some time in that month DB gave a presentation to Altimo which included the information that 'Cukurova is understood to be looking for alternatives to ease the financial pressure associated with the terms of the financial package put together by Alfa.  In

65

**Page 65**

**A674**

particular, it is looking for alternative methods to raise additional cash in order to retire part or all of the outstanding debt to Alfa.'

[201]    Both Mr Musatov and Mr Reznikovich were reluctant to accept that they any knowledge of Cukurova's refinancing plans, beyond the fact that Cukurova had made clear from the outset that it intended to refinance the Alfa loan. While I accept that they may not have known the details, I find that Alfa is likely to have had a fairly shrewd idea as to the progress of Cukurova's refinancing efforts. DB clearly had knowledge by February and passed that knowledge on to Alfa. I find it impossible to believe that Alfa, with its connections in the world of banking and finance, would not have had at least a rough idea of where Cukurova had got to at any given time. I find that the reason why Alfa kept quiet about its plans to call the loan was because it wished to spring acceleration on it so as to reduce the window within which Cukurova might be able to achieve a refinancing.

[202]    Mr Musatov said that at the end of March 2007 Mr Reznikovich probably told him that Alfa needed to accelerate the loan. So an Altimo board meeting was convened for 2 April 2007. At that meeting, which was combined with a meeting of the board of AFH, three Events of Default were identified in the papers prepared for the meeting: the alleged borrowing in November 2006; the supposed inability of CH to comply with any order that the Geneva arbitral tribunal might make as to damages; and the related party matters. When asked why the sale of the 5.88% had not been included, Mr Musatov said that it had not yet been identified as a potential Event of Default by the two external legal teams, who continued working on this point into the middle of April. Two steps were put up for consideration: (1) to declare a default and obtain legal title to the charged shares; and (2), in the absence of repayment, to exercise the right of appropriation or implement a pre-pack receivership. The meeting resolved to call the loan and the call letter was delivered on 16 April 2007 without any prior warning. At the same time, claim 72 was commenced in this jurisdiction. Alfa's witnesses told me, and I accept, that the reason for that was to establish what they described as a 'neutral' (by which they meant non-Turkish) jurisdiction for any legal proceedings that might be needed to resolve disputes.

[203]    In his witness statement, Mr Reznikovich said that 'his reason' for calling the loan was because he felt that Alfa's position had become too exposed. It was put to him that Alfa in fact had ample

66

**A675**

cover, following the repayment of the unsecured borrowing in November 2006, and it would appear to be correct that on a straight look-through valuation the quoted price for the TC shares covered the amount of the loan. But as Mr Palmer pointed out, it does not follow that the realizable value of CFI's holding in CTH was the same. I had no valuation evidence on this topic and it is not possible for me to make any finding as to ATT's financial exposure (if any) at the end of March 2007. In cross examination Mr Reznikovich did not resile from his reliance on financial exposure, but he also said that by 'exposed' he had meant to indicate that Alfa did not feel that Cukurova was a trustworthy partner and an internal conclusion had been reached that the loan relationship should be discontinued. He said that he reached the conclusion from a business perspective that the relationship should not continue. He said that there was no way out on the shareholding -- Alfa and Cukurova were, as he put it, 'partners willy nilly', but he said that his legal advice was that the loan relationship could be brought to an end. He added that exposure was not merely a matter of the value of the security – it was a matter of trustworthiness 'and a lot of related covenants.'

[204]   On the following day, Mr Reznikovich flew to Istanbul and gave a press conference which was reported in a Turkish financial newspaper. It was for this press conference that the speaking notes to which I referred above had been prepared. He is reported as having said, among other things, that Cukurova had been in default sixteen times under the Facility Agreement; that proceedings had been commenced against it in the BVI; that ATT believed that the defaults were deliberate and that before paying the ATT debt Cukurova had obtained a syndicated loan of several hundred million dollars in breach of the Facility Agreement. He also said that the Geneva arbitral award was expected to lead to harsh consequences for Cukurova. Mr Reznikovich accepted that he had said something to that effect. Mr Kenneth MacLean QC suggests that this event was designed to put off persons who might be interested in the refinancing package that was being prepared by JP Morgan. Whatever else, what Mr Reznikovich said on 17 April was hardly likely to inspire confidence in prospective investors and I find that at any rate part of Mr Reznikovich's motive in addressing the press conference as he did was to make it harder for Cukurova to refinance.

[205]   In ATT's disclosure is a JP Morgan Information Memorandum dated 18 April 2007 and intended for circulation to potential investors in Cukurova's refinancing attempt. At page 4 of that document is a transaction timetable, revealing that a management roadshow was to take place in London and New York between 24 and 27 April 2007 and that closing was expected in mid-May. Although this

67

document came from ATT's disclosure, Mr Reznikovich insisted that he did not obtain it until it was sent to him electronically by a vice-president of Altimo called Mustafa Kiral in mid June. Alfa insists that the covering document (which would pin point the date of receipt) is privileged. It is hard to see why anything Mr Kiral may have said would attract legal professional privilege and Mr Kenneth MacLean QC submits, and I agree with him, that a party who relies upon a privileged document in order to establish a matter of fact must, if his evidence is to be accepted, disclose the document upon which he relies, with whatever redactions he may be entitled to make. Quite apart from that, Cukurova's refinancing completed in about mid May and was known to Alfa to have completed in mid May. I find it impossible to accept that a vice president of Altimo would have taken the trouble, a month after Cukurova had completed its refinancing, to send the JP Morgan document to Mr Reznikovich or that, if he had, Mr Reznikovich would have kept it. I find that Mr Reznikovich received the JP Morgan document soon after 18 April 2007 and became aware as a result that Cukurova's refinancing was scheduled to close in mid May.

[206]   Cukurova says that the probability is that Alfa knew that the senior management of Cukurova would be in London and New York between 24 and 27 April 2007 and were thus deliberately taking advantage of their absence. I cannot accept that. ATT served the call letter on 16 April 2007 and will have been well aware of the very limited time which the law allows for a debtor to repay a loan which has become due and payable.

[207]   On 20 April 2007 Alfa received some confused information from DB which it interpreted as meaning that Cukurova was attempting to recover through the banking system the payments totaling some US$574 million which had been made to ATT's DB account on 24 November 2006. Mr Berkmen admitted that the information forwarded to ATT by DB was misleading, apparently as a result of some error on the part of JP Morgan Chase. Mr Reznikovich said that Alfa took it up with DB and instructed them not to make any repayment. The matter was then dropped. Mr Reznikovich said that it had taken half an hour (he later changed this to three hours) to clarify the position. ATT relies upon this incident as justifying a state of jitters on its part. I do not accept that. It seems to me that this is a specious (and wholly unnecessary) attempt on the part of ATT to manufacture a reason justifying or bolstering its attempted resort, on 27 April 2007, to the enforcement remedies under the English charges.

[208]    On 30 April 2007 Altimo issued a press release speaking of Cukurova in derogatory terms and accusing it of having attempted to recover US$80m (this seems to have been a garbled reference to the incident which I mentioned in the preceding paragraph).  This press release was clearly calculated to put off anyone who might be thinking of advancing money on the charged shares.  Mr Kenneth MacLean QC relies upon the words 'against that background' which appear to give as a reason for the appropriation CFI's failure to comply with the Facility Agreement, its failure to make any substantive response to the call letter and the supposed attempt to recover the UD$80m as the reason for resorting to the remedy of appropriation as showing that ATT was acting in bad faith.  While the press release might have justified proceedings in defamation, it has no connection with the concept of bad faith as I understand it.  The same goes for a further press release which Altimo issued in May 2007.

Conclusion on bad faith in relation to acceleration and appropriation

[209]    Cukurova's complaint in these respects is that Alfa decided in about the end of January 2007 to identify matters which could be deployed as Events of Default and use them to acquire the charged shares.  A subsidiary complaint is that Alfa did all of this without giving Cukurova any warning and that having done it Alfa took steps to prevent or at any rate hinder Cukurova's refinancing.  I shall take these elements of complaint in turn.

[210]    I have already found that Alfa's intention from the outset was to use the power of appropriation (or its ability to procure a pre-pack receivership) in order to acquire the shares.  That involved the exercise of rights which Cukurova had agreed to confer upon ATT.  Although I have held that Alfa was wrong in claiming that it had the right to accelerate the loan and appropriate the shares, its attempts to do so were, with the exception of the press conference of 17 April 2007, no more than unsuccessful attempts to exploit commercial advantages which Cukurova had freely agreed to as a matter of contract and were untainted by bad faith.

[211]    For the same reasons, Alfa was within its rights to look for grounds which would entitle it to call the loan.  It did so without using any underhand methods.  It did not entice CFI into committing any Event of Default or lay traps for CFI.  It is irrelevant whether Alfa thought that the defaults which it purported to have identified were damaging to its interests.  The only question is whether or not

69

**A678**

they had occurred as Alfa claimed, and that is something which is to be decided independently of Alfa's state of mind.

[212]   I do not think that the fact that Alfa had never complained to Cukurova about the alleged Events of Default or that it sprung the call letter on CFI without any prior warning means that ATT was acting in bad faith in calling the loan.   It appears to have had no obligation to do either under the Facility Agreement.   The supposed Events of Default, had they been Events of Default, would all have been known to CFI.

[213]   Alfa was clearly anxious, as the speaking notes show, not to convey any suggestion or make any admission that it was accelerating the loan so that it could appropriate the shares. Its legal advisers seem to have been worried that any such admission would justify an attack on the exercise of the remedy. These proceedings are ample proof that such concern was justified. But I cannot see that an understandable caution in this regard has anything to do with bad faith. It is not evidence of bad faith to be reluctant to hand weapons to a potential adversary.

[214]   Mr Reznikovich's press conference of 17 April 2007 stands on a different footing.  When that press conference was given ATT had only just called the loan.  Arguably, Cukurova still had time to come up with payment.  Even though Mr Reznikovich's motives on 17 April 2007 may have been mixed, there can be no doubt that among them was a determination to cast Cukurova in as bad a light as possible and make it difficult for it to raise finance.  In my judgment it would be correct to describe a man who attempts to frustrate performance of a contract to which he is party by means of actions taken outside it as acting in bad faith.  Certainly it seems to me that a mortgagee who takes steps calculated to prevent or hinder the mortgagor from complying with a demand for payment acts in bad faith.

[215]   The question is whether, if my earlier conclusions on the claimed Events of Default should be set aside, this should preclude ATT from relying upon its appropriation.  In my judgment, it should not, because Alfa's behavior on 17 April 2007, reprehensible as it was, was not causative of any prejudice or loss to Cukurova. There is no general rule that breaches of trust (or, I would add, acts done in bad faith) which have no impact on the outcome of events must be visited with what would amount to an award of bounty to the party technically entitled to complain.  On the contrary, the

70

position is the reverse[13]. At the time of the press conference Cukurova had yet to begin its search for new finance in earnest and, as has been seen, the process was not envisaged to complete until mid May. In the event, Cukurova's refinancing succeeded,, even without the use of the CTH shares as security for the refinancing. The position with regard to the press releases of 30 April and 10 May 2007 is no different.

[216]   The actual exercise of the power of appropriation (as opposed, for example, to selling the shares to a third party or parties) cannot, in my judgment, be attacked on the grounds that it was not done in good faith. This was a right conferred on ATT as a matter of bargain under arrangements freely entered into between parties who enjoyed the highest level of expert legal and financial advice. Mr Kenneth Maclean QC said that it produced an instantaneous windfall for Alfa, but in the absence of any valuation evidence that has not been established. Even if it had been, it would have made no difference to the position. The exercise of the right did not involve the application of any discretion (or latitude) otherwise than as to the time at which it was exercised and it is well established that a mortgagee is entitled to realize his security at the time of his choosing. Appropriation was, in my judgment, nothing more than contractually agreed machinery for closing out the transaction. Assuming, contrary to my decision, that ATT had been entitled to resort to it, it could not have been attacked on grounds of bad faith for having done so. The fact that it wished to acquire the shares does not require the conclusion that it acted in bad faith in attempting to do so.

[217]   Mr Stephen Smith QC urged upon me that it was impossible for ATT to be accused of bad faith because of the rolling two working day moratorium which it voluntarily agreed to between 17 April and 27 April 2007. I do not accept this submission. I would have required a much closer understanding of ATT's state of knowledge as to the ability of Cukurova to repay within such a window before I could be satisfied that this was anything other than artful stage management.

Conclusion on bad faith

[218]   ATT was not guilty of any bad faith in and about the conclusion, management or enforcement of the facility, other than in the matter of the press conference of 17 April 2007 and (less blatantly) in the press releases of 30 April and 10 May 2007. Had I decided the case on Events of Default in

---

[13] Swindle v Harrison [1997] 4 All ER 705

71

favour of ATT, none of those matters would have provided Cukurova with an answer to ATT's claim.

### Relief in Equity

[219]   These conclusions make it unnecessary for me to consider CFI's claims based upon relief from forfeiture or the principle which permits debtors in certain circumstances upon payment of the debt, interest and costs, to recover pledged or mortgaged property even after seizure by the creditor.

### Conclusion

[220]   For the reasons given in the first section of this judgment, ATT's claim in BVIHC (COM) 72 of 2007 fails.  In claim BVIHC (COM) 119 of 2007, there will be a declaration that upon payment to ATT of the appropriate sum by way of principal and interest CH and CFI are and have since 25 May 2007 been entitled to delivery up and cancellation of the English and BVI share charges and of the instruments of transfer of the charged shares; and to delivery up of the relative CFI and CTH share certificates.  I will hear Counsel on a date to be fixed as to the amount of interest to be paid by CFI to ATT in discharge of the securities; as to the machinery for completing the discharge; as to such ancillary or other orders and directions as may need to be made or given; and as to costs.  All other proceedings in this matter will be stayed until I have given my decision on those issues (and on any other issues which Counsel may wish to ventilate).

[221]   For the purpose of maintaining the status quo until all outstanding issues are determined, CH may not, until further order, dispose of or otherwise deal with the shares or any interest in the shares which it holds in CFI and CFI may not dispose of or otherwise deal with any of the shares or any interest in any of the shares which it holds in CTH.  Until further order, or unless otherwise agreed

72

in writing, neither CFI nor ATT may vote or exercise any other right attaching to any of the shares held by either of them in CTH. The parties have permission to apply in respect of these injunctions. The injunction granted by Joseph-Olivetti J on 27 April 2007 will remain in place in the meantime.

Commercial Court Judge

20 May 2010

73

**A682**

ANTIGUA AND BARBUDA

## IN THE COURT OF APPEAL

CIV. APP. NO.20A OF 1997

BETWEEN:

### BALDWIN SPENCER

Appellant

and

### THE ATTORNEY-GENERAL OF ANTIGUA AND BARBUDA

First Respondent

### LESTER BRYANT BIRD

Second Respondent

### ASIAN VILLAGE ANTIGUA LIMITED

Third Respondent

Before:   The Hon. Mr. C. M. Dennis Byron      Chief Justice [Ag.]
          The Hon. Mr. Satrohan Singh           Justice of Appeal
          The Hon. Mr. Albert Redhead           Justice of Appeal

Appearances:
          Dr. Fenton Ramsahoye, Q.C.; Mr. Cosmos Phillips, Q.C.
               Mr. Colin Derrick and Mr. Harold Lovell for the Appellant
          Mr. David Turner-Samuels, Q.C. and Mr. Anthony Astaphan
               for the first Respondent
          Mr. Karl Hudson-Phillips, Q.C. and Mr. Anthony Astaphan
               for the second Respondent
          Mr. Donald Halstead for the third Respondent

-------------------------------------------------
1998:  March 9; 10;11; 12; 13;
       April 8.
-------------------------------------------------

*Civil Practice and Procedure* – Administrative law – Challenge
by Opposition leader to legality of certain actions/courses
taken by the Government – Principles governing summarily
striking out actions – **A-G of Duchy of Lancaster v London
and North Western Railway Co.** [1892] 3 Ch 279; **Dyson v
A-G** [1911] 1 K.B. 410; **Wenlock v Moloney** [1965] 2 AER
871 considered; **Williams and Humbert v W and H
Trademarks** [1986] 1 AC 368 applied – Whether a cause of
action was disclosed on allegation of constitutional
violations, fraud, conspiracy and the commission of various
torts of public mischief committed by the government –
Cross-appeal on the issue of locus standi and on the failure
to award costs – Meaning ascribed to 'discrimination' as
used in the constitution – **Nielson v Barker** [1982] 32 WIR
254 applied – Whether the action taken by the Government
was for a 'public purpose' – **Hamabai Framjee Petit v
Secretary of State for India** [1914] LR P.C. applied –
**Clunies-Ross v Commonwealth of Australia** [1985] LRC
[Const.] 292; **Williams v Government of St. Lucia** [1969]
14 WIR 177 applied – Whether a public purpose can be
achieved through private enterprise at the instance of a
private entrepreneur whose sole aim may be to make a

Page 74

2

profit – **Narayan Singh v Bihar** [1978] AIR 136 applied –
Whether the issue of whether an acquisition is made for a
public purpose is rendered non-justiciable by section 3[1],
Land Acquisition Act – Interpretation of the Constitution
Order and section 9 of the Constitution – **Wijeyesekera v
Festing** [1919] AC 646 P.C., and others referred to –
**Windward Properties v Government of St. Vincent** [1996]
1 WLR 279 P.C. applied – Determination of what issues were
political, rather than justiciable, and therefore not for the
Court's interference – **Kenilores v A-G** [1986] LRC [Const.]
126 applied – Interpretation and contrast of sections 18[1]
and 119[1] of the Constitution – Whether, once Parliament
had [subsequently] enacted necessary legislation, the
agreement in issue could still be considered invalid – On the
issue of whether the Opposition leader had locus standi in
the proceedings, **Frank v A-G** [Antigua]; **Blake v Byron** [St.
Kitts]; **A-G v Lawrence; A-G v Payne; Richard and James
v G-G and A-G** [St. Vincent]; **Gordon v Minister of Finance**
[St. Lucia] considered. Appeal dismissed. Cross-appeal
allowed.

## JUDGMENT

### BYRON, C.J. [AG.]

This is an appeal against the decision of Saunders J delivered on 21st
November 1997 striking out the Statements of Claim of the appellant in two
consolidated actions.

### The Proceedings

The appellant is the leader of the opposition in the House of
Representatives in Antigua and Barbuda. He initiated two actions on behalf
of himself and all other members of his political party the United Progressive
Party.

In the first action which commenced on 23rd September,1997 he
sought a declaration that an agreement, dated 18th February 1997 between
the Government of Antigua and Barbuda and Asian Village Antigua Limited
for the development of an area on the west coast of Antigua, was
unconstitutional, illegal null and void and damages for fraud and conspiracy
and misdemeanour in public office and other relief, the said damages to be
paid to him for the benefit of the people of Antigua and Barbuda. The
defendants to the action were the Attorney General, sued "both officially as
representing the Government and personally as a member of the Cabinet";
the Prime Minister sued "as representing himself and all other Cabinet
ministers personally and in their official capacity"; and Asian Village.

In the second Action which commenced on 23rd October 1997 he
sought declarations that a bill the Asian Village Development Act 1997 was

3

ultra vires the powers of the Legislature and that the Governor General was not entitled to assent to it and other reliefs.

The defendants applied to have both writs and Statements of Claim struck out as disclosing no cause of action and being frivolous, vexatious and an abuse of the process of the court.

The matters were consolidated and came on for hearing on 5th November 1997.

**The Judgment**

In a lengthy and closely reasoned judgment the learned trial Judge considered the statements of claim and concluded that the allegations did not disclose any cause of action under the Constitution, but that the appellant had locus standi to bring the action.

He also concluded that no particulars of the essential ingredients of fraud, conspiracy and misdemeanour in public office were pleaded and consequently the allegations pleaded could not to disclose any cause of action for those torts.

Accordingly he dismissed both cases, but made no order as to costs.

**Background**

On 18th February 1997 the Government of Antigua and Barbuda entered into an agreement with Asian Village Antigua Limited (Asian Village) for the development of an area on the west coast of Antigua. The Government was to acquire Guiana Island and other lands and transfer them to Asian Village for $15.5 million dollars spread over a 10 year period. Asian Village would construct a massive project which would include resort accommodation of approximately 1000 rooms; casino; golf course; retail shops; residential developments; and other resort, commercial and hotel related projects and facilities. The agreement was characterised by promises of very extensive fiscal and other incentives which included exemptions from taxes, privileges, special arrangements for construction of infrastructure and many others. There was political controversy about it, the appellant's political party opposing the project. The Government introduced a resolution in Parliament to have both houses consider and affirm the agreement and to obtain authorisation for the acquisition of the lands which were the subject matter of the agreement.

Page 76

**A685**

4

On 4th July 1997 the House of Representatives approved the agreement and authorised the acquisition of the lands for the public purpose of "the promotion and development of tourism and supporting tourist related activities".   The Appellant and four of his Opposition Parliamentary colleagues absented themselves from the House when the resolution was moved and passed.  On 6th August 1997 a similar resolution was passed in the Senate and the opposition Senators similarly absented themselves.

On the 7th, 21st and 28th August 1997 declarations acquiring the lands identified in the agreement were published in the Gazette in accordance with the provisions of section 3 of the Land Acquisition Act.

On 18th September 1997 an order paper was circulated to all members of the House of Representatives in respect of a meeting to be convened on 23rd September.  Item 14(a) was a Motion by the Hon Prime Minister to move the first reading of the Asian Village Development Act, 1997.

On 6th October 1997 the Bill was taken through all its stages in the House of representatives, and was amended at committee stage to be The Asian Village Resort (Incentives) Act. On 20th October the Senate passed the Bill.

At the time of the trial the Governor General had not assented to the Bill and it was not yet enacted.  Since the trial, the Governor assented to the Act on 9th December 1997, and to an amendment thereto on 29th January 1998.

**The Appeal**

The appellant advanced several grounds of appeal.  In effect these challenged the application of the principles of summarily striking out actions, and the conclusion that no cause of action was disclosed on the allegations of constitutional violations and the commission of various torts of public mischief.  The respondent cross appealed on the issue of locus standi and on the failure to award costs.

The third respondent challenged the decision to join him as party but as the whole action had been dismissed this became an academic issue, only relevant to the question of costs.

**Page 77**

**A686**

5

**The Principles of Striking out Pleadings**

Order 18 rule 19 of the Rules of the Supreme Court empowers the Court to strike out any pleading on the ground that it discloses no reasonable cause of action or is frivolous or vexatious is otherwise an abuse of the process of the court.  The principles upon which this jurisdiction is exercised are well settled and counsel for the appellant indicated that he had no quarrel with the principles which the learned trial Judge enunciated. He argued that they were wrongly applied.  In brief the court is empowered to dismiss an action in a summary way without a trial where the statement of claim discloses no cause of action, or is shown to be frivolous or vexatious or is otherwise an abuse of the process of the court.  This summary procedure should only be used in clear and obvious cases, when it can clearly be seen, on the face of it, that a claim is obviously unsustainable, cannot succeed or in some other way is an abuse of the process of the court. In one of the cases from Canada on which reliance was placed the standard was expressed in terms that the claim should not be struck out if there is even a scintilla of a cause of action (**Operation Dismantle v the Queen** (1986) LRC (Const.) 421.

This was the stringent standard which the learned trial Judge applied to the statements of claim in concluding that they should be summarily struck out and the actions dismissed.

Counsel for the appellant submitted that the test was wrongly applied because the learned trial Judge attempted to assess the appellant's chances of success in the action and that was a task which could only be effectively performed after evidence had been adduced.  He submitted that the circumstance that the argument before the learned trial Judge took five days, and before us lasted about the same length of time demonstrated that there were difficult and important points of law and that it was not a clear and obvious matter.  I must comment, however, that we felt that too much time was spent in arguing this case, and it was out of deference to the learned counsel, who appeared for the appellant and the public nature of and interest in the matter, that we did not guillotine the arguments even when we thought they were irrelevant or unnecessarily prolonged.

A number of cases were cited to us on this as on all aspects of the case.  Counsel for the Appellant relied on **A..G. of Duchy of Lancaster v London and North Western Railway Co.** (1892) 3 Ch 279 to show that the

**A687**

6

length of argument could be a factor in the decision. In rejecting an application to strike out pleadings for want of jurisdiction, Lindley L.J said:

> "it appears to me that the object of the rule is to stop cases which ought not to be launched – cases which are obviously frivolous or vexatious, or obviously unsustainable; and if it will take a long time, as is suggested, to satisfy the Court by historical research or otherwise that the County Palantine has no jurisdiction, I am clearly of opinion that such a motion as this ought not to be made."

The case of **Dyson v Attorney General** (1911) 1K.B. 410 was relied on to show that the extent and quality of research necessary to determine the matter could also be a factor as Cozens-Hardy M.R. said at 414:

> "(the order) ought not to be applied to an action involving serious investigation of ancient law and questions of general importance, and on this ground alone I think the plaintiff is entitled to have the action proceed to trial in the usual way".

The principle that the summary process should not take the place of a trial was demonstrated in **Wenlock v Moloney** (1965) 2 All E.R. 871. In that case there was statement of claim, defence and 10 affidavits. On hearing to strike out the Master concluded that the case was unlikely to succeed and struck it out. The Court of Appeal set aside the order and characterised what occurred as a preliminary trial in chambers without full discovery, oral evidence or cross-examination and as an improper exercise of the court's discretion. Sellers LJ disapproved the practice and declared that it is not the practice in the civil administration of our courts to have a preliminary hearing as in crime.

The appellant also emphasised the well-established point, that it was incumbent on the defendant to show that there was no possibility of a cause of action. (**Goodson v Grierson** (1908) 1K.B.761).

The respondents also referred to a number of references which included the reminder of Lord Edmund-Davies in **Farrell v Secretary of State** (1980) 1 All E.R. 166 at 173 of the essential importance of proper pleadings in civil actions: the necessity to particularise and plead alleged violations of the Constitution (**Operation Dismantle v The Queen**, *supra;* the Guyanese case of **Ameerally v A.G.** (1978) 25 WIR 272.): the necessity to particularise allegations of fraud, malice, negligence or misconduct (**Mariner v Bishop of Bath And Wells** (1893) P 145; **Saunders v Jones** (1887) Ch D 435; **Belmont Finance v Williams Furniture** (1979) 2 QB 250): the duty of counsel not to enter a plea of fraud unless he has clear

Page 79

**A688**

7

evidence to support it (**Assoc Leisure v Assoc Newspapers** (1970) 2 QB 450.

He submitted that the case ought to have been dismissed as an abuse of the process of the court as it had an ulterior political motive, referring to **Windward Properties Limited v Williams**, 1988 (unreported) St.Vincent and the Grenadines Civil Appeal No. 4/88 confirming the dismissal of a constitutional motion as an abuse of process, per Moe J.A. at p.10:

> "the court has an inherent jurisdiction to put an end summarily to proceedings which divert the court from its proper purpose and use it with some ulterior motive: See **Mitchell v D.P.P** (1987)LRC 127. In my view on the basis of the material before the learned Judge dismissal of the motion in exercise of his power on the ground of Abuse of Process was clearly warranted."

The modern practice, which in my view is not inconsistent with the long standing principles, is explained by Lord Templeman in **Williams & Humbert v W.& H. Trademarks** (1986)1 A..C. 368 at 435:

> "My Lords, if an application to strike out involves a prolonged and serious argument the Judge should, as a general rule, decline to proceed with the argument unless he not only harbours doubts about the soundness of the pleading but, in addition, is satisfied that striking out will obviate the necessity for a trial or will substantially reduce the burden of preparing for a trial or the burden of the trial itself. In the present case, the general rule would seem to require a refusal by the Judge to embark on the problems of international law involved in the present appeal, leaving those problems to be solved at the trial if they became material. If at the trial the appellants were cleared of any impropriety in their management of the affairs of the Rumasa group, then the problems of international law would not arise. Moreover, even if those problems did arise I do not believe that the length of time, namely seven days, occupied by the Judge in deciding to strike out the pleadings would have been added to the time required to decide other issues. But there are special circumstances which, in my view, made it right for the Judge to proceed and to make the order which he made. If the appellants' pleadings and particulars had not been struck out, the appellants would have proceeded to demand discovery before trial to lead evidence at the trial, harassing to the plaintiffs and embarrassing to the court and designed to support the allegations and insinuations of oppression and bad faith on the part of the Spanish authorities which appear in the amended defences and particulars. These allegations are irrelevant to the trade marks action and the bank's action and are inadmissible as a matter of law and comity and were rightly disposed of at the first opportunity."

It is clear from any reading of the judgment and from the arguments made before us that the special circumstances which so impressed Lord Templeman are present in the case. Striking out the cases resulted from the Judge's conviction that they were not viable and effectively obviated the

8

necessity for the trial, with all the attendant costs and other burdens. In his reasons the learned trial Judge categorised the pleading as containing conclusions expressed in the most pejorative terms and unparticularised allegations, or insinuations of fraud or colourable exercise of power, which did not establish any grounds on which a court of law could adjudicate. There is no doubt that the proceedings are political and the risk of harassing discovery was high. There is also the question of the length and expense of the proceedings to the litigants as well as to the administration of justice. I would consider that the learned trial Judge exercised his discretion properly in disposing of this matter at the first opportunity.

In determining this appeal, the same principles should guide us. Regardless of the length or difficulty of the argument, which has already been concluded the operative issue for determination must be whether there is "even a scintilla of a cause of action". If the pleadings disclose any viable issue for trial then we should order the trial to proceed but if there is no cause of action we should be equally resolute in making that declaration and dismissing the appeal.

**The Pleadings**

I propose to go through the allegations in the statement of claim seriatim and consider whether there is any allegation which would support judicial intervention. In this way, all the grounds of appeal will be considered without overlapping. The first Suit is an attack on the Agreement and the ability of the Executive Branch to make such a contract.

The relevant paragraphs are 10 to 18. The others are merely formal and give background information.

<u>Para 10</u>

Alleges that the proposed development is harmful to the ecology and "is contrary to common law principles which protect the environment". This paragraph does not identify the common law principles to which it refers nor were any advanced or particularised by counsel in agreement. Even learned Counsel Cosmos Phillips Q.C. conceded that he could not identify a cause of action raised in this paragraph. (See for **example R v Secretary of State for the Environment, ex. Greenpeace** (1994) 4 A.E.R. 352 at 376). I agree

Page 81

**A690**

9

with the learned trial Judge that there is no scintilla of a cause of action herein.

### Para 11

Alleges that the agreement is a device to give property of the state under the guise of a public purpose to a private developer for his own profit; that the cost to the government of providing the land will exceed the consideration to be paid by Asian Village; that it is contrary to public policy, is illegal, and void, and amounts to a public mischief.

Apart from the use of the words "guise" and "device" which suggest fraudulence no indication of the wrong alleged is indicated. This paragraph offends the rule requiring particularisation,  and in particular the allegations did not include the essential ingredients of the  tort of misfeasance in public office.  The learned trial Judge referred to the cases of **Calveley v Chief Constable of the Merseyside** (1989) 2 WLR 624 and **Dunlop v Woollahra Municipal Council** (1981) 1 AER 1202 and explained that the failure to allege, and give particulars of malice ran foul of Order 18 rule 12(1)(b) of the Rules of the Supreme Court.  He concluded that the allegations pleaded could not support a cause of action on the tort referred to.  No appeal was made against that finding of the learned trial Judge that there was no cause of action in this paragraph.

### Para 12

Alleges that the agreement is discriminatory against the people of Antigua and Barbuda in that it treats the development and   persons concerned with it as a separate class and community by committing the government to grant special exemptions from laws regulating taxation and good government for its own convenience and profit thereby discriminating against the people of Antigua and Barbuda contrary to section 14 of the Constitution.

In effect the learned trial Judge decided that this paragraph did not give rise to a cause of action because the agreement was inchoate in the sense that it did not affect any rights -- it merely evidenced the intention of the parties; and in any event no allegation of discrimination was made in the sense in which the Constitution described the term.

**Page 82**

10

It is not necessary to consider the inchoate point at this time, and I will deal with this issue when I come to discuss the effect of section 119(1) of the Constitution in relation to the second Suit.

**No Category of Discrimination Alleged**

Counsel for the appellant addressed the issue of discrimination extensively.

In my opinion the matter could summarily resolved as being clear and obvious by any reference to section 14(3) of the Constitution.

It would therefore be instructive to set out the meaning ascribed to discrimination in section 14(3) of the Constitution:

"In this section, the expression "discriminatory" means affording different treatment to different persons attributable wholly or mainly to their respective descriptions by race, place of origin, political opinions or affiliations, colour, creed, or sex whereby persons of one such description are subjected to disabilities or restrictions to which persons of another such description are not made subject or are accorded privileges or advantages that are not accorded to persons of another such description."

There was no allegation that the different treatment alleged in the Statement of Claim was attributable to race, place of origin, political opinions or affiliations, colour, creed, or sex. In the final analysis the resolution of this issue must be based on the interpretation of the constitutional provision. In my view, the words are clear and unequivocal and there is no difficulty in giving them their plain and ordinary meaning. The idea was well expressed in **Nielson v Barker** (1982) 32 WIR by 254 Massiah J.A. at 280:

"What I am endeavouring to develop is the notion that it is a misconception to think that the Constitution is panacean in character, capacitated for the eventual solution of all legal problems. This process of magnification has led to attempts being made to fit a variety of rights into the framework of fundamental rights and freedoms, although the former often lacked the attributes essential for such categorisation...
The word "discriminatory" in article 149 does not bear the wide meaning assigned to it in a dictionary. It has a precise and limited connotation.   Although it contains the elemental constituent of favouritism, or differentiation in treatment, its application is confined only to favouritism or differentiation based on "race, place of origin, political opinions, colour or creed". No other kind of favouritism or differentiation is "discriminatory" within the narrow constitutional definition of that word in article 149(2). It is to be profoundly in error to think  that there has been a contravention of a person's fundamental rights under article 149 where the alleged discrimination is based on some ground other than those referred to above, no matter how reprehensible such grounds may appear to be. Such a situation

11

"clearly does not come within the purview of the constitutional guarantee, although there may well be other means for its investigation and for securing redress."

As wide ranging and interesting as counsel's argument was, he was unable to demonstrate any alleged discrimination in the statement of claim that was based on a ground referred to in section 14(3) of the Constitution.

The cases which he presented in support of his arguments did not assist him.  **Inze v Austria** (1988) 10 E.H.R.R. 394 a case decided by the European Court of Human Rights, relief was given for discrimination on the ground of illegitimate birth, the brother of the appellant, being a legitimate child, was given precedence under Austrian law of intestacy in the attribution of their mother's farm, contrary to Art. 14 of the European Convention of Human Rights.

The category of discrimination was `sex'.  A claim such as this would be arisen under section 14(3) because there is jurisprudence on the issue that discrimination on the ground of sex may arise where the marital status of women affects the rights and status of their children.

**Eldridge v British Columbia** (1997) unreported Canadian Supreme Court case decided on 9th October 1997.  It concerned an application by deaf applicants for a declaration that failure to provide sign language interpreters as an insured benefit under the Medicare scheme violates the constitutional guarantees of equal treatment under the law. In that case the constitutional guarantees against discrimination are in section 15(1) of the Canadian Charter as follows:

"Every individual is equal before and under the law and has the right to the equal protection and equal benefit of the law without discrimination and, in particular, without discrimination based on race, national or ethnic origin, colour, religion, sex, age mental or physical disability."

The Canadian Charter specifically makes "physical disability" a ground upon which discrimination is prohibited. In the Constitution of Antigua and Barbuda "physical disability" seems to lie outside the parametric limitations inherent in section 14(3). Our court is not a super legislature and does not have the power to expand the rights given in the Constitution, making such a claim untenable under section 14 of the Constitution.

**Egan v Canada** (1995) 124 D.L.R.(4th) 609 another Canadian case in which the court dismissed the application of a homosexual couple, who had been living together since 1948, claiming pension and spouses allowance

Page 84

**A693**

12

under the Old Age Security Act, basically on the ground that the relationship did not meet the definition of "spouse" which required opposite sex relationships. The constitutional challenge on the ground of discrimination was unsuccessful, but the case concerned a recognised category of discrimination namely "sex".

**Baloro v University of Bophuthatswana**(1996) 1LRC 12, a South African case established that the constitutional guarantees of equality before the law included any "person" and was not limited to citizens. The ground of discrimination in this case was the "place of origin" which is a category of discrimination recognised in section 14(3) of the Antigua and Barbuda Constitution.

In **Shelley v Kraemer** (1947)334 US 1. the US Supreme Court held that restrictive covenants  denying ownership or occupancy of property on the basis of colour or race violated the constitutional guarantees of equality before the law.  Again the well-established category of discrimination was "race".

The basic and insurmountable hurdle of the appellant in his Statement of Claim was that there was no allegation in the statement of claim of a ground of discrimination that was inherent in section 14(3) of the Constitution. On that basis  alone there could be no cause of action under section 14 of the Constitution.

**Para 13** alleges that the scheme is prejudicial to property, revenue and good government and is the result of a conspiracy between Cabinet, Asian and persons unknown, and of a misdemeanor in public office on the part of the Cabinet and all other persons in public office who support and intend to act in the performance of the obligations of the  government.

**Para 14** alleges that the divestment of publicly owned property without consideration is a fraud on the Government and people by the Cabinet and Asian and persons unknown.

The learned trial Judge found that the Statement of Claim did not allege particulars of the essential ingredients of  the torts mentioned in these paragraphs.  The point is clear and obvious, no serious effort was made by the appellant to have this finding overturned.  In any event, I agree with the learned trial Judge and there was no appeal against this aspect of his decision.

13

### Para 15

#### The Public Purpose Point

**Para 15** alleges that the acquisition of property to be divested to Asian is not for public use and is therefore unconstitutional by contravening section 9 of the Constitution.

The Judge ruled that the allegations failed to show any cause of action for these reasons:  first that the stated purpose of "the promotion of and development of tourism and supporting tourist related activities" is a sufficient expression of a public purpose; and secondly that in any event the question as to whether an acquisition is or is not made for a public purpose is non-justiciable, unless there is a viable allegation that the declaration has been made fraudulently.  The appellant challenged these rulings vigorously.

### Public Purpose

The jurisdiction of the court on the constitutionality of compulsory acquisition is determined by section 9 of the Constitution and also the Land Acquisition Act Cap.233.  For ease of reference I will set out the provisions relevant to our decision.

Section 9(1) of the Constitution provides:

> "No property of any description shall be compulsorily taken possession of, and no interest in or right to or over property of any description shall be compulsorily acquired, except for public use and except in accordance with the provisions of a law applicable to that taking of possession or acquisition and the payment of fair compensation within a reasonable time."

Public use is defined in section 9(6) of the Constitution:

> "For the purposes of this section, "use" is "public" if it is intended to result or results in a benefit or advantage to the public and, without prejudice to its generality, includes any use affecting the physical, economic, social or aesthetic well-being of the public."

The acquisition of land is regulated by the Land Acquisition Act Cap 233, which defines public purpose.  Section 2 states as follows:

> "public purpose" means a purpose determined to be a public purpose in accordance with the provisions of section 3."

And section 3 reads:

> "(1) If the Cabinet considers that any land should be acquired for a public purpose they may, with the approval of the Legislature, cause a declaration to that effect to be made by the Secretary to the Cabinet in the manner provided by this

14

section and the declaration shall be conclusive evidence that the land to which it relates is required for a public purpose."

The meaning and effect of these constitutional and statutory provisions, with all due respect to the lengthy and interesting argument of counsel, is already well settled by highest judicial authority, and cannot be considered a difficult question.

The appellant invested great effort in submitting that section 9 of the Constitution of Antigua was contravened by the fact that the Government intended to acquire property for the purpose of transferring it to a private developer who would use it for his own profit and that could not be a "public purpose" and was an unconstitutional use of the taxpayer's money.

The root decision on the meaning of public purpose can be found in the Privy Council decision of **Hamabai Framjee Petit v Secretary of State for India** (1914) L.R. Vol. XLII Indian Appeals 44 where Lord Dunedin said at p.47:

> "The argument of the appellants is really rested upon the view that there cannot be a "public purpose" in taking land if that land when taken is not in some way or other made available to the public at large.  Their Lordships do not agree with this view.  They think the true view is well expressed by Batchelor, J. in the first case, when he says: "General definitions are, I think, rather to be avoided where the avoidance is possible, and I make no attempt to define precisely the extent of the phrase 'public purposes' in the least; it is enough to say that, in my opinion, the phrase, whatever else it may mean, must include a purpose, that is, an object or aim, in which the general interest of the community, as opposed to the particular interest of individuals, is directly and vitally concerned."

Counsel for the appellant relied on two old US Supreme Court cases to demonstrate violations of the Constitution by (i) compulsory taking for private benefit as opposed to a public purpose and (ii) contracting for private objects to be paid for by taxes.

**Missouri PAC. RL. CO. v State of Nebraski** (1896) SCR 17 130 at p.135 per Gray J.:

> "The petitioners were merely private individuals voluntarily associated together for their own benefit.  They do not appear to have been incorporated by the state for any public purpose whatever, or to have themselves intended to establish an elevator for the use of the public......
> To require the railroad company to grant to the petitioners a location on its right of way for the erection of an elevator for the specified purpose of storing from time to time the grain of the petitioners and of neighboring farmers, is to compel the railroad company, against its will, to transfer an estate in part of the land which it owns and holds,

Page 87

**A696**

15

under its charter, as its private property and for a public use, to an
association of private individuals, for the purpose of erecting and
maintaining a building thereon for storing grain for their own benefit,
without reserving any control of the use of such land, or of the building
to be erected thereon, to the railroad company, for the
accommodation of its own business, or for the convenience of the
public.

The distinction between the facts is that the land in Missouri was for
the private use of the petitioners and no public purpose was alleged or
stated, whereas in Asian a public purpose namely the "development of
tourism" was the stated purpose. **Cole v City of La Grande** (1884) SCR 5
416  at p.418 per Gray J.:

"The general grant of legislative power in the Constitution of a state
does not enable the legislature, in the exercise either of the right of
eminent domain or of the right of taxation, to take private property,
without the owner's consent, for any but a public object.  Nor can the
legislature authorize countries, cities, or towns to contract, for private
objects, debts which must be paid by taxes.  It cannot, therefore,
authorize them to issue bonds to assist merchants or manufacturers,
whether natural persons or corporations, in their private business.
These limits of the legislative power are now too firmly established by
judicial decisions to require extended argument upon the subject."

Similarly, in this case the factual premise on which the principles were
expressed was that the objects were the relief of private objects and debts.
No public purpose was alleged; as in the instant case.  Both cases therefore
turned on their particular facts.

In the Australian case of **Clunies-Ross v Commonwealth of
Australia** (1985) LRC (Const.) 292 more modern American cases were
considered.  Passages from the judgment demonstrate that in both
Australia and America the courts employ principles of interpretation of which
require a broad and generous interpretation the phrase "public purpose". At
page 302 per Murphy J.:

"There is no warrant for a gloss on the Australian Act that public
purpose is confined to some planned use, application, or preservation
of the land or buildings.  Even if "public purpose" should be read as
"public use", the U.S. cases show that acquisition for public use
extends  to  spiritual  and  aesthetic  as  well  as  material
purposes...[reference to  **Berman v Parker** (1954) 348 US 26, a
unanimous judgment of the Supreme Court ] ...
It runs against generally accepted principles of interpretation to read
narrowly a wide phrase such as "for a public purpose".  Acquisition of
land round an airport or a defence installation, not to use, but so that
no one may use it, is for a public purpose.  Acquisition of a derelict
site, not to use it, but to remove an eyesore or to prevent danger, is

**Page 88**

**A697**

for a public purpose. Acquisition of a wilderness area, specifically so no one should use and therefore despoil it, is for a public purpose."

When one applies the principles to the instant case not only is it abundantly clear that the stated purpose of the "development of tourism in Antigua and Barbuda" is a public purpose but the principle has already received judicial approval.

In **Williams v Gov't of St Lucia** (1969) 14 W.I.R. 177 at p.180 Sir Garfield Barwick giving the Judgment of the Privy Council said:

> "That the promotion of tourism can be a public purpose in the Island of Saint Lucia can scarcely be denied...No doubt, the expression "the development of tourism" has a degree of vagueness but what is called for by the Ordinance is the statement of a public purpose, which necessarily must be in very general terms... The expression "the development of tourism" does state a purpose which is a public purpose."

The other criticism that attaining the proposed tourist development through a private entrepreneur whose motive is personal profit and gain cannot be a public purpose, is not only logically untenable but has also been judicially rejected.

A public purpose may be achieved through private enterprise at the instance of a private entrepreneur whose sole aim may be to make profit. The matter was well expressed in the Indian case of **Narayan Singh v Bihar** (1978) A.I.R. 136 at p.138 by S.K. Jha J.:

> "Para 6: ...The objective test applied from case to case, which was since been judicially recognised, is that whatever furthers the general interests of the community as opposed to the particular interests of the individuals must be regarded as a public purpose. Public purpose may be achieved through private enterprise as well as through any public agency. There is no provision in the Act precluding the acquisition at the instance of a private agency so long as the purpose for acquisition is a public purpose. If the acquisition is for a public purpose, the consideration that the State has undertaken the task at the instance of a private entrepreneur or agency or a private institution is not germane. It is well settled that even though the acquisition of land is for a private concern whose sole aim may be to make profit, if the intended acquisition of land could materially help the national economy or the promotion of public health or the furtherance of general welfare of the community or something of the like, the acquisition will be deemed to be for a public purpose."

**The Non-justiciable Issue**

The main objection to the prolonged argument on this issue is that it is well settled law that the effect of section 3(1) of the Land Acquisition Act Cap233 (*supra*) makes the determination of the question as to whether an

17

acquisition is made for a public purpose non-justiciable, in the absence of fraud. The issue of fraud is no longer an issue because the learned trial Judge ruled there were no particulars capable of grounding adjudication on that issue and no appeal has been made against that ruling. The rationale of non-justiciability is based on the Constitution Order paragraph 3:

> "the Constitution of Antigua and Barbuda set out in Schedule 1 to this Order shall come into effect in Antigua and Barbuda on 1st November 1981 subject to the transitional provisions set out in Schedule 2 to this Order."

The Schedule 2 states in paragraph 9:

"Nothing in section 9 of the Constitution shall effect the operation of any law in force immediately before 27th February 1967 or any law made after that date that alters a law in force immediately before that date and does not –

[a]  add to the kinds of property that may be taken possession of or the rights over and interests in property that may be acquired;

[b]  make the conditions governing entitlement to compensation or the amount thereof less favourable to any person owning or having an interest in the property; or

[c]  deprive any person of such right as is mentioned in subsection (2) of that section."

The plain fact is that the Land Acquisition Act Cap 233 was in operation before 27th February 1967. The meaning of the paragraph is plain, clear and unambiguous. Section 9 of the Constitution shall not effect the operation of the Land Acquisition Act Cap.233. The principle has been judicially affirmed for over a century in several cases.

Lots of cases were quoted to us which I have perused. However I shall refer briefly to an old Privy Council case from Ceylon which demonstrates that the concept of the non-justiciablity of the executive decision as to what is a public purpose is a long standing one. In **Wijeyesekera v Festing** (1919) A.C. 646 at p.647 Lord Finlay said:

> "This appeal raises a short point upon the construction of the Ceylon Ordinance No.3 of 1876….
> The whole point in the case is whether the decision of the Governor in Council is conclusive on the point that the land is wanted for a public purpose.  It is now contended that it is open to the person whose land is affected to challenge the decision of the Governor in Council upon this point, as embodied in the order directing the Government Agent to take order for the acquisition of the land….
> The whole case is decided, in the opinion of their Lordships, in the last three lines of s.6 of the Ordinance: "And upon the receipt of such report it shall be lawful for the Governor, with the advice of the Executive Council, to direct the Government agent to take order for

**A699**

18

the acquisition of the land." When you have an enactment of that kind it shows that it was intended that the decision of the Governor in Executive Council on the point should be binding."

There have been a number of recent cases in the Eastern Caribbean which have applied and emphatically settled the point.

There is the Privy Council case of **Blomquist v Attorney General of Dominica** (1987) A.C. 489 applying the principle to similar provisions in the Constitution of Dominica.

There is the Eastern Caribbean Supreme Court decision **Mills v Attorney-General of St. Christopher** (1993) 45 W.I.R. 125. In the leading judgment Liverpool J.A. demonstrated that the principle applied to similar provisions in the Constitution of St.Kitts and Nevis.

The most recent expression of the principle was in the Privy Council case of **Windward Properties v Gov't of St.Vincent** (1996) 1 WLR 279 the principle was applied to similar provisions in the Constitution of St.Vincent and the Grenadines. at p.283 Sir Michael Hardy Boys said:

> "As counsel pointed out, the Court of Appeal did not have its attention drawn to paragraph 11 of the transitional provisions in Schedule 2 which states:
>
> > "Nothing in section 6 of the Constitution shall affect the operation of any law in force immediately before 27 October 1969 or any law made on or after that date that alters a law in force immediately before that date and that does not – (a) add to the kinds of property that may be taken possession of or the rights over and interests in property that may be acquired; (b) make the conditions governing entitlement to compensation or the amount thereof less favourable to any person owning or having an interest in the property; or (c) deprive any person of any such right as is mentioned in subsection (2) of that section."
>
> In their Lordships' view, the two categories of law which are excluded by this paragraph from the effect of section 6 of the Constitution are first, any law in force immediately before 27 October 1969 (when the Constitution became operative), and secondly any subsequent amendment that does not do any of the things described in sub-paragraphs (a), (b) and (c). The Land Acquisition Act is within the first category and consequently is not affected by section 6 of the Constitution. Accordingly section 19(a) is to be applied as it stands."

On careful perusal of the wording of the relevant provisions in the Constitution there is no ambiguity, no uncertainty of the meaning of the provisions. In these circumstances the court cannot indulge in rewriting the Constitution, to borrow the words of the learned trial Judge. The effect is that the declaration made by the Secretary of the Cabinet with the approval of the Legislature to the effect that the land was acquired for a public purpose, is

**A700**

conclusive evidence that the land to which it relates is required for a public purpose. There is absolutely no basis therefore on which a court could find otherwise. I therefore conclude that the learned trial Judge was correct in ruling that this paragraph did not disclose any cause of action.

**Para 16 alleges that**

The agreement made provision for extensive fiscal concessions from duties and taxes. In addition it made provision for the developer to undertake certain works, on terms which would enable the developer to set of the costs incurred from taxes due up to $5,000,000.00, the said sums to be held in a special account for that purpose. The provision included a requirement that these terms would only come into effect on the passage of enabling legislation.

Despite the substantial argument advanced that this arrangement contravened the Constitution by providing for monies to be paid into a fund other than the consolidated fund, and the managing of Government Revenues by non-public servant. In my view, however, the specific provision in section 90 of the Constitution which are sufficiently clear and unambiguous to speak for themselves made those arguments untenable:

> "All revenues or other monies raised or received by Antigua and Barbuda (not being revenues or other monies that are payable under any law for time being in force in Antigua and Barbuda, into a specific fund established for a specific purpose) shall be paid into and form part of a consolidated Fund."

In addition, the agreement did not purport to grant any exemptions nor to make any remissions. It evidenced the agreement of the Government to seek passage of legislation giving effect to the proposed concessions and remissions. Legislation of such nature is specifically permitted by the constitution sections 53(2) (a) (iv); 56 (1); 90 and 93. I agree with the learned trial Judge's conclusion that no cause of action was disclosed in this paragraph of the Statement of Claim.

**Para 17 and 18** complain that the cost to the government and the people of Antigua exceeds the returns from Asian. In my view these are political rather than justiciable questions which involve a vision of and prophesy for the economic and social future of the State. Many evaluations are required and it is possible that political controversy is inevitable.

The undesirability and reluctance of the courts to become embroiled in these matters has often been stated. In this case the position is more

20

acute because the case is brought by the leader of the Parliamentary Opposition, who did not participate in the debate on the agreement and the bill in the House but has sought to have the matter become the subject of investigation in the courts. We were referred to cases making the point such as **Bilston Corp. v Wolverhampton Corp.** (1942) 1 Ch 391; **Blackburn v Attorney-General** (1971) 1W.L.R. 1037; **Eastgate v Rozzoli** (1990) 20 NSWR 188. The trial Judge was impressed by the eloquent exposition of Connolly J.A. in the case of **Kenilores v Attorney-General** (1986) LRC (Const) 126 from the Solomon Islands and I could no better than to adopt them:

> "I think, however, it is important the Courts should exert great care to avoid giving any impression that they have become some sort of extension to the floor of Parliament, where politicians may continue to press their opposition to legislation. Any appearance of political involvement is obviously undesirable.........there is clear division between the legislative, executive and judicial under the Solomon Islands Constitution and the Court should be chary indeed of any procedure which may lead to a blurring of those divisions."

I agree that this paragraph did not disclose any cause of action.

**Suit No.2 against the Attorney General**

The other action in the consolidated hearing was instituted against the Attorney-General and the Statement of Claim attacked the bill for the Asian Village Development Act. In this Statement of Claim the paragraphs which purported to make allegations against the respondent were paragraphs 5 to 11. The main allegations dealt with discrimination under section 14 and the public purpose under section 9 of the Constitution and the issues and legal solution are identical with the issues under the other Statement of Claim and do not need repetition.

As I mentioned at the beginning of my judgment, the fact that the Bill has now become law, has removed the necessity of dealing with the submissions of counsel relating to the jurisdiction of the court to make rulings on the constitutionality of legislation before the legislative process has been completed.

**The Substate Point**

This leaves me to deal with the submission relating to sections 46, 70 and 71 of the Constitution.

Page 93

**A702**

The allegation that the bill by granting privileges, concessions and exemptions was creating a separate or substate seemed illogical. Section 46 of the Constitution reads:

> "Subject to the provisions of this Constitution, Parliament may make laws for the peace, order and good government of Antigua and Barbuda."

This section of the Constitution has been judicially examined in several cases to many of which we were referred. These words do not define the power to legislate. In effect, they establish that Parliament has wide powers. The limitations, necessary to restrain tyranny and preserve democracy do not allow that choices of policy should be justiciable. The matters raised under this argument which in my view do not require detailed attention are based on two divergent theories of economic and social development. The position adopted by the respondent, that is granting incentives is a common feature in the legislation of our times. The respondent referred to an extensive list of legislation, from Antigua and Barbuda and other parts of the Caribbean, based on a similar political theory of stimulating development by granting concessions of various types. It is unnecessary to recite these because they are in fact common throughout our region. In my judgment the questions raised by the appellant under this submission have to do with political choices. I agreed with the learned trial Judge that nothing in the statement of claim came close to raising an issue as to any breach of section 46 of the Constitution.

The allegations of breaches of section 70 and 74 seemed almost facetious. These sections establish the Cabinet and allocation of portfolios to the Ministers. The appellants contended that the granting of exemptions and remissions tended to usurp the powers of the Ministers of Government and vest them in Asian Village.

In my view, I also agree with the learned trial Judge on this issue.

### Section 119 Jurisdiction

The appellant conceded that this action was not brought under section 18(1) and contended that the actions were brought under section 119 of the Constitution:

> "119(1) – Subject to the provisions of sections 25(2), 47(8)(b), 56(4), 65(5), 123(7)(b) and 124 of this Constitution, any person who alleges that any provision of this Constitution (other than a provision of Chapter II) has been or is being contravened may, if he has a relevant interest, apply to the High Court for a declaration and for relief under this section.

Page 94

**A703**

22

The jurisdiction under section 119(1) must be contrasted with the power to institute proceedings under section 18 of the Constitution, to draw attention to two important differences.

> "18(1)-If any person alleges that any of the provisions of sections 3 to 17 (inclusive) of this Constitution has been, is being or is likely to be contravened in relation to him (or, in the case of a person who is detained, if any other person alleges such a contravention in relation to the detained person), then, without prejudice to any other action with respect to the same matter that is lawfully available, that person (or that other person) may apply to the High Court for redress."

The first is that action under section 119 only relates to allegations that any provision "has been or is being contravened". It does not refer to the likelihood of future breaches, whereas actions under section 18(1) can relate to allegations that any provision "has been, or is being or is likely to be contravened" (the inchoate point). The second is that under section 18(1) the only person who can bring an action is a person who can allege that the contravention relates to him (except in the case of a detained person) and under section 119(1) the only person is a person who has a relevant interest (the locus standi point).

**The Inchoate Point**

The appellant challenged the learned trial Judge's conclusion that the Agreement and the Bill were inchoate and that the action was premature because they did no more than evidence an intention to cause future breaches of the Constitution. In my view the definition of completion in the agreement itself which required effective legislation to transfer title and enact the proposed concessions and privileges, licences and permits make the issue rhetorical. It is equally so with regard to a Bill which essentially does not have the force of law.

I think that a necessary consequence of the wording of section 119(1) is that unconstitutionality cannot be based on the entry into an agreement nor a bill prior to the passage of the enabling legislation. There could be no allegation that a provision of the Constitution has been or is being contravened as is required under section 119(1). The allegation would of necessity be that a provision is likely to be contravened. As I have demonstrated, it is only in matters falling under the jurisdiction of section 18 of the Constitution that such an allegation could give rise to a justiciable issue. In the premises, I support the conclusion of the learned trial Judge. Invalidity could only arise if effect was given to the agreement before

Page 95

**A704**

Parliament had enacted the necessary legislation. See **New South Wales v Bardolph** (1933-34) 52 C.L.R. 455.

**The Locus Standi Point**

Counsel for the respondent took issue with several implications inherent in the opinion of the learned trial Judge, that the appellant had locus standi in these proceedings and submitted that the court should give a definitive ruling on the matter.

In my opinion however, there is a short point which is decisive and it derives from the finding that the appellant did not have any cause of action under the Constitution, in effect, there was no sustainable allegation that there was any contravention of the Constitution which affected his interests.

The learned trial Judge did refer to this principle during his judgment:

"In my view a litigant invoking the provisions of section 119 should show on the face of the pleadings the nature of the alleged violation or contravention that is being asserted. The allegations grounding this violation must be serious. The trial judge must then assess whether in light of the allegations made and the degree to which they affect the litigant, whether personally or as a mere member of the general public, locus standi should be accorded."

Had he applied this principle his finding that the pleadings did not contain allegations grounding any contravention of the Constitution would have been decisive. But seemingly, he got carried away into considering whether the appellant's interests would have been affected if there were viable allegations.

The approach which our courts have adopted has recognised the principle that in these public law cases, the court first determines the nature of the alleged violation of the Constitution, and only a sustainable allegation of there is such a violation does it consider whether the applicant has a relevant interest.

We were referred to a collection of Eastern Caribbean Supreme Court authorities on locus standi, among many others.

From Antigua and Barbuda there was the case of **Frank v Attorney-General** Civil Appeal No.1 of 1990. In that case the court considered the issue of locus standi as a preliminary issue. In the decision given by Sir Vincent Floissac it was clear that the approach taken by the court was to examine the meritoriousness of the application. In circumstances which were not dissimilar to this case he expressed himself thus:

**Page 96**

**A705**

"This is an admission by the parliamentary and professed juridical representative of the inhabitants of Barbuda that the proprietary rights and interests claimed on behalf of those inhabitants have not yet been legally established. The appellant wishes the Court to prescribe those rights and interests or to grant relief which amounts to legislation in regard to those rights and interests. This is not the function of a Court of law. The Court can only declare and protect legally established rights and interests. Except in the case of a judicial review of the decision or action of a public authority, it is a precondition of such declaration or protection that there was a previous infringement or threatened infringement of or dispute in regard to those established rights and interests. That precondition was not satisfied in this case. The result is that the appellant had no locus standi to claim the relief demanded in the Motion."

From St.Kitts that was the position adopted by Sir Vincent Floissac in **Blake v Byron** where he said at p.10:

"having elected to decide this appeal on the merits of the application and on the conclusion that the application itself is unmeritorious, it is unnecessary to decide whether the appellant has locus standi either by way of a sufficient interest or by way of a relevant interest in the subject matter of the application."

In **Attorney General v Lawrence** (1983) 31 W.I.R. 176. In that case the decision of the court was given by Sir Neville Peterkin. He adopted the same approach some several years later. He considered the merits of the case and it was only after he concluded that the learned trial Judge was right to in deciding that such deprivations as Lawrence had alleged fell within the purview of section 6 of the constitution that he turned to the question of locus standi. He established the principle:

"I turn now to the second aspect, namely did Lawrence have a locus standi in the constitutionality of the impugned Act? It is submitted not. To make out a case as alleged, it is incumbent upon Lawrence to establish not merely that the law affects his fundamental rights guaranteed by the Constitution then on, but also that it is beyond the competence of the legislature. No-one but one whose rights are directly affected by a law can raise the question of the constitutionality of that law."

In **Attorney-General v Payne** (1982) 30 WIR 88. Robotham C.J. put it at p.98:

"Whether or not a person has a relevant interest can only be determined after the facts have been heard, and not as a preliminary issue. On the conclusion, it then becomes a matter for the judge to decide whether a relevant interest has been established or not, in granting or refusing the application."

Dominica

In the Application of Kareem Abdulgani (1985) LRC(Const) 425 Singh J. adopted the same approach. He first considered the merits and concluded that the Minister of Home Affairs refusal to register the applicant as a citizen was a contravention of section 100(1) of the constitution. It was only then he considered the issue of relevant interest and concluded in favour of the applicant on the ground that the contravention occurred in his application for to be registered as a citizen.

## St.Vincent

In **Richard and James v Governor-General and Attorney-General** of St. Vincent and the Grenadines Suit no. 484 of 1989 and 570 of 1989 Singh J considered substantial arguments and submissions on locus standi and considered much authorities.

He concluded:

"any person in St.Vincent and the Grenadines, can invoke the jurisdiction of this Court under S96(1) of the Constitution provided he alleges a contravention, seeks a declaration or some form of relief and, by admissible evidence, show that the contravention alleged has affected or is affecting his interest. Provided he satisfies these requirements, the Court will accord him standing. Interest there must mean his personal interest, even though shared by the populace at large and, is not limited t pecuniary interests. It will be a matter for Court in each particular case to say whether the interest allegedly affected in each case falls within the framework and intendment of this provision to the Constitution."

## St.Lucia

In **Gordon v Minister of Finance** (1968) 12 WIR 416 a nominated member of the House of Assembly sought a declaration that the procedure employed in reading an Appropriation Bill contravened the constitution. In explaining why he ruled against locus standi. Bishop J. said at p. 420:

"His arguments if I understood them correctly, were confined almost exclusively to the moral concept. They referred to a moral duty and in they meant that members of the House of Assembly; or taxpayers or electors were interested in the sense of being concerned over the events in and the decisions of the legislature. I do not agree that the moral concept can be applied to the word "interests" in the definition of a person with a relevant interest. In my view the mere thought or expectation of to pay money will not suffice. This is too vague and too unsubstantial. Rather, I am of the view that there ought to be involved a right, or a duty, or a liability which can be established by a court. It may be of the nature of a pecuniary or proprietary interest which affects the applicant himself - not sentimentally, not academically, not remotely."

Page 98

**A707**

26

In my view the common premise on which all these decisions seem to have been based was that before any question of locus standi can arise, there must be a sustainable allegation that a provision of the constitution has been or is being contravened, and that the alleged contravention affects the interests of the applicant. . On my reading of section 119(5) it says exactly the same thing. The limitation contained therein effectively makes locus standi a question of statutory interpretation. In my view it is essential that the two requirements of the alleged contravention of the constitution and a resultant affect on the interest of the applicant must both exist.

In this case the finding of the learned trial Judge that there was no allegation of any infringement of any provision of the Constitution of which the Court could take cognisance is conclusive. The appellant therefore failed the test established by section 119(5) of the Constitution. I therefore conclude, that the learned trial Judge was wrong to find that the appellant had locus standi.

**Costs**

The respondents have appealed against the order of the learned trial Judge not to order costs against the appellant in the court below and have asked to make an order for costs in their favour in the appeal. Several cases were cited but I do not think it is necessary to refer to them in detail. It is accepted that the general principle which we have been applying is not to order costs against a private citizen seeking to enforce his Constitutional rights.

However, this is not such a case. The appellant has not alleged that any fundamental rights of his were being invaded. The learned trial Judge and our court are ad idem in concluding that there is no scintilla of a cause of action in relation to any breach of any provision of the constitution. The matters raised related to policy decisions of the executive and legislature. The appellant who is a member of the said legislature did not take part in debates in the House of Representatives but instituted these proceedings,

seemingly substituting the court for Parliamentary debate. In my opinion, therefore, this is not a case of a citizen seeking to enforce his constitutional rights.

The content of the statement of claim includes unparticularised allegations, in pejorative terms of a scandalous nature, namely of fraud, illegality, public mischief and conspiracy. The Prime Minister and the Attorney-General were sued in their personal as well as representative

Page 99

**A708**

27

capacities. The Investor Asian Village was made a party to the suit, and included in the pejorative and scandalous allegations, although no particulars of any misconduct were alleged against them. This circumstance by itself warrants the conclusion that the proceedings were an abuse of the process of the Court.

The matter, is taken further because the appellant sued on "behalf of himself and all other members of the Opposition United Progressive Party". There is no doubt that the motivation for the litigation was political. The statement of claim contained the vexatious and frivolous prayer that damages awarded against the Cabinet Ministers "personally and in their official capacity" be paid to the appellant "for the benefit of the Government and people of Antigua and Barbuda". The documents were more in the form of a political document than a judicial pleading, the view that the appellant had an ulterior political motive in bringing these proceedings is irresistible.

Further the undue length of the argument was unnecessary, and embarrassed the court and increased the cost to the respondents. For all these reasons I would order that the appellant pay the costs of the respondents in the court below and in the appeal.

**The Order**

I would therefore dismiss the appeal and allow the cross appeal. I would order that the appellant pay the costs of the respondents in the Court below and in the Court of Appeal.

**DENNIS BYRON**
Chief Justice [Ag.]

I Concur.          **SATROHAN SINGH**
                   Justice of Appeal

I Concur.          **ALBERT REDHEAD**
                   Justice of Appeal

Page 100

**A709**

104—Vol. 59.]    LLOYD'S LIST LAW REPORTS.    [Dec. 9, 1937.

K.B.]    Bessler, Waechter, Glover & Co., Ltd, v. South Derwent Coal Company, Ltd.    [K.B.

## KING'S BENCH DIVISION.

### Nov. 11, 12, 1937.

## BESSLER, WAECHTER, GLOVER & CO., LTD. v. SOUTH DERWENT COAL COMPANY, LTD.

### Before Mr. Justice GODDARD.

*Contract—Sale of goods—Variation of terms of delivery—Contracts in writing for sale of coal: (1) providing for monthly deliveries from Jan. 1 to June 30, 1936; (2) providing for monthly deliveries from Apr. 1 to Dec. 31, 1936—Deliveries under contracts overlapping — Oral agreement between parties that deliveries under second contract would not begin until deliveries under first contract were finished, the balance undelivered on Dec. 31, 1936, to be delivered after that date—Delivery by sellers under second contract up to end of 1936—Refusal to make further deliveries—Claim by buyers for damages — Enforceability of oral agreement — Arbitration—Award upholding sellers' contention that the oral agreement was unenforceable against them as it was a parol variation of the contract which was required to be in writing—Sale of Goods Act, 1893, Sect. 4.*

*——Held, that the oral agreement was no more than a mere voluntary forbearance by the parties for their mutual benefit to insist on delivery according to the strict terms of the contract and did not amount to a variation; and that therefore Sect. 4 was not an answer to the buyers' claim—Judgment for buyers.*

This was a special case stated by an umpire in an arbitration arising out of a dispute under a coal contract between Messrs. Bessler, Waechter, Glover & Co., Ltd., the claimants, and the South Derwent Coal Co., Ltd., the respondents, both of Newcastle-on-Tyne.

The dispute arose under a contract for the sale of coal, dated Nov. 6, 1935, referred to as contract "C," whereby the claimants bought from respondents 70,000 tons of coal. By that contract the respondents agreed to deliver the coal in about equal monthly quantities from Apr. 1, 1936, to Dec. 31, 1936. Two previous contracts of sale had been entered into between the parties. The first,

which was dated Mar. 18, 1935, referred to as contract "A," was for 48,000 tons of coal, to be delivered in about equal monthly quantities from Apr. 1, 1935, to Dec. 31, 1935, to be mutually arranged; and the second was dated Oct. 10, 1935, referred to as contract "B," and was for 40,000 tons of coal, to be delivered in about equal monthly quantities from Jan. 1, 1936, to June 30, 1936.

The dispute concerned the claimants' allegation that they were entitled to have delivered to them by the respondents 27,966 tons of coal, being the balance outstanding under contract "C"; alternatively, that they were entitled to damages for non-delivery.

The claimants contended (1) that by verbal agreement made in April, 1936, between Mr. A. C. Nicholson, a director of the claimant company, and Mr. E. Cameron, secretary and fitter of the respondent company, it was agreed that delivery under contract "C" should not commence until contracts "A" and "B" had been completed; that delivery should thereafter proceed at the normal monthly rate provided in contract "C"; and that the time of delivery under contract "C" should be extended accordingly; (2) that by reason of the above verbal agreement the claimants had been induced to abstain from requiring deliveries under contract "C" in 1936, more particularly in April, May, June and July, and that the respondents could not therefore hold the claimants to the strict legal interpretation of the contract; and (3) that the terms of contract "C," the conduct of the parties, and the common practice in the trade showed that the time of delivery was not intended to be of the essence of the contract.

The respondents contended (1) that no such verbal agreement had been made and that in any event it had not been reduced to writing as required by law; and (2) that in the circumstances which arose the respondents were not bound to deliver any further quantities of coal to the claimants under contract "C" after Dec. 31, 1936, and that the arrears then outstanding were cancelled.

According to the case stated by the umpire, Mr. W. F. Metcalfe, the claimants from time to time purchased quantities of "West Stanley Unscreened Coking Coals" from the respondents for the purpose of supplying the Ford Motor Company's requirements at Dagenham, Essex. The respondents owned two pits, both situated in County Durham, and coals supplied

A710

pany, Ltd., [K.B.   K.B.]   Bessler, Waechter, Glover & Co., Ltd. v. South Derwent Coal Company, Ltd.   [K.B.

, 1935, referred to
for 46,000 tons in
in about equal
( Apr. 1, 1935, to
lly arranged; and
, 10, 1935, referred
was for 46,000 tons
l in about equal
, Jan. 1, 1936, to

d the claimants
e entitled to have
the respondents
; the balance out-
ct " C"; alter-
re-re entitled to

ded (1) that by
in April, 1936,
lson, a director of
, and Mr. E.
fitter of the re-
was agreed that
" C" should not
" A" and " B"
t delivery should
normal monthly
t " C"; and that
der contract " O"
rdingly; (2) that
rbal agreement the
ed to abstain from
er contract " O"
ly in April, May,
t the respondents
i the claimants to
tation of the con-
terms of contract
e parties, and the
trade showed that
not intended to be
ract.

nded (1) that no
ad been made and
not been reduced
by law; and (2)
e which arose the
nd to deliver any
l to the claimants
ter Dec. 31, 1936,
outstanding were

stated by the um-
lfe, the claimants
ased quantities of
d Coking Coals"
r the purpose of
Motor Company's
pits, both situ-
and coals supplied

from either pit came within the terms of
the contracts. No specific dates of delivery
were mentioned in Messrs. Ford's con-
tracts with the claimants, as the coals were
sold " f.a.s. Dagenham," delivery " as
arranged " or " as scheduled." The pro-
cedure was that Messrs. Ford informed the
claimants of their requirements for the
following month about a month in advance
and the claimants then asked the respon-
dents for stems under the terms of their
contracts and sent them stemming notes
which indicated the quantities of coal re-
quired, the name of the ship and the
approximate date of her readiness to load.
The respondents arranged stems accord-
ingly if agreed upon. The coals purchased
by the claimants from the respondents
under contracts " A," " B " and " O"
were allocated by the former entirely
against their contracts with Messrs. Ford.
The respondents knew that their coal was
destined for Messrs. Ford, but the umpire
found that they did not undertake to be
bound in any respect by Messrs. Ford's
requirements as distinct from the claims of
their contracts with the claimants.

Mr. Nicholson was accustomed to discuss
business matters with Mr. Cameron on fre-
quent occasions at the Exchange, Newcastle-
on-Tyne, and in the middle of October, 1935,
Mr. Nicholson told Mr. Cameron that
Messrs. Ford would like to have deliveries
expedited if possible. The position was
discussed and Mr. Cameron indicated that
it was possible that his company would be
able to expedite deliveries under contracts
" A " and " B " so that the quantity of
coal contracted for under contract " B "
would be completely delivered by about the
end of March, 1936, instead of according to
the contract terms on June 30, 1936; but
the umpire found nevertheless that no
undertaking was given by Mr. Cameron
that the deliveries would, in fact, be ex-
pedited. He (the umpire) also found that
in the expectation that contract " B "
would be completed by the end of March,
1936, Mr. Nicholson on behalf of the
claimants on Nov. 6, 1935, entered into con-
tract " O."

In April, 1936, Mr. Nicholson discussed
with Mr. Cameron on the Newcastle Ex-
change the position which had arisen owing
to the fact that deliveries under contracts
" A " and " B " had not been expedited
as hoped, as it then appeared that deli-
veries under the two contracts " B " and
" O" would overlap during April, May
and June, 1936, so that about 14,444 tons
per month would be due for delivery under

both contracts. The umpire found as a
fact that as a result of that conversation
it was verbally agreed between the
claimants and respondents that notwith-
standing the terms of contract " O" deli-
veries under that contract should not com-
mence until deliveries to the claimants
under contract " B " had finished; that
deliveries should then begin in accordance
with the terms of contract " O"; and
that the coal undelivered under contract
" O" on Dec. 31, 1936, should thereafter
be delivered by the respondents under the
claimants. No definite arrangement was
made as to the date on which these
anticipated arrears under contract " O"
should be delivered to the claimants after
Dec. 31, 1936. He also found as a fact
that that agreement at the time it was
made was to the mutual advantage of both
claimants and respondents and was so
considered by the contracting parties.

The respondents were at that time con-
sidering the advisability of closing their
West Stanley Pit (which was in fact shut
down in May, 1936, owing to economic
reasons) and they would not have been
able to supply the claimants with the
quantities due under contracts " B " and
" O" in April, May and June, 1936, un-
less they had kept the West Stanley Pit in
operation. On the other hand, the
claimants did not wish to take delivery
of as much as 14,444 tons of coal monthly
during April, May and June, 1936, because
Messrs. Ford did not require that amount
and because Messrs. Ford had very little
storage accommodation.

The verbal agreement referred to above
was not communicated by Mr. Cameron to
his directors, but he (the umpire) found
that it was within the scope of his
authority to enter into such an agreement
on behalf of the respondents.

During the year 1936 the claimants also
purchased about 28,000 tons of coal from
other collieries which they delivered to
Messrs. Ford, including 6500 tons of coal
during the months of May and June, 1936.
No information, however, was produced to
the umpire of the prices at which such
other coal was purchased, and he found
that the respondents were not informed by
the claimants that these other purchases
were being made.

In May, 1936, the claimants cancelled
a stem for 2800 tons of coal for Messrs.
Ford's account which they had arranged
with the respondents, on account of
Messrs. Ford's lack of storage capacity.

[K.B.] Bessler, Waechter, Glover & Co., Ltd., v. South Derwent Coal Company, Ltd.   [K.B

The umpire further found that in pursuance of the above verbal agreement the claimants did not ask the respondents to deliver any coals to them in April, May, June and July, 1936, under contract "O" until deliveries under contract "B" had been completed on July 10, 1936, and that no communications passed between the respondents and claimants regarding the fact that deliveries were not asked for during this period. After July 10, 1936, the claimants asked for and obtained from the respondents monthly deliveries of coal under contract "O." In July, 1936, the claimants contracted with Messrs. Ford to deliver to them further quantities of West Stanley Unscreened Coking Coal, and in that connection they assumed that about 30,000 tons of coal would be delivered to them by the respondents under contract "O" during the early months of 1937. The respondents were not, however, aware of that fact.

On Dec. 1, 1936, Mr. Cameron wrote on behalf of the respondents to the claimants stating that there were considerable arrears under contract "O" and that they would be compelled to cancel them at the end of the year. That letter was returned by Mr. Nicholson to the respondents, and he stated verbally that the claimants refused to be bound by its terms.

The umpire found that the respondents repudiated any further liability to deliver coals under contract "O" after Dec. 31, 1936, although the claimants called for further deliveries in January, February and March, 1937; and that under the circumstances the quantity of coal remaining undelivered under contract "O" on Dec. 31, 1936, was 27,966 tons.

No evidence was submitted to the umpire in regard to any customary practice of the coal trade that time of delivery was not intended to be of the essence of the contract in construing contracts such as "O," and the only other evidence submitted by the claimants in that connection was that arrears of coal under an earlier contract for delivery from July 1, 1934, to June 30, 1935, had by mutual agreement been delivered to the claimants by the respondents over a considerable period beyond the contract dates, but that the respondents had finally refused delivery of the balance outstanding thereunder at the end of 1936.

Subject to the opinion of the Court, the umpire held that the time of delivery stated in contract "O" was of the essence

of the contract; further, that there was no any sufficient memorandum in writing the above parol agreement varying the terms of contract "O," and that consequently such parol agreement was unenforceable at law; and further, that the claimants' contention that by reason of the above verbal agreement they had been induced to abstain from requiring deliveries under contract "O" in 1936 more particularly in April, May, June and July, 1936, and that the respondents could not therefore hold the claimants to the strict legal interpretation of the contract, was not correct.

The umpire awarded (inter alia) as follows:—

24. Subject to the opinion of the Court I award and determine that the claimants are not entitled to specific performance of the contract and to have delivered to them by the respondents the said 27,966 tons of coal.

25. Subject to the opinion of the Court I further award and determine that the respondents are not liable to the claimants in damages in respect of non-delivery of the said 27,966 tons of coal.

26. The question for the opinion of the Court is whether on the facts found by me my award and determination as set out in Clauses 24 and 25 hereof is correct in law.

31. If the Court be of opinion that my award is incorrect in Clause 25 hereof then I award and determine that the respondents do pay to the claimants the sum of £4194 18s. as damages for non-delivery of the said 27,966 tons of coal.

Mr. A. T. Miller, K.C., and Mr. R. E. Gathing (instructed by Messrs. Bentleys, Stokes & Lowless, agents for Messrs. Bramwell, Clayton & Clayton, of Newcastle-on-Tyne) appeared for claimants; Mr. J. V. Naisby (instructed by Messrs. King, Wigg & Brightman, agents for Messrs. Wilkinson & Marshall, of Newcastle-on-Tyne) represented respondents.

JUDGMENT.

Mr. Justice GODDARD, in giving judgment, said: The arbitration in which this award in the form of a special case stated arises out of a contract between the claimants as buyers and the respondents as sellers of 70,000 tons of coal, made in

Bessler, Waechter, Glover & Co., Ltd. v. South Derwent Coal Company, Ltd.   [K.B.

November, 1935. The only question that has to be decided is one under Sect. 4 of the Sale of Goods Act, 1893, and for this purpose the facts can be very shortly stated.

On Oct. 10, 1935, the respondents sold to the claimants 40,000 tons of coal to be delivered in equal monthly quantities from Jan. 1 to June 30, 1936. Soon after this contract was made, the claimants' representative asked that deliveries if possible should be expedited, and the respondents' representative, while giving no undertaking, promised to do this if it were possible. Then on Nov. 6 the contract in question was made, providing for equal monthly deliveries between Apr. 1 and Dec. 31, 1936. In April, 1936, while deliveries under the October contract were still being made, and deliveries under the subsequent contract were due to begin, the representatives of the parties met and discussed the situation. Deliveries under the October contract had not been expedited, so that from April to June, 1936, deliveries under both contracts would be due to be made and received.

The representatives came to what the arbitrator refers to as a verbal agreement that deliveries under the later contract should not be begun till the deliveries under the former had finished, and that the deliveries should proceed and the coal undelivered under the later contract on Dec. 31 should thereafter be delivered to the claimants under the later contract. But he does not find that the balance should be delivered in monthly or any instalments, finding, as I understand the case, that there was no agreement on this point. This agreement he finds was for the mutual convenience of the parties, and so considered by them; convenient for the buyers as their customers had no great amount of storage room, and for the sellers because they were considering closing down one of their pits, in which case it would have been difficult for them to keep up double deliveries, and accordingly no deliveries were made under the later contract till July.

But on Dec. 1, 1936, the sellers wrote to the effect that as the buyers had not taken delivery in accordance with the terms of the contract of Nov. 6, 1935, they declined to deliver any coal after Dec. 31. The buyers claim damages for non-delivery, and the arbitrator has found that as the agreement come to in April, 1936, for postponing delivery was not in writing,

Sect. 4 of the Sale of Goods Act is an answer to this claim, and has awarded, subject to this case, that nothing is due by way of damages. He has also awarded that the buyers cannot claim specific performance of the contract; and that finding is not challenged, as of course coal could have been bought elsewhere, though at a higher price.

Mr. Miller, for the claimants, the buyers, took three points: firstly, that on the findings of what took place in April, 1936, there was not a new contract, but only a postponement of delivery, and that the contract remained in operation subject to a modification as to delivery. Secondly, that if there was a new contract it was not one for sale of goods, but for the delivery of goods already sold. Thirdly, that alternatively, if there was a new contract in April, it had been partly performed by the deliveries that were made between July, 1936—when deliveries of the 70,000 tons began—and December, 1936, and therefore the provisions of Sect. 4 are satisfied.

The first two contentions can, I think, be dealt with together, and on this part of the case a large number of cases were cited by either side, those most discussed being Stead v. Dawber, 10 Ad. & E. 57; Tyers and Others v. Rosedale & Ferryhill Iron Company, L.R. 8 Ex. 305 (reversed, L.R. 10 Ex. 195); the Leather-Cloth Company v. Hieronimus, L.R. 10 Q.B. 140; Hickman v. Haynes, L.R. 10 C.P. 598; Plevins v. Downing, 1 C.P.D. 220; and Morris v. Baron, [1918] A.C. 1.

It often happens when either the 4th or the 17th section of the Statute of Frauds, now replaced by Sect. 4 of the Sale of Goods Act, has to be considered, that the cases are found to be somewhat difficult of reconciliation, and this case is no exception. In Stead v. Dawber the Court found it difficult to reconcile the case of Goss v. Lord Nugent, 5 B. & Ad. 58, with Cuff v. Penn, 1 M. & S. 21, and Stead v. Dawber, though the facts were very similar, had in turn to be distinguished by the Court in Hickman v. Haynes.

Mr. Miller relied strongly on Baron Martin's judgment in Tyers v. Rosedale, which was upheld when that case went to the Exchequer Chamber. In that case the plaintiffs had requested the defendants to forbear from delivering certain instalments, and accordingly only partial deliveries were made, and then at the end of the contract period the buyers

108—Vol. 59.]                    LLOYD'S LIST LAW REPORTS.                    [Dec. 9, 1987.

K.B.]      Bessler, Waechter, Glover & Co., Ltd. v. South Derwent Coal Company, Ltd.      [K.B.

demanded delivery of the residue. Baron Martin in a dissenting judgment held that the original contract had not been terminated, and dealt with the objection that the plaintiffs' right to recover was barred by Sect. 17 as not being in writing, by saying (L.R. 8 Ex. at p. 319):

It [that is the variation] was not a contract for the sale of goods, which is the contract provided for by the section, but a contract respecting the delivery of goods already sold, which is not within the section at all.

However, when that case went to the Exchequer Chamber, Counsel for the defendants abandoned this point, because, as I understand the case, if writing were required there was enough to supply a memorandum, and I feel a difficulty in holding that the approval which the Exchequer Chamber gave to the judgment of Baron Martin, who had differed from the rest of the Court below on the question as to whether the original contract was rescinded, necessarily extended to this part of his judgment.

With all respect to the high authority of the learned Baron, it seems to me that a term as to delivery is a term of the sale, and if that term be altered it is an alteration of the terms of the contract of sale, and this was, I think, the ground of the decision in Stead v. Dawber, which Mr. Naisby contended was conclusive in his favour. Stead v. Dawber was, however, as I have said, distinguished in Hickman v. Haynes, another case of a verbal request to allow instalments to stand over, where it was held that the statute was no answer; and in the following year, in Plevins v. Downing, 1 O.P.D. 220, a very similar case, it was decided that it was.

One must therefore try to find the underlying principle which will explain the different results in cases which at first sight appear to be so alike in point of fact. From these two last-cited cases I think it is possible to extract a principle, and it seems to me to be this. If the parties agree to rescind their original contract and to substitute for it a new one, the latter must be evidenced by writing; so, too, if as a matter of contract the parties agree that the terms of the original agreement shall be varied, the variation must be in writing. But if what happens is a mere voluntary forbearance to insist on delivery or acceptance according to the strict terms of the written contract, the original contract remains unaffected, and the obligation to deliver and to accept the full contract quantity still continues.

This view is supported by the speech of Lord Atkinson in Morris v. Baron, sup., at p. 30, where he said:

In Maddison v. Alderson, 8 App. Cas. 467, at p. 488, Lord Blackburn said: "I think it is now finally settled that the true construction of the Statute of Frauds, both the 4th and the 17th sections, is not to render the contracts within them void, still less illegal, but is to render the kind of evidence required indispensable when it is sought to enforce the contract." I do not find that it was ever seriously questioned that this was the true state of the law as to the 4th section of the Statute of Frauds. The doubt was as to whether the same rule applied to the 17th section, or whether contracts within it not in writing where none of the particular matters specified had been done were not absolutely void. There is nothing in all this inconsistent with the well established rule, that a contract which the law requires to be evidenced by writing cannot be varied by parol.

He then cites certain cases, and goes on:

The foundation, I think, on which that rule rests is that after the agreed variation the contract of the parties is not the original contract which had been reduced into writing, but that contract as varied, that of this latter in its entirety there is no written evidence, and it therefore cannot in its entirety be enforced. There is a clear distinction, however, between cases such as these and cases like Ogle v. Earl Vane, L.R. 2 Q.B. 275; L.R. 3 Q.B. 272, where one party at the request of and for the convenience of the other forbears to perform the contract in some particular respect strictly according to its letter. As, for instance, where one party, bound to deliver goods sold upon a certain day, at the request of and for the convenience of the other postpones delivery to a later day. In such a case the contract is not varied at all, but the mode and manner of its performance is, for the reasons mentioned, altered.

It does not appear to me to matter whether the request comes from one side or the other, or whether it is a matter which is convenient to one party or to both.

Ltd., [K.     **K.B.]** Bessler, Waechter, Glover & Co., Ltd, v. South Derwent Coal Company, Ltd.   **[K.B.**

What is of importance is whether it is a mere forbearance or a matter of contract. This, I think, is made clear by Plevins v. Downing, *sup.*, where Mr. Justice Brett emphasises the distinction between the situation where the party suing was always ready and willing to perform his contract and merely abstained at the request of the other party, and where, if he sued for non-acceptance or non-delivery, he would be driven to rely on the assent of the other party to allow him to vary the terms of the original contract.

If, however, one party asks the other if he would refrain from delivering, and the other party says it would suit him very well to do so, both parties being able and willing to perform their obligations, I think we get the same position as is envisaged by Hickman v. Haynes, *sup.*, and by Lord Atkinson in the passage to which I have referred.

It then has to be determined on which side of the line the instant case falls. Mr. Naisby relies on the fact that the arbitrator has found that there was a verbal agreement; but I do not think the use of those words concludes the matter. Whether it be a forbearance or a matter of contract, there is none the less an agreement; there is an agreement between parties, though for want of consideration or because of the provisions of an Act of Parliament their agreement must be regarded as *nudum pactum* or as void. One must have regard to the facts found by the arbitrator, and when one finds that what happened was a conversation which arose, as it seems to me, because one party had not been able to expedite deliveries under an earlier contract which he had promised, but not undertaken, to do if he could, when one finds that neither party thought the matter worth confirming in writing, and that the vendors' representative did not even inform his directors of the matter, and no inquiry was made or pressure applied during the contract period, I think one is driven to the conclusion that this was no more than a mere forbearance, and voluntary in the sense that either party could have rested and called upon the other to make or take delivery in accordance with the terms of the written contract. Accordingly, I hold that the statute is not an answer to the buyers' claim.

This in effect disposes of the case, but I think I ought to deal with Mr. Miller's contention as to part delivery, particularly as I am afraid he thought I did not pay enough attention to it in argument, though in fact it seemed to me an interesting point. He contends that, as deliveries were made after the parties had agreed to the modification, he is entitled to prove the actual contract and rely on the part delivery as taking the case out of Sect. 4.

But the difficulty in the way of accepting this argument to my mind is this, Morris v. Baron has decided that there is a real distinction between varying an existing contract and rescinding a contract and substituting for it a new agreement. If the arbitrator had found, or if the facts had shown, that the parties had rescinded their contract of Nov. 6 and substituted for it a fresh one under which deliveries were now to begin till July, in my opinion Mr. Miller's contention would have been right. But the arbitrator has not found this, and it is, I think, clear that nothing of the sort happened. I think the parties would have been very surprised if they had been told that they had rescinded the contract of Nov. 6, 1936, by the conversation in the following April. Therefore it was under that contract that the part deliveries were made, and if evidence were given that the parties had agreed as a matter of contract that the deliveries should be altered from April/December to July/April, it would have been open to the objection that it was inconsistent with the terms of the written document. Had it been a matter of adding a term, so that the agreement was partly written and partly oral, and part deliveries were made thereunder, it would have been different, but it seems to me that what has been found, if it be a matter of contract, contradicts or at least is inconsistent with the document. I do not think, therefore, that part delivery would be an answer to the statute, if it applied.

Accordingly, I answer the questions propounded in par. 28 of the award as follows. The award contained in par. 24, which deals only with specific performance, is correct. The award contained in par. 25 is incorrect. I uphold the award contained in par. 31.

I may just add that I understand that award to be based on the difference between the contract price and the price prevailing immediately after Dec. 31, 1936, and the buyers have not suggested that they are entitled to any other measure of damage. The buyers will have the costs of this arbitration.



## COURT OF APPEAL

Oct. 27, 30, 31, Nov. 1 and 2, 1978

———

BREMER HANDELSGESELLSCHAFT
M.B.H.
v.
C. MACKPRANG JR.

Before Lord DENNING, M.R.,
Lord Justice STEPHENSON
and Lord Justice SHAW

Sale of goods (c.i.f.) — Prohibition of export — Force majeure — U.S. soya bean meal sold c.i.f. Rotterdam — Shipment to be made monthly April/September, 1973 — Embargo on shipment of U.S. soya bean meal imposed by U.S. Department of Commerce — Whether buyer had waived rights to performance under June bills of lading — GAFTA 100.

By a contract dated Oct. 30, 1972, the sellers sold to the buyer 1200 tonnes of U.S. solvent extracted toasted soya bean meal c.i.f. Rotterdam. Shipment was to be at the rate of 200 tonnes per month from April to September, 1973, at a price of U.S. $135.25 per tonne. The contract incorporated the GAFTA 100 form which contained cl. 10 (an appropriation clause), cl. 21 (a prohibition clause) and cl. 22 (a force majeure clause).

A partial embargo on the export of soya bean meal was imposed by the U.S. Department of Commerce in the summer of 1973, beginning with a warning notice dated June 13, 1973. The embargo ended on Oct. 1, 1973. A dispute arose between the parties as to the June shipment in so far as 159.5 tonnes were concerned. Bills of lading dated July 18 showed that 40 tonnes had been shipped on the vessel Pegasus.

The dispute was referred to arbitration. The buyer contended that there was a default by the sellers as regards the full 159.5 tonnes. The sellers maintained that (i) the buyer had waived his right to have performance under June bills of lading, and (ii) if there was no waiver in respect of the full 159.5 tonnes, there was waiver at least in respect of the Pegasus shipment. The Board of Appeal of the Grain and Feed Trade Association made an award in the form of a special case in favour of the buyer holding that the sellers were in default in respect of the full 159.5 tonnes and that damages were to be calculated on the difference between the contract price and the market price on July 10 (i.e. $635) making a total of $80,029,125.

———Held, by Q.B. (Com. Ct.) (ROBERT GOFF, J.), that (1) on the evidence, there had been no waiver by the buyer of his right to have performance under June bills of lading in respect of the full 159.5 tonnes;

(2) there had been no waiver in respect of the Pegasus shipment;

(3) damages should be assessed on the basis that the date of default was July 10.

Award upheld.

On appeal by the sellers:

———Held, by C.A. (Lord DENNING, M.R., STEPHENSON and SHAW, L.JJ.), that (1) it was not sufficient for the sellers to prove the general embargo which came into effect on June 27, 1973 since it was not a total embargo in that the bulletin permitted the export of goods already on lighters destined for an exporting vessel or for which loading on board an exporting vessel had actually commenced (see p. 223, col. 2; p. 226, col. 2; p. 229, col. 2; p. 230, col. 1); the sellers had to show that the shippers had no goods available within the permitted loopholes (see p. 223, col. 2; p. 229, col. 1; p. 230, col. 1); and the sellers had failed to discharge the burden of proof and had not brought themselves within cl. 21 (see p. 224, cols. 1 and 2; p. 228, col. 1; p. 230, col. 1);

(2) although it was open to the sellers to rely on force majeure in cl. 22 as a reason for not shipping during June 1973, the burden on them was the same as when they were relying on cl. 21 and the sellers had not discharged that burden (see p. 224, col. 2; p. 230, col. 1);

(3) (STEPHENSON, L.J. dissenting): whether the conduct of a party amounted to waiver had to be determined by reference to all the prevailing circumstances (see p. 230, col. 2); in the present case, there was no difficulty in distilling from the telexes sent by the buyer in the circumstances which then obtained coupled in regard to the Pegasus shipment with the delay in rejecting the documents, a strong indication that they (the buyers) had waived their right to treat the sellers as being in default (see p. 225, col. 1; p. 230, col. 2);

(4) the buyer could not rely on the telexes in which their contractual rights were reserved since the reservation was as to the contractual rights in respect of the 60 per cent. which was not delivered and did not extend to the 40 per cent. which was tendered (see p. 225, col. 2);

(5) the buyers could not recover any damages in respect of the shipment on the Pegasus which they ought to have taken up in that their conduct in accepting the notice of appropriation on Aug. 14, 1973, without demur had led the sellers to believe that that notice was good and to forward the shipping documents for acceptance (see p. 225, col. 1; p. 226, col. 1); however they could recover damages in respect of the 60 per cent. which was never delivered (see p. 226, col. 2; p. 231, col. 1);

(6) (STEPHENSON, L.J. concurring): the damages would be assessed as at July 11, 1973 (see p. 226, col. 2; p. 229, col. 2; p. 231, col. 1).

———Bremer Handelsgesellschaft m.b.H. v. Vanden Avenne-Izegem P.V.B.A., [1978] 2 Lloyd's Rep. 109, applied.

Appeal allowed in part.

Per Lord DENNING, M.R. (at p. 226): . . . If a buyer who is entitled to reject goods or documents on the ground of a defect in the notices or the timing of them, so conducts himself as to lead the seller reasonably to believe that he is not going to

rely on any such defect — whether he knows of it or not — then he cannot afterwards set up the defect as a ground for rejecting the goods or documents when it would be unfair and unjust to allow him to do so . . .

The following cases were referred to in the judgments:

Alan (W.J.) & Co. v. El Nasr Export & Import Co. Ltd., (C.A.) [1972] 1 Lloyd's Rep. 313; [1972] 2 Q.B. 189;

Bremer Handelsgesellschaft m.b.H. v. Vanden Avenne-Izegem P.V.B.A., (H.L.) [1978] 2 Lloyd's Rep. 109; (C.A.) [1977] 1 Lloyd's Rep. 337; [1977] 1 Lloyd's Rep. 133;

Bunge S.A. v. Kruse, [1979] 1 Lloyd's Rep. 279;

Central London Property Trust Ltd. v. High Trees House, (C.A.) [1947] K.B. 130;

Finagrain S.A. v. Kruse, (C.A.) [1976] 2 Lloyd's Rep. 508;

Intertradex S.A. v. Lesieur Tourteaux S.A.R.L., (C.A.) [1978] 2 Lloyd's Rep. 509;

Panchaud Freres S.A. v. Etablissements General Grain Co., (C.A.) [1970] 1 Lloyd's Rep. 53;

Rickards (Charles) v. Oppenheim, (C.A.) [1950] 1 K.B. 616;

Toepfer (Alfred C.) v. Peter Cremer, (C.A.) [1975] 2 Lloyd's Rep. 416;

Tradax Export S.A. v. André & Cie, S.A., (C.A.) [1976] 1 Lloyd's Rep. 416;

Woodhouse A.C. Israel Cocoa S.A. v. Nigerian Produce Marketing Co. Ltd., (H.L.) [1972] 1 Lloyd's Rep. 439; [1972] A.C. 741.

This was an appeal by the sellers, Bremer Handelsgesellschaft m.b.H. from the decision of Mr. Justice Robert Goff ([1977] 2 Lloyd's Rep. 467) given in favour of the buyer C. Mackprang Jr. and holding in effect that the sellers were in default in respect of the balance of the June shipment of 200 tonnes of soya bean meal (the buyers having accepted a shipment on the *Olivia Maersk* of about 20 per cent.).

Mr. Brian Davenport and Mr. P. N. Legh-Jones (instructed by Messrs. Richards Butler & Co.) for the appellant sellers; Mr. Kenneth S. Rokison, Q.C., and Mr. Richard Wood (instructed by Messrs. Thomas Cooper & Stibbard) for the respondent buyers.

The further facts are stated in the judgment of Lord Denning, M.R.

Judgment was reserved.

Wednesday Nov. 15, 1978

JUDGMENT

**Lord DENNING, M.R.:** Whenever one of these cases comes before us on GAFTA 100 we get lost in the complications and technicalities which they present. Three years ago in *Toepfer v. Cremer*, [1975] 2 Lloyd's Rep. 118 and *Tradax v. Andre*, [1976] 1 Lloyd's Rep. 416, the trade set us an examination paper with many questions to answer. We did our best, but recently our papers were marked by the House of Lords, see *Bremer Handelsgesellschaft m.b.H. v. Vanden Avenne-Izegem P.V.B.A.*, [1978] 2 Lloyd's Rep. 109. They only gave us about 50 per cent. The House of Lords are fortunate in that there is no one to examine them or mark their papers. If there were, I do not suppose they would get any higher marks than we. At any rate, their answers in *Bremer v. Vanden* mean that we have now to reconsider a number of points.

The Board of Appeal have set out the commercial background to these cases. There is a big trade in soya bean meal. Much of it is produced in the U.S., exported to Europe, and used as food for cattle. The export trade from the U.S. is in the hands of about a dozen big firms. They buy from the producers all the soya bean meal that is produced and store it in their warehouses in bulk. They charter relatively large vessels to carry it to Europe. They load it on to these vessels in large quantities. Always in bulk so there is no difference in parcels. On getting to Europe, it is discharged into lighters. These hold about 200 tonnes each. They are then taken by river for supply to the farmers.

The U.S. shippers sell the soya bean meal long before it is shipped. They sell quantities of it while still in store or even before they get it. They sell it on c.i.f. terms for shipment in succeeding months. The first buyers resell it or portions of it to second buyers and so on along a string. There is usually a string of several traders between the shipper and the ultimate c.i.f. receiver. Contracts are invariably on terms of GAFTA 100.

I am not going to set out the details of our present case. They are all printed very conveniently in the report in [1977] 2 Lloyd's Rep. 467. Sufficient to say that Bremer are intermediate sellers. In October, 1972 they sold 1200 tonnes of soya bean meal to intermediate buyers called Mackprang. The price was $135.25 per tonne c.i.f. Rotterdam. Shipment was to be 200 tonnes each April, May, June, July, August, September, 1973. It incorporated GAFTA 100.

The case of 200 tonn
This shipm
were prim
had risen t
colossal. T
exempt fro
GAFTA 10
been impo
exports of s
27, 1973
exceptions,
partially lif
per cent. of
the embarg
goods en ro
1973 the em

At all s
succeeded. T
that they ar
this Court.

*Bremer v. V*

Before I c
summarise t
All the detail
is set out in p
146. The imp
were the ship
tonnes of so
included 220
27, 1973 the
bean meal
commitments
in warehouse
ports. The se
last three day
days) so as t
shipment. Th
the purpose. N
all their oblig
came down or
sellers from f
shipments. Th
conceded, that
from making
they were held
reason of cl. 2
also an alternat
the force ma
embargo was
notice and an
extension of tir
in some respec
defects. So the
good. The emb
so as to permit t
sellers were read
cent. within the
majeure clause.
this 40 per cent.

The case is only concerned with the shipment of 200 tonnes agreed to be made in June 1973. This shipment was never made. So the sellers were prima facie liable in damages. The price had risen to $585 a tonne. So the damages were colossal. The sellers, however, claimed to be exempt from liability under cl. 21 and cl. 22 of GAFTA 100: because of an embargo that had been imposed by the U.S. government. All exports of soya bean meal were prohibited from June 27, 1973 to July 2, 1973, save for two exceptions. On July 2, 1973 the embargo was partially lifted so as to permit shipment of 40 per cent. of existing contracts. On July 19, 1973 the embargo was further lifted in respect of goods en route on June 27, 1973. On Sept. 21, 1973 the embargo was lifted altogether.

At all stages hitherto the buyers have succeeded. The sellers have not satisfied anyone that they are exempted. The sellers appeal to this Court.

*Bremer v. Vanden*

Before I consider this particular case, I will summarize the decision in *Bremer v. Vanden*. All the details will be found in the award which is set out in [1977] 1 Lloyd's Rep. at pp. 135 to 146. The important facts are these: The sellers were the shippers under contract to ship 44,000 tonnes of soya bean meal in June, 1973. This included 220 tonnes for these buyers. On June 27, 1973 the sellers had 44,000 tonnes of soya bean meal available to fulfil all their commitments. These 44,000 tonnes were stored in warehouses or were actually in transit to the ports. The sellers intended to ship them in the last three days of June, 1973 (or the next eight days) so as to fulfil their obligation of June shipment. They had chartered four vessels for the purpose. No doubt they would have fulfilled all their obligations but for the embargo. This came down on June 27, 1973. It prevented the sellers from fulfilling their obligations of June shipments. The sellers thus proved, and it was conceded, that they were absolutely prevented from making the shipment. On this account they were held to be exempted from liability by reason of cl. 21 of GAFTA 100. The sellers had also an alternative defence by reason of cl. 22 — the force majeure clause. As soon as the embargo was imposed, they gave a warning notice and an extension notice claiming an extension of time. These notices were defective in some respects, but the buyers waived the defects. The notices were to be treated as good. The embargo was lifted on July 2, 1973 so as to permit the shipment of 40 per cent. The sellers were ready and willing to ship this 40 per cent. within the extended time given by the force majeure clause. But the buyers refused to accept this 40 per cent., and claimed damages for non-

shipment of the whole of the June, 1973 shipment. They failed: because the sellers had carried out the requirements of the force majeure clause and were protected by it.

*Clause 21*

Now the present case differs from *Bremer v. Vanden*: because here the sellers were *not* the shippers. It differs, too, because there is no evidence here, that the shippers were prevented by the embargo. There is no evidence whatever to show who were the shippers: nor as to whether there were any goods available for shipment: nor as to whether they were caught by the embargo or not. The absence of evidence raises the crucial point in this case. It is this:

If the seller relied on cl. 21 — claiming that there was a prohibition "preventing fulfilment" — on whom is the burden of proof? Plainly the burden is on the supplier. At common law a party who relies on an exception clause must prove the facts to support his exception. In addition, cl. 21 itself says:

. . . If required, sellers must produce proof to justify their claim for cancellation.

But, in order to discharge their burden, how much has the seller to prove? The seller here says that it is sufficient for the seller were *not* the general embargo which came down on June 27, 1973. If this had been a total embargo on all shipments, that might be sufficient. But this was not a total embargo. There were two exceptions —two "loopholes". The bulletin permitted the export of goods

. . . already on lighters destined for an exporting vessel or for which loading on board an exporting vessel had actually commenced as of 5.00 p.m. on 27th June, 1973.

In view of these two "loopholes", I do not think it is sufficient for the seller to rely on the general prohibition. He must go further and show that the shipper had no goods available within the permitted loopholes. In *Tradax v. Andre*, [1976] 1 Lloyd's Rep. 416 we considered this very point. At p. 423 I said:

In order to prove that shipment was prevented, the seller would have to prove that the shipper had no goods on lighter and none in course of loading, which could be used to fulfil the contract. If the shipper had enough goods on lighters for this contract of 220 tons, he would prima facie be in a position to fulfil this contract; and would not be prevented from fulfilling it . . .

And at p. 426 Lord Justice Browne said:

As to the "lighters" point, it is clear that, if a prohibition of export is subject to exceptions or relaxations (for example by

licensing the seller must prove that he was not, and could not, by reasonable efforts have brought himself within the exception or relaxation . . . The sellers must therefore prove that they were not within either of these exceptions (of goods on lighters or being loaded). If they had been, the goods could have been shipped in spite of the embargo . . .

These two statements were reinforced by Lord Justice Megaw in *Bremer* v. *Vanden*, [1977] 2 Lloyd's Rep. at p. 337, where he said:

. . . If there are "loopholes", such as the right to load goods already in lighters . . . the burden of proof is on the sellers to show that these possible exemptions did not avail . . .

All those statements were in turn approved by Lord Wilberforce in [1978] 2 Lloyd's Rep. at p. 114. The only qualification which he made was that if there was an absolute prohibition — without loopholes — which operated on the last days of the shipment period completely preventing fulfilment — then the sellers could rely on the prohibition without more as a frustrating event.

Such being the burden of proof, I am quite clear that the sellers did not discharge it. For aught that appears, it may well be that the shippers had already loaded, on or before June 27, 1973, goods which they could have appropriated to the contract: or, it may be that they had goods on lighters, or in the process of being loaded, which they could have appropriated to the contract. In the absence of proof that the shippers had no such goods available, they have not discharged the burden of proof. They have not proved that they were prevented by the embargo from fulfilling the contract. So they have not brought themselves within the exemption in cl. 21.

Any other view would lead to this extraordinary consequence: Once this embargo, with loopholes, was imposed, the sellers could cancel all their outstanding contracts in which they had not given notices of appropriation. They could cancel all those in which the goods had already been loaded or were already on lighters or in the process of being loaded: but had not been appropriated. And they could resell those goods at the enhanced prices then ruling in the trade. That would be most unjust. It is quite clear to my mind that if the sellers had sufficient goods available to fulfil all their contracts, they ought to have fulfilled them. If they had sufficient goods to fulfil some, but not all, of their contracts, they ought to have appropriated them reasonably among the various contracting parties. If they had done so, they could have relied on cl. 21 for the contracts they could not fulfil: see *Intertradex* v. *Lesieur-Tourteaux*,

[1978] 2 Lloyd's Rep. 509. It is only if they had no goods available to them — to take advantage of the loopholes — that they can rely on cl. 21 in respect of all their contracts. They never proved this. So they cannot rely on cl. 21.

I find myself, therefore, in agreement with the Board of Appeal when they found—

. . . There was no prohibition of export by the Government of the country of origin which prevented fulfilment of the contract, and no cancellation of the contract by reason of clause 21 of GAFTA Form 100.

*Clause 22*

It was open to the sellers also to rely on "force majeure" as a reason for not shipping during June, 1973. But the burden on them would be just the same as when they were relying on cl. 21, Clause 22 says that the buyers must supply "satisfactory evidence justifying the delay or non-fulfilment". Every word I have said as to burden of proof under cl. 21 applies equally to cl. 22. The sellers have not discharged that burden. I find myself, therefore, in agreement with the Board of Appeal, when they found—

There was no "force majeure" which delayed shipment in accordance with clause 22 of GAFTA 100.

*Waiver*

In the telexes which passed between the parties, the sellers claimed the protection of cl. 21 (which did not require any notices) and of cl. 22 (which required warning notices and extension notices, and so forth). The buyers disputed the sellers' claim, but, nevertheless, when the embargo was lifted on July 2, 1973, they asked for the 40 per cent. then permitted by the authorities. The shippers shipped one half of it — that is as to 20 per cent. under a bill of lading dated July 17, 1973 on the *Olivia Maersk*. The sellers appropriated it to the buyers at the contract price — the very low price of $135.25 — and the buyers accepted that shipment. That was clearly a waiver by the buyers of any claim for damages for the 20 per cent.

*The Pegasus*

The shippers loaded the other half — that is, the second 20 per cent. — under a bill of lading dated July 18, 1973, on the *Pegasus*. The sellers gave notice of appropriation of it to the buyers on Aug. 14, 1973. The buyers all down the line accepted it in several telexes saying that they regarded it as part of the 40 per cent. allowed to be exported. On Aug. 15, 1973 the buyers said: "We insist on delivery of min. 40% of the contractual lot". They also claimed delivery of the balance of 60 per cent. to make up the 100

per cent. which should have been shipped in June. They said that they reserved all their contractual rights.

In due course the sellers on Sept. 17 and 19, 1973 presented the shipping documents relating to the 20 per cent. on the *Pegasus*. On getting the documents the receivers made enquiries so as to see if the notices had been passed on promptly down the string as the contract required. They found that there was a defect in the line of communication. It was this. One buyer in the string had taken nine days before passing on the notice of appropriation: whereas cl. 10 of GAFTA 100 required it to be sent on to the next buyer on the same day (if received before 16 00 hours) or on the morrow (if received after 16 00 hours). On discovering this failure on Sept. 21, 1973 the buyers rejected the documents for the 20 per cent. on the *Pegasus*: and claimed damages. They also claimed damages in respect of the outstanding 60 per cent. for which no notice of appropriation was ever made.

The sellers claimed that the buyers had waived the defect — by accepting the notice of appropriation on Aug. 14, 1973 without demur; and by treating the shipment as good all the time. On the face of it, the sellers held the shipping documents for the benefit of the ultimate receivers and presented them to them. They did not resell the goods at a profit, as they might have done, but tendered them at the contract price (the low price of $135.25) to the buyers. They thus changed their position on the basis that the notice of appropriation was good.

This raises a nice point on the law of waiver. It must be observed that as between these intermediate sellers and these intermediate buyers — in the long string — no one had any knowledge of the nine day gap except the one who was responsible for it. Everyone in the string assumed that the notice of appropriation was passed down the line of communication in the time required by GAFTA 100. The only buyer who defaulted was the one who allowed nine days to elapse before serving it. Are all the others to suffer on that account? I do not think so. If the intermediate buyers down the line and ultimate receivers sought to challenge the notice of appropriation, they ought to have done so when they first received it. They ought to have made enquiries then of the buyers further up the string. They ought not to have treated it as good as they did — right up to the time when the shipping documents were presented.

It seems to me that the buyers down the line by their conduct led the intermediate sellers to believe that the notice of appropriation was good. On the face of it the sellers acted. They forwarded the shipping documents for

acceptance. The receivers ought, I think, to have accepted them. If they had done so, they would have received the second 20 per cent. at the contract price — which is surely fair to all — just as the first 20 per cent. on the *Olivia Maersk*.

The receivers seek to avoid this result by relying on the telexes in which the contractual rights were reserved. I do not think this was sufficient. If their conduct was such as to constitute a waiver, they cannot by such a formula escape the consequences of it. In any case, as I read the telexes, the reservation was as to the contractual rights in respect of the 60 per cent. which was not delivered. It did not extend to the 40 per cent. which was tendered.

The modern law as to waiver was stated by this Court in *Panchaud Freres*, [1970] 1 Lloyd's Rep. 53 and *Wm J. Alan & Co.* v. *El Nasr Export & Import Co. Ltd.*, [1972] 1 Lloyd's Rep. 313; [1972] 2 Q.B. 189, where I said at pp. 323 and 213:

. . . If one party, by his conduct, leads another to believe that the strict rights arising under the contract will not be insisted upon, intending that the other should act on that belief, and he does act on it, then the first party will not afterwards be allowed to insist on the strict legal rights when it would be inequitable for him to do so . . .

That principle was applied by Mr. Justice Mocatta in two cases on cll. 21 and 22 of GAFTA 100. They were *Finagrain* v. *Kruse*, [1976] 2 Lloyd's Rep. 508 (at pp. 524 and 529) on Apr. 12, 1976: and *Bremen* v. *Vanden*, [1977] 1 Lloyd's Rep. 133 (at pp. 164 and 165) on July 13, 1976. Both were reserved judgments by Mr. Justice Mocatta.

In both of those cases the Court of Appeal reversed Mr. Justice Mocatta, but he was well restored by the House of Lords in *Bremer v. Vanden*, [1978] 2 Lloyd's Rep. 109, Lord Wilberforce said significantly at p. 116:

. . . I prefer the judgment of Mr. Justice Mocatta (in favour of waiver) to that of the Court of Appeal . . .

and Lord Salmon (at p. 126) said in effect that the Court of Appeal had gone wrong in the way they interpreted the need for an unequivocal representation. Lord Salmon said:

. . . To make an unequivocal representation or waiver, it is not necessary for the buyers to say — "We hereby waive it". It is quite enough if they behave or write in such a way that reasonable sellers would be led to believe that the buyers were waiving any defect there might be in the notice and were accepting it as effectively extending the date for delivery . . . If the buyers, by their telexes or by their

conduct lead the sellers to believe that they accepted the notice as a good notice, they necessarily waived any defect it might contain, whether they were aware of it or not . . .

Viscount Dilhorne (at p. 120) took the same view, analysing the position in just the same way, Lord Russell of Killowen (at p. 130) agreed with both Lord Wilberforce and Lord Salmon: and Lord Keith of Kinkel (at p. 131) agreed entirely with Lord Wilberforce. The result is that the House unanimously preferred the judgment of Mr. Justice Mocatta to that of the Court of Appeal. So I turn to the judgment of Mr. Justice Mocatta. He held at p. 164 that—

. . . despite the fact that there are on some occasions considerable delays in the passing of notices of appropriation down the string . . .

and despite the fact that telexes down the line were expressly "subject to all reserves"; nevertheless Mr. Justice Mocatta held that the buyers had waived their strict rights both in relation to the form and also to the timing of the notices. They had done this by not questioning in any way the form of the notice and by saying they were prepared to accept 40 per cent.

I regard the decision of the House in *Bremer v. Vanden* as a most important decision on waiver. As Mr. Davenport said, it is the final step in the series of *Central London Property Trust Ltd. v. High Trees House,* [1947] K.B. 130; *Rickards v. Oppenheim,* [1950] 1 K.B. 616; *Panchaud Freres S.A. v. Etablissements General Grain Co.,* [1970] 1 Lloyd's Rep. 53; and *W. J. Alan & Co. v. El Nasr Export & Import Co., Ltd.,* [1972] 1 Lloyd's Rep. 313; [1972] 2 Q.B. 189. Applied to cases of waiver in GAFTA cases, it may be stated thus: If a buyer, who is entitled to reject goods or documents on the ground of a defect in the notices or the timing of them, so conducts himself as to lead the seller reasonably to believe that he is not going to rely on any such defect — whether he knows of it or not — then he cannot afterwards set up the defect as a ground for rejecting the goods or documents when it would be unfair or unjust to allow him to do so. It is unfair and unjust to allow it when the sellers all down the line have acted on the belief that the notices were good and have presented shipping documents accordingly. The sellers here allowed the buyers to have the goods at the very low contract price instead of the higher market price which they might otherwise have obtained. Fair dealing requires that the buyer should take them rather than seize upon some defect to reject them; simply to get more damages.

In my opinion the buyers ought to have taken up the shipping documents for the 20 per cent. on the *Pegasus* at the contract price of $135.25,

Not having done so, they cannot recover any damages in respect of that 20 per cent. They can, however, recover damages in respect of the 60 per cent. which were never delivered: and the damages should be assessed at July 11, 1973 (as decided by the House of Lords). I would allow the appeal in respect of the *Pegasus* shipment, but dismiss it in respect of the outstanding 60 per cent.

Lord Justice STEPHENSON: The sellers have sought to excuse their failure to fulfil their contract by providing a June shipment of 200 tonnes of soya bean meal. Their excuse is an embargo by the U.S. Government making fulfilment of that part of their contract impossible. That embargo they claim amounted to a prohibition which prevented them from fulfilling their contract within cl. 21 of GAFTA 100 and to force majeure which delayed the fulfilment beyond the contract period within cl. 22 of GAFTA 100. Arbitrators and the Board of Appeal have rejected that claim of theirs. Mr. Justice Goff did not decide whether that rejection of that claim was right because the House of Lords had not then given its decision in *Bremer Handelsgesellschaft m.b.H. v. Vanden Avenne-Izegem P.V.B.A.,* now reported in [1978] 2 Lloyd's Rep. 109.

I find nothing in the facts found in the case stated by the Board of Appeal or in the speeches of their Lordships in *Bremer v. Vanden* to invalidate the conclusions in par. 40 of the board's case that—

. . . (a) there was no prohibition of export by the Government of the country of origin which prevented fulfilment of the Contract and no cancellation of the Contract by reason of Clause 21 of GAFTA 100 [and] (c) there was no "force majeure" which delayed shipment in accordance with Clause 22 of GAFTA 100.

The sellers relying on cll. 21 and 22 had to prove that the embargo prevented fulfilment under cl. 21 and occasioned delay under cl. 22. By the express terms of those clauses the sellers were obliged, "if required" by the buyers "at any time", to "produce proof to justify their claim for cancellation" under cl. 21 and to supply "satisfactory evidence justifying the delay or non-fulfilment" under cl. 22. They could not prove that cancellation or prevention, delay or non-fulfilment was caused by the embargo simply by proving the existence of the embargo. That would make breach of contract too easy. They had to prove what exactly the embargo prevented or prohibited, how absolute it was, what exceptions or loopholes it allowed or what acts it did not permit or prohibit, and that the part of their contract which they did not

fulfil was not fulfilled because of the embargo. In *Bremer* v. *Vanden* the House of Lords decided that the same defendants, who were then shippers, as well as sellers, did not have to prove that they had the goods ready to ship within the contract period and a ship to carry them in, or that they could not have bought goods afloat. Mr. Davenport has submitted that the House also decided that the sellers did not have to prove that they had no goods on lighters and none in course of loading, which would be used to fulfil the June shipment. I disagree.

In *Bremer* v. *Vanden* the GAFTA Board of Appeal's award had found that when the embargo came into force on June 27, 1973 none of the vessels chartered to load the sellers' soya bean meal had commenced to load ((par. 8) quoted by Lord Salmon in [1978] 2 Lloyd's Rep. at p. 123) and during the period between June 27 and July 2 when the embargo was absolute no loading took place or was able to take place into any vessel which the sellers had procured (par. 10A): see [1977] 1 Lloyd's Rep. at p. 138. Those findings shut the sellers' evidence had stopped the "loopholes" opened by that exception to the embargo, as this Court had decided in *Tradax* v. *Andre*, [1976] 1 Lloyd's Rep. 416 the sellers had to do. Mr. Justice Mocatta followed that decision on this point and held that the sellers had done so: [1977] 1 Lloyd's Rep. at p. 159. And it was accepted by Counsel that they were not within the loopholes: see [1977] 2 Lloyd's Rep. at p. 342 per Lord Justice Browne referring to par. 10A of the award and disclaiming any real difference of opinion between himself and Lord Denning, M.R., in *Tradax* v. *Andre*. Hence Lord Wilberforce's statement in [1978] 2 Lloyd's Rep. at p. 112 that—

. . . This exception, referred to in the case as "the loophole", was not available to the sellers [—and the statement of Lord Russell of Killowen (p. 129) that—] . . . the seller had no soya bean meal within these loopholes . . . [—the exception(s) for soya bean meal on lighter or in course of loading.]

But though the burden of proving that the embargo as limited by the exception prevented fulfilment had been discharged by the sellers to whom it rested, both the Court of Appeal and the House of Lords held that the sellers did not have to prove that they had goods ready to ship within the contract period and a vessel to ship them. Once they had proved the total prohibition of export (as limited by the exception) it was for the buyers to prove that the sellers would not have performed the contract anyway. Lord Justice Megaw in rejecting the buyers' argument to the contrary on the causation point stated the burden of proof

(Lord Justice Browne agreeing with him) in this way, [1977] 2 Lloyd's Rep. at pp. 336-337:

. . . If a prohibition of export has intervened and the buyers seek to say that the sellers, though they could not have complied with the contract because of that prohibition, nevertheless cannot rely on it because they could not or would not have fulfilled the contract anyway, the burden of proving the allegation would be on the buyers, not the sellers. Accordingly, on the peculiarly nicely-balanced finding, agreed by the parties in par. 8A of the award, the buyers would fail on this point. The burden is, of course, on the sellers to show that the prohibition operated, so that they could not in accordance with its terms have shipped the goods in respect of which they claim prevention. If there are "loopholes", such as the right to load goods already in lighters or such as an opportunity to apply for a licence which, if obtained, would enable the sellers to perform by the due date, the burden of proof is on the sellers to show that these possible exemptions did not avail. But once the sellers have discharged that burden, it would, at the best for the buyers, be for the buyers to show that the sellers would not have performed the contract anyway. This is the same principle as the so-called "self-induced frustration" principle; where, once a frustrating event is proved, it is for the other party to show, if he can, that the party who relies on frustration had himself brought about the frustration.

Only one authority was referred to in support of the buyers' proposition. Reference was made to dicta of Lord Denning in *Tradax Export S.A.* v. *Andre & Cie S.A.*, [1976] 1 Lloyd's Rep. 416, at p. 423:

If he relies on cl. 21, he would have to prove that the shipper, at the head of the string [in that case the seller was not himself the shipper] had goods ready to ship and that shipment was prevented by the prohibition of export.

It is, I believe, conceded by Mr. Mustill that that dictum, if taken literally, would be wider than he would seek to justify. The mere fact that a seller did not have goods ready to ship on June 10, if an embargo was suddenly imposed on that date, could not in itself prevent him from relying on the prohibition. But in any event, as was pointed out in the course of the argument, it appears from the judgment of Lord Justice Browne at p. 425 that Counsel who appeared for the buyers in *Tradax* v. *Andre* conceded

that if there was in force at the end of the contract period an absolute prohibition of export from all ports from which the goods

could be shipped under the contract, the sellers would be protected by the clause without further proof . . ,

As I understand the speeches in the House of Lords on the causation point, it was only those words of Lord Denning, M.R., in *Tradax v. Andre* on their literal interpretation which were not accepted. Lord Wilberforce approved the judgment of Lord Justice Browne in *Tradax v. Andre*, and thought the judgment of Lord Justice Megaw in the case under appeal was correct in accepting it, on what the sellers had to prove: [1978] 2 Lloyd's Rep. at p. 114. I cannot read into Lord Wilberforce's speech or the other speeches of their Lordships, or extract out of them, any such disapproval of the rest of these judgments on the causation point as Mr. Davenport invites us to find in them. It would, I think, be open to a seller to discharge the burden of proving that he was prohibited by the embargo from fulfilling a particular contract or particular contracts by proving that he had acted reasonably in appropriating the soya bean meal which he had to his other contract or contracts, as suggested by Lord Denning, M.R., in *Tradax v. Andre*, and in the case of *Intertradex v. Lesieur-Tourteaux*, [1978] 2 Lloyd's Rep. 509. But that question does not arise on the facts of this case.

What I understand to have been decided in *Bremer v. Vanden* seems to me to accord with generally accepted principles of the law of contract and their application to clauses like cll. 21 and 22, whether called exemption or exclusion clauses or cancellation or frustration clauses. Applied to this case it does not, in my judgment, assist the sellers. I do not think that Mr. Justice Brandon's decision in *Bunge v. Kruse*, [1979] 1 Lloyd's Rep. 279 throws any doubt on the extent of what the sellers have to prove in this case. If it does, I would respectfully disagree with it. They have not proved all they have to prove to come within cll. 21 and 22, apart from any questions of notice or complying with the contractual procedure there laid down.

Have the buyers then waived their contractual right or rights to have 200 tonnes shipped in June? Or estopped themselves from asserting that right or those rights?

Here we have not got the benefit of an express answer from the Board of Appeal in the case, though a negative answer is to be implied from their answers in par. 40. The question of waiver or estoppel was raised by the buyers' contention in par. 30 and answered by the sellers' contention in par. 36. We have, however, the benefit of the learned Judge's exhaustive review of the relevant telexes with his comments and conclusions: [1977] 2 Lloyd's Rep. 467, at

pp. 477-483. I respectfully agree with his findings, that there was no unequivocal representation by the buyers that they would accept, in respect of the June shipment, July bills of lading; no reliance upon any such representation by the sellers; and no such representation by the buyers that they were waiving their right to reject the *Pegasus* shipment or documents. I cannot find that he made any mistake of law or fact in rejecting the sellers' arguments on waiver or estoppel.

The Judge went for guidance to the decision of this Court in *Finagrain S.A. Geneva v. P. Kruse Hamburg*, [1976] 2 Lloyd's Rep. 508 and applied the principles there stated. It is suggested by Mr. Davenport that we should now seek such guidance in *Bremer v. Vanden*, particularly in the speech of Lord Salmon at pp. 126-127 of the report, and will there find a different principle. I agree with Lord Denning, M.R., that that is a most important decision on waiver; but I regret that I cannot interpret it as he does, and I share Lord Wilberforce's view (at p. 116) that the issue of waiver did not raise any question of principle. I do not read anything said in the House in *Bremer v. Vanden* as invalidating the judgments in *Finagrain v. Kruse*, a case cited to their Lordships and referred to by Lord Wilberforce without disapproval (at p. 112), or as qualifying the statement of Lord Hailsham of St. Marylebone in *Woodhouse v. Nigerian Produce Marketing Co. Ltd.*, [1972] 1 Lloyd's Rep. 439; [1972] A.C. 741 at pp. 445 and 755, in which the need for a clear and unequivocal representation is stated. It was, I think, Lord Salmon's opinion that the representation must be unequivocal but that it must also be such as to lead reasonable sellers to believe that the buyers were waiving their contractual rights and accepting goods which were not shipped in accordance with the contract. This is made clear to my mind by the three sentences of which the last has been quoted by Lord Denning, M.R. They read;

. . . I think that any reasonable sellers would rightly have inferred that the buyers were accepting the notice as a valid and effective notice under cl. 22 save that the reference to 500 tonnes should be altered to 280 tonnes. To put it another way, the buyers made an unequivocal representation that they were treating the notice as a valid and effective notice under cl. 22. To make an unequivocal representation or waiver it is not necessary for the buyers to say, "We hereby waive" . . .

I cannot accept the suggestion that Lord Salmon turned his back on what he had there said as he took a final step along the road leading from *High Trees* case.

s with his
inequivocal
they. would
ment, July
any such
d no such
they were
e *Pegasus*
ind that he
ejecting the
ipel.

he decision
*neva* v. *P.*
ep. 508 and
ited. It is
we should
v. *Vanden,*
Salmon at
there find a
d Denning,
decision on
iterpret it as
ice's view (at
tot raise any
id anything
*Vanden* as
*inagrain* v.
idships and
co without
alifying the
Marylebone
e *Marketing*
439; [1972]
ich the need
isentation is
in's opinion
iuivocal but
i reasonable
vere waiving
pting goods
ince with the
mind by the
st has been
y read:

sellers would
buyers were
ind effective
reference to
280 tonnes
ers made an
it they were
ind effective
unequivocal
iot necessary
y waive'' . . .

that Lord
he had there
ing the road

I do not understand Lord Salmon's reference to the buyers waiving any defect in the notice under cl. 22 "whether aware of it or not" as laying down any principle that there can be waiver or equitable estoppel on the part of someone who does not know that his rights have been infringed or has not, at the least, such obvious means of knowing that his rights have been infringed that the other party can reasonably assume that the party waiving or estopped is acting with knowledge of their infringement. Lord Salmon was, I think, referring to a patent defect which could only be missed by not reading the notice or not knowing the law. Here again what matters is the conduct of the "waiving" or "estopped" party, these buyers, and its effect on a reasonable seller, or a reasonable person in the position of the other party, these sellers. And if the buyer so acts as to lead a reasonable seller in these sellers' shoes to believe that he was waiving his rights or accepting a non-contractual shipment as a fulfilment of their contract, and the seller does believe it, the buyer cannot be heard to say, "I did not notice the obvious breach of contract on your part which gave me a right to complain or refuse". But this has no application to matters peculiarly within the seller's knowledge or matters of which he can more easily obtain knowledge than can the buyer.

Here the sellers, if they applied their minds at all to the state of the buyers' knowledge and made no unreasonable assumptions, would have appreciated that the buyers would not know what soya bean meal his sellers had or could get, or whether the sellers had soya bean meal in lighters or in course of loading, and would not know that there had been the nine days' delay in an appropriation further along the string until they got the *Pegasus* documents. And I would not think it unreasonable for the buyers to keep the documents two or three days before rejecting them, even if the sellers had proved that they relied and acted upon any contrary representation of acceptance during those few days.

The facts in *Bremer* v. *Vanden* on which the House reversed the decision of the Court of Appeal and restored Mr. Justice Mocatta's finding of waiver were, in my opinion, clearly distinguishable from the facts of the instant case. There the buyers did complain of the notice under cl. 22, but of one particular defect only, namely that it referred to 500 tonnes instead of 280 tonnes, and thereby negatived any other objection to the notice. There the buyers never suggested in any telex before Aug. 3 that the sellers were in default. There the buyers by a telex of July 24 accepted the force majeure extension under cl. 22. Here the buyers stated that the sellers were in default in their

telex of July 12. Here the buyers not only reserved their contractual rights but repeatedly claimed that contractual shipment was possible by telexes of July 23 and 27 and Aug. 20. They were not, I respectfully agree with Mr. Justice Goff, merely mouthing a formula, or "blowing hot and cold", but justifiably and effectively preserving their rights to reject or claim damages for breaches of contract when they knew of them.

In my judgment, he was justified in holding that reasonable sellers could not have regarded anything the buyers telexed or did or did not do as a clear and unequivocal representation that they were willing to accept post June bills of lading in respect of the June shipment or were abandoning their contractual right — on the judge's construction of cl. 10(b), which I accept — to reject the *Pegasus* documents if it should be discovered later that the notices of appropriation were not correctly passed down the line in accordance with the time schedule.

I am accordingly of opinion that the damages should be assessed as at July 11, 1973 both on the 119.50 tonnes and on the 40 tonnes. So I would dismiss the appeal subject to any variation in the amount of damages necessitated by the substitution of July 11 for July 10.

**Lord Justice SHAW:** The primary question to be decided is whether in the circumstances which have been recounted in the judgment of Lord Denning, M.R., the sellers can, under cl. 21 or cl. 22 of their GAFTA 100 contract escape liability for their failure to deliver in 1973 the June shipment contracted for.

Either of those clauses would operate to exempt sellers from such liability if it were the fact that the failure to deliver was a consequence of the embargo imposed on June 27, 1973. On general principles it would be for the defaulting sellers to prove that their non-delivery was caused by the embargo; and this is reinforced by the express terms of GAFTA 100. The concluding words of cl. 21 state that—

. . . if required sellers must produce proof to justify their claim for cancellation [—while cl. 22 ends with the provision that—] Buyers shall have no claim against Sellers for delay or non-shipment . . . provided that the Sellers shall have supplied to Buyers . . . satisfactory evidence justifying the delay or non-shipment.

The practical issue is how much is it incumbent on sellers to prove in order to establish that they are entitled to exoneration from liability by reason of the embargo? The simple answer is that it must be shown that because of the embargo delivery had become impossible. The impossibility being related to

the embargo, it follows that the extent and scope of the embargo must be precisely delineated and delimited. Thus, if goods outside the embargo corresponding to the contract description are or might be available to the seller under an existing contract without the necessity of his going into the market to find them, he does not bring himself within the exemptions of cll. 21 or 22.

The embargo declared on June 27, 1973 was absolute but not fully comprehensive. It did not apply in all situations. Thus soya bean meal on lighters or in the course of loading before a certain time did not fall within it. In *Bremer v. Vanden*, [1978] 2 Lloyd's Rep. 109 the House of Lords upheld the view that the shippers had to establish that they were caught by the embargo within its defined limits. In the present case the sellers are positioned somewhere in a succession of sellers and buyers. The original shippers are unidentified and their situation in regard to the application of the embargo when it was declared on June 27 is unknown. Counsel for the sellers has contended that for the purpose of bringing them within the exemption of cl. 21 or cl. 22, it is incumbent on the sellers to show only that there was, at material times, a general embargo on the export of soya bean meal and that they were not able to make the deliveries they had contracted for because their suppliers had not delivered to them.

This is a proposition which at least accords with the commercial realities of the situation which developed after the embargo had been imposed. The question is whether this is a consideration which should or could affect the legalities of the matter. To demand proof from a helpless seller of matters he may never be able to discover at any rate in time, puts upon him what might seem an unconscionable burden. Nonetheless, if there was a shipper at the head of the string who could have made appropriations of goods outside the embargo — or to use the language adopted in *Bremer v. Vanden* to whom the "loopholes" in the embargo were available, the string seller would have no protection from liability. If this is a harsh view in the commercial sense, it cannot be refuted on a legalistic basis. The practical answer must be that if an intermediate seller subscribes himself to a contract in the form of GAFTA 100 he must be prepared to take the consequences.

I therefore agree with the preceding judgments that the sellers fail in this contention.

The issue of waiver presents more apparent difficulties. What is beyond contention is that waiver of contractual rights is not to be readily inferred or assumed. On the contrary, in human affairs and more especially in a commercial context the probabilities are against the voluntary sacrifice of vested rights which are or may be of material value. What is said to constitute a waiver must always be scrutinised with this in mind. However there are situations even in a mercantile environment when insistence on full performance may be commercially inexpedient and may prove less profitable than the result of relaxing the right to and the demand for strict performance. Accordingly, so it seems to me, whether the conduct of a contracting party may amount to a waiver must be determined by reference to all the prevailing circumstances. It need not be such as to amount virtually to an express declaration that this or that right is waived or surrendered. If in the prevailing conditions affecting the position of the parties to a contract the conduct of one of them affords a reasonable foundation for the inference that he is prepared to forgo any right or rights he may have in a certain regard and the other contracting party does draw that inference and persists in the residual contractual relationship upon that basis, then whether it be regarded as waiver or estoppel the forgoing of those rights cannot thereafter be gainsaid. This seems to me the effect of the observations of Lord Salmon in the *Bremer v. Vanden*, (at pp. 126-127) and it is consonant with other of their Lordships' views expressed in that case. In my judgment, if I may say so with due respect, this is a standpoint which accords with the realities of mercantile activity and which conduces to the vitality of the world of commerce.

In the present case I see no difficulty, on the basis I have indicated, in distilling from the stream of telexes sent by the buyers in the circumstances which then obtained coupled in regard to the *Pegasus* shipment with their delay in rejecting the documents a strong indication that they waived their right to treat the sellers as being in default. The oft repeated statement that they "reserved all their contractual rights" cannot of itself dissipate the inferences to be drawn from their contemporaneous collateral conduct. Their Counsel sought to reinforce his argument against the implication of waiver by laying emphasis on the buyers' ignorance as to whether, on the facts if and when they became known, the sellers could claim to be exonerated from liability for failing to deliver as required by their contract. I see no reason, however, to limit the effect of waiver to rights known to exist. It may be embracing enough, and so intended, as to forgo rights which *might* exist in regard to a particular contract or in a particular context. What the telexes suggest is that, so long as the market made it worthwhile, the buyers were concerned to get the goods contracted for even if the deliveries were not contractual. No

against the which are or t is said to e scrutinised re situations ment when e may be ly prove less g the right to performance. whether the amount to a ference to all need not be an express is waived or g conditions to a contract a reasonable e is prepared ay have in a tracting party ersists in the p upon that as waiver or rights cannot ns to the rd Salmon in 127) and it is rdships' views ment, if I may a standpoint of mercantile vitality of the

ficulty, on the ing from the buyers in the ed coupled in ith their delay ong indication at the sellers as ted statement ractual rights'' ferences to be eous collateral o reinforce his n of waiver by gnorance as to n they became be exonerated ver as required n, however; ghts known to ough, and so h might exist in in a particular: is that, so long ille, the buyers contracted for ontractual. No

tinge of ambivalence in this regard is introduced by such formulae as ''without prejudice to our rights'' or ''we reserve our contractual rights''. The implication of waiver survives such mild dilution where the surrounding circumstances are sufficiently cogent in themselves.

In this aspect of the appeal I find myself in complete agreement with the views stated in the judgment of Lord Denning, M.R., and I would allow the appeal to the extent and in the manner there indicated.

[Order: Appeal allowed in part. Appellants to pay half respondents' costs. Application for leave to appeal to the House of Lords refused.]

## COURT OF APPEAL

July 20, 21, 24 and 25, 1978

WOOLCOTT

v.

EXCESS INSURANCE CO. LTD.

AND

MILES, SMITH, ANDERSON
AND GAME LTD.

Before Lord Justice MEGAW,
Lord Justice SHAW
and Lord Justice WALLER

Insurance (Fire)—Non-disclosure—Insurance brokers—Plaintiff did not disclose previous convictions to insurers—Property destroyed by fire—Whether non-disclosures material—Whether brokers aware of plaintiff's criminal record—Whether insurers could avoid policy—Whether insurers entitled to an indemnity from brokers.

By an agreement, in writing, dated Feb. 5, 1971, the defendant insurers authorised the third party (the brokers) to bind insurance for the defendants' account in accordance with the terms and conditions of the agreement.

On Apr. 28, 1974, the brokers effected for the plaintiff, insurance with the defendants covering the plaintiff's house ''Greenacres'' together with all risks for a total sum of £32,500, subject to the terms and conditions of the defendants' household comprehensive policy.

The property and contents were destroyed by fire on Aug. 16 and 17, 1974. The defendants, while admitting the policy, the fire and the resultant loss from one of the perils insured against, contended that they were not liable to the plaintiff under the policy because of the failure by the plaintiff to disclose his criminal record in his proposal for insurance.

The plaintiff admitted that he had a serious criminal record culminating in a sentence of 12 years imprisonment for robbery in April, 1960, and although he did not contend that he had disclosed his criminal record or any part of it to the defendants, he asserted that the brokers, who issued the policy on behalf of the defendants, knew that he had some criminal record, certainly at some time before the peril of fire destroyed his home and contents.

The defendants issued a third party notice claiming an indemnity, against the plaintiff's claim, from the brokers, based on the plaintiff's assertion that the brokers were aware of his criminal record. The brokers denied any such knowledge.

———— Held, by Q.B. (CAULFIELD, J.), that (1) the plaintiff's criminal past affected the risk and ought to have been disclosed by him;

EASTERN CARIBBEAN SUPREME COURT
TERRITORY OF THE VIRGIN ISLANDS

IN THE HIGH COURT OF JUSTICE
(CIVIL)

CLAIM NO. BVIHCV 64 of 2013

BETWEEN:

CLEARLIE TODMAN-BROWN

Respondent/Claimant

and

THE NATIONAL BANK OF THE VIRGIN ISLANDS LIMITED

Applicant/Defendant

Appearances:

Dr. Joseph S Archibald QC for the Respondent/Claimant
Mr. Paul Dennis QC with him Ms. Akilah Anderson for Applicant/Defendant

-----------------------------------------------
2013: July 30
August 16
-----------------------------------------------

JUDGMENT

Watchwords: – Summary Judgment Rule 15.2 – Striking Out – 26.9(3)
Considerations in exercising the discretion – whether there is a triable issue

1

**A727**

[1]    **BYER J.:-** By application dated the 23ʳᵈ day May 2013 the Applicant/Defendant sought the following relief as against the Respondent/Claimant:

> (a)  **Summary Judgment be entered in favour of the Defendant under CPR 15.2 (a) on the basis that the Respondent/Claimant Clearlie Todman-Brown (the Claimant) has no real prospect of succeeding on the claim; alternatively**
> (b)  **The Claimant's claim be struck out in its entirety pursuant to CPR 26.3 (1) (b) on the basis that it discloses no reasonable grounds for bringing the claim**
> (c)  **Costs of this application be granted to the Defendant**
> (d)  **Any such further or other order as this Honorable Court sees fit."**

[2]    The essence of the application therefore requires that the case as filed before the Court has to be examined in its totality.

**The Claimant's Case**

[3]    The Respondent/Claimant by her statement of claim filed on the 25ᵗʰ February 2013 stated that in May 2007 she obtained a loan from the Applicant/Defendant Bank to construct a home on her piece of land, Parcel 147. Pursuant to the said agreement with the Applicant/Defendant Bank the Claimant charged by way of mortgage the said parcel 147 to the Bank. During the course of the construction, the relationship between the Respondent/Claimant and her contractor deteriorated which resulted in the failure of the contractor to complete the home for the Respondent/Claimant on time or at all. Out of those set of circumstances, the Respondent/Claimant filed suit against the Contractor for breach of contract and was successful.

[4]    The Respondent/Claimant as a result of this failure by the contractor fell into major financial issues and by her own admission, she fell into arrears with the Applicant/Defendant Bank. Upon this state of affairs, the Respondent/Claimant attempted to request of the Bank, an extension of the facility to allow her to further finance the construction and to complete the building. This was refused.

[5]    Upon the Applicant/Defendant issuing the statutory notices to exercise its power of sale, the Respondent/Claimant sought to move the court seeking several

2

**A728**

declarations from the Court based on the allegation of a failure on the part of the Applicant/Defendant Bank in upholding what the Respondent/Claimant says were certain obligations and undertakings due to her and /or a negligence in their dealings with the Respondent/Claimant. The Respondent/Claimant therefore claimed by paragraph 11 of the Statement of Claim the following:

[6] *"Particulars of Negligence:*

*(1) Undertaking as a bank a duty of care towards the Claimant to inspect the building works during the construction of the house on Parcel 147 and to ensure that money paid out of the Claimant's Loan funds under the Instrument of Charge and according to the Construction Drawdown Schedule, properly matched the stipulated stages of the works set out in the said schedule.*

*(2) Breaching or failing or abandoning that duty of care either by lack of due inspections or by careless inspections or by careless reporting of such inspections or by careless assessment of such inspections or by carelessly disbursing the Loan funds direct to the building contractor without first assessing whether the works had reached the stipulated stages relating to the monies which the Bank paid to the building contractor.*

*(3) Paying the building contractor 96.73% of the Loan funds for all stages of the works which were in fact 40% incomplete.*

*(4) Res ipsa loquitur (i.e. the matter speaks for itself)*

[7] *Particulars for breach of contract*

*(1) The Defendant having undertaken to the Claimant to inspect the works from time to time before paying out any money to the building contractor upon his request at specified stages of the building works, paid out $677,600 of the agreed construction loan funds of $700,500 to the building contractor covering all stages up to completion, leaving only $22,900 retention unpaid in November 2008, in circumstances where the Trial Judge found that the building contractor abandoned the building works with 40% of the building*

3.

**A729**

*incomplete and uninhabitable for any of the purposes for which it was intended, and requiring a further $431,00 as estimated in Trial testimony by the building contractor's expert witness to complete the building works.*

(2) *Failure to inspect the building project properly or to assess the stages of the works in relation to the payments required by the building contractor.*

(3) *Paying to the building contractor 96.73% of the Loan funds for all stages of the works which were in fact 40% incomplete.*

(4) *Res ipsa loquitur (i.e. the matter speaks for itself.)*

[8]     *Particulars of loss and damage*

(1) *Loss of value of the house agreed to be constructed on Parcel 147*

(2) *Loss of expected rents from the rental units designed for the house*

(3) *Loss of the expectation of the Claimant's residence in the house thereby resulting in the Claimant having to incur rents from January 2009 up to the present time*

(4) *Loss of monies incurred for additional bank interest due to inability to meet the bank loan payments brought about by the financial disaster in the Defendant's paying out practically all the Loan funds to the building contractor when the building was 40% incomplete and uninhabitable for any of its intended purposes."*

[9]     The Respondent/Claimant therefore prayed for the following declarations:

(1) *"A Declaration that the intended sale of land Parcel 147 of Black 2438B of the West Central Registration Section in Tortola including the 60% completed house thereon ("Parcel 147"), by the Defendant as Chargee will be unlawful and inequitable*

4

**A730**

having regard to the facts that the Defendant as Chargee has by letter of 3 September 2012 coupled with a statutory three-months notice also dated 3 September 2012 under Section 72 of the Registered Land Ordinance 1970, Cap 229, addressed to the Claimant, called for US696,156.51 and other monies to avoid sale of Parcel 147, and that up to the present time, after expiry in December 2008 of the said statutory notice, the Defendant has not indicated any market value or the best price available or any upset price to be considered for the purposes of the sale of Parcel 147.

(2) A Declaration that any such sale without first ascertaining the market value or the best price available or any upset price for the sale by the Defendant of Parcel 147 will be unlawful and inequitable if effected by public auction; and will also be unlawful and inequitable if carried out by private treaty without the prior sanction of the Court.

(3) A Declaration that any such sale will be unlawful and inequitable if effected prior to the Defendant's response to the Claimant's letters of 5 November 2012 and 12 December 2012 and email of 9 January 2013 requesting the Defendant to disclose to the Claimant the Defendant's disbursements of the Loan funds under Instrument of Charge No. 1236/2007 together with a full print-out statement of the Loan account from its commencement until 3 September 2012 showing the monthly or other periodic calculation of interest with notation as to whether it is simple or compound interest.

(4) An injunction including urgent interim injunction against the intended sale of Parcel 147 by the Defendant, whether by public auction or private treaty

(5) An injunction including urgent interim injunction to restrain the Defendant from selling Parcel 147 by public auction or private treaty while Parcel 147 is the subject of current appeal

5

**A731**

*proceedings in the Court of appeal; which Appeal proceedings arise from a BVI High Court Civil action No 195 of 2009 between Clearlie Todman- Brown as Claimant and her building contractor Melvin Rymer d/b/a Melvin Rymer Architect Inc as Defendant in which a High Court judge the Honourable Madam Justice Indra Hariprashad –Charles after Trial gave written judgment in 113 paragraphs dated 11 May 2011 for the Claimant for against the building contractor in the amounts of $409,150 damages,%61,515 prescribed costs and $5475 expert witness fees plus statutory interest of 5% per annum thereon until payment of the judgment on the ground that the building contractor breached the building contract when he abandoned the project on Parcel 147 in December 2008 after receiving from the Defendant Bank $677,000 of the loan funds and left the building 40% incomplete and uninhabitable for the purposes for which it was intended; and the said judgment debt remains wholly unpaid up to the present time; And the Chief Justice The Honourable Mrs Janice Pereira at a status hearing of the Court of Appeal in Tortola on 15 January 2013 ordered and directed that the appellant Melvin Rymer should expedite the necessary steps of an appellant for hearing of the appeal, which is now expected to be heard in the Virgin islands during the week commencing 6 May 2013 .*

(6) *Damages for loss and damage suffered, as a result of the negligence and/or breach of contract of the Defendant as the Claimant's banker during the period 3 May 2007 to December 2008*

(7) *Interest*

(8) *Further or other relief*

(9) *Costs"*

**The Defendant's Case**

[10]   The Applicant/ Defendant Bank filed a defence on the 27th March 2013. By their defence the Applicant/Defendant Bank admitted that the Respondent/Claimant had entered into a loan agreement with them however it was not only for the construction of the building on Parcel 147 but also was to enable the refinancing of a former loan. The Respondent/Claimant was therefore required and did so

6

**A732**

charge, Parcel 147 to the Applicant/Defendant and was further mandated to make regular payments towards the loan.

[11] The Applicant/Defendant further averred that the Respondent/Claimant undertook to make the payments and that on her own admission; she fell into arrears which default triggered the right of the Applicant/Defendant to issue the statutory notices upon the default. Before any further action could be taken this Claim was filed which they aver has sought to fetter the right of the Applicant/Defendant to enforce their statutory rights of enforcement.

[12] The Applicant/Defendant further averred in their defense that they knew of the agreement that existed between the Respondent/Claimant and her contractor but that they were never a party to that agreement and were not therefore in a position to monitor this agreement on behalf of the Respondent/Claimant. Further the Applicant/Defendant averred and exhibited that all payments that were made to the contractor were made with the express consent and by the authority of the Respondent/Claimant herself and that there was therefore no duty to the Respondent/Claimant by the Applicant/Defendant to act on her behalf and that there was therefore no breach of any implied contract or otherwise or any negligence on their part in their dealings with the Respondent/Claimant.

[13] The Applicant/Defendant therefore denied each and every allegation indicating that they were not liable to the Respondent/Claimant at all.

### Applicant/Defendant's Submissions

[14] The applicants have sought to make their application in the alternative, pursuant to Part 15.2(a) of the CPR 2000 and 26.3(1) (b) of the CPR 2000. However the main thrust of the Applicant/Defendant's submissions was in relation to the operation of Part 15.2(a) of the CPR 2000. The gravamen of the power to be utilized under this Part is whether the Respondent/Claimant has a "*__real prospect of succeeding__*" in

7

its case. The Applicant /Defendant on that point referred the Court to the case of <u>Alfa Telecom Turkey Limited v Cukurova Finance International Limited and Cukurova Holdings AS</u>[1] and the dicta of Lord Hope in <u>Three Rivers District Council v Bank of England (No.3)</u>[2] and stated what was the nature of this test that is to be applied for the determination of a summary judgment:

> *"The rule...is designed to deal with cases which are not fit for trial at all: the test of no real prospect of succeeding requires the judge to undertake an exercise of judgment; he must decide the case without a trial and give summary judgment; it is a discretionary power; he must then carry out the necessary exercise of assessing the prospects of success of the relevant party; the judge is making an assessment of the case as whole which must be looked at ; accordingly the criterion which the judge has to apply under [CPR Pt 24] is not one of possibility; it is the absence of reality"*

[15]    The Applicant/Defendant therefore made the submission that in looking at the totality of the Respondent/Claimant's case, that the grounding of the cause of action was based on what they considered a bald unbuttressed assertion of the existence of an obligation or responsibility or duty on the Bank. This was however untenable, they argued in circumstances where no viable basis of duty or obligation had been pleaded or advanced in the evidence put before the court upon which the Respondent/Claimant sought to rely in opposition to the Application as filed.

[16]    The Applicant/Defendant further argued that the essence of the claim was contained and to be found in Paragraph 11 of the Statement of claim which only made bald assertions that the Bank was in default of its obligation to the Respondent/Claimant by failing to monitor and manage the contract the Respondent/Claimant had entered into with the contractor to which the Bank was not a party.

---

[1] HCVAP 2009/001
[2] [2001] 2 All ER 4513

8

[17]   The Applicant/Defendant in their arguments further advanced on the Court that despite these allegations and nebulous references to "equitable obligations" which they were accused of by the Respondent/Claimant of breaching, they argued that the Respondent/Claimant had failed anywhere in their pleadings to identify the basis of this obligation nor had they identified any agreement to do so. Having failed to do so they have failed to meet the threshold required to defeat the application for summary judgment.

[18]   Further, the Applicant/Defendant in summation argued that the pleadings without more were themselves so deficient that even if the Court refused to make the order pursuant to the Part 15.2 that that it was clear that the pleadings should be struck out under the provisions of Part 26.3 (1)(b) for failing to disclose any reasonable cause of action.

**The Respondent/Claimant's Submissions**

[19]   In response the Respondent/Claimant to the application categorically denies that the pleadings filed on her behalf disclose no viable claims against the Bank.

[20]   The point of contention with the Respondent/Claimant is that there was no need for the contract to be in writing as between the Bank and the Claimant. The pleadings show that the mere fact that there was a contract for the Bank to disburse funds, and did so to the Contractor even when he was in obvious default under his agreement was ipso facto proof that they had failed to protect the Claimant, from the contractor's default, and as such had breached their "equitable obligations" against which the Respondent/Claimant was entitled to claim relief.

[21]   The Respondent/Claimant argued that the claim having been made for substantial reliefs to which the Applicant/Defendant had not answered, made it a matter that could not be dealt with summarily but had to be one that would only have to be assessed by the Trial judge at that stage.

9

**A735**

[22]     The Respondent/Claimant further sought to rely on a document that was exhibited to the Court on the Affidavit in opposition filed by the Respondent/Claimant that was entitled "the Drawdown schedule". This was presented to the Respondent/Claimant by her contractor for the payment of all sums due under the construction contract, which the Respondent/Claimant contends directed the payments by the Bank despite there being no privity of contract with the Bank to this document. Thus they having sight of this document, the Respondent/Claimant contended, and they having paid monies even without checking actual progress amounted to prima facie negligence for which the Respondent/Claimant is entitled to be heard.

[23]     It would therefore not be equitable on a summary hearing to prevent the Respondent/Claimant from ventilating her issues before a full trial.

[24]     In support thereof the Respondent/Claimant sought to rely on several authorities including an extract from the <u>White Book</u> Volume 1 [2009]; M4 <u>Investments Inc v Clico Holdings ( Barbados) Inc</u>[3]; <u>Three Rivers District Council</u> case [4]; <u>Swain v Hillman and another</u> [5]all of which were entirely helpful.

**The Court's Analysis and Findings:-**

[25]     The application before the court is twofold both under the Part 15.2(a) of the CPR 2000 and in the alternative Part 26.3 (1) (b) CPR 2000. Part 15.2 CPR 2000 states

> *"The Court may give summary judgment in the Claim or on a particular issue if it considers that the –*
> *(a) Claimant has no real prospect of succeeding on the claim or the issue; or*
>
> *(b) Defendant has no real prospect of successfully defending the claim or the issue."*

---

[3] 68 WIR 65
[4] Op cit
[5] [2001] 1All ER 91

10

[26]     In support of this application the Rules provide that the same must be served on the other party to the proceedings with requisite evidence in support thereof[6].

[27]     It is therefore only upon examination of these documents filed together with the case as pleaded that a Court can make the determination of whether the party against whom the complaint is made has "*no real prospect in succeeding on the claim*" [7] In order to do so the Court must be invited to "*[assess] the prospects of success of the relevant party... It is the assessment of the case as a whole which must be looked at accordingly. The criterion which the judge has to apply under CPR 24 is not one of probability it is the absence of reality*"[8]

[28]     It is therefore imperative that the Court in making the requisite assessment that all of the evidence and pleadings as filed must be taken into account. In this instant case this comprises the Statement of Claim and Claim form filed on the 25th February 2013, the Defence filed on the 27th March 2013, the affidavit of Richard Lake in support of the Application filed on the 23rd May 2013 and the exhibits thereto and the Affidavits of the Claimant filed on the 10th July 2013 and the 25th July 2013 and exhibits thereto.

[29]     From these documents the Court understands that the Respondent/ Claimant's case is that the Applicant/Defendant had an obligation to monitor the terms and execution of a contract made between the Respondent/Claimant and her contractor. A contract to which admittedly the Applicant/Defendant was neither a party nor which governed the relationship as between the Applicant/Defendant and the Respondent/Claimant. It was this obligation that the Respondent/Claimant says has been breached.

---

[6] Part 15.4 and 15.5 CPR 2000
[7] Swain v Hillman  Op cit  at 96 per Pill LJ
[8] Three Rivers District Council and ors v Bank of England (no.3)  Op cit

11

**A737**                                                        Page 128

[30]     The Court also understands that the Applicant/Defendant has said there was no such obligation and that further all and any payments which are alleged to have been paid to the Contractor in breach of these so called obligations were with the express consent and authority of the Respondent/Claimant. These respective cases are buttressed as they are by the further evidence that was filed and the documents that were brought to the Court's attention.

[31]     The Court has made an in-depth assessment of the cases that were pleaded. The Court is in agreement with Counsel for the Applicant/Defendant that the lack of specificity in the pleadings surrounding the nature of the agreement which is alleged to have been breached, or that was so disregarded to amount to negligence on the part of the Applicant/Defendant is a fatal flaw. It is indeed trite law that a contract is binding as between parties need not be in writing but in order to be relied on, any oral agreement must have specifics which must be pleaded to allow the other party against whom it is alleged to know upon what is relied. Thus there would need to be some indication of inter alia when, where in what manner and the subject matter or nature of the agreement in the pleadings.

[32]     The Court has been unable to satisfy itself that anywhere in the Statement of Claim or even in the Affidavit of the Respondent/Claimant herself in opposition are any of these specifics given. Not one officer's name. Not one instance when a conversation was had between a named officer of the Bank and the Claimant. Not one instance of the nature or tenor of any undertaking or agreement is pleaded or even averred to by the Respondent/Claimant. On the basis that this is the gravamen of the Respondents/Claimant case, the next question would have had to be, would this failure result in the entire effective dismissal of the Respondent/Claimant's case at this summary juncture?

[33]     A court must therefore consider that, "*the hearing of an application for summary judgment is not a summary trial. The court at the summary*

12

*judgment application will consider the merits of the respondent's case only to the extent necessary to determine whether it has sufficient merit to proceed to trial....At a trial the criterion to be applied by the Court is probability: victory goes to the party whose case is the more probable (taking into account the burden of proof).This is not true of a summary judgment application...it is the absence of reality"* [9]

[34]   Having been empowered by the Rules and the learning of the cases so helpfully provided by Counsel for the parties, the Court is required to look at the case as a whole. The pleadings have been effectively been closed and there was no attempt even after the filing of the Defense to attempt to make good any highlighted deficiencies in the Statement of Claim.  Without more, the Court is of the opinion that the Respondent/Claimant has failed to provide to the court, any tangible information upon which the Court can rely, to allow this claim to proceed on the basis that the Respondent/Claimant has established a claim with a real prospect of success.

[35]   In making this assessment this Court is of the view that there is simply not enough evidence to raise a real prospect of a contrary case which would facilitate a trial.[10] There is in fact an *"absence of reality".*[11]

[36]   The Claim in this court's opinion, when looking at all the documents before it, including the entire set of signed requests for the "draw downs" on the loan by the Respondent/Claimant  further  belies  the  contentions  made  by  the Respondent/Claimant. In the Court's opinion they do not raise a case to which this court should further expend the court's resources to determine what may be considered a  speculative claim

---

[9] White Book [2001] Para 24.2.3
[10] Korea National Insurance Corporation v Alvarez Global Corporate and Specilaty AG [2007] EWCA Civ 1066 reported in Blackstone's Civil Practice 2009 para 34.10
[11] Three Rivers case op cit

13

[37]    It is recognized that the court in exercising its discretion and making this determination the overriding objective of the rules must be borne in mind, however, *"a judge should not allow a matter to proceed to trial where the [defendant] has produced nothing to persuade the court that there is a realistic prospect that the defendant will succeed in defeating the claim brought by the claimant. In response to an application for a summary judgment a defendant is not entitled without more merely to say in the course of time something might turn up that would render the claimant's case untenable. To proceed in that vein is to invite speculation and does not demonstrate a real prospect of successfully defending the claim"* [12]

[38]    Although this quotation was made in the context of the viability of a defence the words are just as instructive to any challenged claim and in so accepting that, it becomes clear that even with the overriding objective speculative claims should not be fostered or encouraged by the Court.

[39]    I therefore find that the application for Summary Judgment in favor of the Applicant/Defendant is granted.

**Striking out Application**

[40]    The court having found on the application with regard to summary judgment I find no reason to determine the alternative prayer of the Applicant/Defendant.

[41]    I wish to state on the record the Court's gratitude to the submissions and authorities provided by Counsel for the parties in this matter.

---

[12] Per Sunders CJ(Ag) in <u>Bank of Bermuda Ltd v Pentium</u> Civ App no 14 of 2003 BVI at paragraph 18

14

**A740**

[42]    Order

    i.  The Application for Summary Judgment is granted in favour of the Applicant/Defendant

    ii. Costs  are awarded to the Applicant/Defendant  in the sum of $2,500.00

                                       ...........................
                                         Nicola Byer
                                High Court Judge

15

**A741**



[Home] [Databases] [World Law] [Multidatabase Search] [Help]
[Feedback]

# United Kingdom House of Lords Decisions



---

**You are here:** BAILII >> Databases >> United Kingdom House of Lords Decisions >> Fibrosa Societe Anonyme v Fairbairn Lawson Combe Barbour Ltd [1942] UKHL 4 (15 June 1942)
URL: *http://www.bailii.org/uk/cases/UKHL/1942/4.html*
Cite as: [1942] UKHL 4, [1943] AC 32

---

[New search] [Help]

---

JISCBAILII_CASE_CONTRACT

## Die Lunae, 15° Junii, 1942.

Parliamentary Archives,

HL/PO/JU/4/3/971

Lord
Chancellor

Lord
Atkin

Lord
Russell of
Killowen

Lord

Macmillan

Lord
Wright

Lord
Roche

Lord
Porter

<div align="center">

FIBROSA SPOLKA AKCYJNA

*v.*

FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED.

</div>

# The Lord Chancellor

MY LORDS,

This is the appeal of a Polish Company who were Plaintiffs in the action against the decision of the Court of Appeal composed of Lord Justice MacKinnon, Lord Justice Luxmoore, and Mr. Justice Stable, confirming the judgment of Mr. Justice Tucker at the trial in favour of the Respondents. After the Court of Appeal's judgment and before the appeal came to be argued at your Lordships' bar, the town of Vilna, where the Appellant Company had carried on its business, and indeed the whole of Poland, under the laws of which State the Appellant Company was incorporated, were occupied by our enemy Germany. The question might, therefore, arise whether the Appellant Company should now be debarred from prosecuting its appeal. (See the judgment of the Court of Appeal delivered by Lord Reading C.J. in *Porter* v. *Freudenberg* [1915] I K.B. 857, especially at pages 868 and 884; see also *Rodriguez* v. *Speyer Bros.* [1919] A.C. 59.) In order to obviate any difficulty on this head, the Plaintiff Company, at the suggestion of the House, applied to the Board of Trade, and the Department gave to the Appellants' solicitors a licence to proceed with the appeal, notwithstanding that their clients might be in the position of an alien enemy. The House was content to let the case proceed on this basis. It is not, therefore, necessary to con-

<div align="center">

**A743**

</div>

sider, in dealing with the present appeal, whether the recent decision of the Court of Appeal in re *an Arbitration between N. V. Gebr. van Udens Scheepvaart en Agentuur Maatschappij and Sovfracht* [1941] 3 All E.R. 419, should be approved. If, as the result of the decision of the House, any payment becomes due to the Appellants, and if they were in the position of alien enemies within the meaning of the Trading with the Enemy Act, 1939, the payment would be regulated by that Act.

The Respondents are a limited company carrying on at Leeds the business of manufacturing textile machinery, and by a contract in writing dated the 12th July, 1939, the Respondents agreed to supply the Appellants with certain flax-hackling machines as therein specified and described, at a lump-sum price of £4,800. The machines were of a special kind, and there is no suggestion that the Respondents were not to manufacture them themselves. By the terms of the contract, delivery was to be in three to four months from the settlement of final details. The machines were to be packed and delivered by the Respondents c.i.f. Gdynia; the services of a skilled monteur to superintend erection were to be provided by the Respondents and included in the price; and payment was to be made by cheque on London, one-third of the price (£1,600) with the order and the balance (£3,200) against shipping documents.

On July 18th, 1939, the Appellants paid to the Respondents £1,000 on account of the initial payment of £1,600 due under the contract. On September 1st. 1939, Germany invaded Poland and on the 3rd September Great Britain declared war on Germany. On September 7th, the Appellants' agents in this country wrote to the Respondents: " Owing to the outbreak of hostilities it is now " quite evident that the delivery of the machines on order for " Poland cannot take place. Under the circumstances we shall " be obliged if you will kindly arrange to return our initial pay- " ment of ,£1,000 at your early convenience." To this request, the Respondents replied on the next day refusing to return the sum and stating that " considerable work has been done upon these "machines and we cannot consent to the return of this payment. "After the war the matter can be reconsidered."

**A744**

2 [2]

On September 23rd, by Order in Council made under the provisions of the Trading with the Enemy Act, 1939, it was declared that Poland (including that part in which the port of Gdynia is situated) was enemy territory.

There was further correspondence between the parties or their agents which failed to produce agreement, and on May 1st, 1940, the Appellant Company issued a writ and by its statement of *claim* alleged "that the Respondents had broken the contract by refusing to deliver the machines, while the Appellants " are and have at all " material times been ready and willing to take delivery and pay " for the machines." The prayer of the claim was *(a)* for damages for breach of contract, *(b)* for specific performance—an obviously hopeless claim—or, alternatively, return of the £1,000 with interest, and *(c)* for further or other relief. The substantial defence of the Respondents was that the contract had been frustrated by the German occupation of Gdynia on the 23rd September, 1939, and that in these circumstances the Appellants had no right to the return of the £1,000.

Before passing to the main question involved in the appeal, I must mention another contention of the Appellants which was based on Clause 7 of the conditions of sale attached to the contract. This Clause contained the provision that " should despatch be " hindered or delayed by ... any cause beyond our reasonable " control including . . . war ... a reasonable extension of time " shall be granted." The Appellants argued that there could be no frustration by reason of the war which broke out during the currency of the contract because this contingency was expressly provided for in Condition 7 and, therefore, there was no room for an implied term such as has often been regarded as a suitable way in which to express and apply the doctrine of frustration. I entirely agree with the Court of Appeal that in the circumstances of the present case this is a bad point. The ambit of the express condition is limited to delay in respect of which " a reasonable extension of time " might be granted. That might mean a minor delay as distinguished from a prolonged and indefinite interruption of prompt contractual performance which the present war manifestly and inevitably brings about. A similar argument was unsuccessfully urged in *Bank Line v. Capel* [1919] A.C. 435 and in other cases, a recent instance of which is *Tatem v. Gamboa* [1939] 1 K.B. 132. The principle is that where supervening events, not due to the default of either party, render the performance of a contract indefinitely impossible, and there is no undertaking to be bound in any event, frustration ensues, even though the parties may have expressly provided for the case of a limited interruption. As Lord Justice MacKinnon points out, the unsoundness of the contrary view is implicit in *Jackson v. Union Marine Insurance Co., Ltd.*, L.R. 10 C.P. 125, for the charter-party in that case contained an exception of perils of the sea (see L.R. 8 C.P. at p. 584), but none the less the contract was held to have been terminated

**A745**

and the adventure to have been frustrated By the long delay due
to the stranding of the ship. The situation arising from the out-
break of the present war, so far as this country, Germany and
Poland are concerned, makes applicable Mr. Justice Lush's well-
known observation in *Geipel v. Smith,* L.R. 7 Q.B. 404 at p. 414,
" a state of war " (in that case the Franco-German war of 1870)
" must be presumed to be likely to continue so long and so to
" disturb the commerce of merchants as to defeat and destroy the
" object of a commercial adventure like this."

There is a further reason for saying that this subsidiary con-
tention of the Appellants must fail, viz., that while this country is
at war with Germany and Germany is occupying Gdynia, a British
subject such as the Respondents could not lawfully make arrange-
ments to deliver c.i.f. Gdynia, and therefore the contract could
not be further performed because of supervening illegality. A
provision providing for a reasonable extension of time if despatch
is delayed by war cannot have any application when the circum-
stances of the war make despatch illegal. *(Ertel Bieber & Co. v.
Rio Tinto Co., Ltd.* [1918] A.C. 260.)

[3] 3

Mr. Linton Thorp, in conducting the argument for the Appellants before us, admitted that if the point with which I have already dealt was decided against him, the only other issue to be determined was whether, when this contract became frustrated, the Appellants could, in the circumstances of the present case, claim back from the Respondents the £1,000 which they have paid when placing the order. As to this, Lord Justice MacKinnon, in delivering the judgment of the Court of Appeal, said: " Mr. Justice

"Tucker held that, having regard to the principle laid down in
" *Chandler* v. *Webster* [1904] 1 K.B. 493 and other like cases, this
" claim must fail. We think he was right, and, further, that that
" principle must equally bind this court to reject the claim. Whether
" the principle can be overruled is a matter that can only concern
" the House of Lords."

This alleged principle is to the effect that where a contract has been frustrated by such a supervening event as releases from further performance, " the loss lies where it falls ", with the result that sums paid or rights accrued before that event are not to be surrendered, but that all obligations falling due for performance after that event are discharged. This proposition, whether right or wrong, does not first appear in *Chandler* v. *Webster,* but in *Blakeley* v. *Mutter & Co.,* decided in January, 1903, by a Divisional Court [1903] 2 K.B. 760, note, which was also a case arising out of the abandonment of the coronation procession owing to King Edward VII's sudden illness. In that case, Mr. Justice Channell said, " If the
" money was payable on some day subsequent to the abandonment
" of the procession, I do not think it could have been sued for.
" If, however, it was payable prior to the abandonment of the pro-
" cession, the position would be the same as if it had been actually
" paid and could not be recovered back, and it could be sued
" for. . . . It is impossible to import a condition into a contract
" which the parties could have imported and have not done so.
" All that can be said is that when the procession was abandoned
" the contract was off, not that anything done under the contract
" was void. The loss must remain where it was at the time of the
" abandonment. It is like the case of a charter party where the
" freight is payable in advance and the voyage is not completed,
" and the freight, therefore, not earned. Where the non-completion
" arose through impossibility of performance, the freight could not
" be recovered back." In *Civil Service Co-Operative Society, Ltd.*
v. *General Steam Navigation Co.,* which was decided in the Court of Appeal in October, 1903 [1903] 2 K.B. 756, Lord Halsbury L.C. expressed entire concurrence with this passage in the judgment of Mr. Justice Channell. Lord Alverstone C.J., who was a party to both these decisions, took the same view.

If we are to approach this problem anew, it must be premised that the first matter to be considered is always the terms of the particular contract. If, for example, the contract is " divisible "

**A747**

in the sense that a sum is to be paid over in respect of completion of a denned portion of the work, it may well be that the sum is not returnable if completion of the whole work is frustrated. If the contract itself on its true construction stipulates for a particular result which is to follow in regard to money already paid, should frustration afterwards occur, this governs the matter. The ancient and firmly established rule that freight paid in advance is not returned if the completion of the voyage is frustrated *(Byrne* v. *Schiller* (1871) L.R. 6 Ex. 319) should, I think, be regarded as a stipulation introduced into such contracts by custom, and not as the result of applying some abstract principle. And so, *a fortiori,* if there is a stipulation that the prepayment is " out and out." To take an example, not from commerce, but from sport, the cricket spectator who pays for admission to see a match cannot recover the entrance money on the ground that rain has prevented play if, expressly or by proper implication, the bargain with him is that no money will be returned. Inasmuch as the effect of frustration may be explained as arising from an implied term (see *Joseph Constantine S.S. Line, Ld.* v. *Imperial Smelling Co.* [1942] A.C. 154

20330 A2

at p. 163), it is tempting to speculate whether a further term could be implied as to what was to happen, in the event of frustration, to money. already paid. But if the parties were assumed to have discussed the point when entering into the contract, they could not be supposed to have agreed on a simple formula which would be fair in all circumstances, and all that could be said is that, in the absence of such agreement, the law must decide. The question now to be determined is whether, in the absence of a term in the contract dealing with the matter, the rule which is commonly called the rule in *Chandler v. Webster* should be affirmed.

This supposed rule has been constantly applied in a great variety of cases which have since arisen—and necessarily so, because the rule had been laid down in plain terms by the Court of Appeal in England in 1904, and the present appeal provides the first occasion on which it can be effectively challenged. A very different rule prevails in Scotland, as was made plain by the decision of this House in *Cantiare San Rocco* v. *Clyde Shipbuilding and Engineering Co.* [1924] A.C. 226. In that case the Earl of Birkenhead (at p. 233) was careful to reserve the question whether *Chandler* v. *Webster* and the other English cases on the point were rightly decided, saying, " the question is as to " the law of Scotland, and I desire to say nothing which may in " any way fetter opinion if those authorities hereafter come to " be reviewed by this House, for none of them is binding upon " your Lordships." Similarly, in the same case, Viscount Finlay (at p. 241) observed that it would be out of place on that occasion to enter into the question dealt with in *Chandler v. Webster,* adding, "the principle of English law was re-stated with great " clearness by Lord Parmoor in the case of *French Marine* v. " *Compagnie Napolitaine d'Eclairage et Chauffage par le Gaz* (27 " Com. Cas. 69 at p. 94).. This statement forms no part of the " judgment of the House of Lords in that case, but there is no " doubt that the principle has been repeatedly acted on in the " Court of Appeal." Lord Dunedin in the *Cantiare San Rocco* case (at p. 240) referred to the different angle of approach from which an English or a Scottish Judge would look at the question, and thought that the cause was to be found in the reluctance of the English law to order the repayment of money once paid. But he added, " I do not enlarge on the topic, for I am not at all con- " cerned to criticise English law.. . . . For the purpose of this " case, it is sufficient to say, as I unhesitatingly do, that *Chandler* " v. *Webster,* if it had been tried in Scotland, would have been " decided the other way." Lord Dunedin's restraint was not imitated by Lord Shaw, whose pronouncement included a vigorous denunciation (at p. 259) of the proposition that the loss lies where it falls as amounting to a maxim which " works well enough among " tricksters, gamblers and thieves." The learned Lord asserted that this was part of the law of England (presumably meaning that it had been so laid down by the English Court of Appeal), but

patriotically rejoiced that it had never been part of the law of Scotland.

Mr. Valentine Holmes, in his able argument for the Respondents, asked us to consider whether this House would be justified in disturbing a view of the law which has prevailed for nearly forty years, which has been so frequently affirmed, which has been constantly applied in working out the rights of the parties to commercial contracts, and which, moreover, at any rate furnishes a simple rule against the effect of which the parties to a contract can, if they so desire, expressly provide. These are weighty considerations, but I do not think they ought to prevail in the circumstances of this case over our primary duty of doing our utmost to secure that the law on this important matter is correctly expounded and applied. If the view which has hitherto prevailed in this matter is found to be based on a misapprehension of legal principles, it is of great importance that these principles should be correctly defined, for, if not, there is a danger that the error may spread

[5] 5

in other directions, and a portion of our law be erected on a false
foundation. Moreover, though the so-called rule in *Chandler* v.
*Webster* is nearly forty years old, it has not escaped much un-
favourable criticism. My noble and learned friend Lord Atkin
when sitting in the court of appeal as Justice Atkin in
*Russcoe v. Stirk* [1922] 10 Ll.L.Rep. 212, at p. 217, doubted
whether any two business people in the world would ever make
a contract which embodied such a doctrine as *Chandler* v. *Webster*
laid down; and in the present case the Court of Appeal, while
bound by previous authority, hinted a hope that this House might
be able to substitute a " more civilised rule." I think, therefore,
that we ought to regard ourselves as at liberty to examine the
challenged proposition freely, and to lay down what we regard as
the true doctrine in English law without being hampered by a
course of practice based on previous decisions in the Court of
Appeal.

The *locus classicus* for the view which has hitherto prevailed
is to be found in Sir Richard Collins' judgment in *Chandler* v.
*Webster*. It was not a considered judgment, but it is hardly neces-
sary to say that I approach this pronouncement of the then Master
of the Rolls with all the respect due to so distinguished a common
lawyer. When his judgment is studied, however, one cannot but
be impressed by the circumstance that he regarded the proposition
that money in such cases could not be recovered back as flowing
from the decision in *Taylor v. Caldwell* [1863] 3 B. & S. 826.
*Taylor v. Caldwell,* however, was not a case in which any question
arose as to whether money could be recovered back, for there had
been no payment in advance, and there is nothing in the judgment
of Mr. Justice Blackburn which, at any rate in terms, affirms the
general proposition that " the loss lies where it falls ". Sir Richard
Collins' application of *Taylor* v. *Caldwell to* the actual problem
with which he had to deal in *Chandler* v. *Webster* deserves close
examination. He said at p. 499 of [1904] 1 K.B.: —

    " The Plaintiff contends that he is entitled to recover the
" money which he has paid on the ground that there has been
" a total failure of consideration. He says that the condition
" on which he paid the money was that the procession should
" take place, and that, as it did not take place, there has been
" a total failure of consideration. That contention does no
" doubt raise a question of some difficulty, and one which has
" perplexed the Courts to a considerable extent in several cases.
" The principle on which it has been dealt with is that which
" was applied in *Taylor* v. *Caldwell*—namely, that where, from
" causes outside the volition of the parties, something which
" was the basis of, or essential to the fulfilment of, the contract
" has become impossible, so that, from the time when the fact
" of that impossibility has been ascertained, the contract can
" no further be performed by either party, it remains a per-
" fectly good contract up to that point, and everything pre-

**A751**

" viously done in pursuance of it must be treated as rightly
" done, but the parties are both discharged from further per-
" formance of it. If the effect were that the contract were
" wiped out altogether, no doubt the result would be that money
" paid under it would have to be repaid as on a failure of
" consideration. But that is not the effect of the doctrine;
" it only releases the parties from further performance of the
" contract. Therefore the doctrine of failure of consideration
" does not apply."

It appears to me that the reasoning in this crucial passage is open to two criticisms: —

*(a)* The claim of a party who has paid money under a contract to get the money back, on the ground that the consideration for which he paid it has totally failed, is not based upon any provision contained in the contract, but arises because, in the circumstances that have happened, the law gives a remedy in quasi-contract to the party who has not got that for which he bargained. It is a claim to recover money to which the defendant has no further right

20330 A 3

6 [6]

because in the circumstances that have happened the money must be regarded as received to the plaintiff's use. It is true that the effect of frustration is that, while the contract can no further be performed, " it remains a perfectly good contract up to that point, " and everything previously done in pursuance of it must be treated " as rightly done." But it by no means follows that the situation existing at the moment of frustration is one which leaves the party that has paid money and has not received the stipulated consideration without any remedy. To claim the return of money paid on the ground of total failure of consideration is not to vary the terms of the contract in any way. The claim arises not because the right to be repaid is one of the stipulated conditions of the contract, but because, in the circumstances that have happened, the law gives the remedy. It is the failure to distinguish between (1) the action of *assumpsit* for money had and received in a case where the consideration has wholly failed, and (2) an action on the contract itself, which explains the mistake which I think has been made in applying English law to this subject-matter. Thus, in *Blakeley* v. *Mutter & Co.* (cited above), Lord Alverstone C.J. said, " I agree " that *Taylor* v. *Caldwell* applies, but the consequence of that " decision is that neither party here could have sued on the con- " tract in respect of anything which was to be done under it after " the procession had been abandoned." That is true enough, but it does not follow that because the plaintiff cannot sue " on the " contract" he cannot sue *dehors* the contract for the recovery of a payment in respect of which consideration has failed. In the same case, Mr. Justice Wills relied on *Appleby* v. *Myers*, L.R. 2 C.P. 651, where a contract was made for the erection by A. of machinery upon the premises of B., to be paid for upon completion. There was no pre-payment, and in the course of the work the premises were destroyed by fire. It was held that both parties were excused from further performance, and that no liability accrued on either side. But the liability referred to was liability under the contract, and the learned Judge seems to have thought that no action to recover money in such circumstances as the present could be conceived of unless there was a term of the contract, express or implied, which so provided. Once it is realised that the action to recover money for a consideration that has wholly failed rests not upon a contractual bargain between the parties, but (as Lord Sumner said in *Sinclair* v. *Brougham* [1914] A.C. 398, at p. 452) " upon a notional or imputed promise to repay ", or (if it is preferred to omit reference to a fictitious promise) upon an obligation to repay arising from the circumstances, the difficulty in the way of holding that a pre-payment made under a contract which has been frustrated can be recovered back appears to me to disappear.

(6) There is, no doubt, a distinction between cases in which a contract is " wiped out altogether ", e.g., because it is void as being illegal from the start, or as being due to fraud which the innocent party has elected to treat as avoiding the contract, and

**A753**

cases in which intervening impossibility " only releases the parties
" from further performance of the contract". But does the dis-
tinction between these two classes of case justify the deduction of
Sir Richard Collins that " the doctrine of failure of consideration
" does not apply " where the contract remains a perfectly good
contract up to the date of frustration ? This conclusion seems to
be derived from the view that, if the contract remains good and
valid up to the moment of frustration, money which has already
been paid under it cannot be regarded as having been paid for
a consideration which has wholly failed. The party that has paid
the money has had the advantage, whatever it may be worth, of
the promise of the other party. That is true, but it is necessary to
draw a distinction. In English law, an enforceable contract may
be formed by an exchange of a promise for a promise, or by the
exchange of a promise for an act—I am excluding contracts under
seal—and thus, in the law relating to the formation of contract,
the promise to do a thing may often be the consideration. But

**A754**

[7] 7

when one is considering the law of failure of consideration and of the quasi-contractual right to recover money on that ground, it is, generally speaking, not the promise which is referred to as the consideration, but the performance of the promise. The money was paid to secure performance and, if performance fails, the inducement which brought about the payment is not fulfilled.

If this were not so, there could never Be any recovery of money, for failure of consideration, by the payer of the money in return for a promise of future performance. Yet there are endless examples which show that money can be recovered, as for a complete failure of consideration, in cases where the promise was given but could not be fulfilled. (See the notes in *Bullen and Leake,* 9th edition, page 263.) In this connection the decision in *Rugg* v. *Minett* (11 East 210) is instructive. There the plaintiff had bought at auction a number of casks of oil; the contents of each cask were to be made up after the auction by the seller to the prescribed quantity so that the property in a cask did not pass to the plaintiff until this had been done. The plaintiff paid in advance a sum of money on account of his purchases generally, but a fire occurred after some of the casks had been filled up, while the others had not. The plaintiff's action was to recover the money he had paid its money received by the defendants to the use of the plaintiffs. The Court of King's Bench ruled that this cause of action succeeded in respect of the casks which at the time of the fire had not been filled up to the prescribed quantity. A simple illustration of the same result is an agreement to buy a horse, the price to be paid down, but the horse not to be delivered and the property not to pass until the horse has been shod. If the horse dies before the shoeing, the price can Unquestionably be recovered as for a total failure of consideration, notwithstanding that the promise to deliver was given. This is the case of a contract *de certo corpore* where the *cerium corpus* perishes after the contract is made; but, as Lord Justice Vaughan Williams' judgment in *Krell* v. *Henry* [1903] 2 K.B. 740 explained, the same doctrine applies " to cases where the event which renders the contract incapable " of performance is the cessation or non-existence of an express " condition or state of things, going to the root of the contract, " and essential to its performance." I can see no valid reason why the right to recover pre-paid money should not equally arise on frustration arising from supervening circumstances as it arises on frustration from destruction of a particular subject-matter.

The conclusion is that the rule in *Chandler v. Webster* is wrong, and that the Appellants can recover their £1,000.

While this result obviates the harshness with which the previous view in some instances treated the party who had made a pre-payment, it cannot be regarded as dealing fairly between the parties in all cases, and must sometimes have the result of leaving the recipient who has to return the money at a grave disadvantage.

Page 146

**A755**

He may have incurred expenses, in connection with the partial carrying out of the contract, which are equivalent, or more than equivalent, to the money which he prudently stipulated should be prepaid, but which he now has to return for reasons which are no fault of his. He may have to repay the money, though he has executed almost the whole of the contractual work, which will be left on his hands. These results follow from the fact that the English common law does not undertake to apportion a prepaid sum in such circumstances—contrast the provision, now contained in s. 40 of the Partnership Act, 1894, for apportioning a premium if a partnership is prematurely dissolved. It must be for the legislature to decide whether provision should be made for an equitable apportionment of prepaid monies which have to be returned by the recipient in view of the frustration of the contract in respect of which they were paid.

I move that the Appeal be allowed, and that judgment be entered for the Appellants. The precise provisions with regard to subsidiary matters we might consider after the other Opinions have been delivered.

Lord
Chancellor.

Lord
Atkin.

Lord
Russell of
Killowen.

Lord
Macmillan.

Lord
Wright.

Lord
Roche.

Lord
Porter.

[8]

## FIBROSA SPOLKA AKCYJNA

v.

## FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED.

## **Lord Atkin**

MY LORDS,

For the reasons given by the Lord Chancellor I agree that the Appellant fails on all his points except that arising out of the frustration of the contract. I have no doubt that the contract in this case came to an end before the time for complete performance had arrived by reason of the arising of a state of war which caused an indefinite delay not contemplated by the parties, and eventually the legal impossibility of delivering the goods at a port occupied by the enemy. In other words, to use a short phrase of frequent occurrence since the beginning of the last war, the commercial adventure was frustrated. The legal effects of " frustration " are not in dispute. They were not determined for the first time either by the cases which arose on the postponement of the coronation of Edward VII, or by reason of the last war. It is very necessary to remember that, as pointed out by Vaughan-Williams L.J. in *Krell v. Henry,* 1903, 2 K.B., at p. 748, the principle of law is the same whether the performance of the contract becomes impossible by the cessation of existence of a thing which is the subject of the contract (an obligation *de certo corpore*) or by the cessation or

**Page 148**

non-existence of an express condition or state of things going to the root of the contract and essential to its performance. And it is well settled that when a contract which is still executory on one or both sides is subject to frustration the law is that when the event happens the parties are excused from further performance, but have to give effect to rights under the contract already accrued before the happening of the event. A. sells a horse to B. for £50, delivery to be made in a month, the price to be paid forthwith, but the property not to pass till delivery, and B. to pay A. each week an agreed sum for keep of the horse during the month. The horse dies in a fortnight. A. is excused from delivery and B. from taking delivery; B. is bound to pay the sum due for the fortnight during which the horse was kept. But what is the position as to the £50, the price paid in advance? This is in simple terms the problem in the present case. The answer that I venture to think would occur to most people, whether laymen or lawyers, would be that the buyer ought to get his money back, having had nothing for it; and the lawyer would support the claim by saying that it is money had and received to the use of the buyer, being money paid on a consideration which has wholly failed. But that is not the answer which was given in similar cases in the coronation cases, and it is those decisions that come up for review in the present case. The question arose in the neatest form in the case of *Chandler* v. *Webster*, 1904, I K.B. 493, where the leading judgment was given in the Court of Appeal by Collins M.R., a master of the common law, whose opinion the profession have always rightly held in the greatest respect. In that case the Plaintiff had hired a room to view the coronation procession on Thursday, June 26, 1902, On June 10 he wrote to the Defendant: ' I beg to confirm my " purchase of the first floor room of the Electric Lighting Board " at 7, Pall Mall to view the procession on Thursday, June 26, for " the sum of £141 15s. 0d., which amount is now due. I shall be " obliged if you will take the room on sale, and I authorise you

Page 149

[9] 2

" to sell separate seats in the room, for which I will erect a stand."
It became the subject of controversy whether, in view of certain
other terms arranged between the parties, the whole sum became
due before the procession became impossible; but the Courts
decided, as was clearly the case, that it did so become due. It may
be noted that the Defendant had nothing to do under the contract
but allow the Plaintiff the use of the room. On June 19 the Plaintiff
paid the Defendant £100 on account of the price of the room, but
had not paid the balance at the time the procession was abandoned.
The Plaintiff claimed the return of the £100 on a total failure of
consideration; the Defendant counterclaimed for the balance of
£41 15s. 0d. Collins M.R., at p. 499, dealing with the contention
that there had been a total failure of consideration, after stating
that it raised a question of some difficulty, stated that the principle
on which it has been dealt with is that which was applied in *Taylor*
v. *Caldwell, viz.* that where the contract has become impossible
in the circumstances there stated " it remains a perfectly good
" contract up to that point, and everything previously done in
" pursuance of it must be treated as rightly done; but the parties
" are both discharged from further performance of it." So far the
statement is unassailable. But the Master of the Rolls proceeds:
' If the effect were that the contract were wiped out altogether,
" no doubt the result would be that money paid under it would
" have to be repaid as on a failure of consideration. But that is
" not the effect of the doctrine: it only releases the parties from
" further performance of the contract. *Therefore* " (the italics are
mine) " the doctrine of failure of consideration does not apply."
It seems plain that the Master of the Rolls is not repelling the
claim for money had and received on the ground that the doctrine
as to impossibility of performance itself, as part of its content, ex-
cludes the claim. The case of *Taylor* v. *Caldwell* (1863), 3 B. & S.
826, the principle of which he is expressly applying, had nothing
to do with money had and received. The claim was for damages
in costs of advertisements, etc., for concerts for which the
Defendants had agreed to let their hall at the Surrey Gardens, a
contract which it was impossible to perform because the hall was
destroyed by fire after the contract. The Master of the Rolls there
is applying the common law rule as' to money had and received
to a case of a contract where all that had happened was that in
law both parties were released from further performance. And
in those circumstances he seems to say: the doctrine of failure of
consideration only applies where the contract is wiped out
altogether: in this case it is not: the parties are only discharged
from further performance: therefore the claim for money had and
received must fail.

My Lords, the difficulty which this decision causes me is to
understand how this great lawyer came to the conclusion that the
claim for money paid on a consideration which wholly failed could
only be made where the contract was wiped out altogether: and

I have sought for some construction of his words which stopped short of that absolute statement, but I can find none. I know of no authority for the proposition. It is true that where a party is in a position to rescind a contract he may be able to sue for money which he has paid under the contract now rescinded: but there are numerous cases where there has been no question of rescission where such an action has lain. I may refer to *Giles* v. *Edward* (1797), 7 T.R. 181, where a contract to deliver wood was prevented by the Defendant preventing performance by not loading all the wood. *Rugg* v. *Minett* (1809), 11 East 210, where the buyer had paid part or the purchase price on a sale of turpentine in casks, where the property in some casks had passed while in seller's warehouse, but in some had not, and the purchaser was entitled to recover for money had and received the proportion properly

3 [10]

attributable to the casks in which the property had not passed; *Nockels* v. *Crosby* (1825), 3 B. & C. 814; *Wilson v. Church* (1879), 13 Ch.D. i; (1880), 5 A.C. 177; *Johnson v. Goslett* (1857) 3 C.B.N.S. 569, and *Ashpitel* v. *Sercombe* (1855), 5 Ex. 147, in all of which the Plaintiff had put up money for an adventure which was eventually abandoned by the promoters, *Devaux* v. *Conolly* (1849), 8 C.B. 640, where there had been an over-payment in respect of goods delivered. In none of these cases was it suggested that the contract was " wiped out altogether "; indeed, in other cases where it is suggested that the contract was " rescinded," all that is meant is that the party was entitled to treat himself as no longer bound to perform and to recover what he himself has paid.

With great respect therefore to the judgment in *Chandler v. Webster*, I do not agree with that part of it which refused to give effect to the Plaintiff's claim for return of the sum which he had paid on the ground of total failure of consideration. Some discussion arose as to the precise meaning of this term. It was pointed out that the consideration for the part payment by the Plaintiffs was the promise by Defendants to deliver the goods c.i.f. at Gdynia; and the promise was always effective until further performance was excused. I personally agree with that statement of what the consideration was, and I do not think it necessary to use the word "consideration" in two meanings. I understand by the phrase that the promise to deliver goods totally failed because no goods were or could be delivered, and that therefore a cause of action accrued to the Plaintiff. I should add that if it was wrong in *Chandler* v. *Webster* to refuse the Plaintiff relief on his claim, it was also wrong to give the Defendant judgment on his counterclaim. It is true that the right to receive the balance had accrued before frustration: but if the money had been paid it could have been recovered back as the £100 could, and the principles relating to circuity of action would afford a defence to the counterclaim. Lord Dunedin quotes with approval in the law of Scotland the brocard *frustra petis quod mox es restiturus, French Marine* v. *Compagnie Napolitaine*, 1921, 2 A.C., at p. 511, and the expression aptly fits the English law in this respect. It was urged before us that in the case last cited the House of Lords held that *Chandler* v. *Webster* was rightly decided, and that this House is consequently bound to follow it. I cannot agree. The *French Marine* case was a case of a time charter whose hire was paid monthly in advance, and the ship was only redelivered after part of the month had expired. Lord Sumner, at p. 517, draws attention to the fact that there was no total failure of consideration, but a partial failure only, for which in law no *pro rata* repayment could be claimed. It is obvious therefore that the present question did not arise; and in *Cantiare* v. *Clyde Shipbuilding Co.*, 1924, A.C. 226, a case which turned on the Scots law, all their Lordships treated the question of the English law as open in this House. In the case last mentioned it was decided that according to Scots law restitution could be made of sums paid in advance where the con-

tract was frustrated: and it is satisfactory to find that the English and Scots law now agree on this point. It is unnecessary to discuss the interesting suggestion that the Scots law does not in fact entitle the claimant to recover necessarily the whole amount paid, but only so much as can be shown to be an unjust enrichment of the defender: in other words, that the latter may claim an adjustment in respect of the amount by which he is out of pocket for expenses incurred in respect of the contract. There was no decision on this point in the case, though this House affirmed the interlocutor of Lord Hunter, the Lord Ordinary, who had given permission to the defenders to amend their pleas in order, as it appears, to counterclaim for expenses, a proceeding which in any event I do not understand. It may be that such an adjustment was possible

[11] 4

under Roman Law, but there seems no direct authority for it in Scots law, and there is a dictum of great weight against it in the judgment of Lord President Inglis in *Watson v. Shankland* (1871), 10 M., at p. 152.

That the result of the law may cause hardship when a contract is automatically stayed during performance and any further right to performance is denied to each party is incontrovertible. One party may have almost completed expensive work: he can get no compensation. The other party may have paid the whole price, and if he has received but a slender part of the consideration he can get no compensation. At present it is plain that if no money has been paid on the contract there is no legal principle by which loss can be made good. What is being now decided is that the application of an old-established principle of the Common Law does enable a man who has paid money and received nothing for it to recover the money so expended. At any rate, it can be said it leaves the man who has received the money and given nothing for it in no worse position than if he had received none. Many commercial contracts provide for various risks: it is always possible to provide for the risk of frustration; but what provision the parties may agree will probably take some time to negotiate. Meanwhile by the application of a general doctrine which is independent of the special contract and only comes into play when further performance of the latter is precluded, the man who pays money in advance on a contract which is frustrated and receives nothing for his payment is entitled to recover it back. I think therefore that the appeal should be allowed.

Page 154

**A763**

Lord
Chancellor

Lord Atkin

Lord
Russell of

Killowen

Lord

Macmillan

Lord
Wright

Lord
Roche

Lord
Porter

## FIBROSA SPOLKA AKCYJNA

*v.*

## FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED.

Lord Russell of Killowen

### (READ BY LORD MACMILLAN)

my lords,

That which has been described during the argument of this case, and at other times, as " the rule in *Chandler* v. *Webster* " should, I think, rather be called the rule (to put it shortly) that in cases of frustration loss lies where it falls, or (at greater length) that where a contract is discharged by reason of supervening impossibility of performance, payments previously made and legal rights previously accrued according to the terms of the contract, will not be disturbed, but the parties will be excused from liability further to perform the contract.

I say this because as I read the judgment of the Master of the Rolls in *Chandler* v. *Webster* he does not purport to be framing any new rule, or laying down any new law: he thought that the case which he was deciding was one which, upon its facts, was

**Page 155**

## A764

governed by a rule already established by the authorities.

In Scotland the consequence of frustration is not that loss lies where it falls. The Scots law derives from the Roman law a different view, founded on the doctrine of *restitutio*, which has no place in English law, and which it is not open to us to import into the law of England. We must examine the rule as it exists in the law of England, and determine whether the Appellants are entitled to be repaid the £1,000. If *Chandler* v. *Webster* was rightly decided, they would clearly not be so entitled.

It is to be observed that the doubt as to the correctness of the rule only arises in cases in which one of the parties to the contract has paid over to the other party the whole or part of the money payable by him as the consideration for what he is to receive as the consideration moving from the other party. If no such money has been paid the rule must apply; for I know no principle of English law which would enable either party to a contract which has been frustrated to receive from the other compensation for any expense, or indemnity from any liability, already incurred in performing the contract. Nor could moneys paid before frustration be recovered if the person making the payment has received some part of the consideration moving from the other party for which the payment was made. In such a case the rule would still apply.

But I am of opinion that this appeal should succeed because of another aspect of the matter.

In the present case the Appellants, before frustration, paid in advance a part of the price of the machines. We heard an elaborate argument as to what was the exact consideration moving from the Respondents for that part of the contract which stipulated for payment of part of the price in advance. I am not aware of any justification for splitting up the consideration in this way, and assigning a consideration for each separate provision of a contract. Under the contract here in question the consideration moving from the Respondents was either the delivery of the machines at Gdynia, or the promise to deliver the machines at Gdynia. I think that the delivery was the consideration; but in whichever way the consideration is viewed, it is clear that no part of the consideration

[13] 2

for which part of the price of the machines was paid ever reached
the Appellants. There was a total failure of the consideration for
which the money was paid.

In those circumstances, why should the Appellants not be
entitled to recover back the money paid, as money had and received
to their use, on the ground that it was paid for a consideration
which has wholly failed ? I can see no reason why the ordinary
law, applicable in such a case, should not apply. In such a case
the person who made the payment is entitled to recover the money
paid That is a right which in no way depends upon the continued
existence of the frustrated contract. It arises from the fact that
the impossibility of performance has caused a total failure of the
consideration for which the money was paid.

In his judgment in *Chandler* v. *Webster* the Master of the Rolls
states that the right to recover moneys paid for a consideration
which has failed only arises where the contract is " wiped out
" altogether," by which expression I understand him to mean is
void *ab initio*. This is clearly a misapprehension on the part of the
learned judge. The money was recoverable under the common
*indebitatus* count, as money received for the use of the Plaintiff.
The right so to recover money paid for a consideration that had
failed did not depend on the contract being void *ab initio*. There
are many such cases in the books in which the contract has not
been void *ab initio*, but the money paid for a consideration which
has failed has been held recoverable. Thus, as one example, money
paid as a deposit on a contract of sale which has been defeated
by the fulfilment of a condition is recoverable *(Wright* v. *Newton,
2* CM. & R. 124).

It was submitted by the Respondents, but without argument,
that money paid for a consideration which had failed was recover-
able only when the failure was due to the fault of the other party to
the contract. But, on the authorities, this submission is clearly ill-
founded.

*Chandler* v. *Webster* was accordingly, in my opinion, wrongly
decided. The money paid was recoverable, as having been paid
for a consideration which had failed.

The rule that on frustration the loss lies where it falls cannot
apply in respect of moneys paid in advance when the consideration
moving from the payee for the payment has wholly failed, so as
to deprive the payer of his right to recover moneys so paid as
moneys received to his use; but as I understand the grounds upon
which we are prepared to allow this appeal, the rule will (unless
altered by legislation) apply in all other respects.

**Page 157**

**A766**

A7

Lord
Chancellor

Lord

Atkin

Lord

Russell of
Killowen

Lord

Macmillan

Lord
Wright

Lord
Roche

Lord
Porter

## FIBROSA SPOLKA AKCYJNA

v.

## FAIRBAIRN LAWSON COMBE BARBOUR LIMITED

# Lord Macmillan

## MY LORDS,

Speaking in 1923 of the so-called " Coronation cases " Lord Shaw ventured on prophecy. ' No doubt," he said, " the occasion " will arise when that chapter of the law will have to be considered " in this House," for, as the Earl of Birkenhead had pointedly observed, " none of them " [the " Coronation cases "] " is binding " upon your Lordships." *Cantiare Ban Rocco S.A.* v. *Clyde Shipbuilding and Engineering Co.* [1924] A.C. 226 at pp. 257-8 and 233. The mills of the law grind slowly. Thirty-eight years have elapsed since the Court of Appeal pronounced judgment in *Chandler* v. *Webster* [1904] 1 K.B. 493, and nineteen years have passed since Lord Shaw used the words which I have quoted, but now at length in the present appeal the occasion foretold has arisen, and I may be permitted to express my gratification that it has

**Page 159**

# A768

been employed to clear the law of England by the unanimous judgment which the House is to-day pronouncing from the reproach to which it was exposed so long as the law laid down in *Chandler* v. *Webster* held the field.

My Lords, every system of law has had to face the problem of defining the consequences of a contract becoming impossible of fulfilment owing to some external supervening event for which neither of the parties is responsible. That such an eventuality releases both parties from further performance of any of the stipulations of the contract is agreed on all hands. Each must fulfil his contractual obligations up to the moment when impossibility supervenes, for the contract is not avoided by becoming impossible of fulfilment, but the duty of further performance ceases.

Having so declared, must the law stop there ? What if money has been paid, work has been done, or liabilities have been incurred by one or other or both of the parties in pursuance of or in reliance on the fulfilment of the contract which now can never be completed ?

The law may say that the event which has rendered fulfilment of the contract impossible is, so far as the parties are concerned, a mere accident; of mere accident the law takes no cognizance and for its consequences affords no redress; loss or gain must lie where it happens to fall and the parties must be left where they stood when their contract was frustrated.

On the other hand, the law may endeavour to effect an equitable adjustment between the parties, so as to restore each as far as may be to the position which he occupied before he entered into the contract and by a process of give and take to mitigate the consequences of the contract having proved abortive. I find this doctrine of restitution stated in its broadest terms in Pufendorf's celebrated treatise on the *Law of Nature and Nations*, first published in 1672, as follows: ' When the thing at the time of making
" the promise or pact appeared possible and afterwards becomes
" impossible we must inquire whether this happened by mere
" chance or by default and deceit. In the former case the pact is
" disannulled if nothing has yet been performed on either side. If
" anything have been already done towards it by one of the parties,
" the other shall give it back, or pay to the value of it; if neither of

**A769**

[15] 2

" these can be done he is to use his best endeavours that the man be
" not a loser by him. For in contracts the first regard is had to
" the thing expressly mentioned in the agreement; when this can-
" not be obtained it is sufficient to give an equivalent; but whatever
" happens all imaginable care is to be used that the other party
" suffer no prejudice." (Book III, ch. 7, §3. English Translation,
Oxford, 1703, p. 225.)

It is obvious that neither of these attempted solutions of the
difficulty can be productive of complete justice. To leave matters
as they stood when the contract became impossible of fulfilment
may result in great gain to one of the parties and great loss to the
other and to a grave infringement of the maxim *nemo debet
locupletari aliena jactura*. It is no consolation to the individual
sufferer to be told that on the whole such a rule works less injustice
than any other. It is in truth a confession of impotence in the face
of a problem deemed to be inextricable.

On the other hand to attempt to restore matters in their entirety
is to attempt the impossible. The hands of the clock cannot be
turned back; things cannot be as if they had not been. At best
some sort of equitable accommodation can be achieved which must
inevitably fall short of complete justice. The process is sought to
be rationalised on a theory of quasi-contract. The parties have
made no provision in their contract for the event which has frus-
trated it, so the law implies for them what it assumes they would
have agreed upon if they had had the unforeseen contingency in
contemplation when they entered into their contract. On another
view, restitution is regarded as a separate principle of the law in-
dependent of contract.

Presented with this choice of methods of dealing with the situa-
tion, the law of England has adopted as its general principle the
first of the two alternatives, namely, that each party shall be left
as he stood, despairing of the practicability of conjecturing and
enforcing what the parties might be assumed to have agreed upon
if they had contemplated and provided for the unforeseen contin-
gency. The law of Scotland on the other hand, following in this
respect the Roman law, has accepted the principle of restitution,
though how far it has gone in doing so and with what qualifica-
tions it would be out of place for me to discuss here. It may suffice
to refer to the speeches of Lord Dunedin and Lord Shaw in the
*Cantiare San Rocco* case.

But the law of England has characteristically mitigated the
rigour of its doctrine in one instance, namely, where in pursuance
of a contract money has been paid by one party to the other for a
consideration which has completely failed. The right of a Plaintiff
to recover, under the common *indebitatus* count for money
received, any sum which he has paid for a consideration which has
wholly failed has long been fully recognised in the common law of

Page 161

**A770**

England. (See *Bullen and Leake's Precedents of Pleading,* 3rd ed. 1868, pp. 44 *et seq.)* My noble and learned friends whose opinions I have had the privilege of reading in advance have by ample citations fully vouched the law on the subject and the task is more fittingly discharged by them than by me.

How, then, if such be the law of England did *Chandler* v. *Webster* come to be decided as it was, for there never was a clearer case of money paid for a consideration which had entirely failed ? The explanation is to be found in the passage in the judgment of Collins, M.R., where he said that the doctrine of failure of consideration applies only where a contract is " wiped out altogether ' or, as Romer L.J. put it, " rescinded *ab initio,* " and does not apply where the parties are merely released from further performance. I can only say, with all respect, that this is a complete misapprehension. There is no authority for such a distinction and there is ample authority to prove that it does not exist. It has no basis in principle

3 [16]

or precedent. So *Chandler* v. *Webster* and its congeners must be consigned to the limbo of cases disapproved and overruled. They will be unwept save by those to whom for so many years they have furnished a fruitful and enlivening topic of discussion in lecture rooms and periodicals.

Your Lordships being of one mind that the so-called rule in *Chandler v. Webster* is unsound, the way lies clear for the decision of the present case. The Plaintiffs made a payment to the Defendants to account of the price of certain plant which the Defendants were to manufacture and deliver to them. Owing to circumstances arising out of the present hostilities the contract has become impossible of fulfilment according to its terms. Neither party is to blame. In return for their money the Plaintiffs have received nothing whatever from the Defendants by way of fulfilment of any part of the contract. It is thus a typical case of a total failure of consideration. The money paid must be repaid.

I am accordingly in favour of allowing the Appeal.

Page 163

Lord
Chancellor

Lord
Atkin

Lord

Russell of
Killowen

Lord

Macmillan

Lord
Wright

Lord
Roche

Lord
Porter

[17]

## FIBROSA SPOLKA AKCYJNA

*v.*

## FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED.

Lord Wright

## MY LORDS,

The statement of the facts of the case which has been made by my noble and learned friend the Lord Chancellor renders any further recital by me superfluous.

The claim in the action was to recover a prepayment of £1,000 made on account of the price under a contract which had been frustrated. The claim was for money paid for a consideration which had failed.

It is clear that any civilised system of law is bound to provide remedies for cases of what has been called unjust enrichment or unjust benefit, that is to prevent a man from retaining the money of or some benefit derived from another which it is against conscience that he should keep. Such remedies in English Law are generically different from remedies in contract or in tort, and are now recognised to fall within a third category of the common law

**Page 164**

**A773**

which has been called quasi-contract or restitution. The root idea was stated by three Lords of Appeal, Lord Shaw, Lord Sumner and Lord Carson, in *Jones* v. *Waring & Gillow,* 1926, A.C. 670, which dealt with a particular species of the category, namely, money paid under a mistake of fact. Lord Sumner at p. 696, referring to *Kelly* v. *Solari,* 9 M. & W." 54, where money had been paid by an insurance company under the mistaken impression that it was due to an executrix under a policy which had in fact been cancelled, said: " There was no real intention on the company's " part to enrich her." Payment under a mistake of fact is only one head of this category of the law. Another class is where, as in this case, there is prepayment on account of money to be paid as consideration for the performance of a contract which in the event becomes abortive and is not performed, so that the money never becomes due. There was in such circumstances no intention to enrich the payee. This is the class of claims for the recovery of money paid for a consideration which has failed. Such causes of action have long been familiar and were assumed to be commonplace by Holt L.C.J. in *Holmes* v. *Hall,* Holt 36, in 1704. Holt L.C.J. was there concerned only about the proper form of action and took the cause of the action as beyond question. He says: " If " A give money to B to pay to C upon C's giving writings, etc., and " C will not do it, *indebit* will lie for A against B for so much money " received to his use. And many such actions have been main- " tained for earnests in bargains, when the bargainor would not " perform, and for premiums for insurance, when the ship, etc., " did not go the voyage." The Chief Justice is there using " earnest" as meaning a prepayment on account of the price, not in the modern sense of an irrevocable payment to bind the bargain. And he is recognising that the *indebitatus assumpsit* had by that time been accepted as the appropriate form of action in place of the procedure which had been used in earlier times to enforce these claims such as debt, account or case.

By 1760 actions for money had and received had increased in number and variety. Lord Mansfield, in a familiar passage in *Moses* v. *Macferlan,* 2 Burr, 1005, sought to rationalise the action for money had and received, and illustrates it by some typical

2 [18]

instances. "It lies," he said (at p. 1012), "for money paid by
" mistake; or upon a consideration which happens to fail; or
" for money got through imposition (express or implied); or extor-
" tion; or oppression; or an undue advantage taken of the
" Plaintiff's situation, contrary to laws made for the protection of
" persons under those circumstances. In one word, the gist of this
" kind of action is that the Defendant upon the circumstances of
" the case is obliged by the ties of natural justice and equity to
" refund the money." Lord Mansfield prefaced this pronouncement
by observations (at p. *1008)* which are to be noted. " If the
" Defendant be under an obligation from the ties of natural justice
" to refund, the law implies a debt and gives this action *[sc. indebi-*
" *tatus assumpsit]* founded in the equity of the Plaintiff's case, as it
" were, upon a contract (' *quasi ex contractu* ' as the Roman law ex-
" presses it)." Lord Mansfield does not say that the law implies a
promise; the law implies a debt or obligation which is a different
thing. In fact he denies that there is a contract; the obligation is as
efficacious as if it were upon a contract. The obligation is a creation
of the law, just as much as an obligation in tort. The obligation
belongs to a third class, distinct from either contract or tort, though
it resembles contract rather than tort

This statement of Lord Mansfield has been the basis of the
modern law of quasi-contract, notwithstanding the criticisms which
have been launched against it. Like all large generalisations, it
has needed and received qualifications in practice. There is, for
instance, the qualification that an action for money had and re-
ceived does not lie for money paid under an erroneous judgment
or for moneys paid under an illegal or excessive distress. The law
has provided other remedies as being more convenient. The
standard of what is against conscience in this context has become
more or less canalised or defined. But in substance the juristic
concept remains as Lord Mansfield left it.

The gist of the action is a debt or obligation implied, or more
accurately imposed, by law, in much the same way as the law
enforces as a debt the obligation to pay a statutory or customary
impost. This is important, because some confusion seems to have
arisen, though perhaps only in recent times when the true nature
of the forms of action have become obscured by want of user. If
I may borrow from another context the elegant phrase of the Lord
Chancellor in the *United Australia* case, 1941 A.C. i, at p. 21, there,
as it seems to me, has sometimes been " a misreading of technical
" rules, now happily swept away." The writ of *indebitatus
assumpsit* involved at least two averments, the debt or obligation
and the *assumpsit.* The former was the basis of the claim and was
the real cause of action. The latter was merely fictitious, and need
not be traversed, but was necessary to enable the convenient and
liberal form of action to be used in such cases. This fictitious
*assumpsit* or promise was wiped out by the Common Law Pro-
cedure Act, 1852. As Bullen & Leake, " Precedents of Pleading,"

Page 166

**A775**

3rd Edition, p. 36, point out, this Act, by Section 3, provided that the Plaintiff was no longer required to specify the particular form of action in which he sues, and by Section 49 that *(inter alia)* the statement of promises in *indebitatus* counts which need not be proved were to be omitted; "the action of *indebitatus assumpsit,*" the authors add, " is [that is by 1868] virtually become obsolete." Lord Atkin in [1941] A.C., at p. 29, after instancing the case of the blackmailer, says "the man has my money which I have not " delivered to him with any real intention of passing to him the " property. I sue him because he has the actual property taken." He adds: ' These fantastic resemblances of contracts invented in " order to meet requirements of the law as to forms of action which " have now disappeared should not in these days be allowed to " affect actual rights." Yet the ghosts of the forms of action have

Page 167

[19] 3

been allowed at times to intrude in the ways of the living and impede vital functions of the law. Thus in *Sinclair* v. *Brougham,* 1914, A.C. 398, Lord Sumner stated at p. 452 that "all these " causes of action *[sc.* for money had and received] are common " upon a notional or imputed promise to repay." This observation, which was not necessary for the decision of the case, obviously does not mean that there is an actual promise of the party. The phrase " notional or imputed promise " is only a way of describing a debt or obligation arising by construction of law. The claim for money had and received always rested on a debt or obligation which the law implied, or more accurately imposed, whether the procedure actually in vogue at any time was debt or account or case or *indebitatus assumpsit.* Even the fictitious *assumpsit* disappeared after the Act of 1852. I prefer Lord Sumner's explanation of the cause of action in *Jones's* case *(supra).* This agrees with the words of Lord Atkin which I have just quoted. Yet serious legal writers have seemed to say that these words of the great Judge in *Sinclair v. Brougham (supra)* closed the door to any theory of unjust enrichment in English law. I do not understand why or how. It would indeed be a *reductio ad absurdum* of the doctrine of precedents. In fact the Common law still employs the action for money had and received as a practical and useful, if not complete or ideally perfect, instrument to prevent unjust enrichment, aided by the various methods of technical equity which are also available, as they were found to be in *Sinclair* v. *Brougham (supra).*

Must, then, the Court stay its hand in what would otherwise appear to be an ordinary case for the repayment of money paid in advance on account of the purchase price under a contract for the sale of goods merely because the contract has become impossible of performance and the consideration has failed for that reason ? The Defendant has the Plaintiff's money. There was no intention to enrich him in the events which happened. No doubt when money is paid under a contract it can only be claimed back as for failure of consideration where the contract is terminated as to the future. Characteristic instances are where it is dissolved by frustration or impossibility or by the contract becoming abortive for any reason not involving fault on the part of the Plaintiff where the consideration, if entire, has entirely failed, or where, if it is severable, it has entirely failed as to the severable residue, as in *Rugg* v. *Minett,* 11 East 210. The claim for repayment is not based on the contract which is dissolved on the frustration but on the fact that the Defendant has received the money and has on the events which have supervened no right to keep it. The same event which automatically renders performance of the consideration for the payment impossible, not only terminates the contract as to the future, but terminates the right of the payee to retain the money which he has received only on the terms of the contract performance. In *Hirji's* case (1926, A.C. 497, at p. 510) Lord Sumner, who has done so much in his judgments to elucidate the meaning and effect of frustration, contrasts rescission of a contract by one party on the

Page 168

**A777**

ground of breach by the other party, which depends on election by the former, with frustration, which operates automatically apart from either party's election. He finds, however, a similarity in the respect that rights and wrongs which have come already into existence remain, though the contract is ended as regards obligations *de futuro*. But the contract is in neither case wiped out, or avoided *ab initio*. The right in such a case to claim repayment of money paid in advance must in principle, in my judgment, attach at the moment of dissolution; the payment was originally conditional; the condition of retaining it is eventual performance; accordingly when that condition fails the right to retain the money must simultaneously fail. It is not like a claim for damages for breach of the contract, which would generally differ in measure and amount, nor

**A778**

4 [20]

is it a claim under the contract. It is in theory and is expressed to be a claim to recover money, paid to the use of the Plaintiff. This, I think, was the view of Lord Haldane L.C. speaking for the Judicial Committee in *Royal Bank of Canada* v. *R.,* 1913, A.C. 283, at p. 296. He said: " It is a well-established principle " of the English Common Law that when money has been received " by one person which in justice and equity belongs to another, " under circumstances which render the receipt of it a receipt by the " Defendant to the use of the Plaintiff, the latter may recover as for " money had and received to his use." The principle extends to cases where the money has been paid for a consideration which has failed. It applies, as was pointed out By Brett L.J. in *Wilson v. Church,* 13 Ch.D. 1, at p. 49, when money has been paid to borrowers in consideration of the undertaking of a scheme to be carried into effect subsequently to the payment and which has become abortive. The lender has in this case a right to claim the return of the money in the hands of the borrowers as being held to his use. This language of Brett L.J. was used in connection with the failure of a scheme for the development of a concession in Bolivia which the Bolivian Government revoked, thus rendering the fulfilment of the scheme impossible. The House of Lords affirmed the judgment of a strong Court of Appeal, and held that the borrowers were entitled to repayment of their loan, on the ground that the consideration for the loan had failed *(National Bolivian Navigation Company* v. *Wilson,* 5 A.C. 176, in particular per Lord Cairns L.C., at p. 185). Some years earlier a decision, not dissimilar in principle, was reached in 1850, in *Ashpitel* v. *Sercombe,* 5 Ex- 147. The Plaintiff had paid a deposit on his application for shares in a projected railway company but the scheme had to be abandoned for want of sufficient subscriptions. The appeal was heard before Patteson, Coleridge, Maule, Cresswell, Wightman, Erie and Williams JJ., all masters of the Common Law. The Plaintiff's claim for return of the deposit was upheld. Patteson J., delivering the judgment of the Court, said (at pp. 161-162): " This was an action for money had and received, " brought by the Plaintiff, an allottee of shares in a proposed rail- " way company, which had been abandoned before the commence- " ment of the action, without any fraud or misconduct, against " the Defendant, one of the Managing Committee, to recover back " the Plaintiff's deposit. . . . There seems to be no doubt that " the Plaintiff, having paid his money for shares in a concern which " never came into existence, or a scheme which was abandoned " before it was carried into execution, has paid it on a consideration " which has failed, and may recover it back as money had and " received to his use." It was further held that the Defendant could not deduct money which the directors had expended towards carrying out the scheme, unless it could be shown that the Plaintiff had consented to or acquiesced in the application of his money. The books contain other cases of a similar character, such as *Johnson* v. *Goslett,* 3 C.B.N.S. 569. These cases were merely special instances where performance having become impossible, the payers were held

**Page 170**

**A779**

entitled to recover what they had paid, the contract having come to an end between the time when the money was paid and the date at which the contract was ended. Similar claims have been made for recovery of deposits paid. Such a claim has succeeded even under a contract by deed for the purchase of an estate. Thus in *Greville* v. *Da Costa,* Peake Add. Cas. 113, the vendor was disabled from selling by an order of the Lord Chancellor. Lord Kenyon said that the Defendant held the money against conscience and therefore might be compelled to repay it by an action for money had and received. It is clear that the failure of consideration need not be attributable to breach of contract or misconduct on the part of the Defendant, as the cases I have cited and many others show. Impossibility of performance or frustration is only

Page 171

[21] 5

a particular type of circumstance in which a party who is disabled from performing his contract is entitled to say that the contract is terminated as to the future, and in which repayment of money paid on account of performance *may* be demanded.

These principles, however, only apply where the payment is not of such a character that by the express or implied terms of the contract it is irrecoverable even though the consideration fails. The contract may exclude the repayment. An illustration of this is afforded by advance freight which by English law is not recoverable if the delivery of the goods is prevented by the act of God, perils of the seas or other excepted cause, which excludes an action of damages. In *Allison* v. *Bristol Marine Insurance Co.,* 1 A.C. 209, 253, Lord Selborne stated it to be " the peculiar rule of English " mercantile law that an advance on account of freight to be earned " is, in the absence of any stipulation to the contrary, an irrevocable " payment at the risk of the shipper of the goods ". So indeed the law had been laid down by Sanders L.C.J. in *Anon. 2* Shower 283 in 1682 and has remained ever since. I may also refer to *Byrne v. Schiller,* L.R. 6 Ex. 319. The irrecoverable nature of the payment is there determined by custom or law, unless the contract provides for the contrary. In other cases likewise a particular contract may effectively make a prepayment irrecoverable. In the present case the payment is not made irrecoverable by any custom or rule of law or by any express or implied terms of the contract. It was paid on account of the price; it was not paid out-and-out for the signing of the contract. When the sellers were disabled to perform the contract by the shipment to Gdynia becoming illegal, the ordinary rules of law and the authorities to which I have referred show that the sum of £1,000 paid in advance of the price was recoverable by the Appellants In the present action.

The Court below have held themselves bound to reach the contrary decision only on the authority of certain cases, generally known as the Coronation cases, in particular *Blakeley v. Muller,* reported in a note to *Civil Service Co-operative Society* v. *General Steam Navigation Company,* 1903, 2 K.B. 756, and *Chandler* v. *Webster,* 1904, 1 K.B. 493. These cases dealt with agreements for the hiring of rooms from which to view the procession on the coronation of King Edward VII. It had been held in *Krell* v. *Henry,* 1903, 2 K.B. 740, that the mere use of the rooms on the appointed day was only part of the consideration for the agreed payment, and that an essential part of the consideration was the opportunity of viewing the procession. That was the object or basis of the contract in contemplation of both parties. When the procession could not take place, the contract, it was held, became abortive or was frustrated. There was no decision in that case on whether money paid in advance was recoverable. In *Blakeley* v. *Muller (supra)* the prepayment had fallen due before the frustration supervened. A Divisional Court held that the hirer, who had paid in advance, could not recover back the money. They

did not discuss the principles or authorities to which I have referred on the right to recover money paid for a consideration which has failed. I take the *ratio decidendi* from the judgment of Channell J., because in the next case of that type, the *Civil Service Co-operative Society (supra),* Lord Halsbury, sitting in the Court of Appeal, quoted a long passage from it and added that he concurred with every word of it. The reasoning of Channell J., as I understand his judgment, was that the loss must remain where it was at the time of the abandonment, because it was impossible to import into a contract a condition which the parties might have imported but had not, and that under *Taylor* v. *Caldwell,* 3 B. & S. 826, and *Appleby and Myers,* L.R. 2, C.P. 651 (cases of impossibility), all that was said was that the parties were excused from further performance, not that anything that was done under the contract was void.

6 [22]

In the former case, the claim was for damages, in the latter it was on a *quantum meruit* for partial performance of an entire consideration. Each claim failed. Neither was a claim for money had and received. Channell J. instanced the case of advance freight under the charter-party. I have already explained that rule, which in Lord Selborne's view is peculiar. I have also explained my view that the right to repayment of advance payments as money had and received to the Plaintiff's use is not a claim under the contract or for further performance of the contract or for damages, but a claim outside the contract. The ground of the claim is that the contract has been dissolved as to future performance and hence that the consideration has failed. The Court of Appeal, however, dismissed the claim for the money, following *Blakeley* v. *Mutter (supra)*. When shortly afterwards the same question on similar facts again came before a differently constituted Court of Appeal, in *Chandler v. Webster (supra)*, Collins M.R. discussed the matter more elaborately, but he still ignored the principles and authorities upon the action for money had and received to which I have referred, though the claim was to recover as on a total failure of consideration; he indeed discusses the case from that point of view *loc. cit.* at p. 499. The hirer was claiming to recover what he had paid in advance and was resisting a counterclaim for the balance which was by the contract payable before the date when the procession became impossible. He ought, in my opinion, to have succeeded on both issues, but by the judgment of the Court of Appeal he failed on both. The reasoning of the Master of the Rolls may, I think, fairly be summarised to be that impossibility through the fault of neither party leaves the parties where they were but relieves them from further performance; that it is only if the contract is wiped out altogether that money paid under it would have to be repaid as on a failure of consideration, but that the only effect of impossibility is to release the parties from further performance; the rule, he said, is arbitrary, but it is really impossible to work or adjust with any exactitude what the rights of the parties in the event should be. I hesitate to criticise the ruling of so great a lawyer as the Master of the Rolls. But I cannot concur in these propositions. I need scarcely repeat my reasons for doing so, which are apparent from what I have already said. The claim for money had and received is not, in my opinion, a claim for further performance of the contract; it is a claim outside the contract. If the parties are left where they are, one feature of the position is that the one who has received the prepayment is left in possession of a sum of money which belongs to the other; the frustration does not change the property in the money; nor is the contract wiped out altogether, but only the future performance. I may add that the difficulty emphasised by the Master of the Rolls that such a claim involves constructing a hypothetical contract by supposing what terms the parties would have arrived at if they, contemplated the future impossibility does not arise. But I do not think that this way of envisaging the matter accords with the true position. In my opinion the contract is automatically

terminated as to the future because at that date its further per-
formance becomes impossible in fact, under circumstances which
involve no liability for damages for the failure on either party.
When the Court holds a contract to be thus terminated, it is simply
giving appropriate effect to the circumstances of the case, including
the actual contract and its meaning as applied to the event. It is this
view which is involved in Lord Sumner s phrase in *Hirji (supra],* at
p. 510. "It" *[sc.* the doctrine of frustration] "is really a device
" by which the rules as to absolute contracts are reconciled with a
" special exception which justice demands." He combines with
this a reference to what has been generally accepted by English
Law, that the rule is explained in theory as a condition or term
of the contract implied by the law *ab initio.* No one who reads

**A784**

[23] 7

the reported cases can ignore how inveterate is this theory or
explanation in English law. I do not see any objection to this
mode of expression so long as it is understood that what
is implied is what the Court thinks the parties ought to
have agreed on the basis of what is fair and reasonable, not what
as individuals they would or might have agreed. " It is," said
Lord Sumner, "irrespective of the individuals concerned, their
" temperaments and failings, their interest and circumstances".
The Court is thus taken to assume the rôle of the reasonable man,
and decides what the reasonable man would regard as just on the
facts of the case. The hypothetical " reasonable man " is personified
by the Court itself. It is the Court which decides. The position is
thus somewhat like the position in the cases in which the Court
imports a term in a contract on the basis of what is reasonable. As
frustration is automatic, so equally the claim for money had and
received here follows automatically.

   *Chandler* v. *Webster (supra)* has bound subsequent Courts of
Appeal. Mr. Holmes has contended that it was accepted by this
House as good law in the *French Marine* case, 1921, 2 A.C. 494, and
was not open to review by your Lordships. The most obvious and
shortest answer to that argument is that in *Cantiare San Rocco* y.
*Clyde Shipbuilding Co.,* 1924, A.C. 226, Lord Birkenhead *loc. cit.*
at p. 233, observed of *Chandler* v. *Webster (supra]* that none of
the relevant authorities on the law of England on this question was
binding on the House. Lord Atkinson agreed, and Lord Shaw
indicated that the question of English Law was open in this House.
The *French Marine* case *(supra)* related to freight under a voyage
charter payable on a time basis and the decision may therefore
have been affected by the English rule as to advance freight,
because it was a claim for repayment of time freight paid in
advance for days subsequent to the requisition of the ship which
rendered her further use by the charterers impossible. Their Lord-
ships were divided in opinion, and it is not clear that there was any
real agreement among the majority as to the *ratio decidendi.* I
think the essential ground taken was that the contract provided for
certain events in which freight was to cease, but not for the
particular event in which the contract terminated. But it was also
treated as a case of a partial failure of consideration.

   The decision reached in *Chandler's* case *(supra)* is criticised by
Williston, Contracts, section 1954, p. 5477 (see too, section 1974.
P. 5544), and has not been followed in most of the States of America,
Nor is it adopted in the Restatement of the Law of Contract by the
American Law Institute, section 468, pages 884 *et seq.* Indeed
the law of the United States seems to go beyond the mere remedy
of claims for money had and received and to allow the recovery
of the value of the benefit of any part performance rendered while
performance was possible. Such and similar claims should be
recognised in any complete system of law, but it is not clear how
far they have been admitted in English law. The Scots Law upheld

in the *Cantiare* case *(supra)* may seem to be generally like the English Law and to be limited to recovery of money payments. The opinion which I have been stating perhaps brings the two laws into substantial accord, though in the passage quoted by Lord Birkenhead in the *Cantiare* case *(supra)* at p. 237, from Lord President Inglis' judgment in *Watson v. Shankland,* 10 M. 142, that judge seems to accept that the payer who has paid in advance should give credit to the extent that he is *lucratus* by any part performance. I do not wish to discuss how far, if at all, this is open in English Law. That was a case of advance freight, which Scots Law treats as a prepayment on account. But I think it is clear both in English and Scots Law that the failure of considera-tion which justifies repayment is a failure in the contract perform-ance. What is meant is not consideration in the sense in which

8 [24]

the word is used when it is said that in executory contracts the
promise of one party is consideration for the promise of the other.
No doubt in some cases the recipient of the payment may be
exposed to hardship if he has to return the money though before
the frustration he has incurred the bulk of the expense and is then
left with things on his hands which become valueless to him when
the contract fails, so that he gets nothing and has to return the
prepayment. These and many other difficulties show that the
English rule of recovering payment the consideration for which has
failed works a rough justice. It was adopted in more primitive
times and was based on the simple theory that a man who has paid
in advance for something which he has never got ought to have his
money back. It is further imperfect because it depends on an
entire consideration and a total failure. Courts of equity have
evolved a fairer method of apportioning an entire consideration
in cases where a premium has been paid for a partnership which
has been ended before its time (Partnership Act, sec. 40), contrary
to the Common law rule laid down in *Whincup v. Hughes*, L.R. 6
C.P. 78. Some day the Legislature may intervene to remedy these
defects.

I ought to notice in order to reject an argument of Mr. Holmes
that the House should not reverse or depart from a doctrine which
has stood since 1904 and has been followed in several cases by the
Court of Appeal and acted upon on practical affairs. The doctrine,
however, has been severely criticised by writers both in this country
and elsewhere and has been treated as open to review by this House
as recently as 1923 in the *Cantiare* case *(supra)*. If the doctrine is,
as I think it clearly is, wrong and unjust, it is the duty of this
House, exercising its function of finally declaring the law, to reverse
it, unless there are very special circumstances such as were recently
considered in the *Valverda*, 1938, A.C. 173. On the other hand,
in *Lissenden* v. *Bosch*, 1940, A.C. 412, the House has recently over-
ruled a decision which had been acted upon in frequent practice
for 27 years.

I may in conclusion add a reference to a very learned article by
Professor Buckland, in Harvard Law Review, Vol. XLVI, p. 1281:
he concludes by observing that whatever the merits or demerits of
*Chandler* v. *Webster (supra)* and other cases which he considers
in that article, the Roman Law cannot be made responsible for the
rules laid down in them.

In ray judgment the Appeal should be allowed.

[25]

Lord
Chancellor

Lord
Atkin

Lord
Russell of

Killowen

Lord
Macmillan

Lord
Wright.

Lord
Roche.

Lord
Porter

## FIBROSA SPOLKA AKCYJNA

*v.*

## FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED

# Lord Roche

MY LORDS,

I also am of opinion that this Appeal should be allowed and that judgment should be entered for the Appellants for the amount of their claim in the action.

The contents of the relevant documents and the facts of the case have been so fully set out by the Lord Chancellor that it is unnecessary that I should add anything to his recital. But having regard to the importance of the principles involved I think it right to state concisely the reasons for my conclusion.

I have no doubt that this case is one of frustration of the contract and falls within the doctrine applicable to such cases. An alternative case made by the Appellants that the contract was merely suspended and whilst suspended was repudiated by the Respondents is, I think,

without foundation. The claim of the Appellants, therefore, must be and is a claim to recover the £1,000 in dispute as money had and received to their use as paid upon a consideration which has wholly failed. The Courts below have held themselves bound by authority to decide against this claim. The principal authority for the supposed binding rule of law is the case of *Chandler* v. *Webster* (L.K. 1904 1 K.B. 493) which, it is contended, lays down the rule that on the occurrence of an event which frustrates the performance of the contract the loss lies where it falls and that money paid by one party to the contract to the other party is to be retained by the party in whose hands it is. Taken in their broad and natural sense, the much criticised sentences in the judgment of Collins M.R. in *Chandler* v. *Webster (supra* at p. 499) ending 'Therefore the " doctrine of failure of consideration does not apply " certainly support a conclusion in favour of the rule contended for. Taken in that sense the proposition is, in my judgment, erroneous in law and unsupported by any authority binding upon this House. It is, however, not unimportant to observe the context in which the criticised sentences occur. The learned Master of the Rolls was contrasting the case of contracts avoided *ab initio* where the Courts of England have power to decree restitution and the case of contracts frustrated but subsisting nevertheless up to the moment of frustration. In the latter case it is, I think, true that the law of England, differing in this respect from the civil law and the law of Scotland, does not provide for the exercise of any power by the Courts to decree restitution or repetition on similar or analogous lines to those exercised where contracts are avoided *a b initio*—see *Cantiare San Rocco S.A.* v. *Clyde Shipbuilding and Engineering Coy.* (1924, App. Cas. 226). It is to be observed that whilst the law of England was not directly in question in that case, Lord Birkenhead stated in express terms that the Coronation cases were open to review in this House and were not binding upon your Lordships.

The question therefore is whether, although the Courts of England have not, as was rightly held in *Chandler* v. *Webster,* a power to decree restitution in the sense above discussed, the matter is concluded against the Appellants. The case made by the Appellants

**Page 180**

**A789**

2 [26]

is that no such doctrine of restitution is necessary to entitle them
to succeed in this action. They contend that they are entitled to be
repaid their money because of the operation of ordinary and
accepted rules of law applicable upon a total failure of considera-
tion. In my opinion that contention is right. The true rule, I
think, is that in cases of frustration the loss does lie where it falls,
but that this means where it falls Raving regard to the terms of
the contract between the parties. If under a contract payments
have been made which have been variously described as absolute
or final or out-and-out payments, then they are not recoverable by
the party who made them. Payments of freight in advance are
payments of this nature. Whatever the origin of the rule as to
advance freight, under decisions now centuries old and long acted
upon in commerce the rule itself that such payments of freight
are final and irrecoverable payments is beyond question. In the
case of *French Marine* v. *Compagnie Napolitaine*, 1921, 2 App.
Cas. 494, the majority judgments in this House applied the same
rule to a payment of hire under a time charter-party by reason
of the terms of the charter-party itself (see per Lord Dunedin, at
p. 513, and per Lord Sumner, at p. 519). It is, I think, not un-
important to observe that in the case of *Chandler* v. *Webster
(supra)* Mathew L.J. based his judgment on this ground of finality
in the payment (see 1904, I K.B., at p. 502), and I am disposed
to think that the Master of the Rolls, at p. 497 of the report, is
presenting a similar view of the facts and I am the more disposed
so to think because he, for one of the judges concerned, was a
supreme master of the common law, and unlikely on another
view of the facts to have expressed himself as he did. Similar
views on the facts are expressed in others of the Coronation cases
by some of the judges (see *Civil Service Co-operative Society* v.
*General Steam Navigation Coy.,* 1903, 2 K.B. 756, at pp. 762 and
764), where the payments in question were said to be comparable
to payments of freight in advance. It is, in my judgment, un-
necessary and unfruitful to consider whether, on this ground, those
cases were or were not rightly decided on the facts and documents
in question, but if the payments under discussion were properly
to be regarded as final or out-and-out payments, then in my judg-
ment the conclusion properly followed that they were not recover-
able. It is not possible to say of such payments that the considera-
tion for their payment has wholly failed.

The converse case remains to be considered. It is, I think, a well
settled rule of English law that, subject always to special provisions
in a contract, payments on account of a purchase price are recover-
able if the consideration for which that price is being paid wholly
fails (see *Ockenden* v. *Henly,* E.B. & E. 485, at p. 492). Looking
at the terms of the contract in the case now under consideration,
I cannot doubt that the sum sued for was of this provisional nature.
It was a part of a lump sum price, and when it was paid it was
no more than a payment on account of the price. Its payment
had advantages for the Respondents in affording some security

Page 181

that the Appellants would implement their contract and take up the documents and pay the balance of the price, and it may be that it had other advantages in providing finance for the manufacture of the machines. But if no machines or documents of title were delivered to the Appellants, as was the actual case, then in my opinion the consideration for the price, including the payment on account,; wholly failed and the payment so made is recoverable. It was contended by the Respondents' counsel that unless there is to be found some default on the part of the recipient of such a payment as is now in question the consideration cannot be said to have wholly failed merely because the frustration of the contract produced a result which, had it been due to some default, would have amounted to a failure of consideration. I find no

[27] 3

authority to support this contention, which seems appropriate to an action for damages, but foreign to the action for money had and received. In the case of *Rugg v. Minett*, n East 210, the Court seems to have proceeded on a principle contrary to that contended for when it allowed under this money count payments on account for unappropriated goods destroyed by accidental fire (see p. 219 of the Report). There is no suggestion in that Report of any default on the part of the sellers.

For these reasons I am of opinion that the Appellants arc entitled to suceed.

My Lords, I only desire to add that I am conscious that a conclusion relegating parties in cases of frustration to their contracts may not work out a completely just solution in the pecuniary sense. It happens that in this case it will do so, for the Appellants, who did not get the goods or the documents, will get their money back, and the Respondents have had the machines, which, so far as completed, were said by the Respondents themselves to be realisable without loss. In other cases it might turn out otherwise, and the application of the rules of the civil law or of Scots law might work greater justice, but I do not understand that even those rules would cover the whole ground so as to effect an ideally just distribution of the burden of loss due to the frustration of contracts. But at least, or so it seems to me, the rule now to be laid down by this House is not only more agreeable to the law of England, but is more consistent with justice than the rule upon which the Courts below felt impelled to base their decision. At all events, parties to contracts will know that as the law stands the contract between them is the matter of crucial or final importance, and that if, as may very well be the case in time of war or impending war, frustration of their contracts is to be apprehended, they may make what contracts they think fit to provide in that event for the adjustment of the position between them.

Lord
Chancellor

Lord
Atkin

Lord
Russell
of Killowen

Lord

Macmillan

Lord
Wright

Lord
Roche

Lord
Porter

[28]

## FIBROSA SPOLKA AKCYJNA

*v.*

## FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED

# Lord Porter

## MY LORDS,

The task imposed on your Lordships is said to be a reconsideration of what has been described as the rule in *Chandler* v. *Webster* (1904) 1 K.B. 493. That rule has been variously stated by saying that in a case where a contract is frustrated (1) the loss lies where it falls, and (2) one who has paid money in advance under a contract which provides for the making of such payment cannot recover that money if the contract is afterwards frustrated. Whether either or both principles are to be found in *Chandler* v. *Webster (supra)* need not be determined for the moment: the vital question is are they in fact accurate statements of the law ? The question has given rise to much controversy, and it has been contended on the one hand that in case of total failure of consideration the sum paid should be recoverable upon the ordinary principles applicable in English Law, and on the other that the law is not so wanting in ingenuity as to be unable to apply the principles which are said to find favour in the Scottish Courts and are discussed in *Cantiare San Rocco S.A.* v. *Clyde Shipbuilding Coy. (1924) A.C. 226*; a decision which is alleged to determine that on

some principle of restitution the payer can get back at least an equitable proportion of the sum which he has paid, though exactly what proportion and upon what principle does not, I think, appear.

It may perhaps be advisable to dispose of the second contention at once. I can find no warranty for its application in English Law. Under that system money had and received to the Plaintiff's use can undoubtedly be recovered in cases where the consideration has wholly failed, but unless the contract is divisible into separate parts it is the whole money, not part of it, which can be recovered. If a divisible part of the contract has wholly failed and part of the consideration can be attributed to that part, that portion of the money so paid can be recovered, but unless this be so there is no room for restitution under a claim in *indebitatus assumpsit*. A partial failure of consideration gives rise to no claim for recovery of £>art of what has been paid.

Indeed the contrary has not been contended. What has been said is that the doctrine of frustration depends upon the implication of an implied term. Reasonable persons, it is said, would not have had in mind the event which befell, but if they had they would have unhesitatingly said, "In that event all further " obligation of performance on either side is at an end." So far and no further it is acknowledged the law of this country has gone. But, it is urged, a system of jurisprudence which is astute enough to devise such a term is capable of adding to it the proviso that in such a case some equitable proportion of any sum paid in advance shall be recoverable when the contract becomes impossible of performance. It might be desirable that the law should make some such provision. Indeed the Law Revision Committee has so recommended. But without an Act of Parliament it is difficult to determine what sum shall be recoverable and upon what principles. This difficulty is envisaged by Collins M.R. in *Chandler* v. *Webster (supra)* at p. 500 and is apparent from a perusal of the Report of the Committee. But however desirable the result, I can see no way by which in accordance with English authority or principle a right to recover some equitable sum can be implied.

[29] 2

The only other suggestion made to your Lordships on behalf of the Appellants, and indeed, as I think, the only argument open to them, is that the money which they have paid is recoverable as on a consideration which has wholly failed. With that aspect proceed to deal, merely prefacing my remarks by observing that whether, one adopts the principle that money so paid is recoverable or irrecoverable one may be found to have treated one side or the other with considerable harshness. A contractor stipulates for payment in advance of the whole price of an article which he is to supply and has done nothing when the contract is frustrated, he keeps the whole, perhaps if he keeps any part of the money paid in advance, the buyer is hardly treated. On the other hand he may have done the whole of the work upon an article useless to anyone except the purchaser, but not delivered it, and if the buyer can recover his advance the whole loss will fall upon the seller, and in that case the seller is as hardly treated as the buyer would be in the other. Moreover, the closely analogous case of a supplier who has obtained no advance but though he has done all the work has not delivered the goods and therefore is not able to demand payment, is left unredressed in England, as indeed it is in Scotland. It is possible to say that the seller in such a case who has been prudent enough to stipulate for a payment in advance should reap the advantage of his foresight, but to do so is to speculate as to the object for which the advance was obtained, not to ascertain what his legal remedies are upon the facts as known. In these circumstances I see nothing for it but to neglect considerations of hardship in individual cases and to consider only abstract principles of law.

The doctrine that money payable in advance, under a contract which is afterwards frustrated, is irrecoverable is not of old standing. It began, I think, with the so-called coronation cases. It is true that in *Appleby* v. *Myers* (1867) L.R. 2 C.P. 651 at p. 659 Blackburn J. says of the destruction of the premises, " it is a mis-" fortune equally affecting both parties; excusing both from further " performance of the contract but giving a cause of action to " neither." But this was said in a case where no question of money paid in advance arose and has reference only to the facts of that case.

Of the other cases quoted to us which were decided about the same period, *Stubbs* v. *Holywell Pty.* (1867) L.R. 2 Exch. 31, *Whincup* v. *Hughes* (1871) L.R. 6 C.P. 78 and *Anglo-Egyptian Navigation Coy.* v. *Rennie* (1875) L.R. 10 C.P. 271 are, I think, cases where the consideration was partly performed. In the last-mentioned case, penman J. in delivering the judgment of the Court was careful to point out that the contract was substantially a contract for work and labour: and much work and labour had undoubtedly taken place before further performance of the contract became impossible.

Page 186

**A795**

It is true, however, that advance freight by long custom cannot be recovered though the goods shipped are never delivered. *Byrne v. Schiller* (1871) L.R. 6 Ex. 319 and *Allison v. Bristol Insurance Company* (1875) 1 App. Cas. 209 so declare. The decision was reached with regret. In the former case Cockburn C.J. says he thinks the rule founded on erroneous principle and anything but satisfactory, and Montague Smith J. regards it as the result of an implied term. In the latter Lord Hatherley says, " We must remember that from a very early " period, as long ago, it was said during the argument, as the time " of Charles II.—at all events for a very long time—it has been " settled in our maritime law that prepaid freight cannot be " recovered back ", and all their Lordships seem to have been in-fluenced by the fact that it was the practice for the merchant to insure prepaid freight and indeed of the shipowner to make an allowance for that purpose. This may be the principle applied in *French Marine* v. *Compagnie Napolitaine* (1921) 2 A.C. 494 by the

Case 15-1595, Document 52, 08/27/2015, 1586818, Page195 of 302

## 3 [30]

majority of the House, or it may be that the grounds of that decision
are to be found in the words of Lord Sumner at p. 517, " Here there
" was no total failure of consideration but a partial failure only, for
" which in law no *pro rata* repayment could be claimed." On either
view it is not decisive of the present case.

If I am right in supposing that cases of advance freight form
a class by themselves and that the other cases referred to are
examples of a partial failure of consideration, the doctrine that
money paid in advance in pursuance of the terms of a contract
which is afterwards frustrated cannot be recovered originates, if
it originates at all, with the coronation cases. They were conveni-
ently tabulated by Mr. Holmes in the course of his argument.
*Clark v. Lindsay* and *Griffith* v. *Brymer* (both reported in 19
T.L.R. at pp. 202 and 434 respectively) may be disregarded, since
in each case the contract was entered into under a mistake of
fact as to the state of the King's health at the time when they
were made and therefore both were void *ab initio. Blakeley* v.
*Muller* (1903) 2 K.B. p. 760 (note) and *Lumsden* v. *Barton,* 19
T.L.R. 53 may, I think, be regarded as instances of contracts
partially performed, though the former seems to contain language
applicable to contracts wholly unperformed. *Krell* v. *Henry* (1903)
2 K.B. 740 merely decided that money not due when the frustra-
tion took place was not in law payable, but *Civil Service Co-
operative Society* v. *General Steam Navigation Coy.* (1903) 2 K.B.
756 and *Chandler* v. *Webster* (1904) 1 K.B. 493 are authorities
for the general proposition that money paid in advance under
the terms of a frustrated contract cannot be recovered. In *Blakeley*
v. *Muller (supra]* at p. 761 Wills J. founded his decision on *Appleby*
v. *Myers [supra]* and said: " The argument for the Plaintiffs must
" be that the contract was rescinded *ab initio ",* and Channel! J.
relied upon the analogy of advance freight and added: " All that
" can be said is that when the procession was abandoned, the con-
" tract was off, not that anything done under the contract was void.
" The loss must remain where it was at the time of the abandon-
" ment." I quote from his judgment because it was adopted by
Lord Halsbury, sitting in the Court of Appeal, in *Civil Service Co-
operative Society* v. *General Steam Navigation Coy. (supra)* and
is, I think, the foundation of the decision in *Chandler* v. *Webster
(supra)*. In the latter case the leading judgment was delivered by
Collins M.R. who, in relying upon *Taylor* v. *Caldwell (supra),* says
" where ", owing to frustration, " the contract can no further be
" performed by either party it remains a perfectly good contract up
" to that point and everything previously done in pursuance of it
"must be treated as rightly done, but the parties are both dis-
" charged from further performance of it. If the effect were that
" the contract were wiped out altogether no doubt the result would

[1] be that money paid under it would have to be repaid as on a
" failure of consideration. But that is not the effect of the doctrine;
" it only releases the parties from further performance of the con-
' tract. Therefore the doctrine of failure of consideration does not

' apply ". To the same effect Romer LJ. says at p. 501: " Except
' in cases where the contract can be treated as rescinded *ab initio,*
' any payment previously made and any legal right previously
'accrued according to the terms of the agreement will not be
' disturbed ".

The doctrine as so stated appears to be confined to the termina-
tion of contracts by excusable impossibility and to enunciate a
feature peculiar to such cases. I know of no authority other than
the so-called coronation cases and those which have followed them
in which such a doctrine is promulgated, and except the statements
contained in those cases, weighty and formidable though they be, I
can find no principle to support it.

It is not, I think, accurate to say in general—nor did the
Respondents' advocates seek to support such a statement—that

[31] 4

money had and received can only be recovered as upon a con-
sideration which failed in cases where the contract is void *ab initio*.
The true view is, I think, expressed by Brett LJ. (as he then was)
in *Wilson v. Church* (1879) 13 Ch.D. 1 at p. 49, a case in which he
refused to find fraud. His words are: " The principle of law seems
" to me to be identical with what it would be if the money were paid
" to the borrowers for a consideration which is to be accomplished
" after the payment of the money, and by the most ordinary prin-
" ciple of law, where money is paid for a consideration which is
" to be performed after the payment, if that consideration wholly
" fails, the money becomes money in the hands of the borrowers
" held to the use and for the benefit of the lenders, and must be
" returned ". The decision in that case was affirmed in your Lord-
ships' House under the title *National Bolivian Navigation Coy.* v.
*Wilson* (1880) 5 App. Cas. 176, and the language of Brett L.J. was
approved by Lord Haldane L.C. in *Royal Bank of Canada* v. *Rex*
(1913) A.C. 283 at p. 296. It may be urged that these were cases
of borrowed money and that there was fault though not fraud in
the borrower. I do not think that the decision turned upon so
narrow a ground, but in truth the principle may be illustrated
by the law Which is now codified in Sects. 6 and 7 of the Sale of
Goods Act and was formerly illustrated by *Rugg v. Minett* (1809)
ii East 210. The two sections deal with two cases of impossibility
arising in the cases of the sale of ascertained goods. The first
section treats of a case where the goods have perished before the
agreement for sale is made and is an example of a contract void
*ao initio*. *Clark* v. *Lindsay* and *Griffith* v. *Brymer (supra)* are
illustrations of the same doctrine translated from the sphere where
the tangible subject matter of the contract perished to that where
supervening impossibility prevented the achievement of the object
with which the contract was entered into. The second section, on
the other hand, treats of a contract validly made and continuing in
existence until the goods perish. It is not void *ab initio,* but further
performance is excused after the destruction has taken place.
Yet the price is returnable because the consideration for the whole
or the part undelivered has wholly failed, as the Section says
" without fault on either side ".

This is, I think, the rule generally applicable, but it is not
always so. There are cases where the payer pays not for the per-
formance of the receiver's promise but for the promise itself—not
for the doing of something but for the chance that it may be done.
This, I think, was Mathew L.J.'s view in *Chandler v. Webster,*
when he says, at p. 502, " I think the payment of the £100 by the
" Plaintiff was intended to be a final payment in pursuance of the
" contract, and I do not think such a payment can be recovered
" back ".

The Respondents relied upon this statement and maintained
that the present, like the Coronation cases, was an instance of a
final payment which could not be recovered.

Page 190

**A799**

They also contended that no recovery was possible except in cases where the contractor who has received the money in advance was in fault in some way.

I can find no authority for the second argument, and it is, I think, contrary to the views expressed by the Court of Exchequer in *Knowles* v. *Bovill* (1870), 22 L.T. 70. It is true that in the majority of cases the consideration fails because one party or the other fails to carry out his contract. But it is not the breach but the failure of consideration which enables money paid in advance to be recovered.

The question whether the payment of the £1,000 in advance in the present case was a "final payment" or not depends on no general principle of law but upon the wording of the contract in this particular case.

Page 191

5 [32]

To my mind, clearly it was not. The contract was for the sale of machines c.i.f. Gdynia. It is true that there was an additional provision for the services of a skilled monteur, but in my view the contract would have been substantially fulfilled by shipping the goods to Gdynia and furnishing the requisite documents against payment of the balance of the price, though a failure to provide a monteur might have given rise to a claim for damages.

The price was a lump sum price to be paid in two portions, viz. one-third with the order, balance against shipping documents. But the sum payable in advance was part of the lump sum price payable for the completed articles. The goods remained the property and at the risk of the sellers until the documents were presented and taken up. The case seems to me to come exactly within the principle of Sect. 7 of the Sale of Goods Act, and had they been destroyed by enemy action I cannot doubt but that the advance portion of the price would have been recoverable.

That the inability of the sellers to implement their contract was due to supervening illegality and not to destruction of the subject matter appears to me to make the Plaintiffs' claim at least no weaker. Whether it strengthens it has not been discussed and is unnecessary to be determined.

Having regard to these considerations, in my view the dicta of Collins M.R. in *Chandler* v. *Webster (supra)* cannot be supported, and I think the decision itself is wrong, unless it can be said that in that, as in some of the other cases, there was some partial performance which I have not been able to discover in the report of the case. The error, as I see it, in the dicta which have been used is in imagining that the statement " the loss lies where it falls " is conclusive of the matter. I think it is true to say that the loss lies where it falls, but that expression only means that the rights of the parties are to be determined at the moment when impossibility of further performance supervenes. If at that moment the party who has advanced money is by the ordinary rules of the Common Law entitled to say that the consideration has now wholly failed, he can, in my view, enforce the rights given by those rules and recover the money.

The other arguments on behalf of the Appellants I need not discuss. I agree with all your Lordships in thinking that they fail.

If I thought that the question had been concluded by any decision in your Lordships' House I would, of course, follow that authority, but it plainly is open to review. In support of this opinion I need only refer to the observations of Lord Birkenhead in *Cantiare San Rocco (supra]*, at p. 233.

I would allow the Appeal.

## The Lord Chancellor :

Mr. Linton Thorp, before I put the Questions from the Wool-sack, the House would like to know whether you have any observations to make on the subject of interest on the *£1,000.* The House notices that your Statement of Claim claimed the £1,000 with interest. The Question which is going to be put from the Woolsack will decide that matter, so we thought it right to ask whether you had anything to say about it.

## Mr. Linton Thorp, K.C. (Counsel for the Appellants):

I am grateful to your Lordship. May I ask my clients, my Lord ?

## The Lord Chancellor:

Certainly.

(Counsel conferred with his clients.)

## Mr. Linton Thorp:

My Lord, we do not ask for interest.

(20330) Wt. 8222—4 215 6/42 D.L. G.338

BAILII: Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/uk/cases/UKHL/1942/4.html*

A802

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV 2000/0277

BETWEEN:

MAVIS HENRY
Attorney for MILLICENT RALPH

Applicant/Claimant

-and-

TYRONE WARNER

Respondent/Defendant

APPEARANCES:

Mr. Peighton Knight of Hill & Hill for the          Claimant
Mr. Steadroy Benjamin for the                      Defendant

...................................
2009: May 7
2009: May 25
...................................

DECISION

Striking out Defence – issue estoppel – cause of action estoppel – overriding interests -
s.28 Registered Land Act - Antigua and Barbuda.

1. **Harris J:** This is an application by the Claimant to strike out the Defence to a claim for
possession of land as an abuse of process on the basis of *res judicata*[1]. The Defendant

---

[1] See Judgment of Redhead J. in <u>Millicent Ralph</u> v <u>Clarkson Ralph and others</u> 133/1987 Antigua and
Barbuda.
Application is also made for several other Orders flowing from a striking out.

1

denies that the matter is *res judicata* and alleges that he has acquired an equitable and unregistered interest in the land and house thereupon. Further, the Defendant alleges proprietary estoppel.

### Background

2.  The High Court of Justice entered judgment on behalf of Millicent Ralph, the Claimant herein and Petitioner on the judgment of June 10 1996 in suit No. 133 of 1987– concerning ancillary proceedings for the establishment of proprietary interests of a spouse, one Millicent Ralph. The Defendant in the instant case was one of the Respondents on the said Petition 133/1987. Prior to the commencement of that action the defendant, Tyrone Warner, procured registration of himself as the proprietor of parcel 70, by mistake. Since the filing of that earlier action in 1987, the Claimant, Millicent Ralph, has died. Further, the Defendant herein, Tyrone Warner and Clarkson Ralph the person through whom Tyrone Warner now claims his interest, were both parties in the earlier 1987 matter and bound by the said Judgment of Redhead J.  Tyrone Walker is also the defendant in this matter now before the court.

3.  The Judgment Order declared that Millicent Ralph is beneficially entitled to 50% share in several properties including parcel 70, the property, the subject of dispute in this present action. The Order read further, that the titles to the said properties be delivered up the Registrar of Titles to be cancelled on the ground that the said registration of the titles that were obtained *"by the mistake on the ground that they were registered on the belief that the documents were property executed by Clarkson Ralph (decd)"* [1]

4.  The Defendant herein claims an unregistered ('overriding') interest in parcel 70. [2]

5.  The background to this claim is that the defendant is resident on the subject parcel of land – parcel 70 - having been put to reside in a chattel house there, by the deceased and one

---

[1] See the Judgment Order; The action and consequent Order related to several parcels of registered land.
[2] Pursuant to the Registered Land Act (RLA), at S.28 (g)

2

**Page 195**

**A804**

of the defendants in the Petition, prior to his death. The Defendant alleges he was subsequently given permission to put his own house on the land and knowingly permitted by the deceased to do additions and modifications to the house and at the same time *giving him the assurance that no one would move him from the said land.*[1]

6. Acting on these assurances, the Defendant says that he expended huge amounts of time and money to improve the house and land which he occupied.

7. Sometime prior to the death of Clarkson Ralph (also a defendant in the 1987 matter), the Defendant alleges that the said Clarkson Ralph purported to transfer his interest in the parcel of land to him.

8. The Defendant alleges that prior to the death of Clarkson Ralph, he, the Defendant, had already acquired an equitable interest in the land; parcel 70; an unregistered interest in the land pursuant to S. 28(g) of the Registered Land Act (**"RLA"**).

9. He claims now that the Claimant is estopped from dispossessing him from parcel 70 and the house he built thereon.

10. The Claimant Millicent Ralph was the wife of the deceased. The relationship between the Defendant herein and the deceased is not disclosed on the pleadings or Affidavits in this application. What the defendant does say is that the Clarkson Ralph (decd.) permitted him to come on to the land, build and improve on the house of the defendant and give him the assurance that no one would remove him from the land. This state of affairs, if true, reflects a relationship between the two that goes beyond a mere commercial relationship.. Yet, nothing sufficient is said about the nature of that relationship in this application or indeed the later substantive action.

---

[1] These are facts one would have expected to have been asserted at the earlier 1987 trial by either the deceased or the defendant, Tyrone Walker.

3

**Page 196**

A805

11. In the earlier action filed in 1987 - Matrimonial ancillary proceedings - the Claimant then claimed that she contributed to the acquisition of several properties held in the name of her husband at the time, Clarkson Ralph, and also to the construction of the matrimonial home.[1] The judgment of Justice Redhead speaks of an injunction which was granted on the 11th July 1988 against Tyrone Warner restraining him from further erecting or constructing a building on the subject Parcel 70 in which the Petitioner Millicent Ralph (also now deceased) had an interest. This has not been denied by the defendant.

12. In the end the court held in favor of the Petitioner, Millicent, reversing the process of registration of Tyrone Warner as registered proprietor of parcel 70. No where in the judgment of Justice A. Redhead is any reference made to a defense by Tyrone Warner (also a Defendant in that 1987 action) of the nature and extent he now raises as a defendant in the instant action. Neither is it suggested, by the content of the said judgment, that such a defence was raised in the matter. Very importantly, the defendant in the instant matter does, neither by his pleadings nor his affidavit nor by his counsel in argument, suggest that the present defence was raised in the earlier matter. Counsel for the defendant , Mr. S. Benjamin, in fact, at the hearing of this application, suggested that the defence was not raised in the earlier case because his client felt confident then of his right of ownership and saw no need to defend it in that action.

13. The injunction order of 1988 and the Judgment Order of June 1996 by Justice A. Redhead are both flash points in the history of this matter neither of which, it appears from the record, moved Tyrone Warner at that time(s) to lawfully and diligently defend his alleged interest in the disputed property with the arguments he now raises on this application.[2]

Claimants Submission

14. The Claimant submits that Tyrone cannot in the present action raise the Defense that (i) He is the lawful owner of the parcel 70 or (ii) That he has an equitable interest in the said

---

[1] This matter was filed in1987 and apparently for several reasons including the death of Mr. Clarkson Ralph, judgment was delivered in 1996.
[2] This substantive action was filed in 1987.

4

parcel 70 on the grounds that; the issue as to ownership of the parcel 70 has already been determined by the court in 1996. The court held that the Claimant has a 50% interest in the said property. This interest was an equitable interest.  Having regarded to the history of this matter since it was filed in 1987 nothing has transpired to alter the Claimant's interest.

15. Counsel for the Claimant contends that all issues relating to or forming the basis for the present action and/or Defence were determined in the earlier case and if any issue now raised by the Defendant was not then raised when it could have been raised, then, they are estopped from now raising it, as *an abuse of process*.

Defendant's Submission

16. The Defendant contends that he does not claim a registered interest in the property. That notwithstanding the present registered property interests in parcel 70, he has an unregistered and overriding interest in parcel 70 which is protected by S. 28 (g) of the R.L.A. This section he says, protects the rights of a person in actual occupation of land registered under the R.L.A.

17. The Defendant contends that his interest predates the death of Mr. Clarkson and the Claimant is estopped from dispossessing him on the grounds of Proprietary Estoppel attributable to Mr. Clarkson (decd.). The defendant does not provide the date from which his interest accrued. Counsel for the defendants submits that the defendant does not however claim prescriptive rights. In any event, neither the defendant's pleadings nor his affidavit in defence of this application disclose the basis for the acquisition of prescriptive rights.

Findings

18. The law with respect to the elements of proprietary estoppel is well established. Counsel for the Respondent/Defendant, Mr. Steadroy Benjamin, submitted: an excerpt of Snell's Principles of Equity 27th edit pp 564 – 569; the cases of,  Inwards and Others v Baker

5

**Page 198**

**A807**

[1965] 1 ALL ER and; <u>Sir J. W Ramsden, Bart</u> v <u>Lee Dyson and Joseph Thornton</u> (1865) L.R. Vol 1 129; as authorities on the nature of proprietary estoppel. I accept as the prevailing Law on point, that which is set out in those authorities.

19. There is also much authority on the Law with respect to *res Judicata* and more specifically the related "*cause of Action estoppel*" and "*issue estoppel*". However, I believe there is perhaps no single better authority on the point than the case of <u>Arnold</u> v <u>Nat West Bank PLC</u> (H.L. (E))[1]

20. The application before the court is to strike out the Defence as an abuse of process. The abuse of the process arises from the contention that the issues required to be resolved in this matter or, the cause of Action/Defence, have been litigated already, resolved and disposed of by the High Court of Antigua and Barbuda -- giving rise to *res Judicata*. There is an important distinction between cause of action estoppel and issue estoppel. They represent two species of estoppel *per rem judicatam*[2]. The case for issue estoppel is the stronger case for the claimant in this application.

*21.* In <u>Arnold and others</u> v <u>National Westminster Bank PLC</u> ("**Nat West**")[3]  Lord Keith of Kinkel distinguished the two estoppels thus: *"It is appropriate to commence by noticing the distinction between cause of action estoppel and issue estoppel.* **Cause of action estoppel** *arises where the cause of action in the later proceedings is identical to that in the earlier proceedings, the latter having been between the same parties or their privies and having involved the same subject matter. In such a case the bar is absolute in relation to all points decided unless fraud or collusion is alleged, such as to justify setting aside the earlier judgment. The discovery of new factual matter that could not have been found out by reasonable diligence for use in the earlier proceedings does not, according to the Law of England, permit the latter to be reopened....Cause of action estoppel extends also to* <u>*points which might have been but were not raised and decided in the earlier proceedings*</u>

---

[1] [1991] 2 A.C. 93
[2] See Diplock L.J. in Thoday v Thoday [1964] P. 181 (197 – 198)
[3] At pp 104 D – G, foot note 1

6

*for the purpose of establishing or negativing the existence of a cause of action."(emphasis mine)*

22. Lord Keith of Kinkel refined the distinction between *cause of action* and *issue* estoppel by reference to the case of Thoday v Thoday [1964] pp181 at 198, where Diplock L.J. defined **issue estoppel** thus:" *The second species, which I will call 'issue estoppel,' is an extension of the same rule of public policy. There are many causes of action which can only be established that proving that two or more different conditions are fulfilled. Such causes of action involve as many separate issues between the parties as there are conditions to be fulfilled by the plaintiff in order to establish his cause of action; and there may be cases where the fulfillment of an identical condition is a requirement to two or more causes of action. If in litigation upon one such cause of action any of such separate issues as to whether a particular condition has been fulfilled is determined by a court of competent jurisdiction, either upon evidence or upon a party to the litigation, neither party can, in subsequent litigation between one another upon any cause of action which depends upon the fulfillment of the identical condition, assert that the condition was fulfilled if the court has in the first litigation determined that it was not, or deny that it was fulfilled if the court in the first litigation determined that it was."* [1]

23. The Cause of Action in the instant substantive matter is for; *inter alia,* possession of parcel 70, from a trespasser in the person of the Defendant Tyrone Warner. The cause of action in the earlier suit No. 133/1987 was a claim to establish an interest/share in the same property by way of either a resulting trust or a constructive trust/Common intention by the Claimant/Petitioner[2]. It appears the cause of action in the two matters may not be the same; the present claim assuming an existing interest/right of the claimant in the same property that was the subject of the earlier action and seeking possession of same. However, it appears to me that the question as to who owns the land (whether in law or in equity) in the circumstances of both cases must be decided in both cases in order for the

---

[1] See also the *Nat West case* at pp105(g) for reference to this quote;
[2] In any event it was a claim for an equitable interest – see the Judgment of Redhead J.

court to disposes of the matters. Although trespass - as in the latter case - can be against an occupier as opposed to an owner, the facts do disclose the claimant as an owner.

24. But if I were wrong on the existence of a cause of action estoppel, I turn to the question of Issue Estoppel that arises in this matter. Issue estoppel is described by lord Keith of Kinkel at pp 105 E  of the **Nat West Case** thus:  *"Issue estoppel may arise where a particular issue forming a necessary ingredient in a cause of action has been litigated and decided and in subsequent proceedings between the same parties involving a different cause of action to which the same issue is relevant one of the parties seek to re-open that issue"*[1]

25. In my view, all issues relating to competing interests in the property had to be litigated and decided in the earlier case. The Defendant in the present action was a defendant in the earlier action. The earlier action concerned the ownership and the interest, legal or equitable, in the parcel 70 .Indeed, the Claimants interest in the disputed land in the earlier action was an equitable interest. The issue as to whether the Defendant had acquired an interest in what is now known as parcel 70 could have been raised and should have been raised in that earlier action. The defendant was, it appears, in occupation of the said lands at the time of the filing of the earlier action and now claims that his interest predated the filing of that earlier action.

26. It was incumbent on the Defendant to have raised the issues he presently raises, for the purpose of establishing or negativing the existence of a cause of action in the earlier 1987 proceedings especially when the person through whom he now alleges he obtained his interest in parcel 70 - Clarkson Ralph - was alive and a co-defendant in the same 1987 action.[2]

27. Like Cause of Action estoppel, issue estoppel is extended *"to cover not only the case where a particular point has been raised and specifically determined in the earlier proceeding, but also that where in the subsequent proceedings it is sought to raise a point*

---

[1] See also Diplock L.J. in Mills v Cooper [1967] 2Q.B. 459 at 468 F.
[2] Apparently, Clarkson Ralph died in 1990 – shortly after the 1987 action was filed; see the Judgment of Redhead J.

8

**Page 201**

*which might have been but was not raised in the earlier".* (See <u>Fidelities Shipping Co. Ltd.</u> v <u>v/o Exportschleb</u> [1966] 1. Q.B. 630, 642 per Piplock L.J.)

28. Sir James Wigran V – C in <u>Henderson</u> v <u>Henderson</u> (1843) 3 Hare 100 114 – 115 expressed the defendant's obligation to put his case forward in the earlier action thus: *"In trying this question, I believe I state the rule of the court correctly, when I say, that where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the court requires that the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the subject of litigation in respect of matter which might have been brought forward as part of the subject in contest , but which was not brought forward , only because they have , from negligence, inadvertence, or even accident, omitted part of their case. <u>The plea of res judicata applies, except in special cases , not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.</u>"* **(emphasis mine)**

29. Suffice it to say, the issues that are required now to be determined are issues and points that *properly belonged* to the earlier litigation and which the earlier court would have of necessity had to resolve in the earlier case had it been raised. Key witnesses to the facts in this matter such as the claimant, Millicent Ralph along with the Defendant in the earlier matter, her husband Clarkson Ralph, are now both deceased. The defendant failed to exercise *reasonable diligence* to have his claim for an interest in the subject property brought before the earlier court so that that court could have had the benefit of the first hand evidence of the key witnesses somewhat contemporaneously with the happening of the events. If the Defendant had established his interest in the earlier case, the court could not have made the order it did. Put another way still, the court could not have awarded a 50% interest in parcel 70 to the claimant/petitioner if the Defendant had a

9

**Page 202**

greater and earlier interest/claim to the said parcel 70 and had established that interest/claim.

30. The authorities establish somewhat, that there are exceptions to issue estoppel in special circumstances. These circumstances extend to include; where earlier proceedings have resulted in default judgment[1]; where there is a subsequent change in the law indicating the earlier decision was wrong [2] where fresh materials which could not with reasonable diligence been adduced in the earlier proceedings is now available.[3]

31. I am not satisfied on all the material before me of the existence in the instant case of any one of the special circumstances referred to above.[4] The authorities provide however, that the court ought not to take an inflexible approach in applying the special circumstances rule (see the *Carl Zeiss Case* at pp 947; see pg 10 hereof at foot note 2). Adopting and applying this approach to the instant case, I am still unable to glean circumstances that would prevent the application of issue estoppel (if not cause of action estoppel) to the facts and law of this case.

32. Finally, the Defendant alleges that his interest in the subject property predates the death of Mr. Clarkson Ralph. No allegation is made in the Defendant's Defence or for that matter, is any reference made in the earlier judgment of Justice A. Redhead, of the Defendant's interest far less one that predates the marriage of the Ralph Clarkson and the Claimant, or the date on which the Claimant vacated the matrimonial home or made her last contribution towards the acquisition of the property. Indeed, having regard to the nature of the Defence, it surprisingly lacks particularity with respect to dates. At para 5 of the defendant's Affidavit in Reply on this application, he merely states that he obtained an

---

[1] New Brunswick Railway Co. v British and French Trist Corporation Ltd [1939] AC 1 (28,21,38)

[2] This is subject to certain limiting conditions; The authorities are not entirely clear on the existence and/or application of this exception.

[3] See **Carl Zeis** Sifting v Rayner & Keeler Ltd (No. 2) [1967] 1 AC 853 (947) Lord UpJohn.
[4] Fraud or collusion is not disclosed in this matter either.

10

**Page 203**

**A812**

overriding interest in the property prior to the death of Clarkson Ralph[1]. If the defendant did raise these issues at that trial, then the court found against him and in favor of the claimant's interest. All the evidence the defendant would have required to establish his case would have been available to him then. There is now nothing new raised by the defendant, neither does the nature of his defence and pleadings admit of any fresh evidence or facts accruing after the death of the deceased. The defendant does not allege either in the application to strike out or in his defence to the substantive matter, that any new facts have arisen in relation to his interest claimed. In any event, he claims now that his interest – an equitable interest - arose and crystallized before Mr. Ralph died in 1990.[2]

33. Be that as it may, the effect of the earlier order by the court declaring the interest of the claimant in the subject property vest her rights certainly well prior to Mr. Ralphs death if not at the date of their marriage; both points in time prior to the Defendant entering upon the property [3].

34. Further, the Defendant claims an overriding interest under S. 28 (g) of the R.L.A. But this section, as I understand it, does not create or confer substantive rights on the Defendant. Rather, section 28 protects existing rights or the right to assert ones existing rights, if you have one.

35. So, whatever rights the Defendant has acquired or in any event has, he is entitled to establish while he is still in occupation of the lands. For the reasons provided above I am of the view that he would not have acquired any rights adverse to that of the Claimant and in any event and most importantly, even if he had done so prior to the filing of the earlier action as he has alleged, having failed to raise them before the court on the earlier 1987 action, he is estopped from doing so now.

---

[1] Justice Redhead at pp 5 of the Judgment of 1996 exhibited to the claimants affidavit in the instant application,, referred to Mr. Ralphs date of death as December 1990, some three years after that earlier matter was filed.
[2] He is also claiming an **overriding interest** pursuant to **S.28 (g) of the RLA**.
[3] The defendant does not contend that his entry or cause of action arose earlier than that date; also the chronology of the claimant's acts of contribution towards the acquisition of her interest in the property as set out in the Judgment of Justice Redhead suggests her acquisition of her interest well before the death of Mr. Clarkson. ,

11

**Page 204**

**A813**

36. I note that the evidence before the court suggests that the Defendant disregarded both the 1988 injunction and the subsequent Judgment Order of the court in relation to several particulars.[1].

37. Further still, the Judgment Order of June 1988 remains without compliance. This present application, in addition to being one for the striking out of the Defence, concerns what is essentially an action for an enforcement order in relation to the judgment order of Justice Redhead, in No. Suit 133/1987.

38. The recent action to which the instant application relates, concerns giving effect to the long out - standing judgment of suit 133/1987.

39. For the reason provided above the application of the Claimant/Applicant is allowed and :

**IT IS HEREBY ORDERED** that:-

1. The Defence of the Defendant is struck out as *res judicata* and an abuse of the process of the Court.
2. A date for the trial of this matter within the next 14 days be fixed by the court office forthwith.
3. Evidence in chief be given at trial viva voce.
4. The Claimant to serve a copy of this Order on the Defendant forthwith.

David C. Harris

High Court Judge

Antigua and Barbuda

---

[1] The evidence before the court includes the judgment exhibited to the affidavit of the claimant.

12

**Page 205**

**A814**

A815

128 SUPREME COURT. [VOL. XVIII.

S.C.
IN CHAMBERS.
WELLINGTON.

1899.
Sept. 29.

STOUT, C.J.

### In re FENTON, DECEASED.

*Probate—Insufficient Attestation Clause—Witnesses out of Jurisdiction.*

Probate in common form was granted where the attestation clause was insufficient and the attesting witnesses out of the jurisdiction, the estate being small, and the probate required merely for a family arrangement.

MOTION for probate in common form.

The will had been executed in Australia, and the attestation clause was insufficient. The estate was under £100 in value, the only asset being the surrender value of a policy assuring a sum of over £200 upon the life of the testator's son. This policy had been assigned by the son to his mother, and the executor (the husband of the deceased) swore that he applied for probate only for the purpose of reassigning the policy to the son, in pursuance of a wish expressed by the testatrix. The executor swore also that he was present, and saw the will duly executed in the presence of the attesting witnesses.

*T. F. Martin* moved for probate.

STOUT, C.J., granted probate, referring to *In the Goods of Rees*(1) and *In the Goods of Johnson*(2), and stating that the attestation clause was not in accordance with the statute, but if the witnesses had even been sworn, and forgotten what occurred, a Court might still apply the maxim, *Omnia præsumuntur rite esse acta.* Here the witnesses were out of the jurisdiction, and the estate small—one policy of insurance, not yet due—and it was proposed to settle it for the interests of the son. The husband had also sworn as to what took place at the time of signing the will. Considering all these circumstances, probate would be granted.

Solicitors for the executor : *Martin & Richmond* (Wellington).

(1) 34 L.J. P.D. & A. 56.     (2) 2 Curteis, 341.

---

VOL. XVIII.] SUPREME COURT. 129

S.C.
HEARING
WELLINGTON.

1899.
Aug. 3, 7, 16.

STOUT, C.J.

### MEYER v. GILMER.

*Building-contract — Extras — Waiver of Orders in Writing — Alterations not contemplated as Extras—Certificate of Amount due—Sufficiency—Certificate of Satisfaction — Oral Certificate — Penalties — Delay caused by New Independent Contract.*

Where extras were ordered at the instance of the employer personally, and the employer was present when the orders for such extras were orally given by the architect to the contractor, and part of the amount claimed for extras was afterwards paid for by the employer upon a certificate of the architect showing that part of the amount certified for was for extras, and the employer, in subsequently refusing to pay a final balance claimed to be due, based his refusal not on the want of orders in writing, but on the ground that there were fines or penalties which would absorb the balance,—

*Held,* That the jury were justified in finding that the employer had waived his right under the contract to refuse payment for extras unless ordered in writing.

*Held,* also, That written orders for alterations and extras were not required where these were so many and so great as to be outside the contract altogether, and were not such as were contemplated by the contract as extras. *Russell v. Sa da Bandeira*(1) followed.

A building-contract provided that payments should be made upon certificates in writing under the hand of the architect, and that a final balance of £40 per cent. should be retained in hand until forty days after the work had been satisfactorily completed, and a certificate to that effect had been granted by the architect. After the work was finished, the contractor furnished an account to the architect of the sum he alleged was due to him, the architect considered the account, and reduced it, and a fresh account was drawn up by the contractor in accordance with the alterations made by the architect. At the foot of this account the architect wrote and signed the words, "I certify this account is correct."

*Held,*

That this was a sufficient certificate in writing within the first part of the above provision.

That it was doubtful whether it was a sufficient certificate, within the second part of the provision, that the work had been satisfactorily completed ; but

That a certificate within the second part of the provision did not need to be in writing, and that it was enough that there was evidence, which the jury found, that the architect had orally expressed his satisfaction with the completion of the work.

**A816**

130    SUPREME COURT.  [VOL. XVIII.

S.C.
1899.
MEYER
v.
GILMER.

If the payments made, and the deductions, were applied to the first item in the account, then the full amount of the contract price had been paid, and the balance claimed was for alterations and extras only; and quære, whether under the above circumstances any certificate of satisfaction was necessary in respect of the alterations and extras.

Where completion of the work originally contracted for was delayed by reason of an independent contract entered into for the construction of an additional work, which was not such an extra as was contemplated by a provision for extension of time,—

*Held*, That this set at large the penalties which the contract provided for in case of delay in completion.

THIS was an action upon a building-contract, which was tried at Wellington before Stout, C.J., and a special jury of four, on the 3rd and 7th of August, 1899. The facts of the case and the findings of the jury will be found fully set out in the judgment.

*Skerrett* and *Tringham* for the plaintiff.

*Menteath* for the defendant.    *Cur. adv. vult.*

STOUT, C.J. :—

This is an action for the recovery of £245 5s. 3d., being balance due for buildings erected and alterations made by the plaintiff for the defendant at the Royal Oak Hotel. The defendant has pleaded—(a) That included in this amount are extras to the contract not ordered in writing; (b) payment in full of all money due; (c) no certificate certifying that the plaintiff is entitled to payment. The defendant has also counterclaimed for an amount of £495 for penalties incurred in terms of the contract between the parties. At the hearing of the action—the claim and counterclaim being heard together—it was agreed to submit certain issues to the jury, to leave the other facts in dispute to the Court, and also to leave the counterclaim to the Court on the evidence given. The defendant moved for a nonsuit, contending that there was no evidence to submit to a jury or to entitle the plaintiff to recover, and it was agreed that all questions of law should be dealt with on the case being further considered.

The issues submitted to the jury, and their answers, were as follows :—

---

VOL. XVIII.]    SUPREME COURT.    131

S.C.
1899.
MEYER
v.
GILMER.

1. Did the architect certify that the works included in the contract had been satisfactorily completed ?—Yes, but not in writing, apart from Account No. 9.

2. Did the architect certify that the sum of £345 5s. 3d. was payable by the defendant to the plaintiff for balance due on contract and for extra work?—Yes, by certifying to Account No. 9.

3. Did the defendant, independently of the said written contracts, agree with the plaintiff—

(a.) To pay the sum of £90 for the construction of a cellar ?—Yes.

(b.) To pay £75 10s. for shifting bedrooms ?—Yes.

(c.) To pay £8 5s. for shifting skylight ?—Yes.

(d.) To pay the fair value of the rest of the extra works ?—Yes, by verbal agreement between the proprietor, architect, and builder.

4. Did the defendant waive the necessity for a written order being given by the architect for the extra works, alterations and additions to the said contract ?—Yes.

5. Were the extra works ordered of such a character as not to be within the contemplation of the parties at the time of entering into the said contract, and so as to make the special provisions of the contract relating thereto inapplicable ?—Yes, in regard to No. 2 contract.

It is necessary to state briefly the history of the contract. The defendant invited tenders for two separate works—one was for the alteration of the then-existing building of the Royal Oak Hotel, and the other for the addition of a new wing to the hotel. The plaintiff tendered for both works—tender No. 1 for the new wing, and tender No. 2 for the alterations of the building. Both tenders were accepted. There was one contract or agreement drawn up and signed, and one sum was the price for both works—namely, £3,625. There were incorporated in the memorandum of agreement general conditions of contract. The conditions of importance in the contract between the parties are 11, 12, 18, and 28. They are as follows :—

The architect shall be at liberty, if he shall think

**A817**

Case 15-1595, Document 52, 08/27/2015, 1586818, Page216 of 302

132

SUPREME COURT.                    [VOL. XVIII.

"fit to do so, to make any alterations in, or additions to, or
"omissions from the works contracted for, or the finishing
"thereof; and no such alterations, additions, or omissions
"shall vitiate the contract, but the value of the same shall be
"ascertained by the architect and added to or deducted from
"the amount payable, or that may become payable, to the con-
"tractor, as the case may require." [Then follows an arbitra-
tion clause if either party is dissatisfied with the decision of the
architect under this clause.]

12. "No day work, extra work, or alterations or additions
"of any kind shall be allowed and paid for under any cir-
"cumstances unless a written order for the same shall have
"been given by the architect to the contractor, which order
"must be produced at the completion of the contract as a
"voucher and authority for the works performed."

13. "Subject to the provisions of these conditions, the
"moneys to become due to the contractor shall be paid at such times and in such propor-
"tions as the architect shall deem expedient, upon certificates
"in writing under his hand, at such rate as he may think fit,
"not exceeding £70 per centum of the estimated value of the
"work done and the materials on the ground; a sum equal to
"£5 per centum shall be retained subject to the provisions of
"clause 13, and the balance of £25 per centum of the said
"moneys shall be retained in hand until forty days after the
"work is satisfactorily completed, and a certificate to that
"effect has been granted by the architect." [Then follow
provisions as to liens under the Workmen's Act.] "No
"certificate shall be for any less sum than £25."

23. "The contractor shall complete the whole of the works
"required by tender No. 1 (except such works as the architect
"may in writing direct the contractor to delay) on or before
"the 11th day of August, 1896; and in case of default the
"contractor shall pay to the proprietor, as and by way of
"ascertained and liquidated damages for breach of contract,
"and not by way of penalty, the sum of £3 for every day
"thereafter, excluding Sundays, until the whole of the said
"works shall have been completed. And for tender No. 2

VOL. XVIII.]          SUPREME COURT.                    133

"the date of completion shall be the 11th day of May, 1896,
"under said conditions as to liquidation and ascertained
"damages of £3 per day required under tender No. 1. Pro-
"vided nevertheless that, in any of the events following—
"namely; (a) in the event of the execution by the contractor of
"alterations in or additions to the works by the written order
"of the architect; (b) in the event of the progress of the
"works being delayed by inclement weather; (c) in the event
"of combination of workmen, &c.—the contractor shall not be
"liable for payment of the said sum of £3 per day during
"such time as the architect shall, upon the completion of
"the works, certify in writing that the completion of the
"said works was reasonably delayed." [Then follows a pro-
vision that the decision of the architect shall be final and
conclusive as to what allowance of time should be made.]

The plaintiff began the performance of his works, but he
had no sooner begun than alterations were proposed and
ordered in what was called tender, or contract, No. 2—that
is, in the alteration of the old building. It was not denied
that during the course of the work so many and extensive
were the alterations made that the plans were entirely altered.
Looking at the plans and at the works as finished, there was
no resemblance between them. There were also considerable
and important alterations made in the plans of the new wing.
The main alteration in the new wing was in the bathrooms
and accessories. A separate contract in writing was made for
the construction of a cellar. Payments were made as the
work proceeded, the architect giving certificates for progress-
payments. None of the certificates were produced. They had
been lost or burned in the fire that some time afterwards
destroyed the hotel. In the certificates no distinction was
made as to the works under contract—alterations, extras,
old contract, &c. The whole work was treated as if it were
old work, and certificates given accordingly. The alterations
and old part were finished on the 7th of August, and the
new wing finished in the end of November.

Some time after the work was finished the contractor
furnished an account to the architect of the sum he alleged

S.C.
1899.
MEYER
v.
GILMER.

was due to him. This account, after the maintenance period had expired, was carefully considered by the architect. The clerk of works and the contractor were both present with the architect when the account was considered. Every item was scrutinised and discussed. The architect reduced the account by a considerable amount, and the contractor grumblingly assented to the sum fixed by the architect as being due. The architect fixed £4,170 11s. as the value of the work done, including the contract price, extras, and alterations. He deducted £100 5s. 9d. for work omitted, and £3,725 for moneys paid, thus leaving a balance of £345 5s. 3d. A fresh statement of account, embodying his determination of the amount due, was drawn up. The following is a copy of this account (it is dated October, but the evidence is it was not drawn up till April, 1897):—

Wellington, 6th October, 1896.

S. Gilmer to J. H. Meyer, Builder and Contractor.

| | £ | s. | d. |
|---|---|---|---|
| To amount of original contract for additions to Royal Oak Hotel | 3,625 | 0 | 0 |

| | £ | s. | d. | | |
|---|---|---|---|---|---|
| To extras agreed upon, as per statements attached | 169 | 15 | 0 | | |
| To extras not agreed upon, as per statements attached— | | | | | |
| My own account | 269 | 15 | 7 | | |
| Bricklayers | 59 | 1 | 4 | | |
| Paperhangers | 23 | 11 | 0 | | |
| Plumbers' account, £77 8s. 1d., less amount included in contract for bathrooms, w.c., &c., £33 | 44 | 8 | 1 | | |
| | | | | 545 | 11 | 0 |

| | £ | s. | d. |
|---|---|---|---|
| | | | 4,170 11 0 |
| Less deductions as per schedule, £61 14s. 9d.; plumbers, £14; bricklayers, £24 11s. | 100 | 5 | 9 |
| | | | 4,070 5 3 |
| Credit by progress-payments | 3,725 | 0 | 0 |
| Balance over | £345 | 5 | 3 |

On this statement of account being submitted to the architect, he certified it as follows:—

I CERTIFY this account is correct.

W. C. CHATFIELD, Architect.

3rd April, 1897.

S.C.
1899.
MEYER
v.
GILMER.

Armed with this account and certificate, the contractor waited on the defendant, and the defendant, not without some demur, paid £100 on account, accepting from the plaintiff the following receipt:—

RECEIVED cheque on account, £100.

J. H. MEYER.

3rd April, 1897.

The defendant retained the account.

If credit is to be given against the items appearing first in the account by the payments and deductions, the account would stand thus :—

| | £ | s. | d. | £ | s. | d. |
|---|---|---|---|---|---|---|
| Original contract sum | 3,625 | 0 | 0 | | | |
| Deductions | 100 | 5 | 9 | | | |
| | | | | 3,524 | 14 | 3 |
| Agreed extras—that is, including special contracts for cellar, £90; baths, &c., £73 10s.; and skylight, £3 15s. | | | | 168 | 15 | 0 |
| | | | | 3,693 | 9 | 3 |
| Payments | | | | 3,725 | 0 | 0 |
| Credit | | | | £31 | 10 | 9 |

Then £100 was paid as already referred to. This would give £131 10s. 9d., as against £376 16s., for extras, or a balance unpaid of £245 5s. 3d. It does not appear from the accounts what the proportion of the extras or alterations was in connection with what is termed tender No. 2, and it is impossible from the accounts presented to say what special accounts have been left unpaid.

The questions that were debated were—1. Is the plaintiff entitled to recover for the extras or alterations, there being no order in writing for these produced ? 2. Is the certificate in writing and the oral certificate of satisfaction sufficient to entitle the plaintiff to recover ? 3. Is the defendant entitled to recover any penalties ?

1. It was contended by the defendant's counsel that the works done outside the contract were extras in the meaning of the contract and of the general conditions, and that, as they were not ordered in writing, the plaintiff could not recover. In answer to this contention the plaintiff's counsel submitted (a) That the performance of conditions 11 and 12 had been

S.C.
1899.
Meyer
v.
Gilmer.

waived, and so the jury had found; (b) that the defendant was bound by the final certificate affixed to the statement of account; (c) that the alterations or extras were of such a character as to be outside the contract, and therefore the general conditions did not apply. Dealing with the first point, the finding of the jury is no doubt binding if there was any evidence to submit to the jury. There is practically no dispute as to what occurred. This is not a case where the architect orders alterations: the desire for alterations came not from the architect, but from the proprietor. The proprietor, as the work proceeded, desired from time to time alterations to be made, and alterations of alterations. He conferred with the clerk of the works and the builder, and then sent for the architect. All of these discussed the proposed alterations, and, after consultation together, the architect, at the request of the proprietor, instructed the contractor to make them. This was the usual course adopted. The proprietor was present when the order was given, and no question was raised about it being given in writing. Further, some of the alterations were paid for, for no distinction was made between the alterations and the work under contract—all were treated as one work. When the final statement, with the certificate attached, was presented to the defendant, and the £100 was paid, still no question was raised about orders in writing; and afterwards, when the parties met to discuss the position, the refusal to pay the balance was not based on there being no orders in writing, but on the ground that the fines or penalties would absorb the balance. If, then, there can ever be a waiver of such a condition, the jury had evidence before them that would warrant their finding a waiver. It was contended there could be no waiver unless the defendant knew that he was waiving the condition. The defendant must be presumed to have known the terms of his own contract, and he must have known that no orders had been given in writing. He was present when the architect directed alterations to be made, and he must be presumed to have known that oral directions were not in compliance with the terms of the contract. It has been held that such conditions can be waived: See

(1) p. 866.
(2) 8 Ex. 283; 18 L.J. Ex. 282.
(3) 4 Q.P.D. 48; 48 L.J. Q.P. 207.
(4) 6th ed. 149.
(5) 35 L.J. C.P. 12.
(6) 16 N.Z. L.R. 296.
(7) 18 C.B. N.S. 149; 32 L.J. O P, 68.
(8) 9 Bing. 672.
(9) Roscoe's Building Cases, 3rd ed. 161.

S.C.
1899.
Meyer
v.
Gilmer.

Hudson on Building-contracts(1). This is not like cases of corporations contracting under seal, or corporations bound by statute to enter into contracts in a particular manner: See Lamprell v. Billericay Union(2); Hunt v. The Wimbledon Local Board(8). Pollock on Contracts(4) assumes that but for the defendant in Lamprell v. Billericay Union(2) being a corporation the defendant would have been bound by the waiver.

2. The second point was that it was too late now to raise the question of the orders not being in writing, as the final certificate covered the omission: Goodyear v. The Mayor, &c., of Weymouth and Melcombe Regis(5); Murdoch v. Lockie(6). If the certificate is final, this is no doubt a complete answer. In my opinion the certificate is a final certificate in the sense of being a certificate of an amount due; but I shall deal with the effect of the certificate under another head.

3. The third point is that the alterations, at all events in what is termed tender No. 2, were so many and so great as to be outside the contract altogether, and were not such as were contemplated by the contract as extras. The jury have so found, and if there was evidence to support such a finding the Court is bound by it. Russell v. Sa da Bandeira(7) decides that if the works were outside the contract, then the written orders for extras were not required. Here the evidence was that the whole plans of tender No. 2 were so altered that the work done bore no resemblance to the work contracted for.

The next question is as to the certificates. The written certificate relied on purports to be a certificate. That is of importance, for in all cases where documents have been relied on as certificates and rejected as such they did not purport to be certificates. In Morgan v. Birnie(8) the document was a letter enclosing the builder's account, and it did not say the account was correct, or certify it in any way. And in Goodman v. Layborn(9) the document was headed "Estimate of

188        SUPREME COURT.      [VOL. XVIII.

S.C.
1890.
———
MEYER
v.
GILMER.

" Extras and Deductions," and at the end it had " Balance due " as in conditions, £125," and lower down the architect's signature, but there was no word used showing it was a certificate. Here there is a certificate. And, as was said by Mr. Justice Byles in *Roberts v. Watkins*(1), " certify" means, give information or assurance. What does this certificate do? It certifies the account—that is, the sum claimed—by Mr. Meyer as correct. And it was a sum arrived at by the architect after making deductions, &c., and fixing values. It is true the certificate does not use the words "is due" or "is payable." Condition 18 does not prescribe the use of such words; it only says the money is to be paid on a certificate in writing. Can the certificate mean anything else but that the sum is due — leaving open, no doubt, the question of penalties, which the architect does not seem to have had the power to settle?

None of the cases cited dealing with certificates are exactly like this one. In *Harman* v. *Scott*(2) the words used were, " I hereby certify that     are entitled to   , being " the balance of amount due to them on account of contract." And in another New Zealand case cited, *Official Assignee of Hutson* v. *The New Zealand Antimony Company (Limited)*(3), the words were, " I certify that Mr. H. has rebuilt the " furnaces, &c. Upon my examining them I found they " were working satisfactorily. Since then they have been " cooled down, and upon examination it was found that " the centre cylinders in two cases had cracked, and that " the joints in the outer cylinders had opened. These H. " assures me can be stopped with a mixture of plumbago, " which will render the furnaces perfectly sound." In the former case it was held that this amounted to a certificate of satisfaction, for the amount could not properly have been certified. In the latter case it was held that the latter part of the clause destroyed the effect of the previous part, and that on the face of the document it was plain the work had not been completed. In *Knox* v. *Patutahi Road Board*(4)

(1) 14 C.B. N.S. 592, 595; 32 L.J.      (3) 10 N.Z. L.R. 143.
     C.P. 291, 293.                  (4) 11 N.Z. L R. 496.
(2) 2 N.Z. C.A. 407.

it was held that a statement of the Engineer that he had passed the work was not equivalent to a certificate that the work had been completed to his satisfaction. It may have meant that the Engineer had waived the performance of the work to his satisfaction. And it was admitted in that case that, though the work was not done according to the plan and specifications, he thought it was good enough to pass.

If the certificate of satisfaction required to be in writing, I have some doubt if this certificate could have fulfilled the requirement, as the certificate may be said not to go as far as the one relied on in *Harman* v. *Scott*(1). I do not think, however, that another certificate of satisfaction was required. It will be observed that in the 18th condition it is expressly stated that the certificate for payment must be in writing. The other requirement is that " moneys shall be " retained in hand until forty days after the work is satis- " factorily completed and a certificate to that effect has been " granted by the architect." I am asked to read in the words " in writing" after the word " certificate." I do not think I have any authority to do so, and therefore an oral certificate is all that is necessary : *Roberts v. Watkins*(2). If I am right in this view, then there is evidence of the architect having expressed his satisfaction with the completion of the work. His interviews with the defendant and the plaintiff, and the fact that no question was ever raised till the hearing of this action of there being no certificate of satisfaction, all show that it was only the absence of a written certificate that was relied on. Even in the statement of defence in this action no defence is set up that there was no certificate of satisfaction. It is only at the hearing, as I have said, that this defence is raised, and there was no amendment asked for of the statement of defence. There is raised in the statement of defence that there was no certificate of the amount due—that is, a certificate under the first part of section 18; but there is no mention of the architect not having been satisfied, as is stated in the latter part of section 18, and it may be that such a defence cannot now be raised.

(1) 2 N.Z. C.A. 407.            (2) 14 C.B. N.S. 592; 32 L.J. C.P. 291.

S.C.
1890.
———
MEYER
v.
GILMER.

A821

Case 15-1595, Document 52, 08/27/2015, 1586818, Page220 of 302

Case 1:14-cv-08410-DLC   Document 33-20   Filed 12/12/14   Page 4 of 17

S.C.
1899.
MEYER
v.
GILMER.

Further, I may notice that, if the payments in the account, and the deductions, are to be applied to the first item in the account, then the full amount of the contract has been paid, and all that is left unpaid is the balance due for alterations and extras; and it may be that for these no such certificate of satisfaction was necessary. Assuming, however, that such a certificate was necessary, I am of opinion that an oral certificate was sufficient.

I am therefore of opinion that the defences raised fail, and that the plaintiff is entitled to judgment for the sum of £245 5s. 3d.

I now come to the counterclaim for penalties. The reading of section 28 is peculiar. It may read that section 28 ends before the introduction of the new clause, which has been inserted in writing, the main clause being printed—namely, at the words "been completed." The addition in writing speaks of clause 28 as if it were not part of that clause. I shall assume, however, that it is one clause, and that the provisions apply to both parts of the clause.

As to tender No. 1, I am of opinion no penalties are recoverable, as it is clear that the independent contract for the construction of the baths, &c., delayed the completion of the new wing. This set the penalties at large. The condition is that "the whole of the works required by "tender No. 1" shall be completed on or before the 11th day of August, 1896. These alterations and new works were not required by tender No. 1. This is not, therefore, like the case of *Jones* v. *St. John's College*(1), in which the words were, "and that the period or periods "for completing all such alterations or extra works shall "not exceed the period limited by these presents for the "completion of the works hereby contracted for, unless an "extension of time be also allowed by order specifying "the limit of extension, signed by the clerk of the works "and bursar; . . . and no alterations . . . shall "execute . . ." Here the completion of the work that was contemplated was only a completion of the works that

(1) L.R. 6 Q.B. 115.

S.C.
1899.
MEYER
v.
GILMER

were tendered for. It is true that proviso provides for an extension if there is an order in writing, but the work done in connection with the baths, &c., was not such an extra as the proviso contemplated. It was a new contract, made, as the jury has found, between the proprietor and the builder.

As to tender No. 2, the whole works were so altered, as the jury has found, that the work was substantially a new work, and not the work that had to be completed in the time mentioned in the conditions. The cases are numerous to show that, unless, as in *Jones* v. *St. John's College*(1), the contract expressly declares that alterations are to be completed in the same time as the contract, the penalties are at large. The cases of *Murdoch* v. *Lockie*(2), *Dodd* v. *Churton*(3), and *Fuller* v. *The Queen*(4) need only be cited.

I therefore give judgment for the plaintiff in the counterclaim—that is, I disallow it.

I award costs to the plaintiff according to scale in the statement of claim and in the counterclaim—but not the costs of hearing in the counterclaim, as both were heard together—with witnesses' expenses and disbursements. I allow also fee for extra counsel, £5 5s., and for second day £15 15s.

*Judgment for the plaintiff.*

Solicitor for the plaintiff: *C. W. Tringham* (Wellington).
Solicitors for the defendant: *Menteath & Beere* (Welling-ton).

(1) L.R. 6 Q.B. 115.        (3) 66 L.J. Q.B. 477; [1897] 1 Q.B.
(2) 15 N.Z. L.R. 296.              562.
                           (4) 3 N.Z. Jur. N.S. S.C. 125.

**A822**



## HOUSE OF LORDS

Nov. 6, 7, 8, 9, 13, 14, 15 and 16, 1989

MOTOR OIL HELLAS (CORINTH)
REFINERIES S.A.
v.
SHIPPING CORPORATION OF INDIA

(THE "KANCHENJUNGA")

Before Lord KEITH OF KINKEL,
Lord BRANDON OF OAKBROOK,
Lord TEMPLEMAN, Lord GRIFFITHS and
Lord GOFF OF CHIEVELEY

Charter-party (Consecutive Voyage) — Nomination of unsafe port — Charterers ordered vessel to load at Kharg Island — Iran-Iraq war — Whether owners elected not to treat Kharg Island as improper nomination — Whether owners waived right — Whether charterers in repudiatory breach.

Under a charter-party dated Aug. 8, 1978 the owners let their vessel *Kanchenjunga* to the charterers for four consecutive voyages with an option (which was exercised) to extend the period to cover four further consecutive voyages. The charter was in the Exxonvoy form and the trading option defined the loading ports as 1/2 safe ports Arabian Gulf excluding Fao and Abadan.

On Aug. 8, 1978 the charterers sub-let the vessel on a back to back basis to Varnima Chartering Compania Naviera S.A. On Nov. 19, 1980 Varnima sub-sub-chartered the vessel to Refineria de Petroleos del Norte S.A. (Petronor) for a single voyage from loading ports defined as 1/2 safe ports Arabian Gulf excluding Iran and Iraq but including Kharg, Lavan and Sirri Islands. The Petronor charter was in the Asbatankvoy form.

Following the making of the Petronor charter the charterers ordered the vessel to load a cargo of crude oil at Kharg Island. This order was given on Nov. 20 and repeated on Nov. 21.

On Nov. 21 the owners instructed the master to proceed to Kharg Island. The vessel arrived on Nov. 23 and gave notice of readiness. By Dec. 1 the vessel had still not berthed and on that day there was an Iraqi raid upon Kharg Island during which bombs were dropped. The master of the vessel promptly weighed anchor and proceeded away from Kharg Island to a point of safety.

On Dec. 2 the owners informed the charterers that Kharg Island had been bombed and that the master had proceeded 25 miles out to sea for safety, and called on the charterers to nominate a safe port. The charterers replied repeating their request that the master proceed to Kharg Island.

There then ensued exchanges between the owners and the charterers under which the owners called upon the charterers to nominate another port which would be safe and the charterers refused to do so insisting that the vessel should load at Kharg Island.

The owners wanted the master to go to Kharg Island and told him to comply with the voyage instructions but the master rejected these instructions.

The dispute was referred to arbitration. The charterers submitted that the owners' conduct between Nov. 21 and Dec. 2 showed that they had elected not to treat Kharg Island as an improper nomination of a loading port under the charter; alternatively if there was not an election there was at least a promissory estoppel which precluded owners from contending that Kharg Island was an unsafe port.

Owners sought to rely on cl. 20(vi)(b) of the charter contending that they were entitled after Dec. 1 to refuse to load at Kharg Island. Clause 20(vi)(b) provided inter alia:

(b) if owing to any war, hostilities warlike operations . . . entry into any such port of loading . . . or the loading . . . of cargo at any such port considered by the master or owners in his or their discretion dangerous or prohibited . . . the charterers shall have the right to order the cargo . . . to be loaded . . . at any other safe port . . .

Since the charterers had not exercised their right, Kharg Island remained the only nominated port and as there was no material change of circumstance the master continued to be entitled to refuse to load at that port and was not at fault in exercising his right to do so.

By their interim award the arbitrators held that it was the charterers who were in repudiatory breach and that the owners were entitled to treat the charter as at an end and recover damages from the charterers. There was an appeal against that award.

———*Held*, by Q.B. (Com. Ct.) (HOBHOUSE, J.), that (1) under a charter it could not be contended that a shipowner when he received an order was under an obligation to check whether it was a proper order to a safe port and to reject it if it was not; proceeding to a nominated port did not deprive shipowners of any of their rights but the duty to mitigate or avoid loss did require that the master should in order to safeguard the vessel refuse to enter the port or if already within it, leave it; the order did not give rise to any obligation upon the owners to elect and mere compliance did not amount to any election;

(2) in the context of what had passed between the parties previously owners' communication to charterers on Nov. 21 was correctly characterized as an acceptance of the order not a mere compliance with the order; the fact that the owners served a notice of readiness indicated that the owners were saying that they were ready and willing to load at Kharg Island; on Nov. 25 the owners were still saying that the vessel was available to load and called upon charterers to arrange priority berthing; there was nothing equivocal about the owners' conduct and they were dealing with the charterers on the basis that the loading port nomi-

**A823**

392                    LLOYD'S LAW REPORTS              [1990] Vol. 1

The "Kanchenjunga"                                          [H.L.

nation had been made and that Kharg Island was
that port;

(3) on the facts and evidence the owners did
waive their right to say that Kharg Island was not
the nominated loading port under the charter;

(4) on the promissory estoppel argument the
conduct found by the arbitrators did represent that
the owners were willing that the vessel should pro-
ceed to Kharg Island and load there under the
charter;

(5) on the facts found by the arbitrators the mas-
ter did have the right to refuse to load the cargo at
Kharg Island; this gave rise to an option to char-
terers to nominate another loading port; they chose
not to exercise that option and in circumstances
where the master was still bona fide entitled to
refuse to load at Kharg Island, the charterers termi-
nated the charter; they could not now complain of
any breach on the part of the owners; and the sub-
mission that the owners had waived their rights to
rely on cl. 20(vi)(b) had not been made out.

The owners appealed and the charterers cross-
appealed.

————Held, by C.A. (Fox, Lloyd and Glide-
well, L.JJ.), that (1) nowhere in the owners' telex
of Nov. 20 or in their two telexes of Nov. 21 did
they reserve the right to treat the nomination as
non-contractual; and the owners gave notice of
readiness after proceeding north of latitude 24 deg.
without obtaining the charterers' agreement to pay
the additional war risk premium; these two factors
showed that the owners' conduct was unequivocal
and that the owners were dealing with the char-
terers on the basis that the loading port nomination
had been made and Kharg Island was that port;

(2) it was clear from the arbitrators' findings that
the owners knew the facts; if those facts meant that
Kharg Island was unsafe then the owners must have
known that they were entitled to refuse to accept
the nomination; the right to refuse to load at Kharg
Island was not specifically stated in the charter but
it was implicit as a matter of legal analysis; by
accepting the charterers' nomination the owners
lost their right to refuse to load at Kharg Island;

(3) the charterers were entitled to insist on the
vessel loading at Kharg Island; the owners had by
their conduct waived their right to refuse to load at
Kharg Island and their claim for damages for repu-
diation failed;

(4) under cl. 20(vi) the only right expressly
given to the owners was the right to discharge cargo
at any safe port if the charterers failed to nominate
an alternative port of discharge when requested;
although the clause gave the owners no express
right to sail away in the event of the loading port
being considered dangerous or impossible such a
right existed by necessary implication;

(5) cl. 20 (vi) conferred a separate and indepen-
dent discretion on the master of the vessel and
nothing the owners did could be construed as a
waiver of the master's discretion; the appeal and
cross appeal would be dismissed.

The charterers appealed as to the effect of

cl. 20(vi) and the owners cross-appealed on the
issue of waiver.

————Held, by H.L. (Lord Keith of Kinkel,
Lord Brandon of Oakbrook, Lord Templeman,
Lord Griffiths and Lord Goff of Chieveley), that
(A) as to the cross-appeal: (1) the situation in
which the owners found themselves was one in
which they could either have rejected the char-
terers' nomination of Kharg Island as uncontrac-
tual or they could have, nevertheless, elected to
accept the order and load at Kharg Island thereby
waiving or abandoning their rights to reject nomi-
nation but retaining their right to claim damages
from the charterers for breach of contract (see
p. 400, col. 1);

(2) the master gave notice of readiness on arrival
at Kharg Island; thereafter the owners were assert-
ing that the vessel was available to load and they
called on the charterers to arrange priority berthing
and referred to the fact that laytime was running; in
these circumstances the owners were asserting a
right inconsistent with their right to reject the char-
terers' orders; the owners must be taken in law to
have elected not to reject the charterers' nomi-
nation and the owners' cross-appeal would be dis-
missed (see p. 393, cols. 1 and 2; p. 400, cols. 1 and
2).

(B) As to the charterers' appeal: the clause
expressly referred to the discretion which the
owners and master were entitled to exercise in a
situation of danger and must impliedly recognize
that in the exercise of that discretion they might
decline to load or discharge at the relevant port;
the clause did not only apply to named ports or
ports properly nominated under the charter
because in the event of an improper nomination
being made by the charterers the owners' accept-
ance of the nomination would have the effect that
all the relevant contractual provisions applied
including cl. 20 (vi); and the owners, presented by
the charterers with an uncontractual nomination,
had to decide whether or not to reject it; they
elected not to do so and this election could not have
had any effect on cl. 20 (vi); the appeal would be
dismissed (see p. 393, cols. 1 and 2; p. 401, col. 1).

The following cases were referred to in the
judgment of Lord Goff:

Borrowman Phillips & Co. v. Free & Hollis,
(1878) 4 Q.B.D. 500;

China National Foreign Trade Transportation
Corporation v. Evlogia Shipping Co. S.A. of
Panama (The *Mihalios Xilas*), (H.L.) [1979]
2 Lloyd's Rep. 303; [1979] W.L.R. 1018;

Compania Naviera Maropan S/A v. Bowater's
Lloyd Pulp and Paper Mills Ltd. (The *Stork*),
(C.A.) [1955] 1 Lloyd's Rep. 349; [1955] 2
Q.B. 68; [1954] 2 Lloyd's Rep. 397, [1955] 2
Q.B. 68;

A824

Hughes v. Metropolitan Railway Co., (1877) 2 App.Cas. 439;

Kammins Ballrooms Co. Ltd. v. Zenith Investments (Torquay) Ltd., (H.L.) [1971] A.C. 850;

Kodros Shipping Corporation of Monrovia v. Empresa Cubana de Fletes (The *Evia*), (No. 2), (H.L.) [1982] 2 Lloyd's Rep. 307; [1983] 1 A.C. 736;

Reardon Smith Line Ltd. v. Australian Wheat Board (The *Houston City*), (P.C.) [1956] 1 Lloyd's Rep. 1; [1956] A.C. 266;

Scarf v. Jardine, (H.L.) (1882) 7 App.Cas. 345.

This was an appeal by the charterers Motor Oil (Hellas) Corinth Refineries S.A. and a cross-appeal by the owners, Shipping Corporation of India from the decision of the Court of Appeal ([1989] 1 Lloyd's Rep. 354) dismissing the owners' appeal and the charterers' cross-appeal from the decision of Mr. Justice Hobhouse ([1987] 2 Lloyd's Rep. 509) holding inter alia that the owners had waived their right to treat Kharg Island as non-contractual but that the owners were entitled to the protection of cl. 20(vi) of the charter-party.

Mr. Anthony Clarke, Q.C. and Mr. Charles Haddon-Cave (instructed by Horrocks & Co.) for the charterers; Mr. Michael Collins, Q.C. and Mr. David Mildon (instructed by Messrs. Ince & Co.) for the owners.

The further facts are stated in the judgment of Lord Goff of Chieveley.

Judgment was reserved.

Thursday Feb. 15, 1990

JUDGMENT

Lord KEITH OF KINKEL: My Lords, I agree that this appeal and the cross-appeal should be dismissed for the reasons set out in the speech to be delivered by my noble and learned friend Lord Goff of Chieveley. I also agree with the supplementary observations of my noble and learned friend Lord Brandon of Oakbrook.

Lord BRANDON OF OAKBROOK: My Lords, I have had the advantage of considering in draft the speech prepared by my noble and learned friend, Lord Goff of Chieveley. I agree with it and for the reasons which he gives I would dismiss both the appeal and the cross-appeal.

I think it important to observe that, on the only right which the owners waived was the right to reject the nomination of Kharg Island as uncontractual; and that, if the ship had loaded there and been lost or damaged in a further air raid, the charterers would, despite that waiver, have been liable to the owners for such loss or damage on the ground of their breach of contract in ordering the ship to load at an unsafe port.

It seems to me to follow from this that the owners might have been able to succeed in their claim against the charterers for loss of freight if they had pleaded and proved that the ship's master, in refusing to load at Kharg Island, had acted reasonably so as to mitigate the damage for which the charterers would have been liable in the eventuality to which I have referred. For what may well have been good reasons, however, no contention of this kind was put forward for the owners at any stage of the proceedings. That being so, your Lordships are not required to deal with such a point in this case.

Lord TEMPLEMAN: My Lords, I agree that the appeal and cross-appeal be dismissed.

Lord GRIFFITHS: My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Goff of Chieveley. I agree with it and would dismiss both the appeal and the cross-appeal.

Lord GOFF OF CHIEVELEY: My Lords, this case is concerned with *Kanchenjunga*, a very large crude carrier of 272,372 tons dead weight. Her owners at all material times were the Shipping Corporation of India of Bombay (whom I shall refer to as "the owners") and she flew the Indian flag. The owners (the shares in which are owned by the Government of India) are a large shipping company, owning a number of other tankers as well as *Kanchenjunga*. The vessel was chartered to Motor Oil (Hellas) Corinth Refineries S.A. of Athens (whom I shall refer to as "the charterers") under a consecutive voyage charter-party dated Aug. 8, 1978, on the Exxonvoy form, for four consecutive voyages with an option for the charterers to extend the period for a further four consecutive voyages. That option was exercised by the charterers, and the present case is concerned with the eighth and last voyage under the charter as so extended. The Exxonvoy standard form of charter contains no safe port warranty in the printed form; however, in completing the form, the loading ports in part I of the charter were agreed to be "1/2 (one/two) safe ports Arabian Gulf excluding Fao and Abadan" in charterers' option. There was a wide range of discharging



Lord Goff]                  The "Kanchenjunga"                         [H.L.

ports; these are not material. I shall have later to refer to cl. 20, a substantial printed clause contained in part II of the charter, and in particular to cl. 20 (vi) which is expressed to be concerned with war risks.

On the same date as the above charter, the charterers sub-chartered the vessel on a back-to-back basis to an associated company called Varnima Chartering Compania Naviera S.A. ("Varnima"). Throughout this matter, the charterers and Varnima have been treated as having an identical interest. On Nov. 19, 1980, Varnima sub-sub-chartered the vessel to Refineria de Petroleos del Norte S.A. ("Petronor"). I shall refer to this charter as "the sub-charter", and to the charter between the owners and the charterers as "the head charter". The sub-charter was not on back-to-back terms. It was for a single voyage, on the Asbatankvoy form (for all practical purposes identical to the Exxonvoy form), the loading ports being expressed to be —

. . . one/two safe [ports] Arabian Gulf excluding Iran and Iraq but including Kharg, Lavan and Sirri Islands.

The rate of freight under the sub-charter was substantially higher than that under the head charter.

The vessel had been waiting at Mina al Fahal in the Arabian Gulf since Oct. 8, 1980 for loading port orders for the final voyage under the head charter. It was following the making of the Petronor fixture, on Nov. 19, that the charterers ordered the vessel to proceed to Kharg Island. The order was given on Nov. 20, and repeated on Nov. 21, on which day the owners instructed the master of the vessel to proceed to Kharg Island. He did so, arriving at Kharg Island on Nov. 23, when notice of readiness was given. On Dec. 1 there occurred an air raid by Iraqi aircraft upon Kharg Island, which caused the master of the vessel to weigh anchor and proceed away from Kharg Island to a place where she could wait in safety. There then followed an exchange of telex messages between the parties which led first to impasse and ultimately to the termination of the charter in early January, 1981.

When the head charter was entered into, in August 1978, Iraq and Iran were not at war. It was not until Sept. 22, 1980 that border hostilities between Iran and Iraq, which had been simmering for some months, erupted into full-scale war. The general position in the vicinity of Kharg Island, and the owners' reaction to it, are described in detail in pars. 7 to 10 of the arbitrators' reasons for their award. It appears that,

following the outbreak of war, among the targets for Iraqi air attack were the oil installations at Kharg Island. The natural reaction of ship-owners on the eruption of fighting was to keep their vessels out of areas where they might suffer damage. However, at this time India was very short of crude oil and pressure was put on the owners by the Indian authorities (the Oil Co-ordination Committee — "O.C.C.") to load from Iranian ports, including Kharg Island, in spite of the risks which would be incurred. Paragraphs 9 and 10 of the arbitrators' reasons (in which the owners are referred to as "S.C.I.") read as follows:

9. Up to 19 November, Iran admitted that there had been air raids on Kharg Island on the following dates: 24, 27 September; 5, 10, 13, 14, 15 October. These air raids were not of the concentrated type so familiar in the 1939-45 war; indeed, Iraq did not have the bombers to operate such attacks. Rather they appear to have been of a hit and run type operated by one, two or three fighter-bombers. It is possible that air raids in addition to those admitted by Iran took place. In spite of the risks involved, five tankers belonging to S.C.I. loaded at Kharg in the first half of October. To minimise the risks, the vessels anchored about five miles off until they were called in to berth; a strict black-out was enforced by the Iranian authorities and there were restrictions on the use of radio and V.H.F. The S.C.I. vessels observed that oil tanks had been damaged and were on fire; frequent anti-aircraft firing was observed. The raids would appear to have been directed at the oil storage tanks, rather than at the actual loading installations or at ships. However, on 10 October, two bombs fell in the water in close proximity to S.C.I.'s vessel *B. R. Ambedkar* which was waiting to load (this vessel was diverted to Lavan Island to load). Their *Lok Manya Tilak* also reported heavy attacks on 14 and 15 October; as a result of these reports, S.C.I. decided not to send further tankers to Kharg Island until such time as "reasonably safe conditions for loading" were restored.

10. Towards the end of October and the beginning of November, the Iranian Oil suppliers National Iranian Oil Co, ("N.I.O.C.") were pressing O.C.C. to take up cargo from Kharg and on or about 5 November the Government of India agreed to S.C.I. sending the *C. P. Shivaji* to Kharg "subject to ship's captain local assessment of the situation". At the same time, S.C.I. went into the market with a view to chartering a v.l.c.c.

to load at Kharg which it could put in under its contract(s) of affreightment with O.C.C. S.C.I. ordered the *C. P. Shivaji* to Kharg on 6 November and the *Barauni* on 8 November. The *C. P. Shivaji* reported that the situation was dangerous with attempted air raids, although she encountered no difficulties in loading. As a result on 9 November the *Barauni* was ordered to stay at Mina al Ahmadi pending further orders. In the meantime, the negotiations for charting in a v.l.c.c. had apparently been proceeding and on or about 15 November the *Venus* was fixed to load some 210,000 metric tons. That vessel was expected to berth on 15 or 16 November and on 17 November S.C.I. decided to order the *Barauni* to sail from Mina al Ahmadi at daybreak on 18 November for Kharg so that she could load immediately after the *Venus*. At or shortly after this time, S.C.I. also ordered the *N. S. Bose* and the *Satyamurti* to Kharg to load.

Meanwhile, in September, October and the first half of November telex exchanges took place between the owners and the charterers about the employment of the vessel on her last voyage under the charter. She completed discharge on her seventh voyage at Brunsbuttel in West Germany, and was ordered by the charterers to proceed at slow speed to the Arabian Gulf for orders. Ultimately, following the fixture with Petronor on Nov. 19, the charterers telexed the owners on Nov. 20 informing them of the fixture and requesting them to instruct the master to proceed to Kharg Island for loading. On Nov. 21, the charterers telexed the owners with detailed voyage instruction, which the owners passed on to the master on the same day, advising him that they were arranging bunkers at Damman on the loaded passage and that, in view of the current situation prevailing in the area, he should proceed with due caution. On the same day the owners consulted with the Government of India as to whether the vessel should go to Kharg Island, pointing out that:

. . . since we have been loading our own as well as inchartered vessels at Kharg Island in recent past and also at this very time our non-compliance [with] the charterers' instructions will lead to breach of charterparty with serious implications.

The response was that the owners should take a commercial view of the situation. The arbitrators understood that to mean that:

. . . the national interest was not concerned and that S.C.I. should weigh against the possible risks of damage to the ship and injury to

the crew the possibility of being liable for heavy damages if it were later held that they were not entitled to refuse to order the ship to Kharg Island.

The master was, however, concerned about the order to proceed to Kharg Island, and when he cabled to the owners with his e.t.a. at Kharg Island, he added a protest against ordering the vessel to Kharg Island which "[we] consider dangerous". The owners did not, however, respond to this protest; and when, on the same day, they telexed the charterers confirming that they had instructed the master to comply with the charterers' instructions to proceed to load at Kharg Island, they stated that they had done so without prejudice to their rights in respect of the very substantial delay by the charterers in giving orders for the loading port (a claim which was later to be upheld by the arbitrators), but made no protest about the orders to proceed to Kharg Island.

The vessel anchored off Kharg Island at 18 06 G.M.T. on Nov. 23, and served notice of readiness. Under the charter-party, laytime began to count six hours thereafter, with a total laytime of 72 running hours. Thereafter the owners, referring to the fact that the laytime was running, repeatedly pressed for priority berthing. When the vessel arrived, there were seven other vessels anchored, presumably waiting to load, including the owners' vessel *Barauni*; shortly afterwards *Satyamurti*, also belonging to the owners, arrived for loading. On Nov. 25, the master of *Satyamurti* radioed to the owners reporting "situation generally satisfactory, no cause for alarm", but that a black-out was being strictly observed and that A.A. firing had been observed on the island during the early hours. Because of the reported A.A. fire, the owners instructed their vessels to proceed 25 miles west of Kharg Island and, on Nov. 25, informed the charterers of this, holding the charterers responsible for sending the vessel to Kharg Island. The arbitrators observed that this was the first occasion on which the owners had raised the possible unsafety of Kharg Island with the charterers since receiving orders to proceed there to load. On Nov. 26, the master of *Satyamurti* informed the owners that he had stayed where he was, thinking the anchorage better there than 25 miles west; he reported further sporadic A.A. fire, but thought this was only routine/practice. However, because of the continued delay in berthing, the vessel left Kharg Island on Nov. 26, and proceeded to Mina al Ahmadi for bunkering, returning to Kharg Island early in the morning of Nov. 28. She did not miss her turn by leaving the port for



this short time, and resumed her position as second in turn. On Nov. 28, the owners kept the charterers informed of the vessel's movements. On Nov. 30, the loading berth became free for the vessel; but she was unable to berth because of bad weather, and before she could berth there was an air raid on Kharg Island at 23 15 hours on Dec. 1. The master promptly weighed anchor and proceeded away from Kharg Island until about 03 00 hours on Dec. 2 when the vessel was stopped pending instructions from the owners.

On Dec. 2 the owners telexed the charterers reporting the air raid and the movement of the vessel to the south, and stating that they considered it self-evident that the port was unsafe. They claimed (incorrectly, as the arbitrators held) that they had expressed reservations about the safety of Kharg Island, and that they had agreed to proceed to Kharg Island without prejudice to their right to claim damages. They asked the charterers to nominate soonest a safe port where they proposed to load cargo. There followed an exchange of telex messages, in which the charterers pressed the owners to instruct the vessel to return to Kharg Island for loading, and the owners protested that the port was unsafe. However, on Dec. 3, the owners cabled the master as follows:

Charterers want vessel to proceed immediately to Kharg. Please comply with our voyage instructions. Acknowledge forthwith.

But the master was unwilling to return to Kharg Island and replied on Dec. 4 to the charterers:

Received your voyage instructions through owners to proceed to Kharg. As situation in Kharg is dangerous and as we witnessed heavy bombing regret unable to comply with your instructions.

Petronor continued to press upon Varnima that the vessel should return to Kharg Island for loading, pointing out that other vessels were doing so. Attempts by them to obtain alternative cargo elsewhere in the area failed. The owners, on the other hand, continued to press the charterers to nominate an alternative safe port, and Varnima pressed Petronor to do likewise. By mid-December, solicitors had been instructed. No alternative port having been nominated, the owners' solicitors informed the charterers' solicitors on Nov. 5 that the owners treated the charterers as having repudiated the contract; and the charterers' solicitors maintained that it was the owners who had repudiated the charter, and that the charterers had treated the owners as being in repudiation. So the battle lines were drawn.

In the arbitration, where jurisdiction was conferred on the arbitrators to deal with both the dispute as between the owners and the charterers and the dispute as between Varnima and Petronor, the arbitrators first held that, when the vessel was ordered to Kharg Island on Nov. 21, Kharg Island was not a prospectively safe port. They stated in their reasons for their award (par. 29):

A full-scale war involving Iran and Iraq had been waging for some two months, air attacks had been made on Kharg and it was but a short flying distance from Iraqi bases. On the other hand, ships as such had not been attacked, there had been a pause in the air attacks, war risk insurance was obtainable and ships were loading. However, the risk of further air attacks still obtained as was realised by all concerned and we find that in the context of the head charter Kharg was not a prospectively safe port when nominated on 21 November.

However, they went on to hold that the safety or unsafety of Kharg Island was not changed in any way by the attack on Dec. 1. They stated (par. 31):

The possibility of such an air raid was the very fact that made Kharg prospectively unsafe under the charter but was one of the matters which would have been in the contemplation of the parties when the subcharter was made. The raid was of like character to the earlier ones; the only real change since the date of the sub-charter was that instead of the date of the next attack being uncertain it was ascertained. Thereafter, the date of the succeeding attack became equally uncertain.

Faced with the clear safe port warranty in the head charter, the charterers argued before the arbitrators that the owners had waived their right not to comply with the charterers' orders to proceed to Kharg Island. This argument the arbitrators rejected. They considered that waiver only applied where there were just two alternative courses of action available; here there were at least three courses of action open to the owners, and so they held that the defence must fail. This reasoning was, as is now accepted, erroneous in law. The arbitrators also rejected an alternative argument founded on promissory estoppel, stating that the mere acceptance of orders without protest does not amount to the required clear and unequivocal promise required by the doctrine.

Having rejected both waiver and promissory estoppel, they held that the charterers were in

breach of the ... unsafe po ... held liabl ... having ex ... proceed t ... held that ... tion from

The ch ... the arbitr ... tice Hob ... allowed t ... held that ... terers' or ... that by so ... ness at K ... to assert t ... asking the ... thing and ... the owner ... equivocal.

There ... owners' ... charterer ... nominat ... Island w

Furthermo ... choose. T ... the provis ... their lega ... requireme ... and the re ... The Judge ... deal with ... issory esto ... a true co ... were prot ... in damage ... decision of ... 1 Lloyd's l

The cha ... to your l ... cross-appe ... appeal on ... most subst ... Lordships' ... below. To

There is ... the nature ... gations un ... charterers' ... load (I not ... cl. 20 (vi), ... these matt ... position v ... that Kharg ... nation by ... unsafe por

*[left margin fragments]*

jurisdiction was
deal with both
rs and the char-
n Varnima and
eld that, when
Island on Nov.
spectively safe
sons for their

Iran and Iraq
vo months, air
arg and it was
m Iraqi bases,
. such had not
t a pause in the
was obtainable
ver, the risk of
ned as was re-
find that in the
harg was not a
nominated on

that the safety
not changed in
1. They stated

ir raid was the
prospectively
was one of the
en in the con-
hen the sub-
d was of like
: the only real
ub-charter was
he next attack
tained. There-
ceeding attack

varranty in the
ued before the
l waived their
arterers' orders
argument the
nsidered that
were just two
vailable; here-
of action open
at the defence
s, as is now
arbitrators also
t founded on
hat the more
otest does not
d unequivocal

nd promissory
terers were in

---

breach of contract in ordering the vessel to an unsafe port. On the other hand, Varnima was held liable to Petronor under the sub-charter, having expressly agreed that the vessel would proceed to Kharg Island; and the arbitrators held that Varnima could not derive any protection from cl. 20 (vi) in the sub-charter.

The charterers appealed from the award of the arbitrators with leave of the Court. Mr. Justice Hobhouse [1987] 2 Lloyd's Rep. 509 allowed the appeal on the issue of waiver. He held that the owners had accepted the charterers' orders to proceed to Kharg Island; and that by so doing, by serving notice of readiness at Kharg Island and thereafter continuing to assert that the vessel was available to load, asking the charterers to arrange priority berthing and referring to the running of laytime, the owners' conduct could not be described as equivocal. He said, at p. 516:

There is nothing unequivocal about owners' conduct. They were dealing with charterers on the basis that the loading port nomination had been made and that Kharg Island was that port.

Furthermore, they knew of their right to choose. They knew the facts; they knew what the provisions of the contract were, and what their legal effect was. Therefore both the requirements of waiver, unequivocal conduct and the requisite knowledge, were made out. The Judge did not therefore find it necessary to deal with the alternative argument on promissory estoppel. However he then held that, on a true construction of cl. 20 (vi), the owners were protected from liability to the charterers in damages. The Court of Appeal affirmed the decision of the Judge on both points [see [1981] 1 Lloyd's Rep. 354].

The charterers then obtained leave to appeal to your Lordships' House, and the owners cross-appealed. It was in fact the owners' cross-appeal on the issue of waiver which raised the most substantial issue in the appeal before your Lordships' House, as it had done in the Courts below. To that issue I will first turn.

There is no dispute between the parties as to the nature of their respective rights and obligations under the contract with regard to the charterers' orders to proceed to Kharg Island to load (I put on one side, of course, the effect of cl. 20 (vi), which I will consider later). Since these matters are not in dispute, I can state the position very briefly. The arbitrators' finding that Kharg Island was, at the time of its nomination by the charterers, prospectively an unsafe port was not, and indeed could not be,

---

challenged. Kharg Island was not therefore a port which, under the terms of the charter, the charterers were entitled to nominate. It followed that the nomination was a tender of performance which did not conform to the terms of the contract; as such, the owners were entitled to reject it. Even so, by their nomination of Kharg Island the charterers impliedly promised that that port was prospectively safe for the vessel to get to, stay at, so far as necessary, and in due course, leave (see Kodros Shipping Corporation of Monrovia v. Embrasa Cubana de Fletes (The Evia) (No. 2), [1982] 2 Lloyd's Rep. 307 at p. 315; [1983] A.C. 736 at p. 757, per Lord Roskill). Accordingly if the owners, notwithstanding their right to reject the nomination, complied with it and their ship suffered loss or damage in consequence, they would be entitled to recover damages from the charterers for breach of contract, though the ordinary principles of remoteness of damage and causation would apply to any such claim; see Compania Naviera Maropan SlA v. Bowaters Lloyd Pulp and Paper Mills Ltd. (The Stork), [1955] 1 Lloyd's Rep. 349; [1955] 2 Q.B. 68, and Reardon Smith Line Ltd. v. Australian Wheat Board (The Houston City), [1956] 1 Lloyd's Rep. 1; [1956] A.C. 266.

This is not, however, a case in which the owners have complied with an order to proceed to an unsafe port, and their ship has proceeded there and suffered damage in consequence. This is a case in which the owners have complied with the charterers' orders to the extent that the vessel has proceeded to the unsafe port and given notice of readiness there, but then the master, having tasted at first hand the danger inherent in the port's unsafety, has persuaded them not to persist in loading there but to sail away. Here the crucial question is whether, before the vessel sailed away, the owners had, by their words or conduct, precluded themselves from rejecting the charterers' nomination as not complying with the contract. Hence the reliance by the charterers on the principles of waiver and estoppel, unsuccessful before the arbitrators, but successful, so far as waiver is concerned, before the Judge and the Court of Appeal. The question whether the Courts below were correct in their conclusion depends, in my opinion, upon an analysis of these principles, and their proper application to the facts of the present case.

It is a commonplace that the expression "waiver" is one which may, in law, bear different meanings. In particular, it may refer to a forbearance from exercising a right or to an abandonment of a right. Here we are concerned



with waiver in the sense of abandonment of a right which arises by virtue of a party making an election. Election itself is a concept which may be relevant in more that one context. In the present case, we are concerned with an election which may arise in the context of a binding contract, when a state of affairs comes into existence in which one party becomes entitled, either under the terms of the contract or by the general law, to exercise a right, and he has to decide whether or not to do so. His decision, being a matter of choice for him, is called in law an election. Characteristically, this state of affairs arises where the other party has repudiated the contract or has otherwise committed a breach of the contract which entitles the innocent party to bring it to an end, or has made a tender of performance which does not conform to the terms of the contract. But this is not necessarily so. An analogous situation arises where the innocent party becomes entitled to rescind the contract, i.e. to wipe it out altogether, for example because the contract has been induced by a misrepresentation; and one or both parties may become entitled to determine a contract in the event of a wholly extraneous event occurring, as under a war clause in a charter-party. Characteristically, the effect of the new situation is that a party becomes entitled to determine or to rescind the contract, or to reject an uncontractual tender of performance; but, in theory at least, a less drastic course of action might become available to him under the terms of the contract. In all cases, he has in the end to make his election, not as a matter of obligation, but in the sense that, if he does not do so, the time may come when the law takes the decision out of his hands, either by holding him to have elected not to exercise the right which has become available to him, or sometimes by holding him to have elected to exercise it. Instances of this phenomenon are to be found in s. 35 of the Sale of Goods Act, 1979. In particular, where with knowledge of the relevant facts a party has acted in a manner which is consistent only with his having chosen one of the two alternative and inconsistent courses of action then open to him — for example, to determine a contract or alternatively to affirm it — he is held to have made his election accordingly, just as a buyer may be deemed to have accepted uncontractual goods in the circumstances specified in s. 35 of the 1979 Act. This is the aspect of election referred to by Lord Diplock in *Kammins Ballrooms Co. Ltd. v. Zenith Investments (Torquay) Ltd.*, [1971] A.C. 850 at p. 883. But of course an election need not be made in this

way. It can be communicated to the other party by words or conduct; though, perhaps because a party who elects not to exercise a right which has become available to him is abandoning that right, he will only be held to have done so if he has so communicated his election to the other party in clear and unequivocal terms (see *Scarf v. Jardine*, (1882) 7 App.Cas. 345 at p. 361, per Lord Blackburn, and *China National Foreign Trade Transportation Corporation v. Evlogia Shipping Co. S.A. of Panama (The Mihalios Xilas)*, [1979] 2 Lloyd's Rep. 303 at p. 307; [1979] 1 W.L.R. 1018 at p. 1024, per Lord Diplock). Once an election is made, however, it is final and binding (see *Scarf v. Jardine*, per Lord Blackburn, at p. 360). Moreover it does not require consideration to support it, and so it is to be distinguished from an express or implied agreement, such as a variation of the relevant contract, which traditionally requires consideration to render it binding in English law.

Generally, however, it is a prerequisite of election that the party making the election must be aware of the facts which have given rise to the existence of his new right. This may not always be so. For example, in the law of sale of goods, where goods have been tendered to the buyer which are not in conformity with the contract, he may, if he has had a reasonable opportunity to examine them, be deemed in certain circumstances to have accepted them, thereby electing not to exercise his right to reject them, even though he has not actually examined the goods and discovered the defect (see s. 34 and 35 of the 1979 Act). This may flow from the fact that he has waived his right to examine them — yet another example of waiver. I add in parenthesis that, for present purposes, it is not necessary for me to consider certain cases in which it has been held that, as a prerequisite of election, the party must be aware not only of the facts giving rise to his rights but also of the rights themselves, because it is not in dispute here that the owners were aware both of the relevant facts and of their relevant rights.

There are numerous examples of the application of this principle of election in English law. Perhaps the most familiar situation is that which arises when one contracting party repudiates the contract. The effect is that the other contracting party then has a choice whether to accept the repudiation (as it is called) and bring the contract to an end; or to affirm the contract, thereby waiving or abandoning his right to terminate it. If, with knowledge of the facts giving rise to the repudiation, the other party to the contract acts (for example) in a manner consistent only with treating that contract as still alive,

the other party
perhaps because
a right which
abandoning that
be done so if he
on to the other
rms (see *Scarf*
at p. 361, per
*tional Foreign*
*on v. Evlogia*
(*The Mihalios*
303 at p. 307;
per Lord Dip-
however, it is
*dine*, per Lord
or it does not
ess, and so it is
ess or implied
of the relevant
ires consider-
sh law.

rerequisite of
election must
be given rise to
This may not
law of sale of
ndered to the
with the con-
onable oppor-
ned in certain
them, thereby
o reject them,
examined the
(see s. 34 and
from the fact
mine them —
add in paren-
es, it is not
rtain cases in
rerequisite of
e not only of
but also of the
not in dispute
oth of the re-
ghts.

of the appli-
on in English
tuation is that
ng party repu-
that the other
e whether to
led) and bring
the contract,
is right to ter-
e facts which
party to the
anner consist-
t as still alive,

he is taken in law to have exercised his election to affirm the contract.

The present case is concerned not so much with repudiation as with an uncontractual tender of performance. Even so, the same principles apply. The other party is entitled to reject the tender of performance as uncontractual; and, subject to the terms of the contract, he can then, if he wishes, call for a fresh tender of performance in its place. But if, with knowledge of the facts giving rise to his right to reject, he nevertheless unequivocally elects not to do so, his election will be final and binding upon him and he will have waived his right to reject the tender as uncontractual.

We can see these principles at work in the law of sale of goods. If goods are tendered which are not in conformity with the contract, the buyer is entitled to reject them. However, as is recognized by s. 11(2) of the 1979 Act, where a contract of sale is subject to a condition to be fulfilled by the seller, the buyer may —

. . . *elect* to treat the breach of the condition as a breach of warranty . . .

Of course, if the buyer rejects the goods as not conforming with the contract, and the time for delivery has expired, the buyer can without more sue the seller for damages for non-delivery. If the time for delivery has not yet expired, the seller is still entitled to make a fresh tender which conforms with the contract, in which event the buyer is bound to accept the goods so tendered: see *Borrowman Phillips & Co. v. Free & Hollis*, (1878) 4 Q.B.D. 500. If the buyer elects to accept non-contractual goods, he is bound by his election and is limited to his right of action for damages for breach of warranty, the exercise of that right being consistent with his having waived his right to reject the goods: see s. 11(4) of the 1979 Act. However, as Mr. Justice Devlin pointed out in *The Stork*, [1954] 2 Lloyd's Rep. 397 at p. 414, col. 1; [1955] 2 Q.B. 68 at pp. 76-77, the principle of election is applicable in every class of contract. He said:

. . . There *is* a difference between a contractor who does not discharge his obligation at all and one who does so imperfectly. In the latter case, the contract gives the other party the right to elect to treat the imperfect performance as if it were a fulfilment of the contract (even if he knows that in fact it is not), and to claim damages if any result from the imperfection. The right which is, I think, common to every class of contract. The general principle is that the other party is entitled to proceed just as he would have done if the contract had been properly fulfilled, and the risk of any damage that flows from that must be borne by the wrongdoer.

Mr. Justice Devlin was there speaking in the context of the nomination of an unsafe port under a charter-party, and there can be no doubt that the principle of election applies in such circumstances, as it does in other cases.

Election is to be contrasted with equitable estoppel, a principle associated with the leading case of *Hughes* v. *Metropolitan Railway Co.*, (1877) 2 App.Cas. 439. Equitable estoppel occurs where a person, having legal rights against another, unequivocally represents (by words or conduct) that he does not intend to enforce those legal rights; if in such circumstances the other party acts, or desists from acting, in reliance upon that representation, with the effect that it would be inequitable for the representor thereafter to enforce his legal rights inconsistently with his representation, he will to that extent be precluded from doing so.

There is an important similarity between the two principles, election and equitable estoppel, in that each requires an unequivocal representation, perhaps because each may involve a loss, permanent or temporary, of the relevant party's rights. But there are important differences as well. In the context of a contract, the principle of election applies when a state of affairs comes into existence in which one party becomes entitled to exercise a right, and has to choose whether to exercise the right or not. His election is generally to be an informed choice, made with knowledge of the facts giving rise to the right. His election once made is final; it is not dependent upon reliance on it by the other party. On the other hand, equitable estoppel requires an unequivocal representation by one party that he will not insist upon his legal rights against the other party, and such reliance by the representee as will render it inequitable for the representor to go back upon his representation. No question arises of any particular knowledge on the part of the representor, and the estoppel may be suspensory only. Furthermore, the representation itself is different in character in the two cases. The party making his election is communicating his choice whether or not to exercise a right which has become available to him. The party to an equitable estoppel is representing that he will not in future enforce his legal rights. His representation is therefore in the nature of a promise which, though unsupported by consideration, can have legal consequences; hence it is sometimes referred to as promissory estoppel.

These are the principles which fall to be con-



| 400 | LLOYD'S LAW REPORTS | [1990] Vol. 1 |
|---|---|---|

Lord Goff]                    The "Kanchenjunga"                    [H.L.

sidered in the present case. Here, as I have already indicated, the situation in which the owners found themselves was one in which they could either reject the charterers' nomination of Kharg Island as uncontractual, or could nevertheless elect to accept the order and load at Kharg Island, thereby waiving or abandoning their right to reject the nomination but retaining their right to claim damages from the charterers for breach of contract. Since the owners were in this situation, it is logical first to consider the question of election before considering (if necessary) equitable estoppel.

The arbitrators addressed themselves to the possibility of election, but unfortunately their rejection of it was founded upon a mistaken appreciation of the law. The Judge and the Court of Appeal, however, both held that the owners had elected to waive their right to reject the nomination. In my opinion they were right to reach this conclusion.

Because the arbitrators did not approach the issue of election correctly, they failed to consider the correct questions. In particular, they did not ask themselves whether there had been the necessary unequivocal representation by the owners. It is true that they did ask themselves whether there had been the necessary "clear and unequivocal promise" when considering the alternative principle of equitable estoppel; they held that there was not, on the basis that mere acceptance of orders without protest does not amount to such a promise. As a general proposition, this is no doubt correct; and it would equally be true if made with reference to the question whether there had been an unequivocal representation by the owners that they were waiving their right to reject the nomination as uncontractual. Moreover, if the relevant evidence had related only to the communications passing between the parties before the vessel arrived at Kharg Island, the question would have arisen whether, on these communications (set of course in their factual context), there had been such an unequivocal representation. But the matter does not stop there, because on arrival at Kharg Island the master proceeded to serve notice of readiness. Thereafter, as the Judge pointed out, the owners were asserting that the vessel was available to load; they were also calling upon the charterers to arrange priority berthing, and referring to the fact that laytime was running. In these circumstances, the owners were asserting a right inconsistent with their right to reject the charterers' orders. The right which they were asserting was that laytime had started to run against the charterers at Kharg Island, with

the effect that the charterers had become bound to load the cargo there within the laytime fixed by the charter and, if they failed to do so, to pay demurrage to the owners at the contractual rate. In these circumstances, on the principle stated by Lord Diplock in the *Kammins Ballrooms* case [1971] A.C. 850, at pp. 882–883, the owners must be taken in law to have thereby elected not to reject the charterers' nomination, and so to have waived their right to do so or to call for another nomination. Accordingly, in my opinion, Mr. Justice Hobhouse and the Court of Appeal were fully entitled in these circumstances to substitute their view of the case on this point for that of the arbitrators. There was no question of their reversing the arbitrators on an issue of fact; they were deciding, and in my opinion rightly deciding, that the arbitrators had failed to draw an inference of law which on their findings of fact they were bound to draw.

No doubt the master was entitled to refuse to endanger his ship and crew in the circumstances in which he found himself; but that did not excuse the owners from their breach of contract, after they had elected not to reject the charterers' nomination of Kharg Island in the knowledge of the facts rendering it prospectively unsafe. Furthermore this is not a case in which a new situation had developed at Kharg Island, or some other danger already existed there. If the known danger had become significantly different; or if a new and different danger had developed; or if some other danger, hitherto unknown, already existed at the port — in such circumstances as these, other questions might have arisen. But your Lordships are not troubled with any such questions in the present case. The arbitrators found as a fact that the safety or unsafety of Kharg Island was not changed in any way by the attack on Dec. 1. This was a finding which they were fully entitled to make, and which cannot be challenged.

For these reasons, I would dismiss the owners' cross-appeal on this issue. It follows that it is unnecessary for the purposes of the cross-appeal to consider the alternative question of equitable estoppel.

I turn then to the charterers' appeal which related to the effect of cl. 20 (vi) of the charter. Clause 20 (vi) reads, so far as relevant, as follows:

WAR RISKS (a) If any port of loading or of discharge named in this charterparty or to which the vessel may properly be ordered pursuant to the terms of the bills of lading be blockaded, or (b) if owing to any war, hostilities, warlike operations . . . entry to any such port of loading or of discharge or the loading



**A832**

or discharge of cargo at any such port be considered by the master or owners in his or their discretion dangerous or prohibited . . . the charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of this charterparty (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the master's or owner's discretion dangerous or prohibited) . . .

Both the Judge and the Court of Appeal held that this clause was effective to protect the owners from liability in damages, though it did not render the charterers liable in damages in the events which had happend. With this conclusion I agree; I shall therefore deal with the point briefly.

Three arguments were advanced on behalf of the charterers. The first was that, on its true construction, the clause did was to confer an option on them. It was simply a charterers' option clause, which conferred no rights or protection on the owners in the events specified in the clause. This argument was rejected both by the Judge and by the Court of Appeal, on the basis that it would deprive the clause of all meaning and effect if it were held that it did not protect the owners in the event of their deciding, in their discretion, that the port was dangerous or prohibited and that they would not therefore load or discharge cargo there, as the case might be. With this conclusion I agree. The clause expressly refers to the discretion which the owners and master are entitled to exercise in a situation of danger and must, in my opinion, impliedly recognize that in the exercise of that discretion they may decline to load or discharge at the relevant port. This is precisely what happened in the present case. It was next argued that, on its true construction, the clause only applied to named ports or ports properly nominated under the charter-party. This cannot be right because, in the event of an improper nomination being made by the charterers, owners' acceptance of the nomination would have the effect that all the relevant contractual provisions applied, including cl. 20 (vi). Finally, it was suggested that the owners, by waiving their right to reject the charterers' nomination as uncontractual, thereby also waived their right to rely upon cl. 20 (vi). Again, I cannot agree. The owners, presented by the charterers with an uncontractual nomination, had in the end to decide whether or not

to reject it, and they elected not to do so. I cannot see that this election had any effect upon cl. 20 (vi), and indeed in the course of argument the charterers virtually abandoned the point.

For these reasons, which are substantially the same reasons as those given by the Judge and by the Court of Appeal, I would dismiss both the appeal and the cross-appeal.

Finally, I find it necessary to refer to the fact that my noble and learned friend, Lord Brandon of Oakbrook, has suggested that the owners might have been able to succeed in their claim against the charterers for loss of freight if they had pleaded and proved that the master, in refusing to load at Kharg Island, had acted reasonably so as to mitigate the damage for which the charterers would have been liable if the ship had entered the port and been lost or damaged in a further air raid. This point was not raised in argument, either by Counsel for the owners or indeed by the tribunal, before any of the four tribunals (including your Lordship's House) before which the case has been argued. Having heard no argument on the point, I can express no concluded opinion upon it. Even so, out of fairness to Counsel for the owners, I feel compelled to make the following observations:

(1) The owners, with knowledge of the relevant facts, waived their right to reject the charterers' nomination of Kharg Island as uncontractual, and the arbitrators have found as a fact that there was no material change in the nature of the danger at Kharg Island between the date of the nomination and the date when the owners ultimately refused to load there. In these circumstances, although no doubt the master was entitled to act as he did for the safety of his ship and crew, I find it difficult to see how the owners could, in the absence of any change of circumstances or any hitherto unknown circumstances coming to light which significantly increased the danger of loading at Kharg Island, escape from their contractual obligation to load there by invoking the principle of mitigation of damage.

(2) If it were right that the owners' refusal to load at Kharg Island constituted a reasonable step taken in mitigation of damage, it would follow that, had the ship instead entered Kharg Island and suffered bomb damage while loading there, the charterers could have escaped all liability for such damage on the ground that the owners had failed to mitigate the damage by refusing to enter the port. I have great difficulty in seeing how any tribunal could reach such a conclusion.



402    LLOYD'S LAW REPORTS   [1990] Vol. 1

PART 5    The "Montana"   [Q.B. (Adm. Ct.)

(3) In any event, since the owners, while waiving their right not to treat the charterers' nomination as uncontractual, did not waive their rights under cl. 20 (vi), that clause legislated for the circumstances which arose.

For these reasons, quite apart from others which might have been advanced if the point had been argued, as at present advised it seems to me very understandable that Counsel for the owners should not have raised the point.

### QUEEN'S BENCH DIVISION
### (ADMIRALTY COURT)

Dec. 13, 14, 15, 18 and 19, 1989

### THE "MONTANA"

Before Mr. Justice SHEEN

Carriage by sea — Short delivery — Title to sue — Bulk cargo of barley discharged at Singapore bagged and reloaded for shipment to Jeddah — Plaintiff consignee alleged short delivery — Whether defendants liable in damages for failing to deliver all cargo loaded in Singapore — Whether plaintiff had title to sue.

Bunge (Australia) Pty. Ltd. of Melbourne chartered *Montana* from the disponent owners by a charter-party dated Dec. 14, 1983 at Melbourne. Under the terms of the charter the receivers' stevedores were to be employed at the port of discharge.

A cargo of barley in bulk was carried in *Montana* from the port of shipment, Geelong, to Singapore. At Singapore the cargo was discharged. It was then bagged and reloaded. It was agreed that *Montana* sailed from Singapore laden with 27,500 tonnes of barley in 550,000 bags. Each bag and its contents weighed 50 kgs.

The bill of lading stated that the cargo was to be delivered in the like apparent good order and condition at Jeddah unto the order of the Saudi Cairo Bank or their assigns. The bills of lading incorporated the provisions of the charter-party.

The letter of credit was opened by the Saudi Cairo Bank on Dec. 20, 1983 for the account of Mr. S.H.A. Sharbatly of Jeddah. The beneficiaries were named as Bunge (Australia) Pty. Ltd. of Melbourne and was for about U.S.$10,200,000 (10 per cent. more or less). There was no evidence that that letter of credit referred to the shipment of barley.

*Montana* arrived in Jeddah on Feb. 28, 1984. Discharging commenced at 07 00 hours on Feb. 29 and was completed on Mar. 13. The master sent a telex message to the owners' London agents stating *inter alia* that 27,464 tonnes had been discharged and only a quantity of about 15 tonnes remained in the holds in bulk from bags torn by the stevedores in the course of discharging. The stevedores refused to discharge this cargo.

On Apr. 28, 1984 a document headed summary of vessel's outturn was issued indicating a shortage of 1108 bags. On Apr. 20, 1984 the Jeddah customs issued a shortage certificate which stated that 550,000 bags were loaded in *Montana* but only 548,892 bags were discharged.

The plaintiff claimed damages on the ground that 1108 bags of barley were not delivered to him and that 4000 bags were delivered partly empty. After the contents of those 4000 bags were rebagged it was found that they filled only 3442 bags and that there was a further shortage of 558 bags. The total



1 of 1 DOCUMENT

Premium Nafta Products Ltd and others v Fili Shipping Co Ltd and others

HOUSE OF LORDS

*[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)*

HEARING-DATES: 30, 31 JULY, 17 OCTOBER 2007

17 OCTOBER 2007

CATCHWORDS:

Shipping - Charterparty - Arbitration clause - Construction - Shelltime form - Owners purporting to rescind charterparty for fraud and bribery - Whether dispute arising under charterparty - Whether arbitration clause surviving rescission of charterparty - Arbitration Act 1996, s 7

COUNSEL:

C Butcher QC and P Jones QC for the Appellants; N Hamblen QC and V Flynn fort the Respondents.

PANEL: LORDS, HOFFMANN, HOPE, SCOTT, WALKER, BROWN

JUDGMENTBY-1: LORD HOFFMANN

JUDGMENT-1:

LORD HOFFMANN:

MY LORDS,

[1] This appeal concerns the scope and effect of arbitration clauses in eight charterparties in Shelltime 4 form made between eight companies forming part of the Sovcomflot group of companies (which is owned by the Russian state) and eight charterers. It is alleged by the owners that the charters were procured by the bribery of senior officers of the Sovcomflot group by a Mr Nikitin, who controlled or was associated with the charterer companies. It is unnecessary to set out the details of these allegations because it is not disputed that the owners have an arguable case. They have purported to rescind the charters on this ground and the question is whether the issue of whether they were entitled to do so should be determined by arbitration or by a court. The owners have commenced court proceedings for a declaration that the charters have been validly rescinded and the charterers have applied for a stay under s 9 of the Arbitration Act 1996. Morison J [2007] 1 All ER (Comm) 81 refused a stay but the Court of Appeal (Tuckey, Arden and Longmore LJJ) [2007] Bus LR 686 allowed the appeal and granted it.

[2] The case has been argued on the basis that there are two issues: first, whether, as a matter of construction, the arbitration clause is apt to cover the question of whether the contract was procured by bribery and secondly, whether it is possible for a party to be bound by submission to arbitration when he alleges that, but for the bribery, he would never have entered into the contract containing the arbitration clause. It seems to me, however, that for the reasons I shall explain, these questions are very closely connected.

[3] I start by setting out the arbitration clause in the Shelltime 4 form:

'41(a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

(b) Any dispute arising under this charter shall be decided by the English courts to whose jurisdiction the parties hereby agree.

(c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred . . . to arbitration in London, one arbitrator to be nominated by Owners and the other by Charterers, and in case the arbitrators shall not agree to the decision of an umpire, whose decision shall be final and binding upon both parties. Arbitration shall take place in London in accordance with the London Maritime Association of Arbitrators, in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.

(i) A party shall lose its right to make such an election only if:

(a) it receives from the other party a written notice of dispute which –

(1) states expressly that a dispute has arisen out of this charter;

(2) specifies the nature of the dispute; and

(3) refers expressly to this cl 41(c) and

(b) it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute . . . .'

[4] It will be observed that cl 41(b) is a jurisdiction clause in respect of 'any dispute arising under this charter' which is then incorporated by reference (by the words 'any such dispute') in the arbitration clause in 41(c). So the first question is whether cl 41(b) refers the question of whether the charters were procured by bribery to the jurisdiction of the English court. If it does, then a party may elect under cl 41(c) to have that question referred to arbitration. But I shall for the sake of convenience discuss the clause as if it was a simple arbitration clause. The owners say that for two reasons it does not apply. The first is that, as a matter of construction, the question is not a dispute arising under the charter. The second is that the jurisdiction and arbitration clause is liable to be rescinded and therefore not binding upon them.

[5] Both of these defences raise the same fundamental question about the attitude of the courts to arbitration. Arbitration is consensual. It depends upon the intention of the parties as expressed in their agreement. Only the agreement can tell you what kind of disputes they intended to submit to arbitration. But the meaning which parties intended to express by the words they used will be affected by the commercial background and the reader's understanding of the purpose for which the agreement was made. Businessmen in particular are assumed to have entered into agreements to achieve some rational commercial purpose and an understanding of this purpose will influence the way in which one interprets their language.

[6] In approaching the question of construction, it is therefore necessary to inquire into the purpose of the arbitration clause. As to this, I think there can be no doubt. The parties have entered into a relationship, an agreement or what is alleged to be an agreement or what appears on its face to be an agreement, which may give rise to disputes. They want those disputes decided by a tribunal which they have chosen, commonly on the grounds of such matters as its neutrality, expertise and privacy, the availability of legal services at the seat of the arbitration and the unobtrusive efficiency of its supervisory law. Particularly in the case of international contracts, they want a quick and efficient adjudication and do not want to take the risks of delay and, in too many cases, partiality, in proceedings before a national jurisdiction.

[7] If one accepts that this is the purpose of an arbitration clause, its construction must be influenced by whether the parties, as rational businessmen, were likely to have intended that only some of the questions arising out of their relationship were to be submitted to arbitration and others were to be decided by national courts. Could they have intended that the question of whether the contract was repudiated should be decided by arbitration but the question of whether it was induced by misrepresentation should be decided by a court? If, as appears to be generally accepted, there is no rational basis upon which businessmen would be likely to wish to have questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another, one would need to find very clear language before deciding that they must have had such an intention.

[8] A proper approach to construction therefore requires the court to give effect, so far as the language used by the parties will permit, to the commercial purpose of the arbitration clause. But the same policy of giving effect to the commercial purpose also drives the approach of the courts (and the legislature) to the second question raised in this ap-

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

peal, namely, whether there is any conceptual reason why parties who have agreed to submit the question of the validity of the contract to arbitration should not be allowed to do so.

[9] There was for some time a view that arbitrators could never have jurisdiction to decide whether a contract was valid. If the contract was invalid, so was the arbitration clause. In Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd [1988] 2 Lloyd's Rep 63, 66 Evans J said that this rule 'owes as much to logic as it does to authority'. But the logic of the proposition was denied by the Court of Appeal in Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd [1993] QB 701, [1993] 3 All ER 897, [1993] 3 WLR 42 and the question was put beyond doubt by s 7 of the Arbitration Act 1996:

'Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement.'

[10] This section shows a recognition by Parliament that, for the reasons I have given in discussing the approach to construction, businessmen frequently do want the question of whether their contract was valid, or came into existence, or has become ineffective, submitted to arbitration and that the law should not place conceptual obstacles in their way.

[11] With that background, I turn to the question of construction. Your Lordships were referred to a number of cases in which various forms of words in arbitration clauses have been considered. Some of them draw a distinction between disputes 'arising under' and 'arising out of' the agreement. In Heyman v Darwins Ltd [1942] AC 356, 399, [1942] 1 All ER 337, 111 LJKB 241 Lord Porter said that the former had a narrower meaning than the latter but in Union of India v E B Aaby's Rederi A/S [1975] AC 797, [1974] 2 All ER 874, [1974] 3 WLR 269 Viscount Dilhorne, at p 814, and Lord Salmon, at p 817, said that they could not see the difference between them. Nevertheless, in Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd [1988] 2 Lloyd's Rep 63, 67, Evans J said that there was a broad distinction between clauses which referred 'only those disputes which may arise regarding the rights and obligations which are created by the contract itself' and those which 'show an intention to refer some wider class or classes of disputes'. The former may be said to arise 'under' the contract while the latter would arise 'in relation to' or 'in connection with' the contract. In Fillite (Runcorn) Ltd v Aqua-Lift (1989) 26 Con LR 66, 76 Slade LJ said that the phrase 'under a contract' was not wide enough to include disputes which did not concern obligations created by or incorporated in the contract. Nourse LJ gave a judgment to the same effect. The court does not seem to have been referred to Mackender v Feldia AG [1967] 2 QB 590, [1966] 3 All ER 847, [1967] 2 WLR 119, in which a court which included Lord Denning MR and Diplock LJ decided that a clause in an insurance policy submitting disputes 'arising thereunder' to a foreign jurisdiction was wide enough to cover the question of whether the contract could be avoided for non-disclosure.

[12] I do not propose to analyse these and other such cases any further because in my opinion the distinctions which they make reflect no credit upon English commercial law. It may be a great disappointment to the judges who explained so carefully the effects of the various linguistic nuances if they could learn that the draftsman of so widely used a standard form as Shelltime 4 obviously regarded the expressions 'arising under this charter' in cl 41(b) and 'arisen out of this charter' in cl 41(c)(1)(a)(i) as mutually interchangeable. So I applaud the opinion expressed by Longmore LJ in the Court of Appeal (at para 17) that the time has come to draw a line under the authorities to date and make a fresh start. I think that a fresh start is justified by the developments which have occurred in this branch of the law in recent years and in particular by the adoption of the principle of separability by Parliament in s 7 of the 1996 Act. That section was obviously intended to enable the courts to give effect to the reasonable commercial expectations of the parties about the questions which they intended to be decided by arbitration. But s 7 will not achieve its purpose if the courts adopt an approach to construction which is likely in many cases to defeat those expectations. The approach to construction therefore needs to be re-examined.

[13] In my opinion the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal. The clause should be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction. As Longmore LJ remarked, at para 17: 'if any businessman did want to exclude disputes about the validity of a contract, it would be comparatively easy to say so'.

[14] This appears to be the approach adopted in Germany: see the Bundesgerichtshof's Decision of 27 February 1970 (1990) Arbitration International, vol 6, No 1, p 79:

# A837

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

'There is every reason to presume that reasonable parties will wish to have the relationships created by their contract and the claims arising therefrom, irrespective of whether their contract is effective or not, decided by the same tribunal and not by two different tribunals.'

[15] If one adopts this approach, the language of cl 41 of Shelltime 4 contains nothing to exclude disputes about the validity of the contract, whether on the grounds that it was procured by fraud, bribery, misrepresentation or anything else. In my opinion it therefore applies to the present dispute.

[16] The next question is whether, in view of the allegation of bribery, the clause is binding upon the owners. They say that if they are right about the bribery, they were entitled to rescind the whole contract, including the arbitration clause. The arbitrator therefore has no jurisdiction and the dispute should be decided by the court.

[17] The principle of separability enacted in s 7 means that the invalidity or rescission of the main contract does not necessarily entail the invalidity or rescission of the arbitration agreement. The arbitration agreement must be treated as a 'distinct agreement' and can be void or voidable only on grounds which relate directly to the arbitration agreement. Of course there may be cases in which the ground upon which the main agreement is invalid is identical with the ground upon which the arbitration agreement is invalid. For example, if the main agreement and the arbitration agreement are contained in the same document and one of the parties claims that he never agreed to anything in the document and that his signature was forged, that will be an attack on the validity of the arbitration agreement. But the ground of attack is not that the main agreement was invalid. It is that the signature to the arbitration agreement, as a 'distinct agreement', was forged. Similarly, if a party alleges that someone who purported to sign as agent on his behalf had no authority whatever to conclude any agreement on his behalf, that is an attack on both the main agreement and the arbitration agreement.

[18] On the other hand, if (as in this case) the allegation is that the agent exceeded his authority by entering into a main agreement in terms which were not authorized or for improper reasons, that is not necessarily an attack on the arbitration agreement. It would have to be shown that whatever the terms of the main agreement or the reasons for which the agent concluded it, he would have had no authority to enter into an arbitration agreement. Even if the allegation is that there was no concluded agreement (for example, that terms of the main agreement remained to be agreed) that is not necessarily an attack on the arbitration agreement. If the arbitration clause has been agreed, the parties will be presumed to have intended the question of whether there was a concluded main agreement to be decided by arbitration.

[19] In the present case, it is alleged that the main agreement was in un-commercial terms which, together with other surrounding circumstances, give rise to the inference that an agent acting for the owners was bribed to consent to it. But that does not show that he was bribed to enter into the arbitration agreement. It would have been remarkable for him to enter into any charter without an arbitration agreement, whatever its other terms had been. Mr Butcher QC, who appeared for the owners, said that but for the bribery, the owners would not have entered into any charter with the charterers and therefore would not have entered into an arbitration agreement. But that is in my opinion exactly the kind of argument which s 7 was intended to prevent. It amounts to saying that because the main agreement and the arbitration agreement were bound up with each other, the invalidity of the main agreement should result in the invalidity of the arbitration agreement. The one should fall with the other because they would never have been separately concluded. But s 7 in my opinion means that they must be treated as having been separately concluded and the arbitration agreement can be invalidated only on a ground which relates to the arbitration agreement and is not merely a consequence of the invalidity of the main agreement.

[20] Mr Butcher submitted that the approach to construction and separability adopted by the Court of Appeal infringed the owners' right of access to a court for the resolution of their civil disputes, contrary to art 6 of the European Convention on Human Rights. I do not think there is anything in this point. The European Convention was not intended to destroy arbitration. Arbitration is based upon agreement and the parties can by agreement waive the right to a court. If it appears upon a fair construction of the charter that they have agreed to the arbitration of a particular dispute, there is no infringement of their Convention right.

[21] For these reasons, which are substantially the same as those given by Longmore LJ in the Court of Appeal, I would hold that the charterers are entitled to a stay of the proceedings to rescind the charters and dismiss the appeal.

JUDGMENTBY-2: LORD HOPE

JUDGMENT-2:

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

LORD HOPE:

MY LORDS,

[22] I have had the advantage of reading in draft the speech of my noble and learned friend Lord Hoffmann. I entirely agree with it, and for the reasons he gives I too would dismiss the appeal. I wish to add only a few brief comments.

[23] There are, as my noble and learned friend has said, two issues in this appeal. The first is an issue of construction: whether the Appellants' claims that the charterparties have been validly rescinded are disputes which arise under, or out of, the charterparties within the meaning of cl 41. The second is an issue of separability: whether, assuming that the Appellants have an arguable case that the charterparties have been validly rescinded, they also have an arguable case that the arbitration agreements in cl 41 have been rescinded as well. The Appellants submit that they were entitled to rescind the charterparties, including the arbitration agreements, because the charterparties were induced by bribery. The allegations of bribery are directed to the terms on which the charters were entered into by the Sovcomflot group of companies as owners with Mr Nikitin's chartering companies. They are said to have been un-commercial and unbelievably generous. The bribes are said to impeach not only the charters themselves but also the arbitration clause. The argument is essentially one of causation. It is that the charters would not have been entered into in the absence of these bribes or other benefits, and that but for the agreement to enter into them there would have been no agreement to go to arbitration. Had it not been for the bribes provided by Mr Nikitin to their director-general, Mr Skarga, Sovcomflot would not have done business with Mr Nikitin's companies at all.

[24] On the first issue, the Appellants say that it is highly unlikely that the parties, in agreeing to an arbitration provision, intended it to cover disputes as to whether the contract itself was induced by bribery, as to which it must be assumed one party would be entirely ignorant. The clear trend of recent authorities, they say, is to give a narrow meaning to the words used in the arbitration agreement to identify the disputes that are referred by it. They must be taken to be informed any decision to use the clause which is set out in the Shelltime 4 standard forms. I think that there are two answers to this argument. One is to be found in the wording of cl 41 itself. The other is to be found by considering whether its consequences make sense in the international commercial context within which these standard forms are designed to operate.

[25] As for the wording, contracts negotiated between parties in the international market are commonly based upon standard forms the terms of which are well known. Because they have a well-understood meaning, they enable contracts to be entered into quickly and efficiently. The Shelltime 4 standard form is a good example of this practice. It has been in frequent use since at least 1984, and it is still in use. But it must be appreciated that the various clauses in these forms serve various functions. In some a high degree of precision is necessary. Terms which define the parties' mutual obligations in relation to price and performance lie at the heart of every business transaction. They fall into that category. In others, where the overall purpose is clear, the parties are unlikely to linger over the words which are used to express it.

[26] Clause 41 falls into the latter category. No contract of this kind is complete without a clause which identifies the law to be applied and the methods to be used for the determination of disputes. Its purpose is to avoid the expense and delay of having to argue about these matters later. It is the kind of clause to which ordinary businessmen readily give their agreement so long as its general meaning is clear. They are unlikely to trouble themselves too much about its precise language or to wish to explore the way it has been interpreted in the numerous authorities, not all of which speak with one voice. Of course, the court must do what it can to provide charterers and shipowners with legal certainty at the negotiation stage as to what they are agreeing to. But there is no conflict between that proposition and the guidance which Longmore LJ gave in paras 17 - 19 of the Court of Appeal's judgment about the interpretation of jurisdiction and arbitration clauses in international commercial contracts. The proposition that any jurisdiction or arbitration clause in an international commercial contract should be liberally construed promotes legal certainty. It serves to underline the golden rule that if the parties wish to have issues as to the validity of their contract decided by one tribunal and issues as to its meaning or performance decided by another, they must say so expressly. Otherwise they will be taken to have agreed on a single tribunal for the resolution of all such disputes.

[27] The overall purpose of cl 41 is identified in the two opening paragraphs. These are the choice of law and jurisdiction clauses. There is no sign here - leaving aside the question of arbitration for a moment - that the parties intended that the disputes which were to be determined in accordance with the laws of England and be decided by the English courts were not to include disputes about the charter's validity. The simplicity of the wording is a plain indication to the contrary. The arbitration clause which follows is to be read in that context. It indicates to the reader that he need not trouble himself with fussy distinctions as to what the words 'arising under' and 'arising out of' may mean. Taken overall,

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

the wording indicates that arbitration may be chosen as a one-stop method of adjudication for the determination of all disputes. Disputes about validity, after all, are no less appropriate for determination by an arbitrator than any other kind of dispute that may arise. So I do not think that there is anything in the Appellants' point that it must be assumed that when the charters were entered into one party was entirely ignorant that they were induced by bribery. The purpose of the clause is to provide for the determination of disputes of all kinds, whether or not they were foreseen at the time when the contract was entered into.

[28] Then there are consequences that would follow, if the Appellants are right. It is not just that the parties would be deprived of the benefit of having all their disputes decided in one forum. The jurisdiction clause does not say where disputes about the validity of the contract are to be determined, if this is not to be in the forum which is expressly mentioned. The default position is that such claims would have to be brought in the jurisdiction where their opponents' were incorporated, wherever and however unreliable that might be, while claims for breach of contract have to be brought in England. But why, it may be asked, would any sensible businessmen have wished to agree to this? As Bingham LJ said in Ashville Investments Ltd v Elmer Contractors Ltd [1989] QB 488, 517, [1988] 2 All ER 577, [1988] 3 WLR 867, one should be slow to attribute to reasonable parties an intention that there should in any foreseeable eventuality be two sets of proceedings. If the parties have confidence in their chosen jurisdiction for one purpose, why should they not have confidence in it for the other? Why, having chosen their jurisdiction for one purpose, should they leave the question which court is to have jurisdiction for the other purpose unspoken, with all the risks that this may give rise to? For them, everything is to be gained by avoiding litigation in two different jurisdictions. The same approach applies to the arbitration clause.

[29] The Court of Appeal said that the time had come for a fresh start to be made, at any rate for cases arising in an international commercial context. It has indeed been clear for many years that the trend of recent authority has risked isolating the approach that English law takes to the wording of such clauses from that which is taken internationally. It makes sense in the context of international commerce for decisions about their effect to be informed by what has been decided elsewhere.

[30] The Bundesgerichtshof's Decision of 27 February 1970 to which Lord Hoffmann has referred makes two points that are relevant to this issue. The first is that haphazard interpretations should be avoided and a rule of construction established which presumes, in cases of doubt, that reasonable parties will wish to have the claims arising from their contract decided by the same tribunal irrespective of whether their contract is effective or not. The second is that experience shows that as soon as a dispute of any kind arises from a contract, objections are very often also raised against its validity. As the Bundesgerichtshof said, entrusting the assessment of the facts of the case to different tribunals according to the approach that is taken to the issues between them is unlikely to occur to the contracting parties.

[31] In AT & T Technologies Inc v Communications Workers of America, 475 US 643 (1986), 650, the United States Supreme Court said that, in the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration could prevail. In Threlkeld & Co Inc v Metallgesellschaft Ltd (London), 923 F 2d 245 (2d Cir 1991), the court observed that federal arbitration policy required that any doubts concerning the scope of arbitration issues should be resolved in favour of arbitration and that arbitration clauses should be construed as broadly as possible. In Comandate Marine Corp v Pan Australia Shipping Pty Ltd [2006] FCAFC 192, para 165 the Federal Court of Australia said that a liberal approach to the words chosen by the parties was underpinned by the sensible commercial presumption that the parties did not intend the inconvenience of having possible disputes from their transaction being heard in two places, particularly when they were operating in a truly international market. This approach to the issue of construction is now firmly embedded as part of the law of international commerce. I agree with the Court of Appeal that it must now be accepted as part of our law too.

[32] It is in the light of these observations that the issue of severability should be viewed also. Section 7 of the Arbitration Act 1996 reproduces in English law the principle that was laid down by s 4 of the United States Arbitration Act 1925. That section provides that, on being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration. Section 7 uses slightly different language, but it is to the same effect. The validity, existence or effectiveness of the arbitration agreement is not dependent upon the effectiveness, existence or validity of the underlying substantive contract unless the parties have agreed to this. The purpose of these provisions, as the United States Supreme Court observed in Prima Paint Corpn v Flood & Conklin Mfg Co, 388 US 395 (1967), 404, is that the arbitration procedure, when selected by the parties to a contract, should be speedy and not subject to delay and obstruction in the courts. The statutory language, it said, did not permit the court to consider claims of fraud in the inducement of the contract generally. It could consider only issues relating to the making and performance of the agreement to arbitrate. Dicey, Morris and Collins, The Con-

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

fiict of Laws, 14th ed (2006), vol 1, para 12-099, acknowledge that there are excellent reasons of policy to support this approach.

[33] The Appellants' case is that, as there was no real consent to the charter parties because they were induced by bribery, there was no real consent to the arbitration clauses. They submit that a line does not have to be drawn between matters which might impeach the arbitration clause and those which affect the main contract. What is needed is an analysis of whether the matters that affect the main contract are also matters which affect the validity of the arbitration clause. As the Respondents point out, this is a causation argument. The Appellants say that no substantive distinction can be drawn between various situations where the complaint is made that there was no real consent to the transaction. It would be contrary to the policy of the law, which is to deter bribery, that acts of the person who is alleged to have been bribed should deprive the innocent party of access to a court for determination of the issue whether the contract was induced by bribery.

[34] But, as Longmore LJ said in para 21 of the Court of Appeal's judgment, this case is different from a dispute as to whether there was ever a contract at all. As everyone knows, an arbitral award possesses no binding force except that which is derived from the joint mandate of the contracting parties. Everything depends on their contract, and if there was no contract to go to arbitration at all an arbitrator's award can have no validity. So, where the arbitration agreement is set out in the same document as the main contract, the issue whether there was an agreement at all may indeed affect all parts of it. Issues as to whether the entire agreement was procured by impersonation or by forgery, for example, are unlikely to be severable from the arbitration clause.

[35] That is not this case, however. The Appellants' argument was not that there was no contract at all, but that they were entitled to rescind the contract including the arbitration agreement because the contract was induced by bribery. Allegations of that kind, if sound, may affect the validity of the main agreement. But they do not undermine the validity of the arbitration agreement as a distinct agreement. The doctrine of separability requires direct impeachment of the arbitration agreement before it can be set aside. This is an exacting test. The argument must be based on facts which are specific to the arbitration agreement. Allegations that are parasitical to a challenge to the validity to the main agreement will not do. That being the situation in this case, the agreement to go to arbitration must be given effect.

JUDGMENTBY-3: LORD SCOTT

JUDGMENT-3:

LORD SCOTT:

MY LORDS,

[36] I have had the advantage of reading in advance the opinion of my noble and learned friend Lord Hoffmann and find myself in complete agreement with the conclusion he has reached and his reasons for that conclusion. I cannot improve upon those reasons and shall not try to do so. I, too, would dismiss this appeal.

JUDGMENTBY-4: LORD WALKER

JUDGMENT-4:

LORD WALKER:

MY LORDS,

[37] I have had the privilege of reading in draft the opinion of my noble and learned friend Lord Hoffmann. I am in full agreement with it. It gives full effect to the legislative purpose of s 7 of the Arbitration Act 1996. It marks a fresh start, leaving behind some fine verbal distinctions (on the language of particular arbitration clauses) which few commercial men would regard as significant. For these reasons I too would dismiss this appeal.

JUDGMENTBY-5: LORD BROWN

JUDGMENT-5:

LORD BROWN:

A841

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

MY LORDS,

[38] For the reasons given in the speeches prepared by my noble and learned friends, Lord Hoffmann and Lord Hope of Craighead, with which I am in full agreement, I too would dismiss this appeal.

DISPOSITION:

Appeal dismissed.

SOLICITORS:

Ince & Co; Lax & Co.

**A842**



Session 1995-1996
Publications on the Internet
*Judgments*

**House of Lords**

# Judgments - Westdeutsche Landesbank Girozentrale v. Islington London Borough Council

### HOUSE OF LORDS

Lord Goff of Chieveley Lord Browne-Wilkinson Lord Slynn of Hadley Lord Woolf Lord Lloyd of Berwick

### OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT

### IN THE CAUSE

*WESTDEUTSCHE LANDESBANK GIROZENTRALE*

*(APPELLANTS)*

*v.*

*ISLINGTON LONDON BOROUGH COUNCIL*

*(RESPONDENTS)*

### ON 22 MAY 1996

#### LORD GOFF OF CHIEVELEY

My Lords,

   This appeal is concerned with a transaction known as an interest rate swap. Under such a transaction, one party (the fixed rate payer) agrees to pay the other over a certain period interest at a fixed rate on a notional capital sum; and the other party (the floating rate payer) agrees to pay to the former over the same period interest on the same notional sum at a market rate determined in accordance with a certain formula. Interest rate swaps can fulfil many purposes, ranging from pure speculation to more useful purposes such as the hedging of liabilities. They are in law wagers, but they are not void as such because they are excluded from the regime of the Gaming Acts by section 63 of the Financial Services Act 1986.

One form of interest rate swap involves what is called an upfront payment, i.e. a capital sum paid by one party to the other, which will be balanced by an adjustment of the parties' respective liabilities. Thus, as in the present case, the fixed rate payer may make an upfront payment to the floating rate payer, and in consequence the rate of interest payable by the fixed rate payer is reduced to a rate lower than the rate which would otherwise have been payable by him. The practical effect is to achieve a form of borrowing by, in this example, the floating rate payer through the medium of the interest rate swap transaction. It appears that it was this feature which, in particular, attracted local authorities to enter into transactions of this kind, since they enabled local authorities subject to rate-capping to obtain upfront payments uninhibited by the relevant statutory controls.

At all events, local authorities began to enter into transactions of this kind soon after they came into use in the early 1980s. At that time, there was thought to be no risk involved in entering into such transactions with local authorities. Financially, they were regarded as secure; and it was assumed that such transactions were within their powers. However, as is well known, in *Hazell v. Hammersmith and Fulham London Borough Council* [1992] 2 A.C. 1 your Lordships' House, restoring the decision of the Divisional Court [1990] 2 Q.B. 697, held that such transactions were ultra vires the local authorities who had entered into them. It is unnecessary for present purposes to examine the basis of that decision; though I wish to record that it caused grave concern among financial institutions, and especially foreign banks, which had entered into such transactions with local authorities in good faith, with no idea that a rule as technical as the ultra vires doctrine might undermine what they saw as a perfectly legitimate commercial transaction. There then followed litigation in which banks and other financial institutions concerned sought to recover from the local authorities with which they had dealt the balance of the money paid by them, together with interest. Out of the many actions so commenced, two were selected as test cases. These were the present case, *Westdeutsche Landesbank Girozentrale v. Islington Borough Council*, and *Kleinwort Benson Ltd. v. Sandwell Borough Council*. Both cases came on for hearing before Hobhouse J. [1994] 4 All E.R. 890. Your Lordships are concerned only with the former case. In a powerful judgment Hobhouse J. held that the plaintiffs ("the bank") were entitled to recover from the defendants ("the council") the net balance outstanding on the transaction between the parties, viz. the difference between the upfront payment of £2.5m. paid by the bank to the council on 18 June 1987, and the total of four semi-annual interest payments totalling £1,354,474.07 paid by the council to the bank between December 1987 and June 1989, leaving a net balance of £1,145,525.93 which the judge ordered the council to pay to the bank. He held the money to be recoverable by the bank either as money had and received by the council to the use of the bank, or as money which in equity the bank was entitled to trace into the hands of the council and have repaid out of the council's assets. He decided that the bank's right to restitution at common law arose from the fact that the payment made by the bank to the council was made under a purported contract which, unknown to both parties, was ultra vires the council and so void, no consideration having been given for the making of the payment. The decision by the judge, which was affirmed by the Court of Appeal [1994] 1 W.L.R. 938, raised important questions in the law of restitution, which are of great interest to lawyers specialising in this field. Yet it is an extraordinary feature of the present appeal to your Lordships' House that the judge's decision on the substantive right of recovery at common law does not fall for consideration by your Lordships' House. The appeal of the council is confined to one point only - the question of interest.

The judge ordered that the council should pay compound interest on the sum awarded against

A844

them, calculated at six-monthly rests from 1 April 1990 to the date of judgment. The Court of Appeal affirmed the judge's decision to award compound interest but, allowing a cross-appeal by the bank, ordered that interest should run from the date of receipt of the upfront payment. Both the judge and the Court of Appeal held that they were entitled to invoke against the council the equitable jurisdiction to award compound interest, on the basis that the bank was entitled to succeed against the council in an equitable proprietary claim. The foundation for the bank's equitable proprietary claim lay in the decision of this House in *Sinclair v. Brougham* [1914] A.C. 398. Since that decision has for long been controversial, the Appellate Committee invited argument on the question whether the House should depart from the decision despite the fact that it has stood for many years.

*The shape of the case*

Once the character of an interest swap transaction has been identified and understood, and it is appreciated that, because the transaction was beyond the powers of the council, it was void ab initio, the basic question is whether the law can restore the parties to the position they were in before they entered into the transaction. That is, of course, the function of the law of restitution. I feel bound to say that, in the present case, there ought to be no difficulty about that at all. This is because the case is concerned solely with money. All that has to be done is to order that each party should pay back the money it has received - or, more sensibly, to strike a balance, and order that the party who has received most should repay the balance; and then to make an appropriate order for interest in respect of that balance. It should be as simple as that. And yet we find ourselves faced with a mass of difficult problems, and struggling to reconcile a number of difficult cases.

I must confess that, like all the judges who have been involved in these cases, I too have found myself struggling in this way. But in the end I have come to realise the importance of keeping my eyes on the simple outline of the case which I have just described; and I have discovered that, if one does that - if one keeps one's eyes open above the thicket of case law in which we can so easily become enclosed - the solution of the problem in the present case becomes much more simple. In saying this, I do not wish in any way to criticise the judges who have been grappling with the case at first instance and in the Court of Appeal, within the confines of the doctrine of precedent by which they are bound. On the contrary, they are entitled to our gratitude and respect. The masterly judgment of Hobhouse J., in particular, has excited widespread admiration. But it is the great advantage of a supreme court that, not only does it have the great benefit of assistance from the judgments of the courts below, but also it has a greater freedom to mould, and remould, the authorities to ensure that practical justice is done within a framework of principle. The present case provides an excellent example of a case in which this House should take full advantage of that freedom.

*The three problems*

There are three reasons why the present case has become so complicated. The first is that, in our law of restitution, there has developed an understanding that money can only be recovered on the ground of failure of consideration if that failure is total. The second is that because, in particular, of the well known but controversial decision of this House in *Sinclair v. Brougham*, it has come to be understood that a trust may be imposed in cases such as the present where the incapacity of one of the parties has the effect that the transaction is void. The third is that our law of interest has developed in a fragmentary and unsatisfactory manner, and in consequence insufficient attention has

**A845**                                                                 Page 236

been given to the jurisdiction to award compound interest.

I propose at the outset to devote a little attention to each of these matters.

## (1) *Total failure of consideration*

There has long been a desire among restitution lawyers to escape from the unfortunate effects of the so-called rule that money is only recoverable at common law on the ground of failure of consideration where the failure is total, by reformulating the rule upon a more principled basis; and signs that this will in due course be done are appearing in judgments throughout the common law world, as appropriate cases arise for decision. It is fortunate however that, in the present case, thanks (I have no doubt) to the admirable researches of counsel, a line of authority was discovered which had escaped the attention of the scholars who work in this field. This line of authority was concerned with contracts for annuities which were void if certain statutory formalities were not complied with. They were not therefore concerned with contracts void by reason of the incapacity of one of the parties. Even so, they were concerned with cases in which payments had been made, so to speak, both ways; and the courts had to decide whether they could, in such circumstances, do justice by restoring the parties to their previous positions. They did not hesitate to do so, by ascertaining the balance of the account between the parties, and ordering the repayment of the balance. Moreover the form of action by which this was achieved was the old action for money had and received - what we nowadays call a personal claim in restitution at common law. With this precedent before him, Hobhouse J. felt free to make a similar order in the present case; and in this he was self-evidently right.

The most serious problem which has remained in this connection is the theoretical question whether recovery can here be said to rest upon the ground of *failure* of consideration. Hobhouse J. thought not. He considered that the true ground in these cases, where the contract is void, is to be found in the absence, rather than the failure, of consideration; and in this he was followed by the Court of Appeal. This had the effect that the courts below were not troubled by the question whether there had been a total failure of consideration.

The approach so adopted may have found its origin in the idea, to be derived from a well known passage in the speech of Viscount Simon L.C. in *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32, 48, that a failure of consideration only occurs where there has been a failure of performance by the other party of his obligation under a contract which was initially binding. But the concept of failure of consideration need not be so narrowly confined. In particular it appears from the annuity cases themselves that the courts regarded them as cases of failure of consideration; and concern has been expressed by a number of restitution lawyers that the approach of Hobhouse J. is contrary to principle and could, if accepted, lead to undesirable consequences: see Professor Birks, "No Consideration: Restitution after Void Contracts" (1993) 23 W.A.L.R. 195; Mr. W. J. Swadling, "Restitution for No Consideration" [1994] R.L.R. 73 and Professor Burrows, "Swaps and the Friction between Common Law and Equity" [1995] R.L.R. 15. However since there is before your Lordships no appeal from the decision that the bank was entitled to recover the balance of the payments so made in a personal claim in restitution, the precise identification of the ground of recovery was not explored in argument before the Appellate Committee. It would therefore be inappropriate to express any concluded view upon it. Even so, I

think it right to record that there appears to me to be considerable force in the criticisms which have been expressed; and I shall, when considering the issues on this appeal, bear in mind the possibility that it may be right to regard the ground of recovery as failure of consideration.

## (2) *A proprietary claim in restitution*

I have already stated that restitution in these cases can be achieved by means of a personal claim in restitution. The question has however arisen whether the bank should also have the benefit of an equitable proprietary claim in the form of a resulting trust. The immediate reaction must be - why should it? Take the present case. The parties have entered into a commercial transaction. The transaction has, for technical reasons, been held to be void from the beginning. Each party is entitled to recover its money, with the result that the balance must be repaid. But why should the plaintiff bank be given the additional benefits which flow from a proprietary claim, for example the benefit of achieving priority in the event of the defendant's insolvency? After all, it has entered into a commercial transaction, and so taken the risk of the defendant's insolvency, just like the defendant's other creditors who have contracted with it, not to mention other creditors to whom the defendant may be liable to pay damages in tort.

I feel bound to say that I would not at first sight have thought that an equitable proprietary claim in the form of a trust should be made available to the bank in the present case, but for two things. The first is the decision of this House in *Sinclair v. Brougham* [1914] A.C. 398, which appears to provide authority that a resulting trust may indeed arise in a case such as the present. The second is that on the authorities there is an equitable jurisdiction to award the plaintiff compound interest in cases where the defendant is a trustee. It is the combination of these two factors which has provided the foundation for the principal arguments advanced on behalf of the bank in support of its submission that it was entitled to an award of compound interest. I shall have to consider the question of availability of an equitable proprietary claim, and the effect of *Sinclair v. Brougham*, in some depth in a moment. But first I wish to say a few words on the subject of interest.

## (3) *Interest*

One would expect to find, in any developed system of law, a comprehensive and reasonably simple set of principles by virtue of which the courts have power to award interest. Since there are circumstances in which the interest awarded should take the form of compound interest, those principles should specify the circumstances in which compound interest, as well as simple interest, may be awarded; and the power to award compound interest should be available both at law and in equity. Nowadays, especially since it has been established (see *National Bank of Greece S.A. v. Pinios Shipping Co. No. 1* [1990] 1 A.C. 637) that banks may, by the custom of bankers, charge compound interest upon advances made by them to their customers, one would expect to find that the principal cases in which compound interest may be awarded would be commercial cases.

Sadly, however, that is not the position in English law. Unfortunately, the power to award compound interest is not available at common law. The power is available in equity; but at present that power is, for historical reasons, exercised only in relation to certain specific classes of claim, in particular proceedings against trustees for an account. An important - I believe the most important - question in the present case is whether that jurisdiction should be developed to apply in a commercial context, as in the present case.

*Equitable proprietary claims*

I now turn to consider the question whether an equitable proprietary claim was available to the bank in the present case.

Ever since the law of restitution began, about the middle of this century, to be studied in depth, the role of equitable proprietary claims in the law of restitution has been found to be a matter of great difficulty. The legitimate ambition of restitution lawyers has been to establish a coherent law of restitution, founded upon the principle of unjust enrichment; and since certain equitable institutions, notably the constructive trust and the resulting trust, have been perceived to have the function of reversing unjust enrichment, they have sought to embrace those institutions within the law of restitution, if necessary moulding them to make them fit for that purpose. Equity lawyers, on the other hand, have displayed anxiety that in this process the equitable principles underlying these institutions may become illegitimately distorted; and though equity lawyers in this country are nowadays much more sympathetic than they have been in the past towards the need to develop a coherent law of restitution, and to identify the proper role of the trust within that rubric of the law, they remain concerned that the trust concept should not be distorted, and also that the practical consequences of its imposition should be fully appreciated. There is therefore some tension between the aims and perceptions of these two groups of lawyers, which has manifested itself in relation to the matters under consideration in the present case.

In the present case, however, it is not the function of your Lordships' House to rewrite the agenda for the law of restitution, nor even to identify the role of equitable proprietary claims in that part of the law. The judicial process is neither designed for, nor properly directed towards, such objectives. The function of your Lordships' House is simply to decide the questions at issue before it in the present case; and the particular question now under consideration is whether, where money has been paid by a party to a contract which is ultra vires the other party and so void ab initio, he has the benefit of an equitable proprietary claim in respect of the money so paid. Moreover the manner in which this question has arisen before this House renders it by no means easy to address. First of all, the point was not debated in any depth in the courts below, because they understood that they were bound by *Sinclair v. Brougham* [1914] A.C. 398 to hold that such a claim was here available. But second, the point has arisen only indirectly in this case, since it is relevant only to the question whether the court here has power to make an award of compound interest. It is a truism that, in deciding a question of law in any particular case, the courts are much influenced by considerations of practical justice, and especially by the results which would flow from the recognition of a particular claim on the facts of the case before the court. Here, however, an award of compound interest provides no such guidance, because it is no more than a consequence which is said to flow, for no more than historical reasons, from the availability of an equitable proprietary claim. It therefore provides no guidance on the question whether such a claim should here be available.

In these circumstances I regard it as particularly desirable that your Lordships should, so far as possible, restrict the inquiry to the actual questions at issue in this appeal, and not be tempted into formulating general principles of a broader nature. If restitution lawyers are hoping to find in your Lordships' speeches broad statements of principle which may definitively establish the future shape of this part of the law, I fear that they may be disappointed. I also regard it as important that your Lordships should, in the traditional manner, pay particular regard to the practical consequences which

**A848**

may flow from the decision of the House.

With these observations by way of preamble, I turn to the question of the availability of an equitable proprietary claim in a case such as the present. The argument advanced on behalf of the bank was that the money paid by it under the void contract was received by the council subject to a resulting trust. This approach was consistent with that of Dillon L.J. in the Court of Appeal: see [1994] 1 W.L.R. 938, 947. It is also consistent with the approach of Viscount Haldane L.C. (with whom Lord Atkinson agreed) in *Sinclair v. Brougham* [1914] A.C. 398, 420-421.

I have already expressed the opinion that, at first sight, it is surprising that an equitable proprietary claim should be available in a case such as the present. However, before I examine the question as a matter of principle, I propose first to consider whether *Sinclair v. Brougham* supports the argument now advanced on behalf of the bank.

*Sinclair v. Brougham*

The decision of this House in *Sinclair v. Brougham* has loomed very large in both the judgments in the courts below and in the admirable arguments addressed to the Appellate Committee of this House. It has long been regarded as a controversial decision, and has been the subject of much consideration by scholars, especially those working in the field of restitution. I have however reached the conclusion that it is basically irrelevant to the decision of the present appeal.

It is first necessary to establish what the case was about. The Birkbeck Permanent Benefit Building Society decided to set up a banking business, known as the Birkbeck Bank. The banking business was however held to be ultra vires the objects of the building society; and there followed a spate of litigation concerned with solving the problems consequent upon that decision. *Sinclair v. Brougham* was one of those cases.

The case has been analysed in lucid detail in the speech of my noble and learned friend, Lord Browne-Wilkinson, which I have read (in draft) with great respect. In its bare outline, it was concerned with the distribution of the assets of the society, which was insolvent. There were four classes of claimants. First, there were two classes of shareholders - the A shareholders (entitled to repayment of their investment on maturity) and the B shareholders (whose shares were permanent). Next, there was a numerous class of people who had deposited money at the bank, under contracts which were ultra vires and so void. Finally, there were the ordinary trade creditors of the society. By agreement, the A shareholders and the trade creditors were paid off first, leaving only the claims of the depositors and the B shareholders. There were sufficient assets to pay off the B shareholders, but not the depositors and certainly not both. The question of how to reconcile their competing claims arose for consideration on a summons by the liquidator for directions.

The problem arose from the fact that the contracts under which the depositors deposited their money at the bank were ultra vires and so void. That prevented them from establishing a simple contractual right to be repaid, in which event they would have ranked with the ordinary trade creditors of the society in the liquidation. As it was, they claimed to be entitled to repayment in an action for money had and received - in the same way as the bank claimed repayment in the case now before your Lordships. But the House of Lords held that they were not entitled to claim on this ground. This was in substance because to allow such a claim would permit an indirect enforcement of

A849

the contract which the policy of the law had decreed should be void. In those days, of course, judges still spoke about the common law right to restitution in the language of implied contract, and so we find Lord Sumner saying in a much quoted passage, at p. 452:

"To hold otherwise would be indirectly to sanction an ultra vires borrowing. All these causes of action are common species of the genus assumpsit. All now rest, and long have rested, upon a notional or imputed promise to repay. The law cannot de jure impute promises to repay, whether for money had and received or otherwise, which, if made de facto, it would inexorably avoid."

This conclusion however created a serious problem because, if the depositors had no claim, then, in the words of Lord Dunedin, at p. 436:

"The appalling result in this very case would be that the society's shareholders, having got proceeds of the depositors' money in the form of investments, so that each individual depositor is utterly unable to trace his money, are enriched to the extent of some 500 per cent."

As a matter of practical justice, such a result was obviously unacceptable; and it was to achieve justice that the House had recourse to equity to provide the answer. It is, I think, apparent from the reasoning of the members of the Appellate Committee that they regarded themselves, not as laying down some broad general principle, but as solving a particular practical problem. In this connection it is, in my opinion, significant that there was a considerable variation in the way in which they approached the problem. Viscount Haldane L.C., with whom Lord Atkinson agreed, did so, at p. 421, on the basis that there arose in the circumstances "a resulting trust, not of an active character." Lord Dunedin based his decision upon a broad equity of restitution, drawn from Roman and French law. He asked himself the question, at p. 435: "Is English equity to retire defeated from the task which other systems of equity have conquered?" - a question which he answered in the negative. Lord Parker of Waddington, at pp. 441-442, attempted to reconcile his decision with the established principles of equity by holding that the depositors' money had been received by the directors of the society as fiduciaries, with the effect that the depositors could thereafter follow their money in equity into the assets of the society. Lord Sumner, at p. 458, considered that the case should be decided on equitable principles on which there was no direct authority. He regarded the question as one of administration, in which "the most just distribution of the whole must be directed, so only that no recognised rule of law or equity be disregarded." Setting on one side the opinion of Lord Parker, whose approach I find very difficult to reconcile with the facts of the case, I do not discern in the speeches of the members of the Appellate Committee any intention to impose a trust carrying with it the personal duties of a trustee.

For present purposes, I approach this case in the following way. First, it is clear that the problem which arose in *Sinclair v. Brougham*, viz. that a personal remedy in restitution was excluded on grounds of public policy, does not arise in the present case, which is not of course concerned with a borrowing contract. Second, I regard the decision in *Sinclair v. Brougham* as being a response to that problem in the case of ultra vires borrowing contracts, and as not intended to create a principle of general application. From this it follows, in my opinion, that *Sinclair v. Brougham* is not relevant to the decision in the present case. In particular it cannot be relied upon as a precedent that a trust arises on the facts of the present case, justifying on that basis an award of compound interest against the council.

**A850**

But I wish to add this. I do not in any event think that it would be right for your Lordships' House to exercise its power under the *Practice Statement (Judicial Precedent)* [1966] 1 W.L.R. 1234 to depart from *Sinclair v. Brougham*. I say this first because, in my opinion, any decision to do so would not be material to the disposal of the present appeal, and would therefore be obiter. But there is a second reason of substance why, in my opinion, that course should not be taken. I recognise that nowadays cases of incapacity are relatively rare, though the swaps litigation shows that they can still occur. Even so, the question could still arise whether, in the case of a borrowing contract rendered void because it was ultra vires the borrower, it would be contrary to public policy to allow a personal claim in restitution. Such a question has arisen in the past not only in relation to associations such as the Birkbeck Permanent Benefit Building Society, but also in relation to infants' contracts. Moreover there is a respectable body of opinion that, if such a case arose today, it should still be held that public policy would preclude a personal claim in restitution, though not of course by reference to an implied contract. That was the opinion expressed by Leggatt L.J. in the Court of Appeal in the present case [1994] 1 W.L.R. 938, 952E-F, as it had been by Hobhouse J.; and the same view has been expressed by Professor Birks (see *An Introduction to the Law of Restitution* (1985), p. 374). I myself incline to the opinion that a personal claim in restitution would not indirectly enforce the ultra vires contract, for such an action would be unaffected by any of the contractual terms governing the borrowing, and moreover would be subject (where appropriate) to any available restitutionary defences. If my present opinion were to prove to be correct then *Sinclair v. Brougham* will fade into history. If not, then recourse can at least be had to *Sinclair v. Brougham* as authority for the proposition that, in such circumstances, the lender should not be without a remedy. Indeed, I cannot think that English law, or equity, is so impoverished as to be incapable of providing relief in such circumstances. Lord Wright, who wrote in strong terms (" *Sinclair v. Brougham*" (1938) 6 C.L.J. 305) endorsing the just result in *Sinclair v. Brougham*, would turn in his grave at any such suggestion. Of course, it may be necessary to reinterpret the decision in that case to provide a more satisfactory basis for it; indeed one possible suggestion has been proposed by Professor Birks (see *An Introduction to the Law of Restitution*, pp. 396 et seq.). But for the present the case should in my opinion stand, though confined in the manner I have indicated, as an assertion that those who are caught in the trap of advancing money under ultra vires borrowing contracts will not be denied appropriate relief.

*The availability of an equitable proprietary claim in the present case*

Having put *Sinclair v. Brougham* on one side as providing no authority that a resulting trust should be imposed in the facts of the present case, I turn to the question whether, as a matter of principle, such a trust should be imposed, the bank's submission being that such a trust arose at the time when the sum of £2.5m. was received by the council from the bank.

As my noble and learned friend, Lord Browne-Wilkinson, observes, it is plain that the present case falls within neither of the situations which are traditionally regarded as giving rise to a resulting trust, viz. (1) voluntary payments by A to B, or for the purchase of property in the name of B or in his and A's joint names, where there is no presumption of advancement or evidence of intention to make an out-and-out gift; or (2) property transferred to B on an express trust which does not exhaust the whole beneficial interest. The question therefore arises whether resulting trusts should be extended beyond such cases to apply in the present case, which I shall treat as a case where money has been paid for a consideration which fails.

In a most interesting and challenging paper, "Restitution and Resulting Trusts," published in *Equity: Contemporary Legal Developments* (1992) (ed. Goldstein), p. 335, Professor Birks has argued for a wider role for the resulting trust in the field of restitution, and specifically for its availability in cases of mistake and failure of consideration. His thesis is avowedly experimental, written to test the temperature of the water. I feel bound to respond that the temperature of the water must be regarded as decidedly cold: see, e.g., Professor Burrows, "Swaps and the Friction between Common Law and Equity" [1995] R.L.R. 15, and Mr. W. J. Swadling, "A new role for resulting trusts?" (1996) 16 Legal Studies 133.

In the first place, as Lord Browne-Wilkinson points out, to impose a resulting trust in such cases is inconsistent with the traditional principles of trust law. For on receipt of the money by the payee it is to be presumed that (as in the present case) the identity of the money is immediately lost by mixing with other assets of the payee, and at that time the payee has no knowledge of the facts giving rise to the failure of consideration. By the time that those facts come to light, and the conscience of the payee may thereby be affected, there will therefore be no identifiable fund to which a trust can attach. But there are other difficulties. First, there is no general rule that the property in money paid under a void contract does not pass to the payee; and it is difficult to escape the conclusion that, as a general rule, the beneficial interest in the money likewise passes to the payee.

This must certainly be the case where the consideration for the payment fails after the payment is made, as in cases of frustration or breach of contract; and there appears to be no good reason why the same should not apply in cases where, as in the present case, the contract under which the payment is made is void ab initio and the consideration for the payment therefore fails at the time of p

**A852**

Case 1:14-cv-08410-DLC Document 33-215, Filed 12/12/14, Page 13 of 26

Westlaw.

WILLSTN-CN § 38:6                                                                                          Page 1
13 Williston on Contracts § 38:6 (4th ed.)

Williston on Contracts
Database updated May 2011

Richard A. Lord

Chapter
38. Conditions in Contracts, generally
I. In General

References

§ 38:6. Literal compliance with express conditions

**West's Key Number Digest**

West's Key Number Digest, Contracts ⚬—218, 219, 278(.5)

**Forms**

Williston on Contracts 4th—Forms §§ 38F:2, 38F:3

As a general rule, unless the performance is waived, excused,[55] or prevented by the other party, or unless he or she repudiates the contract,[56] conditions which are either express or implied in fact[57] must be literally met or exactly fulfilled or no liability can arise on the promise qualified by such conditions.[58] The reason for this is obvious. The promisor can only be held liable according to the terms of the promise which he or she makes.[59] If he or she promises $5.00, he or she cannot be made to pay $5.01. For the same reason if he or she makes a promise to do an act on condition that he or she receives $5.01, the promisor cannot be required to perform on being paid $5.00. The condition is part of the promise qualifying and limiting it, and the promise, as a matter of plain fact, is not broken until the condition has happened or has been performed.[60] A party to a contract cannot have the benefit of favorable provisions and ignore its conditions which are to be performed by that party or which must occur before its benefits are due.[61]

Thus, it has been recognized that conditions that shipped goods would arrive by a certain day,[62] or that notice of dispatch of the goods would be given by cable[63] must be literally met and will be strictly enforced. In a charter party where there is a provision that if time be lost through such causes as embargoes and the delay extends over a named number of days, the charter party shall become null and void, a late tender of performance will not revive the contract.[64] Similarly, insurance policies,[65] building contracts,[66] contracts of sale,[67] loans,[68] and other contracts frequently contain express conditions which must be literally met or exactly performed in order to create liability on the contract, and the fact that nonperformance of the condition or incomplete performance of it has caused no injury to the promisor is immaterial.[69]

"A reasonable compliance with the conditions of the contract relating to notice is indispensable to fix liability. These conditions are a material and important part of the contract, and should not be set aside as of no moment."[70]

A distinction in law if not in logic must, however, be observed. Logically, there is no distinction among these

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:14-cv-08410-DLC Document 33-215 Filed 12/12/14 Page 190 of 26

WILLSTN-CN § 38:6
13 Williston on Contracts § 38:6 (4th ed.)

Page 2

three cases:
    1. A promise to pay if a house is completed according to plans and specifications.
    2. A promise to pay if the house is completed in every respect exactly according to plans and specifications.
    3. A promise to pay if the house is completed exactly in every respect according to plans and specifications, and if it is not so completed it is understood that the promisor is to pay nothing at all.

Even in the first of these cases, as the promise is conditional on the house being completed according to plans and specifications, there is no undertaking to pay except on this condition. And except for such slight qualification as the principle of *de minimis* may justify, the condition naturally means exact and full completion.[71] "There may be omissions of that which could not afterwards be supplied exactly as called for by the contract without taking down the building to its foundations, and at the same time the omission may not affect the value of the building for use or otherwise, except so slightly as to be hardly appreciable."[72]

Nevertheless, modern courts not infrequently deal differently with provisions substantially in the forms stated above. If the promise is in the first form, many courts are disposed to allow recovery where there has been merely substantial performance.[73] If the promise is in the last form suggested, most courts seem indisposed to set any limits to the defense of the promisor in spite of the forfeiture which may be involved.

Doubtless, the rule that an instrument is to be interpreted most strongly against the maker, and that a fair and reasonable interpretation will be preferred to a harsh one,[74] will often justify a recovery where at first sight there seems a failure of condition. Especially in insurance cases, courts have gone far in this direction.[75] Moreover, if a promise is in the last of the three forms suggested, it is evident that the minds of the parties were addressed to the particular contingency of substantial performance marred by a slight failure, while in the second form, and still more clearly in the first, the possible effect of their words may not have occurred to them.

Express conditions precedent define the satisfaction of a necessary antecedent to a party's performance under a contract and are subject to the rule of strict compliance, and are distinctly different from, although analogous to, constructive conditions of exchange, which regulate the parties' course of performance, and are subject to the rule of substantial performance.[76]

## CUMULATIVE SUPPLEMENT

**Cases:**

Courts generally demand strict compliance with requirement that a condition precedent be satisfied. In re Krueger, 192 F.3d 733 (7th Cir. 1999).
Where a party's promise is expressly made dependent on the existence of a stated condition, unless "waived, excused, or prevented by the other party" such a condition must generally be "literally met or exactly fulfilled" before any binding contractual liability can arise. McGough v. Broadwing Communications, Inc., 177 F. Supp. 2d 289 (D.N.J. 2001) (citing text).
Before a party can enforce conditional contract obligations, the party must perform those requisite conditions for which the party is responsible. Wachter v. Gratech Co., Ltd., 2000 ND 62, 608 N.W.2d 279 (N.D. 2000).

**[END OF SUPPLEMENT]**

---

[FN55] As to waiver or excuse, generally, see Ch 39.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# THE COMMON LAW LIBRARY

# CHITTY
# ON
# CONTRACTS

## THIRTIETH EDITION

VOLUME I

### GENERAL PRINCIPLES

NEW YORK LAW INSTITUTE
LIBRARY

JAN - 9 2009

120 BROADWAY - N.Y.C.

SWEET & MAXWELL        THOMSON REUTERS

*Paragon Finance Plc*[157] it was held that a lender's entitlement to vary interest rates was not completely unfettered. The court implied a term into the agreement to the effect that the rates of interest would not be set dishonestly, for an improper purpose, capriciously or arbitrarily, or in a way in which no reasonable mortgagee, acting reasonably, would do.[158] The legislature has also intervened to control clauses such as those which purport to entitle a lender unilaterally and in its absolute discretion to vary the rate of interest subject to notice to the debtor. Where such a provision is contained in a contract concluded between a seller or supplier and a consumer and that contract has not been individually negotiated, it may fall within the scope of the Unfair Terms in Consumer Contracts Regulations 1999.[159] Thus a contract term which enables the seller or supplier to alter the terms of the contract unilaterally without a valid reason which is specified in the contract,[160] or enables the seller or supplier to alter unilaterally without a valid reason any characteristics of the product or service to be provided,[161] or which provides for the price of the goods to be determined at the time of delivery, or allows a seller of goods or supplier of services to increase their price without in both cases giving the consumer the corresponding right to cancel the contract if the final price is too high in relation to the price agreed when the contract was concluded,[162] may constitute an unfair term which will not be binding upon the consumer.

### 6. WAIVER[163]

**Waiver or forbearance.** Where one party voluntarily accedes to a request by    22-040
the other that he should forbear to insist on the mode of performance fixed by the contract, the court may hold that he has *waived* his right to require that the contract be performed in this respect according to its original tenor.[164] Waiver (in the sense of "waiver by estoppel" rather than "waiver by election")[165] may also

---

[157] [2001] EWCA Civ 1466; [2002] 1 W.L.R. 685. The Court of Appeal declined to follow dicta of Staughton L.J. in *Lombard Tricity Finance Ltd v Paton*, [1989] 1 All E.R. 918, 923.

[158] On the facts of the case it was held that the borrowers had no real prospect of successfully establishing a breach of the implied term. The reason for the increase in interest rates was that the creditors were in financial difficulties and so had to increase their interest rates in order to protect their own financial position. It could not be said that they had acted dishonestly, capriciously, arbitrarily or wholly unreasonably in acting as they did: See also *Paragon Finance Plc v Pender*, [2005] EWCA Civ 760; [2005] 1 All E.R. (D) 307 (Jun).

[159] SI 1999/2083: See further above, Ch.15, where the scope of the Regulations and the definition of terms such as "seller or supplier", etc. is discussed in more detail.

[160] See Sch.2 to the 1999 Regulations para.1(j); (set out at para.15–103) although note the restricted applicability of this provision to the supply of financial services: (para.2(b)).

[161] See Sch.2 to the 1999 Regulations para.1(k).

[162] See Sch.2 to the 1999 Regulations para.1(l); although note the restricted applicability of this provision to financial services: (para.2(c)) and, that it does not apply to a "price indexation clauses, where lawful, provided that the method by which prices vary is explicitly described": (para.2(d)).

[163] See generally Wilken and Villiers, *The Law of Waiver, Variation and Estoppel*, 2nd edn (2002), Ch.3–5.

[164] See above para.3–081.

[165] The distinction between these two types of waiver is discussed, below para.24–007: See also *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India*, [1990] 1 Lloyd's Rep. 391, 397–399.

---

[1469]

22–040      CHAP. 22—DISCHARGE BY AGREEMENT

be held to have occurred if, without any request, one party represents to the other that he will forbear to enforce or rely on a term of the contract to be performed or observed by the other party, and the other party acts in reliance on that representation.[166]

22–041      **Form of waiver.** A waiver may be oral or written or inferred from conduct[167] even though the provision waived is found in a contract required to be made in or evidenced by writing. It has been noted that any variation of a contract required to be made in or evidenced by writing must itself be made in or evidenced by writing.[168] If it is merely oral, it is of no effect. An oral forbearance or concession made by one party to the other does not require to be so evidenced, even if made at the latter's request.[169] Thus, what is ineffective as a variation may possibly have effect as a waiver. The formal requirements in relation to such a contract, of rescission, variation and waiver were thus described by Goddard J. in *Besseler Waechter Glover & Co v South Derwent Coal Co*[170]:

> "If the parties agree to rescind their original contract and to substitute for it a new one, the latter must be evidenced by writing; so, too, if as a matter of contract the parties agree that the terms of the original agreement shall be varied, the variation must be in writing. But if what happens is a mere voluntary forbearance to insist on delivery or acceptance according to the strict terms of the written contract, the original contract remains unaffected, and the obligation to deliver and accept the full contract quantity still continues.... It does not appear to me to matter whether the request comes from one side or the other, or whether it is a matter which is convenient to one party or to both. What is of importance is whether it is a mere forbearance or a matter of contract."

The distinction between variation and waiver is, however, a difficult one to apply in practice,[171] particularly since a waiver may be consensual and be just as far reaching in its effect as a variation of the agreement. Fortunately, in respect of formal requirements,[172] it has become much less important since the almost total repeal of the Statute of Frauds by the Law Reform (Enforcement of Contracts) Act 1954.[173]

22–042      **Effect on 'party forbearing'.** The party who forbears will be bound by the waiver and cannot set up the original terms of the agreement. If, by words or conduct, he has agreed, or led the other party to believe that he will accept performance at a later date than or in a different manner from that provided in the

---

[166] See above, 3–081, 3–085.
[167] *Bruner v Moore* [1904] 1 Ch. 305; *Bremer Handelsgesellschaft mbH v Vanden Avenne-Izegem P.V.B.A.* [1978] 2 Lloyd's Rep. 109.
[168] See above, para.22–033.
[169] *Msas Global Logistics v Power Packaging Inc* [2003] EWHC 1393 (Ch), [2003] All E.R. (D) 211 (Jun).
[170] [1938] 1 K.B. 408, 416, 417; *Msas Global Logistics v Power Packaging Inc* [2003] EWHC 1393 (Ch), [2003] All E.R. (D) 211 (Jun).
[171] See *Besseler Waechter Glover & Co v South Derwent Coal Co* [1938] 1 K.B. 408; *Watson v Healy Lands* [1965] N.Z.L.R. 511; Dugdale and Yates (1976) 39 M.L.R. 680.
[172] See Ch.5.
[173] See above, para.4–009.

contract, he will not be able to refuse that performance when tendered.[174] However, in cases of postponement of performance, if the period of postponement is specified in the waiver, then, if time was originally of the essence, it will remain so in respect of the new date.[175] If the period of postponement is not specified in the waiver, the party forbearing is entitled, upon reasonable notice, to impose a new time limit, which may then become of the essence of the contract.[176] Similarly, in other cases of forbearance, he may be entitled, upon reasonable notice, to require the other party to comply with the original mode of performance,[177] unless, in the meantime circumstances have so changed as to render it impossible[178] or inequitable[179] so to do. He cannot treat the waiver as entirely without effect. If a seller of goods withholds delivery of the goods at the purchaser's request (i.e. if the seller waives the obligation of the purchaser to accept the goods within a certain time), he will still be under a duty to deliver within a reasonable time if so requested by the purchaser.[180]

**Effect on party to whom forbearance is extended.** Where one party has induced the other party to accede to his request, the party seeking the forbearance will not be permitted to repudiate the waiver and to rely on the letter of the agreement.[181] Thus in *Levey & Co v Goldberg*,[182] the defendant agreed in writing to buy from the plaintiffs certain pieces of cloth over the value of £10[183] to be delivered within a certain period. At the oral request of the defendant, the plaintiffs voluntarily withheld delivery during that period. The defendant subsequently refused to accept delivery, and, when sued, contended that the plaintiffs themselves were in breach, as the oral agreement was insufficient to vary the terms of a contract which was required by law to be evidenced by writing. It was held that the forbearance by the plaintiffs at the request of the defendant did not constitute a variation, but a waiver, and the plaintiffs were entitled to maintain their action.

22–043

---

[174] *Leather Cloth Co v Hieronimus* (1875) L.R. 10 Q.B. 140; *Bruner v Moore* [1904] 1 Ch. 305; *Panoutsos v Raymond Hadley Corp of New York* [1917] 2 K.B. 473; *Hartley v Hymans* [1920] 2 K.B. 475; *Besseler Waechter Glover & Co v South Derwent Coal Co* [1938] 1 K.B. 408; *Tankexpress A/S v Compagnie Financière Belge des Pétroles S.A.* [1949] A.C. 76; *Plasticmoda Società per Azioni v Davidsons (Manchester) Ltd* [1952] 1 Lloyd's Rep. 527; *Enrico Furst & Co v W.E. Fischer* [1960] 2 Lloyd's Rep. 340; *W.J. Alan & Co Ltd v El Nasr Export and Import Co* [1972] 2 Q.B. 189, 213.

[175] *Luck v White* (1973) 26 P. & C.R. 89; *Buckland v Farmar & Moody* [1979] 1 W.L.R. 221; *Nichimen Corp v Gatoil Overseas Inc* [1987] 2 Lloyd's Rep. 46.

[176] *Hartley v Hymans* [1920] 2 K.B. 475; *Charles Rickards Ltd v Oppenhaim* [1950] 1 K.B. 616; *Jacobson van den Berg & Co (UK) Ltd v Biba Ltd* [1977] 121 S.J. 333; *State Trading Corp of India Ltd v Compagnie Française d'Importation et de Distribution* [1983] 2 Lloyd's Rep. 679. See also *Etna S.A. v Sociedad e Cadex Ltda* [1980] 2 Lloyd's Rep. 418, 431.

[177] *Panoutsos v Raymond Hadley Corp of New York* [1917] 2 K.B. 473.

[178] *Leather Cloth Co v Hieronimus* (1875) L.R. 10 Q.B. 140.

[179] *Toepfer v Warinco AG* [1978] 2 Lloyd's Rep. 569, 576. See also above, para.3–083.

[180] *Tyers v Rosedale & Ferryhill Iron Co* (1875) L.R. 10 Ex. 195.

[181] *Ogle v Earl Vane* (1868) L.R. 3 Q.B. 272; *Hickman v Haynes* (1875) L.R. 10 C.P. 598.

[182] [1922] 1 K.B. 688.

[183] Statute of Frauds 1677 s.17 (re-enacted as s.4 of the Sale of Goods Act 1893) required such a contract to be evidenced by writing. Both provisions have now been repealed by the Law Reform (Enforcement of Contracts) Act 1954.

[1471]

A858

**22-044**     **Consideration for waiver.** A waiver is also distinguishable from a variation of a contract in that there is no consideration for the forbearance moving from the party to whom it is given.[184] It may therefore be more satisfactory to regard this form of waiver, that is "waiver by estoppel", as analogous to, or even identical with, equitable forbearance or "promissory" estoppel.[185] Although consideration need not be proved, certain other requirements must be satisfied for such an estoppel to be effective: first, it must be clear and unequivocal; secondly, the other party must have altered his position in reliance on it, or at least acted on it.[186]

**22-045**     **Contracting out of waiver.** It would appear that there is no general principle of law that parties to a contract cannot restrict the operation of the doctrine of waiver by the terms of their contract.[187] In *State Securities Plc v Initial Industry Ltd*[188] Jonathan Gaunt Q.C., sitting as a Deputy Judge of the High Court, stated:

> "I can, however, see no reason in principle why the parties to an equipment lease . . . or other commercial contract, should not be free to stipulate that a particular act, such as payment of a rental instalment should not be taken to waive a right to terminate for an earlier breach. After all, such a provision may be very convenient and operate to the benefit of both parties. The finance company may want to encourage the lessee to 'correct the breach but not want him to fall behind with his payments while he does so. It may be in the interests of the lessee that the finance company should not have to take an early decision whether to terminate."[189]

However it cannot be assumed that the courts in all cases will give effect to a term of the contract which purports to exclude or limit the operation of the doctrine of waiver; in some circumstances the term of the contract may not

[184] *W.J. Alan & Co Ltd v El Nasr Export and Import Co* [1972] 2 Q.B. 189, 193. See also above, para.3–081.

[185] See above, para.3–085.

[186] *Woodhouse A.C. Israel Cocoa Ltd SA v Nigerian Produce Marketing Co Ltd* [1972] A.C. 741, 755, 758, 761, 762, 767–768, 781; *W.J. Alan & Co Ltd v El Nasr Export & Import Ltd* [1972] 2 Q.B. 189, 212–214, 215, 217; *Finagrain SA v P. Kruse* [1976] 2 Lloyd's Rep. 508, 534–535, 540, 546; *Bremer Handelsgesellschaft mbH v Vanden Avenne-Izegem P.V.B.A.* [1978] 2 Lloyd's Rep. 109, 127; *Bunge SA v Schleswig-Holsteinische Landwirtschaftliche Hauptgenossenschaft Eingetr GmbH* [1978] 1 Lloyd's Rep. 480, 490; *Bremer Handelsgesellschaft mbH v C. Mackprang* [1979] 1 Lloyd's Rep. 220, 225–226, 228, 230; *Avimex SA v Dewulf & Cie* [1979] 2 Lloyd's Rep. 57, 67–68; *Bremer Handelsgesellschaft mbH v Westzucker* [1981] 1 Lloyd's Rep. 207, 213; *Cremer v Granaria B.V.* [1981] 2 Lloyd's Rep. 583, 587; *Cerealmangimi SpA v Toepfer* [1981] 3 All E.R. 533; *Cook Industries Inc v Meunerie Liegeois SA* [1981] 1 Lloyd's Rep. 359, 368; *Société Italo-Belge pour le Commerce et l'Industrie v Palm and Vegetable Oils (Malaysia) Sdn Bhd* [1981] 2 Lloyd's Rep. 695, 700–702; *Bremer Handelsgesellschaft mbH v Finagrain Compagnie Commerciale, etc. SA* [1981] 2 Lloyd's Rep. 259, 263, 266; *Bremer Handelsgesellschaft mbH v Raiffeisen Hauptgenossenschaft E/G* [1982] 1 Lloyd's Rep. 599; *Bremer Handelsgesellschaft mbH v Deutsche Conti-Handelsgesellschaft mbH* [1983] 2 Lloyd's Rep. 45; *Allied Marine Transport Ltd v Vale do Rio Doce Navegacao SA* [1985] 1 W.L.R. 925; *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India* [1990] 1 Lloyd's Rep. 391. cf. *Scandinavian Trading Tanker Co AB v Flota Petrolera Ecuatoriana* [1983] Q.B. 529, [1983] 2 A.C. 694. See above, para. 3–081; below, paras 24–007–24–009.

[187] *State Securities Plc v Initial Industry Ltd* [2004] All E.R. (D) 317 (Jan).

[188] [2004] All E.R. (D) 317 (Jan).

[189] [2004] All E.R. (D) 317 (Jan) at [57].

[1472]



suffice to deny effect to a clear and unequivocal representation made by one party to the contract.[190]

**Waiver of condition for benefit of one party.** Where the terms of a contract include a provision which has been inserted solely for the benefit of one party, he may, without the assent of the other party, waive compliance with that provision and enforce the contract as if the provision had been omitted.[191] He will not be permitted to do so where the provision has been inserted for the benefit of both parties[192] or where there is in reality no concluded agreement.[193] 22–046

**Waiver of breach.** One party may waive his right to terminate a contract consequent upon a repudiation of the contract by the other party.[194] It is, however, important to distinguish between the case in which a party waives his right to treat the contract as repudiated but does not abandon his right to claim damages for the loss suffered as a result of the breach[195] and the case where the innocent party waives not only his right to terminate performance of the contract but also his claim for damages for the breach.[196] The former is an example of waiver by election,[197] whereas the latter is more properly classified as a species of waiver by estoppel.[198] 22–047

## 7. PROVISION FOR DISCHARGE IN THE CONTRACT ITSELF

**Express provision.** The parties may expressly provide in their contract that either or one of them is to have an option to terminate the contract.[199] This right 22–048

---

[190] *I-Way Ltd v World Online Telecom Ltd* [2002] EWCA Civ 413 (Court of Appeal refused to give summary judgment in a case in which the court was asked, in effect, to enforce a term of the contract which provided that "no addition, amendment or modification of this Agreement shall be effective unless it is in writing and signed by or on behalf of both parties").

[191] *Bennett v Fowler* (1840) 2 Beav. 302; *Hawksley v Outram* [1892] 3 Ch. 359; *Morrell v Studd and Millington* [1913] 2 Ch. 648; *E.E. Napier v Dexters Ltd* (1926) 26 Ll. L. R. 62, 63–64, 184, 187–188. See also *North v Loomes* [1919] 1 Ch. 378 and Sale of Goods Act 1979 s.11(2). Once he has waived the condition, either expressly or by conduct, he cannot then rely on it to deny his own liability: *Barrett Bros (Taxis) Ltd v Davies* [1966] 1 W.L.R. 1334.

[192] *Lloyd v Nowell* [1895] 2 Ch. 744; *Burgess v Cox* [1951] Ch. 383; *Heron Garage Properties Ltd v Moss* [1974] 1 W.L.R. 148; *Gregory v Wallace* [1998] I.R.L.R. 387; *Wessex Reserve Forces and Cadets Association v White* [2005] EWHC 983 (QB); [2005] All E.R. (D) 310 (May).

[193] *Allsopp v Orchard* [1923] 1 Ch. 323.

[194] See below, para.24–007.

[195] *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India* [1990] 1 Lloyd's Rep. 391, 397–398.

[196] This is sometimes known as "total waiver": see Sale of Goods Act 1979 s.11(2); *Benjamin's Sale of Goods*, 7th edn (2006), paras 12–034—12–036; Treitel, *The Law of Contract*, 12th edn by Peel, 2007), para.18–076 and below, para.24–007.

[197] See below, para.24–007.

[198] See below, para.24–007. There are important differences between the two types of waiver: see below, para.24–008 and Treitel at paras 18–074—18–080.

[199] In *Aktieselskabet Dampskibsselskabet Svendborg v Mobil North Sea Ltd* [2001] 2 Lloyd's Rep. 127, 130 David Steel J. said that he saw no reason to accord the word "terminated" in a termination clause anything other than "its ordinary meaning of coming, or being brought, to an end, however that result may have occurred". Thus he held that a repudiatory breach by either party accepted by the other constituted a "termination" within the meaning of the clause.

WILKEN AND VILLIERS

# THE LAW OF WAIVER, VARIATION AND ESTOPPEL

SEAN WILKEN
*BA (Oxon); Dip Law;*
*Barrister of the Middle Temple*

OXFORD
UNIVERSITY PRESS

*B. Definition*

the broader expression 'injurious reliance' in preference to 'estoppel' so as to embrace all circumstances in which A can say to B: 'You led me reasonably to believe that you were assuming particular legally enforceable rights to me . . .'[37]

There is therefore, an obvious tension. On the one hand, the Courts recognise that there is no overarching doctrine of injurious reliance. On the other, there is the desire to maintain a merits-based flexible doctrine. The result is, it is submitted, to generate further confusion in this difficult area; the Courts still recognising that there are differences between doctrines but on occasion applying them as if they were one and the same doctrine.[38] Notwithstanding that criticism we would suggest that any definition of waiver must acknowledge the existence and effect of both approaches on this area of the law.     **3.08**

## B. Definition

A preliminary definition of waiver can be arrived at by using two interdependent methods—a process of exclusion, identifying the circumstances in which the Courts have drawn a distinction between waiver and some other doctrine; and a process of inclusion, identifying the circumstances in which the courts have found that there was a waiver.     **3.09**

### (1) The process of exclusion

Waiver can simply be distinguished from variation. It is a distinction which in principle[39] the Courts have consistently drawn:     **3.10**

> Waiver does not vary the terms of the contract . . . Waiver is conduct on the part of a party to a contract which affects his remedies for a breach of contract by the other party.[40]

further holding that variation is 'wholly distinct from the doctrine of forbearance . . .'[41] The maintenance of that distinction would accord with the facts that a waiver is unsupported by consideration[42] whereas a variation requires consideration in

---

[37] *Paal Wilson & Co A/S v Partenreederei Hannah Blumenthal* [1983] 1 AC 854 at 916 A–C per Lord Diplock.

[38] See *Wilson v Kingsgate Mining Industries Pty Ltd* [1973] 713 at 730D–G per Wootten J where the Court recognised the tendency to create and apply one doctrine but emphasised that there remained clear differences between the doctrines.

[39] In practice the distinction may be less easy to draw; the practical results of applying the two doctrines may be indistinguishable—see *Watson v Healy Lands Ltd* [1965] NZLR 511 at 513, ll 10–20 per Woodhouse J.

[40] *Enrico Furst & Co v WE Fischer Ltd* [1960] 2 Lloyd's Rep 340 per Devlin J at 349 col 2–350 col 1.

[41] *Levey & Co v Goldberg* [1922] 1 KB 688 at 690 per McCardie J. See also *Impala Distributors v Taunus Chemical Manufacturing Co (Pty) Ltd* (1993) (3) SA 273; *Van As v du Preez* (1981) (3) SA 760; *Waimor Holdings Ltd v Dean* [1981] 2 NZLR 416.

[42] Stoljar, 'The Modification of Contracts' (1957) 35 *Canadian Bar Review* 485 at 492.

39

some form or another;[43] variation requires there to be offer and acceptance,[44] whereas waiver may not; the parties by varying the contract can restrict their ability to waive requirements of that contract[45] and variation will affect the substantive performance by both parties under the contract as opposed to merely affecting the remedies[46] which one party can seek in relation to a current or future breach of the contract.[47] Thus, although a party may be forced to accept different performance under the contract by virtue of a waiver, the obligations under the contract have not in fact changed. As Mr Justice Mustill, as he then was, pointed out in *Cook Industries Inc v Meunerie Legois SA:*[48]

> It may seem a paradox to assert that even if, by virtue of a waiver, the sellers could properly tender July bills of lading in fulfilment of a June instalment, it does not follow that the contract became one under which the obligation to ship in June was replaced by one which required the sellers to ship or procure shipment in June or July. I am not convinced however that this is a paradox, nor to my mind is it clear that the question of waiver (which is relevant to the liability of the buyers for a refusal to accept an appropriation) is the same as the question of variation (which is relevant to the liability of the sellers for failing to effect or procure a timely shipment).[49]

**3.11** Drawing the distinction between waiver and 'estoppel' appears to cause more difficulty. In *Kammins Ballroom Co v Zenith Investments*[50] Lord Diplock stated:

> 'Waiver' is a word which is sometimes used loosely to describe a number of different legal grounds on which a person may be debarred from asserting a substantive right which he once possessed or from raising a particular defence to a claim against him which would otherwise be available to him. We are not concerned in the instant appeal with the first type of waiver. This arises in a situation where a person is entitled to alternative rights inconsistent with one another. If he has knowledge of the facts which give rise in law to these alternative rights and acts in a manner which is consistent only with his having chosen to rely on one of them, the law holds him to his choice even though he was unaware that this would be the legal consequence of what he did. He is sometimes said to have 'waived' the alternative rights . . . but this is better categorised as 'election' rather than as 'waiver' . . . The second type of waiver

---

[43] See paras 2.15 ff above.

[44] See para at 2.14 above.

[45] See *SN Kurkjian (Commodity Brokers) Ltd v Marketing Exchange for Africa Ltd* [1986] 2 Lloyd's Rep 614 at 615 col 2; the parties could, for instance, vary the contract to introduce a 'no-waiver' agreement—see paras 21.72 and 17.20 below.

[46] Even where the Courts have found that a particular waiver had contractual status, it was still only an 'agreement to release or not to assert a right'—*Nippon Menkwa Kabushiki Kaisha (Japan Cotton Trading Company Ltd) v Dawsons Bank Ltd* (1935) 51 Ll L R 147 at 150 col 2 per Lord Russell.

[47] Thus even in cases of unilateral or pure waiver which may operate *in futuro* (see paras 4.28 and 4.36 below), the waivor is forgoing its remedies where the waivee proffers different performance at the later date.

[48] [1981] 1 Lloyd's Rep 359.

[49] At 368 col 2–369 col 2 per Mustill J. See the discussion as to whether a waiver irrevocably changes the terms of the contract at para 5.02 below.

[50] [1971] AC 850.

## B. Definition

which debars a person from raising a particular defence to a claim against him arises when he either agrees with the claimant not to raise that defence or so conducts himself as to be estopped from raising it . . . The ordinary principles of estoppel apply to it.[51]

*Kammins* was applied in *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corporation of India ('The Kanchenjunga')*.[52] There, Lord Goff relied on *Kammins* in discussing the principles underlying the doctrine of 'election'[53] and stated:

Election is to be contrasted with equitable estoppel . . . There is an important similarity between the two principles, election and equitable estoppel, in that each requires an unequivocal representation, perhaps because each may involve a loss, permanent or temporary, of the relevant party's rights. But there are important differences as well. In the context of a contract, the principle of election applies when a state of affairs comes into existence in which one party becomes entitled to exercise a right, and has to choose whether to exercise the right or not. His election has generally to be an informed choice, made with the knowledge of the facts giving rise to the right. His election once made is final; it is not dependent upon reliance on it by the other party. On the other hand, equitable estoppel requires an unequivocal representation by one party that he will not insist upon his legal rights against the other party, and such reliance by the representee as will render it inequitable for the representor to go back upon his representation. No question arises of any particular knowledge on the part of the representor, and the estoppel may be suspensory only. Furthermore, the representation itself is different in character in the two cases. The party making his election is communicating his choice whether or not to exercise a right which has become available to him. The party to an equitable estoppel is representing that he will not in future enforce his legal rights. His representation is therefore in the nature of a promise which, though unsupported by consideration, can have legal consequences; hence it is sometimes referred to as promissory estoppel.[54]

**3.12** It follows that there is powerful authority for contrasting waiver, in the sense of waiver by election, with all forms of 'estoppel' creating a simple twofold categorisation. However, on balance, we would suggest that although there are links between the second type of waiver enunciated by Lord Goff and estoppel, it would be wrong to suggest that this second type of waiver is merely an estoppel. It is submitted that, although a simple twofold classification may lead to a unified theory of estoppel, a concept at present unknown to the common law,[55] 'estoppel' proper can be distinguished from all types of waiver[56] by reference to the basic

---

[51] At 882H–883D.
[52] [1990] 1 Lloyd's Rep 391.
[53] See Chapter 6, *passim* below.
[54] *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corporation of India ('The Kanchenjunga')* [1990] 1 Lloyd's Rep 391 at 399 col 2 per Lord Goff; more recently *HIH Casualty and General Insurance Ltd v Axa Corporate Solutions & ors* (Comm Ct, 21 December 2001) per Jules Sher QC at 11–12. For a discussion of the relationship between the two cases see para 4.06 below.
[55] See paras 7.09 ff below.
[56] Including this second type.

41

A864

principles underlying the doctrine, key to which is the question of knowledge.[57] Thus:

> When its true foundations are stated, it will be seen that estoppel is separated from waiver in point of principle by a very broad line of demarcation. First of all, the law of estoppel looks chiefly at the situation of the person relying on the estoppel; next, as a consequence of the first, the knowledge of the person sought to be estopped is immaterial; thirdly as a further consequence, it is not essential that the person sought to be estopped should have acted with any intention to deceive; fourthly conduct short of positive acts is sufficient.[58]

3.13    Other distinctions can be drawn. An estoppel may operate where the parties are not in a contractual relationship.[59] As set out below, it is clear that waiver in all senses involves the abnegation of contractual rights and therefore can only come into play where there is a contract between the parties. Further, it is possible for a party to claim that the other is estopped by silence or inaction where the other was under a duty to inform that party of certain facts and did not.[60] As set out below,[61] waiver in any form requires a clear unequivocal representation by words or conduct, silence or inaction do not suffice. Finally, a claim in estoppel may permit equity to intervene on other grounds to assist the party raising the estoppel.[62] A claim in waiver will succeed or fall on its own terms and does not lead to the general intervention of equity. We would therefore suggest that waiver is certainly to be distinguished from variation and, albeit with more difficulty, from estoppel.

### (2)  The process of inclusion

3.14    The Courts have utilised two broad categories of 'waiver'.[63] The first, we would suggest, is waiver in the proper sense of the word. The second is a doctrine, Lord Goff's second type of waiver, which is a hybrid having elements in common with waiver and estoppel proper but capable of distinction from both. Given the con-

---

[57]    See *Shell Oil UK Ltd v Enterprise Oil Plc* [1999] 2 Lloyd's Rep 456 at 478 col 2–479 col 2; paras 149; 153 per Lloyd J; *HIH Casualty and General Insurance Ltd v Axa Corporate Solutions & ors* (Comm Ct, 21 December 2001) per Jules Sher QC at 11–12.

[58]    *Craine v Colonial Mutual Fire Insurance Co* (1920) 28 CLR 305 at 327 per Isaacs J.

[59]    See *Evenden v Guildford City FC* [1975] QB 917 at 924B–C per Denning MR; *Waltons Stores (Interstate) Ltd v Maher* (1988) 164 CLR 387 at 399–406 per Deane J; *The Commonwealth of Australia v Verwayn* (1990) 170 CLR 394 at 410 per Mason CJ.

[60]    See *Pacol Ltd & ors v Trade Lines and RII Sif IV ('The Henrik Sif')* [1982] 1 Lloyd's Rep 456 at 465 col 2 per Webster J.

[61]    See paras 4.07 ff below.

[62]    See *BICC v Burndy* [1985] Ch 232 at 253B–C per Kerr LJ.

[63]    See also *HIH Casualty and General Insurance Ltd v Axa Corporate Solutions & Ors* (Comm Ct, 21 December 2001) per Jules Sher QC at 11–12; *State Trading Corporation of India v Compagnie Francaise d'Importation et de Distribution* [1983] 2 Lloyd's Rep 679 at 681 col 2 per Lloyd J; *Telfair Shipping Corporation v Athos Shipping Co SA* [1981] 2 Lloyds Rep 74 at 87 col 2–88 col 2 per Neill J; [1983] 1 Lloyd's Rep 127 (CA) at 134 col 2 per Kerr LJ; *Craine v Colonial Mutual Fire Insurance Co* (1920) 28 CLR 305 at 326 per Isaacs J.

*B. Definition*

cept's hybrid nature, we would suggest that this second category be termed equitable forbearance.[64] Rights are forgone generating the forbearance. Equity intervenes because the other party has relied on that forbearance.[65]

Waiver in the true sense of the word can be crudely described as 'a voluntary or intentional[66] relinquishment of a known right,[67] claim or privilege'.[68] Put bluntly, waiver is an informed choice manifested in unequivocal conduct.[69] On a more complex level, we would suggest that there are four types of waiver.[70] The first and main type is waiver by election. There are three additional types of waiver which can be best described by the situations in which the Courts have found that there has been a waiver: where X has not been put to its election but nevertheless decides to accept different future performance by Y under the contract ('pure waiver'),[71] where Y has failed to perform its obligations under the contract and X accepts that non-performance as proper performance under the contract forgoing X's right to repudiate and to sue for damages ('total waiver'),[72] and X's forgoing of a right under the contract which inured solely for X's benefit ('unilateral waiver').[73]

Adopting this categorisation has four main benefits. First, it enables distinctions to be drawn between the type of defective performance being excused.[74] Second, it allows for analysis of the extent to which the waivor's remedies are lost.[75] Third, by outlining four related categories of waiver and one of equitable forbearance, it draws a broad distinction between those cases where there is reliance by one party on the other's actions and those where there is not. The latter, cases in which the Courts have examined the conduct and knowledge of one party alone, are examples of the four related categories of waiver and not examples of equitable forbearance.

**3.15**

**3.16**

---

[64] See Treitel 1 at 100 ff; Birks II 8.5.1 and paras 4.39 ff below. However, a full analysis of equitable forbearance falls outwith the scope of this chapter and is dealt with in Chapter 8.
[65] See Hudson 1.255.
[66] As to the broad requirement of knowledge or intention—see *Purmasing v National Transport Corp (Mauritius)* [1998] UKPC 50 (HL, 9 December 1998) at paras 13–14; *Oliver Ashworth (Holdings) Ltd v Ballard (Kent) Ltd* [2000] Ch 12 [1999] EWCA Civ 1027 at para 37 per Robert Walker LJ.
[67] The rights forgone can be legal or equitable—see J Glover, *Commercial Equity: Fiduciary Relationships* (Butterworths, Sydney, 1995) at 3.29–30, pp 46–7.
[68] See *Northwestern Fire & Marine Insurance Co v Pollard* 238 P 594 at 596 (1925); *Hoxie v Howe Insurance Co* 32 Conn 21 (1864); *Clark v West* 193 NY 349 (1908).
[69] See *Insurance Corporation Channel Islands v The Royal Hotel Ltd* [1998] LRLR 151 at 162 col 2 per Mance J as he then was.
[70] Common and essential to all is the need for an unequivocal representation—*Keller Ltd (T/A Concrete) v Morrison Construction Ltd* [1998] EWCA 161 (CA, 14 January 1998) at paras 36–7 per Hobhouse LJ.
[71] As to which see paras 4.28 ff below.
[72] See paras 4.30 ff below.
[73] See paras 4.36 ff below.
[74] Whether past or future.
[75] Total waiver as opposed to waiver by election and pure waiver.

43

Fourth, whilst it might be said that the practical results of the application of any of the doctrines will be the same, a party loses its rights, the position is clarified so that a party wishing to avoid losing its rights may be able to moderate its actions to achieve that end.[76]

---

[76] There is powerful support for this taxonomic approach—see eg Treitel 1 at 752—albeit that it renders extremely difficult the formulation of any overarching theoretical exegesis of the doctrines.

44

# 4

# WAIVER (II)—TYPES OF WAIVER AND THEIR ELEMENTS

| | | | | | |
|---|---|---|---|---|---|
| A. | Waiver by Election | 4.01 | D. | Unilateral Waiver | 4.36 |
| | (1) Elements of waiver by election | 4.02 | E. | Equitable Forbearance | 4.39 |
| | (2) Examples of waiver by election | 4.27 | F. | Elements Common to All Forms of | |
| B. | Pure Waiver | 4.28 | | Waiver | 4.45 |
| C. | Total Waiver | 4.30 | G. | Practical Effect | 4.46 |

## A. Waiver by Election

In *Kammins Ballroom Co v Zenith Investments*,[1] Lord Diplock stated that the fun- **4.01** damental requirement of waiver by election is that X, the party alleged to have waived a right,[2] has made an election in the sense that:

> where a party in his own mind has thought that he would choose one of two reme-
> dies, even though he has written it down in a memorandum or has indicated it in
> some other way, that alone will not bind him; but so soon as he has not only deter-
> mined to follow one of his remedies but has communicated it to the other side in
> such a way as to lead the opposite party to believe that he has made that choice, he
> has completed his election and can go no further; and whether he intended it or not,
> if he has done an unequivocal act—I mean an act which would be justifiable if he had
> elected one way and would not be justifiable if he had elected another way—the fact
> of his having done that unequivocal act to the knowledge of the persons concerned
> is an election.[3]

Thus, there is an immediate and intimate link between election[4] and waiver[5] so that 'The consequence of the election, if established, is the abandonment, ie the

---

[1] [1971] AC 850.

[2] For the purposes of the analysis in this chapter we refer at all times to the party who is waiving the right as X and the other party to the contract as Y.

[3] *Scarf v Jardine* (1882) 7 App Cas 345 at 360–1 per Lord Blackburn.

[4] Election in the sense used by us encompasses equitable and common law election—see para 6.04 below.

[5] See *Van Schalkwyk v Griesel* (1948) (1) SA 460 at 463 per Tindall JA; *contra Ex p Sussen* 1941 TPD 15 at 20 per Murray J.

45

A868

waiver, of a right'.[6] As with election,[7] the primary function of waiver by election is to prevent there being inconsistency in the manner in which a party to a contract asserts its rights and thereby ensure that X does not 'approbate and reprobate' the contract.[8] Similarly, waiver by election is a reaction on the part of X to non-contractual performance by Y; that is to previously defective performance by Y under the contract.[9] As a result of the waiver by election, X's choice of future remedies arising from the default will be curtailed; X will not be allowed to repudiate the contract.[10] Therefore, this type of waiver:

> applies to an election as to something in futuro; it is not a term to describe an answer to a right which is complete in praesenti.[11]

It follows that waiver by election cannot affect X's complete and accrued right to damages.[12] This link forms the basis of our analysis of the requisite elements of a waiver by election.

### (1) Elements of waiver by election

4.02   The leading analysis of waiver by election is that of Lord Goff in *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corporation of India ('The Kanchenjunga').*[13] In *The Kanchenjunga,* the owners chartered the vessel *The Kanchenjunga* for four consecutive voyages under a charter party dated 8 August 1978. The charter was subject to a warranty given by the charterers as to the safety of any port which the vessel might visit. The charterers then sub-chartered the vessel to Varnima Chartering Compania Naviera SA. The sub-charterers on 19 November 1980 sub-sub-chartered the vessel for one voyage from one of two safe ports to Refineria de Petroleos del Norte SA (Petronor). One of the nominated safe ports was Kharg Island in the Gulf. On 20 November, the charterers ordered the vessel to Kharg, the order being repeated on 21 November. At the time, however, due to the Iran–Iraq war, Kharg Island had been bombed on more than one occasion by Iraq. Therefore Kharg Island was arguably not a safe port. On 21 November, the owners instructed the vessel to proceed to Kharg Island and it arrived on 23 November

---

[6]   *China National Foreign Trade Transportation Corporation v Evlogia Shipping Co SA of Panama* [1979] 1 WLR 1018 at 1034H per Lord Scarman. See also *Tucker v Angus Healthcare (Glenesk) Ltd* [2001] ScotCS 6 (Ct Sess, 12 January 2001) at para 11.

[7]   As to which see *Commonwealth of Australia v Verwayn, supra* at 423 per Brennan J.

[8]   See *Craine v Colonial Mutual Fire Insurance Co* (1920) 28 CLR 305 at 320 per Isaacs J.

[9]   A distinction is therefore to be drawn between waiver by election which is retrospective and pure waiver which waives the future performance of a particular obligation.

[10]   See *Enrico Furst & Co v WE Fischer Ltd* [1960] 2 Lloyd's Rep 340 at 349 col 2–350 col 1 per Devlin J.

[11]   *Atlantic Shipping and Trading Co Ltd v Louis Dreyfus & Co* [1922] 2 AC 250 at 262 per Lord Sumner.

[12]   This conclusion is also supported by logic—if X were to elect in a particular way (for instance to accept the non-contractual performance as proper performance) X might forgo any right to damages that it might have.

[13]   [1990] 1 Lloyd's Rep 391.

46

giving notice of readiness to load on that date. On 25 November, the owners ordered the vessel away from Kharg Island on the basis that Kharg Island was not a safe port. This was the first indication by the owners that they did not consider the nominated port to be safe and that the safe port warranty in the main charter party had not been complied with. However, the vessel remained where it was. By 1 December, the vessel still had not reached its berth at Kharg Island and Kharg Island was bombed. The master of the vessel then took the vessel away from Kharg Island. The owners then called on the charterers to nominate another safe port but the charterers insisted on Kharg Island. The owners then instructed the vessel to return to Kharg Island and the master refused. As a result there was a failure to load the vessel and the charterers suffered loss and damage.

The dispute proceeded to arbitration where the arbitrators found that Kharg **4.03** Island could not at any time be said to have been a safe port. Therefore the charterers, in theory, had acted in breach of contract in nominating Kharg Island and insisting that *The Kanchenjunga* berth at Kharg Island. That finding of the arbitrators therefore inevitably led to a consideration of whether the owners' conduct constituted an election or estoppel. The arbitrators rejected the charterers' argument that there had been an election or estoppel and the charterers appealed, the case eventually reaching the House of Lords.

Lord Goff found that there had been an election on the part of the owners by their **4.04** instruction to the vessel to proceed to Kharg Island. He analysed the position as follows:

> 'waiver' . . . may refer to a forbearance from exercising a right or to an abandonment of a right. Here we are concerned with waiver in the sense of abandonment of a right which arises by virtue of the party making the election. Election itself is a concept which may be relevant in more than one context. In the present case, we are concerned with an election which may arise in the context of a binding contract, when a state of affairs comes into existence in which one party becomes entitled, either under the terms of the contract or by the general law, to exercise a right, and he has to decide whether or not to do so. His decision, being a matter of choice for him, is called in law an election. . . . Characteristically, the effect of the new situation is that a party becomes entitled to determine or to rescind the contract, or to reject an uncontractual tender of performance; but, in theory at least, a less drastic course of action might become available to him, under the terms of the contract. In all cases, he has in the end to make his election, not as a matter of obligation, but in the sense that, if he does not do so, the time may come when the law takes the decision out of his hands, either by holding him to have elected not to exercise the right which has become available to him, or sometimes by holding him to have elected to exercise it . . . In particular, where with knowledge of the relevant facts a party has acted in a manner which is consistent only with his having chosen one of the two alternative and inconsistent courses of action then open to him—for example, to determine a contract or alternatively to affirm it—he is held to have made his election accordingly . . . It can be communicated to the other party by words or conduct; though, perhaps because a party who elects not to exercise a right which has become available

47

A870

to him is abandoning that right, he will only be held to have done so if he has so com-
municated his election to the other party in clear and unequivocal terms . . . Once an
election is made, however, it is final and binding . . . Moreover, it does not require
consideration to support it, and so it is to be distinguished from an express or implied
agreement, such as a variation of the relevant contract, which traditionally requires
consideration to render it binding in English law.[14]

**4.05**  Lord Goff made one additional point; he stressed that a waiver by election could
only properly exist where X at least had knowledge of the facts giving rise to his
choice.[15] It follows that two elements must be present for there to be a waiver by
election: an unequivocal representation by X in relation to the right allegedly
being waived and at least knowledge by X of the facts which show that it has to
choose between two inconsistent courses of conduct.

**4.06**  It has been suggested[16] that Lord Goff's analysis differs from that of Lord Diplock
in *Kammins*. On one level Lord Diplock distinguishes between waiver and estop-
pel by pointing out that waiver is the choice between rights whereas estoppel is the
loss of a defence.[17] Lord Goff, on the other hand, may be said to distinguish
between waiver and estoppel by reference to the breaches which have led to the
rights which X is allegedly losing. Waiver relates to past breaches; estoppel to the
excusing of future non-performance. The difficulty with this analysis is that it
reduces all forms of waiver to waiver by election; that is, to X's reaction to a past
repudiatory breach. Further, complications in the relationship between waiver
and estoppel are created. If waiver only relates to past breaches and a waiver takes
place, it becomes impossible for there to be a waiver and an estoppel arising from
the same facts; X's rights will be altered by the waiver and there will be nothing for
an alleged estoppel to bite on.[18] However, it appears that a waiver can lead to an
estoppel.[19] One way of resolving this difficulty is to distinguish between waiver
and estoppel by reference to the fact that estoppel is based on the actual or poten-
tial detriment suffered by Y.[20] In this way the elements of the relevant doctrines are
examined and potentially difficult questions of the relationship between the loss

---

[14] At 397 col 2–398 col 2.

[15] At 398 col 2–399 col 1.

[16] See Clarke 26-4A2 for this analysis.

[17] See *The Athos* [1981] 2 Lloyd's Rep 74 at 87–8 per Neil J; *Cia Tirrena di Assicurazioni SpA v Grand Union Insurance Co* [1991] 2 Lloyd's Rep 143 at 153 per Waller J compared with *The Scaptrade* [1983] QB 529 at 536 per Goff LJ; *Janred Properties Ltd v ENIT* [1989] 2 All ER 444.

[18] A similar difficulty may arise if waiver is confined to an accepting of different future perform-
ance as again it is X's rights arising from Y's change of position which are being waived—see Stoljar,
'The Modification of Contracts' (1957) 35 *Canadian Bar Review* 485 at 491; compare 3 Corbin on
Contracts (1951) s 752.

[19] See eg *Ficom SA v Sociedad Cadex Limitada* [1980] 2 Lloyd's Rep 118 at 132 col 2 per Goff J.
Further, a waiver or estoppel may arise from the same facts allowing one claim to succeed and the
other to fail—see *Commonwealth of Australia v Antonio Giorgio Pty Ltd* (1986) 67 ALR 244.

[20] That is the analysis in *Craine v Colonial Mutual Fire Insurance Co* (1920) 28 CLR 305 at 326
per Isaacs J.

48

*A. Waiver by Election*

of rights and the loss of defences are avoided. Further, it is suggested that, on this level, there is no inconsistency between Lord Diplock and Lord Goff.

**Unequivocal representation**

An election must be communicated or conveyed[21] to the other party,[22] therefore X's waiver by election must also must be communicated to Y. Further, as election is an unequivocal act, the communication must be unequivocal.[23] However, X's waiver does not have to be orally communicated, provided that there has been an election,[24] a waiver by election can be implied from X's conduct. Thus:

> A party can represent that he will not enforce a specific legal right by words or conduct. He can say so expressly—this of course he can only do if he is aware of the right. Alternatively he can adopt a course of conduct which is inconsistent with the exercise of that right. Such a course of conduct will only constitute a representation that he will not exercise the right if the circumstances are such to suggest either that he was aware of the right when he embarked on the course of conduct inconsistent with it or that he was content to abandon any rights that he might enjoy which were inconsistent with that course of conduct.[25]

It is important to note that even though a waiver may be spelt out from conduct, that conduct must be unequivocal in the true sense of the word.[26] The conduct must be capable of one construction only, namely that X has chosen to forgo its rights.[27] Thus, examples of unequivocal conduct will include: agreeing in advance

4.07

4.08

---

21  *Vitol SA v Norelf Ltd* [1996] 3 WLR 105 at 113B–114E per Lord Steyn.

22  See para 6.05 below and cases there cited. *David Blackstone v Burnetts (West End) Ltd* [1973] 1 WLR 1487 at 1499C per Swanwick J; *Sargent v ASL Developments Ltd* (1974) 131 CLR 634 at 656 per Mason J; *Newbon v City Mutual Life Assurance Society Ltd* (1935) 52 CLR 723 at 733 per Rich, Dixon, Evatt JJ; *Khoury v Government Insurance Office of NSW* (1984) 165 CLR 622 at 633 per the Court; *Zucker v Straightlace Pty Ltd* (1986) 11 NSWLR 87 at 94F–96E per Young J.

23  See *Finagrain SA Geneva v P Kruse Hamburg* [1976] 2 Lloyd's Rep 508 at 534 col 1 per Megaw LJ; *Mardorf Peach & Co Ltd v Attica Sea Carriers Corp of Liberia* [1977] AC 850 at 871C per Lord Wilberforce; *Bremer Handelsgesellschaft v C Mackprang Jr* [1979] 1 Lloyd's Rep 221 at 228 col 2 per Stephenson LJ; *Avimex SA v Dewulf & Cie* [1979] 2 Lloyd's Rep 57 at 67 col 2–68 col 1 per Goff J; *Sea Calm Co SA v Chantiers Navals de L'Esterel SA ('The Uhenbels')* [1986] 2 Lloyd's Rep 294 at 298 col 1 per Hirst J. See also *Berry v Hodsdon* [1989] 1 Qd R 361 at 365 per Derrington J; *Hawler Pacific Pty Ltd v Helicopter Charter Pty Ltd* (1991) 22 NSWLR 298 at 304 per Priestley JA; *Spelson v George* (1992) 22 NSWLR 666 at 672 per Handley JA; *Hamar & Lockville Trustees Ltd v French* [1997] EWCA 1121 (CA, 18 March 1997) at para 57 per Millet LJ; *Keller Ltd (T/A Keller Concrete) v Morrison Construction Ltd* [1998] EWCA 161 (CA, 14 January 1998) at paras 36–7 per Hobhouse LJ.

24  *Tropical Traders Ltd v Goonan* (1964) 111 CLR 41 at 55 per Kitto J.

25  *Youell & ors v Bland Welch & Co Ltd & ors ('The "Superhulls Cover" Case') (No 2)* [1990] 2 Lloyd's Rep 431 at 450 col 1 per Phillips J; see also *Bremer Handelsgesellschaft mbH v Westzucker GmbH* [1981] 1 Lloyd's Rep 207 at 212 col 2 per Goff J; *Cerealmangimi SpA v Toepfer ('The Eurometal')* [1981] 1 Lloyd's Rep 337 at 341 col 2 per Lloyd J.

26  See *Keller Ltd (T/A Keller Concrete) v Morrison Construction Ltd* [1998] EWCA 161 (CA, 14 January 1998) at paras 36–7 per Hobhouse LJ (as he then was)..

27  The proposition was explicitly approved in *Christiánsen v Klepac* [2001] NSWSC 385 (20 April 2001) at para 18. See also *Tropical Traders Ltd v Goonan* (1964) 111 CLR 41 at 55; *Sargent v ASL Developments Pty Ltd* (1974) 131 CLR 634 and *Immer (No 145) Pty Ltd v Uniting Church in*

A872

that X will not exercise specific rights which might accrue on breach;[28] an insistence after breach that Y continue to perform the contract;[29] X's voluntary[30] acceptance after breach of benefits arising from the contract;[31] commencing an action for specific performance only;[32] and obtaining an order for specific performance.[33] By parity of reasoning, claiming damages and specific performance in the alternative[34] or requesting that Y perform the contract pending X's review of Y's conduct[35] are not sufficiently unequivocal.

4.09 Two difficulties arise: whether silence or delay can amount to a waiver and whether X's reservation of its rights will in all cases protect it from a finding that it has waived its rights.

*Silence or delay*

4.10 There is authority to suggest that silence, delay or a failure to act can constitute a sufficiently unequivocal representation so as to found waiver.[36] However, in both

---

*Australia Property Trust (NSW)* (1993) 182 CLR 26. The fact that the unequivocal representation must only be capable of one construction cuts both ways. Thus, in *The Mayor and Commonalty and Citizens of the City of London v (1) Reeve & Co Ltd; (2) G Lawrence Wholesale Meat Co Ltd; (3) Citigen (London) Ltd* [2000] BLR 211, Part 20 proceedings were barred by the waiver clause previously entered into by the parties.

[28] Thus, eg, X can by prior agreement waive any rights accruing from a breach of fiduciary duty by Y—see J Glover, *Commercial Equity: Fiduciary Relationships* (Butterworths, Sydney, 1995) paras 3.29–3.30, pp 46–7.

[29] See *Trustees of Henry Smith's Charity v Wilson* [1983] QB 316 at 331 per Slade LJ; and also *O'Connor v SP Bray Ltd* (1936) 36 SR (NSW) 248 at 261 per Jordan CJ; *Holland v Wiltshire* (1954) 90 CLR 409.

[30] See *Metcalfe v Britannia Ironworks Co* (1877) 2 QBD 423 at 427 per Lord Coleridge CJ; *Forman & Co Pty Ltd v The Ship Liddesdale* [1900] AC 190 at 204 per Lord Hobhouse.

[31] See *Davenport v R* (1877) 3 App Cas 115; *R v Paulson* [1921] 1 AC 271 at 286 per Lord Atkinson; *Fuller's Theatre v Musgrove* (1923) 31 CLR 524 at 541 per Isaacs and Rich JJ; *Mulcahy v Hoyne* (1925) 26 CLR 41 at 57 per Starke J; *Wendt v Bruce* (1931) 45 CLR 245; *Tropical Traders Ltd v Goonan* (1964) 111 CLR 41 at 42 per Kitto J; *Sargent v ASL Developments Ltd* (1974) 131 CLR 634; *Expert Clothing Service & Sales Ltd v Hillgate House Pty Ltd* [1986] Ch 340 at 359D per Slade LJ.

[32] *Ogle v Comboyuro Investments Pty Ltd* (1976) 136 CLR 444. The claim must be for specific performance alone, ie not for specific performance and damages in lieu.

[33] See *Johnson v Agnew* [1980] AC 367.

[34] The obvious factual overlap between the remedy of specific performance and the right to treat the contract as at an end collapses the distinction normally drawn between election between remedies and election between rights—see *Oliver Ashworth (Holdings) Ltd v Ballard Kent Ltd* [2000] Ch 12, [1999] EWCA Civ 1027 (CA, 18 March 1999) at para 36 per Robert Walker LJ. As to the need to draw the distinction between election between rights and election between remedies, see *United Australia v Barclay Bank* [1941] AC 1 at 29–30 per Lord Atkin; *Johnson v Agnew* [1980] AC 367 at 396 per Lord Wilberforce and *Tang Man Sit v Capacious Investments* [1996] 514 at 521–2 per Lord Nicholls (contrast, however, *China National Foreign Trade Transportation v Evlogia Shipping* [1979] 1 WLR 1018 at 1043 per Lord Scarman; *The Kanchenjunga* [1990] 1 Lloyd's Rep 391 at 398 per Lord Goff).

[35] See para 21.46 below esp n 128.

[36] See *Allen v Robles* [1969] 1 WLR 1193 at 1196G–H per Fenton-Atkinson LJ; *Wahbe Tamari & Sons and Jaffa Trading Co v Colprogeca-Sociedade General de Fibras, Cafes e Produtos Colonias Lda* [1969] 2 Lloyd's Rep 18 at 23 col 1 per Megaw J.

A873

*Chapter 19: Construction Law*

and deduced from the difference that the parties no longer intended to be bound by the original or any contract. We would suggest that such a process of comparison generates confusion between qualitative changes[32] with quantative changes.[33] Thus, for example, *Pepper* does not assist the Court in deciding whether or not a given change abnegates the contract. Conceptually, it is difficult to see how a consensual variation, which constitutes a new agreement,[34] can destroy all contractual relations between the parties. We would therefore suggest that the better approach would be for the Court to consider whether the elements of variation set out above have been complied with and then ascertain which terms of the contract have been moderated and to what extent. If, on analysis, the new agreement operated as a consensual discharge of all obligations under the contract with one party continuing to perform, then it would be appropriate to adopt restitutionary principles to ascertain the extent of that party's recovery.

## C. Waiver

**19.13** In considering waiver in this context, care must be taken as it is common for standard form construction contracts to contain express provisions as to when and in what circumstances a party will be taken to have waived its rights.[35] However, absent express provision, the various types of waiver, as defined above,[36] apply equally to construction law.[37] Thus, rights accruing from a non-compliance with agreed mechanisms governing the formation of contracts[38] or the approval or certification of variations[39] are capable of being waived. In the former case, the waiver loses the right to argue that there was no concluded contract and in the latter the right to contest payment where the works had not been certified as per the contract.[40] Similarly, the employer can waive its rights to repudiate the contract for late completion of the works[41] and, in extreme cases, its right to claim liquidated damages for the late completion of the works.[42] All such waivers can be categorised

---

[32] That is the importance that may attach to a change to any one obligation.

[33] That is the number of obligations which have changed.

[34] Which occurs in all variations—see para 2.38 above.

[35] As with other non-waiver or entire agreement clauses, a non-waiver clause in this context may be bypassed—see *Deepak Fertilisers and Petrochemical Corp v ICI Chemicals & Polymers Ltd* [1999] 1 Lloyd's Rep 387; *I-Way Ltd v World Online Telecom Ltd* [2002] EWCA Civ 413 at paras 11 ff.

[36] See Chapter 4, *passim*.

[37] However, see Hudson 1.255 where the author appears to suggest that for there to be a waiver there must be a change of position on the part of the representee.

[38] *MR Hornibrook v Eric Newham* (1971) 45 AJLR 523.

[39] *Meyer v Gilman* (1899) 18 NZLR 129.

[40] Indeed, a Court may well readily find that the employer is precluded from relying on non-compliance with the contractual mechanism for approving variations as a defence to a claim by the contractor for monies arising from those variations—see Hudson 7.042.

[41] See Hudson 9.012.

[42] *Thornhill v Neats* (1860) 8 CB NS 831.

A874

## C. Waiver

either as pure waivers or waivers by election. In each case, the elements of an unequivocal representation coupled with knowledge must be made out.[43] However, care must be taken in two respects—whether rights accruing from defective works can be waived by mere inspection on the part of the employer's architect or engineer, and whether a particular breach of contract is continuing.

### (1) Waiver of defects

It is standard practice for the works to be inspected and certified by the employer's architect or engineer. That process of inspection has led defaulting contractors (or their sureties and bondsmen) to argue that any defective works are waived by that inspection. Whilst there can be little doubt[44] that the act of certification would count as the necessary unequivocal representation,[45] whether or not the architect or engineer has the authority to waive defects or the requisite knowledge are more difficult. We would suggest that the architect or engineer has neither.

**19.14**

As far as authority is concerned, it is clear that the architect or engineer is appointed to supervise the works on the employer's behalf. Although it is possible that an employer could expressly authorise its architect or engineer to waive defects on its behalf, such a widely-ranging express authority is unlikely.[46] If there is no express authority, the contractor will be forced to argue that the architect or engineer had ostensible authority to waive defects in the works. The weakness of that argument is that the architect or engineer is appointed to ensure that only the employer's interests are protected. The architect or engineer cannot instruct the builder how to carry out its works,[47] nor does it owe an obligation to the contractor to inform it that its works are defective.[48] Thus, by parity of reasoning, the architect's or engineer's authority is limited and does not extend to confer the benefit of its expertise on the contractor.[49] The builder will normally be aware of that fact. Thus any representation as to the nature of the works which confers the benefit of that expertise on the contractor will not be supported by ostensible

**19.15**

---

[43] See *Mitsui Babcock Ltd v John Brown Engineering Ltd* (1997) 51 Con LR 129 at 185 ff per HHJ Esyr Lewis QC.
[44] Absent express agreement to the contrary.
[45] See para 4.08 above for analogous examples.
[46] The position is different where the engineer/architect is explicitly contractually authorised and mandated to issue a certificate of practical completion. There, certification will be taken to be conclusive of the contractor's performance.
[47] See *Clayton v Woodman & Son Ltd* [1962] 1 WLR 585.
[48] See Hudson 5.021; *AMF International Ltd v Magnet Bowling* [1968] 1 WLR 1028 at 1053 per Mocatta J. Thus the fact that the architect or engineer fails to notice defective works and is thereby in breach of its obligations to the employer cannot confer the benefit on the contractor of exempting that contractor from liability: *East Ham Corporation Council v Bernard Sunley* [1966] AC 406 at 444 per Lord Reid.
[49] It is to be noted that the limit on the architect's or engineer's authority arises more as a matter of policy than of strict legal analysis.

A875

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES
------------------------------------------------------------------------X

LEEWARD CONSTRUCTION COMPANY, LTD.

                            Claimant,

        against

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE C/O GCLR, LLC,

                       Respondents.

**CLAIMANT'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO DISMISS RESPONDENT'S COUNTERCLAIMS AND IN OPPOSITION TO RESPONDENT'S CROSS-MOTION FOR <u>SUMMARY JUDGMENT</u>**

Case No.: 50 110 T 00118 13

------------------------------------------------------------------------X

Claimant, Leeward Construction Company, Ltd. ("Claimant" or "Leeward") submits this Reply in further support of its Motion for an order (a) dismissing the Respondent American University of Antigua -- College of Medicine's (the "AUA" or "Respondent") First Counterclaim for repayment of EC $3,614,552.41 in ABST; (b) dismissing the Respondent's Second Counterclaim for damages relating to certain alleged defective works performed by Leeward; and (c) for such other and further relief as the Tribunal may deem appropriate. This Reply is also submitted in opposition to the AUA's cross-motion to "strike the Claimant's stated defenses" and for summary judgment on its First Counterclaim. Leeward's Motion to Dismiss is submitted in accordance with the Tribunal's Procedural Order No. 1, dated July 19, 2013, as modified.[1]

As an initial matter, Leeward notes that Procedural Order No. 1 provided that dispositive motions aimed at the rejection of claims asserted herein shall be made "by any reason not

---

[1] Leeward notes that its moving papers addressed, in depth, each issue presented by the pending motions. The purpose of this Reply is not to address each and every statement in the AUA's opposition papers but rather, to highlight specific points. The failure to specifically mention a specific statement herein does not mean that Leeward concedes the alleged fact or legal argument. Rather, in addition to this Reply, Leeward relies on its moving papers.

requiring the examination of any evidence other than documentary evidence submitted therewith." The AUA's submission goes beyond the scope of this order and includes, *inter alia*, hearsay statements in the Affirmation of Neal Simon, President of the AUA, dated November 12, 2013, in support of the AUA's cross-motion (the "Simon Affm."). *See* Simon Affm., ¶¶89-93. Mr. Simon also makes several unsubstantiated assertions concerning tax law matters that border on expert witness testimony for which no foundation has been provided. *See* Simon Affm., ¶39. The AUA also violated Procedural Order No. 1 by submitting a Witness Statement of Douglas James McLaren, dated November 4, 2013, in support of the AUA's cross-motion (the "McLaren Statement"), which contains misleading representations concerning the mechanics of the ABST Act. *See, e.g.,* McLaren Statement, ¶¶3, 6. Leeward respectfully requests that the Tribunal reject the AUA's submission to the extent it goes beyond the permissible scope of Procedural Order No. 1 and indeed, the rules of evidence.

## PRELIMINARY STATEMENT

1. Both in its moving papers and herein, Leeward has established a right to dismissal of both the AUA's ABST Claim and Defective Work Claims. In opposition, the AUA argues out of both sides of its mouth that the ABST Claim is both not barred by the doctrine of *res judicata*, arises out of the very same Contract that was the subject of the Prior Arbitration and therefore, is subject to arbitration. (The AUA has failed to defend Leeward's argument that the Defective Work Claims are also barred by *res judicata*.) As the following illustrates, the AUA cannot have its cake and eat it too. If the ABST Claim (and also the Defective Work Claims) arises out of the Contract, then they are barred by the doctrine of *res judicata* because they could have and should have been raised in the Prior Arbitration. *See* Leeward's Motion to Dismiss, Point I(B) and II(A) and Point I(A), *infra*. If the AUA's ABST claim does not arise out of the Contract, then there is

2

**A877**

no arbitration clause to cover the claim and, it is not subject to arbitration. *See* Leeward's Motion to Dismiss, Point I(E)(2) and Point I(B), *infra*. To the extent the ABST Claim ever existed and is not barred by *res judicata*, the AUA has waived it. *See* Point III, *infra*. In any case, the AUA's claims herein should be dismissed.

      2.     Aside from procedural and substantive issues implicated in the AUA's ABST Claim, the AUA has also failed to demonstrate that it has standing to bring the ABST Claim in the first instance. In support of its attempt to show that it does, the AUA has submitted the McLaren Statement. However, a close review of the McLaren Statement reveals that it does not support the AUA's assertions and in some instances, misleadingly describes the procedure for obtaining a credit note under Paragraph 34 of the ABST Act. *See* Point II, *infra*. A plain reading of the ABST Act does not support the AUA's claim that it can seek a monetary refund from Leeward for ABST properly paid under the Contract.

      3.     Finally, the AUA has waived its ability to bring any claims for defective work by its own actions. *See* Point IV, *infra*. In *toto*, the AUA has failed to articulate a defense to Leeward's motion to dismiss. It has also failed to demonstrate that it is entitled to summary judgment on its own claims. Accordingly, the Tribunal should grant Leeward's motion to dismiss the AUA's ABST Claim as well as its Defective Work Claims.

### POINT I

### LEEWARD IS ENTITLED TO DISMISSAL OF THE ABST CLAIM AND THE DEFECTIVE WORK CLAIMS

      4.     The Tribunal should dismiss the ABST Claim as well as the Defective Work Claims because (A) the claims are barred by the doctrine of *res judicata*; or (B) the claims do not arise under the Contract and as such, are not subject to arbitration. The AUA has failed to

**A878**

articulate a basis to avoid dismissal on these grounds and therefore, Leeward is entitled to their dismissal.

### A. The AUA's Claims Are Barred by The Doctrine of *Res Judicata.*

5.     The most astounding part about the AUA's opposition to Leeward's motion is that it completely fails to contest Leeward's argument that the Defective Work Claims are barred by *res judicata* on the grounds that the AUA should have asserted the claims in the Prior Arbitration. *See* Leeward Motion to Dismiss, Point II(A),¶¶77-83. The AUA has admitted in this proceeding that it was aware of the Defective Work Claims prior to the commencement of the Prior Arbitration, but made a tactical decision not to raise them. (Exhibit 48) The Tribunal should dismiss these claims because the AUA's silence on this issue is tantamount to its admission.

6.     Equally astounding is the AUA's total failure to address the fact that as of August 31, 2007, (Exhibit L to the AUA's opposition papers) the AUA knew that the Project was exempt from ABST requirements and that by November 17, 2009 the Antiguan Government had advised the AUA to seek refunds of ABST payments from its vendors (Exhibits 50, 59), but nevertheless failed to raise the ABST Claim in the Prior Arbitration.[2] Most significantly, the AUA fails to address its internal December 11, 2009 email wherein the AUA apparently decided to recoup the ABST from the contract retainage owed to Leeward  "at the appropriate time," (Exhibit 63); yet failed to assert the ABST Claim in the Prior Arbitration, which was commenced in February, 2011.

---

[2] Leeward maintains that the Inland Revenue Department's November 17, 2009 statement to the AUA was incorrect as the ABST Act states that refunds must be sought from the Antiguan Government. *See* ABST Act, Part XI (2006), *as amended* (2008). However, the statement is relevant to Leeward's *res judicata* argument as it evidences the date the AUA knew of its alleged ABST Claim. *See* Leeward's Motion to Dismiss, Point I(C); *see also* Point II *infra*.

**A879**

7.     Rather than address these issues, the AUA argues that the ABST Claim is not barred by *res judicata* because the "same evidence" and "facts essential" to the ABST Claim were not presented in the Prior Arbitration; the ABST Claim does not concern the "same transaction or connected series of transactions at issue;" and as silly as it sounds, Leeward's defense of *res judicata* is barred by the doctrine of *res judicata*. *See* AUA Memorandum of Law in Opposition to Leeward's Motion to Dismiss and in Support of its Motion for Summary Judgment ("AUA Memo of Law"), Point V, pp. 27-35. The AUA is wrong.

8.     Under Antiguan law, *res judicata* applies to all "issues and points that properly belonged to the earlier litigation and which the earlier court would have out of necessity had to resolve had it been raised." *Mavis Henry v. Tyrone Warner*, Claim No. ANUHCV 2000/0277, Eastern Caribbean Supreme Court (2009) (citing *Henderson v Henderson*, 3 Hare 100, 114-115 (1943) [emphasis added]). In *Mavis Henry*, the parties were involved in a land dispute. A previous action between them resulted in a finding that the plaintiff had a 50% ownership interest in the subject parcel. The court held the defendant had no interest and restrained him from making any further improvements to the property. Thereafter, a second action was commenced between the parties concerning the same parcel. In the second action, the defendant attempted to assert, for the first time, an equitable interest in the parcel that he claimed pre-dated the first action. The court found his defense precluded by *res judicata* because he did not exercise "reasonable diligence" in asserting his claim within the prior proceeding. *See Id.*

9.     The present case is very similar to *Mavis Henry*: The Prior Arbitration determined the amount that the AUA owes Leeward under the Contract; and in this proceeding, the AUA is for the first time seeking to prosecute claims that it knew about and could have asserted in the Prior Arbitration but did not, and which directly affects the Contract balance due to Leeward

5

**A880**

from the AUA. Just as the court in *Mavis Henry* found the defendant's defense was barred by res *judicata* because the defendant did not exercise "reasonable diligence" in asserting a claim that it could have asserted in the first action, so too should this Tribunal find that the AUA's claims herein are barred by *res judicata* because the AUA could have and should have exercised "reasonable diligence" in asserting its claim in the Prior Arbitration.

10.     The AUA's argument that the "same evidence" is not needed to support both claims, and that "facts essential" to the ABST Claim were not presented in the Prior Arbitration is irrelevant. *See* AUA Memo of Law, p. 29. The subject matter of the Prior Arbitration and this proceeding is the contract between the parties for the construction of the medical school. The issue in the Prior Arbitration was the amount due and owing from the AUA to Leeward under the Contract.   To make this determination, the Tribunal in the Prior Arbitration would have necessarily had to address the AUA's ABST Claim if it had asserted the claim in the Prior Arbitration, to determine the amount due under the Contract. Moreover, the only evidence and facts that are presented herein that were not within the Prior Arbitration are those in the AUA's sole possession (ie., internal AUA correspondence and communications between the AUA and the Inland Department of Revenue). (Exhibits 46; 50-65) The AUA would have and should have asserted the ABST Claim in the Prior Arbitration and thus, it is now barred.

11.     The same is true of the AUA's assertion that the ABST Claim does not concern the "same transaction or connected series of transactions at issue." *N.L.R.B. v. United Technologies*, 706 F.2d 1254, 1260 (2d Cir. 1988). *See* AUA Memo of Law, p. 29. The term "'transaction' is given a flexible, common sense construction that recognizes the reality of the situation." *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997). Here, the exact same transaction as was at issue within the Prior Arbitration – the Contract for the

6

**A881**

construction of the medical school – and the exact same series of transactions that were at issue – the payment requisitions that Leeward submitted to the AUA - are in issue herein with regard to the ABST Claim. (Exhibit 1-30; 39)  As such, the ABST Claim is barred by *res judicata*.

12.     Further, the AUA's argument has confused *res judicata* (claim preclusion) with collateral estoppel (issue preclusion).  *See* AUA Memo of Law, p. 30 (citing *Berth Compton v. Dr. Christiana Nathaniel, et al.*, (Civil Appeal No. 12 of 2004), *HWR Wade & CF Forsyth*, Administrative Law (7th Edition), and *Alexander M. Fundora v. Nigel Hamilton-Smith*, (Claim Anu CHV 2009/0149)).  *Res judicata* (claim preclusion) is different from collateral estoppel (issue preclusion) in that *res judicata* requires a party to present their whole case concerning the same subject matter at the same time.  The doctrine precludes a party from asserting causes of action concerning the same subject matter in multiple litigations.  *See, e.g., Mavis Henry, supra.* By contrast, issue preclusion prevents a party from asserting an issue that was already decided by a court of competent jurisdiction against a party to the subsequent litigation.  *See Id.* (citing *Thoday v. Thoday* (1964) P. 181 (197-198)).  In the proceeding at hand, *res judicata* applies because the same parties have previously litigated the same subject matter – the amount due and owing from the AUA to Leeward under the Contract - in the Prior Arbitration.

13.     Finally, the AUA incorrectly argues that Leeward's defense of *res judicata* is barred by the doctrine of *res judicata*.  Not only is the AUA's argument incorrect, it confuses two different issues.  The AUA claims that the Prior Arbitration Tribunal denied Leeward's claim for the ABST mis-tabulation therein so as to preserve the "AUA's right to due process." (AUA Memo of Law, p. 27)  Thus, the AUA argues that Leeward is precluded from asserting the claim within this arbitration because it could have and should have asserted the claim within the Prior Arbitration.  Regardless of whether or not AUA's contention with regard to Leeward's

7

**A882**

affirmative claim is true, it has absolutely nothing to do with whether or not Leeward is entitled to assert the **defense** of *res judicata* against the ABST Claim.

14.    The bottom line is this: If the AUA properly asserted the ABST Claim in the Prior Arbitration, an adjudication of the claim would have involved the same subject matter previously adjudicated: the scope of the Contract, the administration of the Contract, payments under the Contract, Leeward's performance under the Contract, and the amount due Leeward under the Contract.   In addition, the same series of transactions that were at issue within the Prior Arbitration are at issue within the ABST claim, namely the 27 payment requisitions that Leeward submitted to the AUA and the AUA reviewed, processed and paid, including the payment of ABST. (Exhibits 2 – 30) The same witnesses, evidence and facts are needed to support both the claims made within the Prior Arbitration and the ABST claim asserted by the AUA herein.  *(See, e.g.,* Exhibits 1-8,-10-11, 13, 15-30, 47.)  The AUA knew about the ABST Claim at least 14 months prior to the commencement of the Prior Arbitration (Exhibit 60), but failed to assert the claim at its own peril.  It is barred from raising it herein by the doctrine of *res judicata*.

**B. The ABST Claim And Part of The Defective Work Claims do Not Arise Under The Contract And Are Not Subject to Arbitration.**

15.    Assuming *arguendo*, that the AUA's claims herein are not barred by *res judicata*, as a threshold matter, they are only subject to arbitration if they arise out of the Contract.  The ABST Claim, premised on the November 17, 2009 correspondence from the Inland Revenue Department instructing the AUA to seek ABST refunds from its vendors, does not arise under the Contract and therefore, it is not subject to arbitration.  *See* Leeward Motion to Dismiss, Point I(E)(2), ¶¶71-74.  So too, the AUA's claim for defective window work does not arise under the Contract and is not subject to arbitration.  *See* Leeward Motion to Dismiss, Point II(C), ¶¶91-97.

8

**A883**

In its opposition, the AUA fails to contest Leeward's claim that the defective window work does not arise under the Contract. The AUA's concession requires a dismissal of this claim.

16.    With regard to the ABST Claim, the AUA argues that the claim should be subject to arbitration because the Contract allows for the "assumption that the parties intended that all disputes that relate to the relationship between them should be submitted to arbitration." AUA Memo of Law, p. 6. The AUA's argument in this proceeding contradicts its position on the exact same issue in the Prior Arbitration. (Exhibit 38, ¶¶72-77)

17.    In the Prior Arbitration, the parties litigated the amount due from the AUA to Leeward under the Contract as well as certain additional work contracts. The additional work contracts covered work that had originally been part of the Contract's scope but the AUA deleted and put out for rebid in an effort to save money. Leeward was awarded several of these smaller contracts through a competitive bidding process. At the conclusion of the Project, the AUA owed Leeward monies on the additional work contracts as well as the Contract, itself. During the Prior Arbitration, the AUA argued that the additional work contracts were not subject to arbitration because they did not include arbitration clauses and did not fall within the four corners of the Contract. As such, the AUA claimed they were not subject to arbitration because as separate agreements the additional work contracts "did not arise out of or relate to the Contract." (Exhibit 38, ¶74)

18.    "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citing *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).    This common law rule, known

**A884**

as judicial estoppel, "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, n. 8, (2000). The purpose of judicial estoppel is "'to protect the integrity of the judicial process,' by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

19.     Judicial estoppels applies where several factors are present, including: (1) a party's later position must be "clearly inconsistent" with its earlier position; (2) the party succeeded in persuading a court to accept its earlier position; and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *See New Hampshire v. Maine*, 532 U.S. 742, 750-751 (2001).

20.     Here, the AUA is invoking a "clearly inconsistent" position to the one it took in the Prior Arbitration. (*See* AUA Memo of Law, p. 5-8; *compare with* Exhibit 38, ¶¶ 72-77.) The AUA successfully persuaded the Prior Arbitration Tribunal to hold that the additional work contracts were outside the Tribunal's jurisdiction even though the work was originally part of the Contract. (Exhibit 39) The AUA would derive an unfair advantage and would impose an unfair detriment to Leeward if it is not estopped herein because, under the standard cited by the AUA, the Prior Arbitration Tribunal should have made a decision on the claims relating to the additional works contracts as they clearly "relate to the relationship" between Leeward and the AUA. The AUA is judicially estopped from asserting that the interpretation of "relate to" the Contract allows for the "assumption that the parties intended that all disputes that relate to the relationship between them should be submitted to arbitration." (AUA Memo of Law, p. 6) Just like the additional work contracts, the ABST Claim does not "arise out of" the Contract, but the

**A885**

ABST Act and the Inland Revenue Department's pronouncements and is not subject to arbitration herein.

21.    The arbitrability of Leeward's claim does not change this analysis. Leeward is seeking a payment due under the Contract, not under the substantive laws of Antigua. (Exhibit 38, p. 59, ¶78-80) Leeward was only made aware of the claim by the AUA's attorney during the hearings in the Prior Arbitration. (Exhibit 33, 72:4-73:2; Exhibit 39, p. 29-30) By contrast, the AUA repeatedly acknowledges herein that as of August 31, 2007 it knew that it was not required to pay ABST on the Project. Yet, it never provided Leeward with any documentation demonstrating its exemption (*see, e.g.*, ABST Act, Part II, ¶8(8) (2006), *as amended* (2008)) and it continued to pay ABST to Leeward throughout the Project without protest because this same letter was "unclear" about whether the AUA had to pay ABST under the laws of Antigua. *See* AUA Memo of Law, p. 23-25; Simon Affm., ¶54. Further, the AUA never presented the ABST Claim in the Prior Arbitration even though as of November 17, 2009, it knew that the Antiguan Government expected it to recoup its ABST loss from all of its vendors. (Exhibit 50)

22.    Finally, the AUA has failed to demonstrate that its claim for unjust enrichment arises under the Contract. A claim for unjust enrichment is an equitable, restitution claim that is independent of any contract. *See Fibrosa Spolka Akcyina v. Fairbarin Lawson Combe Barbour Ltd*, [1943] A.C 32, 61; *Westdeutsche Landesbank Girozentrade v. Islington London BC*, [1996] 2 WLR 802(HL). The AUA has not cited anything to the contrary. The AUA's unjust enrichment claim does not arise under the Contract and is not subject to arbitration herein.

## POINT II

### THE AUA HAS FAILED TO ESTABLISH THAT IT HAS STANDING TO RECOVER FOR THE ABST CLAIM

23.     There is no provision in the ABST Act for a private right of enforcement.  The only mechanism by which the AUA can obtain a refund of ABST inadvertently or mistakenly paid to Leeward is to seek a refund from the Antiguan Government pursuant to the ABST Act. *See, e.g.,* ABST Act, Part XVII, ¶44 (2006), *as amended* (2008).  Moreover, there is nothing in the ABST Act that requires a consumer to demonstrate that its supplier paid the ABST to the Antiguan Government in order for the consumer to obtain a refund. *See generally* ABST Act (2006), *as amended* (2008).  If Leeward failed to remit ABST that it might owe to the Antiguan Government that it lawfully collected from the AUA, *see* ABST Act, Part II (2006), *as amended* (2008), then the only statutory remedy is for the Antiguan Government to commence enforcement proceedings against Leeward. *See, e.g.,* ABST Act, Part XVI (2006), *as amended* (2008).  In the face of these statutory constraints, the AUA contends herein that it has standing to assert the ABST Claim based on hearsay statements and misleading advice from Douglas McLaren, an employee of the Department of Inland Revenue.

24.     First, the AUA relies upon the self-serving, unsubstantiated hearsay statement of Neal Simon, its president. *See* AUA Memo of Law, p. 13-14; Simon Affm., ¶¶ 89-93.  In his affirmation Mr. Simon states: "Mr. McLaren explained *to AUA's counsel during his meetings with him*…that, because the Leeward has not filed tax returns…[the] Government would not, and could not, refund any of the sums that AUA paid as ABST to the Leeward…" (Simon Affm., ¶¶ 89-90) (emphasis added)  Mr. Simon does not allege personal knowledge of the alleged conversations between AUA counsel and Mr. McLaren and Mr. McLaren makes no such statement in his witness statement. *See* McLaren Statement   Paragraphs 89-93 of the Simon

12

**A887**

Affirmation conflict with the ABST Act, *see, e.g.*, ABST Act, Part I and Part XI (2006), *as amended*, (2008); constitute hearsay; and violate Procedural Order No. 1 with respect to the evidentiary limitations of this motion; and therefore, should not be afforded any weight herein.

25.    Notably absent from the AUA's opposition papers is any claim that the AUA provided Leeward with any proof of the Project's exemption from ABST. *See* ABST Act, Part II, ¶8(8) (2006), *as amended* (2008).[3] Indeed, the AUA admits that it was unsure based on the August 31, 2007 correspondence from Inland Revenue Department whether the Project was ABST-exempt. As late as January 28, 2010, the AUA's vendors were still telling it that it had not provided proof that the Project was exempt from ABST. (Exhibit 51)

26.    The McLaren Statement also fails to support the AUA's claim. First, McLaren's statement is inadmissible because a party may not offer opinion testimony without the prior authorization of the Tribunal. *See* Part 32.6 of the Civil Procedure Rules ("CPR") (2000). Second, the McLaren Statement is misleadingly at best. According to Mr. McLaren, Paragraph 34 of the ABST Act provides "the procedures which should be used where the supplier has erroneously charged the tax on a supply for which an original tax invoice has already been issued." McLaren Statement, ¶4. Paragraph 34 of the ABST Act states:

> If
> (a)    a registered supplier has made a taxable supply to a *registered recipient*;
> (b)    an ABST adjustment event has occurred in relation to the supply;

---

[3] ABST Act, Part II, ¶8(8) (2006), *as amended* (2008) states in relevant part: "No person, class of persons, transaction, class of transactions, import, or class of imports is exempt from ABST except as provided by this Act, or by a law or regulations duly enacted by the Parliament of Antigua and Barbuda and signed into effect by the Governor-General, and as a general rule: (a) exemptions of a general nature or application should be provided for in this Act or the Regulations; and (b) exemptions of an isolated or specific nature, or in relation to a particular transaction or event, may be provided for in a law specifically dealing with the person, event, or transaction for which the exemption is granted."

**A888**

(c)     at the time of the supply, the supplier issued an original ABST invoice to the recipient; and

(d)     the amount shown on that invoice as the ABST charged exceeds the ABST properly chargeable in respect of the supply, the supplier must provide the recipient with an original ***ABST credit note***.

ABST Act, Part IX, ¶34 (2006), *as amended* (2008) [Emphasis added].

27.     However, McLaren never asserts nor does the AUA allege or provide documentation to indicate that the AUA is a registered recipient under the ABST Act.  In fact, as part of discovery in this matter, Leeward demanded that the AUA provide:

> Each document concerning a communication between the AUA (including its officers, directors, shareholders, employees, and agents) and the Antigua & Barbuda government (including its officers, ministers, employees, and agents) with respect to the ABST Act and/or the payment/collection of ABST, including documents concerning the following:
> - ABST exemptions with respect to the Project at issue.
> - ABST Registration (a/k/a "registering for Antigua & Barbuda Sales") pursuant to the ABST Act, Part III (2006), as amended

(A copy of Leeward's Demand for Production of Documents is annexed hereto as Exhibit "66".) In response to the demand, the AUA indicated that it "has no documents within its possession, custody, or control, that are responsive to Leeward's request for production of documents" (A copy of the AUA's Response to Leeward's Demand for Production of Documents is annexed hereto as Exhibit "67".)

28.     Moreover, even had the AUA provided proof that it is a registered recipient, Paragraph 34 of the ABST Act only entitles it to a credit note not a monetary refund. *See* ABST Act, Part IX, ¶ 34(d) (2006), *as amended* (2008) ("(d) the amount shown on that invoice as the

ABST charged exceeds the ABST properly chargeable in respect of the supply, the supplier must provide the recipient with an original ***ABST credit note***.")

29.      The procedure under Paragraph 34 of the ABST Act is completely logical.  Any other approach would cause pandemonium on large, multi-million dollar construction projects involving a multitude of vendors, if suppliers had to give monetary refunds of taxes and then turn to their suppliers to get monetary refunds and so on down the chain.  In Leeward's case, giving the AUA a monetary refund would require Leeward to go back to hundreds of suppliers to get refunds who would then have to go back to all of their suppliers to get refunds.  If the process actually worked like this it would bring commerce in Antigua and Barbuda to a screeching halt.

30.      Paragraph 34 of the ABST Act does not provide the AUA with a private right of action for reimbursement of ABST.  Thus, the AUA does not have standing to assert the ABST claim.

### POINT III

### <u>THE AUA WAIVED THE ABST CLAIM</u>

31.      To the extent the AUA could ever articulate a claim for the ABST paid on the Project, it waived the claim and/or modified the Contract by paying the ABST on 27 separate requisitions.  Faced with this truth, the AUA now conveniently claims that it could not have waived its right to enforce the Contract provisions relating to the payment of taxes because "no ABST was, in fact, due in connection with" the Project.  AUA Memo of Law, p. 21.  The AUA's contention is without merit as it has repeatedly admitted that "there was confusion as to whether... ABST was required to be paid in the first instance ...which confusion, the Government did not clear up...until after the Leeward completed its work on the Project....[I]t was because of the confusion that AUA determined that it would pay ... the ABST ...."  AUA

15

**A890**

Memo of Law, p. 24-25. Therefore, during the pendency of the Project, the AUA's payment of ABST on each and every payment requisition submitted by Leeward, without protest, constituted a waiver of General Conditions §3.6.1, to the extent the contract provision can be read to require payment of ABST by Leeward. *See Wilken*, § 3.15; The Kanchenjunga, I Lloyd's Rep. 391, 397-98 (House of Lords 1990) (explaining that waiver occurs when a party forbears from exercising a right upon the other party's breach); Chitty, § 22-040 ("Where one party voluntarily accedes to a request by the other that he should forbear to insist on the mode of performance fixed by the contract, the Court may hold that he has waived this right to require that the contract be performed in this respect according to its original tenor"); *Besseler Waechter Glover & Co., Ltd. v. South Derwent Coal Co., Ltd.*, 59 Lloyd's List Law Report 104, 108 (King's Bench 1937).

32.     Further, the AUA's assertion that it did not waive General Conditions §3.6.1 because there was no reliance on the AUA's failure to enforce the provision is without merit. Leeward relied upon the AUA's actions with the submission of each and every requisition. If the AUA had refused to pay the ABST or demonstrated to Leeward that the Project was ABST-exempt, Leeward would not have charged ABST on the next requisition or any requisitions going forward. However, the evidence demonstrates and the AUA openly admits, that it never questioned the inclusion of ABST on any of the payment requisitions Leeward submitted and indeed believed that it was required to pay ABST during the pendency of the Project. *See* AUA Memo of Law, p. 23-24.

33.     Finally, the Contract, read in conjunction with the ABST Act required Leeward to: (a) collect 15% ABST from the AUA on the payments the AUA made to Leeward for the goods and services Leeward provided under the Contract and (b) pay the Antiguan Government the ABST to the extent the ABST Leeward collected on all "outputs" exceeded the ABST it paid

16

**A891**

on all work, labor, services, equipment, and materials during the relevant period. *See* Leeward

Motion to Dismiss, Point I(A).  General Conditions §13.4.1 of the Contract provides:

> Duties and obligations imposed by the Contract Documents and
> rights and remedies available thereunder shall be ***in addition to
> and not a limitation of*** duties, obligations, rights and remedies
> otherwise imposed or available by law.

Exhibit 1, General Conditions, § 13.4.1 (emphasis added).  General Conditions § 13.1.1 further

provides that the "Contract shall be governed by the law of the place where the Project is

located," to wit: Antigua.  Taken together, these provisions require that General Conditions

§3.6.1 be read in conjunction with the ABST Act which requires Leeward to charge and collect

ABST for goods and services it provided under the Contract.  *See* ABST Act, Part II (2006), *as

amended* (2008).  In fact, the ABST Act, itself provides that invoices are presumed to include

ABST, regardless of whether there is an express line item for ABST.  *See* ABST Act, Part XIV,

¶57(1) (2006), *as amended* (2008).  This method cannot be changed without the express approval

of the Commissioner of Inland Revenue.  *See* ABST Act, Part XIV, ¶57(5) (2006), *as amended*

(2008).  In the absence of a demonstrable exemption, Leeward was required to collect ABST

from the AUA on the Project.

### POINT IV

### THE AUA'S DEFECTIVE WORK CLAIMS ARE UNTIMELY UNDER THE CONTRACT

34.    In addition to being barred by *res judicata*, the AUA's claims for defective work

are also untimely and have been waived under the Contract because the AUA failed to give

Leeward timely notice of the alleged defects and an opportunity to cure them as required by the

Contract.  *See* Leeward Motion to Dismiss, Point II(B), ¶¶84-89.

17

**A892**

35.     General Conditions §2.4 of the Contract provides that the Owner is only allowed to correct work not in accordance with the Contract after providing the Contractor with written notice of the alleged defects.  If the Contractor does not correct the work within seven days after receiving the initial notice of the defects, the Owner is required to send the Contractor a second notice.  If the Contractor fails to begin to correct the work within three days after receiving the second notice, then the Owner may correct the work itself and seek damages from the Contractor.  (A copy of General Conditions §2.4 is annexed hereto as Exhibit "68".)

36.     In its opposition the AUA admits that it did not give Leeward the required notice and opportunity to cure because "providing the Leeward with the opportunity to cure the defects involved herein would have been a futile act."  Simon Affm., ¶15  As with many of the statements in his affirmation, Mr. Simon's assertion that providing Leeward with notice of alleged defects and an opportunity to cure would have been futile is a self-serving and has no basis in fact.  The actual fact is that the notice was not provided as required by the Contract; Leeward was not given any opportunity to cure; and as a result, the AUA's claims for defective work have been waived.  *See* 13 Lord, Williston on Contracts § 38:6 (Express provisions in a building contract "must be literally met or exactly performed in order to create liability on the contract, and the fact that nonperformance of the condition or incomplete performance of it has caused no injury to the promisor is immaterial."); *see also, Bremer Handelsgesellschaft v. C. Mackprang Jr.,* 1 Lloyd's Rep 221 (Court of Appeal 1979) (A person waives contractual right by words or conduct that is knowing, intentional, and unequivocal); Wilken, §3.15.

18

**A893**

## POINT V

### THE AUA IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ABST CLAIM OR THE DEFECTIVE WORK CLAIMS

37.    In support of its cross-motion for summary judgment, the AUA requests that the Tribunal "strike each of the defenses that the Leeward advances in support of its motion". AUA Memo of Law, p. 35.   However, the AUA has not demonstrated that Leeward's defenses are without merit.   Thus, the AUA is not entitled to summary judgment on either of its claims.

38.    Even had the AUA established that it was entitled to have Leeward's defenses stricken, it still would not be entitled to summary judgment.   Part 15.2 of the Civil Procedure Rules ("CPR") 2000 states:

> The Court may give summary judgment in the Claim or on a particular issue if it considers that the – (a) Claimant has no real prospect of succeeding on the claim or the issue; or (b) Defendant has no real prospect of successfully defending the claim or the issue.

(CPR 2000, Part 15.2)   In so doing, the Court may only examine the documents filed with the case as pleaded to make the determination of whether the party against whom the complaint is made has no real prospect in succeeding on the claim.   To do so, the Court must "[assess] the prospects of success ... based upon the case as a whole.   The test is not one of probability; it is the absence of reality." *Alfa Telecom Turkey Limited v. Cukurova Finance International Limited and Cukurova Holdings AS*, HCVAP 2009/001; *see also Clearlee Todman-Brown v. Nat'l. Bank of the Virgin Islands, Ltd.*, BVIHCV 64/2013 *(citing Three Rivers District Council v. Bank of England (No.3)*, [2001] 2 All ER 4513).

39.     Aside from failing to prove that it will be successful on the merits of its claims, the AUA has wholly failed to demonstrate that Leeward cannot defend against the AUA's claims. In fact, the opposite is true. Leeward has provided the AUA with thousands of pages of documents evidencing the ABST that it paid, not only related to the Project, but to all vendors with whom it did business, during each tax period at issue. In the face of Leeward's voluminous production, the AUA has not and cannot demonstrate that during the relevant tax period, Leeward paid less in ABST than it collected.

**WHEREFORE,**   Claimant Leeward Construction Company, Ltd. respectfully requests that the Arbitrators grant the Claimant's motion for an order (a) dismissing the Respondent American University of Antigua -- College of Medicine's First Counterclaim for repayment of EC $3,614,552.41 in ABST; (b) dismissing the Respondent's Second Counterclaim for damages relating to certain alleged defective works performed by Leeward; and (c) for such other and further relief as the Arbitrators may deem appropriate and deny the AUA's cross-motion for summary judgment in its entirety.

Dated: Poughkeepsie, New York
        November 22, 2013

J. Scott Greer, Esq.
**LEWIS & GREER, P.C.**
*Attorney for Claimant,*
*Leeward Construction Company, Ltd.*
510 Haight Avenue, P. 0. Box 2990
Poughkeepsie, New York 12603
Telephone: (845) 454-1200

TO:   Diego Brian Gosis
      175 SW 7th Street, Suite 2110
      Miami, FL 33130
      Tel: +1 305 856 7723
      Email: diego.gosis@gommsmith.com

      Judith B. Ittig

20

**A895**

Ittig & Ittig, P.C.
1420 Ninth Street, NW
Washington, DC 20001-3344
Tel: +1 202 387 5508
Email: jbi@ittig-ittig.com

Carlos A. Romero Jr.
3195 Ponce de Leon Blvd. Suite 400
Coral Gables, FL 33134
Tel: +1 305 445 0014
Email: car@postandromero.com

Carolina Cardenas-Soto
Senior Case Manager
International Centre for Dispute Resolution
1633 Broadway, 10th Floor
New York, New York 10019
Email: cardenasc@adr.org

Leonard Sclafani, Esq.
*Law Offices of Leonard Sclafani, Esq.*
*Attorney for Respondent AUA*
One Battery Park Plaza, 33rd Floor
New York, New York  10004
Email: las@lasattorney.com

**A896**

AUA also seeks damages against the Leeward arising from defects and deficiencies in the Leeward's construction of AUA's campus building in Antigua.

Dated:  August 1, 2013
       New York, New York

                   American University of Antigua College of
                   Medicine

                   By:
                     Leonard A. Sclafani, Esq.
                   Law Offices of Leonard A. Sclafani, Esq.
                   Attorneys for Respondent AUA
                   One Battery Park Plaza, 33rd Fl.
                   New York, New York 10004
                   (Tel.) 212-696-988
                   email:  l.a.s@mindspring.com

been tiled; others have not yet been tiled or are in the process of being tiled. To date, AUA has expended $266,310 EC AUA has also contracted, and partially paid for additional tile and roof leak repair work at a cost in excess of $94,150 EC.

5.  Scuppers and pipes in the drain system were improperly sized leading to flooding in the building during heavy rains. The collection area of the roof and the 4-inch drains connect to 2 ½-inch storm water pipes at ground level.. Some repairs have been made at a cost of $8,500 EC; however, these repairs have not fully alleviated the problem. As a result, AUA expends approximately $8,500 EC each time the building is flooded due to the improper sizing of the scuppers. These events occur on average three times each year.

6.  Windows in the lobby and third floor of the building were improperly installed without removal of the packing materials. As a result, every window leaked both internally into the walls and externally into the interior of the building. The external leaks caused damage to floors and finish of the interior walls. The water that leaked inside the walls caused damage to the finished exterior walls. The improperly installed windows were refitted without the packaging material. The cost of this repair was $129,385 EC.

7.  Roof tiles throughout the entire roofing areas were of poor quality resulting in discoloration. This condition has not been repaired. The estimated cost of replacement of the defective tiles. Flashing is missing throughout the project is $ 639,792 EC.

8.  The tracery and fascia throughout the building are failing and continue to disengage from the building. This condition has not been repaired as of today's date. The estimated cost of repair is $115,592.60 EC.

9.  The flat roof area slopes toward the building. This condition coupled with the lack of flashing and the improper installations of roof tiles (see item 4 above) have resulted in ponding on the roof and leaking into the building. See items 3 and 4 for the costs associated with the repairs of these conditions to date and the estimate for completion of these repairs. It is estimated that an additional sum of $ 110,216 will be required for repair of these conditions.

10. The elevator shafts were not square. AUA estimates the cost of repair of the shafts to be in the amount of $168,130 EC

11. Several areas of the concrete floors of the building were uneven and not properly graded. The floors on the third floor wings needed to be screeded at a total cost of $56,675 EC.

The Leeward would determine how much had been paid to date by keeping a running tally of the prior progress payments, exclusive of ABST, which it submitted with its payment applications. With respect to the EC $ 83,083.24 ABST payment at issue, the Leeward, according to its claim, mistakenly recorded the total amount paid by AUA, including ABST, in its running tally. As a result, when the Leeward issued the following payment application, the amount of money Leeward reflected as having been paid by AUA in prior progress payments was EC $ 83,083.24 more than it should have been. The so-called concession was simply an acknowledgment of this alleged error and by implication assumed that AUA was obligated to pay the misapplied ABST in the first place, nothing more. Because, as demonstrated above, AUA was not obligated to pay ABST, the Leeward's misapplication of the money serves to reimburse AUA for a small fraction of the ABST Leeward wrongfully collected.

In sum, AUA respectfully requests that the Leeward's claim be denied and that an award issue in AUA's favor declaring for the amount of the ABST that the Leeward was wrongfully paid; to wit, EC $3,614,552.

AUA also seeks damages against the Leeward for defects in its work on the project. These claims have been submitted to the project architect in accordance with the requirements of the parties' contract. More than 30 days has expired since AUA submitted its claim to the architect. As of the date hereof, the architect has not rendered any determination on them. Under the terms of the parties contract, failure of the architect to respond to a submission of a claim within 30 days of the date that it is submitted to him entitles the claimant, in this case AUA, to proceed to advance its claims through arbitration.

Below is a list of the defects.

1. The risers on staircases in the building are of uneven height creating a safety hazard. The defect has not been repaired as of today's date. Repair would require the removal and reconstruction of the staircases. AUA estimates its damages for this defect at $241,200 EC.

2. Wall surfaces throughout the building were improperly finished. The integrity of the structure of the masonry wall systems throughout the project is lacking resulting in cracking which continues to reveal itself in multiple locations throughout the project. Additionally, the wall finish is uneven and unacceptable in its appearance The defect has not been repaired as of today's date. AUA estimates the cost of repair at $268,000 EC.

3. Common to all roofs throughout the building is the absence of needed flashing. The failure to provide and install flashing has resulted in incursion of storm water into the interior spaces of the building, leaking and flooding. AUA estimates the cost or repair to be upward of $536,000 EC.

4. Tiles had to be installed on the roofs of the building in order to mitigate against leaks due to improper roof installation. Some areas have already

Lastly, AUA asserts that it submitted its claim for a reimbursement of the said sum to the Project Architect, R. Sundaram, Sundaram Architects as required by the parties contract; and that the Project Architect has approved the claim. AUA is therefore entitled to this sum. (see the attached correspondence)

In this regard, AUA states the following:

Section 3.6.1 of the General Conditions to the Contract, entitled "Taxes," unambiguously obligates the Contractor, Leeward, to "pay sales, consumer, use and similar taxes for the Work provided by the Contractor ... ." This obligation plainly includes the Antigua and Barbuda Sales Tax ("ABST"). Notwithstanding this clear mandate, as evidenced by the payment applications submitted by the Leeward (*e.g.,* Ex. A to the Leeward's December 21, 2012 letter to the Project Architect), throughout the Project Leeward charged AUA ABST at a rate of 15% for all the work the Leeward performed on the Project. As the invoices AUA approved for payment reflect, AUA paid the ABST charged by the Leeward. See Ex. 1, hereto. Our records reflect that the Leeward wrongfully charged, and AUA mistakenly paid, no less than EC $3,614,552.41 in ABST. Accordingly, AUA is entitled to a ruling that the Leeward was obligated to pay ABST, and the Leeward, in turn, is therefore obligated to reimburse AUA for all the ABST it collected from AUA.

In its November 20, 2012 claim, the Leeward contends that AUA conceded during a prior arbitration that it was obligated to pay the Leeward EC $83,083.24 in progress payment, because that payment was a payment for ABST in connection with Payment Requisition No. 22 and wrongfully applied. However, the Leeward's claim for this money, and the alleged concession made by AUA's counsel during opening arguments at the prior arbitration, are both premised on the mistaken belief that AUA was responsible to pay ABST and on the assumption to the Leeward actually paid Antigua EC $ 83,083.24 for the ABST collected at that time.[1]

As set forth in the Leeward's December 21, 2012 supplemental submission to the Project Architect on its claim herein, what the parties called at the arbitration the "ABST Error" and what the Leeward has now labeled a "mis-tabulation" was a product of the manner in which the Leeward tracked payments on the Project. Generally speaking, the Leeward issued monthly payment applications for the work it completed on the Project since the last payment application, which amounts were based upon measuring the work done and applying the predetermined unit rates set forth in the Bill of Quantities that was made a part of the Contract. The Leeward's payment application would calculate the amount earned to date for its Work and then subtract the total amount that had been paid to date. The Leeward would then bill AUA for this difference, separately charge AUA 15% in ABST and request payment for the sum. AUA would then pay the sum, including ABST.

---

[1]   AUA's wrongful payment of ABST, in general, was not at issue in the prior arbitration.

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL CONSTRUCTION INDUSTRY ARBITRATION RULES
AMENDED ANSWER AND COUNTERCLAIMs

TO: Leeward Construction Company, Ltd.
    c/o Lewis & Greer, P.C.
    Attorneys for Claimant
    510 Haight Avenue
    Poughkeepsie, New York 12603

Re: 50 110 T 00118 13
    Leeward Construction Corp. v. American University of Antigua College of
Medicine

PLEASE TAKE NOTICE that American University of Antigua College of Medicine
("AUA") hereby amends its Answer to the the Statement of Claim of Leeward
Construction Company, Ltd. and Counterclaims as per Procedural Order No. 1 dated
July 19, 2013, (which, inter alia, permitted AUA to amend its Answer and
Counterclaims to include counterclaims for construction defects)as follows:

Claimant claims entitlement to EC$83, 059.56/US$30,762/80 which said sum
derives from an alleged "mis-tabulation as Antigua and Barbuda Sales Tax ("ABST")
during the requisition process.
There is no issue that the sum was paid to the Leeward. The claim here is that the
sum was paid as reimbursement for ABST that AUA allegedly owed to the Leeward,
but was subsequently added to the amount that was paid to the Leeward as a
progress payment so that, when the Leeward was paid on the following requisition,
the amount allegedly "mis-tabulated" was deducted from that requisition leaving
the Leeward short on the payment of the requisition in the amount of the sum above
stated.
AUA asserts herein, first, that the Leeward has not provided any evidence that it
actually paid the Government of Antigua and Barbuda the ABST in connection with
the requisition at issue or in connection with any prior or subsequent requisition.
AUA further asserts that, even if the Leeward establishes that it paid this, or any
other amount of ABST, it was its responsibility and obligation to do so under the
terms of the parties contract, such that the amount that the Leeward was paid for
the requisition at issue was correctly added to the amount of its progress payment.
The Leeward was not entitled to a separate or additional payment for
reimbursement of ABST.
AUA further asserts by way of a defense and a counterclaim that it paid ABST to
the Leeward in addition to, and not as a part of its progress payments in all but the
one from which the Leeward's claim herein originates in the sum of
EC$3,614,552.41 as a result of error, mis-tabulation and mutual mistake, despite
that the sLeeward provided no proof of payment of the tax and, in any event, was,
itself, obligated to pay the tax without reimbursement by AUA.

**A901**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X
AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE,

<div style="text-align:center">Petitioner,</div>

-against-

LEEWARD CONSTRUCTION COMPANY, LTD.,

<div style="text-align:center">Respondent.</div>

--------------------------------------------------------------X

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED 05/05/2015 | |

14 **CIVIL** 8410 (DLC)

**<u>JUDGMENT</u>**

    Petitioner American University of Antigua College of Medicine ("AUA") having moved to confirm an international arbitral award against respondent Leeward Construction Company, Ltd. ("Leeward"). Leeward having cross-moved to deny enforcement of, vacate, or modify the arbitral award, arguing that the award is non-final and ambiguous; that the Arbitration Tribunal ("Tribunal") exceeded its authority; and that the award constitutes a "manifest disregard for the law." AUA also moves for an order of attachment and a preliminary injunction regarding a related arbitral award against it that is currently on appeal, and the matter having been brought before the Honorable Denise L. Cote, United States District Judge, and the Court, on May 1, 2015, having issued its Opinion & Order (Doc. #51) granting AUA's October 16, 2014 petition to conform the Second Award, and denying its motion for an order of attachment and preliminary injunction as moot; and denying Leeward's December 11, 2014 cross-motion to deny enforcement, vacate, or modify the arbitral award; and directing the Clerk of Court to enter judgment in the amount of $1,338,712 and to close the case, it is,

    **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion & Order dated May 1, 2015, AUA's October 16, 2014 petition to confirm the Second Award is granted, and its motion for an order of attachment and preliminary injunction is

<div style="text-align:center">

**A902**

</div>

denied as moot. Leeward's December 11, 2014 cross-motion to deny enforcement, vacate, or modify the arbitral award is denied; judgment is entered in the amount of $1,338,712; accordingly, the case is closed.

**Dated:** New York, New York
May 5, 2015

<div style="text-align: right;">

RUBY J. KRAJICK

**Clerk of Court**

BY: _K. Mango_

**Deputy Clerk**

</div>

**A903**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the Appendix Volumes 1, 2, 3 and 4 on behalf of the Respondent-Appellant, Leeward Construction Company, Ltd. with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the Appellate CM/ECF system on August 25, 2015.

I hereby certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF system.

I hereby certify that six (6) copies of the Appendix Volumes 1, 2, 3 and 4 on behalf of the Respondent-Appellant, Leeward Construction Company, Ltd. have been forwarded to the Clerk of the Court for the United States Court of Appeals for the Second Circuit via Federal Express for filing pursuant to Local Rule 31.1.


Dated:      August 25, 2015
            Poughkeepsie, New York

LEWIS & GREER, P.C.

Veronica A. McMillan, Esq.
510 Haight Avenue, Suite 202
Poughkeepsie, New York 12603
Telephone: (845) 454-1200
vamcmillan@lewisgreer.com
*Attorney for Respondent-Appellant,*
*Leeward Construction Company, Ltd.*